# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| | § |
| **In re:** | § **Chapter 11** |
| | § |
| **NEIGHBORS LEGACY HOLDINGS, INC.,** | § **Case No. 18-33836** |
| *et al.,* | § |
| | § **(Jointly Administered)** |
| **Debtors.**[1] | § **(Emergency Hearing Requested)** |

**DEBTORS' (A) EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING THE USE OF CASH COLLATERAL, GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, AND SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001; AND (B) MOTION FOR FINAL ORDER[2] AUTHORIZING SECURED POST-PETITION FINANCING ON A PRIMING AND SUPER PRIORITY BASIS**

THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED WITH RESPECT TO THE DEBTORS' USE OF CASH COLLATERAL. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

---

[1]   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/neighbors. The location of Debtors' principal place of business and the Debtors' service address is: 10800 Richmond Avenue. Houston, Texas 77042.

[2]   The Debtors are not requesting emergency consideration of their request for final order authorizing post-petition financing, but instead are only requesting consideration of that relief on regular notice, pursuant to Bankruptcy Rule 4001(c)(2).

> **A HEARING WILL BE CONDUCTED ON THIS MATTER ON JULY 13, 2018 AT 10:30A.M. IN COURTROOM 404, UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 515 RUSK STREET, HOUSTON, TEXAS 77002.**
>
> **REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.**

Neighbors Legacy Holdings, Inc. ("NLH") and certain of its affiliates and subsidiaries, as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), move (the "Motion") (a) for entry of an interim order (the "Interim Order") and a final order (the "Final Order") (i) authorizing the use of "cash collateral," as defined in Bankruptcy Code Section 363(a) (the "Cash Collateral"), of the Agent (as defined below) and the Prepetition Secured Parties (as defined below); (ii) authorizing adequate protection to the Agent and the Prepetition Secured Parties for any aggregate diminution in value of their respective interests in the Cash Collateral and Prepetition Collateral (as defined below); (iii) modifying the automatic stay imposed by Bankruptcy Code Section 362 to the extent necessary; and (iv) scheduling a hearing to consider the relief requested on a final basis (the "Final Hearing") and (b) for entry of a final order (i) authorizing the Debtors to obtain secured post-petition financing on a priming and super priority basis (the "DIP Financing").  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Chad J. Shandler in Support of Chapter 11 Petitions and First Day Motions*, filed with the Court concurrently with this Motion (the "Shandler Declaration").  In further support of this Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. § 1408.

6501135v4

## EMERGENCY CONSIDERATION

2.      In accordance with Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of the relief sought in this Motion (with the exception of DIP Financing, for which the Debtors are not requesting emergency relief) pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  The Debtors believe that an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in obtaining the use of Cash Collateral would cause immediate and irreparable harm to the Debtors' operations and the value of their assets.  Failure to receive such authorization and other relief (with the exception of DIP Financing) during the first 21 days of these Chapter 11 Cases (detailed below) would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion (with the exception of the DIP Financing) on an emergency basis.

## BACKGROUND

**A.      General Background**

3.      On July 12, 2018 (the "Petition Date"), the Debtors each commenced a case by filing a petition for relief under Chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

4.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

6501135v4

5.      To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of Texas (the "United States Trustee").  No trustee or examiner has been appointed in the Chapter 11 Cases.

6.      The Debtors currently operate 22 freestanding emergency centers (the "Emergency Centers") throughout the State of Texas, including in South Texas, El Paso, Golden Triangle, the Permian Basin, the Panhandle, and the greater Houston area.  The Debtors' Emergency Centers are designed to offer an attractive alternative to traditional hospital emergency rooms by reducing wait times, providing better working conditions for physicians and staff, and giving patient care the highest possible priority.

7.      The Debtors' original parent was founded in 2008, and the first Neighbors emergency center opened in 2009.  At their peak, the Debtors operated 33 Emergency Centers across three states. In recent years, the Debtors have experienced financial difficulties caused in large part by increased competition, less favorable insurance payor conditions, declining revenues, and disproportionate overhead costs as compared to their operational income.  These challenges have caused significant strain on the Debtors' liquidity and threatened their ability to continue operating as a going concern. Prepetition, the Debtors engaged professionals and explored various out-of-court solutions, including closing unprofitable Emergency Centers and downsizing their corporate overhead. Ultimately, the Debtors' out-of-court restructuring efforts were unsuccessful and the Debtors elected to commence these Chapter 11 Cases.

8.      Additional background information regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the Chapter 11 Cases, is set forth in detail in the First Day Declaration.

6501135v4

**B.      Summary of the Debtors' Prepetition Capital Structure**

9.      On November 19, 2015, Neighbors Global Holdings, LLC ("Neighbors"), as borrower, entered into a Credit Agreement (as amended, restated, or supplemented the "Credit Agreement") with the lenders from time to time party thereto (collectively, the "Prepetition Lenders"); KeyBank National Association ("KeyBank"), as administrative agent, swing line lender, and issuing bank (the "Agent"); KeyBanc Capital Markets Inc., as joint lead arranger and a joint bookrunner; Compass Bank Association, as joint lead arranger, a joint bookrunner, and sole syndication agent; and LegacyTexas Bank, as the documentation agent (together with the Prepetition Lenders and the Agent the "Prepetition Secured Parties").

10.      Simultaneously with the execution of the Credit Agreement, various subsidiary affiliates, as guarantors (the "Guarantors") entered into a Guaranty dated November 19, 2015 (as amended, restated, or supplemented, the "Guaranty"), with the Agent on behalf of the Prepetition Lenders.[3]

11.      Since the November 19, 2015 date of the Guaranty, guarantors have been added through joinder agreements.  As of the Petition Date, with the exception of NLH, all of the Neighbors entities, including each Emergency Center, have guaranteed the Credit Agreement.[4]

12.      The Credit Agreement provided the Debtors with a revolving credit facility in an initial aggregate principal amount of up to $30 million.  On May 9, 2017, Neighbors, the Prepetition Lenders, and the Agent entered into the Waiver, Consent and Amendment No. 3, reducing availability under the revolving credit facility to $27 million.  The maturity date for the

---

[3] *See* the attached Proposed Interim and Final Orders for a detailed description of the Guaranty and related loan documents.

[4] A full list of the Guarantors is contained in **Exhibit A.**

revolving cash borrowings under the Credit Agreement is November 19, 2020. Neighbors has never drawn on the revolving credit facility.

13.     The Credit Agreement also provided the Debtors with (a) a term loan in the maximum principal amount of $100 million, and (b) a delayed draw term loan in the maximum principal amount of $20 million (with any borrowings incurred under the delayed draw term loan facility automatically becoming part of the term loan facility). The maturity date for the term loan under the Credit Agreement is November 19, 2020.  On November 19, 2015, the date that the Credit Agreement funded, Neighbors drew $100 million on the term loan facility.   In September 2016, Neighbors drew $20 million on the delayed term loan facility (collectively the revolving, term, and delayed draw term loans the "Credit Facility").

14.     The Debtors have, from time to time, addressed issues arising under the Credit Agreement with the Prepetition Lenders. Specifically, Neighbors entered into three amendments to the Credit Agreement:

(a)     July 5, 2016 – Neighbors, the Prepetition Lenders, and the Agent entered into Amendment No. 1 to the Credit Agreement, dated July 5, 2016, pursuant to which the Prepetition Lenders waived certain events of default under the Credit Agreement (including, without limitation, failure to comply with certain disclosure and delivery requirements), and certain Guarantors joined the Guaranty and the Pledge and Security Agreement (as defined in the Credit Agreement).

(b)     September 9, 2016 – Neighbors, the Prepetition Lenders, and the Agent entered into a Waiver, Consent and Amendment No. 2 to the Credit Agreement, dated September 9, 2016, pursuant to which the Prepetition Lenders waived certain events of default under the Credit Agreement (including, without limitation, failure to deliver certain financial statements).

(c)     May 9, 2017 – Neighbors, the Prepetition Lenders, and the Agent entered into a Waiver, Consent and Amendment No. 3 to the Credit Agreement, dated May 9, 2017, pursuant to which the Prepetition Lenders waived certain events of default under the Credit Agreement (including, without limitation, failure to comply with the fixed charge coverage ratio), amended certain covenants and related provisions to allow Neighbors to operate without being in default, accommodated the conversion of Neighbors Physician Group, LLC, a Texas limited liability company, from

one entity type to another, and required the contribution of additional capital from its equity holders in the form of shareholder loans.

15.     Pursuant to (a) the Deeds of Trust, Assignments of Leases and Rents, Pledge and Security Agreement and UCC Financing Statements for Fixture Filings, in each case dated November 19, 2015 (the "Deeds of Trust"), and (b) the Amended and Restated Pledge and Security Agreement dated May 9, 2017 (the "Pledge and Security Agreement" and together with the "Deeds of Trust," collectively, the "Prepetition Security Documents"), all amounts outstanding under the Credit Agreement are secured by a first-priority security interest (the "Prepetition Liens") in substantially all of the Debtors' existing and future assets (collectively, the "Prepetition Collateral"), other than certain excluded payroll accounts and deposit accounts. In addition, the obligations under the Credit Agreement are guaranteed by the Guarantors. Accordingly, the Debtors do not have any unencumbered cash or assets as of the Petition Date, other than any payroll accounts or deposit accounts which may have been excluded as collateral pursuant to the Pledge and Security Agreement.

16.     As of the Petition Date, the aggregate principal amount outstanding under the Credit Agreement is approximately $109 million.

**C.     Negotiations Regarding the Use of Cash Collateral and DIP Financing**

17.     The Debtors require the immediate use of cash collateral to operate their business postpetition.  Given the Debtors' deteriorating cash position, the Debtors also require the use of the DIP Financing in order to ensure that they have sufficient liquidity to conduct a competitive sale process and monetize their assets for the benefit of creditors. DIP Financing is further necessary to provide a cushion in the event that the filing of these bankruptcy cases negatively impacts the Debtors' existing cash flow or operations.

6501135v4

18.     Prior to the Petition Date, the Debtors and the Agent (and their respective advisors) engaged in arm's-length negotiations regarding the terms and conditions of potential DIP Financing, as well as a consensual cash collateral order.  The Debtors also conducted a search to identify potential alternative lenders to provide DIP Financing to the Debtors.  The Debtors received DIP Financing offers from at least two parties.  After this search, the Debtors concluded that no other party could provide alternative financing on the same or more favorable terms than those provided by KeyBank (the "<u>DIP Agent</u>") and the other lenders party to the DIP Credit Agreement (collectively, the "<u>DIP Lenders</u>").   In particular, each potential alternative financing source required a priming lien, which the Debtors do not believe is possible without consent.

<b><u>RELIEF REQUESTED</u></b>

19.     The Debtors request the ability to use cash, receipts, and equivalents constituting the Cash Collateral of the Prepetition Secured Parties, pursuant to the terms of the Interim and Final Orders.  Specifically, the Debtors request entry of an order:

(a)     authorizing the Debtors to use Prepetition Collateral (including Cash Collateral) in which the Prepetition Secured Parties have an interest;

(b)     granting adequate protection to the Prepetition Secured Parties solely to the extent of any aggregate diminution of value of their respective interests therein;

(c)     modifying the automatic stay imposed by Bankruptcy Code Section 362 to the extent necessary to implement and effectuate the terms and provisions of the Interim Order;

(d)     scheduling the Final Hearing as soon as reasonably practicable and within thirty (30) days of entry of the Interim Order for this Court to consider and enter the Final Order;

(e)     only a final basis only, authorizing the Debtors to obtain the post-petition financing as set forth in **<u>Exhibit B</u>** (the "<u>DIP Credit Agreement</u>")[5] from

---

[5] Capitalized terms not defined herein shall have the meaning set forth in the DIP Credit Agreement.

the DIP Lender, consisting of a senior secured term loan in an aggregate principal amount of $24 million (the "<u>DIP Financing</u>") to be funded upon the entry of the Final Order pursuant to that DIP Credit Agreement.

(f)  authorizing the Debtors to execute and deliver to the DIP Lenders the DIP Credit Agreement and any other document of any kind required to be executed and delivered in connection with the DIP Financing;

(g)  authorizing the Debtors to comply with and perform all of the terms and conditions contained in the DIP Credit Agreement in accordance with and subject to the terms and conditions set forth in the Final Order;

(h)  authorizing the Debtors to pay all fees and expenses, including, without limitation, all reasonable fees and expenses of professionals engaged by the DIP Lenders in accordance with the terms of the DIP Credit Agreement;

(i)  granting of super-priority claims and priming liens under section 364(c)(1) and 364(d)(1) of the Bankruptcy Code to the DIP Lenders payable from the DIP Collateral (as defined in the DIP Credit Agreement), subject to the Carve-Out (as defined in the Interim Order);

(j)  granting of a perfected first priority lien on all DIP Collateral (as defined in the DIP Credit Agreement) that is property of the Debtors that is otherwise not encumbered by a valid perfected and non-avoidable lien as of the Petition Date or a valid and perfected lien in existence at the time of the Petition Date that is subsequently perfected pursuant to 11 U.S.C. § 546(b);

(k)  granting of junior liens on all of Debtors' assets subject to Permitted Liens;

(l)  authorizing the Debtors to borrow from the DIP Lender, on the terms and subject to the conditions and limitations in availability set forth in the DIP Credit Agreement and the Final Order;

(m)  authorizing the Debtors to use the proceeds of the DIP Financing in the operation of the Debtors' business, on the terms and subject to the conditions contained in the DIP Credit Agreement and the Final Order; and

(n)  granting certain related relief.

## <u>CONCISE STATEMENT PURSUANT TO BANKRUPTCY RULE 4001(b)</u>

20.  As required by Bankruptcy Rule 4001(b) and the Complex Case Procedures, the following is a summary of the material terms of the Proposed Interim and Final Orders:

6501135v4

A.      **Summary of DIP Financing**

21.      The Debtors have been unable to obtain post-petition financing on an unsecured basis. After negotiation, the Debtors have reached an agreement with the DIP Lenders to provide the DIP Financing.   The Debtors negotiated the DIP Financing at arm's-length and have determined that it is the best proposal under the circumstances.   The principal terms of the DIP Financing are as follows:

| | |
|---|---|
| **Borrower:** | Neighbors Global Holdings, LLC |
| **Guarantors** | All existing Guarantors except NEC Aurora Emergency Center, LP (non-debtor), NEC Victoria Emergency Center, LP (non-debtor), NEC Lake Jackson Emergency Center, LP (non-debtor), NEC El Paso Upper Valley Emergency Center, LP (non-debtor), NEC Grand Prairie Emergency Center, LP (non-debtor), NEC Pueblo Emergency Center, LP (non-debtor), Arizona Emergency Center, LP (non-debtor), NEC Lafayette Emergency Center, LP (non-debtor), and Neighbors Physician Group – Rhode Island, LLC. |
| **Lenders** | Agent and potentially other Prepetition Lenders |
| **New Money Amount** | $8,000,000 revolving loan (the "DIP Revolving Loan") (with no letter of credit availability). |
| **Roll-up Amount** | $16,000,000 |
| **Total DIP Loan** | $24,000,000 |
| **Maturity Date** | 6 months from entry of the Final Order |
| **Interest Rate on DIP** | Prime + 8% or Libor + 9% |
| **Commitment Fee** | $300,000 |
| **Unused Availability Fee** | 1.50% |
| **Agent Fee** | $100,000 |
| **Established Milestones** | 1)  Within three days of the Petition Date, the Debtors shall file and properly serve a motion, in form and substance satisfactory to the Agent, the DIP Agent, the Secured Creditors, and the DIP Lenders (the "Sale/Bidding Procedures Motion"), seeking the Court's approval of: (i) the sale of all or substantially all of the Debtors' assets relating to the Debtors' Freestanding Emergency Room business through one or more transactions;   and (ii) bidding procedures acceptable to the Agent, the DIP Agent, the Secured Creditors, and the DIP Lenders in their sole discretion for the sale of all or substantially all of the Debtors' assets relating to the Debtors' Freestanding Emergency Room business, pursuant to Section 363 and Section 365 of the Bankruptcy Code. The terms of each such sale transaction shall be acceptable to the DIP Agent and the Prepetition First Lien Agent in their sole discretion. |

2) Within 21 days after the Petition Date, unless the Agent, Required Lenders (as defined in the Credit Agreement), the DIP Agent and the Required DIP Lenders (which shall mean the "Required Lenders", as defined in the DIP Financing Documents) agree otherwise, the Court shall have entered a sales procedures order (the "Bidding Procedures Order") approving the bidding procedures contained in the Sale/Bidding Procedures Motion, which Bidding Procedures Order (including the bidding procedures approved therein) shall be acceptable to the Agent, Required Lenders, DIP Agent and Required DIP Lenders in their sole discretion.  The Bidding Procedures Order shall not be amended, modified, supplemented or waived by the Debtors without the written consent of the Agent, Required Lenders, DIP Agent and Required DIP Lenders.

3) Within 45 days after the Petition Date, unless the Agent, Required Lenders, DIP Agent and Required DIP Lenders agree otherwise, all qualified bids (which bids, among other things, shall not contain any financing or diligence conditions) shall be due.

4) Within 60 days after the Petition Date, unless the Agent, Required Lenders, DIP Agent and Required DIP Lenders agree otherwise, the Debtors shall have held and completed an auction in accordance with the provisions of the Bidding Procedures Order, and shall have selected for approval by the Court, at a sale hearing to be held in accordance with the Bidding Procedures Order, the highest and otherwise best bid(s) for the applicable assets made by any bidder(s) at the auction, (each such highest and otherwise best bid, a "**Winning Bid**").  No bid that fails to provide for irrevocable payment in full in cash of all of the DIP Obligations and the Secured Claim at closing shall constitute, or be eligible to constitute, a Winning Bid unless such bid is acceptable to the Agent, Required Lenders, DIP Agent and Required DIP Lenders in their respective sole discretion.

5) Within 70 days after the Petition Date, unless the Agent, Required Lenders, DIP Agent and Required DIP Lenders agree otherwise, the Court shall have entered one or more orders (the "**Sale Approval Order**") approving the Winning Bid(s), the transaction or transactions contemplated by the Winning Bid(s) (each, an "**Approved Transaction**," and the terms and conditions of the Approved Transaction and the documents evidencing or otherwise relating to each Approved Transaction, the "**Approved Transaction Documents**"), which Sale Approval Order and Approved Transaction(s) shall be in form and substance acceptable to the Agent, Required Lenders, DIP Agent and Required DIP

| | |
|---|---|
| | Lenders in their sole discretion.<br><br>6) On or before the date that is 60 days after the entry of the Sale Approval Order, unless the Agent, Required Lenders, DIP Agent and Required DIP Lenders agree otherwise, Debtors shall have executed all Approved Transaction Documents and the Approved Transaction(s) shall have been consummated. The Approved Transaction Documents shall be in form and substance acceptable to the Agent, Required Lenders, DIP Agent and Required DIP Lenders in their sole discretion. |
| **Miscellaneous** | Borrower to provide a re-forecast to budget every four weeks for approval by Agent. Draws limited to one every two-week period based on an approved budget. |
| **Method of Funding:** | The DIP Revolving Loan will be funded upon the entry of the Final Order. |
| **Use of Proceeds:** | The proceeds of the DIP Financing will be used solely for: (a) the payment of normal operating expenses consistent with the Budget; (b) the administrative costs associated with these Chapter 11 Cases; and (c) if applicable, the Carve Out. |
| **Default Interest:** | After the occurrence of an Event of Default (as defined in the DIP Credit Agreement and Interim Order) the outstanding principal balance of the Term Loans and any and all other amounts owing to the DIP Lenders will bear interest at rates that are five percent (5%) per annum in excess of the rates otherwise payable under the Agreement. |
| **Security:** | (i) Pursuant to 11 U.S.C. § 364(c)(1), super-priority over administrative expense claims for payment of all obligations under the DIP Facility, subject only to the Carve-Out and Permitted Liens;<br><br>(ii) Pursuant to 11 U.S.C. § 364(c)(2), a perfected first priority Lien on all DIP Collateral that is property of the Debtors that is otherwise not encumbered by a valid perfected and non-avoidable Lien as of the Petition Date or a valid and perfected Lien in existence at the time of such commencement that is perfected subsequent to such commencement as permitted by 11 U.S.C. § 546(b);<br><br>(iii) Pursuant to 11 U.S.C. § 364(c)(3), junior liens on all of the Debtors' assets subject to Permitted Liens; and<br><br>(iv) Pursuant to 11 U.S.C. § 364(d)(1), priming lien on Debtors' property already subject to a lien. |
| **Carve-Out:** | The Budget will include an administrative expense carve out for (a) incurred or accrued and pending professional fees and expenses of estate professionals incurred in the Bankruptcy Cases to the extent |

|   | provided for in the Budget and allowed by the Bankruptcy Court and incurred prior to the expiration of the DIP Credit Agreement (the "Termination Date"), (b) professional fees and expenses of estate professionals incurred in the Bankruptcy Cases after the Termination Date to the extent allowed by the Bankruptcy Court for the payment of costs of winding up the Chapter 11 cases, not to exceed $350,000 in the aggregate, and (c) allowed United States Trustee fees pursuant to 28 USC §1930(a)(b). No part of the Carve-Out Amount shall be used to object to or contest any post-petition lien or post-petition obligations or to challenge any pre-petition lien or to otherwise seek affirmative relief against the DIP Lenders. |
|---|---|

**B.    Statement Regarding Significant Provisions**

22.     As summarized in the *Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral*, which is attached as **Exhibit C**, the Interim Order may contain any of the provisions identified on Exhibit B to the Complex Case Procedures (the "Significant Provisions")[6].  As a condition to obtaining the use of cash collateral and proposed financing, the Agent and the Debtors have agreed to the following provisions:

23.     **Section 506(c) Waiver**.  The Debtors have waived and released, and will not assert a claim under Bankruptcy Code § 506(c) for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by, the Agent or the DIP Lenders upon the Collateral.

24.     **DIP Super-Priority Administrative Expense**.  The DIP Agent is granted super-priority administrative expense status with respect to the obligations under the DIP Credit

---

[6] The term "Significant Provisions" refers to those provisions that: (a) grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors; (b) deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code; (c) bind the Debtors' estates or any parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor; (d) waive or limit the Debtors' estates' rights under section 506(c) of the Bankruptcy Code; (e) grant to the prepetition secured creditor liens on the Debtors' claims and causes of action arising under section 544, 545, 547, 548, or 549 of the Bankruptcy Code; (f) impose deadlines for the filing of a plan or a disclosure statement; and (g) grant an administrative claim.

Agreement, with priority over any and all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b), 507(b) and 546(c), subject only to the Carve-Out.

25.     **Priming of Liens**.  The DIP Lenders' liens and security interests under the DIP Credit Agreement primes all Prepetition Lender liens and liens on or in the DIP Collateral.

26.     **Roll-Up**.  The DIP Credit Agreement includes a partial roll-up of $16,000,000.

27.     **Stipulations**.  The Debtors have made certain stipulations with regard to the Prepetition Indebtedness, including amounts owing and that the Prepetition Indebtedness constitutes a legal, valid, binding, and enforceable obligation of the Debtors.

28.     **Milestones**.  The Debtors have agreed to certain Milestones with regard to the sale process and these Chapter 11 Bankruptcy Cases, as more fully set out in the Interim Order and **Schedule 1**.

## C.     Adequate Protection

29.     As adequate protection for their interest in the Prepetition Collateral, including Cash Collateral, the Debtors propose that pursuant to Sections 361, 363, and 507(b) of the Bankruptcy Code, to the extent that (i) prepetition obligations remain outstanding to the Prepetition Lenders, (ii) the Agent holds valid and perfected liens in certain of the DIP Collateral, including Cash Collateral, and (iii) there is any diminution in value of Agent's interest in the Prepetition Collateral, the Agent shall be granted, as adequate protection, automatically perfected, replacement liens (the "Adequate Protection Liens") on the Prepetition Collateral to the same extent and priority of its respective prepetition liens and against each Debtor in which the Agent holds an Adequate Protection Lien. The Adequate Protection Liens shall be deemed "Permitted Liens" within the meaning of the DIP Credit Agreement and this Interim Order; provided, however, that the Adequate Protection Liens will be subordinate in priority and payment to the DIP Liens (when they are granted), the DIP Obligations (when they are incurred)

6501135v4

and the Carve Out.  To the extent that the Adequate Protection Liens fail to protect the Agent against any diminution in value, the Debtors propose that the Agent shall, upon demonstration of such failure as to the applicable party, be entitled, pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, to an allowed superiority administrative expense claim (the "Superpriority Claims") against each applicable Debtor for all diminution in value claims.  The Superpriority Claims would be subordinate in payment and priority to the DIP Superpriority Claims but shall otherwise have priority over any and all administrative expenses and unsecured claims against the Debtors and their estates, subject to the Carve Out.

## BASIS FOR RELIEF AND APPLICABLE AUTHORITY

**A.   The Court Should Authorize the Debtors to Use Cash Collateral and Provide Adequate Protection**

30.    A debtor's use of property of the estate, including cash collateral, is governed by Bankruptcy Code Section 363. Pursuant to Bankruptcy Code section 363(c)(2), a debtor may use cash collateral if "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of [Bankruptcy Code Section 363]."  11 U.S.C. § 363(c)(2). If a secured creditor does not consent to the use of its cash collateral, the court can authorize the debtor-in-possession to use such cash collateral under Bankruptcy Code Section 363(c)(2)(B) if the court determines that the debtor has provided "adequate protection" of the secured creditor's interest in the cash collateral. *See* 11 U.S.C. § 363(e).

31.    The means by which adequate protection can be provided are specified in Bankruptcy Code Section 361. That section sets forth three non-exclusive forms of adequate protection:  (a) lump sum cash payments to the extent that use of property results in a diminution in value of an entity's interest in property; (b) provision of additional or replacement liens to the

6501135v4

extent that use of property results in a diminution in value of an entity's interest in property; and (c) such other relief as will result in an entity realizing the indubitable equivalent of its interest in property. 11 U.S.C. § 361. As the foregoing list is neither exclusive nor exhaustive, there is a great deal of flexibility in terms of what may constitute adequate protection. Generally, courts decide what constitutes adequate protection on a case-by-case basis in light of the particular facts and circumstances presented. *See In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986); *see also Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."). The purpose of adequate protection is to ensure that a secured party's economic position is not worsened because of the filing of a bankruptcy case. *In re DeSardi*, 340 B.R. 790, 804 (Bankr. S.D. Tex. 2006).

32.     The Debtors, with the assistance of their financial advisors, have prepared a budget showing sources and uses of cash necessary for the Debtors' operations on a weekly basis for the first four (4) weeks of these Chapter 11 Cases (as such budget may be modified from time to time by the Debtors, the "Budget"), a copy of which is attached hereto as **Exhibit D**. Specifically, the Budget shows the Debtors' forecasted receipts and disbursements from the Petition Date through August 10, 2018 (such initial period, the "Budget Period").  The Budget itemizes the sources and uses of cash and provides a projection of cash receipts and expenditures. The Budget includes a list of business expenses that are reasonable and necessary and that must be paid in order to continue the Debtors' business operations until the Court hears this Motion at a final hearing.

33.     Consistent with the purposes underlying the provision of adequate protection, the continued operation of the Debtors' business along with the additional protections in the

16

proposed Interim Order provide the Prepetition Secured Parties with adequate protection to protect the Prepetition Secured Parties from any diminution in value of their interests during the pendency of these Chapter 11 Cases.

34.     Accordingly, the adequate protection provided for in the Interim Order is fair and reasonable under the circumstances, satisfies the requirements of Bankruptcy Code Sections 363(c)(2) and 363(e), is in the best interests of the Debtors, their estates, and all parties in interest, and should be approved by this Court.

**B.     The DIP Financing Should be Approved**

35.     The Debtors believe that the terms and conditions of the DIP Financing are fair, reasonable, and appropriate under the circumstances.

36.     The DIP Lenders require that the Debtors grant the liens and superpriority claims contemplated by the Final Order and the DIP Credit Agreement.  Those liens and superpriority claims will be subject to the Carve Out, which includes estate professional fees that are accrued and unpaid after the Termination Date, up to $350,000, and amounts payable to the United States Trustee. Such carve outs generally "preserve the adversary system" by ensuring that the Debtors' estates are adequately assisted by counsel.  *See In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (noting that courts generally "insist on a carve out" for professional fees, and that "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of the Chapter 11 Cases by ensuring that some assets remain for the payment of United States Trustee fees and certain professional fees of the Debtors, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Financing.

37.     Furthermore, the DIP Financing provides the Debtors with the liquidity they need to operate their businesses during the Chapter 11 Cases.

6501135v4

38.     The Debtors' use of DIP Collateral, including Cash Collateral, is necessary to preserve the value of their assets and property during the Chapter 11 Cases.  The DIP Financing will be used by the Debtors to fund reasonable and necessary business expenses – expenses that will allow the Debtors to continue business operations and preserve value for creditors.

39.     After thorough analysis by the Debtors and their advisors, they have concluded that the terms of the DIP Credit Agreement are reasonable and appropriate under the circumstances.  Bankruptcy courts routinely defer to a debtor's business judgment in considering whether to approve the debtor's request to obtain postpetition financing.  *See e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.),* 163 B.R. 964, 974 (Bankr. D. Del. 1994) (quoting order approving post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.,* 115 B.R. at 40 (The court should defer to debtor's "reasonable business judgment . . . so long as the financing agreement does not . . . leverage the bankruptcy process" and its purpose is to benefit the estate rather than another party-in-interest.).

40.     To determine whether the Debtors' proposed DIP Credit Agreement is an exercise of the Debtors' sound business judgment, the Court must find the following elements: 1) a business decision, 2) disinterestedness, 3) due care, 4) good faith, and 5) no abuse of discretion or waste of corporate assets.  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992). Generally, "[c]ourts are loathe to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence." *Id.* (citing *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985).  "[C]ourts will uphold the [debtor's] decisions as long as they are attributable to any rational business purpose." *In re Glob. Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

41.     The Debtors exercised their reasonable business judgment in determining that the DIP Financing is the best financing option available under the present circumstances.   The Debtors are requesting authorization to enter into the DIP Credit Agreement for the purpose of ensuring enough liquidity for a competitive sale process and to provide a cushion in the event that these bankruptcy cases negatively impact the Debtors' cash flow or operations. The DIP Credit Agreement is clearly a business decision.   As explained above, the Debtors, together with their advisors, carefully and strategically engaged in arms'-length negotiations, the result of which is the DIP Credit Agreement.   The Debtors and their advisors negotiated the DIP Credit Agreement with due care to the Debtors' best interests and in good faith in order to obtain the best terms possible, in light of the Debtors' circumstances.   The DIP Credit Agreement and its terms are fair, reasonable, and in the best interests of the Debtors and their estates, and are therefore neither an abuse of discretion nor a waste of corporate assets.   In requesting that the Court approve the Credit Agreement, the Debtors are exercising sound business judgment. Accordingly, the Debtors respectfully request that the Court authorize the Debtors to entire into the DIP Credit Agreement and obtain access to the DIP Financing on the terms described herein.

## C.     The Automatic Stay Should be Modified on a Limited Basis

42.     The DIP Credit Agreement and the proposed Interim Order contemplate that the DIP Lenders may exercise certain rights and remedies after obtaining relief from the automatic stay pursuant to Bankruptcy Code § 362(a) or any other applicable stay or injunction on an emergency basis.   The Interim Order provides that the DIP Lenders must provide the Debtors (and any official committee) with three (3) days' prior written notice before asking to exercise any enforcement rights or remedies.

43.     Stay modification provisions of this sort are ordinary features of postpetition financing arrangements, and, in the Debtors' business judgment, are reasonable under the

6501135v4

circumstances. *See, e.g., In re Fieldwood Energy, LLC, et al.*, Case No. 18-30648, Docket No. 201, (Bankr. S.D. Tex. 2018) (DRJ); *In re Offshore Specialty Fabricators, LLC*, Case No. 17-35623, Docket No. 317 (Bankr. S.D. Tex. 2017) (MI); *In re Emas Chiyoda Subsea Limited, et al.*, Case No. 17-31146, Docket No. 453, (Bankr. S.D. Tex. 2017) (MI); *In re Linc USA GP, et al.*, Case No. 16-32689, Docket No. 196 (Bankr. S.D. Tex. 2018) (DRJ).

**D.      Approval of Cash Collateral Usage on an Interim Basis is Necessary to Prevent Immediate and Irreparable Harm**

44.     The Court may grant interim relief in respect of a motion filed pursuant to Bankruptcy Code Sections 363(c) or 364 where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

45.     The Debtors have sufficient cash to fund operations without immediate access to the DIP Financing, however, the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including use of cash collateral, is not granted promptly. Further, the Debtors anticipate that the commencement of these Chapter 11 Cases will immediately increase the demands on its free cash as a result of, among other things, the costs of administering the Chapter 11 Cases, addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of the cases and making the payments authorized by other orders entered granting the Debtors' first day motions.

46.     Accordingly, the Debtors have an immediate need for cash collaeteral on an interim basis to, among other things, continue the operation of their business, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and otherwise

satisfy their working capital and operational needs, all of which is required to preserve and maintain enterprise value for the benefit of all parties in interest.

47.     For the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under Bankruptcy Rule 4001(b) and (c).

## WAIVER OF BANKRUPTCY RULE 6004

48.     With respect to any aspect of the relief sought herein that constitutes a use of property under Bankruptcy Code Section 363(b), the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 6004(h). As described above, the relief that the Debtors seek in this Motion is immediately necessary for the Debtors to be able to continue to operate their businesses and preserve the value of their estates. The Debtors thus submit that the requested waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is appropriate.

## RESERVATION OF RIGHTS

49.     Except as otherwise set forth herein or in the Interim Order, nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under Bankruptcy Code Section 365. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be, nor should it be construed as, an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## NOTICE

50.     Notice of this Motion will be given to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) Reed Smith LLP, Three Logan Square, 1717 Arch Street,

Suite 3100, Philadelphia, PA 19103 (Attn: Matthew E. Tashman), and via email to mtashman@reedsmith.com and llim@reedsmith.com, counsel to KeyBank National Association in its capacity as Agent and DIP Agent; (c) the Securities and Exchange Commission; (d) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002; and (e) the parties included on the Debtors' list of 50 (fifty) largest unsecured creditors. The Debtors submit that, under the circumstances, no other or further notice is required.

## PRAYER

51.     The Debtors respectfully request that the Court (a) enter an Interim Order granting the relief requested in this Motion on an interim basis, (b) schedule a final hearing on this Motion within 30 (thirty) days of the Petition Date, or as soon as is otherwise practicable thereafter, to consider entry of the Final Order, and (c) grant such other and further relief as may be just and proper.

Dated:  Houston, Texas
        July 12, 2018

PORTER HEDGES LLP

By:    /s/ John F. Higgins
       John F. Higgins
       State Bar No. 09597500
       Eric M. English
       State Bar No. 24062714
       Genevieve M. Graham
       State Bar No. 24085340
       1000 Main Street, 36th Floor
       Houston, Texas 77002
       Telephone: (713) 226-6000
       Fax: (713) 226-6248

       PROPOSED COUNSEL FOR DEBTORS
       AND DEBTORS IN POSSESSION

6501135v4

**<u>EXHIBIT A</u>**

List of Guarantors

**Guarantors of Prepetition Credit Agreement**

| No. | Facility # | Legal Name | Guarantor |
|-----|-----------|-----------|-----------|
| 1 | 4001 | NEC Bellaire Emergency Center, LP | X |
| 2 | 4002 | NEC Kingwood Emergency Center, LP | X |
| 3 | 4003 | NEC Baytown Emergency Center, LP | X |
| 4 | 4004 | NEC Pasadena Emergency Center, LP | X |
| 5 | 4005 | NEC Pearland Emergency Center, LP | X |
| 6 | 4006 | NEC Lakeline Emergency Center, LP | X |
| 7 | 4007 | NEC Beaumont Emergency Center, LP | X |
| 8 | 4008 | NEC Mueller Emergency Center, LP | X |
| 9 | 4009 | NEC Yorktown Emergency Center, LP | X |
| 10 | 4010 | NEC Crosby Emergency Center, LP | X |
| 11 | 4011 | NEC Orange Emergency Center, LP | X |
| 12 | 4012 | NEC Zaragoza Emergency Center, LP | X |
| 13 | 4013 | NEC Midland Emergency Center, LP | X |
| 14 | 4014 | NEC Tyler Emergency Center, LP | X |
| 15 | 4015 | NEC Eastside Emergency Center, LP | X |
| 16 | 4016 | NEC Port Arthur Emergency Center, LP | X |
| 17 | 4017 | NEC Texas City Emergency Center, LP | X |
| 18 | 4018 | NEC Odessa Emergency Center, LP | X |
| 19 | 4019 | NEC Harlingen Emergency Center, LP | X |
| 20 | 4020 | NEC Amarillo Emergency Center, LP | X |
| 21 | 4021 | NEC Porter Emergency Center, LP | X |
| 22 | 4022 | NEC Brownsville Emergency Center, LP | X |
| 23 | 4023 | NEC McAllen Emergency Center, LP | X |
| 24 | 4024 | NEC Wichita Falls Emergency Center, LP | X |
| 25 | 4025 | NEC Longview Emergency Center, LP | X |
| 26 | 4026 | NEC Texarkana Emergency Center, LP | X |
| 27 | 4027 | NEC San Angelo Emergency Center, LP | X |
| 28 | 4028 | NEC College Station Emergency Center, LP | X |
| 29 | 4029 | NEC Lufkin Emergency Center, LP | X |
| 30 | 4030 | NEC West Warwick Emergency Center, LP | X |
| 31 | 4031 | NEC Lubbock Emergency Center, LP | X |
| 32 | 4032 | NEC Greeley Emergency Center, LP | X |
| 33 | 4033 | Next Door Urgent Care, LLC | X |
| 34 | 4034 | NEC Aurora Emergency Center, LP | X |
| 35 | 4035 | NEC Paris Emergency Center, LP | X |
| 36 | 4036 | NEC Kerrville Emergency Center, LP | X |
| 37 | 4037 | NEC Victoria Emergency Center, LP | X |
| 38 | 4038 | NEC Amarillo South Emergency Center, LP | X |
| 39 | 4039 | NEC Lake Jackson Emergency Center, LP | X |
| 40 | 4040 | NEC El Paso Upper Valley Emergency Center, LP | X |
| 41 | 4041 | NEC Grand Prairie Emergency Center, LP | X |
| 42 | 4042 | NEC Pueblo Emergency Center, LP | X |
| 43 | 4044 | Arizona Emergency Center 01, LP | X |
| 44 | 4046 | NEC Lafayette Emergency Center, LP | X |
| 45 | 6000 | EDMG, LLC | X |
| 46 | 6000 | Neighbors Emergency Center, LLC | X |
| 47 | 6000 | Neighbors Global Holdings, LLC | X |
| 48 | 6000 | Neighbors GP, LLC | X |
| 49 | 6000 | Neighbors Health, LLC | X |
| 50 | 6000 | Neighbors Physician Group, PLLC | X |
| 51 | 6001 | Neighbors Practice Management, LLC | X |
| 52 | 6007 | Neighbors Physician Group – Colorado, LLC | X |
| 53 | 8000 | NEC Pharr Emergency Center, LP | X |
| 54 | 8001 | NEC Phoenix Emergency Center, LP | X |
| 55 | 8002 | NEC Abilene Emergency Center, LP | X |
| 56 | 8003 | NEC Bristol Emergency Center, LP | X |
| 57 | 8006 | NEC Hartford Emergency Center, LP | X |
| 58 | 8008 | NEC Santa Fe Emergency Center, LP | X |
| 59 | 8009 | NEC Seguin Emergency Center, LP | X |
| 60 | 8010 | NEC Waco Emergency Center, LP | X |
| 61 | 8013 | NHS Emergency Centers, LLC | X |
| 62 | 8016 | Neighbors Concierge Services, LLC | X |
| 63 | 8017 | Neighbors Telehealth Services, LLC | X |
| 64 | 9002 | NEC Kingwood Asset Holdings LLC | X |
| 65 | 9003 | NEC Baytown Asset Holdings, LLC | X |
| 66 | 9005 | NEC Pearland Asset Holdings, LLC | X |
| 67 | 9007 | NEC Beaumont Asset Holdings, LLC | X |

# **EXHIBIT B**

DIP Credit Agreement

6501135v4

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of  _____ , 2018

Among

NEIGHBORS GLOBAL HOLDINGS, LLC,
as Borrower,

THE LENDING INSTITUTIONS NAMED HEREIN,
as Lenders,

and

KEYBANK NATIONAL ASSOCIATION,
as the Administrative Agent

835477.60020
US_ACTIVE-139246328.5

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS AND TERMS......................................................................................... 1

Section 1.01      Certain Defined Terms. .......................................................................... 1
Section 1.02      Computation of Time Periods. ............................................................. 27
Section 1.03      Accounting Terms. ............................................................................... 28
Section 1.04      Terms Generally. ................................................................................. 28

ARTICLE II THE TERMS OF THE CREDIT FACILITY ............................................................. 28

Section 2.01      Establishment of the Credit Facility. ................................................... 28
Section 2.02      Revolving Facility. ............................................................................... 29
Section 2.03      Term Loan. .......................................................................................... 29
Section 2.04      Notice of Borrowing. ........................................................................... 29
Section 2.05      Funding Obligations; Disbursement of Funds. .................................... 30
Section 2.06      Evidence of Obligations. ..................................................................... 31
Section 2.07      Interest; Default Rate. ......................................................................... 31
Section 2.08      Conversion and Continuation of Loans................................................. 32
Section 2.09      Fees. .................................................................................................... 33
Section 2.10      Termination and Reduction of Revolving Commitments. ...................... 33
Section 2.11      Voluntary, Scheduled and Mandatory Prepayments of Loans.............. 34
Section 2.12      Method and Place of Payment............................................................. 35
Section 2.13      Defaulting Lenders............................................................................... 36
Section 2.14      [Reserved] ........................................................................................... 37
Section 2.15      Status of Obligations; Perfection and Priority of Security Interests ......... 37

ARTICLE III INCREASED COSTS, ILLEGALITY AND TAXES ............................................... 38

Section 3.01      Increased Costs, Illegality, etc. ........................................................... 38
Section 3.02      Breakage Compensation. .................................................................... 40
Section 3.03      Net Payments. ..................................................................................... 41
Section 3.04      Change of Lending Office; Replacement of Lenders............................. 44

ARTICLE IV CONDITIONS PRECEDENT .................................................................................. 45

Section 4.01      Conditions Precedent at Closing Date.................................................. 45
Section 4.02      Conditions Precedent to All Credit Events. .......................................... 47

ARTICLE V REPRESENTATIONS AND WARRANTIES ........................................................... 47

Section 5.01      Corporate Status.................................................................................. 47
Section 5.02      Corporate Power and Authority. .......................................................... 48
Section 5.03      No Violation.......................................................................................... 48
Section 5.04      Governmental Approvals. .................................................................... 48

| | | |
|---|---|---|
| Section 5.05 | Litigation. | 48 |
| Section 5.06 | Use of Proceeds; Margin Regulations. | 48 |
| Section 5.07 | Financial Statements. | 49 |
| Section 5.08 | [Reserved]. | 49 |
| Section 5.09 | No Material Adverse Change. | 49 |
| Section 5.10 | Tax Returns and Payments. | 49 |
| Section 5.11 | Title to Properties, etc. | 49 |
| Section 5.12 | Lawful Operations, etc. | 50 |
| Section 5.13 | Environmental Matters. | 50 |
| Section 5.14 | Compliance with ERISA. | 50 |
| Section 5.15 | Intellectual Property, etc. | 51 |
| Section 5.16 | Investment Company Act, etc. | 51 |
| Section 5.17 | Insurance. | 51 |
| Section 5.18 | Burdensome Contracts; Labor Relations. | 51 |
| Section 5.19 | Orders. | 52 |
| Section 5.20 | True and Complete Disclosure. | 52 |
| Section 5.21 | Defaults. | 52 |
| Section 5.22 | Capitalization. | 52 |
| Section 5.23 | Healthcare Law Compliance. | 52 |
| Section 5.24 | Anti-Terrorism and Anti-Money Laundering Law Compliance. | 52 |
| ARTICLE VI AFFIRMATIVE COVENANTS | | 53 |
| Section 6.01 | Reporting Requirements. | 53 |
| Section 6.02 | Books, Records and Inspections. | 55 |
| Section 6.03 | Insurance. | 56 |
| Section 6.04 | Payment of Taxes and Claims. | 56 |
| Section 6.05 | Corporate Franchises. | 57 |
| Section 6.06 | Good Repair. | 57 |
| Section 6.07 | Compliance with Statutes, etc. | 57 |
| Section 6.08 | Compliance with Environmental Laws. | 57 |
| Section 6.09 | Further Assurances. | 58 |
| Section 6.10 | Material Contracts. | 58 |
| Section 6.11 | Senior Debt. | 58 |
| Section 6.12 | Subordination. | 58 |
| Section 6.13 | [Reserved]. | 58 |
| Section 6.14 | Use of Proceeds. | 58 |
| Section 6.15 | Monitoring of Expenses. | 58 |

| | | |
|---|---|---|
| Section 6.16 | Budget Compliance. | 58 |
| Section 6.17 | Financial Consultant. | 59 |
| Section 6.18 | Final Order. | 59 |
| Section 6.19 | [Reserved]. | 59 |
| Section 6.20 | First and Second Day Orders. | 59 |
| Section 6.21 | Chapter 11 Sale Milestones. | 59 |

ARTICLE VII NEGATIVE COVENANTS ........................................................................ 61

| | | |
|---|---|---|
| Section 7.01 | Changes in Business. | 61 |
| Section 7.02 | Consolidation, Merger, Acquisitions, Asset Sales, etc. | 61 |
| Section 7.03 | Liens. | 62 |
| Section 7.04 | Indebtedness. | 62 |
| Section 7.05 | Investments and Guaranty Obligations. | 63 |
| Section 7.06 | Restricted Payments. | 63 |
| Section 7.07 | Limitation on Certain Restrictive Agreements. | 64 |
| Section 7.08 | Transactions with Affiliates. | 64 |
| Section 7.09 | Modification of Certain Agreements. | 64 |
| Section 7.10 | Anti-Terrorism Laws. | 65 |
| Section 7.11 | Fiscal Year. | 65 |
| Section 7.12 | Issuance of Disqualified Equity Interests. | 65 |
| Section 7.13 | Sale and Lease-Back Transaction. | 65 |
| Section 7.14 | Accounting Changes. | 65 |
| Section 7.15 | Unfunded Capital Expenditures. | 65 |
| Section 7.16 | Leases. | 66 |
| Section 7.17 | Certain Payments. | 66 |
| Section 7.18 | Material Contracts. | 66 |
| Section 7.19 | DIP Financing. | 66 |
| Section 7.20 | Alteration of Rights of Lenders. | 66 |
| Section 7.21 | Chapter 11 Claims. | 66 |
| Section 7.22 | Reclamation Claims; Bankruptcy Code § 546(c) Agreements. | 66 |
| Section 7.23 | 506(c) Claims. | 66 |

ARTICLE VIII EVENTS OF DEFAULT ........................................................................ 67

| | | |
|---|---|---|
| Section 8.01 | Events of Default. | 67 |
| Section 8.02 | Remedies. | 70 |
| Section 8.03 | Application of Certain Payments and Proceeds. | 71 |

ARTICLE IX THE ADMINISTRATIVE AGENT ........................................................... 72

| | | |
|---|---|---|
| Section 9.01 | Appointment. | 72 |

Section 9.02    Delegation of Duties. ................................................................72
Section 9.03    Exculpatory Provisions. ...........................................................73
Section 9.04    Reliance by Administrative Agent. ............................................73
Section 9.05    Notice of Default. .....................................................................74
Section 9.06    Non-Reliance. ...........................................................................74
Section 9.07    No Reliance on Administrative Agent's Customer Identification Program................74
Section 9.08    USA Patriot Act. .......................................................................75
Section 9.09    Indemnification. ........................................................................75
Section 9.10    The Administrative Agent in Individual Capacity. ...................75
Section 9.11    Successor Administrative Agent. ..............................................75
Section 9.12    Other Agents. ............................................................................76
Section 9.13    Collateral Matters......................................................................76
Section 9.14    Agency for Perfection. ..............................................................76
Section 9.15    Proof of Claim. .........................................................................77
Section 9.16    Posting of Approved Electronic Communications.....................77
Section 9.17    Credit Bidding. .........................................................................78
ARTICLE X [RESERVED] ...........................................................................79
ARTICLE XI MISCELLANEOUS .................................................................79
Section 11.01   Payment of Expenses etc. .........................................................79
Section 11.02   Indemnification. ........................................................................79
Section 11.03   Right of Setoff. .........................................................................80
Section 11.04   Equalization. .............................................................................81
Section 11.05   Notices. .....................................................................................81
Section 11.06   Successors and Assigns..............................................................82
Section 11.07   No Waiver; Remedies Cumulative.............................................86
Section 11.08   Governing Law; Submission to Jurisdiction; Venue; Waiver of Jury Trial................86
Section 11.09   Counterparts. .............................................................................87
Section 11.10   Integration. ................................................................................88
Section 11.11   Headings Descriptive. ...............................................................88
Section 11.12   Amendment or Waiver; Acceleration by Required Lenders. ......88
Section 11.13   Survival of Indemnities..............................................................90
Section 11.14   Domicile of Loans......................................................................90
Section 11.15   Confidentiality. .........................................................................91
Section 11.16   General Limitation of Liability. .................................................91
Section 11.17   No Duty......................................................................................91
Section 11.18   Lenders and Agent Not Fiduciary to Borrower, etc. .................92

Section 11.19    Survival of Representations and Warranties. ..................................................... 92

Section 11.20    Severability. ...................................................................................................... 92

Section 11.21    Interest Rate Limitation. .................................................................................. 92

Section 11.22    USA Patriot Act. .............................................................................................. 92

Section 11.23    Advertising and Publicity................................................................................. 93

Section 11.24    Release of Guarantees and Liens. .................................................................. 93

Section 11.25    Payments Set Aside.......................................................................................... 93

EXHIBITS

Exhibit A-1      Form of Revolving Facility Note

Exhibit A-2      Form of Term Note

Exhibit B-1      Form of Notice of Borrowing

Exhibit B-2      Form of Notice of Continuation or Conversion

Exhibit C        Form of Guaranty

Exhibit D        Form of Closing Certificate

Exhibit E        Budget

Exhibit G        Form of Assignment Agreement

Exhibit H        Form of Final Order

Exhibit I        [Reserved]

Exhibit J        Form of Intercompany Subordination Agreement

Exhibit K-1      Form of U.S. Tax Compliance Certificate

Exhibit K-2      Form of U.S. Tax Compliance Certificate

Exhibit K-3      Form of U.S. Tax Compliance Certificate

Exhibit K-4      Form of U.S. Tax Compliance Certificate


SCHEDULES

Schedule 1.01    Chapter 11 Subsidiaries

Schedule 1        Lenders and Commitments

Schedule 2        Operating Companies and Non-Operating Companies

835477.60020
US_ACTIVE-139246328.5

Schedule 5.11   Real Property

Schedule 5.15   Intellectual Property

Schedule 5.17   Insurance

Schedule 5.22   Capitalization

Schedule 7.03   Existing Liens

Schedule 7.04   Existing Indebtedness

Schedule 7.05   Existing Investments

This DEBTOR-IN-POSSESSION CREDIT AGREEMENT is entered into as of _____, 2018 among the following: (i) Neighbors Global Holdings, LLC, a Delaware limited liability company, as the borrower (the "Borrower"); (ii) the lenders from time to time party hereto (each a "Lender" and collectively, the "Lenders"); and (iii) KeyBank National Association, as the administrative agent (the "Administrative Agent").

PRELIMINARY STATEMENTS:

(1)      On July 12, 2018 (the "Petition Date"), the Borrower commenced Chapter 11 Case No. _____ (the "Borrower Chapter 11 Case") and its Subsidiaries set forth on Schedule 1.01 (together with the Borrower and any other Person later joined therewith, the "Debtors") commenced case Nos. _____ (together with the Borrower Chapter 11 Case, the "Chapter 11 Cases") by filing voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

(2)      Prior to the Petition Date, the Pre-Petition Lenders provided financing to the Borrower pursuant to that certain Credit Agreement dated as of November 19, 2015 (as amended or otherwise modified through the Petition Date, the "Pre-Petition Credit Agreement"), among the Borrower, the lenders party thereto (collectively, the "Pre-Petition Lenders"), KeyBank National Association, as administrative agent (in such capacity, the "Pre-Petition Administrative Agent"), as the Swing Line Lender (as defined in the Pre-Petition Credit Agreement) and as LC Issuer (as defined in the Pre-Petition Credit Agreement), KeyBanc Capital Markets Inc., as a joint lead arranger and a joint bookrunner, Compass Bank, as a joint lead arranger, a joint bookrunner and the sole syndication agent, and LegacyTexas Bank, as the documentation agent.

(3)      The Pre-Petition First Lien Obligations are secured by a security interest in substantially all of the existing and after acquired assets of the Borrower and its Subsidiaries and by a lien on certain of the real property of certain of its Subsidiaries, as more fully set forth in the Security Agreement and the Mortgages (as such terms are defined in the Pre-Petition Credit Agreement) and such security interest and lien are perfected and, with certain exceptions as described in the Security Agreement and the Mortgages (as such terms are defined in the Pre-Petition Credit Agreement), have priority over other security interests.

(4)      The Borrower has requested that the Lenders make available to the Borrower certain credit facilities to be used for the purposes specified in this Agreement.

(5)      Subject to and upon the terms and conditions set forth herein, the Lenders are willing to extend credit and make available to the Borrower the credit facilities provided for herein for the foregoing purposes.

AGREEMENT:

In consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS AND TERMS

Section 1.01      Certain Defined Terms.  As used herein, the following terms shall have the meanings herein specified unless the context otherwise requires:

"1934 Act" means the Securities Exchange Act of 1934, as amended.

"Acceptable Bankruptcy Plan" means a plan of reorganization or liquidation for each of the Chapter 11 Cases that (a) provides for the termination of the unused Revolving Commitments and the payment in full in cash and full discharge of the Obligations at emergence, (b) contains releases and other exculpatory provisions for the Administrative Agent and the Lenders in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders and (c) is otherwise in form and substance satisfactory to the Administrative Agent and the Required Lenders.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (i) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (ii) the acquisition or ownership of in excess of 50% of the Equity Interests of any Person, or (iii) the acquisition of another Person by a merger, consolidation, amalgamation or any other combination with such Person.

"Adjusted Eurodollar Rate" means with respect to each Interest Period for a Eurodollar Loan, the greater of (A) (i) the rate per annum equal to the offered rate appearing on Reuters Screen LIBOR01 Page (or on the appropriate page of any successor to or substitute for such service, or, if such rate is not available, on the appropriate page of any generally recognized financial information service, as selected by the Administrative Agent from time to time) that displays an average ICE Benchmark Administration (or any successor thereto) Interest Settlement Rate at approximately 11:00 A.M. (London time) two Business Days prior to the commencement of such Interest Period, for deposits in Dollars with a maturity comparable to such Interest Period, divided (and rounded to the nearest I /16th of 1%) by (ii) a percentage equal to 100% minus the then stated maximum rate of all reserve requirements (including, without limitation, any marginal, emergency, supplemental, special or other reserves and without benefit of credits for proration, exceptions or offsets that may be available from time to time) applicable to any member bank of the Federal Reserve System in respect of Eurocurrency liabilities as defined in Regulation D (or any successor category of liabilities under Regulation D); provided that, if the rate referred to in clause (i) above is not available at any such time for any reason, then the rate referred to in clause (i) shall instead be the interest rate per annum, as determined by the Administrative Agent in its reasonable discretion in accordance with then applicable market practices, to be the average (rounded to the nearest 1/16th of 1%) of the rates per annum at which deposits in Dollars in an amount equal to the amount of such Eurodollar Loan are offered to major banks in the London interbank market at approximately 11:00 A.M. (London time), two Business Days prior to the commencement of such Interest Period, for contracts that would be entered into at the commencement of such Interest Period for the same duration as such Interest Period and (B) (i) in the case of any Term Borrowing, 1.00% per annum or (ii) in the case of any Revolving Borrowing, 0.00% per annum.

"Administrative Agent" has the meaning provided in the first paragraph of this Agreement and includes any successor to the Administrative Agent appointed pursuant to Section 9.11.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. Notwithstanding the foregoing, neither the Administrative Agent nor any Lender shall in any event be considered an Affiliate of the Borrower or any of its Subsidiaries.

"Agent Advances" has the meaning provided in Section 9.13.

"Aggregate Credit Facility Exposure" means, at any time, the sum of (i) the Aggregate Revolving Facility Exposure at such time, and (ii) the aggregate principal amount of the Term Loans outstanding at such time.

"Aggregate Revolving Facility Exposure" means, at any time, the aggregate principal amount of all Revolving Loans made by all Lenders and outstanding at such time.

"Agreement" means this Credit Agreement, including any exhibits or schedules, as the same may from time to time be amended, restated, amended and restated, supplemented or otherwise modified.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any Subsidiary or any other Credit Party from time to time concerning or relating to bribery or corruption.

"Anti-Terrorism Law" means the USA Patriot Act or any other law pertaining to the prevention of future acts of terrorism, in each case as such law may be amended from time to time.

"Applicable Lending Office" means, with respect to each Lender, the office designated by such Lender to the Administrative Agent as such Lender's lending office for all purposes of this Agreement. A Lender may have a different Applicable Lending Office for Base Rate Loans and Eurodollar Loans.

"Applicable Revolving Loan Margin" means, a percentage amount equal to (i) if a Base Rate Loan, 8% per annum and (ii) if a Eurodollar Loan, 9% per annum.

"Applicable Term Loan Margin" means a percentage amount equal to (i) if a Base Rate Loan, 6.25% per annum and (ii) if a Eurodollar Loan, 7.25% per annum.

"Approved Bank" has the meaning provided in subpart (ii) of the definition of "Cash Equivalents."

"Approved Fund" means a fund that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit and that is administered or managed by a Lender or an Affiliate of a Lender or its investment advisor. With respect to any Lender, an Approved Fund shall also include any swap, special purpose vehicle purchasing or acquiring security interests in collateralized loan obligations or any other vehicle through which such Lender may leverage its investments from time to time.

"Asset Sale" means, with respect to any Person, the sale, lease, transfer or other disposition (including by means of Sale and Lease-Back Transactions, and by means of mergers, consolidations, amalgamations and liquidations of a corporation, partnership or limited liability company of the interests therein of such Person) by such Person to any other Person of any of such Person's assets, provided that the term Asset Sale specifically excludes (i) any sales, transfers or other dispositions of inventory, or furniture, fixtures, equipment or other property, real or personal, tangible or intangible and other property that is obsolete, worn-out, no longer used or useful in the business, scheduled to be upgraded or replaced, or is excess and no longer needed, in each case in the ordinary course of business or consistent with historical practices or as determined by the Borrower in its business judgment, (ii) disposition (including discounts and forgiveness) of delinquent accounts in the ordinary course of business for purposes of collection and (iii) the actual or constructive total loss of any property or the use thereof resulting from any Event of Loss.

"Assignment Agreement" means an Assignment Agreement substantially in the form of Exhibit G hereto.

"Authorized Officer" means, with respect to any Person, any of the following officers: the President, the Chief Executive Officer, the Chief Financial Officer, any Vice President, the Treasurer, the

Assistant Treasurer, the Controller, the Chief Restructuring Officer, or such other Person as is authorized in writing to act on behalf of such Person and is acceptable to the Administrative Agent. Unless otherwise qualified, all references herein to an Authorized Officer shall refer to an Authorized Officer of the Borrower.

"<u>Avoidance Actions</u>" means claims and causes of action under Sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "<u>Bankruptcy</u>," as now or hereafter in effect, or any successor thereto, as hereafter amended.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Texas.

"<u>Bankruptcy Plan</u>" means a plan of reorganization or liquidation for all or any of the Credit Parties proposed pursuant to the Bankruptcy Code.

"<u>Base Rate</u>" means, for any day, a fluctuating interest rate per annum as shall be in effect from time to time, which rate per annum shall at all times be equal to the greatest of: (i) the rate of interest established by the Administrative Agent, from time to time, as its "prime rate," whether or not publicly announced, which interest rate may or may not be the lowest rate charged by it for commercial loans or other extensions of credit; (ii) the Federal Funds Effective Rate in effect from time to time, determined one Business Day in arrears, plus 1/2 of 1% per annum; and (iii) the Adjusted Eurodollar Rate for a one-month Interest Period on such day plus 1.00%; provided that, the foregoing shall not be less than zero.

"<u>Base Rate Loan</u>" means any Loan bearing interest at a rate based upon the Base Rate in effect from time to time.

"<u>Bidding Procedures Order</u>" has the meaning given to such term in <u>Section 6.21</u>.

"<u>Borrower</u>" has the meaning provided in the first paragraph of this Agreement.

"<u>Borrower Chapter 11 Case</u>" has the meaning provided in the <u>Paragraph (1)</u> of the Preliminary Statements of this Agreement.

"<u>Borrowing</u>" means a Revolving Borrowing or a Term Borrowing.

"<u>Budget</u>" means the Debtors' budget set forth on <u>Exhibit E</u>, setting forth in reasonable detail the receipts and disbursements of the Debtors on a weekly basis for the periods covered therein, as such budget is updated from time to time pursuant to <u>Section 6.01(d)</u>.

"<u>Business Day</u>" means (i) any day other than Saturday, Sunday or any other day on which commercial banks in Cleveland, Ohio or Houston, Texas, are authorized or required by law to close and (ii) with respect to any matters relating to Eurodollar Loans, any day on which dealings in U.S. Dollars are carried on in the London interbank market.

"<u>Capital Distribution</u>" means, with respect to any Person, a payment made, liability incurred or other consideration given for the purchase, acquisition, repurchase, redemption or retirement of any Equity Interest of such Person or as a dividend, return of capital or other distribution in respect of any of such Person's Equity Interests.

"Capital Expenditures" means, without duplication, (a) any expenditure or commitment to expend money for any purchase or other acquisition of any asset including capitalized leasehold improvements, which would be classified as a fixed or capital asset on a consolidated balance sheet of Borrower and its Subsidiaries prepared in accordance with GAAP, and (b) Capitalized Lease Obligations and Synthetic Lease Obligations, but excluding the purchase price of equipment that is purchased substantially contemporaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time.

"Capital Lease" as applied to any Person means any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, should be accounted for as a capital lease on the balance sheet of that Person.

"Capitalized Lease Obligations" means, with respect to any Person, all obligations under Capital Leases of such Person, without duplication, in each case taken at the amount thereof accounted for as liabilities identified as "capital lease obligations" (or any similar words) on a consolidated balance sheet of such Person prepared in accordance with GAAP.

"Carve-Out" means, at any time, the aggregate amount of the following: (i) all unpaid fees required to be paid in the Chapter 11 Cases to the clerk of the Bankruptcy Court and to the office of the U.S. Trustee under 28 U.S.C. § 1930(a)(6) (as determined by final order of the Bankruptcy Court or by agreement with the U.S. Trustee); (ii) all reasonable fees and expenses incurred by a trustee appointed under Section 701 of the Bankruptcy Code in an amount not to exceed $25,000; (iii) subject to the terms and conditions of the Final Order, the reasonable unpaid fees, costs, and disbursements of professionals retained by the Debtors in the Chapter 11 Cases (the "Debtors' Professionals") that: (a) are incurred prior to the delivery by the Administrative Agent of a Carve-Out Trigger Notice, (b) are provided for in the Budget, (c) are allowed by the Bankruptcy Court under Sections 327, 328, 330, or 1103 of the Bankruptcy Code, and (d) remain unpaid after application of any retainers being held by such professionals and any other available proceeds of unencumbered assets of the Debtors; (iv) subject to the terms and conditions of the Final Order, the reasonable unpaid fees, costs, and disbursements of professionals retained by the Committee in the Chapter 11 Cases (collectively, the "Committee's Professionals") and all reasonable unpaid out-of-pocket expenses of the members of any Committee ("Committee Members"), in each case that: (a) are incurred prior to the delivery by the Administrative Agent of a Carve-Out Trigger Notice, (b) are provided for in the Budget, and (c) are allowed by the Bankruptcy Court under Sections 327, 328, 330, or 1103 of the Bankruptcy Code, and (d) remain unpaid after application of any retainers being held by such professionals and any other available proceeds of unencumbered assets of the Debtors; (v) the reasonable unpaid fees, costs, and disbursements of the Debtors' Professionals that are: (a) incurred after the delivery of a Carve-Out Trigger Notice by the Administrative Agent (by way of clarification, fees incurred by the Debtors' Professionals but not invoiced and/or paid by the Debtors prior to the delivery of a Carve-Out Trigger Notice are not subject to the Post-Default Carve-Out Cap defined below, but instead, are subject to the Carve-Out provisions set forth in Section (iii) above), (b) provided for in the Budget, (c) allowed by the Bankruptcy Court under Sections 327, 328, 330 or 363 of the Bankruptcy Code after application of any retainers being held by such professionals and any other available proceeds of unencumbered assets of the Debtors, in an aggregate amount not to exceed $325,000 (the "Debtors' Professionals Carve-Out Cap"), which includes $15,000 for any Patient Care Ombudsman appointed, and as that term is defined, under 11 U.S.C. § 333); and (vi) the reasonable unpaid fees, costs, and disbursements of the Committee Professionals and the reasonable unpaid expenses of Committee Members that are: (i) incurred after the delivery of a Carve-Out Trigger Notice by the Administrative Agent (by way of clarification, fees of the Committee's Professionals and reasonable unpaid expenses of Committee members that are incurred but not invoiced and/or paid by the Debtors prior to the delivery of a Carve-Out Trigger Notice are not subject to the Post-Default Carve-Out Cap defined below, but instead,

are subject to the Carve-Out provisions set forth in Section (iv) above), (ii) provided for in the Budget, and (iii) allowed by the Bankruptcy Court under Sections 327, 328, 330 or 1103 of the Bankruptcy Code after application of any retainers being held by such professionals and any other available proceeds of unencumbered assets of the Debtors, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $25,000 (the "Committee Carve-Out Cap" and together with the Debtors' Professionals Carve-Out Cap, the "Post-Default Carve-Out Cap").  No amount set forth in this definition with respect to the Post-Default Carve-Out Cap may be modified without the prior written consent of the Administrative Agent.

"Carve-Out Trigger Notice" means a written notice delivered by the Administrative Agent to Debtors' counsel, the United States Trustee, and counsel for any Committees appointed in the Chapter 11 Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Termination Date (as defined in the Final Order), and expressly stating that the Post-Default Carve-Out Cap is triggered.

"Cash Equivalents" means any of the following:

(i)      securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than one year from the date of acquisition;

(ii)      U.S. dollar denominated time deposits, certificates of deposit and bankers' acceptances of (x) any Lender, (y) any commercial bank of recognized standing organized under the laws of the United States (or any state thereof or the District of Columbia) and having capital and surplus in excess of $500,000,000 or (z) any commercial bank (or the parent company of such bank) of recognized standing organized under the laws of the United States (or any state thereof or the District of Columbia) and whose short-term commercial paper rating from S&P is at least A-1, A-2 or the equivalent thereof or from Moody's is at least P-1, P-2 or the equivalent thereof (any such bank, an "Approved Bank"), in each case with maturities of not more than 180 days from the date of acquisition;

(iii)      commercial paper issued by any Lender or Approved Bank or by the parent company of any Lender or Approved Bank and commercial paper issued by, or guaranteed by, any industrial or financial company with a short-term commercial paper rating of at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's, or guaranteed by any industrial company with a long-term unsecured debt rating of at least A or A2, or the equivalent of each thereof, from S&P or Moody's, as the case may be, and in each case maturing within 180 days after the date of acquisition;

(iv)      fully collateralized repurchase agreements entered into with any Lender or Approved Bank having a term of not more than 30 days and covering securities described in clause (i) above;

(v)      investments in money market funds substantially all the assets of which are comprised of securities of the types described in clauses (i) through (iv) above; and

(vi)      investments in money market funds access to which is provided as part of "sweep" accounts maintained with a Lender or an Approved Bank.

"Cash Proceeds" means, with respect to (i) any Asset Sale, the aggregate cash payments (including any cash received by way of deferred payment pursuant to a note receivable issued in connection with such Asset Sale, other than the portion of such deferred payment constituting interest, but only as and when so received) received by the Borrower, any Subsidiary or any other Credit Party from such Asset Sale, (ii) any Event of Loss, the aggregate cash payments, including all insurance proceeds

and proceeds of any award for condemnation or taking, received in connection with such Event of Loss and (iii) the issuance or incurrence of any Indebtedness, the aggregate cash proceeds received by the Borrower, any Subsidiary or any other Credit Party in connection with the issuance or incurrence of such Indebtedness.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same may be amended from time to time, 42 U.S.C. § 9601 et seq.

"CFC" means Subsidiary that is a controlled foreign corporation under the Code.

"CFC Holdco" means any Domestic Subsidiary with no material operations and no material assets other than capital stock of and/or indebtedness incurred by one or more Foreign Subsidiaries or CFCs and related assets.

"Change in Control" means:

(i)     any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the 1934 Act, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the 1934 Act), directly or indirectly, of forty-nine percent (49%) or more of the Equity Interests of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such Equity Interests that such "person" or "group" has the right to acquire pursuant to any option  right);

(ii)    Borrower shall fail to own and control, directly or indirectly, 100% of the Equity Interests of NHS;

(iii)   NHS shall fail to own and control, directly or indirectly, 100% of the Equity Interests of each of its Subsidiaries (or, in the case of any Subsidiary that is a non-wholly owned Subsidiary as of the Closing Date, not less than the percentage of the Equity Interests of such Subsidiary owned and controlled, directly or indirectly, by the Borrower as of the Closing Date), except that the foregoing shall not apply to NPG, which is not owned by NHS, or any transaction not otherwise prohibited by this Agreement;

(iv)    the General Partner shall cease to own 100% of the general partnership interests of the Operating Companies;

(v)     the Limited Partner shall cease to own 100% of the limited partnership interests of the Operating Companies; or

(vi)    any Equity Interest issued by the Limited Partner (other than the interests held by members of the individual series established under the Limited Partner) shall cease to be owned by NHS or the Borrower or any of their respective Subsidiaries (and, for the avoidance of doubt, a transaction or series of transactions which result in (a) such Equity Interest ultimately being held by the Borrower, one of its Subsidiaries, or a Subsidiary of NHS, or (b) the elimination of the series established under the Limited Partner, shall not constitute a Change in Control, even if a third party holds such Equity Interest during the course of such transaction or transactions);

(vii)   the failure, for any reason, of Chad Shandler to serve as the chief restructuring officer of the Borrower; or

(viii)   NPG shall fail to own and control, directly or indirectly, 100% of the Equity Interests of each of its Subsidiaries.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 7 Cases" means any of the Chapter 7 Cases of the Chapter 7 Subsidiaries.

"Chapter 7 Subsidiaries" means NEC Aurora Emergency Center, LP; NEC Victoria Emergency Center, LP; NEC Lake Jackson Emergency Center, LP; NEC El Paso Upper Valley Emergency Center, LP; NEC Grand Prairie Emergency Center, LP; NEC Pueblo Emergency Center, LP; Arizona Emergency Center 01, LP; NEC Lafayette Emergency Center, LP; and Neighbors Physician Group – Rhode Island, LLC.

"Chapter 11 Cases" has the meaning provided in Paragraph (1) of the Preliminary Statements of this Agreement.

"Charges" has the meaning provided in Section 11.21.

"CIP Regulations" has the meaning provided in Section 9.07.

"Claims" has the meaning set forth in the definition of "Environmental Claims."

"Closing Date" means _____, 2018.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.  Section references to the Code are to the Code as in effect at the Closing Date and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" means the "DIP Collateral" as defined in the Orders.

"Commitment" means, with respect to each Lender, (i) its Revolving Commitment or (ii) its Term Commitment, if any, or, in the case of such Lender, all of such Commitments.

"Commitment Fees" has the meaning provided in Section 2.09(b).

"Committee" means the Creditors' Committee and any other statutory committee.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Communications" has the meaning provided in Section 9.16(a).

"Competitor" means any Person that (a) is a competitor of the Borrower or any of its Subsidiaries, which Person has been designated by the Borrower as a "Competitor" by written notice to the Administrative Agent and the Lenders not less than five Business Days prior to any relevant date of determination, or (b) to the knowledge of the assigning Lender, is a Person who Controls a Competitor (as defined in clause (a)); provided that "Competitors" shall exclude any Person that the Borrower has designated as no longer being a "Competitor" by written notice delivered to the Administrative Agent from time to time.

"Confidential Information" has the meaning provided in Section 11.15(b).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Continue," "Continuation" and "Continued" each refers to a continuation of a Eurodollar Loan for an additional Interest Period as provided in Section 2.08.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Convert," "Conversion" and "Converted" each refers to a conversion of Loans of one Type into Loans of another Type.

"Credit Event" means the making of any Borrowing or any Conversion or Continuation.

"Credit Facility" means the credit facility established under this Agreement pursuant to which the Lenders shall make Revolving Loans to the Borrower under the Revolving Facility pursuant to the Revolving Commitment of each such Lender and the Term Loan to the Borrower pursuant to Term Commitment of each such Lender.

"Credit Facility Exposure" means, for any Lender at any time, the sum of (i) such Lender's Revolving Facility Exposure at such time and (ii) the outstanding aggregate principal amount of the Term Loan made by such Lender, if any.

"Credit Party" means the Borrower and each Guarantor.

"Creditors' Committee" means the official committee of unsecured creditors.

"Debtor" has the meaning provided in Paragraph (1) of the Preliminary Statements of this Agreement.

"Default" means any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default.

"Default Rate" means, for any day, (i) with respect to any Loan, a rate per annum equal to 2% per annum above the interest rate that is or would be applicable from time to time to such Loan pursuant to Section 2.07(a) or Section 2.07(b), as applicable and (ii) with respect to any other amount, a rate per annum equal to 2% per annum above the rate that would be applicable to Revolving Loans that are Base Rate Loans pursuant to Section 2.07(a).

"Defaulting Lender" means, subject to Section 2.13(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under the Bankruptcy Code or any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.13(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"Disqualified Equity Interests" means any Equity Interest, other than a Qualified Equity Interest.

"Dollars," "U.S. Dollars" and the sign "$" each means lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary organized under the laws of the United States, any State thereof, or the District of Columbia.

"Eligible Assignee" means (i) a Lender, (ii) an Affiliate of a Lender, (iii) an Approved Fund, and (iv) any other Person (other than a natural Person) approved by (A) the Administrative Agent and (B) unless an Event of Default has occurred and is continuing, the Borrower (each such approval not to be unreasonably withheld or delayed (and the Borrower shall be deemed to have consented if it fails to object to any assignment within five Business Days after it received written notice thereof)); provided, however, no such approval of the Administrative Agent or the Borrower shall be required in connection with assignments to (x) any Lender under the Credit Facility or (y) any Affiliate of a Lender under the Credit Facility; and, provided further, that notwithstanding the foregoing, "Eligible Assignee" shall not include (w) the Borrower or any of the Borrower's Affiliates or Subsidiaries, (x) any holder of any

Subordinated Indebtedness of any of such holder's Affiliates or (y) any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (y), or (z) a Competitor.

"Eligible Participant" means (i) a Lender, (ii) an Affiliate of a Lender, (iii) an Approved Fund, (iv) any commercial bank (or the parent company of such bank), insurance company or any company engaged in the business of making commercial loans and (v) any other Person (other than a natural Person) approved by (A) the Administrative Agent and (B) unless a Default or Event of Default has occurred and is continuing, the Borrower (each such approval not to be unreasonably withheld or delayed (and the Borrower shall be deemed to have consented thereto if it fails to object to any participation within five Business Days after it received written notice thereof)); provided that, notwithstanding the foregoing, "Eligible Participant" shall not include (w) the Borrower or any of the Borrower's Affiliates or Subsidiaries, (x) any holder of any Subordinated Indebtedness or any of such holder's Affiliates, or (y) any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (y), or (z) a Competitor.

"Environmental Claims" means any and all global, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of non-compliance or violation, investigations or proceedings relating in any way to any Environmental Law or any permit issued under any such law (hereafter - Claims"), including, without limitation, (i) any and all Claims by any Governmental Authority for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the storage, treatment or Release (as defined in CERCLA) of any Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment.

"Environmental Law" means any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy and rule of common law now or hereafter in effect and in each case as amended, and any binding and enforceable judicial or global interpretation thereof, including any judicial or global order, consent, decree or judgment issued to or rendered against the Borrower or any of its Subsidiaries relating to the environment, employee health and safety or Hazardous Materials, including, without limitation, CERCLA; RCRA; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Safe Drinking Water Act, 42 U.S.C. § 300f et seq.; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 U.S.C. § 11001 et seq., the Hazardous Material Transportation Act, 49 U.S.C. § 5101 et seq. and the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq. (to the extent it regulates occupational exposure to Hazardous Materials); and any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"Equity Interest" means with respect to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or non-voting) of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) or any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, such partnership, but in no event will Equity Interest include any debt securities convertible or exchangeable into equity unless and until actually converted or exchanged.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are

to ERISA, as in effect at the Closing Date and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" means each Person (as defined in Section 3(9) of ERISA), which together with the Borrower or a Subsidiary of the Borrower, would be deemed to be a "single employer" within the meaning of Sections 414(b), (c), (m) or (o) of the Code or Section 4001(a)(14) or 4001(b)(1) of ERISA.

"ERISA Event" means: (i) that a Reportable Event has occurred with respect to any Plan; (ii) the institution of any steps by the Borrower, any Subsidiary or any other Credit Party, any ERISA Affiliate, the PBGC or any other Person to terminate any Plan or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan; (iii) the institution of any steps by the Borrower, any Subsidiary or any other Credit Party or any ERISA Affiliate to withdraw from any Multi-Employer Plan or Multiple Employer Plan, if such withdrawal could result in withdrawal liability (as described  in Part I of Subtitle E of Title IV of ERISA or in Section 4063 of ERISA) in excess of $2,000,000; (iv) a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA  in connection with any Plan that  would result in liabilities in excess of $2,000,000; (v) that a Plan has Unfunded Benefit Liabilities exceeding $2,000,000; (vi) the cessation of operations at a facility of the Borrower, any Subsidiary or any other Credit Party or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA that would result in liabilities in excess of $2,000,000; (vii) the conditions for imposition of a Lien under Section 303(a) of ERISA shall have been met with respect to a Plan; (viii) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 206(g) of ERISA; (ix) the insolvency of or commencement of reorganization proceedings with respect to a Multi-Employer Plan; (x) any material increase in the contingent liability of the Borrower, any Subsidiary or any other Credit Party with respect to any post-retirement welfare liability; or (xi)  the taking of any action by, or the threatening of the taking of any action by, the Internal Revenue Service, the Department of Labor or the PBGC with respect to any of the foregoing.

"Eurodollar Loan" means each Loan bearing interest at a rate based upon the Adjusted Eurodollar Rate.

"Event of Default" has the meaning provided in Section 8.01.

"Event of Loss" means, with respect to any property, (i) the actual or constructive total loss of such property or the use thereof resulting from destruction, damage beyond repair, or the rendition of such property permanently unfit for normal use from any casualty or similar occurrence whatsoever, (ii) the destruction or damage of a portion of such property from any casualty or similar occurrence whatsoever, (iii) the condemnation, confiscation or seizure of, or requisition of title to or use of, any property, or (iv) in the case of any property located upon a leasehold, the termination of such leasehold (other than by expiration of such leasehold in accordance with the terms of the lease).

"Excluded Subsidiary" means (i) any CFC, (ii) any CFC Holdco, and (iii) any Subsidiary whose Equity Interests are owned directly or indirectly by a CFC.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect

to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 3.04) or (ii) such Lender changes its Applicable Lending Office, except in each case to the extent that, pursuant to Section 3.04, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Applicable Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.03(g) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal Funds transactions with members of the Federal Reserve System arranged by Federal Funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal Funds brokers of recognized standing selected by the Administrative Agent.

"Fees" means all amounts payable pursuant to, or referred to in, Section 2.09.

"Final" means, as to any order, that such order is no longer subject to review, reversal, modification or amendment by appeal or writ of certiorari.

"Final Order" means an order of the Bankruptcy Court substantially in the form of Exhibit H hereto.

"Financial Officer" means the chief executive officer, the president, the chief financial officer, controller or the chief restructuring officer of the Borrower.

"First Day Orders" means all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Petition Date or within three (3) days of the Petition Date or based on motions filed on or about the Petition Date, which shall each be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

"Foreign Lender" means (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States of America as in effect from time to time.

"General Partner" means Neighbors GP, LLC, a Texas limited liability company.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority,

instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Granting Lender" has the meaning provided in Section 11.06(f).

"Guarantors" means, collectively, NPG and the Subsidiary Guarantors.

"Guaranty" has the meaning provided in Section 4.01(iii).

"Guaranty Obligations" means as to any Person (without duplication) any obligation of such Person guaranteeing any Indebtedness ("primary Indebtedness") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent: (i) to purchase any such primary Indebtedness or any property constituting direct or indirect security therefore; (ii) to advance or supply funds for the purchase or payment of any such primary Indebtedness or to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary Indebtedness of the ability of the primary obligor to make payment of such primary Indebtedness; or (iv) otherwise to assure or hold harmless the owner of such primary Indebtedness against loss in respect thereof, provided that, the definition of Guaranty Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guaranty Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary Indebtedness in respect of which such Guaranty Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder).

"Hazardous Materials" means (i) any petrochemical or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; and (ii) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "restricted hazardous materials," "extremely hazardous wastes," "restrictive hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar meaning and regulatory effect, under any applicable Environmental Law; provided that, "Hazardous Materials" shall not include medical supplies or materials used by the Borrower and its Subsidiaries in the ordinary course of business or medical waste disposed of by Borrower or its Subsidiaries in compliance with applicable Environmental Laws and in the ordinary course of business.

"Healthcare Laws" means, collectively, (i) any and all federal, state and local laws, rules, regulations, administrative manuals, orders, guidelines and requirements, quality and safety standards, accreditation standards and requirements of the applicable state Department of Health (the "DOH") and other federal, state or local governmental authorities including, without limitation, Medicare and Medicaid laws and regulations and those relating to the quality and adequacy of medical care, distribution of pharmaceuticals, rate setting, equipment, personnel, operating policies, additions to facilities and services and fee splitting, (ii) any law governing the licensing or regulation of healthcare providers, professionals, facilities or payors or otherwise governing or regulating the provision of, or payment for, medical services or the sale of medical supplies, including, without limitation, Section 1128B(b) of the Social Security Act, as amended, 42 U.S.C. Section 1320a-7(b) (Criminal Penalties Involving Medicare or State Health Care Programs), commonly referred to as the "Federal Anti-Kickback Statute," and the

Social Security Act, as amended, Section 1877, 42 U.S.C. Section 1395nn (Prohibition Against Certain Referrals), commonly referred to as the "Stark Statute".

"Hedge Agreement" means (i) any interest rate swap agreement, any interest rate cap agreement, any interest rate collar agreement or other similar interest rate management agreement or arrangement or (ii) any currency swap or option agreement, foreign exchange contract, forward currency purchase agreement or similar currency management agreement or arrangement.

"Indebtedness" of any Person means without duplication:

       (i)      all indebtedness of such Person for borrowed money;

       (ii)      all bonds, notes, debentures, loan agreements and similar debt securities of such Person;

       (iii)      the deferred purchase price of capital assets or services that in accordance with GAAP would be shown on the liability side of the balance sheet of such Person;

       (iv)      the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder;

       (v)      all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances;

       (vi)      all indebtedness of a second Person secured by any Lien on any property owned by such first Person, whether or not such indebtedness has been assumed;

       (vii)      all Capitalized Lease Obligations and Purchase Money Indebtedness of such Person;

       (viii)      the present value, determined on the basis of the implicit interest rate, of all basic rental obligations under all Synthetic Leases of such Person;

       (ix)      all obligations of such Person with respect to asset securitization financing;

       (x)      all obligations of such Person to pay a specified purchase price for goods or services whether or not delivered or accepted, i.e., take-or-pay and similar obligations, in each case that in accordance with GAAP would be shown on the liability side of the balance sheet of such Person;

       (xi)      all net obligations of such Person under Hedge Agreements;

       (xii)      all Disqualified Equity Interests of such Person;

       (xiii)      the full outstanding balance of trade receivables, notes or other instruments sold with full recourse (and the portion thereof subject to potential recourse, if sold with limited recourse), other than in any such case any thereof sold solely for purposes of collection of delinquent accounts;

       (xiv)      purchase price adjustments or earn-outs not yet due under the acquisition documents related to any permitted Investment, to the extent such purchase price

835477.60020
US_ACTIVE-139246328.5

adjustments or earn-outs are paid when due (after giving effect to the final resolution of any disputes or adjustments with respect thereto); and

(xv)      all Guaranty Obligations of such Person;

provided that, (y) neither trade payables (other than trade payables outstanding for more than 90 days after the date such trade payables were created), deferred revenue, taxes nor other similar accrued expenses, in each case arising in the ordinary course of business, shall constitute Indebtedness; and (z) the Indebtedness of any Person shall in any event include (without duplication) the Indebtedness of any other entity (including any general partnership in which such Person is a general partner) to the extent such Person is liable thereon as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide expressly that such Person is not liable thereon.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning provided in Section 11.02.

"Insolvency Event" means, with respect to any Person:

(i)      the commencement of a voluntary case by such Person under the Bankruptcy Code or the seeking of relief by such Person under any bankruptcy or insolvency or analogous law in any jurisdiction outside of the United States;

(ii)      the commencement of an involuntary case against such Person under the Bankruptcy Code or any bankruptcy or insolvency or analogous law in any jurisdiction outside of the United States and the petition is not controverted within 10 days, or is not dismissed within 60 days, after commencement of the case;

(iii)      a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of such Person;

(iv)      such Person commences (including by way of applying for or consenting to the appointment of, or the taking of possession by, a rehabilitator, receiver, custodian, trustee, conservator or liquidator (collectively, a "conservator") of such Person or all or substantially all of its property) any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency, liquidation, rehabilitation, conservatorship or similar law of any jurisdiction whether now or hereafter in effect relating to such Person;

(v)      any such proceeding of the type set forth in clause (iv) above is commenced against such Person to the extent such proceeding is consented to by such Person or remains undismissed for a period of 45 days;

(vi)      such Person is adjudicated insolvent or bankrupt;

(vii)      any order of relief or other order approving any such case or proceeding is entered;

(viii)      such Person suffers any appointment of any conservator or the like for it or any substantial part of its property that continues undischarged or unstayed for a period of 45 days; or

(ix)     such Person makes a general assignment for the benefit of creditors or generally does not pay its debts as such debts become due.

"Intercompany Subordination Agreement" means the Intercompany Subordination Agreement substantially in the form of Exhibit J hereto.

"Interest Period" means, with respect to each Eurodollar Loan, a period of one, two or three months as selected by the Borrower; *provided that*, (i) the initial Interest Period for any Borrowing of such Eurodollar Loan shall commence on the date of such Borrowing (the date of a Borrowing resulting from a Conversion or Continuation shall be the date of such Conversion or Continuation) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires; (ii) if any Interest Period begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the Last Business Day of such calendar month; (iii) if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; *provided that*, if any Interest Period would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; (iv) no Interest Period for any Eurodollar Loan may be selected that would end after the Termination Date; and (v) if, upon the expiration of any Interest Period, the Borrower has failed to (or may not) elect a new Interest Period to be applicable to the respective Borrowing of Eurodollar Loans as provided above, the Borrower shall be deemed to have elected to Convert such Borrowing to Base Rate Loans effective as of the expiration date of such current Interest Period.

"Interim Order" means the order of the Bankruptcy Court dated _____ and bearing docket #_____.

"Investment" means: (i) any direct or indirect purchase or other acquisition by a Person of any Equity Interest of any other Person; (ii) any loan, advance (other than deposits with financial institutions available for withdrawal on demand), capital contribution or extension of credit to, guarantee or assumption of debt or purchase or other acquisition of any other Indebtedness of, any Person by any other Person; or (iii) the purchase, acquisition or investment of or in any stocks, bonds, mutual funds, notes, debentures or other securities, or any deposit account, certificate of deposit or other investment of any kind.

"IRS" means the United States Internal Revenue Service.

"Leaseholds" of any Person means all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"Legacy" means Neighbors Legacy Holdings, Inc., a Texas corporation.

"Lender" and "Lenders" have the meaning provided in the first paragraph of this Agreement and includes any other Person that becomes a party hereto pursuant to an Assignment Agreement, other than any such Person that ceases to be a party hereto pursuant to an Assignment Agreement. For the avoidance of doubt, the term "Lender" excludes all Defaulting Lenders.

"Lender Register" has the meaning provided in Section 2.06(b).

"<u>Lien</u>" means any mortgage, pledge, security interest, hypothecation, encumbrance, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof).

"<u>Limited Partner</u>" means NHS Emergency Centers, LLC, a Texas limited liability company. Limited Partner is a series limited liability company.

"<u>Loan</u>" means any Revolving Loan or Term Loan.

"<u>Loan Documents</u>" means this Agreement, the Notes, the Guaranty, and the Intercompany Subordination Agreement, in each case, including all schedules, exhibits, and annexes thereto.

"<u>Loan Transaction</u>" means the transactions contemplated by the Loan Documents.

"<u>Margin Stock</u>" has the meaning provided in Regulation U.

"<u>Material Adverse Effect</u>" means from and after the Petition Date any or all of the following: (i) any material adverse effect on the business, operations, property, assets, liabilities, financial or other condition of the Borrower and its Subsidiaries, taken as a whole, including as a consequence of any change in regulatory or reimbursement policies or procedures; (ii) any material adverse effect on the ability of the Borrower and the other Credit Parties, taken as a whole, to perform their obligations under any of the Loan Documents to which they are party; (iii) any material adverse effect on the validity, effectiveness or enforceability, as against the Borrower and the other Credit Parties, taken as a whole, of any of the Loan Documents to which it is a party; (iv) any material adverse effect on the rights and remedies of the Administrative Agent or any Lender under any Loan Document; or (v) any material adverse effect on the validity, perfection or priority of any Lien in favor of the Administrative Agent on any of the Collateral; provided that, neither the filing of the Chapter 11 Cases, the filing of the Chapter 7 Cases by the Chapter 7 Subsidiaries, nor the consummation of any asset sales, liquidations, or other transactions contemplated in any Acceptable Bankruptcy Plan or otherwise approved by the Bankruptcy Court and the Required Lenders shall constitute a Material Adverse Effect.

"<u>Material Contract</u>" means each contract or agreement to which the Borrower, any of its Subsidiaries or any other Credit Party is a party involving aggregate consideration payable to or  by the Borrower, such Subsidiary or such Credit Party of $1,000,000 or more per annum (other than purchase orders in the ordinary course of business of the Borrower, such Subsidiary or such Credit Party and other than contracts that by their terms may be terminated by the Borrower, such Subsidiary or such Credit Party in the ordinary course of its business upon less than 60 days' notice without penalty or premium).

"<u>Material Indebtedness</u>" means, as to the Borrower, any of its Subsidiaries or any other Credit Party, any particular Indebtedness of the Borrower, such Subsidiary or such Credit Party (including any Guaranty Obligations) in excess of the aggregate principal amount of $1,000,000.

"<u>Maximum Rate</u>" has the meaning provided in <u>Section 11.21</u>.

"<u>Minimum Borrowing Amount</u>" means (i) with respect to any Base Rate Loan, $250,000, with minimum increments thereafter of $50,000 and (ii) with respect to any Eurodollar Loan, $500,000, with minimum increments thereafter of $100,000.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and its successors.

"<u>Multi-Employer Plan</u>" means a multi-employer plan, as defined in Section 4001(a)(3) of ERISA to which the Borrower, any Subsidiary of the Borrower or any other Credit Party or any ERISA Affiliate is making or accruing an obligation to make contributions or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"<u>Multiple Employer Plan</u>" means an employee benefit plan, other than a Multi-Employer Plan, to which the Borrower, any Subsidiary of the Borrower or any other Credit Party or any ERISA Affiliate, and one or more employers other than the Borrower, a Subsidiary of the Borrower or any other Credit Party or an ERISA Affiliate, is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which the Borrower, a Subsidiary of the Borrower or any other Credit Party or an ERISA Affiliate made or accrued an obligation to make contributions during any of the five plan years preceding the date of termination of such plan.

"<u>Net Cash Proceeds</u>" means, with respect to (i) any Asset Sale, the Cash Proceeds resulting therefrom net of (A) reasonable and customary expenses of sale incurred in connection with such Asset Sale, and other reasonable and customary fees and expenses incurred, and all state and local taxes paid or reasonably estimated to be payable by such person as a consequence of such Asset Sale, and the payment of principal, premium and interest of Indebtedness (other than the Obligations) secured by the asset that is the subject of such Asset Sale, and required to be, and that is, repaid under the terms thereof as a result of such Asset Sale, and (B) incremental federal, state and local income taxes paid or payable as a result thereof and (ii) any Event of Loss, the Cash Proceeds resulting therefrom net of (A) reasonable and customary expenses incurred in connection with such Event of Loss, and local taxes paid or reasonably estimated to be payable by such person as a consequence of such Event of Loss and the payment of principal, premium and interest of Indebtedness (other than the Obligations) secured by the asset that is the subject of the Event of Loss and required to be, and that is, repaid under the terms thereof as a result of such Event of Loss, and (B) incremental federal, state and local income taxes paid or payable as a result thereof; in the case of each of clauses (i) and (ii), to the extent, but only to the extent, that the amounts so deducted are properly attributable to the asset that is the subject thereof.

"<u>NHS</u>" means Neighbors Health System, LLC, a Texas limited liability company. "<u>Non-Consenting Lender</u>" has the meaning provided in <u>Section 11.12(e)</u>.

"<u>Non-Defaulting Lender</u>" means, at any time, each Lender that is not a Defaulting Lender at such time.

"<u>Non-Operating Companies</u>" means (a) NHS, (b) General Partner, (c) Limited Partner, (d) Neighbors Emergency Center, LLC, a Texas limited liability company, (e) EDMG, LLC, a Texas limited liability company, (f) NPG, (g) NPM and (h) each other Person set forth on <u>Schedule 2</u> and identified as a "<u>Non-Operating Company.</u>"

"<u>Note</u>" means a Revolving Facility Note or a Term Note, as applicable.

"<u>Notice of Borrowing</u>" has the meaning provided in <u>Section 2.04(b)</u>.

"<u>Notice of Continuation or Conversion</u>" has the meaning provided in <u>Section 2.08(b)</u>.

"<u>Notice Office</u>" means the office of the Administrative Agent at 4900 Tiedeman Road, OH-01-49-0114, Brooklyn, OH 44144, Attention: Janelle Calame (email: Janelle_calame@keybank.com and agent_servicing@keybank.com), or such other office as the Administrative Agent may designate in writing to the Borrower from time to time.

"NPG" means Neighbors Physician Group, PLLC, a Texas professional limited liability company.

"Obligations" means all amounts, indemnities and reimbursement obligations, direct or indirect, contingent or absolute, of every type or description, and at any time existing, owing by the Borrower or any other Credit Party to the Administrative Agent, any Lender, any Affiliate of any Lender pursuant to the terms of this Agreement or any other Loan Document (including, but not limited to, interest and fees that accrue after the commencement by or against any Credit Party of any insolvency proceeding, regardless of whether allowed or allowable in such proceeding or subject to an automatic stay under Section 362(a) of the Bankruptcy Code). Without limiting the generality of the foregoing description of Obligations, the Obligations include (a) the obligation to pay principal, interest, charges, expenses, fees, reasonable attorneys' fees and disbursements, indemnities and other amounts payable by the Credit Parties under any Loan Document and (b) the obligation to reimburse any amount in respect of any of the foregoing that the Administrative Agent, any Lender or any Affiliate of any of them, in connection with the terms of any Loan Document, may elect to pay or advance on behalf of the Credit Parties.

"Operating Companies" means (a) NEC Bellaire Emergency Center, LP, a Texas limited partnership, (b) NEC Kingwood Emergency Center, LP, a Texas limited partnership, (c) NEC Baytown Emergency Center, LP, a Texas limited partnership, (d) NEC Pasadena Emergency Center, LP, a Texas limited partnership, (e) NEC Pearland Emergency Center, LP, a Texas limited partnership, (f) NEC Mueller Emergency Center, LP, a Texas limited partnership, (g) NEC Beaumont Emergency Center, LP, a Texas limited partnership, (h) NEC Orange Emergency Center, LP, a Texas limited partnership, (i) NEC Yorktown Emergency Center, LP, a Texas limited partnership, (j) NEC Crosby Emergency Center, LP, a Texas limited partnership, (k) NEC Eastside Emergency Center, LP, a Texas limited partnership, (1) NEC Midland Emergency Center, LP, a Texas limited partnership, (m) NEC Port Arthur Emergency Center, LP, a Texas limited partnership, (n) NEC Odessa Emergency Center, LP, a Texas limited partnership, (o) NEC Harlingen Emergency Center, LP, a Texas limited partnership, (p) NEC Amarillo Emergency Center, LP, a Texas limited partnership, (q) NEC Porter Emergency Center, LP, a Texas limited partnership, (r) NEC Brownsville Emergency Center, LP, a Texas limited partnership, (s) NEC McAllen Emergency Center, LP, a Texas limited partnership, (t) NEC Texarkana Emergency Center, LP, a Texas limited partnership, (u) NEC Lubbock Emergency Center, LP, a Texas limited partnership, (v) NEC Paris Emergency Center, LP, a Texas limited partnership, (w) each other Person set forth on Schedule 2 and identified as an "Operating Company" and (x) each other limited partnership for which General Partner is the sole general partner and Limited Partner is the sole limited partner which executes and delivers a joinder agreement.

"Operating Lease" as applied to any Person means any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is not accounted for as a Capital Lease on the balance sheet of that Person.

"Orders" means the Interim Order and the Final Order.

"Organizational Documents" means, with respect to any Person (other than an individual), such Person's Articles (Certificate) of Incorporation, or equivalent formation documents, and Regulations (Bylaws), or equivalent governing documents, and, in the case of any partnership, includes any partnership agreement and any amendments to any of the foregoing.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in

any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.04).

"Participant Register" has the meaning provided in Section 11.06(b).

"Payment Office" means the office of the Administrative Agent at 4900 Tiedeman Road, OH-01-49-0114, Brooklyn, OH 44144, Attention: Janelle Calame (email: Janelle_calame@keybank.com and agent_servicing@keybank.com), or such other office(s), as the Administrative Agent may designate to the Borrower in writing from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Permitted Creditor Investment" means any securities (whether debt or equity) received by the Borrower, any of its Subsidiaries or any other Credit Party in connection with the bankruptcy or reorganization of any customer or supplier of the Borrower, any such Subsidiary or any such Credit Party and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business.

"Permitted Lien" means any Lien permitted by Section 7.03.

"Permitted Note" means an unsecured, subordinated promissory note, dated as of May 9, 2017, by the Borrower in favor of a Permitted Note Holder.

"Permitted Note Holder" means any Person, approved by the Administrative Agent in its sole discretion, that has issued Indebtedness to the Borrower on May 9, 2017.

"Permitted Note Subordination Agreement" means that certain Subordination Agreement, dated as of May 9, 2017, by and among the Borrower, the Administrative Agent, and each of the Permitted Note Holders.

"Person" means any individual, partnership, joint venture, firm, corporation, limited liability company, association, central bank, trust or other enterprise or any governmental or political subdivision or any agency, department or instrumentality thereof.

"Petition Date" has the meaning provided in Paragraph (1) of the Preliminary Statements of this Agreement.

"Plan" means any Multi-Employer Plan, Multiple Employer Plan or Single-Employer Plan.

"Platform" has the meaning provided in Section 9.16(a).

"Pre-Petition Administrative Agent" has the meaning provided in the Paragraph (2) of the Preliminary Statements of this Agreement.

"Pre-Petition Credit Agreement" has the meaning provided in the <u>Paragraph (2)</u> of the Preliminary Statements of this Agreement.

"Pre-Petition First Lien Obligations" means the "Obligations" under and as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Lenders" has the meaning provided in the <u>Paragraph (2)</u> of the Preliminary Statements of this Agreement.

"Pre-Petition Loan Documents" means the Pre-Petition Credit Agreement and each of the other documents executed in connection therewith.

"primary Indebtedness" has the meaning provided in the definition of "Guaranty Obligations."

"primary obligor" has the meaning provided in the definition of "Guaranty Obligations."

"Purchase Money Indebtedness" means, for any Person, Indebtedness incurred for the purpose of financing all or any part of the purchase price of any fixed or capital assets (including Equity Interests of any Person owning fixed or capital assets) or the cost of installation, construction or improvement of any fixed or capital assets; provided that, (i) such Indebtedness is incurred within 90 days after such acquisition, installation, construction or improvement of such fixed or capital assets (including Equity Interests of any person owning the applicable fixed or capital assets) by such person and (ii) the amount of such Indebtedness does not exceed the lesser of 100% of the fair market value of such fixed or capital asset or the cost of the acquisition, installation, construction or improvement thereof, as the case may be.

"Qualified Equity Interest" means an Equity Interest that is either (i) a common Equity Interest or (ii) is not entitled to any cash payments of dividends or distributions, and is not subject to any mandatory redemption or optional redemption (at the option of the holders thereof), prior to the date that occurs six months after the final maturity date for any Loan.

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.

"Real Property" of any Person shall mean all of the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"Recipient" means (a) the Administrative Agent and (b) any Lender, as applicable.

"Regulation" means Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, partners, agents and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means an event described in Section 4043 of ERISA or the regulations thereunder with respect to a Plan, other than those events as to which the notice requirement is waived under subsection .22, .23, .25, .27, .28, .29, .30, .31, .32, .34, .35, .62, .63, .64, .65 or .67 of PBGC Regulation Section 4043.

"<u>Required Lenders</u>" means Lenders whose Credit Facility Exposure and Unused Revolving Commitments constitute more than 50% of the sum of the Aggregate Credit Facility Exposure and the Unused Total Revolving Commitment. The Credit Facility Exposure and Unused Revolving Commitments of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"<u>Restricted Payment</u>" means (i) any Capital Distribution, (ii) any amount paid by the Borrower or any of its Subsidiaries in repayment, redemption, retirement, repurchase, direct or indirect, of any Subordinated Indebtedness, (iii) any payment by the Borrower or any of its Subsidiaries of any management fees, consulting fees or any similar fees, whether pursuant to a management agreement or otherwise or (iv) any voluntary or mandatory prepayment of principal of any (a) Subordinated Indebtedness, or (b) Material Indebtedness, in the case of each of (a) and (b), other than the Obligations and other than Indebtedness subject to an Intercompany Subordination Agreement. By way of further clarification, neither payments made to professionals in the Chapter 11 Cases nor payments made from one Credit Party to another Credit Party shall constitute Restricted Payments.

"<u>Revolving Availability</u>" means, at the time of determination, (a) the sum of all Revolving Commitments at such time less (b) the principal amount of Revolving Loans made and outstanding at such time less (c) reserves established and maintained by the Administrative Agent on account of the Carve-Out (including, for avoidance of doubt, the Administrative Agent's estimate of future fees and expenses of the Debtors' Professionals, the Committee's Professionals and the Committee Members that may be incurred before or after the delivery of a Carve-Out Trigger Notice).

"<u>Revolving Borrowing</u>" means the incurrence of Revolving Loans consisting of one Type of Revolving Loan by the Borrower from all of the Lenders having Revolving Commitments in respect thereof on a pro rata basis on a given date (or resulting from Conversions or Continuations on a given date) in the same currency, having in the case of any Eurodollar Loans, the same Interest Period.

"<u>Revolving Commitment</u>" means, with respect to each Lender, the amount set forth opposite such Lender's name in <u>Schedule 1</u> hereto as its "<u>Revolving Commitment</u>" or in the case of any Lender that becomes a party hereto pursuant to an Assignment Agreement, the amount set forth in such Assignment Agreement, as such commitment may be reduced from time to time pursuant to <u>Section 2.10</u> or adjusted from time to time as a result of assignments to or from such Lender pursuant to <u>Section 11.06</u>.

"<u>Revolving Facility</u>" means the credit facility established under <u>Section 2.02</u> pursuant to the Revolving Commitment of each Lender.

"<u>Revolving Facility Availability Period</u>" means the period from the date of the Final Order until the Termination Date.

"<u>Revolving Facility Exposure</u>" means, for any Lender at any time, the principal amount of Revolving Loans made by such Lender and outstanding at such time.

"<u>Revolving Facility Note</u>" means a promissory note substantially in the form of <u>Exhibit A-1</u> hereto.

"<u>Revolving Facility Percentage</u>" means, at any time for any Lender, the percentage obtained by dividing such Lender's Revolving Commitment by the Total Revolving Commitment, provided that, if the Total Revolving Commitment has been terminated, the Revolving Facility Percentage for each Lender shall be determined by dividing such Lender's Revolving Commitment immediately prior to such

termination by the Total Revolving Commitment immediately prior to such termination. The Revolving Facility Percentage of each Lender as of the Closing Date is set forth on Schedule 1 hereto.

"Revolving Loan" means, with respect to each Lender, any loan made by such Lender pursuant to Section 2.02.

"S&P" means Standard & Poor's Ratings Group, a division of McGraw Hill, Inc., and its successors.

"Sale" has the meaning provided in Section 11.06(c)(vi).

"Sale/Bidding Procedures Motion" has the meaning given to such term in Section 6.21.

"Sale and Lease-Back Transaction" means any arrangement with any Person providing for the leasing by the Borrower, any Subsidiary of the Borrower or any other Credit Party of any property (except for temporary leases for a term, including any renewal thereof, of not more than one year and except for leases between the Borrower and a Subsidiary or any other Credit Party or between a Subsidiary and another Subsidiary or any other Credit Party), which property has been or is to be sold or transferred by the Borrower, such Subsidiary or such Credit Party to such Person.

"SDN List" has the meaning provided in Section 5.23.

"SEC" means the United States Securities and Exchange Commission.

"SEC Regulation D" means Regulation D as promulgated under the Securities Act of 1933, as amended, as the same may be in effect from time to time.

"Secured Creditors" has the meaning provided in the Security Agreement.

"Security Agreement" means the Pledge and Security Agreement (as defined in the Orders).

"Single Employer Plan" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, to which the Borrower, any Subsidiary of the Borrower, any other Credit Party or any ERISA Affiliate is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate made or accrued an obligation to make contributions during any of the five plan years preceding the date of termination of such plan.

"SPC" has the meaning provided in Section 11.06(f).

"Specified Event of Default" means any Event of Default under Section 8.01(a).

"Standard Permitted Lien" means any of the following:

(i)        Liens for taxes not yet delinquent or Liens for taxes, assessments or governmental charges being contested in good faith and by appropriate proceedings for which adequate reserves in accordance with GAAP have been established;

(ii)        Liens in respect of property or assets imposed by law that were incurred in the ordinary course of business, such as carriers', suppliers', warehousemen's, materialmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, that do not in the aggregate materially

detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Borrower or any of its Subsidiaries and do not secure any Indebtedness;

(iii)    Liens created by this Agreement or the other Loan Documents;

(iv)    Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 8.01(h));

(v)    easements, rights-of-way, zoning or other restrictions, charges, encumbrances, defects in title, prior rights of other persons, and obligations contained in similar instruments, in each case that do not secure Indebtedness and do not involve, and are not likely to involve at any future time, either individually or in the aggregate, (A) a substantial and prolonged interruption or disruption of the business activities of the Borrower and its Subsidiaries considered as an entirety, or (B) a Material Adverse Effect; and

(vi)    Liens arising from the rights of lessors under leases (including financing statements regarding property subject to lease) not in violation of the requirements of this Agreement, provided that such Liens are only in respect of the property subject to, and secure only, the respective lease (and any other lease with the same or an affiliated lessor).

"Subordinated Debt Documents" means, collectively, any loan agreements, indentures, note purchase agreements, promissory notes, guarantees and other instruments and agreements evidencing the terms of any Subordinated Indebtedness.

"Subordinated Indebtedness" means any Indebtedness (other than Prepetition First Lien Obligations) that has been subordinated to the prior payment in full of all of the Obligations pursuant to a written agreement or written terms acceptable to the Administrative Agent.

"Subsidiary" of any Person means (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary Voting Power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have Voting Power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries, and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person directly or indirectly through Subsidiaries, owns more than 50% of the Equity Interests of such Person at the time or in which such Person, one or more other Subsidiaries of such Person or such Person and one or more Subsidiaries of such Person, directly or indirectly, has the power to direct the policies, management and affairs thereof. Unless otherwise expressly provided, all references herein to "Subsidiary" shall mean a Subsidiary of the Borrower.

"Subsidiary Guarantor" means (i) as of the Closing Date, the Operating Companies and the Non-Operating Companies, and (ii) after the Closing Date, any other Domestic Subsidiary formed or acquired after the Closing Date that becomes a party to the Guaranty; provided that, no Excluded Subsidiary shall be required to be a Subsidiary Guarantor.

"Superpriority Claims" shall mean Indebtedness or other claims arising out of credit obtained or debt incurred by the Borrower having priority in accordance with the provisions of Section 364(c)(1) of the Bankruptcy Code or any or all administrative expenses of the kind specified in Section 503(b) or 507(b) of the Bankruptcy Code.

"Syndication Agent" has the meaning provided in the first paragraph of this Agreement.

"Synthetic Lease" means any lease (i) that is accounted for by the lessee as an Operating Lease, and (ii) under which the lessee is intended to be the "owner" of the leased property for federal income tax purposes.

"Synthetic Lease Obligations" means, as to any person, an amount equal to the capitalized amount of the remaining lease payments under any Synthetic Lease that would appear on a balance sheet of such person in accordance with GAAP if such obligations were accounted for as Capitalized Lease Obligations.

"Tax Distributions" means, for any period in which the Borrower is a disregarded entity for U.S. federal income tax purposes, distributions made to the members of the Borrower in an aggregate amount not greater than the amount necessary for such member to pay their state and U.S. federal income tax liabilities, in each case, solely and directly in respect of income earned by the Borrower and its Subsidiaries (calculated as taxable income, on a quarterly basis, based on a combined federal and state tax rate of 40%).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Borrowing" means the incurrence of Term Loans consisting of one Type of Term Loan by the Borrower from all of the Lenders having Term Commitments in respect thereof on a pro rata basis on a given date (or resulting from Conversions or Continuations on a given date), having in the case of Eurodollar Loans the same Interest Period.

"Term Commitment" means, with respect to each Lender, the amount, if any, set forth opposite such Lender's name in Schedule 1 hereto as its "Term Commitment" or in the case of any Lender that becomes a party hereto pursuant to an Assignment Agreement, the amount set forth in such Assignment Agreement, as such commitment may be reduced from time to time as a result of assignments to or from such Lender pursuant to Section 11.06.

"Term Loan" means any loan made by the Lenders to the Borrower pursuant to Section 2.03.

"Term Note" means a promissory note substantially in the form of Exhibit A-2 hereto.

"Termination Date" means the earliest to occur of (i) January 8, 2019, (ii) August 11, 2018, if the Bankruptcy Court shall not have entered the Final Order by the end of such date, (iii) the Closing Date of the Acceptable Bankruptcy Plan that is confirmed pursuant to an order entered by the Bankruptcy Court in the Chapter 11 Cases; and (iv) the acceleration of any Loans and the termination of the Commitments pursuant to Section 8.02.

"Total Credit Facility Amount" means the aggregate of the Total Revolving Commitment and the Total Term Loan Commitment. As of the Closing Date, the Total Credit Facility Amount is $24,000,000.

"Total Revolving Commitment" means the sum of the Revolving Commitments of the Lenders as the same may be decreased pursuant to Section 2.10(c) hereof. As of the Closing Date, the amount of the Total Revolving Commitment is $8,000,000.

"Total Revolving Facility Usage" means, when determined, the sum of the principal amount of all Revolving Loans outstanding at such time.

"Total Term Loan Commitment" means the sum of the Term Commitments of the Lenders. As of the Closing Date, the amount of the Term Loan Commitment is $16,000,000.

"Type" means any type of Loan determined with respect to the interest option and currency denomination applicable thereto, which in each case shall be a Base Rate Loan or a Eurodollar Loan.

"UCC" means the Uniform Commercial Code as in effect from time to time. Unless otherwise specified, the UCC shall refer to the UCC as in effect in the State of New York.

"Unfunded Benefit Liabilities" of any Plan means the amount, if any, of its unfunded benefit liabilities, as defined in Section 4001(a)(18) of ERISA.

"Unfunded Capital Expenditures" means, without duplication, any Capital Expenditures made other than with the proceeds of Indebtedness (other than Revolving Loans).

"United States" and U.S." each means United States of America.

"Unused Fees" has the meaning provided in Section 2.09(a).

"Unused Revolving Commitment" means, for any Lender at any time, the excess of (i) such Lender's Revolving Commitment at such time over (ii) such Lender's Revolving Facility Exposure at such time.

"Unused Total Revolving Commitment" means, at any time, the excess of (i) the Total Revolving Commitment at such time over (ii) the Aggregate Revolving Facility Exposure at such time.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 3.03(g)(ii)(B)(3).

"U.S. Trustee" means the  Office of the United States Trustee for the Southern District of Texas

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001.

"Voting Power" means, with respect to any Person, the exclusive ability to control, through the ownership of shares of capital stock, partnership interests, membership interests or otherwise, the election of members of the board of directors or other similar governing body of such Person, and the holding of a designated percentage of Voting Power of a Person means the ownership of shares of capital stock, partnership interests, membership interests or other interests of such Person sufficient to control exclusively the election of that percentage of the members of the board of directors or other similar governing body of such Person.

"Withholding Agent" means any Credit Party and the Administrative Agent.

Section 1.02    Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each means "to but excluding" and the word "through" means "through and including."

Section 1.03    Accounting Terms.  Except as otherwise specifically provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time, provided that (i) if the Borrower notifies the Administrative Agent and the Lenders that the Borrower wishes to amend any financial ratio or requirement to eliminate the effect of any change in GAAP that occurs after the Closing Date on the operation of such financial ratio or requirement, or (ii) if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend any financial ratio or requirement for such purpose), the Borrower, the Administrative Agent and the Lenders shall enter into negotiations to amend any such financial ratio or requirement immediately upon receipt from any party entitled to send such notice and the Borrower's compliance with such financial ratio or requirement shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such financial ratio or requirement is amended in a manner satisfactory to the Borrower, the Administrative Agent and the Required Lenders. Notwithstanding the foregoing, (A) all financial statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof and (B) all leases of the Borrower and its Subsidiaries that were treated as operating leases in accordance with GAAP on the Closing Date shall continue to be treated as operating leases for purposes of the financial definitions contained herein, regardless of any change in GAAP after the Closing Date that would otherwise require such operating leases to be treated as Capital Leases; provided that, the Borrower shall provide to the Administrative Agent financial statements and other documents required under this Agreement which include a reconciliation showing such treatment before and after giving effect to such change in GAAP.

Section 1.04    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," -includes" and -including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Schedules and Exhibits shall be construed to refer to Sections of, and Schedules and Exhibits to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all Real Property, tangible and intangible assets and properties, including cash, securities, accounts and contract rights, and interests in any of the foregoing, and (f) any reference to a statute, rule or regulation is to that statute, rule or regulation as now enacted or as the same may from time to time be amended, re-enacted or expressly replaced.

## ARTICLE II

## THE TERMS OF THE CREDIT FACILITY

Section 2.01    Establishment of the Credit Facility.  On the Closing Date, and subject to and upon the terms and conditions set forth in this Agreement and the other Loan Documents, the Administrative Agent and the Lenders agree to establish the Credit Facility for the benefit of the Borrower; provided that at no time will (i) the Aggregate Credit Facility Exposure exceed the Total Credit

Facility Amount, or (ii) the Credit Facility Exposure of any Lender exceed the aggregate amount of such Lender's Commitment.

Section 2.02    Revolving Facility.    During the Revolving Facility Availability Period, each Lender severally, and not jointly, agrees, on the terms and conditions set forth in this Agreement, to make a Revolving Loan or Revolving Loans to the Borrower from time to time pursuant to such Lender's Revolving Commitment, which Revolving Loans: (i) may, except as set forth herein, at the option of the Borrower, be incurred and maintained as, or Converted into, Revolving Loans that are Base Rate Loans or Eurodollar Loans, in each case denominated in Dollars, provided that all Revolving Loans made as part of the same Revolving Borrowing shall consist of Revolving Loans of the same Type; (ii) may be repaid or prepaid and reborrowed in accordance with the provisions hereof; and (iii) shall not be made if, after giving effect to any such Revolving Loan, (A) the Revolving Facility Exposure of any Lender would exceed such Lender's Revolving Commitment, (B) the Aggregate Revolving Facility Exposure would exceed the lesser of (x) the Total Revolving Commitment and (y) the Revolving Availability or (C) the Borrower would be required to prepay Loans pursuant to Section 2.11(b)(ii) or (iii). The Revolving Loans to be made by each Lender will be made by such Lender on a pro rata basis based upon such Lender's Revolving Facility Percentage of each Revolving Borrowing, in each case in accordance with Section 2.05 hereof.

Section 2.03    Term Loan.    On the Closing Date, each Lender that has a Term Commitment severally, and not jointly, agrees, on the terms and conditions set forth in this Agreement, to make a Term Loan to the Borrower pursuant to such Lender's Term Commitment, which Term Loans: (i) can only be incurred on the Closing Date in the entire amount of each Lender's Term Commitment; (ii) once prepaid or repaid, may not be reborrowed; (iii) may, except as set forth herein, at the option of the Borrower, be incurred and maintained as, or Converted into, Term Loans that are Base Rate Loans or Eurodollar Loans, in each case denominated in Dollars, provided that all Term Loans made as part of the same Term Borrowing shall consist of Term Loans of the same Type; (iv) shall be repaid in accordance with Section 2.11; and (v) shall not exceed (A) for any Lender at the time of incurrence thereof the aggregate principal amount of such Lender's Term Commitment, if any, and (B) for all the Lenders at the time of incurrence thereof the Total Term Loan Commitment. The Term Loans to be made by each Lender will be made by such Lender in the aggregate amount of its Term Commitment in accordance with Section 2.05 hereof.

Section 2.04    Notice of Borrowing.

(a)    Time of Notice.    Each Borrowing of a Loan (other than a Continuation or Conversion) shall be made upon notice in the form provided for below which shall be provided by the Borrower to the Administrative Agent at its Notice Office (with a copy to Sally C. Barton, 127 Public Square, Cleveland, OH 44114) not later than (i) in the case of each Borrowing of a Eurodollar Loan, 11:00 A.M. (local time at its Notice Office) at least three Business Days' prior to the date of such Borrowing and (ii) in the case of each Borrowing of a Base Rate Loan, prior to 11:00 A.M. (local time at its Notice Office) on the proposed date of such Borrowing.

(b)    Notice of Borrowing.    Each request for a Borrowing (other than a Continuation or Conversion) shall be made by an Authorized Officer of the Borrower by delivering written notice of such request substantially in the form of Exhibit B-1 hereto (each such notice, a "Notice of Borrowing") or by telephone (to be confirmed immediately in writing by delivery by an Authorized Officer of the Borrower of a Notice of Borrowing), and in any event each such request shall be irrevocable, shall be made no more often than as set forth in clause (d) below and shall specify (i) the aggregate principal amount of the Loans to be made pursuant to such Borrowing, (ii) the date of the Borrowing (which shall be a Business Day), (iii) the Type of Loans such Borrowing will consist of, and (iv) if applicable, the initial Interest Period. Without in any way limiting the obligation of the Borrower to confirm in writing

any telephonic notice permitted to be given hereunder, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower entitled to give telephonic notices under this Agreement on behalf of the Borrower. In each such case, the Administrative Agent's record of the terms of such telephonic notice shall be conclusive absent manifest error.

(c)   <u>Minimum Borrowing Amount</u>.   The aggregate principal amount of each Borrowing by the Borrower shall not be less than the Minimum Borrowing Amount.

(d)   <u>Maximum Borrowings</u>.   No more than one Borrowing may be incurred by the Borrower in any two (2) week period, and such Borrowings must be consistent with the Budget. At no time shall there be more than five (5) Borrowings of Eurodollar Loans outstanding hereunder.

Section 2.05   <u>Funding Obligations; Disbursement of Funds</u>.

(a)   <u>Several Nature of Funding Obligations</u>. The Commitments of each Lender hereunder and the obligation of each Lender to make Loans are several and not joint obligations. No Lender shall be responsible for any default by any other Lender in its obligation to make Loans or fund any participation hereunder and each Lender shall be obligated to make the Loans provided to be made by it and fund its participations required to be funded by it hereunder, regardless of the failure of any other Lender to fulfill any of its Commitments hereunder. Nothing herein and no subsequent termination of the Commitments pursuant to <u>Section 2.10</u> shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder and in existence from time to time or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder.

(b)   <u>Borrowings Pro Rata</u>.   All Loans hereunder shall be made as follows: (i) all Revolving Loans made shall be made on a pro rata basis based upon each Lender's Revolving Facility Percentage of the amount of such Revolving Borrowing in effect on the date the applicable Revolving Borrowing is to be made; and (ii) all Term Loans shall be made by the Lenders having Term Commitments pro rata on the basis of their respective Term Commitments.

(c)   <u>Notice to Lenders</u>.   The Administrative Agent shall promptly give each Lender, as applicable, written notice (or telephonic notice promptly confirmed in writing) of each proposed Borrowing, or Conversion or Continuation thereof, and of such Lender's proportionate share thereof or participation therein and of the other matters covered by the Notice of Borrowing, Notice of Continuation or Conversion, as the case may be, relating thereto.

(d)   <u>Funding of Loans</u>.   No later than 2:00 P.M. (local time at the Payment Office) on the date specified in each Notice of Borrowing, each Lender will make available its amount, if any, of each Borrowing requested to be made on such date to the Administrative Agent at the Payment Office in Dollars and in immediately available funds and the Administrative Agent promptly will make available to the Borrower by [wiring to _____] (or such other account as the Borrower shall specify) the aggregate of the amounts so made available in the type of funds received.

(e)   <u>Advance Funding</u>.   Unless the Administrative Agent shall have been notified by any Lender prior to the date of Borrowing that such Lender does not intend to make available to the Administrative Agent its portion of the Borrowing or Borrowings to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing, and the Administrative Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrower a corresponding amount. If such corresponding amount is not in fact made available to the

Administrative Agent by such Lender and the Administrative Agent has made the same available to the Borrower, the Administrative Agent shall be entitled to recover such corresponding amount from such Lender. If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the Borrower, and the Borrower shall immediately pay such corresponding amount to the Administrative Agent. The Administrative Agent shall also be entitled to recover from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower to the date such corresponding amount is recovered by the Administrative Agent at a rate per annum equal to (i) if paid by such Lender, the overnight Federal Funds Effective Rate or (ii) if paid by the Borrower, the then applicable rate of interest, calculated in accordance with <u>Section 2.07</u>, for the respective Loans (but without any requirement to pay any amounts in respect thereof pursuant to <u>Section 3.02</u>).

Section 2.06     <u>Evidence of Obligations</u>.

(a)     <u>Loan Accounts of Lenders</u>.  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Obligations of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(b)     <u>Loan Accounts of Administrative Agent; Lender Register</u>.  The Administrative Agent shall maintain accounts in which it shall record: (i) the amount of each Loan and Borrowing made hereunder, the Type thereof, the currency in which such Loan is denominated, the Interest Period and applicable interest rate; (ii) the amount of any principal due and payable or to become due and payable from the Borrower to each Lender hereunder; (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof; and (iv) the other details relating to the Loans and other Obligations. In addition, the Administrative Agent shall maintain a register (the "<u>Lender Register</u>") on or in which it will record the names and addresses of the Lenders, and the Commitments from time to time of each of the Lenders. The Administrative Agent will make the Lender Register available to any Lender or the Borrower upon its request.

(c)     <u>Effect of Loan Accounts, etc.</u>  The entries made in the accounts maintained pursuant to <u>Section 2.07(b)</u> shall be prima facie evidence of the existence and amounts of the Obligations recorded therein; provided that, the failure of the Administrative Agent to maintain such accounts or any error (other than manifest error) therein shall not in any manner affect the obligation of any Credit Party to repay or prepay the Loans or the other Obligations in accordance with the terms of this Agreement.

(d)     <u>Notes</u>.  Upon request of any Lender, the Borrower will execute and deliver to such Lender (i) a Revolving Facility Note with blanks appropriately completed in conformity herewith to evidence the Borrower's obligation to pay the principal of, and interest on, the Revolving Loans made to it by such Lender and (ii) a Term Note with blanks appropriately completed in conformity herewith to evidence its obligation to pay the principal of, and interest on, the Term Loan made to it by such Lender; provided that, the decision of any Lender to not request a Note shall in no way detract from the Borrower's obligation to repay the Loans and other amounts owing by the Borrower to such Lender.

Section 2.07     <u>Interest; Default Rate</u>.

(a)     <u>Interest on Revolving Loans</u>.  The outstanding principal amount of each Revolving Loan made by each Lender shall bear interest at a fluctuating rate per annum that shall at all times be equal to (i) during such periods as such Revolving Loan is a Base Rate Loan, the Base Rate plus the Applicable Revolving Loan Margin and (ii) during such periods as such Revolving Loan is a

Eurodollar Loan, the relevant Adjusted Eurodollar Rate for such Eurodollar Loan for the applicable Interest Period plus the Applicable Revolving Loan Margin.

(b)     Interest on Term Loans.  The outstanding principal amount of each Term Loan made by each Lender shall bear interest at a fluctuating rate per annum that shall at all times be equal to (i) during such periods as such Term Loan is a Base Rate Loan, the Base Rate plus the Applicable Term Loan Margin, and (ii) during such periods as such Term Loan is a Eurodollar Loan, the relevant Adjusted Eurodollar Rate for such Eurodollar Loan for the applicable Interest Period plus the Applicable Term Loan Margin.

(c)     Default Interest.  Notwithstanding the above provisions, if (x) any Event of Default other than a Specified Event of Default has occurred and is continuing, then upon written notice by the Administrative Agent (which notice the Administrative Agent may give in its discretion and shall give at the direction of the Required Lenders) and (y) a Specified Event of Default has occurred and is continuing, then automatically the principal amount of all Loans outstanding and, to the extent permitted by applicable law, all overdue interest in respect of each Loan and all fees or other amounts owed hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code or other applicable bankruptcy laws) payable on demand, at a rate per annum equal to the Default Rate. In addition, if any amount (other than amounts as to which the foregoing sentence is applicable) payable by the Borrower under the Loan Documents is not paid when due, upon written notice by the Administrative Agent (which notice the Administrative Agent may give in its discretion and shall give at the direction of the Required Lenders), such amount shall bear interest, payable on demand, at a rate per annum equal to the Default Rate.

(d)     Accrual and Payment of Interest.  Interest shall accrue from and including the date of any Borrowing to but excluding the date of any prepayment or repayment thereof and shall be payable by the Borrower: (i) in respect of each Base Rate Loan, quarterly in arrears on the last Business Day of each March, June, September and December: (ii) in respect of each Eurodollar Loan, on the last day of each Interest Period applicable thereto; and (iii) in respect of all Loans, other than Revolving Loans accruing interest at a Base Rate, on any repayment, prepayment or Conversion (on the amount repaid, prepaid or Converted), at maturity (whether by acceleration or otherwise), and, after such maturity, on demand.

(e)     Computations of Interest.  All computation of interest hereunder shall be made on the actual number of days elapsed over a year of 360 days, except that interest computed by reference to the Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year).

(f)     Information as to Interest Rates.  The Administrative Agent, upon determining the interest rate for any Borrowing, shall promptly notify the Borrower and the Lenders thereof. Any such determination by the Administrative Agent shall be conclusive and binding absent manifest error.

Section 2.08     Conversion and Continuation of Loans.

(a)     Conversion and Continuation of Revolving Loans.  The Borrower shall have the right, subject to the terms and conditions of this Agreement, to (i) Convert all or a portion of the outstanding principal amount of Loans of one Type made to it into a Borrowing or Borrowings of another Type of Loans that can be made to it pursuant to this Agreement and (ii) Continue a Borrowing of Eurodollar Loans at the end of the applicable Interest Period as a new Borrowing of Eurodollar Loans with a new Interest Period; provided that, any Conversion of Eurodollar Loans into Base Rate Loans shall be made on, and only on, the last day of an Interest Period for such Eurodollar Loans.

(b)    <u>Notice of Continuation and Conversion</u>.  Each Continuation or Conversion of a Loan shall be made upon notice in the form provided for below provided by the Borrower to the Administrative Agent at its Notice Office (with a copy to Sally C. Barton, 127 Public Square, Cleveland, OH 44114) not later than (i) in the case of each Continuation of or Conversion into a Eurodollar Loan, prior to 11:00 A.M. (local time at its Notice Office) at least three Business Days' prior to the date of such Continuation or Conversion, and (ii) in the case of each Conversion to a Base Rate Loan, prior to 11:00 A.M. (local time at its Notice Office) on the proposed date of such Conversion. Each such request shall be made by an Authorized Officer of the Borrower delivering written notice of such request substantially in the form of <u>Exhibit B-2</u> hereto (each such notice, a "Notice of Continuation or Conversion") or by telephone (to be confirmed immediately in writing by delivery by an Authorized Officer of the Borrower of a Notice of Continuation or Conversion), and in any event each such request shall be irrevocable and shall specify (A) the Borrowings to be Continued or Converted, (B) the date of the Continuation or Conversion (which shall be a Business Day), and (C) the Interest Period or, in the case of a Continuation, the new Interest Period. Without in any way limiting the obligation of the Borrower to confirm in writing any telephonic notice permitted to be given hereunder, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower entitled to give telephonic notices under this Agreement on behalf of the Borrower. In each such case, the Administrative Agent's record of the terms of such telephonic notice shall be conclusive absent manifest error.

Section 2.09    <u>Fees</u>.

(a)    <u>Unused Fees</u>.  The Borrower agrees to pay to the Administrative Agent, for the ratable benefit of each Lender based upon each such Lender's Revolving Facility Percentage, as consideration for the Revolving Commitments of the Lenders, unused fees (the "<u>Unused Fees</u>") for the period from the Closing Date to, but not including, the Termination Date, computed for each day at a rate per annum equal to (A) 1.50% times (B) the Total Revolving Commitment in effect on such day minus the Total Revolving Facility Usage as of such day. Accrued Unused Fees shall be due and payable in arrears on the first Business Day after the last Business Day of each March, June, September and December and on the Termination Date, commencing on the first Business Day of the first full calendar quarter after the Closing Date. For the avoidance of doubt, for purposes of computing Unused Fees, a Revolving Commitment of a Lender shall be deemed to be used to the extent of the outstanding Revolving Loans of such Lender.

(b)    <u>Commitment Fee</u>.  The Borrower agrees to pay to the Administrative Agent, a commitment fee (the "<u>Commitment Fee</u>") in the amount of $300,000, payable on the Closing Date.  The first $60,000 of the Commitment Fee shall be payable to the Administrative Agent as an arranger fee. The remaining Commitment Fee shall be for the ratable benefit of each Lender pro rata on the basis of their respective Revolving Commitments,

(c)    <u>Administrative Agent Fees</u>.  The Borrower shall pay to the Administrative Agent, on the Closing Date, for its own account, an agent's fee of $100,000.

(d)    <u>Computations and Determination of Fees</u>.  All computations of Unused Fees and other Fees hereunder shall be made on the actual number of days elapsed over a year of 360 days.

Section 2.10    <u>Termination and Reduction of Revolving Commitments</u>.

(a)    <u>Mandatory Termination of Revolving Commitments</u>.    All of the Revolving Commitments shall terminate on the Termination Date.

(b)      Voluntary Termination of the Total Revolving Commitment.  Upon at least three Business Days' prior irrevocable written notice (or telephonic notice confirmed in writing) to the Administrative Agent at its Notice Office, with a copy to Sally C. Barton, 127 Public Square, Cleveland, OH 44114 (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Borrower shall have the right to terminate in whole the Total Revolving Commitment, provided that all outstanding Revolving Loans are contemporaneously prepaid in accordance with Section 2.11.

(c)      Partial Reduction of Total Revolving Commitment.  Upon at least three Business Days' prior irrevocable written notice (or telephonic notice confirmed in writing) to the Administrative Agent at its Notice Office, with a copy to Sally C. Barton, 127 Public Square, Cleveland, OH 44114 (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Borrower shall have the right to partially and permanently reduce the Unused Total Revolving Commitment; provided that, (i) any such reduction shall apply to proportionately (based on each Lender's Revolving Facility Percentage) and permanently reduce the Revolving Commitment of each Lender and (ii) no such reduction shall be permitted if the Borrower would be required to make a mandatory prepayment of Loans pursuant to Section 2.11(b)(ii) or (iii), and any partial reduction shall be in the amount of at least $1,000,000 (or, if greater, in integral multiples of $500,000).

Section 2.11      Voluntary, Scheduled and Mandatory Prepayments of Loans.

(a)      Voluntary Prepayments.  The Borrower shall have the right to prepay any of the Loans owing by it, in whole or in part, without premium or penalty, except as specified in subparts (c) and (d) below, from time to time. The Borrower shall give the Administrative Agent at the Notice Office written or telephonic notice (in the case of telephonic notice, promptly confirmed in writing if so requested by the Administrative Agent) of its intent to prepay the Loans, the amount of such prepayment and (in the case of Eurodollar Loans) the specific Borrowing(s) pursuant to which the prepayment is to be made, which notice shall be received by the Administrative Agent by (y) 11:00 A.M. (local time at the Notice Office) three (3) Business Days prior to the date of such prepayment, in the case of any prepayment of Eurodollar Loans, or (z) 11:00 A.M. (local time at the Notice Office) one Business Day prior to the date of such prepayment, in the case of any prepayment of Base Rate Loans, and which notice shall promptly be transmitted by the Administrative Agent to each of the affected Lenders, provided that:

(i)      each partial prepayment shall be in an aggregate principal amount of at least (A) in the case of any prepayment of a Eurodollar Loan, $500,000 (or, if less, the full amount of such Borrowing), or an integral multiple of $100,000 and (B) in the case of any prepayment of a Base Rate Loan, $100,000 (or, if less, the full amount of such Borrowing), or an integral multiple of $50,000;

(ii)      no partial prepayment of any Loans made pursuant to a Borrowing shall reduce the aggregate principal amount of such Loans outstanding pursuant to such Borrowing to an amount less than the Minimum Borrowing Amount applicable thereto; and

(iii)      in the case of any voluntary prepayment of Term Loans, such prepayment shall be applied in the manner directed by the Borrower.

(b)      Mandatory Payments.  The Loans shall be subject to mandatory repayment or prepayment (in the case of any partial prepayment conforming to the requirements as to the amounts of partial prepayments set forth in Section 2.11(a) above) in accordance with the following provisions:

(i)      Revolving Facility Termination Date.  The entire principal amount of all outstanding Revolving Loans shall be repaid in full on the Termination Date.

(ii)    <u>Loans Exceed the Commitments</u>.  If on any date (after giving effect to any other payments on such date) (A) the Aggregate Credit Facility Exposure exceeds the Total Credit Facility Amount, (B) the Revolving Facility Exposure of any Lender exceeds such Lender's Revolving Commitment or (C) the Aggregate Revolving Facility Exposure exceeds the Total Revolving Commitment, then, in the case of each of the foregoing, the Borrower shall, on such day, prepay on such date the principal amount of Loans in an aggregate amount at least equal to such excess.

(iii)    <u>Term Loan Maturity Date</u>.  The entire principal amount of all outstanding Term Loans shall be repaid in full on the Termination Date.

(iv)    <u>Proceeds of Asset Sales</u>.  Subject to the terms of the Orders, in the event of any Asset Sale with respect to any asset of any of the Credit Parties, to the extent not directly paid to the Administrative Agent, promptly (and in any event not later than the next Business Day following the receipt of the Net Cash Proceeds of such Asset Sale), an amount equal to 100% of the Net Cash Proceeds from such Asset Sale shall be applied as a mandatory prepayment of the Loans in accordance with <u>Section 2.11(c)</u> below.

(v)    <u>Certain Proceeds of an Event of Loss</u>.  Subject to the terms of the Orders, if any Event of Loss with respect to any property of any of the Credit Parties occurs, promptly (and in any event not later than the third Business Day following the date of receipt of the Net Cash Proceeds of such Event of Loss) an amount equal to 100% of the Net Cash Proceeds from such Event of Loss shall be applied as a mandatory prepayment of the Loans in accordance with <u>Section 2.11(c)</u> below.

(c)    <u>Applications of Certain Prepayment Proceeds</u>.  Each prepayment required to be made pursuant to <u>Section 2.11(b)(iv)</u> or <u>(v)</u> above shall be applied as a mandatory prepayment of principal of first, the outstanding Term Loans, and second, after no Term Loans are outstanding, the outstanding Revolving Loans (but without any corresponding reduction in Revolving Commitments).

(d)    <u>Particular Loans to be Prepaid</u>.  With respect to each repayment or prepayment of Loans made or required by this Section, the Borrower shall designate the Types of Loans that are to be repaid or prepaid and the specific Borrowing(s) pursuant to which such repayment or prepayment is to be made; provided that, (i) the Borrower shall first so designate all Loans that are Base Rate Loans and Eurodollar Loans with Interest Periods ending on the date of repayment or prepayment prior to designating any other Eurodollar Loans for repayment or prepayment, and (ii) if the outstanding principal amount of Eurodollar Loans made pursuant to a Borrowing is reduced below the applicable Minimum Borrowing Amount as a result of any such repayment or prepayment, then all the Loans outstanding pursuant to such Borrowing shall, in the case of Eurodollar Loans, be Converted into Base Rate Loans. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its sole discretion with a view, but no obligation, to minimize breakage costs owing under <u>Article III</u>.

(e)    <u>Breakage and Other Compensation</u>.  Any prepayment made pursuant to this <u>Section 2.11</u> shall be accompanied by any amounts payable in respect thereof under <u>ARTICLE III</u> hereof.

Section 2.12    <u>Method and Place of Payment</u>.

(a)    <u>Generally</u>.  All payments made by the Borrower hereunder under any Note or any other Loan Document shall be made without setoff, counterclaim or other defense.

(b)    Application of Payments.  Except as specifically set forth elsewhere in this Agreement and subject to Section 8.03, (i) all payments and prepayments of Revolving Loans shall be applied by the Administrative Agent on a pro rata basis based upon each Lender's Revolving Facility Percentage of the amount of such prepayment and (ii) all payments and prepayments of Term Loans shall be applied by the Administrative Agent to reduce the principal amount of the Term Loans made by each Lender with a Term Commitment, pro rata on the basis of their respective Term Commitments.

(c)    Payment of Obligations.  Except as specifically set forth elsewhere in this Agreement, all  payments under this Agreement with respect to any of the Obligations shall be made to the Administrative Agent on the date when due and shall be made at the Payment Office in immediately available funds and, except as set forth in the next sentence, shall be made in Dollars.

(d)    Timing of Payments.  Any payments under this Agreement that are made later than  11:00 A.M. (local time at the Payment Office) shall be deemed to have been made on the next succeeding Business Day. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

(e)    Distribution to Lenders.  Upon the Administrative Agent's receipt of payments hereunder, the Administrative Agent shall immediately distribute to each Lender its ratable share, if any, of the amount of principal, interest, and Fees received by it for the account of such Lender. Payments received by the Administrative Agent in Dollars shall be delivered to the Lenders in Dollars in immediately available funds; provided that, if at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and Fees then due hereunder then, except as specifically set forth elsewhere in this Agreement and subject to Section 8.03, such funds shall be applied, first, towards payment of interest and Fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and Fees then due to such parties, and second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

Section 2.13    Defaulting Lenders.

(a)    Defaulting Lender Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)    Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(ii)    Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 11.03 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit

account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such Loans were made at a time when the conditions set forth in <u>Section 4.02</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments under the applicable Credit Facilities. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    <u>Certain Fees</u>.  No Defaulting Lender shall be entitled to receive any Unused Fee for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    <u>Defaulting Lender Cure</u>.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held pro rata by the Lenders in accordance with the Commitments under the applicable Credit Facility, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

Section 2.14    [Reserved].

Section 2.15    <u>Status of Obligations; Perfection and Priority of Security Interests</u>.

(a)    <u>Superpriority Claims</u>. The Obligations are, subject to the Carve-Out and the Orders, pursuant to Section 364(c)(1) of the Bankruptcy Code, entitled (without the need to file a proof of claim) to a joint and several superpriority claim against the Debtors, with priority over any and all other obligations, liabilities, and indebtedness against the Debtors, now existing or hereafter arising, of any kind whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under Sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final Order), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, whether now in existence or hereafter incurred by the Debtors, and shall at all times be senior to the rights of the Debtors, each Debtor's estate and any successor trustee, estate representative, or any creditor, in any of the Chapter 11 Cases or any subsequent cases or proceedings under the Bankruptcy Code (the "<u>Lender Superpriority</u>

Claim"), and the Lender Superpriority Claim shall have recourse to and be payable from all prepetition and postpetition assets of the Debtors, including, but not limited to, the Collateral; Lender Superpriority Claim in respect of the Revolving Commitments shall be senior and have priority to Lender Superpriority Claims in respect of the Term Loans.

(b)    Lien on Unencumbered Assets. The Obligations are, subject to the Carve-Out and the Orders, pursuant to Section 364(c)(2) of the Bankruptcy Code, secured by a perfected first priority lien on all Collateral that is not subject to valid, perfected, and non-avoidable liens as of the Petition Date and such liens are perfected without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

(c)    Junior Lien on Certain Encumbered Assets.  The Obligations are, subject to the Carve-Out and the Orders, pursuant to Section 364(c)(3) of the Bankruptcy Code, secured by a perfected lien on all Collateral (other than Collateral described in Section 2.15(b) or Section 2.15(d), as to which the liens in favor of the Administrative Agent are as described in such Sections) that is subject to valid and non-avoidable liens as of the Petition Date that were permitted pursuant to the terms of the Prepetition Credit Agreement or (with respect to statutory liens) applicable laws and which were senior to the liens under the Prepetition Credit Agreement and which were either perfected as of the Petition Date or subsequently perfected pursuant to Section 546(b) of the Bankruptcy Code, which liens are junior to such valid, perfected, and non-avoidable liens and are perfected without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing agreements, or other agreements.

(d)    Priming Lien on Certain Encumbered Assets.  The Obligations are, subject to the Carve-Out and the Orders, pursuant to Section 364(d)(1) of the Bankruptcy Code, secured by a perfected first priority, senior priming lien on all the Collateral on which (i) liens were granted as security for the obligations under or in connection with the Prepetition Credit Agreement, or (ii) liens were granted as of the Petition Date that were not permitted pursuant to the terms of the Prepetition Credit Agreement or (with respect to statutory liens) applicable law, all of which existing liens, rights, and interests (the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first priority senior lien to be granted to the Administrative Agent for its and the Lenders' benefit (the "Priming Lien"), which Priming Lien also primes any liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens, and such liens are perfected without necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements. For the avoidance of doubt, notwithstanding Section 2.15(c), the Priming Lien primes and is senior to the Primed Liens.

(e)    The priorities set forth above are subject, in each case, only to the Carve-Out. All of the liens and security interests described in Section 2.15 shall be effective and perfected as of the date that the Bankruptcy Court enters the Final Order, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents.  The Debtors shall execute and deliver to the Administrative Agent (for recordation or filing, as appropriate) such mortgages and pledges (and other security instruments), and be authorized pursuant to the Orders to file such financing statements and other instruments and documents, as shall be advisable (as reasonably determined by Administrative Agent) to evidence and secure the Obligations.  The cost of such recordation and filing shall be set forth in the Budget.

ARTICLE III

INCREASED COSTS, ILLEGALITY AND TAXES

Section 3.01    Increased Costs, Illegality, etc.

(a)      In the event that (y) in the case of clause (i) below, the Administrative Agent or (z) in the case of clauses (ii) and (iii) below, any Lender or other Recipient, shall have determined on a reasonable basis (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto):

(i)      on any date for determining the interest rate applicable to any Eurodollar Loan for any Interest Period that, by reason of any changes arising after the Closing Date, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in this Agreement for such Eurodollar Loan; or

(ii)      at any time, that such Lender or other Recipient shall incur increased costs or reductions in the amounts received or receivable by it hereunder in an amount that such Lender or other Recipient deems material with respect to any Eurodollar Loans (other than any increased cost or reduction in the amount received or receivable resulting from the imposition of or a change in the rate of any Connection Income Taxes) because of (x) any Change in Law since the Closing Date (including, but not limited to, a change in requirements for any reserve, special deposit, liquidity or similar requirements (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, any Lender or other Recipient, but, in all events, excluding reserves already includable in the interest rate applicable to such Eurodollar Loan pursuant to this Agreement) or (y) other circumstances adversely affecting the London interbank market or the position of such Lender or other Recipient in any such market; or

(iii)      at any time, that the making or continuance of any Eurodollar Loan has become unlawful by compliance by such Lender in good faith with any Change in Law since the Closing Date, or would conflict with any thereof not having the force of law but with which such Lender customarily complies, or has become impracticable as a result of a contingency occurring after the Closing Date that materially adversely affects the London interbank market;

then, and in each such event, such Lender or other Recipient (or the Administrative Agent in the case of clause (i) above) shall (1) on or promptly following such date or time and (2) within 10 Business Days of the date on which such event no longer exists give notice (by telephone confirmed in writing) to the Borrower and to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders or other Recipients). Thereafter (x) in the case of clause (i) above, the affected Type of Eurodollar Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders or other Recipients that the circumstances giving rise to such notice by the Administrative Agent no longer exist, and any Notice of Borrowing or Notice of Continuation or Conversion given by the Borrower with respect to such Type of Eurodollar Loans that have not yet been incurred, Converted or Continued shall be deemed rescinded by the Borrower or, in the case of a Notice of Borrowing, shall, at the option of the Borrower, be deemed converted into a Notice of Borrowing for Base Rate Loans to be made on the date of Borrowing contained in such Notice of Borrowing, (y) in the case of clause (ii) above, the Borrower shall pay to such Lender or other Recipient, upon written demand therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender or other Recipient shall determine) as shall be required to compensate such Lender or other Recipient for such increased costs or reductions in amounts receivable hereunder (a written notice as to the additional amounts owed to such Lender or other Recipient, showing the basis for the calculation thereof, which basis must be reasonable, submitted to the Borrower by such Lender or other Recipient shall, absent manifest error, be final and conclusive and binding upon all parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 3.01(b) as promptly as possible and, in any event, within the time period required by law.

(b)      At any time that any Eurodollar Loan is affected by the circumstances described in Section 3.01(a)(ii) or (iii), the Borrower may (and in the case of a Eurodollar Loan affected pursuant to Section 3.01(a)(iii) the Borrower shall) either (i) if the affected Eurodollar Loan is then being made pursuant to a Borrowing, by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender or other Recipient pursuant to Section 3.01(a)(ii) or (iii), cancel said Borrowing, or, in the case of any Borrowing, convert the related Notice of Borrowing into one requesting a Borrowing of Base Rate Loans or require the affected Lender or other Recipient to make its requested Loan as a Base Rate Loan, or (ii) if the affected Eurodollar Loan is then outstanding, upon at least one Business Days' notice to the Administrative Agent, require the affected Lender or other Recipient to Convert each such Eurodollar Loan into a Base Rate Loan; provided that, if more than one Lender or other Recipient is affected at any time, then all affected Lenders or other Recipients must be treated the same pursuant to this Section 3.01(b).

(c)      If any Lender shall have determined that after the Closing Date, any Change in Law regarding capital adequacy by any Governmental Authority, central bank or comparable agency charged by law with the interpretation or administration thereof, or compliance by such Lender or its parent corporation with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank, or comparable agency, in each case made subsequent to the Closing Date, has or would have the effect of reducing by an amount reasonably deemed by such Lender to be material to the rate of return on such Lender's or its parent corporation's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent corporation could have achieved but for such adoption, effectiveness, change or compliance (taking into consideration such Lender's or its parent corporation's policies with respect to capital adequacy), then from time to time, within 15 days after demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent corporation for such reduction. Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 3.01(c), will give prompt written notice thereof to the Borrower, which notice shall set forth, in reasonable detail, the basis of the calculation of such additional amounts, which basis must be reasonable, although the failure to give any such notice shall not release or diminish any of the Borrower's obligations to pay additional amounts pursuant to this Section 3.01(c) upon the subsequent receipt of such notice.

(d)      Notwithstanding anything in this Agreement to the contrary, (i) no Lender shall be entitled to compensation or payment or reimbursement of other amounts under Section 3.01 or Section 3.04 for any amounts incurred or accruing more than 90 days prior to the giving of notice to the Borrower of additional costs or other amounts of the nature described in such Sections, and (ii) no Lender shall demand compensation for any reduction referred to in Section 3.01(c) or payment or reimbursement of other amounts under Section 3.04 if it shall not at the time be the general policy or practice of such Lender to demand such compensation, payment or reimbursement in similar circumstances under comparable provisions of other credit agreements.

Section 3.02     Breakage Compensation.  The Borrower shall compensate each Lender, upon its written request (which request shall set forth the detailed basis for requesting and the method of calculating such compensation), for all reasonable losses, costs, expenses and liabilities (including, without limitation, any loss, cost, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Eurodollar Loans) which such Lender may sustain in connection with any of the following: (i) if for any reason (other than a default by such Lender or the Administrative Agent) a Borrowing of Eurodollar Loans does not occur on a date specified therefor in a Notice of Borrowing or a Notice of Continuation or Conversion (whether or not withdrawn by the Borrower or deemed withdrawn pursuant to Section 3.01(a)); (ii) if any repayment, prepayment, Conversion or Continuation of any Eurodollar Loan occurs on a date that is not the last day

of an Interest Period applicable thereto; (iii) if any prepayment of any of its Eurodollar Loans is not made on any date specified in a notice of prepayment given by the Borrower; (iv) as a result of an assignment by a Lender of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto pursuant to a request by the Borrower pursuant to Section 3.04(b); or (v) as a consequence of (y) any other default by the Borrower to repay or prepay any Eurodollar Loans when required by the terms of this Agreement or (z) an election made pursuant to Section 3.04(b). The written request of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such request within 10 days after receipt thereof.

Section 3.03    Net Payments.

(a)    Defined Terms.  For purposes of this Section 3.03, the term "applicable law" includes FATCA.

(b)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Credit Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)    Payment of Other Taxes by the Borrower.  The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    Indemnification by the Borrower.  The Credit Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.06(b) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall

be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this <u>Section 3.03</u>, such Credit Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g)     <u>Status of Lenders</u>.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 3.03(g)(ii)(A), (ii)(B) and (ii)(D)</u> below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Borrower,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 (or successor form) certifying that such Lender is exempt from U.S. federal backup withholding Tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN or W-8BEN-E, as applicable, (or successor form) establishing an

835477.60020
US_ACTIVE-139246328.5

exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E, as applicable, (as successor form) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)        executed originals of IRS Form W-8ECI (or successor form);

(3)        in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit K-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN or W-8BEN-E, as applicable (or successor form); or

(4)        to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY (or successor form), accompanied by IRS Form W-8ECI, IRS Form W-8BEN, W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit K-2 or Exhibit K-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit K-4 on behalf of each such direct and indirect partner;

(C)        any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)        if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA

and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(h)    Treatment of Certain Refunds.  If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.03 (including by the payment of additional amounts pursuant to this Section 3.03), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    Survival.  Each party's obligations under this Section 3.03 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 3.04    Change of Lending Office; Replacement of Lenders.

(a)    Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a)(ii) or (iii), 3.01(c) or 3.03 requiring the payment of additional amounts to the Lender, such Lender will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another Applicable Lending Office for any Loans or Commitments affected by such event; provided that, such designation is made on such terms that such Lender and its Applicable Lending Office suffer no economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If (i) any Lender requests any compensation, reimbursement or other payment under Section 3.01(a)(ii) or (iii) or 3.01(c) with respect to such Lender, (ii) the Borrower is, or because of a matter in existence as of the date that the Borrower is seeking to exercise its rights under this Section will be, required to pay any additional amount to any Lender or Governmental Authority pursuant to Section 3.03, or (iii) or if any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and

delegate, without recourse (in accordance with the restrictions contained in <u>Section 11.06(c)</u>), all its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations; provided that, (1) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not be unreasonably withheld or delayed, (2) such Lender shall have received payment of an aggregate amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts, including any breakage compensation under <u>Section 3.02</u> hereof), and (3) in the case of any such assignment resulting from a claim for compensation, reimbursement or other payments required to be made under <u>Section 3.01(a)(ii)</u> or <u>(iii)</u> or <u>Section 3.01(c)</u> with respect to such Lender, or resulting from any required payments to any Lender or Governmental Authority pursuant to <u>Section 3.03</u>, such assignment will result in a reduction in such compensation, reimbursement or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

(c)     Nothing in this <u>Section 3.04</u> shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in <u>Sections 3.01</u> or <u>3.03</u>.

ARTICLE IV

CONDITIONS PRECEDENT

Section 4.01     <u>Conditions Precedent at Closing Date</u>.  The obligation of the Lenders to make Loans is subject to the satisfaction of each of the following conditions on or prior to the Closing Date:

(i)     <u>Credit Agreement</u>.  This Agreement shall have been executed by the Borrower, the Administrative Agent and each of the Lenders.

(ii)     <u>Notes</u>.  The Borrower shall have executed and delivered to the Administrative Agent the appropriate Note or Notes for the account of each Lender that has requested the same.

(iii)     <u>Guaranty</u>.  The Guarantors shall have duly executed and delivered a Guaranty of Payment (the "<u>Guaranty</u>"), substantially in the form attached hereto as <u>Exhibit C</u>.

(iv)     <u>Final Order</u>.  The Final Order shall have been entered by the Bankruptcy Court in the Chapter 11 Cases and shall have been in form and substance satisfactory to the Administrative Agent and the Required Lenders in their reasonable discretion, and shall be in full force and effect and shall not have been vacated, stayed, revised, modified, or amended in any manner without the prior written consent of the Administrative Agent and the Required Lenders.

(v)     <u>Fees</u>.  The Borrower shall have (A) paid to the Administrative Agent, for the account of the Lenders, the Commitment Fees required to be paid by it pursuant to <u>Section 2.09(b)</u>, (B) paid to the Administrative Agent, for its own account, the fees required to be paid by it on the Closing Date pursuant to <u>Section 2.09(b)</u> and (C) paid or caused to be paid all reasonable fees and expenses of the Administrative Agent and of special counsel to the Administrative Agent that have been invoiced on or prior to the Closing Date in connection with the preparation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby.

(vi)     Corporate Resolutions and Approvals.  The Administrative Agent shall have received certified copies of the resolutions of the Board of Directors (or similar governing body) of each Credit Party approving the Loan Documents to which such Credit Party is or may become a party, and of all documents evidencing other necessary corporate or other organizational action, as the case may be, and governmental and third party consents and approvals, if any, with respect to the execution, delivery and performance by such Credit Party of Loan Transaction (including Hart-Scott Rodino clearance, if applicable) and the Loan Documents to which it is or may become a party and the expiration of all applicable waiting periods, all of which documents to be in form and substance satisfactory to the Administrative Agent.

(vii)    Incumbency Certificates.  The Administrative Agent shall have received a certificate of the Secretary or an Assistant Secretary of each Credit Party certifying the names and true signatures of the officers of such Credit Party authorized to sign the Loan Documents to which such Credit Party is a party and any other documents to which such Credit Party is a party that may be executed and delivered in connection herewith.

(viii)   Evidence of Insurance.  The Administrative Agent shall have (A) received certificates of insurance and other evidence satisfactory to it of compliance with the insurance requirements of this Agreement and (B) received endorsements naming the Administrative Agent, for the benefit of the Lenders, as an additional insured on the liability insurance policies of the Credit Parties and as a lenders loss payee on the property insurance policies of the Credit Parties.

(ix)     Financial Statements; Budget.  The Administrative Agent shall have received (A) the financial statements set forth in Section 5.07 and the Budget.

(x)      Closing Certificate.  The Administrative Agent shall have received a closing certificate in the form attached hereto as Exhibit D, dated as of the Closing Date, and executed by the Borrower.

(xi)     Proceedings and Documents.  All corporate and other proceedings and all documents incidental to the transactions contemplated hereby shall be satisfactory in substance and form to the Administrative Agent and the Administrative Agent and its special counsel shall have received all such counterpart originals or certified or other copies of such documents as the Administrative Agent or its special counsel may reasonably request.

(xii)    Intercompany Subordination Agreement.  The Credit Parties shall have duly executed and delivered the Intercompany Subordination Agreement.

(xiii)   Refinancing.  On the Closing Date, and substantially concurrently with the use of the Term Loans to refinance in part the Term Loans and the Delayed Draw Loans (as such terms are defined in the Pre-Petition Credit Agreement) under the Pre-Petition Credit Agreement on such date, and subject to the Final Order, all commitments under the Pre-Petition Credit Agreement shall have been terminated, and all letters of credit issued pursuant to the Pre-Petition Credit Agreement shall have been terminated and the Administrative Agent shall have received reasonably satisfactory evidence of the same.

(xiv)    No Material Adverse Change.  As of the Closing Date, no event, change or condition shall have occurred since the Petition Date that has had or could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

(xv)    <u>Patriot Act</u>.  The Administrative Agent shall have received, at least five Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer", beneficial ownership and anti-money laundering rules and regulations, including the USA Patriot Act.

(xvi)    <u>Notice of Borrowing</u>.  The Administrative Agent shall have received a Notice of Borrowing no later than 11:00 a.m. three (3) Business Days in advance of the Closing Date (or such later time or date as the Administrative Agent may agree).

Section 4.02    <u>Conditions Precedent to All Credit Events</u>.  Each Credit Event is subject, at the time thereof, to the satisfaction of all conditions set forth in <u>Section 4.01</u> plus the following conditions:

(a)    <u>Revolving Credit Exposure</u>.  Immediately after giving effect to any such Credit Event, the Aggregate Revolving Facility Exposure shall not exceed the Revolving Availability then in effect;

(b)    <u>Notice</u>.  The Administrative Agent shall have received, as applicable, (i) a Notice of Borrowing meeting the requirements of <u>Section 2.04(b)</u> with respect to any Borrowing (other than a Continuation or Conversion) or (ii) a Notice of Continuation or Conversion meeting the requirements of <u>Section 2.08(b)</u> with respect to a Continuation or Conversion.

(c)    <u>No Default; Representations and Warranties</u>.  At the time of each Credit Event and also after giving effect thereto, (i) there shall exist no Default or Event of Default and (ii) all representations and warranties of the Credit Parties contained herein or in the other Loan Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Credit Event, except to the extent that such representations and warranties expressly relate to an earlier specified date, in which case such representations and warranties shall have been true and correct in all material respects as of the date when made (except to the extent any such representation or warranty is qualified by "materiality or "Material Adverse Effect" or a similar term, in which case such representation and warranty shall be true and correct in all respects).

The acceptance of the benefits of (i) the Credit Events on the Closing Date shall constitute a representation and warranty by the Borrower to the Administrative Agent and each of the Lenders that all of the applicable conditions specified in <u>Section 4.01</u> have been satisfied as of the times referred to in such Section and (ii) each Credit Event thereafter shall constitute a representation and warranty by the Borrower to the Administrative Agent and each of the Lenders that all of the applicable conditions specified in <u>Section 4.02</u> have been satisfied as of the times referred to in such Section.

ARTICLE V

REPRESENTATIONS AND WARRANTIES

In order to induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans provided for herein, subject to the entry of the Orders and the terms thereof, the Borrower makes the following representations and warranties to the Administrative Agent and the Lenders, all of which shall survive the execution and delivery of this Agreement and each Credit Event:

Section 5.01    <u>Corporate Status</u>.  Each Credit Party (i) is a duly organized or formed and validly existing corporation, partnership or limited liability company, as the case may be, in good standing or in full force and effect under the laws of the jurisdiction of its formation and has the corporate, partnership

or limited liability company power and authority, as applicable, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage, and (ii) has duly qualified and is authorized to do business in all jurisdictions where it is required to be so qualified or authorized except where the failure to be so qualified would not have a Material Adverse Effect.

Section 5.02    Corporate Power and Authority.  (a) Each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Loan Documents to which it is party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is party and (b) each Credit Party has duly executed and delivered each Loan Document to which it is party and each Loan Document to which it is party constitutes the legal, valid and binding agreement and obligation of such Credit Party enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

Section 5.03    No Violation.   Neither the execution, delivery and performance by any Credit Party of the Loan Documents to which it is party nor compliance with the terms and provisions thereof (i) will contravene any provision of any law, statute, rule, regulation, order, writ, injunction or decree of any Governmental Authority applicable to such Credit Party or its properties and assets, (ii) will result in any breach of, any of the material terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (other than the Liens described in Section 2.15) upon any of the property or assets of such Credit Party pursuant to the terms of (A) any Material Contract, or (B) any other promissory note, bond, debenture, indenture, mortgage, deed of trust, credit or loan agreement, or any other agreement or other instrument, to which such Credit Party is a party or by which it or any of its property or assets are bound or to which it may be subject, or (iii) will violate any provision of the Organizational Documents of such Credit Party.

Section 5.04    Governmental Approvals.  No order, consent, approval, license, authorization, or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority is required to authorize or is required as a condition to (i) the execution, delivery and performance by any Credit Party of any Loan Document to which it is a party or any of its obligations thereunder, or (ii) the legality, validity, binding effect or enforceability of any Loan Document to which any Credit Party is a party, except the filing and recording of financing statements and other documents necessary in order to perfect the Liens created by the Security Agreement.

Section 5.05    Litigation.  There are no actions, suits, investigations or proceedings pending or to the knowledge of any Credit Party, threatened in writing with respect to any Credit Party or against any of their respective properties (i) that have had, or could reasonably be expected to have, a Material Adverse Effect, that are not subject to the automatic stay imposed pursuant to Section 362 of the Bankruptcy Code, or (ii) that question the validity or enforceability of any of the Loan Documents, or of any action to be taken by any Credit Party pursuant to any of the Loan Documents.

Section 5.06    Use of Proceeds; Margin Regulations.

(a)    The Debtors will use the proceeds of the Revolving Loans to finance ongoing working capital requirements of the Debtors and to pay for fees, costs, and expenses relating to the Chapter 11 Cases, each in accordance with this Agreement. Upon the Closing Date, the Debtors will use the proceeds of the Term Loans to pay in part the Term Loans and Delayed Draw Loans (each as defined in the Pre-Petition Credit Agreement) owing to the Lenders prior to the Petition Date under the Pre-Petition Credit Agreement.

835477.60020
US_ACTIVE-139246328.5

(b)     No part of the proceeds of any Credit Event will be used directly or indirectly to purchase or carry Margin Stock, or to extend credit to others for the purpose of purchasing or carrying any Margin Stock, in violation of any of the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System. No Credit Party is engaged in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. At no time would more than 25% of the value of the assets of the Borrower or of the Borrower and its consolidated Subsidiaries that are subject to any "arrangement" (as such term is used in Section 221.2(g) of such Regulation U) hereunder be represented by Margin Stock.

Section 5.07     Financial Statements.  The Borrower has furnished to the Administrative Agent and the Lenders complete and correct copies of: (i) the audited consolidated balance sheets of the Borrower and its consolidated Subsidiaries for the fiscal year ended December 31, 2016 and the related audited consolidated statements of income, shareholders' equity, and cash flows of the Borrower and its consolidated Subsidiaries for the fiscal year of the Borrower then ended, accompanied by the report thereon of Grant Thornton, LLP, and (ii) the interim consolidated balance sheet, and the related statements of income and of cash flows, of (1) the Borrower and its Subsidiaries for each fiscal quarter and fiscal month ended after December 31, 2017 and ending at least 45 days prior to the Closing Date. All such financial statements have been prepared in accordance with historic accounting practices, consistently applied (except as stated therein), and fairly present the financial position of the Borrower and its Subsidiaries, in each case, as of the respective applicable dates indicated and the consolidated results of their operations and cash flows for the respective periods indicated, subject in the case of any such financial statements that are unaudited, to normal audit adjustments. The Borrower and its Subsidiaries did not have, as of the date of the latest financial statements referred to above, and will not have as of the Closing Date after giving effect to the incurrence of Loans hereunder, any material or significant contingent liability or liability for taxes, long-term lease or unusual forward or long-term commitment that is not reflected in the foregoing financial statements or the notes thereto and that in any such case is material in relation to the business, operations, properties, assets, financial or other condition or prospects of the Borrower and its Subsidiaries.

Section 5.08     [Reserved].

Section 5.09     No Material Adverse Change.  Since the Petition Date, there has been no change in the condition, business, affairs or prospects of the Credit Parties taken as a whole, or their properties and assets considered as an entirety, except for: (a) changes none of which, individually or in the aggregate, has had or could reasonably be expected to have, a Material Adverse Effect or (b) changes which are consistent with the Budget and/or the sale milestones set forth in Section 6.21.

Section 5.10     Tax Returns and Payments.  Each Credit Party has filed all federal income tax returns and all other tax returns, domestic and foreign, required to be filed by it and has paid all taxes and assessments payable by it that have become due, other than those not yet delinquent and except for those contested in good faith or those for which extensions have been filed, including franchise taxes, which have not been paid. No Credit Party knows of any proposed assessment for additional federal, foreign or state taxes for any period, or of any basis therefor, which, individually or in the aggregate, taking into account such charges, accruals and reserves in respect thereof as the Borrower and its Subsidiaries have made, could reasonably be expected to have a Material Adverse Effect.

Section 5.11     Title to Properties, etc.  Each Credit Party has good and marketable title, in the case of Real Property, and good title (or valid Leaseholds, in the case of any leased property), in the case of all other property, to all of its properties and assets free and clear of Liens other than Permitted Liens. The interests of the Credit Parties and their Subsidiaries in the properties reflected in the most recent balance sheet referred to in Section 5.07, taken as a whole, were sufficient, in the judgment of the Credit

Parties, as of the date of such balance sheet for purposes of the ownership and operation of the businesses conducted by the Credit Parties and their Subsidiaries. Schedule 5.11 sets forth a complete list of Real Property owned and/or leased or subleased (as lessor or sublessor, lessee or sublessee) by the Credit Parties on the Closing Date.

Section 5.12    Lawful Operations, etc.  Each Credit Party and each of its Subsidiaries: (i) holds all necessary foreign, federal, state, local and other governmental licenses, registrations, certifications, permits and authorizations necessary to conduct its business and own its properties; and (ii) is in full compliance with all requirements imposed by law, regulation or rule, whether foreign, federal, state or local, that are applicable to it, its operations, or its properties and assets, including, without limitation, applicable requirements of Environmental Laws and Healthcare Laws, except for any failure to obtain and maintain in effect, or noncompliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.13    Environmental Matters.

(a)    Each Credit Party and each of their Subsidiaries is in compliance with all applicable Environmental Laws, except to the extent that any such failure to comply (together with any resulting penalties, fines or forfeitures) would not reasonably be expected to have a Material Adverse Effect. All licenses, permits, registrations or approvals required for the conduct of the business of each Credit Party and each of their Subsidiaries under any Environmental Law have been secured and each Credit Party and each of their Subsidiaries is in substantial compliance therewith, except for such licenses, permits, registrations or approvals the failure to secure or to comply therewith is not reasonably likely to have a Material Adverse Effect. No Credit Party nor any of their Subsidiaries has received written notice, or otherwise knows, that it is in any respect in noncompliance with, breach of or default under any applicable writ, order, judgment, injunction, or decree to which such Credit Party or such Subsidiary is a party or that would affect the ability of such Credit Party or such Subsidiary to operate any Real Property and no event has occurred and is continuing that, with the passage of time or the giving of notice or both, would constitute noncompliance, breach of or default thereunder, except in each such case, such noncompliance, breaches or defaults as would not reasonably be expected to, in the aggregate, have a Material Adverse Effect. There are no Environmental Claims pending or, to the best knowledge of any Credit Party, threatened wherein an unfavorable decision, ruling or funding would reasonably be expected to have a Material Adverse Effect. There are no facts, circumstances, conditions or occurrences on any Real Property now or at any time owned, leased or operated by the Credit Parties or their Subsidiaries or on any property adjacent to any such Real Property, that are known by the Credit Parties or as to which any Credit Party or any such Subsidiary has received written notice, that could reasonably be expected: (i) to form the basis of an Environmental Claim against any Credit Party or any of their Subsidiaries or any Real Property of a Credit Party or any of their Subsidiaries; or (ii) to cause such Real Property to be subject to any restrictions on the ownership, occupancy, use or transferability of such Real Property under any Environmental Law, except in each such case, such Environmental Claims or restrictions that individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect.

(b)    Hazardous Materials have not at any time been (i) generated, used, treated or stored on, or transported to or from, any Real Property of the Credit Parties or any of their Subsidiaries or (ii) released on or about any such Real Property, in each case where such occurrence or event is not in compliance with or could give rise to liability under Environmental Laws and is reasonably likely to have a Material Adverse Effect.

Section 5.14    Compliance with ERISA.  Compliance by the Credit Parties with the provisions hereof and Credit Events contemplated hereby will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code. The Credit Parties, their Subsidiaries and each ERISA

Affiliate (i) is in compliance with the minimum funding standards of ERISA and the Code with respect to each Plan that is not a Multi-Employer Plan or a Multiple Employer Plan, (ii) has satisfied all contribution obligations in respect of each Multi-Employer Plan and each Multiple Employer Plan, (iii) is in compliance in all material respects with all other applicable provisions of ERISA and the Code with respect to each Plan, and (iv) has not incurred any liability under Title IV of ERISA to the PBGC (other than for payment of premiums) with respect to any Plan. No Plan or trust created thereunder has been terminated, and there have been no Reportable Events, with respect to any Plan or trust created thereunder or with respect to any Multi-Employer Plan or Multiple Employer Plan, which termination or Reportable Event will or could give rise to a material liability of the Credit Parties or any ERISA Affiliate in respect thereof. No Credit Party nor any Subsidiary of a Credit Party nor any ERISA Affiliate is at the date hereof, or has been at any time within the five years preceding the date hereof, an employer required to contribute to any Multi-Employer Plan or Multiple Employer Plan, or a "contributing sponsor" (as such term is defined in Section 4001 of ERISA) in any Multi-Employer Plan or Multiple Employer Plan. No Credit Party nor any Subsidiary of a Credit Party nor any ERISA Affiliate has any material contingent liability with respect to any post-retirement "welfare benefit plan" (as such term is defined in ERISA) except as has been disclosed to the Administrative Agent and the Lenders in writing.

Section 5.15    Intellectual Property, etc.   Each Credit Party and each of its Subsidiaries has obtained or has the right to use all patents, trademarks, service marks, trade names, copyrights, licenses and other rights with respect to the foregoing necessary for the present and planned future conduct of its business, without any known conflict with the rights of others, except for such patents, trademarks, service marks, trade names, copyrights, licenses and rights, the loss of which, and such conflicts that, in any such case individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect. As of the Closing Date, Schedule 5.15 sets forth a complete list of all material licenses, trade names and service marks and all registered patents, trademarks and copyrights.

Section 5.16    Investment Company Act, etc.   No Credit Party nor any of its Subsidiaries is subject to regulation with respect to the creation or incurrence of Indebtedness under the Investment Company Act of 1940, as amended, the Federal Power Act, as amended or any applicable Federal or state public utility law.

Section 5.17    Insurance.   The Credit Parties and their Subsidiaries maintain insurance coverage by such insurers and in such forms and amounts and against such risks as are generally consistent with industry standards and in each case in compliance with the terms of Section 6.03.   Schedule 5.17 sets forth a complete list of all insurance maintained by the Credit Parties on the Closing Date.

Section 5.18    Burdensome Contracts; Labor Relations.   No Credit Party nor any of its Subsidiaries (a) is subject to any burdensome contract, agreement, corporate restriction, judgment, decree or order, (b) is a party to any labor dispute affecting any bargaining unit or other group of employees generally, (c) is subject to any strike, slowdown, workout or other concerted interruptions of operations by employees of a Credit Party or any Subsidiary, whether or not relating to any labor contracts, (d) is subject to any pending or, to the knowledge of any Credit Party, threatened, unfair labor practice complaint, before the National Labor Relations Board, (e) is subject to any pending or, to the knowledge of any Credit Party, threatened grievance or arbitration proceeding arising out of or under any collective bargaining agreement, (f) is subject to any pending or, to the knowledge of any Credit Party, threatened significant strike, labor dispute, slowdown or stoppage, or (g) is, to the knowledge of the Credit Parties, involved or subject to any union representation organizing or certification matter with respect to the employees of the Credit Parties or any of their Subsidiaries, except (with respect to any matter specified in any of the above clauses) for such matters as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any of its Subsidiaries has suffered any strikes, walkouts or work stoppages in the five years preceding the Closing Date.

Section 5.19    Orders.  The Final Order is effective to create, in favor of the Administrative Agent, for the benefit of the Lenders, a legal, valid, binding, and enforceable perfected security interest in the Collateral and the proceeds and products thereof without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents.

Section 5.20    True and Complete Disclosure.  The factual information (taken as a whole) heretofore or contemporaneously furnished by or on behalf of any Credit Party to the Administrative Agent or any Lender for purposes of or in connection with this Agreement or any transaction contemplated herein, is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of such Person in writing to the Administrative Agent or any Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any material fact necessary to make such information (taken as a whole) not misleading at such time in light of the circumstances under which such information was provided, except that the Budget and any information consisting of financial projections prepared by any Credit Party or any Subsidiary is only represented herein as being based on good faith estimates and assumptions believed by such persons to be reasonable at the time made.

Section 5.21    Defaults.  No Default or Event of Default exists as of the Closing Date hereunder, nor will any Default or Event of Default begin to exist immediately after the execution and delivery hereof.

Section 5.22    Capitalization.  As of the Closing Date, Schedule 5.22 sets forth a true, complete and accurate description of the equity capital structure of the Borrower and each of its Subsidiaries showing, for each such Person, accurate ownership percentages of the equityholders of record and accompanied by a statement of authorized and issued Equity Interests for each such Person. Except as set forth on Schedule 5.22, as of the Closing Date (a) there are no preemptive rights, outstanding subscriptions, warrants or options to purchase any Equity Interests of any Credit Party, (b) there are no obligations of any Credit Party to redeem or repurchase any of its Equity Interests and (c) there is no agreement, arrangement or plan to which any Credit Party is a party or of which any Credit Party has knowledge that could directly or indirectly affect the capital structure of any Credit Party. The Equity Interests of each Credit Party described on Schedule 5.22 (i) are validly issued and fully paid and non-assessable (to the extent such concepts are applicable to the respective Equity Interests) and (ii) are owned of record and beneficially as set forth on Schedule 5.22, free and clear of all Liens (other than Liens described in Section 2.15).

Section 5.23    Healthcare Law Compliance.  Each Credit Party and each Subsidiary of each Credit Party is and will remain in compliance in all material respects with all Healthcare Laws. Each Credit Party and each Subsidiary of a Credit Party has maintained in all material respects all records required to be maintained by The Joint Commission (to the extent such entity currently maintains accreditation of such Credit Party or Subsidiary), the Food and Drug Administration, Drug Enforcement Agency and State Boards of Pharmacy and, to the knowledge of each Credit Party and each Subsidiary, there are no presently existing circumstances which would result or likely would result in material violations of the Healthcare Laws. Each Credit Party and each Subsidiary has such permits, licenses, franchises, certificates and other approvals or authorizations of governmental or regulatory authorities as are necessary under applicable law to own their respective properties and to conduct their respective business (including without limitation such permits as are required under such federal, state and other health care laws, and under such HMO or similar licensure laws and such insurance laws and regulations, as are applicable thereto).

Section 5.24    Anti-Terrorism and Anti-Money Laundering Law Compliance.  Each Credit Party and each Subsidiary of each Credit Party is and will remain in compliance in all material respects

with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control, and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it. No Credit Party and no Subsidiary or Affiliate of a Credit Party (i) is a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is controlled by (including without limitation by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law. The Credit Parties, each of their Subsidiaries and each of their Affiliates are in compliance with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations. No part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

The Borrower hereby covenants and agrees that on the Closing Date and thereafter so long as this Agreement is in effect and until such time as the Commitments have been terminated, no Notes remain outstanding and the Loans, together with interest, Fees and all other Obligations incurred hereunder and under the other Loan Documents, have been paid in full, as follows:

Section 6.01    Reporting Requirements.  The Borrower will furnish to the Administrative Agent and each Lender:

(a)    Daily Cash/Liquidity Report.  Beginning on the Closing Date, and continuing every Business Day thereafter, a daily cash/liquidity report setting forth cash on hand on an aggregate basis.

(b)    Weekly Volume Report.  Beginning on _____, 2018, and continuing on every first Business Day of every week thereafter, a volume report setting forth the amount of patients, in the aggregate and broken down by facility, treated by the Debtors in the immediately preceding week.

(c)    Bi-Weekly Budget Variance Report.  Beginning on _____, 2018, and continuing on every other Wednesday thereafter (by Noon Eastern Time), a budget variance report (a "Budget Variance Report") comparing (a) actual cash receipts and cash disbursements (excluding debt service, professional fees, adequate protection, U.S. Trustee fees and capital expenditures) for the time period commencing on the Petition Date and ending on the Friday preceding the delivery of the Budget Variance Report to projected cash receipts and cash disbursements for the same period contained in the Budget; (b) the actual cash balance (after adding back any debt service, professional fees, adequate protection, U.S. Trustee fees and capital expenditures) on the Friday preceding the delivery of the Budget Variance Report to the projected cash balance (after adding back any debt service, professional fees,

adequate protection, U.S. Trustee fees and capital expenditures) on the Friday preceding the delivery of the Budget Variance Report;  (c) actual debt service, professional fees, adequate protection, and U.S. Trustee fees (on an individual basis) for the time period commencing on the Petition Date and ending on the Friday preceding the delivery of the Budget Variance Report to projected debt service, professional fees, adequate protection, and US Trustee fees (on an individual basis) for the same period contained in the Budget; and (d) actual capital expenditures for the two week time period ending on the Friday preceding the delivery of the Budget Variance Report to projected capital expenditures for the same time period contained in the Budget.  To the extent that: (x) the actual cash disbursements (excluding debt service, professional fees, adequate protection, U.S. Trustee fees and capital expenditures) exceed the projected cash disbursements in the Budget by more than the Permitted Disbursements Variance or (y) the actual cash receipts are less than the projected cash receipts by more than the Permitted Receipts Variance, the Budget Variance Report shall also include a detailed explanation regarding the reason that the Debtors failed to comply with the terms of the Budget.  To the extent not described in the Final Order, the Budget Variance Reports shall also include the reporting provided by the Debtors to the Pre-Petition Administrative Agent as part of its weekly pre-petition "flash reporting"

(d)     Budgets.  (i) Within five (5) Business Days of the end of the immediately preceding month, an updated Budget reasonably acceptable to the Administrative Agent extending the existing Budget so that it covers the upcoming thirteen-week period (along with continuing to show/compare budget and actual performance for all prior weeks); (ii) Within five (5) Business Days of the sale of any Debtor's business or principal operations, a revised Budget reasonably acceptable to the Administrative Agent restating the following thirteen week period, in light of such sale; and (iii) Within five (5) Business Days of the sale of all or substantially all of the Debtors' businesses or assets, a revised Budget reasonably acceptable to the Administrative Agent covering the time period from such sale until the effective date of any Acceptable Bankruptcy Plan.

(e)     End of Month Report.  Beginning on August 20, 2018, and continuing on the twentieth (20th) day of each month thereafter, an end-of-month report as of the end of the immediately preceding month that details: (i) accounts receivable balances; (ii) the aging of accounts receivable; (iii) a listing of all deposits and prepaid items requested or posted; (iv) accrued liabilities as of the preceding month, setting forth (without limitation) accounts payable detail and all other material unpaid post-bankruptcy liabilities (excluding professional fees) and (v) such other financial information as reasonably requested by the Administrative Agent.

(f)     Monthly Operating Reports.  On the date the Borrower's monthly operating reports are filed with the Bankruptcy Court, a copy of such reports.

(g)     Notices.  Promptly, and in any event within two Business Days, after the Borrower determines that it has likely occurred, notice of:

(A)     the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(B)     the commencement of, or any other material development concerning, any litigation or governmental or regulatory proceeding pending or investigation against any Credit Party or any Subsidiary or the occurrence of any other event, if the same could be reasonably likely to have a Material Adverse Effect;

(C)     any amendment or waiver of the terms of, or notice of default under, the Subordinated Debt Documents; or

(D)        any event that could reasonably be expected to have a Material Adverse Effect.

(h)        ERISA.  Promptly, and in any event within 10 Business Days after any Credit Party or any Subsidiary of a Credit Party or any ERISA Affiliate knows of the occurrence of any ERISA Event, the Borrower will deliver to the Administrative Agent and each of the Lenders a certificate of an Authorized Officer of the Borrower setting forth the full details as to such occurrence and the action, if any, that such Credit Party or such Subsidiary of such Credit Party or such ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given by such Credit Party or such Subsidiary of such Credit Party or the ERISA Affiliate to or filed with the PBGC, a Plan participant or the Plan administrator with respect thereto.

(i)        [Reserved].

(j)        [Reserved].

(k)        [Reserved].

(l)        [Reserved].

(m)        [Reserved].

(n)        Other Notices.  Promptly after the transmission or receipt thereof, as applicable, copies of all notices received or sent by any Credit Party to or from the holders of any Material Indebtedness or any trustee with respect thereto.

(o)        Violation of Anti-Terrorism Laws.  Promptly (i) if any Credit Party obtains knowledge that any Credit Party or any Person that owns, directly or indirectly, any Equity Interests of any Credit Party, or any other holder at any time of any direct or indirect equitable, legal or beneficial interest therein is the subject of any of the Anti-Terrorism Laws, such Credit Party will notify the Administrative Agent and (ii) upon the request of the Administrative Agent or any Lender (through the Administrative Agent), such Credit Party will provide any information the Administrative Agent or such Lender believes is reasonably necessary to be delivered to comply with the USA Patriot Act.

(p)        Mandatory Prepayments.  Promptly, and in any event within three Business Days, the Borrower shall provide the Administrative Agent with notice of any event or action resulting in a mandatory repayment under Section 2.11(b).

(q)        Other Information.  Promptly upon the reasonable request therefor (and in any events within 10 Business Days after such request), such other information or documents (financial or otherwise) relating to any Credit Party or any Subsidiary as the Administrative Agent or any Lender (through the Administrative Agent) may reasonably request from time to time.

Section 6.02        Books, Records and Inspections.  Each Credit Party will, and will cause each of its Subsidiaries to, (i) keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of such Credit Party or such Subsidiary, as the case may be, in accordance with historical accounting practices; and (ii) upon reasonable advance notice and during regular business hours, permit officers and designated representatives of the Administrative Agent or any of the Lenders to visit and inspect any of the properties or assets of such Credit Party and/or its Subsidiaries in whomsoever's possession (but only to the extent such Credit Party or such Subsidiary, as applicable, has the right to do so to the extent in the possession of another Person), to examine the books of account of such Credit Party or such Subsidiary, as applicable, and make copies

thereof and take extracts therefrom, and to discuss the affairs, Finances and accounts of such Credit Party and/or such Subsidiary, as applicable, with, and be advised as to the same by, its and their officers and independent accountants and independent actuaries, if any, all at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or any of the Lenders (through the Administrative Agent) may request.

Section 6.03    <u>Insurance</u>.

(a)    Each Credit Party will, and will cause each of its Subsidiaries to, (i) maintain insurance coverage by such insurers and in such forms and amounts and against such risks as are generally consistent with the insurance coverage maintained by the Credit Parties and their Subsidiaries as of the Closing Date, and (ii) forthwith upon the Administrative Agent's or any Lender's written request, furnish to the Administrative Agent or such Lender such information about such insurance as the Administrative Agent or such Lender may from time to time reasonably request, which information shall be prepared in form and detail satisfactory to the Administrative Agent or such Lender and certified by an Authorized Officer of the Borrower.

(b)    Each Credit Party will at all times keep its respective property that is subject to the Liens described in <u>Section 2.15</u> insured in favor of the Administrative Agent, for the benefit of the Lenders and all policies or certificates (or certified copies thereof) with respect to such insurance (and any other insurance maintained by the Credit Parties) (i) shall be endorsed to the Administrative Agent's satisfaction for the benefit of the Administrative Agent (including, without limitation, by naming the Administrative Agent as loss payee (with respect to Collateral) or, to the extent permitted by applicable law, as an additional insured), (ii) shall state that such insurance policies shall not be canceled without 30 days' prior written notice thereof (or 10 days' prior written notice in the case of cancellation for the non-payment of premiums) by the respective insurer to the Administrative Agent, (iii) shall provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Administrative Agent and the Lenders, and (iv) shall in the case of any such certificates or endorsements in favor of the Administrative Agent, be delivered to or deposited with the Administrative Agent.

(c)    If any Credit Party shall fail to maintain any insurance in accordance with this <u>Section 6.03</u>, or if any Credit Party shall fail to so endorse and deliver or deposit all endorsements or certificates with respect thereto, the Administrative Agent shall have the right (but shall be under no obligation) to procure such insurance and the Borrower agrees to reimburse the Administrative Agent on demand for all costs and expenses of procuring such insurance.

Section 6.04    <u>Payment of Taxes and Claims</u>.  Subject to Bankruptcy Code limitations, each Credit Party will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims that, if unpaid, might become a Lien or charge upon any properties of any Credit Party or any of their respective Subsidiaries; provided that, no Credit Party nor any of their respective Subsidiaries shall be required to pay any such tax, assessment, charge, levy or claim for which extensions have been filed, including franchise taxes, which have not been paid or that is otherwise being contested in good faith and by proper proceedings if (i) it has maintained adequate reserves with respect thereto in accordance with GAAP and (ii) in the case of a tax or claim that has or may become a Lien against any of the Collateral, such proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such tax or claim. Without limiting the generality of the foregoing, each Credit Party will, and will cause each of its Subsidiaries to, pay in full all of its wage obligations in accordance with the Fair Labor Standards Act (29 U.S.C. Sections 206-207), with respect to its employees subject thereto, and any comparable provisions of applicable law.

835477.60020
US_ACTIVE-139246328.5

Section 6.05    <u>Corporate Franchises</u>.  Each Credit Party will do, and will cause each of its Subsidiaries to do, or cause to be done, all things necessary to preserve and keep in full force and effect its corporate existence, rights and authority, qualification, franchises, privileges, licenses, permits and governmental approvals and authorizations; provided that, nothing in this <u>Section 6.05</u> shall be deemed to prohibit any transaction permitted by <u>Section 7.02</u>.

Section 6.06    <u>Good Repair</u>.  Each Credit Party will, and will cause each of its Subsidiaries to, ensure that its material properties and equipment used or useful in its business in whomsoever's possession they may be, are kept in reasonably good repair, working order and condition, normal wear and tear excepted, and that from time to time there are made in such properties and equipment all needful and proper repairs, renewals, replacements, extensions, additions, betterments and improvements thereto, in each case, to the extent and in the manner customary for companies in similar businesses.

Section 6.07    <u>Compliance with Statutes, etc</u>.  Each Credit Party will, and will cause each of its Subsidiaries to, comply with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property, including all applicable Environmental Laws and Healthcare Laws, other than those the noncompliance with which would not individually or in the aggregate be reasonably expected to have a Material Adverse Effect. Borrower will, in its reasonable business judgment, maintain in effect and enforce policies and procedures designed to ensure compliance, in all material respects, by Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and anti-money laundering rules and regulations applicable to the Credit Parties and their Subsidiaries.

Section 6.08    <u>Compliance with Environmental Laws</u>.  Without limitation of the covenants contained in <u>Section 6.07</u>:

(a)    Each Credit Party will comply, and will cause each of its Subsidiaries to comply, with all Environmental Laws applicable to the ownership, lease or use of all Real Property now or hereafter owned, leased or operated by such Credit Party or any of its Subsidiaries, and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, except to the extent that such compliance with Environmental Laws is being contested in good faith and by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP, and the reasonably likely outcome in such proceedings could not reasonably be expected to have a Material Adverse Effect.

(b)    Each Credit Party will keep or cause to be kept, and will cause each of its Subsidiaries to keep or cause to be kept, all such Real Property free and clear of any Liens imposed pursuant to such Environmental Laws other than Permitted Liens.

(c)    No Credit Party nor any of its Subsidiaries will generate, use, treat, store, release or dispose of, or permit the generation, use, treatment, storage, release or disposal of, Hazardous Materials on any Real Property now or hereafter owned, leased or operated by the Credit Parties or any of their Subsidiaries or transport or permit the transportation of Hazardous Materials to or from any such Real Property other than in compliance with applicable Environmental Laws and in the ordinary course of business, except to the extent that any noncompliance with Environmental Laws is being contested in good faith and by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP, and the reasonably likely outcome in such proceedings could not reasonably be expected to have a Material Adverse Effect.

(d)    If required to do so under any applicable order of any Governmental Authority, each Credit Party will undertake, and cause each of its Subsidiaries to undertake any clean up, removal,

remedial or other action necessary to remove and clean up any Hazardous Materials from any Real Property owned, leased or operated by the Credit Parties or any of their Subsidiaries in accordance with, in all material respects, the requirements of all applicable Environmental Laws and in accordance with, in all material respects, such orders of all Governmental Authorities, except to the extent that such Credit Party or such Subsidiary contesting such order in good faith and by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP, and the reasonably likely outcome in such proceedings could not reasonably be expected to have a Material Adverse Effect.

Section 6.09     Further Assurances.  The Credit Parties will, and will cause each of their respective Subsidiaries to, at the expense of the Borrower, make, execute, endorse, acknowledge, file and/or deliver to the Administrative Agent from time to time such conveyances, financing statements, transfer endorsements, powers of attorney, certificates, and other assurances or instruments and take such further steps relating to the Collateral covered by any of the Liens described in Section 2.15 as the Administrative Agent may reasonably require, including any documents, instruments and filings required by the Assignment of Claims Act of 1940.

Section 6.10     Material Contracts.  Except as otherwise excused by or rejected in accordance with the Bankruptcy Code, each Credit Party will perform and observe in all material respects all the terms and provisions of each Material Contract to be performed or observed by it, and no Credit Party will take any action that would cause any such Material Contract to not be in full force and effect, and cause each of its Subsidiaries to do so except, in each case, where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 6.11     Senior Debt.  The Obligations shall, and the Credit Parties shall take all necessary action to ensure that the Obligations shall, at all times rank prior in right of payment, to the extent set forth in the applicable subordination agreement, to the Subordinated Indebtedness.

Section 6.12     Subordination.  Each Credit Party shall cause all Indebtedness and other obligations now or hereafter owed by it to any of its Affiliates (other than, in the case of management of the Credit Parties, payroll obligations) to be subordinated in right of payment and security to the Indebtedness and other Obligations owing to the Administrative Agent and the Lenders in accordance with the Intercompany Subordination Agreement or another subordination agreement in form and substance reasonably satisfactory to the Administrative Agent.

Section 6.13     [Reserved].

Section 6.14     Use of Proceeds.  The Borrower will use the proceeds of the Loans only for the purposes set forth in Section 5.06.

Section 6.15     Monitoring of Expenses.  Notwithstanding any Bankruptcy Court authorization to pay "critical vendors", prior to making such payment, the Borrower shall implement procedures, which shall be acceptable to the Lenders in their sole discretion, for monitoring and controlling the Credit Parties' compliance with the Budget, which shall include, without limitation, implementation of protocols by the Borrower's financial advisors, which protocols shall include training and implementation of standards for paying expenses in accordance with the Budget.

Section 6.16     Budget Compliance.

(a)     The Debtors shall comply with the Budget such that as of the end of every other week (beginning with the week ending June __, 2018): (i) the aggregate amount of all disbursements (exclusive of debt service, professional fees, adequate protection, U.S. Trustee's fees and capital

expenditures) actually paid by the Debtors from the Petition Date through the end of such reporting period is not more than 105% (the "Permitted Disbursement Variance") of the aggregate, cumulative disbursements (exclusive of debt service, professional fees, adequate protection, U.S. Trustee's fees and capital expenditures) set forth in the Budget for such period; (ii) the aggregate amount of all cash receipts received by the Debtors from the Petition Date through the end of such reporting period is not less than 90% (the "Permitted Receipts Variance") of the total cash receipts projected in the Budget for such period; (iii) the actual cash balance (after adding back any debt service, professional fees, adequate protection, U.S. Trustee fees and capital expenditures) on the Friday preceding the delivery of the Budget Variance Report is not more than $1,100,000 less than the projected cash balance (after adding back any debt service, professional fees, adequate protection, U.S. Trustee fees and capital expenditures) on the Friday preceding the delivery of the Budget Variance Report; and (iv) the aggregate amount of capital expenditures for the two-week reporting period then ended does not exceed the amount of capital expenditures set forth in the Budget for such period, unless the Debtors have obtained prior written approval from the Administrative Agent.

(b)     Measurement.  The Budget compliance covenants set forth in this Section shall be measured by the Administrative Agent upon the Administrative Agent's receipt of the bi-weekly Budget Variance Report required to be delivered by the Borrower pursuant to Section 6.01(c).

Section 6.17     Financial Consultant.  The Borrower shall employ (and continue to employ) a financial consultant/crisis management firm acceptable to the Administrative Agent and upon terms and conditions acceptable to the Administrative Agent, including permitting such firm to assist the Borrower with the ongoing operation and restructuring of its business.

Section 6.18     Final Order.  The Credit Parties shall comply with all the terms and conditions of the Final Order, as it may be modified from time to time with the approval of the Bankruptcy Court, the Administrative Agent, and the Required Lenders.

Section 6.19     [Reserved].

Section 6.20     First and Second Day Orders.  The Debtors shall cause all proposed First Day Orders, "second day" orders, and all other orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement and reasonably  acceptable to the Administrative Agent in all respects; it being understood and agreed that the forms of orders approved by the Administrative Agent prior to the Petition Date are in accordance with and permitted by the terms of this Agreement in all respects and are reasonably acceptable and any orders that provide for the termination of the Revolving Commitments and the Term Loan Commitments and the indefeasible repayment in full of the Obligations are reasonably acceptable.

Section 6.21     Chapter 11 Sale Milestones.

(a)     Sale/Bidding Procedures Motion.  On the Petition Date the Debtors shall have filed and properly served a motion, in form and substance satisfactory to the Pre-Petition Administrative Agent, the Administrative Agent, the Secured Creditors, and the Lenders, in the Chapter 11 Cases (the "Sale/Bidding Procedures Motion") seeking the Bankruptcy Court's approval of: (i) the sale of all or substantially all of the Debtors' assets relating to the Debtors' Freestanding Emergency Room business through one or more transactions and (ii) bidding procedures acceptable to the Pre-Petition Administrative Agent, the Administrative Agent, the Secured Creditors, and the Lenders in their sole discretion for the sale of all or substantially all of the Debtors' assets relating to the Debtors' Freestanding Emergency Room business, pursuant to Section 363 and Section 365 of the Bankruptcy Code.  The terms

of each such sale transaction shall be acceptable to the Administrative Agent and the Pre-Petition Administrative Agent in their sole discretion.

(b)     Bidding Procedures Order.  Within 21 days after the Petition Date, unless the Pre-Petition Administrative Agent, Required Lenders (as defined in the Pre-Petition Credit Agreement and herein called the "Pre-Petition Required Lenders")), the Administrative Agent and the Required Lenders (which shall mean the "Required Lenders", as defined in this Agreement) agree otherwise, the Court shall have entered a sales procedures order (the "Bidding Procedures Order") approving the bidding procedures contained in the Sale/Bidding Procedures Motion, which Bidding Procedures Order (including the bidding procedures approved therein) shall be acceptable to the Pre-Petition Administrative Agent, Pre-Petition Required Lenders, Administrative Agent and Required Lenders in their sole discretion.  The Bidding Procedures Order shall not be amended, modified, supplemented or waived by the Debtors without the written consent of the Pre-Petition Administrative Agent, Pre-Petition Required Lenders, Administrative Agent and Required Lenders.

(c)     Bid Due Date.  Within 45 days after the Petition Date, unless the Pre-Petition Administrative Agent, Pre-Petition Required Lenders, Administrative Agent and Required Lenders agree otherwise, all qualified bids (which bids, among other things, shall not contain any financing or diligence conditions) shall be due.

(d)     Auction.  Within 60 days after the Petition Date, unless the Pre-Petition Administrative Agent, Pre-Petition Required Lenders, Administrative Agent and Required Lenders agree otherwise, the Debtors shall have held and completed an auction in accordance with the provisions of the Bidding Procedures Order, and shall have selected for approval by the Court, at a sale hearing to be held in accordance with the Bidding Procedures Order, the highest and otherwise best bid(s) for the applicable assets made by any bidder(s) at the auction, (each such highest and otherwise best bid, a "Winning Bid").  No bid that fails to provide for irrevocable payment in full in cash of all of the Obligations and the Secured Claim (as defined in the Orders) at closing shall constitute, or be eligible to constitute, a Winning Bid unless such bid is acceptable to the Pre-Petition Administrative Agent, Pre-Petition Required Lenders, Administrative Agent and Required Lenders in their respective sole discretion.

(e)     Sale Approval Order.  Within 70 days after the Petition Date, unless the Pre-Petition Administrative Agent, Pre-Petition Required Lenders, Administrative Agent and Required Lenders agree otherwise, the Court shall have entered one or more orders (the "Sale Approval Order") approving the Winning Bid(s), the transaction or transactions contemplated by the Winning Bid(s) (each, an "Approved Transaction," and the terms and conditions of the Approved Transaction and the documents evidencing or otherwise relating to each Approved Transaction, the "Approved Transaction Documents"), which Sale Approval Order and Approved Transaction(s) shall be in form and substance acceptable to the Pre-Petition Administrative Agent, Pre-Petition Required Lenders, Administrative Agent and Required Lenders in their sole discretion.

(f)     Sale Closing.  On or before the date that is sixty (60) days after the entry of the Sale Approval Order, unless the Pre-Petition Administrative Agent, Pre-Petition Required Lenders, Administrative Agent and Required Lenders agree otherwise, Debtors shall have executed all Approved Transaction Documents and the Approved Transaction(s) shall have been consummated.  The Approved Transaction Documents shall be in form and substance acceptable to the Pre-Petition Administrative Agent, Pre-Petition Required Lenders, Administrative Agent and Required Lenders in their sole discretion.

(g)     Remaining Assets.  With respect to any assets relating to the Debtors' Freestanding Emergency Room business that are not sold pursuant to any Approved Transaction, unless

the Pre-Petition Administrative Agent, Pre-Petition Required Lenders, Administrative Agent and Required Lenders agree otherwise, the Debtors shall use commercially reasonable efforts to sell, liquidate or otherwise dispose of such assets on terms and conditions and pursuant to a timeline to be agreed upon by the Debtors, the Pre-Petition Administrative Agent, Pre-Petition Required Lenders, Administrative Agent and Required Lenders.

(h)    Twice Weekly Calls.  At the request of the Administrative Agent on a twice weekly basis (or more frequently as reasonably requested by the Administrative Agent) from and after the date hereof, management of the Debtors and the Investment Bankers shall conduct a telephonic meeting to be attended by the respective management representatives of the Debtors and the Administrative Agent and their respective representatives.  At such telephonic meeting, the Debtors and the Investment Bankers shall present an update on the sale process (including an assessment of any proposed sale transaction or any indication of interest or other offer from any prospective purchaser).

(i)    Until such time as the Obligations are indefeasibly paid in full, the Debtors shall continue to retain one or more investment bankers reasonably acceptable to the Administrative Agent and Required Lenders (collectively, the "Investment Bankers") on terms and conditions acceptable to the Administrative Agent and Required Lenders in their sole discretion, to assist the Debtors to sell their respective assets and businesses, and no proceeds of the Collateral (as defined in the Orders and herein called the "Pre-Petition Collateral")), the Collateral, or the proceeds of the Loans may be used to pay, and the Carve-Out shall not include, any fees and expenses of any investment banker or other financial advisor retained by any Debtor unless the Administrative Agent and Required Lenders have consented in writing to the terms and conditions of such retention.  Additionally, the Debtors shall authorize and direct the Investment Bankers, upon the request of the Administrative Agent: (i) to fully and promptly disclose to the Administrative Agent, and its advisors, all material documents, information and developments in connection with the efforts of the Debtors and/or the Investment Bankers to market and sell the Pre-Petition Collateral and/or the Collateral; and (ii) to regularly consult with, and promptly respond to the inquiries of, the Administrative Agent and its advisors, in connection with any sale transaction, the marketing and sale process relating thereto, and any and all other matters relating to the affairs, finances and business of the Debtors, the assets and capital stock of the Debtors, and the Investment Bankers' activities related to any and all of the foregoing.


ARTICLE VII

NEGATIVE COVENANTS

Each of the Borrower and the Subsidiaries hereby covenants and agrees that on the Closing Date and thereafter for so long as this Agreement is in effect and until such time as the Commitments have been terminated, no Notes remain outstanding and the Loans, together with interest, Fees and all other Obligations incurred hereunder and under the other Loan Documents, have been paid in full as follows:

Section 7.01    Changes in Business.  No Credit Party nor any of its Subsidiaries will engage in any business other than the businesses engaged in by the Credit Parties and its Subsidiaries on the Closing Date and any other business reasonably related thereto.  NPG will not engage in any business other than the provision of physicians to practice at the Operating Companies.

Section 7.02    Consolidation, Merger, Acquisitions, Asset Sales, etc.  No Credit Party will, nor will any Credit Party permit any of its Subsidiaries to, (i) wind up, liquidate or dissolve its affairs, (ii) enter into any transaction of merger or consolidation, (iii) make or otherwise effect any Acquisition, (iv)

effect any Asset Sale or (v) have any Subsidiary not existing on the Closing Date, except that, each of the following shall be permitted:

 (a) [reserved];

 (b) [reserved];

 (c) any Asset Sale approved by the Bankruptcy Court and consented to by the Administrative Agent and the Required Lenders;

 (d) any transaction permitted pursuant to Section 7.05; and

 (e) any winding up, liquidation, dissolution, merger, consolidation or amalgamation approved by the Bankruptcy Court and consented to by the Administrative Agent and the Required Lenders.

 Section 7.03 Liens.  No Credit Party will, nor will any Credit Party permit its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets of any kind of such Credit Party or such Subsidiary whether now owned or hereafter acquired, except that the foregoing shall not apply to:

 (a) any Standard Permitted Lien;

 (b) Liens in existence on the Petition Date that are listed in Schedule 7.03 hereto; and

 (c) any Lien granted to the Administrative Agent securing any of the Obligations or any other Indebtedness of the Credit Parties under the Loan Documents.

 Section 7.04 Indebtedness.  No Credit Party will, nor will any Credit Party permit any of its Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness of the Credit Parties or any of their respective Subsidiaries, except:

 (a) Indebtedness incurred under this Agreement and the other Loan Documents;

 (b) the Indebtedness existing on the Petition Date and set forth on Schedule 7.04 hereto;

 (c) [Reserved];

 (d) any intercompany loans made by the Borrower or any Subsidiary of the Borrower to any Credit Party, provided that such intercompany loans are subject to the Intercompany Subordination Agreement;

 (e) [Reserved];

 (f) Indebtedness constituting Guaranty Obligations permitted by Section 7.05;

 (g) Indebtedness under the Permitted Notes, in each case, as in effect on May 9, 2017, but only so long as the Permitted Note Subordination Agreement shall remain in full force and effect; and

(h)     Indebtedness arising from agreements of any Credit Party or any of their Subsidiaries providing for indemnification, adjustment of purchase price, working capital adjustments or similar adjustments (including earn-out obligations), in each case, incurred or assumed in connection with any Asset Sale or Investment permitted under this Agreement (any such obligations, "Deferred Acquisition Obligations"), provided that, so long as no Event of Default exists and is continuing at the time of incurrence of such Indebtedness or would result therefrom, payment of such Deferred Acquisition Obligations shall be permitted.

Section 7.05     Investments and Guaranty Obligations.  No Credit Party will, nor will any Credit Party permit any of its Subsidiaries to, directly or indirectly, (i) make or commit to make any Investment or (ii) be or become obligated under any Guaranty Obligations, except:

(a)     Investments by the Borrower or any of its Subsidiaries in cash and Cash Equivalents;

(b)     any endorsement of a check or other medium of payment for deposit or collection, or any similar transaction in the normal course of business;

(c)     the Borrower and its Subsidiaries may acquire and hold receivables and similar items owing to them in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(d)     any Permitted Creditor Investment;

(e)     loans and advances to employees for business-related travel expenses, moving expenses, costs of replacement homes, business machines or supplies, automobiles and other similar expenses, in each case incurred in the ordinary course of business, provided that the aggregate outstanding amount of all such loans and advances shall not exceed $25,000 at any time;

(f)     Investments existing as of the Petition Date and described on Schedule 7.05 hereto;

(g)     any Guaranty Obligations of the Credit Parties or any of their respective Subsidiaries in favor of the Administrative Agent and the Lenders;

(h)     Investments of the Borrower and its Subsidiaries in Hedge Agreements permitted to be entered into pursuant to this Agreement;

(i)     Investments (A) of the Borrower or any of its Subsidiaries in any Subsidiary existing as of the Petition Date, (B) of the Borrower in any Credit Party made after the Petition Date or (C) of any Credit Party in any other Credit Party (other than the Borrower) made after the Petition Date;

(j)     intercompany loans and advances permitted by Section 7.04(d); and

(k)     any Guaranty Obligation incurred by any Credit Party with respect to Indebtedness of another Credit Party that is permitted by Section 7.04.

Section 7.06     Restricted Payments.  No Credit Party will, nor will any Credit Party permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except:

(a)    [reserved];

(b)    any Subsidiary of the Borrower may declare and pay or make Restricted Payments to the Borrower or any Subsidiary Guarantor;

(c)    dividends or distributions by any Subsidiary to the Borrower in order to fund the consolidated or combined federal, foreign, state and local income taxes payable by the Borrower on behalf of an affiliated group filing consolidated or combined returns which includes Borrower;

(d)    Tax Distributions consented to in writing by the Administrative Agent and Required Lenders in their sole and absolute discretion; and

(e)    any Subsidiary may make distributions to the Borrower in the amount required for the Borrower to pay franchise, income and other taxes owing by it.

Section 7.07    Limitation on Certain Restrictive Agreements.  No Credit Party will, nor will any Credit Party permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist or become effective, any "negative pledge" covenant or other agreement, restriction or arrangement that prohibits, restricts or imposes any condition upon (a) the ability of any Credit Party or any of their respective Subsidiaries to create, incur or suffer to exist any Lien upon any of its property or assets as security for Indebtedness, or (b) the ability of any such Credit Party or any such Subsidiary to make Capital Distributions or any other interest or participation in its profits owned by any Credit Party or any Subsidiary, or pay any Indebtedness owed to any Credit Party or any Subsidiary, or to make loans or advances to any Credit Party or any Subsidiary, or transfer any of its property or assets to any Credit Party or any Subsidiary, except for such restrictions existing under or by reason of (i) applicable law, (ii) this Agreement and the other Loan Documents, (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest, (iv) customary provisions restricting assignment of any licensing agreement entered into in the ordinary course of business, (v) customary provisions restricting the transfer or further encumbering of assets subject to Liens permitted under Section 7.03(b), (vi) customary restrictions affecting only a Subsidiary of the Borrower under any agreement or instrument governing any of the Indebtedness of a Credit Party permitted pursuant to Section 7.04, (vii) any document relating to Indebtedness secured by a Lien permitted by Section 7.03, insofar as the provisions thereof limit grants of junior Liens on the assets securing such Indebtedness and (viii) any Operating Lease or Capital Lease, insofar as the provisions thereof limit grants of a security interest in, or other assignments of, the related leasehold interest to any other Person.

Section 7.08    Transactions with Affiliates.  No Credit Party will, nor will any Credit Party permit any of its Subsidiaries to, enter into any transaction or series of transactions with any Affiliate (other than, in the case of the Borrower, any Subsidiary, and in the case of a Subsidiary, the Borrower or another Subsidiary) other than in the ordinary course of business of and pursuant to the reasonable requirements of such Credit Party's or such Subsidiary's business and upon fair and reasonable terms no less favorable to such Credit Party or such Subsidiary than would be obtained in a comparable arm's-length transaction with a Person other than an Affiliate, except (i) sales of goods to an Affiliate for use or distribution outside the United States that in the good faith judgment of the Credit Parties comply with any applicable legal requirements of the Code, or (ii) agreements and transactions with and payments to officers, directors and shareholders that are either (A) entered into in the ordinary course of business and not prohibited by any of the other provisions of this Agreement, or (B) entered into outside the ordinary course of business, approved by the directors or shareholders of the Borrower, and not prohibited by any of the other provisions of this Agreement or in violation of any law, rule or regulation.

Section 7.09    Modification of Certain Agreements.

(a)      Subject to the Orders and the terms thereof, without the prior written consent of the Required Lenders, no Credit Party will amend, modify, supplement, waive or otherwise change, or consent or agree to any amendment, modification, supplement, waiver or other change to, or enter into any forbearance from exercising any rights with respect to the terms or provisions contained in:

(i)      any Subordinated Debt Document (other than any amendment, modification, supplement, waiver or other change for which no fee is payable to the holders of the Subordinated Indebtedness and that (A) extends the maturity or reduces the amount of any repayment, prepayment or redemption of the principal of such Subordinated Indebtedness, (B) reduces the rate or extends any date for payment of interest, premium (if any) or fees payable on such Subordinated Indebtedness or (C) makes the covenants, events of default or remedies in such Subordinated Debt Documents less restrictive on any applicable Credit Party);

(ii)      any of the terms of any preferred Equity Interests of the Credit Parties which (i) causes the scheduled redemption date to occur earlier or increases the amount of any scheduled redemption payment or (ii) increases the rate or causes any date for payment of dividends thereon to occur earlier; or

(iii)      the Organizational Documents of any Credit Party if such amendment, modification, supplement, waiver or other change would be adverse to the interests of the Lenders.

(b)      Without the consent (such consent not to be unreasonably withheld or delayed) of the Administrative Agent, neither the Borrower nor the Limited Partner shall amend, modify, supplement or otherwise change the Organizational Documents of the Borrower or the Limited Partner.

Section 7.10      Anti-Terrorism Laws.  No Credit Party nor any of their respective Subsidiaries shall violate any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list, Executive Order No. 13224 or the USA Patriot Act) that prohibits or limits the conduct of business with or the receiving of funds, goods or services to or for the benefit of certain Persons specified therein or that prohibits or limits any Lender from making any advance or extension of credit to the Borrower or from otherwise conducting business with the Borrower or any other Credit Party.

Section 7.11      Fiscal Year.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, change its Fiscal Year end from December 31.

Section 7.12      Issuance of Disqualified Equity Interests.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, issue or sell any Disqualified Equity Interests.

Section 7.13      Sale and Lease-Back Transaction.  The Borrower and its Subsidiaries will not enter into any Sale and Lease-Back Transaction.

Section 7.14      Accounting Changes.  Each Credit Party will not, and will not permit any of its Subsidiaries to, make or permit any material change in its accounting policies or financial reporting practices and procedures, except changes in accounting policies which are required or permitted by GAAP and changes in financial reporting practices and procedures which are required or permitted by GAAP.

Section 7.15      Unfunded Capital Expenditures.  The Borrower, NPG and each of their Subsidiaries will not make Unfunded Capital Expenditures.

Section 7.16    Leases.  No Credit Party may enter into any lease for real property or assume any lease for real property (other than those leases existing on the Petition Date) without the written approval of the Administrative Agent in its reasonable discretion.

Section 7.17    Certain Payments.    Except as expressly provided or permitted hereunder (including, without limitation, to the extent pursuant to any First Day Order or "second day" order complying with the terms of this Agreement) or, with the prior consent of the Administrative Agent, as provided pursuant to any other order of the Bankruptcy Court, no Credit Party shall, nor shall it permit any of its Subsidiaries to, make any payment or distribution to any non-Debtor affiliate or corporate insider outside of the ordinary course of business.

Section 7.18    Material Contracts.    No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into a material contractual obligation without the consent of the Administrative Agent.

Section 7.19    DIP Financing.  No Debtor shall incur or apply to the Bankruptcy Court for authority to incur, or suffer to exist, any indebtedness having the priority afforded by Section 364(c) or (d) of the Bankruptcy Code (including any Superpriority Claims) other than the financing provided for under this Agreement unless such financing would pay in full the Obligations under this Agreement and the Pre-Petition First Lien Obligations.

Section 7.20    Alteration of Rights of Lenders.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, limit, affect or modify, or apply to the Bankruptcy Court to limit, adversely affect or modify any of the Lenders' rights with respect to the Obligations, including rights with respect to the Pre-Petition Collateral and Collateral and the priority thereof and payment of various amounts, pursuant to any Bankruptcy Plan or otherwise.

Section 7.21    Chapter 11 Claims.  Except for the Carve-Out, no Debtor shall apply to the Bankruptcy Court for the authority or allow to be incurred, created, assumed, suffered or permitted any Lien (other than Permitted Liens) against such Debtor, or any of its assets in the Chapter 11 Cases to be pari passu with, or senior to, the Liens of the Lenders granted and arising hereunder and under the Orders.

Section 7.22    Reclamation Claims; Bankruptcy Code § 546(c) Agreements.

(a)    Unless authorized by Bankruptcy Court Order, no Debtor shall make any payments or transfer any property on account of claims asserted by such Debtor's vendors for reclamation in accordance with UCC Section 2-702 and Bankruptcy Code Section 546(c) in excess of an amount to be agreed upon, in each case, by such Debtor, the Administrative Agent and the Required Lenders.

(b)    No Debtor shall enter into any agreements or file any motion seeking a Bankruptcy Court order for the return of inventory or supplies to any vendor pursuant to Bankruptcy Code Section 546(c) without the written consent of the Lenders.

Section 7.23    506(c) Claims.  Except pursuant to a Bankruptcy Court Order, no Debtor shall make or impose any claim of any kind upon or against any Lender, the Administrative Agent or the Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise.  In addition the Borrower shall cause the priority of all liens of the Lenders and the Administrative Agent on the Collateral to be maintained in full force and effect and in accordance with this Agreement, the other Loan Documents and the Orders.  The Borrower will ensure that except as otherwise provided in this Agreement, no person or entity shall be permitted to exercise any rights or remedies with respect to the Collateral unless and until all amounts due under this Agreement and the other Loan Documents have been paid in full.

ARTICLE VIII

EVENTS OF DEFAULT

Section 8.01    Events of Default.  Any of the following specified events shall constitute an Event of Default (each an "Event of Default"):

(a)    Payments: the Borrower shall (i) default in the payment when due (whether at maturity, on a date fixed for a scheduled repayment, on a date on which a required prepayment is to be made, upon acceleration or otherwise) of any principal of the Loans; or (ii) default, and such default shall continue for two or more Business Days, in the payment when due of any interest on the Loans, any Fees or any other Obligations; or

(b)    Representations, etc.: any representation, warranty or statement made by the Borrower or any other Credit Party herein or in any other Loan Document or in any statement or certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect (without duplication as to any materiality modifiers, qualifications, or limitations applicable thereto) on the date as of which made, deemed made, or confirmed; or

(c)    Certain Covenants: the Borrower shall default in the due performance or observance by it of any term, covenant or agreement contained in (1) Section 6.01 (other than Sections (j) through (o)), 6.11 or 6.16 through 6.21 or Article VII of this Agreement, or (2) Sections 6.01(j) through (o), 6.03, 6.04, 6.05 or 6.10 of this Agreement and such default is not remedied for a period of 10 days; or

(d)    Other Covenants: any Credit Party shall default in the due performance or observance by it of any term, covenant or agreement contained in this Agreement or any other Loan Document (other than those referred to in Section 8.01(a), (b) or (c) above) and such default is not remedied within 10 days after the earlier of (i) an Authorized Officer of any Credit Party obtaining knowledge of such default or (ii) the Borrower receiving written notice of such default from the Administrative Agent or the Required Lenders (any such notice to be identified as a "notice of default" and to refer specifically to this paragraph); or

(e)    Cross Default Under Other Agreements; Hedge Agreements: any Credit Party or any of its Subsidiaries shall (i) default in any payment with respect to any Material Indebtedness (other than the Obligations), and such default shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Material Indebtedness; or (ii) default in the observance or performance of any agreement or condition relating to any Material Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto (and all grace periods applicable to such observance, performance or condition shall have expired), or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Material Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause any such Material Indebtedness to become due prior to its stated maturity; or any such Material Indebtedness of any Credit Party or any of its Subsidiaries shall be declared to be due and payable, or shall be required to be prepaid (other than by a regularly scheduled required prepayment or redemption, prior to the stated maturity thereof); or (iii) without limitation of the foregoing clauses, default in any payment obligation under a Hedge Agreement, and such default shall continue after the applicable grace period, if any, specified in such Hedge Agreement or any other agreement or instrument relating thereto; or

(f)      Invalidity of Loan Documents: any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or under such Loan Document or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Credit Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Credit Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document or the Administrative Agent fails to have; or

(g)      Invalidity of Liens: any security interest and Lien described in Section 2.15 shall cease to be in full force and effect (other than in accordance with the terms hereof and thereof), or shall cease to give the Administrative Agent, for the benefit of the Lenders, the Liens, rights, powers and privileges as described in Section 2.15 (including a perfected first priority security interest in and Lien on, all of the Collateral thereunder (except as otherwise expressly provided in Section 2.15)) or shall be asserted by any Credit Party not to be, a valid, perfected, first priority (except as otherwise expressly provided in this Agreement) security interest in or Lien on any Collateral covered thereby; or

(h)      Judgments: (i) one or more judgments, orders or decrees (or any settlement of any claim that, if breached, could result in a judgment order or decree) shall be entered against any Credit Party and/or any of its Subsidiaries involving a post-Petition liability (other than a liability covered by insurance, as to which the carrier has adequate claims paying ability and has not effectively reserved its rights) of $500,000 or more in the aggregate for all such judgments, orders, decrees and settlements for the Credit Parties and their Subsidiaries, and any such judgments or orders or decrees or settlements shall not have been vacated, discharged or stayed or bonded pending appeal within 20 days (or such longer period, not in excess of 60 days, during which enforcement thereof, and the filing of any judgment lien, is effectively stayed or prohibited) from the entry thereof; (ii) one or more judgments, orders, decrees or settlements involving a post-Petition liability shall be entered against any Credit Party and/or any of its Subsidiaries involving a required divestiture of any material properties, assets or business reasonably estimated to have a fair value in excess of $500,000, and any such judgments, orders or decrees shall not have been vacated, discharged or stayed or bonded pending appeal within 20 days (or such longer period, not in excess of 60 days, during which enforcement thereof, and the filing of any judgment lien, is effectively stayed or prohibited) from the entry thereof; (iii) one or more judgments, orders, decrees or settlements shall be entered against any Credit Party involving a required divestiture of any material properties, assets or business reasonably estimated to have a fair value in excess of $500,000, and any such judgments, orders or decrees shall not have been vacated, discharged or stayed (including by virtue of the automatic stay under Section 362 of the Bankruptcy Code) or bonded pending appeal within 20 days (or such longer period, not in excess of 60 days, during which enforcement thereof, and the filing of any judgment lien, is effectively stayed or prohibited) from the entry thereof, or (iv) one or more nonmonetary judgments, order, decrees or settlements shall be entered against any Credit Party that in the aggregate could reasonably be expected to have a Material Adverse Effect and any such judgments or orders or decrees or settlements shall not have been vacated, discharged or stayed or bonded pending appeal within 20 days (or such longer period, not in excess of 60 days, during which enforcement thereof, and the filing of any judgment lien, is effectively stayed or prohibited) from the entry thereof;

(i)      Insolvency Event: any Insolvency Event other than (i) the Chapter 11 Cases with respect to the Debtors and (ii) the Chapter 7 Cases with respect to the Chapter 7 Subsidiaries shall occur with respect to any Credit Party or any of its Subsidiaries; or

(j)      Bankruptcy Related Defaults:

(i)      The Bankruptcy Court shall enter an order with respect to any Debtor dismissing its Chapter 11 Case or converting it to a case under chapter 7 of the Bankruptcy Code, or

appointing a trustee in its Chapter 11 Case (other than at the request of the Lenders) or appointing a responsible officer or an examiner (other than at the request of the Lenders); or

(ii)    The Bankruptcy Court shall enter an order granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder of any Lien other than Liens in favor of the Lenders in any assets of any Debtor having an aggregate value in excess of $500,000; or

(iii)    An order of the Bankruptcy Court shall be entered in any of the Chapter 11 Cases amending, supplementing, staying, vacating or otherwise modifying any of the Orders, or any Credit Party shall apply for authority to do so; provided, that no Event of Default shall occur under this clause to the extent that any such amendment, supplement or other modification is made in compliance with this Agreement and is not adverse, in the sole and absolute judgment of the Lenders, to the rights and interests of the Lenders under this Agreement and the Loan Documents; or

(iv)    Any Debtor shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Debtor or by way of other written or unwritten statements to the Bankruptcy Court) any other Person's opposition of any motion made in the Bankruptcy Court by the Lenders seeking confirmation of the amount of the Lenders' claim or the validity and enforceability of the Liens in favor of the Lenders and/or the Administrative Agent for the benefit of the Lenders; or

(v)    From and after the date of entry thereof, the Final Order shall cease to be in full force and effect (or shall have been vacated, stayed, reversed, modified or amended), in each case without the consent of the Required Lenders; or

(vi)    Any Debtor shall make any payments on any Indebtedness of such Debtor (other than as permitted under the Orders or permitted hereunder) arising before the Petition Date; or

(vii)    Any Debtor shall fail to comply with the terms of the Orders in all material respects; or

(viii)    The Debtors shall have failed to file an Acceptable Bankruptcy Plan and Disclosure Statement, within the meaning of Section 1125 of the Bankruptcy Code, on or before November 9, 2018; or

(ix)    Any of the Collateral is attached, seized, or repossessed or transferred, actually or constructively, to the possession of a trustee, receiver, custodian or similar client; or

(x)    Any motion shall have been filed or any claim shall have been asserted against the Collateral under Section 506(c) or 552 of the Bankruptcy Code; or

(xi)    Any objections and other challenges shall have been filed by any party with respect to the validity, priority, secured status or amount of any of Lenders' or Administrative Agent's liens or claims (whether pre- or post-petition) as provided for herein that has not been overruled, withdrawn or otherwise dismissed within fifteen (15) days of such filing; or

(xii)    Any Debtor (i) shall be unable to pay its debts as they become due other than debts as to which such Debtor either (a) is relieved from paying by operation of the Bankruptcy

Code or order of the Bankruptcy Court, or (b) has made an application to the Bankruptcy Court for an extension of time to pay (and such application has not been denied), or (ii) shall cease to do business as a going concern; or

(xiii)   A Bankruptcy Plan to which the Required Lenders have not consented is filed with the Bankruptcy Court.

(k)      ERISA: any ERISA Event shall have occurred and either (i) such event or events could reasonably be expected to have a Material Adverse Effect or (ii) there shall result from any such event or events the imposition of a Lien; or

(l)      Change in Control: if there occurs a Change in Control; or

(m)      Subordinated Indebtedness: (i) any of the Obligations for any reason shall cease to be "Senior Indebtedness" or "Designated Senior Indebtedness" (or any comparable terms) under, and as defined in, any Subordinated Debt Document, (ii) any Indebtedness other than the Obligations shall constitute "Designated Senior Indebtedness" (or any comparable term) under, and as defined in, any Subordinated Debt Document, (iii) any holder of Subordinated Indebtedness that is an Affiliate of any Credit Party shall fail to perform or comply with any of the subordination provisions of the Subordinated Debt Document evidencing or governing such Subordinated Indebtedness, or (iv) the subordination provisions of the documents evidencing or governing any Subordinated Indebtedness shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness.

Section 8.02   Remedies.

(a)      Further Advances; Acceleration, Etc.   Upon the occurrence of any Event of Default, and at any time thereafter, if any Event of Default shall then be continuing, and without further order of the Bankruptcy Court, the Administrative Agent (i) may, in its discretion, or (ii) shall, upon the written request of the Required Lenders, by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against the Borrower or any other Credit Party in any manner permitted under applicable law:

(i)      declare the Commitments terminated, whereupon the Commitment of each Lender shall forthwith terminate immediately without any other notice of any kind;

(ii)      declare the principal of and any accrued interest in respect of all Loans and all other Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and/or

(iii)      terminate any Debtor's ability to use the cash collateral provided for by the Final Order.

(b)      Relief from Stay.  Three (3) Business Days after written notice to the Borrower by the Administrative Agent of the occurrence of any one or more Events of Default, the Administrative Agent, on behalf of the lenders, shall be entitled to file an emergency motion seeking to exercise relief from the automatic stay imposed by Section 362 of the Bankruptcy Code and the Lenders may seek relief from the Bankruptcy Court to proceed to protect and enforce its rights under this Agreement and the other Loan Documents by exercising such remedies as are available to the Lenders in respect thereof under applicable law, either by suit in equity or by action at law, or both, whether for specific performance of

any provision contained in this Agreement or any of the other Loan Documents or in aid of the exercise of any power granted in this Agreement or any of the other Loan Documents.

(c)      <u>Appointment of Chapter 11 Trustee</u>.  Upon the occurrence of any one or more Events of Default, upon the motion of the Administrative Agent on behalf of itself and the Lenders and in accordance with Section 1104 of the Bankruptcy Code, the Debtors shall consent to the appointment of a chapter 11 trustee acceptable to the Lenders, subject to approval by Bankruptcy Court Order.

(d)      <u>Sale of Property</u>.  Upon the occurrence of any one or more Events of Default, upon the motion of the Administrative Agent requesting authority under Section 363 of the Bankruptcy Code, on behalf of itself and the Lenders, the Bankruptcy Court shall authorize the Administrative Agent to conduct absolute auction sales in accordance with Section 363 of the Bankruptcy Code of the Debtors' interests in any of the Collateral.  To the extent that (i) any such property interests are encumbered by a lien securing an obligation owed to a creditor other than the Lenders, and (ii) such lien ranks prior to the lien securing the Obligations, then the proceeds of any such auction sale shall be used to pay such obligation owed to such creditor prior to the payment of the Obligations.

Section 8.03      <u>Application of Certain Payments and Proceeds</u>.  All payments and other amounts received by the Administrative Agent or any Lender through the exercise of remedies hereunder or under the other Loan Documents shall, unless otherwise required by the terms of the other Loan Documents or by applicable law, be applied as follows:

(a)      first, to the payment of that portion of the Obligations constituting fees, indemnities and expenses and other amounts (including attorneys' fees and amounts due under <u>Article III</u>) payable to the Administrative Agent in its capacity as such;

(b)      second, to the payment of that portion of the Obligations constituting fees, indemnities and expenses (including attorneys' fees and amounts due under <u>Article III</u>) payable to each Lender, ratably among them in proportion to the aggregate of all such amounts;

(c)      third, to the payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the aggregate of all such amounts;

(d)      fourth, pro rata to the payment of that portion of the Obligations constituting unpaid principal of the Revolving Loans, ratably among the Lenders with outstanding Revolving Loans in proportion to the aggregate of all such amounts;

(e)      fifth, pro rata to the payment of that portion of the Obligations constituting unpaid principal of the Term Loans, ratably among the Lenders with outstanding Term Loans in proportion to the aggregate of all such amounts;

(f)      sixth, to the payment of all other Obligations of the Credit Parties owing under or in respect of the Loan Documents that are then due and payable to the Administrative Agent and the Lenders, ratably based upon the respective aggregate amounts of all such Obligations owing to them on such date; and

(g)      finally, any remaining surplus after all of the Obligations have been paid in full, to the Borrower or to whomsoever shall be lawfully entitled thereto.

ARTICLE IX

THE ADMINISTRATIVE AGENT

Section 9.01    Appointment.

(a)    Each Lender hereby irrevocably designates and appoints the Administrative Agent to act as specified herein and in the other Loan Documents, and each such Lender hereby irrevocably authorizes the Administrative Agent for such Lender, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. The Administrative Agent agrees to act as such upon the express conditions contained in this Article. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein or in the other Loan Documents, nor any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist against the Administrative Agent. The provisions of this Article IX are solely for the benefit of the Administrative Agent and the Lenders, and no Credit Party shall have any rights as a third-party beneficiary of any of the provisions hereof. In performing its functions and duties under this Agreement, the Administrative Agent shall act solely as agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation or relationship of agency or trust with or for the Credit Parties or any of their respective Subsidiaries.

(b)    Each Lender hereby further irrevocably authorizes the Administrative Agent on behalf of and for the benefit of the Lenders, to be the agent for and representative of the Lenders with respect to the Guaranty, the Collateral and any other Loan Document. Subject to Section 11.12, without further written consent or authorization from Lenders, the Administrative Agent may execute any documents or instruments necessary to (i) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which the Required Lenders (or such other Lenders as may be required to give such consent under Section 11.12) have otherwise consented, or (ii) release any Guarantor from the Guaranty with respect to which the Required Lenders (or such other Lenders as may be required to give such consent under Section 11.12) have otherwise consented.

(c)    Anything contained in any of the Loan Documents to the contrary notwithstanding, the Borrower, the Administrative Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Lenders in accordance with the terms hereof and all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent, and (ii) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale, the Administrative Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Administrative Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent at such sale.

Section 9.02    Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document by or through agents, sub-agents or attorneys-in-fact,

and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents, sub-agents or attorneys-in-fact selected by it with reasonable care except to the extent otherwise required by <u>Section 9.03</u>. All of the rights, benefits and privileges (including the exculpatory and indemnification provisions) of <u>Section 9.03</u> shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by the Administrative Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory and rights to indemnification) and shall have all of the rights, benefits and privileges of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of the Credit Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to the Administrative Agent and not to any Credit Party, any Lender or any other Person and no Credit Party, Lender or any other Person shall have the rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

Section 9.03    <u>Exculpatory Provisions</u>.  Neither the Administrative Agent nor any of its Related Parties shall be (a) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except for its or such Related Parties' own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction) or (b) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by the Credit Parties or any of their respective Subsidiaries or any of their respective officers contained in this Agreement, any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for any failure of any Credit Party or any of its officers to perform its obligations hereunder or thereunder. The Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of the Credit Parties or any of their respective Subsidiaries. The Administrative Agent shall not be responsible to any Lender for the effectiveness, genuineness, validity, enforceability, collectability or sufficiency of this Agreement or any Loan Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statement or in any financial or other statements, instruments, reports, certificates or any other documents in connection herewith or therewith furnished or made by the Administrative Agent to the Lenders or by or on behalf of the Credit Parties or any of their respective Subsidiaries to the Administrative Agent or any Lender or be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained herein or therein or as to the use of the proceeds of the Loans or of the existence or possible existence of any Default or Event of Default.

Section 9.04    <u>Reliance by Administrative Agent</u>.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, e-mail or other electronic transmission, facsimile transmission, telex or teletype message, statement, order or other document or conversation believed by it, in good faith, to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Borrower or any of its Subsidiaries), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required

Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders or all of the Lenders, as applicable, as to any matter that, pursuant to <u>Section 11.12</u>, can only be effectuated with the consent of all Required Lenders, or all applicable Lenders, as the case may be), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

Section 9.05    <u>Notice of Default</u>.   The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." If the Administrative Agent receives such a notice, the Administrative Agent shall give prompt notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 9.06    <u>Non-Reliance</u>.    Each Lender expressly acknowledges that neither the Administrative Agent nor any of its Related Parties has made any representations or warranties to it and that no act by the Administrative Agent hereinafter taken, including, without limitation, any review of the affairs of the Credit Parties or their respective Subsidiaries, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent, or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, assets, operations, property, financial and other conditions, prospects and creditworthiness of the Credit Parties and their Subsidiaries and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigation as it deems necessary to inform itself as to the business, assets, operations, property, financial and other conditions, prospects and creditworthiness of the Credit Parties and their Subsidiaries. The Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, assets, property, financial and other conditions, prospects or creditworthiness of the Credit Parties and their Subsidiaries that may come into the possession of the Administrative Agent or any of its Related Parties.

Section 9.07    <u>No Reliance on Administrative Agent's Customer Identification Program</u>.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Administrative Agent to carry out such Lender's, Affiliate's, participants or assignee' s customer identification program, or other obligations required or imposed under or pursuant to the USA Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "<u>CIP Regulations</u>"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with the Credit Parties or their respective Subsidiaries, any of their respective Affiliates or agents, the Loan Documents or the transactions hereunder: (a) any identity verification procedures, (b) any record keeping, (c) any comparisons with government lists, (d) any customer notices or (e) any other procedures required under the CIP Regulations or such other laws.

Section 9.08     USA Patriot Act.  Each Lender or assignee or participant of a Lender that is not organized under the laws of the United States of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the USA Patriot Act and the applicable regulations because it is both (a) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (b) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Administrative Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the USA Patriot Act and the applicable regulations: (i) within 10 days after the Closing Date, and (ii) at such other times as are required under the USA Patriot Act.

Section 9.09     Indemnification.  The Lenders agree to severally indemnify the Administrative Agent and its Related Parties, ratably according to their pro rata share of the Aggregate Credit Facility Exposure, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, reasonable expenses or disbursements of any kind whatsoever that may at any time (including, without limitation, at any time following the payment of the Obligations) be imposed on, incurred by or asserted against the Administrative Agent or such Related Parties in any way relating to or arising out of this Agreement or any other Loan Document, or any documents contemplated hereby or referred to herein or the transactions contemplated hereby or any action taken or omitted to be taken by the Administrative Agent or such Related Parties under or in connection with any of the foregoing, but only to the extent that any of the foregoing is not paid by the Borrower; provided that, no Lender shall be liable to the Administrative Agent or any of its Related Parties for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements to the extent resulting solely from the Administrative Agent's or such Related Parties' gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. If any indemnity furnished to the Administrative Agent or any such Related Parties for any purpose shall, in the opinion of the Administrative Agent, be insufficient or become impaired, the Administrative Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished. The agreements in this Section shall survive the payment of all Obligations.

Section 9.10     The Administrative Agent in Individual Capacity.  The Administrative Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Credit Parties, their respective Subsidiaries and their Affiliates as though not acting as Administrative Agent hereunder. With respect to the Loans made by it and all Obligations owing to it, the Administrative Agent shall have the same rights and powers under this Agreement as any Lender and may exercise the same as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" shall include the Administrative Agent in its individual capacity.

Section 9.11     Successor Administrative Agent.  The Administrative Agent may resign at any time upon not less than 30 days' notice to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent; provided that, if the Administrative Agent shall notify the Borrower and the Lenders that no such successor is willing to accept such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (i) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such

collateral security until such time as a successor Administrative Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this paragraph. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph). The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 11.02 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Section 9.12    Other Agents.  Any Lender identified herein as a Co-Agent, Syndication Agent, Documentation Agent, Managing Agent, Manager or any other corresponding title, other than "Administrative Agent," shall have no right, power, obligation, liability, responsibility or duty under this Agreement or any other Loan Document except those applicable to all Lenders as such. Each Lender acknowledges that it has not relied, and will not rely, on any Lender so identified in deciding to enter into this Agreement or in taking or not taking any action hereunder.

Section 9.13    Collateral Matters.  The Administrative Agent may from time to time make such disbursements and advances ("Agent Advances") that the Administrative Agent, in its sole discretion, deems necessary or desirable to preserve, protect, prepare for sale or lease or dispose of the Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by the Borrower of the Loans and other Obligations or to pay any other amount chargeable to the Borrower or the other Credit Parties pursuant to the terms of this Agreement, including, without limitation, costs, fees and expenses as described in Section 11.01; provided that the aggregate amount of such Agent Advances shall not exceed 10% of the Total Revolving Commitment and in no event shall the Agent Advances, together with the Aggregate Revolving Facility Exposure, exceed the Total Revolving Commitment. The Agent Advances shall constitute Obligations hereunder, shall be repayable on demand, shall be secured by the Collateral and shall bear interest at a rate per annum equal to the rate then applicable to Revolving Loans that are Base Rate Loans. The Administrative Agent shall notify each Lender and the Borrower in writing of each such Agent Advance, which notice shall include a description of the purpose of such Agent Advance. Without limitation to its obligations pursuant to Section 9.09, each Lender agrees that it shall make available to the Administrative Agent, upon the Administrative Agent's demand, in Dollars in immediately available funds, the amount equal to such Lender's pro rata share of each such Agent Advance. If such funds are not made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such funds on demand from such Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Administrative Agent, at the Federal Funds Effective Rate for three Business Days and thereafter at the Base Rate.

Section 9.14    Agency for Perfection.  The Administrative Agent and each Lender hereby appoints the Administrative Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets that, in accordance with Article 9 of the UCC, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and the Administrative Agent and each Lender hereby acknowledges that it holds possession of or otherwise

controls any such Collateral for the benefit of the Administrative Agent and the Lenders as secured party. Should any Lender obtain possession or control of any such Collateral, such Lender shall notify the Administrative Agent thereof, and, promptly upon the Administrative Agent's request therefor shall deliver such Collateral to the Administrative Agent or in accordance with the Administrative Agent's instructions. Without limiting the generality of the foregoing, each Lender hereby appoints the Administrative Agent for the purpose of perfecting the Administrative Agent's Liens on deposit accounts or securities accounts of any Credit Party. Each Credit Party by its execution and delivery of this Agreement hereby consents to the foregoing.

Section 9.15    Proof of Claim.  The Lenders and the Borrower hereby agree that in case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Borrower or any of the Guarantors, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower or any of the Guarantors) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of principal and interest owing and unpaid in respect of the Loans and any other Obligations that are owing and unpaid and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their agents and counsel and all other amounts due the Lenders and the Administrative Agent hereunder) allowed in such judicial proceeding; and

(b)    to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent and other agents hereunder. Nothing herein contained shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lenders or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding. Further, nothing contained in this Section 9.15 shall affect or preclude the ability of any Lender to (i) file and prove such a claim in the event that the Administrative Agent has not acted within ten (10) days prior to any applicable bar date and (ii) require an amendment of the proof of claim to accurately reflect such Lender's outstanding Obligations.]

Section 9.16    Posting of Approved Electronic Communications.

(a)    Delivery of Communications.  Each Credit Party hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to such Credit Party that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent or to the Lenders pursuant to the Loan Documents, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Notice of Borrowing or a

Notice of Continuation or Conversion, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Loan or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent. In addition, each Credit Party agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

(b)     Platform.  Each Credit Party further agrees that Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks, SyndTrak, Debt Domain or a substantially similar electronic transmission system (the "Platform").

(c)     No Warranties as to Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE INDEMNITEES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE INDEMNITEES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL THE INDEMNITEES HAVE ANY LIABILITY TO ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY INDEMNITEES IS FOUND IN A FINAL, NON-APPEALABLE ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNITEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     Delivery Via Platform.  The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its electronic mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents. Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's electronic mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such electronic mail address.

(e)     No Prejudice to Notice Rights.  Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 9.17     Credit Bidding.  Each Lender hereby irrevocably authorizes the Administrative Agent, based upon the instruction of the Required Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral at any sale thereof conducted under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 thereof, at any sale

thereof conducted under the provisions of the Bankruptcy Code (including Section 363 of the Bankruptcy Code) or any applicable bankruptcy, insolvency, reorganization or other similar law (whether domestic or foreign) now or hereafter in effect, or at any sale or foreclosure conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with applicable law.

ARTICLE X

[RESERVED]


ARTICLE XI

MISCELLANEOUS

Section 11.01   Payment of Expenses etc.  Each Credit Party agrees to pay (or reimburse the Administrative Agent, the Lenders or their Affiliates, as the case may be) all of the following: (i) whether or not the transactions contemplated hereby are consummated, for all reasonable and invoiced out-of-pocket costs and expenses of the Administrative Agent in connection with the negotiation, preparation, syndication, administration and execution and delivery of the Loan Documents and the documents and instruments referred to therein and the syndication of the Commitments; (ii) all reasonable and invoiced out-of-pocket costs and expenses of the Administrative Agent in connection with any amendment, waiver or consent relating to any of the Loan Documents; (iii) all reasonable out-of-pocket costs and expenses of the Administrative Agent in connection with the enforcement of any of the Loan Documents or the other documents and instruments referred to therein, including, without limitation, the reasonable fees and disbursements of any individual counsel to the Administrative Agent; (iv) any and all present and future stamp and other similar taxes with respect to the foregoing matters and save the Administrative Agent and each of the Lenders harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to any such indemnified Person) to pay such taxes; (v) all the actual costs and expenses of creating and perfecting Liens in favor of the Administrative Agent, for the benefit of Lenders, including filing and recording fees, expenses and amounts owed pursuant to Article III, search fees, title insurance premiums and fees, expenses and disbursements of counsel to the Administrative Agent and of counsel providing any opinions that the Administrative Agent or the Required Lenders may request in respect of the Collateral; (vi) all the actual costs and fees, expenses and disbursements of any auditors, accountants, consultants or appraisers whether internal or external; (vii) all the actual costs and expenses (including the reasonable and documented fees, expenses and disbursements of counsel (including allocated costs of internal counsel) and of any appraisers, consultants, advisors and agents employed or retained by the Administrative Agent and its counsel) in connection with the custody or preservation of any of the Collateral; and (viii) all out-of-pocket costs and expenses of the Administrative Agent and each Lender incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding or in connection with any workout or restructuring), including the fees, disbursements and other charges of counsel (limited to the fees, disbursements and other charges of one counsel to the Administrative Agent and the Lenders taken as a whole, and, in the event any legal conflict of interest exists, one additional counsel for the Lenders taken as a whole, if deemed advisable by the Administrative Agent or the Lenders).

Section 11.02   Indemnification.  Each Credit Party agrees to indemnify the Administrative Agent, each Lender, and their respective Related Parties (collectively, the "Indemnitees") from and hold each of them harmless against any and all losses, liabilities, claims, damages or expenses reasonably incurred by any of them as a result of, or  arising out of, or in any way related to, or by reason of (i) any

investigation, litigation or other proceeding (whether or not any Indemnitee is a party thereto) related to the entering into and/or performance of any Loan Document or the use of the proceeds of any Loans hereunder or the consummation of any transactions contemplated in any Loan Document, other than any  such investigation, litigation or proceeding arising out of transactions solely between any of  the Lenders or the Administrative Agent, transactions solely involving the assignment by a Lender of all or a portion of its Loans and Commitments, or the granting of  participations therein,  as provided in this Agreement, or arising solely out of any examination of a Lender  by  any  regulatory or other Governmental Authority having jurisdiction over it that is not in any way related to the entering into and/or performance of any Loan Document, or (ii)  the  actual  or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property owned, leased or at any time operated by the Credit Parties or any of their respective Subsidiaries, the release, generation, storage, transportation, handling or disposal of Hazardous Materials at any location, whether or not owned or operated by the Credit Parties or any of their respective Subsidiaries, if the Borrower, such Credit Party or any such Subsidiary could have or is alleged to have any responsibility in respect thereof, the noncompliance of any such Real Property with foreign, federal, state and local laws, regulations and ordinances (including applicable permits thereunder) applicable thereto, or any Environmental Claim asserted against any Credit Party or any of their respective Subsidiaries, in respect of any such Real Property, including, in the case of each of (i) and (ii) above, without limitation, the reasonable documented fees and disbursements of one outside counsel for all Indemnitees and, if necessary, one special counsel and one firm of local counsel in each relevant material jurisdiction (which may include a single special counsel acting in multiple jurisdictions) incurred  in connection with any such investigation, litigation or other proceeding (but excluding any such losses,  liabilities, claims, damages  or expenses of any  Indemnitee  to the extent (A) arising  from (x) the gross negligence or willful misconduct of such Indemnitee (but in the case of any agent or advisor, only to the extent such agent or advisor was acting at the direction of the applicable Indemnitee) to the extent determined by a final non-appealable judgment of a court of competent jurisdiction or (y) a material breach by such Indemnitee of their obligations under the Loan Documents, in each case, as determined by a final non-appealable judgment of a court of competent jurisdiction or (B) arising solely from a dispute among Indemnitees (other than a claim against the Administrative Agent solely in its capacity as such) not resulting from any action or inaction of the Borrower, any Subsidiary Guarantor or any Credit Party). To the extent that the undertaking to indemnify, pay or hold harmless any Person set  forth  in the  preceding sentence may be unenforceable because it is violative of any law or public policy, each Credit Party shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities that is permissible under applicable law.

Section 11.03   <u>Right of Setoff</u>.  In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by such Lender (including, without limitation, by branches, agencies and Affiliates of such Lender wherever located) to or for the credit or the account of any Credit Party against and on account of the Obligations and liabilities of any Credit Party to such Lender under this Agreement or under any of the other Loan Documents, including, without limitation, all claims of any nature or description arising out of or connected with this Agreement or any other Loan Document, irrespective of whether or not such Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.13</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed

held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Each Lender agrees to promptly notify the Borrower after any such set off and application, provided that, the failure to give such notice shall not affect the validity of such set off and application.

Section 11.04    Equalization.

(a)    Equalization.    If at any time any Lender receives any  amount  hereunder (whether  by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Loan Documents, or otherwise) that is applicable to the payment of the principal of or interest on, the Loans or Fees (other than Fees that are intended to be paid solely to the Administrative Agent and amounts payable to a Lender under Article III), of a sum that with respect to the related sum or sums received by other Lenders is in a greater proportion than the total of such Obligation then owed and due to such Lender bears to the total of such Obligation then owed and due to all of the Lenders immediately prior to such receipt, then such Lender receiving such excess payment shall purchase for cash without recourse or warranty from the other Lenders an interest in the  Obligations  to  such Lenders in such amount as shall result in a proportional participation by all of the Lenders in such amount. The provisions of this Section 11.04(a) shall not be construed to apply to  (i)  any payment  made  by the Borrower  pursuant to and in accordance  with  the express  terms  of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which  the  provisions  of this paragraph shall apply).

(b)    Recovery of Amounts.    If any amount paid to any Lender pursuant to subpart (a) above is recovered in whole or in part from such Lender, such original purchase shall be rescinded, and the purchase price restored ratably to the extent of the recovery.

(c)    Consent of Borrower.    The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 11.05    Notices.

(a)    Generally.    Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subpart (c) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows:

(A)    if to the Borrower or any other Credit Party, to it at 10800 Richmond Avenue, Houston, Texas 77042, Attention: Chief Restructuring Officer, (Facsimile No. (713) 436-9669);

(B)    if to the Administrative Agent, to it at the Notice Office and to Sally C. Barton, 127 Public Square, Cleveland, OH 444144; and

(C)    if to a Lender, to it at its address (or facsimile number) set forth next to its name on the signature pages hereto or, in the case of any Lender that becomes a party to this Agreement

by way of assignment under Section 11.06 of this Agreement, to it at the address set forth in the Assignment Agreement to which it is a party;

(b)     Receipt of Notices.  Notices and communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent and receipt has been confirmed by telephone. Notices delivered through electronic communications to the extent provided in subpart (c) below shall be effective as provided in said subpart (c).

(c)     Electronic Communications.     Notices and other communications to the Administrative Agent or any Lender hereunder and required to be delivered pursuant to Section 6.01 may be delivered or furnished by electronic communication (including e-mail and Internet or intranet web sites) pursuant to procedures approved by the Administrative Agent.  The Administrative Agent and the Borrower may, in their discretion, agree in a separate writing to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.   Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet web site shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the web site address therefor.

(d)     Change of Address, Etc.  Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to each of the other parties hereto in accordance with Section 11.05(a).

Section 11.06     Successors and Assigns.

(a)     Successors and Assigns Generally. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns; provided that, the Borrower may not assign or transfer any of its rights or obligations hereunder without the prior written consent of all the Lenders, provided, further, that any assignment or participation by a Lender of any of its rights and obligations hereunder shall be effected in accordance with this Section 11.06.

(b)     Participations.  Each Lender may at any time grant participations in any of its rights hereunder or under any of the Notes to an Eligible Assignee, an Eligible Participant or any other Person, provided that in the case of any such participation,

(i)     the participant shall not have any rights under this Agreement or any of the other Loan Documents, including rights of consent, approval or waiver (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto),

(ii)     such Lender's obligations under this Agreement (including, without limitation, its Commitments hereunder) shall remain unchanged,

(iii)      such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations,

(iv)      such Lender shall remain the holder of the Obligations owing to it and of any Note issued to it for all purposes of this Agreement, and

(v)      the Borrower, the Administrative Agent, and the other Lenders shall continue to deal solely and directly with the selling Lender in connection with such Lender's rights and obligations under this Agreement,

and, provided, further, that no Lender shall transfer, grant or sell any participation under which the participant shall have rights to approve any amendment to or waiver of this Agreement or any other Loan Document except to the extent (A) such participant is an Affiliate or an Approved Fund of the Lender granting the participations or (B) such amendment or waiver would (x) extend the final scheduled maturity of the date of any of the Loans in which such participant is participating, or reduce the rate or extend the time of payment of interest or Fees thereon (except in connection with a waiver of the applicability of any post-default increase in interest rates), or reduce the principal amount thereof, or increase such participant's participating interest in any Commitment over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default shall not constitute a change in the terms of any such Commitment), (y) release all or any substantial portion of the Collateral, or release any guarantor from its guaranty of any of the Obligations, except in accordance with the terms of the Loan Documents, or (z) consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and, provided still further that each participant shall be entitled to the benefits of <u>Section 3.03</u> with respect to its participation as if it was a Lender, except that a participant shall (i) only deliver the forms described in <u>Section 3.03(g)</u> to the Lender granting it such participation and (ii) not be entitled to receive any greater payment under <u>Section 3.03(g)</u> than the applicable Lender would have been entitled to receive absent the participation, except to the extent such entitlement to a greater payment arose from a Change in Law occurring after the participant became a participant hereunder.

In the event that any Lender sells participations in a Loan, such Lender shall, acting for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name of all participants in such Loan and the principal amount of (and stated interest on) the portion of such Loan that is the subject of the participation (the "Participant Register"). The entries in the Participant Register shall be conclusive absent manifest error, and each Borrower, the Administrative Agent and each Lender shall treat each person whose name is recorded in the Participant Register as the owner of the participation in question for all purposes of this Agreement notwithstanding any notice to the contrary. A Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of a Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice; provided that, no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(c)     Assignments by Lenders.

(A)     Any Lender may assign all, or if less than all, a fixed portion, of its Loans and/or Commitments and its rights and obligations hereunder to one or more Eligible Assignees, each of which shall become a party to this Agreement as a Lender by execution of an Assignment Agreement; provided that,

(1)     except in the case of (x) an assignment of the entire remaining amount of the assigning Lender's Loans and/or Commitments or (y) an assignment to another Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender, the aggregate amount of the Commitment so assigned (which for this purpose includes the Loans outstanding thereunder) shall not be less than $1,000,000 in the case of any assignment in respect of the Revolving Facility and $1,000,000 in the case of any assignment in respect of the Term Loans;

(2)     in the case of any assignment to an Eligible Assignee at the time of any such assignment the Lender Register shall be deemed modified to reflect the Commitments of such new Lender and of the existing Lenders;

(3)     upon surrender of the old Notes, if any, upon request of the new Lender, new Notes will be issued, at the Borrower's expense, to such new Lender and to the assigning Lender, to the extent needed to reflect the revised Commitments;

(4)     unless waived by the Administrative Agent, the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $3,500;

(5)     the Administrative Agent's consent (which consent shall not be unreasonably withheld or delayed) shall be required for any assignment unless such assignment is to another Lender or an Affiliate of a Lender; and

(6)     the Borrower's consent (which consent shall not be unreasonably withheld or delayed) shall be required for any assignment of Revolving Loans unless (x) an Event of Default has occurred and is continuing or (y) such assignment is to another Lender or an Affiliate of a Lender.

(B)     To the extent of any assignment pursuant to this subpart (c), the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Commitments provided that, except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

(C)     At the time of each assignment pursuant to this subpart (c), to a Person that is not already a Lender hereunder and that is not a U.S. Person for Federal income tax purposes, the respective assignee Lender shall provide to the Borrower and the Administrative Agent the applicable Internal Revenue Service Forms (and any necessary additional documentation) described in Section 3.03(g).

(D)     With respect to any Lender, the transfer of any Commitment of such Lender and the rights to the principal of, and interest on, any Loan made pursuant to such Commitment shall not be effective until such transfer is recorded on the Lender Register maintained by the

Administrative Agent (on behalf of and acting solely for this purpose as a non-fiduciary agent of the Borrower) with respect to ownership of such Commitment and Loans, including the name and address of the Lenders and the principal amount of the Loans (and stated interest thereon). Prior to such recordation, all amounts owing to the transferor with respect to such Commitment and Loans shall remain owing to the transferor. The registration of assignment or transfer of all or part of any Commitments and Loans shall be recorded by the Administrative Agent on the Lender Register only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment Agreement pursuant to this subpart (c). The Lender Register shall be available for the inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice.

(E)     Nothing in this Section shall prevent or prohibit (A) any Lender that is a bank, trust company or other financial institution from pledging its Notes or Loans to a Federal Reserve Bank or to any Person that extends credit to such Lender in support of borrowings made by such Lender from such Federal Reserve Bank or such other Person, or (B) any Lender that is a trust, limited liability company, partnership or other investment company from pledging its Notes or Loans to a trustee or agent for the benefit of holders of certificates or debt securities issued by it. No such pledge, or any assignment pursuant to or in lieu of an enforcement of such a pledge, shall relieve the transferor Lender from its obligations hereunder.

(F)     In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent and each Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Revolving Facility Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(d)     No SEC Registration or Blue Sky Compliance.  Notwithstanding any other provisions of this Section, no transfer or assignment of the interests or obligations of any Lender hereunder or any grant of participation therein shall be permitted if such transfer, assignment or grant would require the Borrower to file a registration statement with the SEC or to qualify the Loans under the "Blue Sky" laws of any State.

(e)     Representations of Lenders.  Each Lender initially party to this Agreement hereby represents, and each Person that becomes a Lender pursuant to an assignment permitted by this Section will, upon its becoming party to this Agreement, represents that it is a commercial lender, other financial institution or other "accredited" investor (as defined in SEC Regulation D) that makes or acquires loans in the ordinary course of its business and that it will make or acquire Loans for its own account in the ordinary course of such business; *provided that*, subject to the preceding Section 11.06(b) and (c), the disposition of any promissory notes or other evidences of or interests in Indebtedness held by such Lender shall at all times be within its exclusive control.

(f)    Special Purpose Funding Vehicles.  Notwithstanding anything to the contrary contained herein, any Lender ("Granting Lender") may grant to a special purpose funding vehicle (a "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided that (x) nothing herein shall constitute a commitment by any SPC to make any Loans and (y) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this clause, any SPC may (i) with notice to, but without the prior written consent of, the Borrower or the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and the Administrative Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basic any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.  This may not be amended without the written consent of the SPC.  The Borrower acknowledges and agrees, subject to the next sentence, that, to the fullest extent permitted under applicable law, each SPC, for purposes of Sections 2.08, 2.12, 3.01, 3.03, 11.01, 11.02 and 11.03, shall be considered a Lender.

Section 11.07    No Waiver; Remedies Cumulative.   No failure or delay on the part of the Administrative Agent or any Lender in exercising any right, power or privilege hereunder or under any other Loan Document and no course of dealing between the Borrower and the Administrative Agent or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent or the Lenders to any other or further action in any circumstances without notice or demand. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time. The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies that the Administrative Agent or any Lender would otherwise have.

Section 11.08    Governing Law; Submission to Jurisdiction; Venue; Waiver of Jury Trial.

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT (EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN A LOAN DOCUMENT) AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)      EACH CREDIT PARTY HEREBY IRREVOCABLY CONSENTS TO THE NON-EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL OR NEW YORK STATE COURT SITTING IN NEW YORK CITY IN ANY LITIGATION OR OTHER PROCEEDING BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, ANY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, THE LENDERS OR THE CREDIT PARTIES IN CONNECTION HEREWITH OR THEREWITH; PROVIDED THAT, ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE ADMINISTRATIVE AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND; PROVIDED, FURTHER, THAT NOTHING HEREIN SHALL LIMIT THE RIGHT OF THE ADMINISTRATIVE AGENT OR ANY LENDER TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION.

(c)      EACH CREDIT PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK AT THE ADDRESS FOR NOTICES SPECIFIED IN SECTION 11.05. EACH CREDIT PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO IN CLAUSE (b) ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY CREDIT PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, SUCH CREDIT PARTY HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS. EACH CREDIT PARTY HEREBY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT THAT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN THIS SECTION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.

(d)      THE ADMINISTRATIVE AGENT, EACH LENDER AND EACH CREDIT PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, ANY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, SUCH LENDER OR SUCH CREDIT PARTY IN CONNECTION THEREWITH. EACH CREDIT PARTY ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT AND EACH LENDER ENTERING INTO THE LOAN DOCUMENTS.

Section 11.09   Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same agreement. A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Administrative Agent.

Section 11.10    Integration.  This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent, for its own account and benefit and/or for the account, benefit of, and distribution to, the Lenders, constitute the entire contract among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof or thereof. To the extent that there is any conflict between the terms and provisions of this Agreement and the terms and provisions of any other Loan Document, the terms and provisions of this Agreement will prevail.

Section 11.11    Headings Descriptive.  The headings of the several Sections and other portions of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Section 11.12    Amendment or Waiver; Acceleration by Required Lenders.

(a)    Neither this Agreement nor any other Loan Document, nor any terms hereof or thereof, may be amended, changed, waived or otherwise modified unless such amendment, change, waiver or other modification is in writing and signed by the Borrower, the Administrative Agent and the Required Lenders or by the Administrative Agent acting at the written direction of the Required Lenders; provided that,

(A)    no change, waiver or other modification shall:

(1)    increase the amount of any Commitment of any Lender hereunder, without the written consent of such Lender;

(2)    extend or postpone the Termination Date or extend or postpone any scheduled expiration or termination date provided for herein that is applicable to a Commitment of any Lender, without the written consent of such Lender;

(3)    reduce the principal amount of any Loan made by any Lender, or reduce the rate or extend, defer or delay the time of payment of, or excuse the payment of, principal or interest thereon (other than as a result of (x) waiving the applicability of any post-default increase in interest rates or (y) any amendment or modification of defined terms used in financial covenants), without the written consent of such Lender; or

(4)    reduce the rate or extend the time of payment of, or excuse the payment of, any Fees to which any Lender is entitled hereunder, without the written consent of such Lender; and

(B)    no change, waiver or other modification or termination shall, without the written consent of each Lender affected thereby,

(1)    release the Borrower from any of its obligations hereunder;

(2)    release any Credit Party from the Guaranty, except, in the case of a Subsidiary Guarantor, in accordance with a transaction permitted under this Agreement;

(3)    release all or substantially all of the Collateral, except in connection with a transaction permitted under this Agreement;

(4)      amend, modify or waive any provision of this <u>Section 11.12</u>, <u>Section 8.03</u>, <u>Section 11.04</u> or any other provision of any of the Loan Documents pursuant to which the consent or approval of all Lenders, or a number or specified percentage or other required grouping of Lenders or Lenders having Commitments, is by the terms of such provision explicitly required;

(5)      reduce the percentage specified in, or otherwise modify, the definition of Required Lenders;

(6)      consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement; or

(7)      amend, modify or waive any provision of <u>Section 2.05(b)</u>, <u>Section 2.12(b)</u> or <u>Section 2.12(e)</u>.

Any waiver or consent with respect to this Agreement given or made in accordance with this Section shall be effective only in the specific instance and for the specific purpose for which it was given or made.

(b)      No provision of <u>Article IX</u> may be amended without the consent of the Administrative Agent.

(c)      To the extent (i) the Required Lenders consent to any sale, transfer or other disposition of any Collateral otherwise prohibited under this Agreement, (A) such Collateral (but not any proceeds thereof) shall be sold, transferred or disposed of free and clear of the Liens set forth in <u>Section 2.15</u>; (B) if such Collateral includes all of the capital stock of a Subsidiary that is a party to the Guaranty or whose stock is pledged pursuant to the Liens set forth in <u>Section 2.15</u>, such capital stock (but not any proceeds thereof) shall be released from Liens set forth in <u>Section 2.</u>15 and such Subsidiary shall be released from the Guaranty; and (C) the Administrative Agent shall be authorized to take actions deemed appropriate by it in order to effectuate the foregoing.

(d)      In no event shall the Required Lenders, without the prior written consent of each Lender, direct the Administrative Agent to accelerate and demand payment of the Loans held by one Lender without accelerating and demanding payment of all other Loans or to terminate the Commitments of one or more Lenders without terminating the Commitments of all Lenders. Each Lender agrees that, except as otherwise provided in any of the Loan Documents and without the prior written consent of the Required Lenders, it will not take any legal action or institute any action or proceeding against any Credit Party with respect to any of the Obligations or Collateral, or accelerate or otherwise enforce its portion of the Obligations. Without limiting the generality of the foregoing, none of Lenders may exercise any right that it might otherwise have under applicable law to credit bid at foreclosure sales, uniform commercial code sales or other similar sales or dispositions of any of the Collateral except as authorized by the Required Lenders. Notwithstanding anything to the contrary set forth in this <u>Section 11.12(e)</u> or elsewhere herein, each Lender shall be authorized to take such action to preserve or enforce its rights against any Credit Party where a deadline or limitation period is otherwise applicable and would, absent the taking of specified action, bar the enforcement of Obligations held by such Lender against such Credit Party, including the filing of proofs of claim in any insolvency proceeding.

(e)      Notwithstanding anything to the contrary contained in this <u>Section 11.12</u>, (x) Loan Documents and related documents executed by Subsidiaries of the Borrower in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be amended, supplemented and waived with the consent of the Administrative Agent and the Borrower without the need to obtain the consent of any other Person if such amendment, supplement or waiver is

delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities, omissions, mistakes or defects or (iii) to cause such Loan Document or other document to be consistent with this Agreement and the other Loan Documents and (y) if following the Closing Date, the Administrative Agent and the Borrower shall have jointly identified an ambiguity, inconsistency, obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Credit Parties shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

(f)     Notwithstanding the provisions of Section 11.12(a), this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Credit Parties (i) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the Revolving Loans and the accrued interest and fees in respect thereof, and (ii) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders

(g)     If, in connection with any proposed amendment, modification, termination, waiver or consent with respect to any provisions hereof as contemplated by this Section 11.12 that requires the consent of a greater percentage of the Lenders than the Required Lenders, the consent of the Required Lenders shall have been obtained but the consent of a Lender whose consent is required shall not have been obtained (each a "Non-Consenting Lender"), then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with the restrictions contained in Section 11.04(c)), all its interests, rights and obligations under this Agreement to an Eligible Assignee that shall assume such obligations; provided that (A) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not be unreasonably withheld or delayed, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts, including any breakage compensation under Section 3.02 and any amounts accrued and owing to such Lender under Section 3.01(a)(i), Section 3.01(c), Section 3.03 or Section 3.04), and (C) such Eligible Assignee shall consent at the time of such assignment to each matter in respect of which such Non-Consenting Lender did not consent.  Each Lender agrees that, if it becomes a Non-Consenting Lender and is being replaced in accordance with this Section 11.12(g), it shall execute and deliver to the Administrative Agent an Assignment Agreement to evidence such assignment and shall deliver to the Administrative Agent any Notes previously delivered to such Non-Consenting Lender.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 11.13    Survival of Indemnities.  All indemnities set forth herein including, without limitation, in Article III, Section 9.09 or Section 11.02 shall survive the execution and delivery of this Agreement and the making and repayment of the Obligations.

Section 11.14    Domicile of Loans.  Each Lender may transfer and carry its Loans at, to or for the account of any branch office, subsidiary or affiliate of such Lender; provided that, the Borrower shall not be responsible for costs arising under Section 3.01 resulting from any such transfer (other than a transfer pursuant to Section 3.05) to the extent not otherwise applicable to such Lender prior to such transfer.

Section 11.15    <u>Confidentiality</u>.

(a)    Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Confidential Information, except that Confidential Information may be disclosed (1) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential), (2) to any direct or indirect contractual counterparty in any Hedge Agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section, (3) to the extent requested by any regulatory authority, (4) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (5) to any other party to this Agreement, (6) to any other creditor of any Credit Party that is a direct or intended beneficiary of any of the Loan Documents, (7) in connection with the exercise of any remedies hereunder or under any of the other Loan Documents, or any suit, action or proceeding relating to this Agreement or any of the other Loan Documents or the enforcement of rights hereunder or thereunder, (8) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or participant in any of its rights or obligations under this Agreement, or in connection with transactions permitted pursuant to <u>Section 11.06(c)(v)</u> or <u>Section 11.06(f)</u>, (9) with the consent of the Borrower, or (10) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this <u>Section 11.15</u>, or (ii) becomes available to the Administrative Agent or any Lender on a non-confidential basis from a source other than a Credit Party and not otherwise in violation of this <u>Section 11.15</u>.

(b)    As used in this Section, "Confidential Information" shall mean all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative Agent or any Lender on a non-confidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential.

(c)    Any Person required to maintain the confidentiality of Confidential Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Confidential Information as such Person would accord to its own confidential information. The Borrower hereby agrees that the failure of the Administrative Agent or any Lender to comply with the provisions of this Section shall not relieve the Borrower, or any other Credit Party, of any of its obligations under this Agreement or any of the other Loan Documents.

Section 11.16    <u>General Limitation of Liability</u>.  No claim may be made by any Credit Party, any Lender, the Administrative Agent or any other Person against the Administrative Agent or any other Lender or the Affiliates, directors, officers, employees, attorneys or agents of any of them for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any of the other Loan Documents, or any act, omission or event occurring in connection therewith; and the Borrower, each Lender and the Administrative Agent hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor.

Section 11.17    <u>No Duty</u>.    All attorneys, accountants, appraisers, consultants and other professional persons (including the firms or other entities on behalf of which any such Person may act) retained by the Administrative Agent or any Lender with respect to the transactions contemplated by the

Loan Documents shall have the right to act exclusively in the interest of the Administrative Agent or such Lender, as the case may be, and shall have no duty of disclosure, duty of loyalty, duty of care, or other duty or obligation of any type or nature whatsoever to the Borrower, to any of its Subsidiaries, or to any other Person, with respect to any matters within the scope of such representation or related to their activities in connection with such representation. The Borrower agrees, on behalf of itself and its Subsidiaries, not to assert any claim or counterclaim against any such persons with regard to such matters, all such claims and counterclaims, now existing or hereafter arising, whether known or unknown, foreseen or unforeseeable, being hereby waived, released and forever discharged.

Section 11.18    <u>Lenders and Agent Not Fiduciary to Borrower, etc.</u>  The relationship among the Borrower and its Subsidiaries, on the one hand, and the Administrative Agent and the Lenders, on the other hand, is solely that of debtor and creditor, and the Administrative Agent and the Lenders have no fiduciary or other special relationship with the Borrower and its Subsidiaries, and no term or provision of any Loan Document, no course of dealing, no written or oral communication, or other action, shall be construed so as to deem such relationship to be other than that of debtor and creditor.

Section 11.19    <u>Survival of Representations and Warranties</u>.  All representations and warranties herein shall survive the making of Loans hereunder, the execution and delivery of this Agreement, the Notes and the other documents the forms of which are attached as Exhibits hereto, the issue and delivery of the Notes, any disposition thereof by any holder thereof, and any investigation made by the Administrative Agent or any Lender or any other holder of any of the Notes or on its behalf. All statements contained in any certificate or other document delivered to the Administrative Agent or any Lender or any holder of any Notes by or on behalf of the Borrower or any of its Subsidiaries pursuant hereto or otherwise specifically for use in connection with the transactions contemplated hereby shall constitute representations and warranties by the Borrower hereunder, made as of the respective dates specified therein or, if no date is specified, as of the respective dates furnished to the Administrative Agent or any Lender.

Section 11.20    <u>Severability</u>.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 11.21    <u>Interest Rate Limitation</u>.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively, the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Base Rate to the date of repayment, shall have been received by such Lender.

Section 11.22    <u>USA Patriot Act</u>.  Each Lender subject to the USA Patriot Act hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the USA Patriot Act.

Section 11.23  <u>Advertising and Publicity</u>.  No Credit Party shall issue or disseminate to the public (by advertisement, including without limitation any "tombstone" advertisement, press release or otherwise), submit for publication or otherwise cause or seek to publish any information describing the credit or other financial accommodations made available by the Lenders pursuant to this Agreement and the other Loan Documents without the prior written consent of the Administrative Agent. Nothing in the foregoing shall be construed to prohibit any Credit Party from making any submission or filing which it is required to make by applicable law or pursuant to judicial process; provided that, (i) such filing or submission shall contain only such information as is necessary to comply with applicable law or judicial process and (ii) unless specifically prohibited by applicable law or court order, the Borrower shall promptly notify the Administrative Agent of the requirement to make such submission or filing and provide the Administrative Agent with a copy thereof.

Section 11.24  <u>Release of Guarantees and Liens</u>.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender) to take any action requested by the Borrower having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction permitted by any Loan Document or that has been consented to in accordance with the terms hereof or (ii) under the circumstances described in the next succeeding sentence. When this Agreement has been terminated and all of the Obligations have been fully and finally discharged (other than contingent indemnity obligations) and the obligations of the Administrative Agent and the Lenders to provide additional credit under the Loan Documents have been terminated irrevocably, and the Credit Parties have delivered to the Administrative Agent a written release of all claims against the Administrative Agent and the Lenders, in form and substance satisfactory to the Administrative Agent, the Administrative Agent will, at the Borrower's sole expense, execute and deliver any termination statements, lien releases, mortgage releases, re-assignments of intellectual property, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are necessary or advisable to release, as of record, the Administrative Agent's Liens and all notices of security interests and liens previously filed by the Administrative Agent with respect to the Obligations.

Section 11.25  <u>Payments Set Aside</u>.  To the extent that any Lender receives a payment from or on behalf of the Borrower or any other Credit Party, from the proceeds of any Collateral, from the exercise of its rights of setoff, any enforcement action or otherwise, and such payment is subsequently, in whole or in part, invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligations or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not occurred.

[Remainder of page intentionally left blank.]

**Schedule 1**

**Lenders and Commitments**

| Lender | Revolving Commitment | Revolving Facility Percentage | Term Commitment |
|---|---|---|---|
| KeyBank National Association | $ | % | $ |
| BBVA Compass | $ | % | $ |
| LegacyTexas Bank | $ | % | $ |
| Hancock Whitney Bank | $ | % | $ |
| Green Bank, N.A. | $ | % | $ |
| Brown Brothers Harriman & Co. | $ | % | $ |
| Bank of America, N.A. | $ | % | $ |
| BOKF, NA dba Bank of Texas | $ | % | $ |
| **Total:** | **$8,000,000** | **100%** | **$16,000,000** |

**EXHIBIT C**

Attorney Checklist Concerning Motion and Order Pertaining to use of Cash Collateral

6501135v4

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| | § |
| **In re:** | § **Chapter 11** |
| | § |
| **NEIGHBORS LEGACY HOLDINGS, INC.,** | § **Case No. 18-_____** |
| *et al.,* | § |
| | § **(Joint Administration Pending)** |
| **Debtors.**[1] | § **(Emergency Hearing Requested)** |

## ATTORNEY CHECKLIST CONCERNING MOTION
## AND ORDER PERTAINING TO USE OF CASH COLLATERAL

The above-referenced debtors and debtors in possession (collectively, the "Debtors"), by and through their undersigned counsel, hereby file this *Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral*.

**PLEASE NOTE:**

\*        Means generally <u>not</u> favored by Bankruptcy Courts in this District.

\*\*        Means generally <u>not</u> favored by Bankruptcy Courts in this District without a reason <u>and</u> a time period for objections.

### CERTIFICATE BY COUNSEL

This is to certify that the checklist below fully responds to the Court's inquiry concerning material terms of the motion and/or proposed order.

**Y** means yes; **N** means no
**N/A** means not applicable

---

[1]    Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/neighbors. The location of Debtors' principal place of business and the Debtors' service address is: 10800 Richmond Avenue. Houston, Texas 77042.

II.     **Identification of Proceeding:**

    A.     **Preliminary or final motion/order** ........................................    Interim

    B.     **Continuing use of cash collateral (§ 363)** .......................    Y

    C.     **New financing (§ 364)** ................................................    Y (not interim)

    D.     **Combination of §§ 363 and 364 financing** .....................    N

    E.     **Emergency hearing (immediate and irreparable**    Y (cash collateral only)
        **harm)** ...........................................................................

III.    **Stipulations:**

    A.     **Brief history of debtors' businesses and status of
        debtors' prior relationships with lender** ..........................    Y

    B.     **Brief statement of purpose and necessity of financing** ...    Y

    C.     **Brief statement of type of financing (i. e., accounts
        receivable, inventory)** ..................................................    Y

\*\*    D.     **Are lender's prepetition security interest(s) and liens
        deemed valid, fully perfected and non-avoidable** ...........    Y
        **(i)     Are there provisions to allow for objections to
            above?** ................................................................    Y

    E.     **Is there a postpetition financing agreement between
        lender and debtor** ........................................................    Y
        **(i)     If so, is agreement attached?** ....................................    Y

\*\*    F.     **If there is an agreement, are lender's postpetition
        security interests and liens deemed valid, fully
        perfected, and non-avoidable?** .........................................    Y

    G.     **Is lender undersecured or oversecured?** ..........................    UNDERSECURED

    H.     **Has lender's non-cash collateral been appraised?** ..........    N
        **(i)     Insert date of latest appraisal** .................................    N/A

    I.     **Is debtor's proposed budget attached?** .............................    Y

    J.     **Are all prepetition loan documents identified?** ..............    Y

    K.     **Are prepetition liens on single or multiple assets?** ..........    MULTIPLE

    L.     **Are there prepetition guaranties of debt?** .......................    Y
        **(i)     Limited or unlimited** .................................................    UNLIMITED

IV.     **Grant of Liens:**

\*    A.     **Do postpetition liens secure prepetition debts?** ..............    Y (partially)

\*    B.     **Is there cross-collateralization?** .........................................    N

\*\*    C.     **Is the priority of postpetition liens equal to or higher
        than existing liens?** ........................................................    Y

2

6501135v4

**IV.**   <u>Grant of Liens</u>:

| | | | |
|---|---|---|---|
| ** | **D.** | **Do postpetition liens have retroactive effect?**..................... | N |
| | **E.** | **Are there restrictions on granting further liens or liens of equal or higher priority?**.......................................... | Y |
| * | **F.** | **Is lender given liens on claims under §§ 506(c), 544-50 and §§ 552?** ................................................... | N |
| ** | | **(i)    Are lender's attorney's fees to be paid?**................... | Y |
| | | **(ii)    Are debtors' attorney's fees excepted from § 506(c)?** ................................................... | Y (full 506(c) waiver) |
| * | **G.** | **Is lender given liens upon proceeds of causes of action under §§ 544, 547 and 548?** ................................... | N |

**V.**   <u>Administrative Priority Claims</u>:

| | | | |
|---|---|---|---|
| | **A.** | **Is lender given an administrative priority?** ....................... | Y |
| | **B.** | **Is administrative priority higher than § 507(a)?**.............. | Y |
| | **C.** | **Is there a conversion of pre-petition secured claim to post-petition administrative claim by virtue of use of existing collateral?** ......................................................... | Y |

**VI.**   <u>Adequate Protection (§ 361)</u>:

| | | | |
|---|---|---|---|
| | **A.** | **Is there post-petition debt service?**..................................... | Y |
| | **B.** | **Is there a replacement/additional § 361(1) lien?** ............. | Y |
| ** | **C.** | **Is the lender's claim given super-priority? (§ 364(c) or (d)) (designate)** ............................................ | Y |
| | **D.** | **Are there guaranties?** ......................................................... | Y |
| | **E.** | **Is there adequate insurance coverage?** ............................. | Y |
| | **F.** | **Other?** .................................................................................. | |

**VII.**   <u>Waiver/Release Claims v. Lender</u>:

| | | | |
|---|---|---|---|
| ** | **A.** | **Debtor waives or release claims against lender, including, but not limited to, claims under §§ 506(c), 544-50, 552, and 553 of the Code?** ................................. | Y |
| ** | **B.** | **Does the debtor waive defenses to claim or liens of lender?**.................................................................................. | Y |

3

**VIII.** **Source of Postpetition Financing (§ 364 Financing):**

    **A.** **Is the proposed lender also the prepetition lender?**........     Y

    **B.** **New post-petition lender?**.................................................     N

    **C.** **Is the lender an insider?** .....................................................     N

**IX.** **Modification of Stay:**

\*\*     **A.** **Is any modified lift of stay allowed?**...............................     Y

\*\*     **B.** **Will the automatic stay be lifted to permit lender to exercise self-help upon default without further order?**..     N

    **C.** **Are there any other remedies exercisable without further order of court?** ...................................................     N

    **D.** **Is there a provision that any future modification of order shall not affect status of debtor's postpetition obligations to lender?**..............................................     Y

**X.** **Creditors' Committee:**

    **A.** **Has creditors' committee been appointed?** ......................     N

    **B.** **Does creditors' committee approve of proposed financing?**.....................................................................     N/A

**XI.** **Restrictions on Parties in Interest:**

\*\*     **A.** **Is a plan proponent restricted in any manner, concerning modification of lender's rights, liens and/or causes?**....................................................................     N

\*\*     **B.** **Is the debtor prohibited from seeking to enjoin the lender in pursuit of rights?**............................................     Y

\*\*     **Is any party in interest prohibited from seeking to modify this order?** ...............................................     Y

    **C.** **Is the entry of any order conditioned upon payment of debt to lender?**............................................................     N

    **D.** **Is the order binding on subsequent trustee on conversion?** .........................................................     Y

**XII.** **Nunc Pro Tunc:**

\*\*     **A.** **Does any provision have retroactive effect?** .....................     N

6501135v4

**XIII.  Notice and Other Procedures:**

|   |   |   |
|---|---|---|
| A. | Is shortened notice requested?............................................ | Y |
| B. | Is notice requested to shortened list? ............................... | N |
| C. | Is time to respond to be shortened? | Y |
| D. | If final order sought, have 15 days elapsed since service of motion pursuant to Rule 4001(b)(2)? .............. | Y (requesting final on full notice) |
| E. | If preliminary order sought, is cash collateral necessary to avoid immediate and irreparable harm to the estate pending a final hearing?................................... | Y |
| F. | Is a Certificate of Conference included?......................... | N |
| G. | Is a Certificate of Service included?................................. | Y |
| H. | Is there verification of transmittal to U.S. Trustee included pursuant to Rule 9034? ..................................... | Y |
| I. | Has an agreement been reached subsequent to filing motion?............................................................................. | N/A |
| | (i)   If so, has notice of the agreement been served pursuant to Rule 4001(d)(1)? ................................... | |
| | (ii)  Is the agreement in settlement of motion pursuant to Rule 4001(d)(4)? ................................... | |
| | (iii) Does the motion afford reasonable notice of material provisions of agreement pursuant to Rule 4001(d)(4)? ............................................... | |
| | (iv) Does the motion provide for opportunity for hearing pursuant to Rule 9014?............................... | |

6501135v4

**<u>EXHIBIT D</u>**

Budget

| Month | Jul-18 | Jul-18 | Aug-18 | Aug-18 | 4 |
| Week Ending | 07/20/18 | 07/27/18 | 08/03/18 | 08/10/18 | Week |
| Fiscal Week # | 29 | 30 | 31 | 32 | Total |
| Forecast Week # | 1 | 2 | 3 | 4 | |
| Forecast/Actual | Forecast | Forecast | Forecast | Forecast | |
|---|---|---|---|---|---|
| **Cash Receipts** | | | | | |
| Patient Revenue | $ 1,934,487 | $ 2,027,209 | $ 1,936,452 | $ 1,892,932 | $ 7,791,081 |
| Other | - | - | 19,583 | - | 19,583 |
| **Total Cash Receipts** | 1,934,487 | 2,027,209 | 1,956,036 | 1,892,932 | 7,810,664 |
| **Cash Disbursements** | | | | | |
| Operating | | | | | |
| Payroll, Payroll Taxes, and Benefits | 142,300 | 1,603,500 | 165,000 | 1,713,500 | 3,624,300 |
| Physician Payroll | - | 1,417,920 | - | 1,417,920 | 2,835,840 |
| Rent & Other Occupancy | - | 97,921 | 979,271 | - | 1,077,192 |
| Equipment Leases | 234,161 | - | - | - | 234,161 |
| Utilities | 45,980 | 45,980 | 45,980 | 45,980 | 183,920 |
| Radiology Services and Maintenance | 56,496 | 52,307 | 48,997 | 48,997 | 206,797 |
| Lab Fees, Supplies & Other Patient Expenses | 136,420 | 136,420 | 136,420 | 136,420 | 545,680 |
| Insurance | - | - | 50,000 | - | 50,000 |
| Property Taxes | - | - | - | - | - |
| Marketing | 62,755 | 62,755 | 62,755 | 62,755 | 251,020 |
| Other Disbursements | 308,732 | 308,732 | 307,226 | 307,226 | 1,231,915 |
| Total Operating Disbursements | 986,843 | 3,725,534 | 1,795,649 | 3,732,798 | 10,240,824 |
| Financing | | | | | |
| Principal | - | - | - | - | - |
| Interest/Fees | - | - | - | - | - |
| Adequate Protection Payments | - | - | - | - | - |
| Total Financing Disbursements | - | - | - | - | - |
| Restructuring Related Disbursements | | | | | |
| Professional Fees | - | - | - | 75,000 | 75,000 |
| Utility Deposits | - | - | - | 125,000 | 125,000 |
| Critical Vendors | - | - | - | - | - |
| Total Non-Operating Disbursements | - | - | - | 200,000 | 200,000 |
| BEPA Settlement | | | | - | - |
| Franchise Taxes | | | | - | - |
| Maintenance Capex | 35,000 | 35,000 | 35,000 | 35,000 | 140,000 |
| **Total Cash Disbursements** | 1,021,843 | 3,760,534 | 1,830,649 | 3,967,798 | 10,580,824 |
| **Net Cash Flow** | $ 912,644 | $ (1,733,325) | $ 125,387 | $ (2,074,866) | $ (2,770,160) |
| **Beg Est. Cash Balance - Book** | 7,600,000 | 8,512,644 | 6,779,319 | 6,904,706 | 7,600,000 |
| DIP Borrowing/(Repayments) | - | - | - | - | - |
| **Ending Est.Cash Balance** | $ 8,512,644 | $ 6,779,319 | $ 6,904,706 | $ 4,829,840 | $ 4,829,840 |