**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| | § |
| **In re:** | § **Chapter 11** |
| | § |
| **NEIGHBORS LEGACY HOLDINGS, INC.,** | § **Case No. 18-18-33836 (MI)** |
| ***et al.,*** | § |
| | § **(Jointly Administered Pending)** |
| **Debtors.**[1] | § |

**DECLARATION OF CHAD J. SHANDLER IN SUPPORT OF CHAPTER 11**
**PETITIONS AND FIRST DAY PLEADINGS**

I, Chad J. Shandler, being duly sworn, depose and say:

1.      I am the Chief Restructuring Officer of Neighbors Legacy Holdings, Inc. ("NLH") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors").  I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtors.

2.      I have served as the Chief Restructuring Officer of the Debtors since August 28, 2017.  Since then, I have become generally familiar with the Debtors' day-to-day operations, businesses, and financial affairs.

3.      I am also a partner with CohnReznick LLP ("CohnReznick"), a national advisory firm that specializes in corporate restructurings, operations improvement, litigation analytics, valuations, and bankruptcy case management services.  I specialize in providing corporate restructuring and financial advisory services to financially troubled companies, trustees, secured creditors, and creditor groups.  My expertise includes developing and evaluating restructuring

---

[1] Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/neighbors. The location of Debtors' principal place of business and the Debtors' service address is: 10800 Richmond Avenue. Houston, Texas 77042.

alternatives, valuing business enterprises, and negotiating with stakeholders. I also perform forensic services, including analyzing fraudulent and preferential transfers and solvency issues. I have been qualified as an expert witness in bankruptcy court and I have been appointed a Special Fiscal Agent in the Superior Court of New Jersey. I have served as the chief restructuring officer of several entities. I have also served as a liquidating trustee. My industry expertise includes senior living and healthcare, telecommunications, retail, manufacturing, publishing, multifamily housing and real estate, distribution, and sports and entertainment. In the past five years the majority of my experience has been in the healthcare industry.

4. Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' senior management, my review of relevant documents or, based on my experience and knowledge of the Debtors' operations and financial conditions, and my opinion. In making this Declaration, I have relied, in part, on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

5. To minimize any disruption to the Debtors' operations and to ensure a smooth transition into chapter 11, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings") in connection with these chapter 11 cases (the "Chapter 11 Cases").[2] I submit this declaration in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) the First Day Pleadings.

---

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

6318135v20

6.     This Declaration is divided into two parts.   Part I provides background information about the Debtors, their business operations, their corporate and capital structures, and the circumstances surrounding the commencement of the Chapter 11 Cases.  Part II sets forth the relevant facts in support of each of the First Day Pleadings.

## PART I – BACKGROUND

### A.  Preliminary Statement

7.     The Debtors operate freestanding emergency centers (the "Emergency Centers") throughout the State of Texas, including in the greater Houston area, South Texas, El Paso, the Golden Triangle, the Panhandle, and the Permian Basin.  The Emergency Centers are designed to offer an attractive alternative to traditional hospital emergency rooms by reducing wait times, providing better working conditions for physicians and staff, and giving patient care the highest possible priority.

8.     The Debtors were founded in Houston in 2008 by nine emergency room physicians.  The Debtors were initially successful and experienced rapid growth.  At their peak, in 2017, the Debtors operated 33 Emergency Centers in three different states.

9.     As discussed below, the Debtors funded their expansion by incurring over $110 million in secured bank debt.  In 2016, the Debtors also explored the possibility of a substantial capital raise or other transaction to fund further growth.  Ultimately, the Debtors did not close such a transaction.

10.     In late 2016, the Debtors' business began experiencing financial difficulties caused, in large part, by two fundamental challenges: (1) increased competition in the freestanding emergency department space, and (2) less favorable insurance payor conditions.  Further, the Debtors' aggressive expansion plans resulted in the opening or planned opening of

Emergency Centers, some in what was ultimately determined to be less favorable locations. Each Emergency Center required significant capital for build out, was subject to a long-term real property lease, and an anticipated 12- to 18-month timeframe for the Emergency Center to achieve cash flow positive results.  These challenges have resulted in declining revenues and disproportionate overhead costs compared to the number of the Debtors' Emergency Centers and, as the business began to contract, the Debtors began closing Emergency Centers.

11.    These challenges have forced the Debtors to close unprofitable Emergency Centers (and abandon several planned – but never opened – centers), lay off employees, and downsize corporate overhead.  The challenges have also caused significant strain on the Debtors' relationships with some of their landlords, vendors, and doctors, upon whom the Debtors rely to operate their business.  Prepetition, the Debtors engaged professionals and explored various out-of-court solutions to their financial difficulties.  While the Debtors were able to improve their revenue cycle systems and procedures and further reduce costs, the Debtors cannot continue to service their secured debt and satisfy the burden of their closed or never-opened Emergency Centers.  Accordingly, the Debtors undertook a robust marketing process and have filed these Chapter 11 Cases to pursue a sale of their assets.

**B.  The Debtors' Business**

12.    The Debtors opened their first Emergency Center in Bellaire, Texas in 2009.  At that time, the state of Texas did not license freestanding emergency centers and Debtors were required to partner with hospitals to obtain licensure.  In June 2010, the Texas legislature enacted Title 25, Chapter 131 of the Texas Administrative Code, which authorized, for the first time, independent licensure for freestanding emergency rooms.  Thereafter, the Debtors were able to open additional freestanding emergency rooms without the requirement to partner with hospitals.

13.     From 2011 to 2013, the Debtors gradually expanded by adding four new facilities in the Houston metropolitan area.  In 2014, the Debtors added two additional Houston locations and expanded into Austin, opening two Austin Emergency Centers.  In 2015 and 2016, the Debtors expanded into new Texas markets as well as markets outside of Texas, including Arizona, Colorado, and Rhode Island.  The Debtors financed their expansion in large part through a $150 million credit facility obtained in November 2015, as discussed in more detail below.

14.     The Debtors currently operate 22 free-standing Emergency Centers throughout Texas and provide support for the Emergency Centers at a corporate headquarters located in the Westchase area of Houston.  Together with their non-debtor subsidiaries and affiliates, the Debtors' corporate network (the "Neighbors Network") consists of approximately 115 entities organized under the laws of various states.  The Debtors lease the real property for most of the Emergency Centers as well as their corporate headquarters, and own the real property associated with four of their centers.[3]  In total, Neighbors Network employs or engages as independent contractors approximately 900 physicians, nurses, radiology technicians, laboratory professionals, and administrative staff on either a full- or part-time basis (collectively, the "Employees").  Approximately 140 of the Employees work at the Debtors' corporate headquarters. The corporate Employees perform various functions for the Debtors, including billing, coding, collection of accounts receivable, finance, human resources, marketing, information technologies ("IT"), and administrative tasks.

---

[3] The Debtors own the real property for their Kingwood, Baytown, Pearland, and Beaumont Centers.

6318135v20



*Neighbors – Pearland*

15.     The remainder—and the vast majority—of the Debtors' Employees work at the various Emergency Centers, which are located throughout Texas, as shown in the chart below.

| Facility No. | Continuing |
|---|---|
| 4001 | Bellaire |
| 4002 | Kingwood |
| 4003 | Baytown |
| 4004 | Pasadena |
| 4005 | Pearland |
| 4007 | Beaumont |
| 4008 | Mueller |
| 4009 | Yorktown |
| 4010 | Crosby |
| 4011 | Orange |
| 4013 | Midland |
| 4015 | Edgemere |
| 4016 | Port Arthur |
| 4018 | Odessa |
| 4019 | Harlingen |
| 4020 | Amarillo |
| 4021 | Porter |
| 4022 | Brownsville |
| 4023 | McAllen |
| 4026 | Texarkana |
| 4031 | Lubbock |
| 4035 | Paris |

*Neighbors' 22 Open Facilities (the "Open Facilities")*

6318135v20



*Neighbors – Pasadena*

16.     The Debtors generate revenues by collecting payments from patients and insurance providers in satisfaction of services rendered at the Emergency Centers.  As detailed in the Anatomy of a Claim chart below, the Debtors bill patients and insurance companies for the services provided (the "<u>Billed Charges</u>").[4]  Thereafter, the Debtors negotiate with the payor (which may involve appeals) to arrive at a "Final Allowable" claim amount.  That amount is then divided between the insurance provider and the patient, based on the patient's specific health plan, and paid to the Debtors.  On average for 2017, the total amount collected by the Debtors was approximately 36% of the Billed Charges.

### C.  The Debtors' Corporate Structure

17.     The Debtors' full corporate structure, which includes non-debtor entities, is reflected in the organizational chart attached as **<u>Exhibit A</u>**.

18.     The Debtors' Emergency Centers are structured as separate limited partnerships with Neighbors GP, LLC as the general partner of each.  The limited partners for each Emergency Center are organized as separate series LLCs (series 100 through series 153) (collectively, the "<u>Series LLCs</u>") existing as part of NHS Emergency Centers, LLC.[5] Each of the

---

[4] While the Debtors may accept Medicare or Medicaid patients, as required, for emergent care, the Debtors do not bill Medicare or Medicaid.

[5] A series LLC is a form of a limited liability company in which each "series" operates as its own, unique entity so that the series are separate from each other for liability purposes.  All Series LLCs are non-Debtors.

6318135v20

series LLCs are owned by a combination of "Class A" physicians, which are the original nine founding physicians,[6] and "Class B" physicians, which are physicians that have purchased interests in profits and losses in specific series LLCs ("Purchased Interests"). The Class B physicians typically work shifts at the Emergency Centers where they own Purchased Interests. In connection with purchasing their interests in one or more Emergency Centers, the Class B physicians are entitled to a corresponding number of monthly 24-hour shifts at such centers. In addition to being eligible to receive distributions related to their Purchased Interests, Class B physicians receive compensation for working their respective shifts.[7] As of the Petition Date, there are approximately 125 Class B physicians.

19.     Management and corporate functions for each of the Emergency Centers are provided by separate Debtor entities, as follows:

  a.  EDMG, LLC – provides staffing and back office support to the Emergency Centers, Neighbors Physician Group, PLLC, and Neighbors Practice Management, LLC, including payroll, human resources, IT, and accounting;

  b.  Neighbors Practice Management, LLC – provides billing, coding, and revenue cycle management to the Emergency Centers and Neighbors Physician Group, PLLC;

  c.  Neighbors Emergency Center, LLC – holds ownership of intellectual property assets;

  d.  Neighbors Health LLC – provides management services to all of the Debtors pursuant to management agreements; and

  e.  Neighbors Physician Group, PLLC – provides physician staffing in the Emergency Centers.

**D. The Debtors' Capital Structure**

  **i.  *Prepetition Credit Agreement***

20.     On November 19, 2015, Neighbors Global Holdings, LLC ("Neighbors"), as

---

[6] Not all nine founding physicians are participants in every series LLC.

[7] The physician contractors are paid on an hourly basis by Neighbors Physicians Group, PLLC.

6318135v20

borrower, entered into a Credit Agreement (as amended, restated, or supplemented the "Prepetition Credit Agreement") with the lenders from time to time party thereto (collectively, the "Prepetition Lenders"); KeyBank National Association, as administrative agent, swing line lender, and issuing bank (the "Prepetition Agent"); KeyBanc Capital Markets Inc., as joint lead arranger and a joint bookrunner; Compass Bank Association, as joint lead arranger, a joint bookrunner, and sole syndication agent; and LegacyTexas Bank, as the documentation agent (together with the Prepetition Lenders and the Prepetition Agent the "Prepetition Secured Parties").

21.     Simultaneously with the execution of the Prepetition Credit Agreement, various subsidiary affiliates, as guarantors (the "Guarantors") entered into a Guaranty dated November 19, 2015 (as amended, restated, or supplemented, the "Guaranty"),[8] with the Prepetition Agent.

22.     The Prepetition Credit Agreement provided the Debtors with a revolving credit facility in an initial aggregate principal amount of up to $30 million.   On May 9, 2017, Neighbors, the Prepetition Lenders, and the Prepetition Agent entered into the Waiver, Consent and Amendment No. 3, reducing availability under the revolving credit facility to $27 million. The maturity date for the revolving cash borrowings under the Prepetition Credit Agreement is November 19, 2020. Neighbors has never drawn on the revolving credit facility. The Prepetition Credit Agreement also provided the Debtors with (a) a term loan facility in an aggregate principal amount of $100 million and (b) a delayed draw term loan facility in the aggregate principal amount of $20 million (with any borrowings incurred under the delayed draw term loan

---

[8] Since the November 19, 2015 date of the Guaranty, guarantors have been added through joinder agreements.  As of the Petition Date, all of the entities in the Neighbors Network, including each Emergency Center, have guaranteed the Prepetition Credit Agreement.  A full list of the Guarantors is contained in **Exhibit B**.  (Note:  The Perfection Certificate dated November 19, 2015, includes the list of Guarantors as of the closing date.  The Perfection Certificate dated November 14, 2016, includes the list of Guarantors as of such date (several were added along the way pursuant to joinder agreements).

6318135v20

facility automatically becoming part of the term loan facility). The maturity date for the term loan under the Prepetition Credit Agreement is November 19, 2020. On the date that the Prepetition Credit Agreement funded, November 19, 2015, Neighbors drew $100 million on the term loan facility. In September 2016, Neighbors drew $20 million on the delayed draw term loan facility.

23. The Debtors have, from time to time, addressed issues arising under the Prepetition Credit Agreement with the Prepetition Lenders. Specifically, Neighbors entered into three amendments to the Prepetition Credit Agreement:

(a) July 5, 2016, Amendment No. 1 – Neighbors, the Prepetition Lenders, and the Prepetition Agent entered into Amendment No. 1 to the Credit Agreement, dated July 5, 2016, pursuant to which the Prepetition Lenders waived certain events of default under the Prepetition Credit Agreement (including, without limitation, failure to comply with certain disclosure and delivery requirements), and certain Guarantors joined the Guaranty and the Security Agreement (as defined in the Prepetition Credit Agreement).

(b) September 9, 2016, Amendment No. 2 – Neighbors, the Prepetition Lenders, and the Prepetition Agent entered into a Waiver, Consent and Amendment No. 2 to the Credit Agreement, dated September 9, 2016, pursuant to which the Prepetition Lenders waived certain events of default under the Prepetition Credit Agreement (including, without limitation, failure to deliver certain financial statements).

(c) May 9, 2017, Amendment No. 3 – Neighbors, the Prepetition Lenders, and the Prepetition Agent entered into a Waiver, Consent and Amendment No. 3 to the Credit Agreement, dated May 9, 2017, pursuant to which the Prepetition Lenders waived certain events of default under the Prepetition Credit Agreement (including, without limitation, failure to comply with the fixed charge coverage ratio), amended certain covenants and related provisions to allow Neighbors to operate without being in default, accommodated the conversion of Neighbors Physician Group, LLC, a Texas limited liability company, from one entity type to another, and required the contribution of additional capital from its equity holders in the form of shareholder loans.

24. The obligations under the Prepetition Credit Agreement are secured by substantially all of the Debtors' assets. In particular, pursuant to (a) the Amended and Restated Pledge and Security Agreement dated May 9, 2017 (the "Security Agreement"), and (b) the

6318135v20

Deeds of Trust, Assignments of Leases and Rents, Security Agreement and UCC Financing Statements for Fixture Filings, in each case dated November 19, 2015 (the "Deeds of Trust", and together with the Security Agreement, collectively, the "Prepetition Security Documents"), all amounts outstanding under the Prepetition Credit Agreement are secured by a first-priority security interest (the "Prepetition Liens") in substantially all of the Debtors' existing and future assets (collectively, the "Prepetition Collateral"), other than certain excluded payroll accounts and deposit accounts.  In addition, the obligations under the Prepetition Credit Agreement are guaranteed by the Guarantors.  Accordingly, as of the Petition Date, other than any payroll accounts or deposit accounts that may have been excluded as collateral pursuant to the Security Agreement, the Debtors do not have any unencumbered cash or assets.

### ii.  *Equipment Leases*

25.    The Debtors lease their radiology equipment, including CT machines, x-ray equipment, and ultrasound machines.  The Debtors' primary equipment lessors are BBVA Compass and Wells Fargo. Prepetition, the Debtors entered into an agreement with BBVA Compass regarding return of equipment at Closed Centers and the impact on BBVA Compass's claims against the Debtors.

26.    The Debtors also lease non-medical equipment, such as monitors and computer equipment from various parties.

27.    The Debtors intend to assume and assign certain equipment leases related to Open Facilities, as directed by the ultimate successful purchaser of their assets.  Conversely, the Debtors intend to reject certain leases related to their Closed Centers, as described in more detail below.

6318135v20

### iii.  Outstanding Vendor Obligations

28.     The Debtors utilize a broad range of vendors to provide medical supplies and other items necessary to operate the Emergency Centers.  On the Petition Date, the Debtors' aggregate accounts payable to vendors is approximately $12.8 million.

### iv.  Equity

29.     NLH, which is the parent company of all the Debtors except Neighbors Physician Group, PLLC ("NPG"), is owned by nine individual shareholders who were the founders of the business: Paul Alleyne, Michael Chang, Andy Chen, Cyril Gilman, Henderson Quang, Darmesh Patel, Hitesh Patel, Setul Patel, and Tom Vo.  NPG is owned by the same nine shareholders.

## E.  The Debtors' Material Litigation

30.     The Debtors are involved, as both Plaintiffs and Defendants, respectively, in various litigation. The most significant litigation is summarized as follows:

a.  <u>Beaumont Emergency Physicians Associates, PLLC ("BEPA") litigation</u> – BEPA, the entity formed by certain physicians who staff the Debtors' Beaumont, Texas location and who own net profits interests in the Debtors' Beaumont, Texas location, filed suit against Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc., Neighbors GP, LLC (collectively, the "<u>Neighbors Defendants</u>"), along with several individual physicians (who are also board members in the Neighbors Network) in the Jefferson County District Court in Beaumont. In December 2013, the Neighbors facility in Beaumont, Texas ("<u>NEC Beaumont LLC</u>") exchanged its membership interests for shares of the limited partner of a new entity.  The conversion was approved by BEPA and BEPA's president signed the conversion documents.  BEPA is now claiming, however, that NEC Beaumont LLC was not converted and filed suit against the Neighbors Defendants on this basis.

BEPA alleges that if NEC Beaumont LLC was not converted, the Neighbors Defendants are in breach of contract or possibly made negligent or fraudulent misrepresentations at the time of the purported conversion.  The Neighbors Defendants filed a counterclaim against BEPA asserting breach of contract and negligent and/or fraudulent misrepresentation for signing the conversion documents, allowing conversion paperwork to be filed with the Texas Secretary of state, and accepting millions of dollars in distributions from the new entity.

BEPA filed a Motion for Partial Summary Judgment on the viability of the

6318135v20

conversion, which the court granted in part.  However, the court noted that there is a fact issue as to whether BEPA ratified or otherwise consented to the conversion due to BEPA's president signing the conversion documents and the new entity operating for years.  The parties attended mediation on April 4 and 10, 2018, and continue settlement discussions.  No trial date has been set.

b.  <u>Equipment Leases litigation</u> – Certain of the Debtors are parties to a related series of cases pending in the United States District Court for the District of New Jersey, the United States District Court for the Southern District of Texas, in the Harris County District Court, and in the Circuit Court for the State of Missouri.  These cases involve Equipment Leases for which the Debtors stopped paying certain obligations based on allegations that: a) the lease schedules were improperly obtained, and 2) the original vendor failed to provide certain items, including software licenses and professional services.  Given that the cases involve lessors on Debtors' equipment, the cases potentially affect the Debtors' restructuring efforts.  These cases involve various equipment lessors and Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc., Neighbors Health, LLC f/k/a Neighbors Health System, LLC, Neighbors Global Holdings, LLC, Neighbors GP, LLC, and various individual Emergency Centers.  Neighbors Network entities are defendants, plaintiffs, and counter-plaintiffs. No trial dates have been set.

c.  <u>Rhode Island Litigation</u> – Several physicians filed lawsuits against Neighbors Health LLC, NEC West Warwick Emergency Centers, LP, NHS Emergency Centers, LLC, Neighbors GP, LLC, Neighbors Physicians Group-Rhode Island, LLC, and Neighbors Physicians Group, LLC alleging breach of contract and promissory estoppel based on lease agreements between the physicians and the Neighbors defendants.  A special master was appointed and the Court entered an order permitting the landlord to re-let the property and ordering the special master to take no further action.  The cases are pending in the Superior Court of Rhode Island.

**F.  Events Leading to the Chapter 11 Cases**

   ### *i.  Increased Competition in the Industry*

31.     Beginning in 2016, the Debtors experienced increased competition in the industry in the form of traditional hospital emergency rooms, hospital outpatient departments, other freestanding emergency centers and urgent care facilities.  Despite growth in net revenue from opening new facilities, the Debtors have experienced significant declining earnings before interest, tax, depreciation, and amortization ("<u>EBITDA</u>") since 2015.  For example, the Debtors' consolidated EBITDA dropped from $49 million in 2015, to $45 million in 2016, to $10.3

million[9] in 2017.   This drop has been caused, in part, by the increased competition in the industry, which has led to lower patient volumes per Emergency Center.   For the Emergency Centers opened prior to 2016, the average claims per day fell from approximately 13 in the first quarter of 2017 to approximately 10 currently.   For Emergency Centers opened during 2016, there continues to be, on average, fewer than 10 claims per day.   This marked reduction in patient volume led to a strain at previously profitable locations and underperformance at new locations.

### ii.   *Compression of Insurance Payor Reimbursements*

32.     In addition to increased competition in the industry, the Debtors' liquidity crisis was caused by a challenging insurance payor environment, which significantly reduced allowed reimbursement as well as collection rates.   The net patient service revenue collected as a percentage of gross billings continues to decrease over time because insurance payors have increasingly reduced or denied the Emergency Centers' claims.   This is largely the result of insurance companies increasingly classifying the services provided as "non-emergent," rather than "emergent" care.

### iii.   *Excessive Overhead*

33.     The Debtors' aggressive growth strategy included significant investments in their infrastructure to support future Emergency Centers. These investments included a new corporate headquarters in Houston, a significant marketing spend, and increased employee headcount.   As the Debtors were forced to shift away from a growth strategy, they have closed underperforming facilities and elected not to open new facilities.   As a result, the Debtors' overhead costs have become inconsistent with the current size of their business.   Although the Debtors made significant corporate overhead expense reductions in 2017, including reductions in force and

---

[9] Consolidated EBITDA of $10.3 million includes restructuring expenses of $3.8 million.

6318135v20

spending cuts, corporate overhead remains out of proportion to the current level of operations primarily due to the high costs of unutilized headquarters space.

### iv.   Costs Associated with Closed and Never-Opened Emergency Centers

34.     The Debtors' obligations still include costs related to the Closed Centers – specifically, and significantly, the Debtors' unexpired lease obligations.  As of the Petition Date, the Debtors had future non-cancelable obligation commitments for operating and capital leases of approximately $90 million.

35.     The Debtors primary real property landlord on closed and never-opened centers is Read King.  Prepetition, the Debtors (and certain principals of the Debtors) partnered with Read King to develop new locations for Emergency Centers.   In many instances, the arrangement included Read King identifying a property; Neighbors executing a long-term lease (typically 12 years); Read King financing the purchase of the real property and the building shell; Neighbors building out the interior, opening the site, and paying rent to Read King (the "RK Leases").

36.     As tenants under the RK Leases, the Emergency Centers are subject to a Master Guaranty of Leases (the "Master Guaranty"), which provides that the tenant Emergency Centers under the RK Leases are guarantors of all the RK Leases.  Based on these cross-guarantees, as guarantors of the RK Leases, the tenant Emergency Centers are jointly and severally liable for default of any of the other Emergency Centers.

### v.   Attempts at Out-of-Court Restructuring

37.     In the fourth quarter of 2016, certain of the Debtors fell out of compliance with certain covenants under the Prepetition Credit Agreement.  After significant negotiations, the Debtors and KeyBank agreed on an amendment to the Prepetition Credit Agreement.  In the summer of 2017, the enterprise experienced continued underperformance and cash strain, which

6318135v20

resulted in additional covenant defaults.

38.     Beginning in the fourth quarter of 2016 and continuing into 2017, Debtors implemented various expense reduction initiatives, including an aggregate reduction in senior management salaries, eliminating certain corporate headquarters positions, reductions in marketing expenses across all Emergency Centers, reductions in expenditures for corporate office supplies and food, and corporate travel reductions.

39.     As of the fourth quarter of 2017, these cost reductions generated annualized cost savings of almost $22 million (approximately $18,000 average reduction in overhead costs per month at each of the individual Emergency Centers).   Additionally, based on the significant headwinds facing the business, the Debtors closed 13 underperforming Emergency Centers (the "Closed Centers") and elected not to open 8 centers that had been in various stages of planning and preparation for opening.

| Facility No. | Closed | Facility No. | Never Opened |
|---|---|---|---|
| 4006 | Lakeline | 4034 | Aurora |
| 4012 | Zaragoza | 4037 | Victoria |
| 4014 | Tyler | 4039 | Lake Jackson |
| 4017 | Texas City | 4040 | El Paso #3 |
| 4024 | Wichita Falls | 4041 | Grand Prairie |
| 4025 | Longview | 4042 | Pueblo |
| 4027 | San Angelo | 4044 | Tucson |
| 4028 | College Station | 4046 | Lafayette |
| 4029 | Lufkin | | |
| 4030 | West Warwick | | |
| 4032 | Greeley | | |
| 4036 | Kerrville | | |
| 4038 | Amarillo South | | |

*Neighbors Closed and Never-Opened Locations*

40.     During this process, the Debtors also engaged me as CRO and, as set forth in this Declaration, my duties included evaluating the existing business model, recommending the

closure of unprofitable locations, negotiating with Key Bank, negotiating with vendors and real property lessors, negotiating with real property lessors, and assessing other areas of change within the business

41.     In addition to retaining me as CRO, the Debtors' retained my firm, CohnReznick, to lead efforts to facilitate the Debtors' restructuring efforts, which included the following advisory services:

      a.  evaluating and assessing the Company's operating performance and strategy;

      b.  assessing projected EBITDA and net cash flow by facility and corporate entity service provider;

      c.  evaluating a go forward strategy to continue or close facilities;

      d.  assisting management with cost saving initiatives including the reduction of corporate personnel and streamlining the organization by realigning responsibilities;

      e.  providing assistance and analysis in determining DIP financing size and requirements;

      f.  assisting in the development of strategy relating to patients and vendors;

      g.  providing accounting and financial advisory and support services; evaluating cash management controls and procedures; assisting with the management of cash disbursements and vendor relationships;

      h.  implementing controls and procedures to conserve cash;

      i.  assisting in the preparation of weekly and monthly reports;

      j.  analyzing actual results  in comparison to cash forecasts and financial projections;

      k.  assisting the Debtors' with the data and information gathering relating to third party due diligence for potential transactions with financial and strategic buyers; and

      l.  advising and assisting the Debtors' and other professionals retained by the Debtors' in developing and executing a Chapter 11 strategy including section 363 sales.

42.     In addition, CohnReznick assisted the Debtors in improving their Revenue Cycle

Management, which included:

    a.  the supervision and management of the claims processing;

    b.  payment and revenue generation performed by the billing and collection departments;

    c.  implementation of improvements in charge capture, pricing and coding;

    d.  development of accounts receivable coverage strategies;

    e.  development of high priority, cash driving, work lists for account follow up staff;

    f.  implementation of outsourced vendor coverage for previously uncovered accounts receivable including worker's compensation, liability and commercial underpays;

    g.  development of productivity standards and measurement tools; and

    h.  facilitation of the transition to a new and enhanced revenue cycle management system software to improve billing accuracy and follow-up.

43.    Since my retention, the Debtors closed 7 underperforming Emergency Centers resulting in annual EBITDA savings of at least $3.2 million and reduced corporate overhead, primarily headcount reductions, resulting in approximately $3.4 million in annual savings. In addition, the decision not to open a center resulted in a savings of approximately $400,000 in pre-opening costs and an additional $1.1 million of projected EBITDA losses due to operating inefficiencies and the lack of market awareness sustained by new centers in its first year of operations.[10]

44.    In late 2017 and early 2018 the Debtors engaged in discussions with all categories of stakeholders, including its secured lenders, landlords, employees, and vendors.

45.    After carefully considering all available strategic alternatives, and in consultation with KeyBank, the Debtors concluded that it was in the best interests of their creditors and other

---

[10] The decision to not open a facility takes into consideration many factors including, but not limited to, the competitive landscape and the negative impact on operating cash flow before an emergency center achieves the volume and profitability to contribute to system-wide performance.

6318135v20

stakeholders to market their assets for sale and prepare for a chapter 11 bankruptcy case.

### vi.  *Marketing of the Debtors' Assets and Negotiation of the Stalking Horse Bid*

46.     On January 2, 2018, in conjunction with their ongoing discussions with KeyBank,

the Debtors retained Houlihan Lokey ("Houlihan") as their investment banker.   Thereafter,

Houlihan and the Debtors began a marketing process that included, among other things:

    a.  Establishing a data room with relevant documents about the Debtors' businesses, financial status and operations;

    b.  Negotiating and executing non-disclosure agreements with interested parties;

    c.  Preparing a Confidential Information Presentation ("CIP");

    d.  Approaching strategic and financial buyers with industry and/or "special situations" experience;

    e.  Approaching Class A and B holders that had expressed an interest in participating in the sale process;

    f.  Marketing the Debtors as 1) an entire portfolio, 2) by individual market, and 3) by individual facility;

    g.  Having numerous informal discussions with bidders regarding the Debtors' business and bidder due diligence;

    h.  Holding management presentations with 3 parties;

    i.  Conducting site visits with 3 parties;

    j.  Analyzing bids, negotiating asset purchase agreements and selecting the Stalking Horse Bidder (defined below);

47.     Houlihan initially contacted 127 parties.   Sixty-one parties signed non-disclosure

agreements and were granted access to the data room.   Thereafter, Debtors and Houlihan

solicited indications of interest ("IOI") with a deadline of February 16, 2018.   Eighteen parties

submitted IOI, ranging from interest in a whole-system bid to bids on specific Emergency

Centers.  Houlihan spent a substantial amount of time providing feedback and guidance to parties

that submitted IOI.  The Debtors' and Houlihan further provided supplemental due diligence and

6318135v20

had numerous telephone conferences, in person meetings, 3 management presentations, and 3 site visits at the Debtors' headquarters in Houston or at various Emergency Centers.

48.      The Debtors' counsel, with input from Houlihan, prepared a form of asset purchase agreement to serve as the baseline agreement for all bidders.  Stalking horse candidates were required to provide an asset purchase agreement marked against the Debtors' version by April 9, 2018.  The Debtors received five formal bids.  Two bids were whole-system bids for substantially all of the Debtors' assets.  Two bids were for some or all of the Debtors' Houston locations.  One bid was for the Debtors' Midland and Odessa locations.

49.      After evaluating all of the bids and consulting with their advisors and with KeyBank, the Debtors selected Altus Health Systems OPCO, LLC and Altus Health System Realty, LLC as the stalking horse bidder for Houston assets.  As further described in the Bid Procedures Motion, the Debtors intend to conduct an auction to maximize the ultimate purchase price for their assets.

## PART II.  FIRST DAY PLEADINGS

50.      I have reviewed each of the First Day Pleadings and proposed orders (including any attached exhibits) and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.  I believe the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum disruption to their business and minimum loss of productivity or value and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases.

### A.  Administrative and Procedural First Day Pleadings

51.      **Joint Administration Motion**.  I believe that joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and

other pleadings, and related notices, that otherwise would need to be filed in each separate case absent joint administration.  I believe that joint administration will save considerable time and expense for the Debtors, the Clerk of the Court, the U.S.  Trustee and other parties in interest, which will, in turn, result in substantial savings for the Debtors' estates.  I do not believe that the rights of the Debtors' creditors will be adversely affected by joint administration of the Chapter 11.

52.     **Application to Appoint Claims and Noticing Agent.**  KCC's retention is the most effective and efficient manner of noticing these creditors and parties in interest of the filing of the Chapter 11 Cases and of other developments in the Chapter 11 Cases.  I am informed that KCC has acted as the claims and noticing agent in numerous cases of comparable size.

53.     KCC's retention to act as an agent of the Court, as an independent third party with significant experience in this role, is in the best interests of the Debtors as well as their estates and creditors.

54.     **Motion to Extend Time to File Schedules and Consolidate Creditors.**  Due to the (i) the substantial size and scope of the Debtors' businesses, (ii) the complexity of their financial affairs, (iii) the limited staffing available to perform the required internal review of their accounts and affairs, and (iv) the Debtors' focus of their attention on initial bankruptcy filing matters, the Debtors will not be able to assemble all of the information necessary to complete and file the schedules and statements of financial affairs by the applicable deadline.

55.     The Debtors, while separate legal entities, have a large number of common creditors and a centralized cash management system.  Filing separate Top 20 Lists and separate creditor matrices in their respective cases would generate a variety of lists with a large number of duplicate entries.  Consolidating the list of creditors to one list between the Debtors of the 50

6318135v20

largest unsecured creditors is in the best interest of the Debtors, its estate, and its creditors to avoid unnecessary duplication and to ensure administrative inefficiency.

**B. Operational First Day Pleadings**

56.     **Motion to Provide Adequate Assurance for Utilities.**   In order to operate their businesses, the Debtors rely on various utility services.   Uninterrupted Utility Services are essential to the Debtors' continued operations.   Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, jeopardizing the Debtors' reorganization efforts.   It is therefore essential that the Utility Services continue uninterrupted.

57.     On average, prior to the Petition Date, the Debtors spent approximately $250,000 each month on account of Utility Services.   I believe that the Debtors monthly utility costs going forward will be substantially similar for the initial stages of the Chapter 11 Cases, but may be reduced as part of the Debtors' cost-saving measures.   The Debtors have proposed to deposit $125,000 into the Utility Deposit Account, which is equal to approximately one half (1/2) of one month of Utility Services for all of the Utility Companies that do not already have deposits in place (the "Utility Deposit").

58.     **Motion to Use Cash Collateral and Obtain DIP Financing.**   Prior to the Petition Date, the Debtors and the Prepetition Agent (and their respective advisors) engaged in arms'-length negotiations regarding the terms and conditions of potential DIP Financing, as well as a consensual cash collateral order.   The Debtors also conducted a search to identify potential alternative lenders to provide DIP Financing to the Debtors.   The Debtors received at least two DIP loan offers and, after this search, the Debtors concluded that no other party could provide alternative financing on as or more favorable terms than those provided by KeyBank (the "DIP

Lenders Agent") and the other lenders party to the DIP Credit Agreement (the "DIP Lenders").

59.     The Debtors have sufficient cash to fund operations without immediate access to the DIP Financing, however, the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including use of cash collateral, is not granted promptly. Further, the Debtors anticipate that the commencement of these Chapter 11 Cases will immediately increase the demands on its free cash as a result of, among other things, the costs of administering the Chapter 11 Cases, addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of the cases and making the payments authorized by other orders entered granting the Debtors' first day motions.

60.     The Budget attached to the motion includes only expenditures that are necessary to operate the Debtors' businesses, continue the sale process for their assets and avoid irreparable harm. As reflected in the Budget, the Debtors project over $2.5 in negative cash flow over the next 4 weeks.  The prepetition secured parties are already undersecured. The Debtors have no viable alternative to using cash collateral under the agreement set forth in the Interim Order.

61.     Accordingly, the Debtors have an immediate need for cash collateral on an interim basis to, among other things, continue the operation of their business, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain enterprise value for the benefit of all parties in interest.

62.     **Patient Confidentiality Motion.**  The Debtors are requesting that they not be required to file a mailing matrix of patient names and addresses in order to protect confidential patient information. Instead, the Debtors request that the claims agent be allowed to maintain a Patient Matrix and a separate set of Patient Schedules with patient information that shall not be

filed or shared with any other party (except to this Court and the United States Trustee, upon request). The Debtors request that they be allowed to file a redacted version of the Patient Schedules in order to protect confidential information and to comply with applicable laws, including the HIPAA.

63. **Motion to Continue Cash Management System.** The Debtors have filed a motion to continue their ordinary course banking practices. I understand that the Debtors maintain a cash management system, comprised of 89 (eighty-nine) bank accounts, which include the Debtors' Facility Income Accounts, Facility Expense Accounts, Corporate Accounts, the Payroll Account, the NPM Account, and the NPG Account (the "Bank Accounts"). Continued use of these Bank Accounts facilitates the efficient flow and management of funds involved in the Debtors' operations (the "Cash Management System"). The Debtors utilize the cash management system on a daily basis to support virtually all aspects of their operations. Without access to their existing cash management system and accounts, the Debtors will not be able to operate.

64. In the ordinary course of business, the Debtors may use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "Business Forms"). Given that the Business Forms were used prepetition, they do not include references to the Debtors' current status as debtors in possession. Most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding the Chapter 11 Cases and the notice of commencement of the Chapter 11 Cases that has been or will soon be provided to parties in interest. As is the case with the existing Cash Management System, requiring the Debtors to change existing Business Forms would unnecessarily distract

the Debtors from their restructuring efforts and impose needless expenses on the estates, without any meaningful corresponding benefit.

65.     The Debtors further seek authority to continue the Intercompany Transactions postpetition. Because the Debtors engaged in the Intercompany Transactions on a regular basis prepetition and such transactions are common for enterprises like the Debtors, the Debtors believe that they may continue the Intercompany Transactions in the ordinary course, as contemplated by section 363(c)(1) of the Bankruptcy Code, without court approval. Nonetheless, out of an abundance of caution, the Debtors seek express authority to continue engaging in the Intercompany Transactions.

66.     Failure to continue the Intercompany Transactions in the ordinary course of the Debtors' business would unnecessarily and severely hinder operations. Absent the continuation of the Intercompany Transactions, the Debtors' ability to operate their business during the Chapter 11 Cases would be severely prejudiced, and their ability to maximize value for creditors would be drastically reduced. Avoiding such potentially crippling hindrances by continuing the Intercompany Transactions is, therefore, in the best interests of the estates. The Debtors therefore request that the Court authorize them to continue the Intercompany Transactions in the ordinary course of business

67.     **Motion to Pay Prepetition Employee Wages.**   The Debtors' Workforce is comprised of three primary groups, as defined below: (i) Employees, including part-time and full-time employees, (ii) the Physicians, and (iii) the Pharmacists, and the Debtors are supplement their workforce with temporary staff and contract third-party collectors.   The Workforce's skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  In many instances, the Workforce

includes highly-trained medical professionals who are not easily replaced. Without the continued, uninterrupted services of their Workforce, the Debtors' reorganization efforts will be jeopardized.

68.     In the ordinary course of business, the Debtors pay their Employees on a biweekly basis, every other Thursday, one week in arrears.  The current aggregate gross amount for the Employee payroll is approximately $1,400,000 per pay period. As of the Petition Date, approximately 90 Physicians are owed approximately $710,000, in the aggregate, for their services, approximately 15 Pharmacists are owed approximately $16,000, in the aggregate, for their services, Staffing Agencies are owed approximately $40,000, in the aggregate, and Third-Party Collectors are similarly owed approximately $40,000, in the aggregate.

69.     Finally the Debtors are seeking authority to continue their benefit programs, including their Health Plans, Medical Plans, Dental and Vision Plans, HSA, and Other Employee Benefits.  Continuation of Benefits in the ordinary course of business is critical to keeping and maintaining the Debtors' specialized workforce in order to ensure smooth transition into these Chapter 11 Cases.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: Houston, Texas
        July 12      , 2018

                                            By: _____
                                            Name:   Chad J. Shandler

## **EXHIBIT A**

Corporate Organizational Chart



NEIGHBORS LEGACY HOLDINGS, INC

NEIGHBORS GLOBAL HOLDINGS, LLC

NEIGHBORS HEALTH, LLC

- EDMG, LLC
- Neighbors Concierge Services, LLC
- Next Door Urgent Care, LLC
- Neighbors Telehealth Services, LLC
- Neighbors Practice Management, LLC
- Neighbors Emergency Center, LLC
- Neighbors GP, LLC
- NHS Emergency Centers, LLC (Series LLC)

Neighbors GP, LLC — 1%
NHS Emergency Centers, LLC (Series LLC) — 99%

NEC Kingwood Asset Holdings, LLC
NEC Baytown Asset Holdings, LLC
NEC Pearland Asset Holdings, LLC
NEC Beaumont Asset Holdings, LLC

NEC Bellaire Emergency Center, LP
NEC Kingwood Emergency Center, LP
NEC Baytown Emergency Center, LP
NEC Pasadena Emergency Center, LP
NEC Pearland Emergency Center, LP
NEC Mueller Emergency Center, LP
NEC Beaumont Emergency Center, LP
NEC Lakeline Emergency Center, LP
NEC Yorktown Emergency Center, LP
NEC Harlingen Emergency Center, LP
NEC Crosby Emergency Center, LP
NEC Orange Emergency Center, LP
NEC Midland Emergency Center, LP
NEC Odessa Emergency Center, LP
NEC Eastside Emergency Center, LP
NEC Zaragoza Emergency Center,LP
NEC College Station Emergency Center, LP
NEC Texas City Emergency Center, LP
NEC Port Arthur Emergency Center, LP
NEC Tyler Emergency Center, LP
NEC Texarkana Emergency Center, LP
NEC Amarillo Emergency Center, LP
NEC Brownsville Emergency Center, LP
NEC McAllen Emergency Center, LP
NEC Porter Emergency Center, LP
NEC Longview Emergency Center, LP
NEC Pharr Emergency Center, LP
NEC San Angelo Emergency Center, LP
NEC Wichita Falls Emergency Center, LP
NEC Pueblo Emergency Center, LP
NEC Aurora Emergency Center, LP
NEC Greeley Emergency Center, LP
NEC West Warwick Emergency Center, LP
NEC Lubbock Emergency Center, LP
NEC Bristol Emergency Center, LP
NEC Seguin Emergency Center, LP
NEC Lafayette Emergency Center, LP
NEC Weatherford Emergency Center, LP
NEC Lake Jackson Emergency Center, LP
NEC Lufkin Emergency Center, LP
NEC Paris Emergency Center, LP
NEC Kerrville Emergency Center, LP
NEC Amarillo South Emergency Center, LP
NEC Grand Prairie Emergency Center, LP
NEC Victoria Emergency Center, LP
NEC Abilene Emergency Center, LP
NEC Greenville Emergency Center, LP
NEC Phoenix Emergency Center, LP
NEC Hartford Emergency Center, LP
NEC Santa Fe Emergency Center, LP
NEC El Paso Upper Valley Emergency Center, LP
NEC Santa Ana Emergency Center, LP
Arizona Emergency Center 01, LP
NEC Waco Emergency Center, LP

Neighbors Physician Group – Colorado, LLC

Series 100 – Bellaire
Series 101 – Kingwood
Series 102 – Baytown
Series 103 – Pasadena
Series 104 – Pearland
Series 105 – Mueller
Series 106 – Beaumont
Series 107 – Lakeline
Series 108 – Yorktown
Series 109 – Harlingen
Series 110 – Crosby
Series 111 – Orange
Series 112 – Midland
Series 113 – Odessa
Series 114 – Eastside
Series 115 – Zaragoza
Series 116 – College Station
Series 117 – Texas City
Series 118 – Port Arthur
Series 119 – Tyler
Series 120 – Texarkana
Series 121 – Amarillo
Series 122 – Brownsville
Series 123 – McAllen
Series 124 – Porter
Series 125 – Longview
Series 126 – Pharr
Series 127 – San Angelo
Series 128 – Wichita Falls
Series 129 – Pueblo
Series 130 – Aurora
Series 131 – Greeley
Series 132 – West Warwick
Series 133 – Lubbock
Series 134 – Bristol
Series 135 – Seguin
Series 136 – Lafayette
Series 137 – Weatherford
Series 138 – Lake Jackson
Series 139 – Lufkin
Series 140 – Paris
Series 141 – Kerrville
Series 142 – Amarillo South
Series 143 – Grand Prairie
Series 144 – Victoria
Series 145 – Abilene
Series 146 – Greenville
Series 147 – Phoenix
Series 148 – Harford
Series 149 – Santa Fe
Series 150 – El Paso Upper Valley
Series 151 – Santa Anna
Series 152 – Arizona 01

- Alleyne Paul
- Chang Michael
- Chen Andy
- Gillman Cyril
- Henderson Quang
- Patel Dharmesh
- Patel Hitesh
- Patel Setul
- Vo Tom

Neighbors Physician Group, PLLC

Neighbors Physician Group - Rhode Island, LLC

## **EXHIBIT B**

List of Guarantors

**Guarantors of Prepetition Credit Agreement**

| No. | Facility # | Legal Name | Guarantor |
|---|---|---|---|
| 1 | 4001 | NEC Bellaire Emergency Center, LP | X |
| 2 | 4002 | NEC Kingwood Emergency Center, LP | X |
| 3 | 4003 | NEC Baytown Emergency Center, LP | X |
| 4 | 4004 | NEC Pasadena Emergency Center, LP | X |
| 5 | 4005 | NEC Pearland Emergency Center, LP | X |
| 6 | 4006 | NEC Lakeline Emergency Center, LP | X |
| 7 | 4007 | NEC Beaumont Emergency Center, LP | X |
| 8 | 4008 | NEC Mueller Emergency Center, LP | X |
| 9 | 4009 | NEC Yorktown Emergency Center, LP | X |
| 10 | 4010 | NEC Crosby Emergency Center, LP | X |
| 11 | 4011 | NEC Orange Emergency Center, LP | X |
| 12 | 4012 | NEC Zaragoza Emergency Center, LP | X |
| 13 | 4013 | NEC Midland Emergency Center, LP | X |
| 14 | 4014 | NEC Tyler Emergency Center, LP | X |
| 15 | 4015 | NEC Eastside Emergency Center, LP | X |
| 16 | 4016 | NEC Port Arthur Emergency Center, LP | X |
| 17 | 4017 | NEC Texas City Emergency Center, LP | X |
| 18 | 4018 | NEC Odessa Emergency Center, LP | X |
| 19 | 4019 | NEC Harlingen Emergency Center, LP | X |
| 20 | 4020 | NEC Amarillo Emergency Center, LP | X |
| 21 | 4021 | NEC Porter Emergency Center, LP | X |
| 22 | 4022 | NEC Brownsville Emergency Center, LP | X |
| 23 | 4023 | NEC McAllen Emergency Center, LP | X |
| 24 | 4024 | NEC Wichita Falls Emergency Center, LP | X |
| 25 | 4025 | NEC Longview Emergency Center, LP | X |
| 26 | 4026 | NEC Texarkana Emergency Center, LP | X |
| 27 | 4027 | NEC San Angelo Emergency Center, LP | X |
| 28 | 4028 | NEC College Station Emergency Center, LP | X |
| 29 | 4029 | NEC Lufkin Emergency Center, LP | X |
| 30 | 4030 | NEC West Warwick Emergency Center, LP | X |
| 31 | 4031 | NEC Lubbock Emergency Center, LP | X |
| 32 | 4032 | NEC Greeley Emergency Center, LP | X |
| 33 | 4033 | Next Door Urgent Care, LLC | X |
| 34 | 4034 | NEC Aurora Emergency Center, LP | X |
| 35 | 4035 | NEC Paris Emergency Center, LP | X |
| 36 | 4036 | NEC Kerrville Emergency Center, LP | X |
| 37 | 4037 | NEC Victoria Emergency Center, LP | X |
| 38 | 4038 | NEC Amarillo South Emergency Center, LP | X |
| 39 | 4039 | NEC Lake Jackson Emergency Center, LP | X |
| 40 | 4040 | NEC El Paso Upper Valley Emergency Center, LP | X |
| 41 | 4041 | NEC Grand Prairie Emergency Center, LP | X |
| 42 | 4042 | NEC Pueblo Emergency Center, LP | X |
| 43 | 4044 | Arizona Emergency Center 01, LP | X |
| 44 | 4046 | NEC Lafayette Emergency Center, LP | X |
| 45 | 6000 | EDMG, LLC | X |
| 46 | 6000 | Neighbors Emergency Center, LLC | X |
| 47 | 6000 | Neighbors Global Holdings, LLC | X |
| 48 | 6000 | Neighbors GP, LLC | X |
| 49 | 6000 | Neighbors Health, LLC | X |
| 50 | 6000 | Neighbors Physician Group, PLLC | X |
| 51 | 6001 | Neighbors Practice Management, LLC | X |
| 52 | 6007 | Neighbors Physician Group – Colorado, LLC | X |
| 53 | 8000 | NEC Pharr Emergency Center, LP | X |
| 54 | 8001 | NEC Phoenix Emergency Center, LP | X |
| 55 | 8002 | NEC Abilene Emergency Center, LP | X |
| 56 | 8003 | NEC Bristol Emergency Center, LP | X |
| 57 | 8006 | NEC Hartford Emergency Center, LP | X |
| 58 | 8008 | NEC Santa Fe Emergency Center, LP | X |
| 59 | 8009 | NEC Seguin Emergency Center, LP | X |
| 60 | 8010 | NEC Waco Emergency Center, LP | X |
| 61 | 8013 | NHS Emergency Centers, LLC | X |
| 62 | 8016 | Neighbors Concierge Services, LLC | X |
| 63 | 8017 | Neighbors Telehealth Services, LLC | X |
| 64 | 9002 | NEC Kingwood Asset Holdings LLC | X |
| 65 | 9003 | NEC Baytown Asset Holdings, LLC | X |
| 66 | 9005 | NEC Pearland Asset Holdings, LLC | X |
| 67 | 9007 | NEC Beaumont Asset Holdings, LLC | X |