**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:** | § |
| | § **Chapter 11** |
| | § |
| **NEIGHBORS LEGACY HOLDINGS, INC.,** | § **Case No.  18-33836 (MI)** |
| *et al.,* | § **(Jointly Administered)** |
| | § |
| **Debtors.**[1] | § |

**DEBTORS' EMERGENCY MOTION (I) FOR ENTRY OF AN ORDER
(A) APPROVING AUCTION AND BID PROCEDURES, INCLUDING BID
PROTECTIONS, AND (B) AUTHORIZING AND SCHEDULING AN AUCTION FOR
THE SALE OF THE DEBTORS' ASSETS; AND (II) FOR ENTRY OF AN ORDER (A)
APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (B) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
<u>UNEXPIRED LEASES</u>**

THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED.  IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER.  IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

---

[1]   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/neighbors. The location of Debtors' principal place of business and the Debtors' service address is: 10800 Richmond Avenue. Houston, Texas 77042.

6721892v1

| REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS. |
| --- |

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") file this Motion (the "Bid Procedures and Sale Motion") for (I) an Order (A) Approving Auction and Bid Procedures, Including Bid Protections, and (B) Authorizing and Scheduling an Auction for the Sale of the Debtors' Assets (the "Bid Procedures Order"); and for (II) an Order (A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases (the "Sale Order").  In support of the Motion, the Debtors rely upon the Declaration of Chad J.  Shandler in Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration").  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## PRELIMINARY STATEMENT

1.     The Debtors have undertaken a robust six-month prepetition marketing process, which resulted in formal bids for various of the Debtors' assets.  The Debtors anticipate a sale of substantially all of their assets in two, or more, separate asset packages (each, an "Asset Package").  To date, the Debtors have negotiated one asset purchase agreement (the "Stalking Horse Agreement") for the sale of substantially all of the Debtors' Houston-area centers with Altus Health Systems OPCO, LLC, and Altus Health System Realty, LLC (collectively, the "Stalking Horse Bidder," and collectively with any other stalking horse bidder that may be subsequently designated as provided herein, the "Stalking Horse Bidders").  Any Stalking Horse Bidder's offer remains subject to higher and better bids at auction.  To induce the Stalking Horse Bidder to serve as the "stalking horse" bidder in the sale process, the Debtors have agreed to

2

certain bid procedures and protections, including break-up fees. The Debtors seek court approval of these procedures and bid protections as set forth below.

2.      The Debtors seek the immediate entry of the Bid Procedures Order, attached as **Exhibit A**, establishing the bid procedures related to an auction of the Debtors' assets, approving the form of the Stalking Horse Agreement and the bid protections being granted to the Stalking Horse Bidder, scheduling a hearing to approve the proposed sale, and establishing notice procedures related to the assumption and assignment of executory contracts and unexpired leases.

3.      In this Motion, the Debtors also seek entry of the Sale Order approving the proposed sale to the Stalking Horse Bidder on the terms set forth in the Stalking Horse Agreement or to the highest and/or best bid received at auction and authorizing the assumption and assignment of certain executory contracts and unexpired leases.

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. § 1408.

5.      The legal predicates for the relief requested herein are Bankruptcy Code sections 105, 363, 365, 503, and 507 and Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

6721892v1

## BACKGROUND

**A.     General Background**

6.      On July 12, 2018 (the "<u>Petition Date</u>"), the Debtors each commenced a case by filing a petition for relief under Chapter 11 of the Bankruptcy Code (collectively, the "<u>Chapter 11 Cases</u>").  The Debtors have requested that the Chapter 11 Cases be jointly administered.

7.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

8.      To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of Texas (the "<u>United States Trustee</u>").  No trustee or examiner has been appointed in the Chapter 11 Cases.

9.      The Debtors currently operate 22 freestanding emergency centers (the "<u>Emergency Centers</u>") throughout the State of Texas, including in South Texas, El Paso, the Golden Triangle, the Permian Basin, the Panhandle, and the greater Houston area.  The Debtors' Emergency Centers are designed to offer an attractive alternative to traditional hospital emergency rooms by reducing wait times, providing better working conditions for physicians and staff, and giving patient care the highest possible priority.

10.     The Debtors' original parent was founded in 2008, and the first Neighbors Emergency Center opened in 2009.  At their peak, the Debtors operated 33 Emergency Centers across three states.  In recent years, the Debtors have experienced financial difficulties caused in large part by increased competition, less favorable insurance payor conditions, declining revenues, and disproportionate overhead costs as compared to their operating income.  These challenges have caused significant strain on the Debtors' liquidity and threatened their ability to continue operating as a going concern.  Prepetition, the Debtors engaged professionals and

6721892v1

explored various out-of-court solutions, including closing unprofitable Emergency Centers and downsizing their corporate overhead.  Ultimately, the Debtors' out-of-court restructuring efforts were unsuccessful and the Debtors elected to commence these Chapter 11 Cases.

11.     In August 2017, the Debtors retained Chad J. Shandler of CohnReznick LLP ("CohnReznick") to serve as the Debtors' chief restructuring officer ("CRO") and, on January 2, 2018, the Debtors retained Houlihan Lokey, Inc. ("Houlihan") as the investment banker to market the Debtors' assets.

12.     Thereafter, Houlihan and the Debtors began a marketing process that included, among other things:

a. Establishing a data room with relevant documents about the Debtors' businesses, financial status and operations;

b. Negotiating and executing non-disclosure agreements with interested parties;

c. Preparing a Confidential Information Presentation ("CIP");

d. Approaching strategic and financial buyers with industry and/or "special situations" experience;

e. Approaching Neighbors Class A and B interest holders that had expressed an interest in participating in the sale process;

f. Marketing the Debtors 1) as an entire portfolio, 2) by individual market, and 3) by individual facility;

g. Having numerous informal discussions with bidders regarding the Debtors' business and bidder due diligence;

h. Holding management presentations with parties;

i. Conducting site visits with parties;

j. Analyzing bids, selecting the Stalking Horse Bidder, and negotiating the Stalking Horse Agreement.

13.     Houlihan initially contacted 126 parties.  61 parties signed non-disclosure agreements and were granted access to the data room established by Houlihan.  Thereafter, the

6721892v1

Debtors and Houlihan solicited indications of interest ("IOI") with a deadline of February 16, 2018.  Eighteen parties submitted an IOI, ranging from interest in a whole-system bid to bids on specific Emergency Centers.  Houlihan and the Debtors spent a substantial amount of time providing feedback and guidance to parties that submitted an IOI.  The Debtors and Houlihan further provided supplemental due diligence and had numerous telephone conferences, in person meetings, management presentations, and site visits at the Debtors' headquarters in Houston or at various Emergency Centers.

14.     The Debtors' counsel, with input from Houlihan, prepared a form of asset purchase agreement to serve as the baseline agreement for all bidders.  Stalking horse candidates were required to provide a draft stalking horse agreement marked against the Debtors' version by April 9, 2018.  The Debtors received five formal bids.  Two bids were whole-system bids for substantially all of the Debtors' assets and the remaining three bids were for specific regions.

15.     After evaluating all of the bids and consulting with their advisors and with KeyBank, the Debtors selected Altus Health Systems OPCO, LLC and Altus Health System Realty, LLC as the Stalking Horse Bidder for all Houston-area locations.  A copy of the Stalking Horse Agreement, which is expressly subject to higher and better offers, is attached as **Exhibit B**.  In connection with the Stalking Horse Agreement, and in order to maximize the ultimate purchase price for their assets, the Debtors agreed to seek approval of sale procedures, form of Stalking Horse Agreement, and form of notice and certain bid protections as more fully set forth below.

## RELIEF REQUESTED

**A.** **The Bid Procedures, Form of Stalking Horse Agreement, and Form of Notice**

16.     The Debtors seek approval of the form of Stalking Horse Agreement attached as **Exhibit B**.  The Debtors also seek approval of the bid procedures attached as **Exhibit C** (the "Bid Procedures").

17.     The Bid Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process consistent with the timeline available to the Debtors under the Stalking Horse Agreement and the terms of the Debtors' agreed use of cash collateral and proposed post-petition financing.  The Bid Procedures are the result of good faith, arm's length negotiations with each Stalking Horse Bidder.  The Bid Procedures are transparent and represent a fair balance of the competing issues present in this case.

**B.** **Notice Relating to Potential Assumption and Assignment of Executory Contracts and Unexpired Leases**

18.     As part of the Sale, the Debtors seek authority to assume and assign certain executory contracts and/or unexpired leases (the "Desired 365 Contracts") to the Stalking Horse Bidder or other successful bidders.

19.     With respect to the Desired 365 Contracts, the Debtors respectfully request approval of the following notice procedures:

  a.  No later than 10 (ten) days prior to the Sale Hearing, the Debtors will file with the Court and serve on each party to a Desired 365 Contract a notice setting forth the amount of cure owed thereunder according to the Debtors' books and records (the "Cure Notice").  The Cure Notice shall state the cure amount that the Debtors believe is necessary to assume such contract or lease pursuant to Bankruptcy Code section 365 (the "Cure Amount"), and notify each party that such party's lease or contract may be assumed and assigned to the successful bidder to be identified at the conclusion of the Auction.

  b.  No later than five (5) days prior to the Sale Hearing, any objection to the Cure Amount must be filed with the Court (the "Cure Objection

Deadline"). Any objection to the Cure Amount must state with specificity what cure the party to the Desired 365 Contract believes is required with appropriate documentation in support thereof. If no objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Desired 365 Contract or other document as of the date of the Cure Notice; the non-debtor party to the Desired 365 Contract shall be deemed to have stipulated that the Cure Amount set forth in the Cure Notice is correct; the non-debtor party shall be forever barred, estopped and enjoined from asserting or claiming against the Debtors or the Stalking Horse Bidder that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Desired 365 Contract or that there is any objection or defense to the assumption and assignment of such Desired 365 Contract, including any argument that there exist conditions to assumption and assignment that must be satisfied under such Desired 365 Contract or that any required consent to assignment has not been given; and the non-debtor party to such Desired 365 Contract shall be forever barred from objecting to the adequacy of the Stalking Horse Bidder'a adequate assurance of future performance and that there exists any other basis on which to object to such assumption and assignment.

## C.      Breakup Fee, Expense Reimbursement, and Minimum Overbid

20.     In connection with approval of the Stalking Horse Agreement, the Debtors seek approval of a Breakup Fee and/or Expense Reimbursement, as applicable under the Stalking Horse Agreement, or subsequent Stalking Horse Agreements that may be negotiated by the Debtors (collectively the "Bid Protections"). Specifically, in the event that the Debtors consummate an alternative transaction, which would include a sale of the Purchased Assets to any party other than a Stalking Horse Bidder, or fail to conduct the Auction or sell the Purchased Assets in compliance in all material respects with the Bid Procedures Order, the Debtors shall pay the respective Stalking Horse Bidder the Breakup Fee and Expense Reimbursement, as applicable. In the event that a Stalking Horse Bidder terminates a Stalking Horse Agreement based on a material breach of the Stalking Horse Agreement by the Debtors, the Debtors shall be liable for and shall pay to the respective Stalking Horse Bidder the Bid Protections.

6721892v1

21.     The Debtors believe that the Bid Protections are appropriate under the circumstances as a cost of ensuring that the Debtors' bankruptcy estates maximize value for the Purchased Assets, while also providing the Debtors with the opportunity to continue their marketing efforts.    The Debtors seek approval to provide a Breakup Fee and Expense Reimbursement under a Stalking Horse Agreement that does not exceed an aggregate of 5%. The Debtors believe that the Bid Protections are reasonable for a transaction of the type and size contemplated, and in light of the attendant risks present in this case.

22.     The determination of whether a stalking horse fee/expense arrangement should be allowed is based on whether the fees and expenses are necessary to preserve the value of the estate.  *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 534 (3d Cir. 1999).  Courts have evaluated such arrangements under the business judgment rule standard.  *See In re ASARCO, LLC*, 650 F.3d 593 (5th Cir. 2011) (affirming bankruptcy court's decision to apply the business judgment rule to evaluate whether an expense reimbursement bid protection was permissible); *see also In re ASARCO LLC*, 441 B.R. 813, 826 (S.D. Tex. 2010) (explaining three-part test used to determine whether expense reimbursement was permissible under business judgment rule); *Cottle v. Storer Communications, Inc.*, 849 F.2d 570 (11th Cir. 1988); *CRTF Corp. v. Federated Dep't Stores*, 683 F.Supp. 422 (S.D.N.Y. 1988); *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 657 (S.D.N.Y. 1992), *appeal dismissed by* 3 F.3d 49 (2d Cir. 1993); *see also In re Twenver, Inc.*, 149 B.R. 954 (Bankr. D. Colo. 1992).  The considerations that underlie a debtor's business judgment to pay a break-up fee or expense reimbursement are relevant to the Court's determination of the request.  *Id.*

6721892v1

23.     It is well-established that "[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations." *In re Integrated Res., Inc.*, 147 B.R. at 658.  In the instant case, the proposed Bid Protections have been the product of good faith, arm's-length negotiations between the Debtors and the Stalking Horse Bidder.  The proposed Bid Protections are within the spectrum of "break-up fees" approved by bankruptcy courts in chapter 11 cases throughout the country.  *See e.g., In re Cobalt International Energy, Inc., et al.*, Case No. 17-36709 (MI) (Bankr. S.D. Tex. Jan. 25, 2018) (court authorized payment of Bid Protections up to an aggregate of 3% of the purchase price), *In re Stone Energy Corp., et al.*, Case No. 16-36390 (court approved break-up fee of 3% and expense reimbursement of 1%) (MI) (Bankr. S.D. Tex. Jan. 18, 2017) (same), *In re Enron Corp.*, Case No. 01-16034 (Bankr. S.D.N.Y. April 8, 2004) (court approved break-up fee equal to 5% of the purchase price); *In re TransCom USA Management Co., L.P.*, Case No. 01-35158 (KKB) (Bankr. S.D. Tex. February 12, 2002) (court approved a break-up fee of more than 3.6% of the purchase price for the assets); *In re Samson Resources Corp.*, Case No. 15-11934 (Bankr. D. Del. 2016) (authorizing, for multiple stalking horse agreements, breakup fees of 1 and 1.5% and expense reimbursements of 3 and 3.5%).

**D.     The Sale of Assets is an Exercise of the Debtors' Sound Business Judgment**

24.     Bankruptcy Code section 363(b) does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate; however, bankruptcy courts in this District and elsewhere have required that the authorization of such use, sale, or lease of property of the estate out of the ordinary course of business be based upon sound business justification.  *See Institutional Creditors of Continental Air Lines, Inc v. Continental Air Lines, Inc., et al.  (In re Continental Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor,

creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Asarco*, 650 F.3d at 601; *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *38 (Bankr. S.D. Tex.  Mar. 21, 2014); *In re St. Marie Clinic PA*, No. 10-70802, 2013 WL 5221055, at *9 (Bankr. S.D. Tex. Sept. 17, 2013); *In re Particle Drilling Techs., Inc.*, No. 09-33744, 2009 WL 2382030, at *2 (Bankr. S.D. Tex. July 29, 2009); *In re San Jacinto Glass Indus., Inc.*, 93 B.R. 934, 944 (Bankr. S.D. Tex. 1988).   Once the Debtors articulate a valid business justification, "[t]he business judgment rule is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company."  *In re S.N.A. Nut Co.*, 86 B.R. 98 (Bankr. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) (". . . a presumption of reasonableness attaches to a Debtor's management decisions.").

25.     The Debtors have a sound business justification for selling the Purchased Assets under the terms of the Stalking Horse Agreement, and pursuant to a competitive-Bidding Process consistent with the Bidding Procedures.

26.     The Debtors submit that the Stalking Horse Agreement (or, if the Stalking Horse Bidder is not the prevailing bidder, an alternative bid resulting from the Bidding Procedures) will constitute the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination to sell the Purchased Assets under the terms of the Stalking Horse Agreement (or through a competitive Bidding Process as provided for in the Bidding Procedures) is a valid and sound exercise of the Debtors' business judgment.

27.     Accordingly, the Debtors believe that they have proposed a fair process for obtaining the highest and best offer and sale of the Purchased Assets for the benefit of the Debtors' estates and their creditors.

**E.     Request to Approve Sale Free and Clear Pursuant to 11 U.S.C. § 363(f)**

28.     By this Motion, the Debtors also request that the Court approve the sale of the Purchased Assets to the Stalking Horse Bidder or the successful bidder pursuant to Bankruptcy Code sections 105, 363, and 365.  This portion of the relief is requested to be entered after the Sale Hearing, pursuant to a form of Sale Order to be filed prior to the Sale Hearing.  The Debtors submit that the sale of the Purchased Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement, or such agreement as the Debtors may reach with the successful bidder, is in the best interest of the Debtors' estates and should be approved.

29.     A debtor should be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and prior to obtaining a confirmed plan or reorganization if it demonstrates a sound business purpose for doing so.  *See, e.g., Committee of Equity Security Holders v. Lionel Corp.*  (*In re Lionel Corp.*), 722 F.2d 1063 (2d Cir. 1983); *see also In re Gulf Oil Corp.*, 404 B.R.  407 (Bankr. S.D. Tex.  2009).  Factors considered in approving a sale outside of plan include (i) the business justification, (ii) the amount of elapsed time since the filing date, (iii) whether the proposed bid procedures and Stalking Horse Agreement facilitate competitive bidding, (iv) whether the assets have been aggressively marketed, (v) the likelihood that a plan will be confirmed in the near future, (vi) the effect of disposition on the future plan, and (vii) whether the assets are increasing or decreasing in value.  *Id*.

6721892v1

30.     Together with Houlihan, the Debtors began a formal marketing process in January 2018.  The Debtors and Houlihan aggressively marketed the Debtors' assets for sale before agreeing on the Stalking Horse Agreement.  The disposition of the Purchased Assets will not control the terms of a future plan.  Further, a timely sale is important in this case in order to preserve the continuity of services to the Debtors' patients.

31.     The Debtors request that the Court approve the sale of the Purchased Assets free and clear of all liens, claim, and encumbrances.  In evaluating such a sale, a court must balance the need for flexibility with the concern of affected creditors.  *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 715 (Bankr. W.D. Tex. 1989).  The Court must also determine that creditors' lien rights are adequately protected and that the offered price is the highest price and/or best terms obtainable under the circumstances in the particular case.  *Id.*; *In re Beker Indus. Corp.*, 63 B.R. 474, 477–78 (Bankr. S.D.N.Y. 1986).

32.     The Debtors maintain that one of the five subsections of section 363(f) will be satisfied and, therefore, the Debtors may sell the Purchased Assets free and clear of all liens, claims, and encumbrances.  Specifically, the Debtors submit that any such lien, claim, or encumbrance will be adequately protected by attachment to the net proceeds of the sale, subject to any claims and defenses the Debtors may possess with respect thereto and/or the Debtors will obtain the consent of the party holding the lien, claim or encumbrance.  Accordingly, the Debtors request that the Purchased Assets be sold to the Stalking Horse Bidder or the successful bidder free and clear of all liens, claims, and encumbrances, with such liens, claims, and encumbrances attaching to the proceeds of the sale of the Purchased Assets.

**F.      Authorization of Assumption and Assignment of Executory Contracts and Unexpired Leases**

33.      To enhance the value to the Debtors of the proposed sale, the Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Desired 365 Contracts to the Stalking Horse Bidder or the successful bidder.  The Debtors further request that the Sale Order provide that the Desired 365 Contracts will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Bidder or the successful bidder notwithstanding any provisions in the Desired 365 Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

34.      Adequate assurance of future performance depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp.* (*In re Sanshoe Worldwide Corp.*), 139 B.R. 585, 593 (S.D.N.Y. 1992); *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *see also In re Prime Motor Inns Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

35.      The Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Stalking Horse Bidder or the successful bidder to perform under the Desired 365 Contracts.  The Sale Hearing thus will afford the Court and other

14

interested parties the opportunity to evaluate the ability of the Stalking Horse Bidder or the successful bidder to provide adequate assurance of future performance under the Desired 365 Contracts, as required under Bankruptcy Code section 365(b)(1)(C).  Further, as set forth above, the Debtors will give notice to all parties to the Desired 365 Contracts of their intention to assume the Desired 365 Contracts and what the Debtors believe are the Cure Amounts. Accordingly, the Court should authorize the Debtors to assume and assign the Desired 365 Contracts to the Stalking Horse Bidder or the successful bidder.

36.     Accordingly, the Debtors request that the Court (i) enter the Bid Procedures Order; (ii) schedule the Sale Hearing to consider the Sale Order; and (iii) grant the Debtors other just relief.

### **WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)**

37.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 (fourteen) days after the entry of the order, unless the court orders otherwise."  Here, an expeditious closing of a sale is necessary and appropriate to maximize value for the estates and is a requirement under the Debtors' post-petition financing. Accordingly, the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

38.     Accordingly, the Debtors request that the Court (i) enter the Bid Procedures Order; (ii) schedule the Sale Hearing to consider the Sale Order; and (iii) grant the Debtors other just relief.

6721892v1

## NOTICE

39.     Notice of this Motion shall be given to (a) the Office of the United States Trustee for the Southern District of Texas; (b) the Debtors' 50 largest unsecured creditors on a consolidated basis; (c) Reed Smith LLP, Three Logan Square, 1717 Arch Street, Suite 3100, Philadelphia, PA 19103 (Attn: Matthew E. Tashman), and via email to mtashman@reedsmith.com and llim@reedsmith.com, counsel to KeyBank National Association in its capacity as Agent and DIP Agent; (d) the United States Attorney's Office for the Southern District of Texas; (e) the Internal Revenue Service; (f) any party known to have asserted a Lien on the Purchased Assets; (g) all known affected federal, state, and local regulatory, and taxing authorities; (h) any buyer that signed a nondisclosure agreement with respect to the Purchased Assets; (i) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service; and (j) any party required to be served under Bankruptcy Local Rule 9013-1(d) (the parties listed in (a) - (j) above, the "Notice Parties").  Due to the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

## CONCLUSION

40.     The Debtors respectfully request that the Court enter the Bidding Procedures Order now and the Sale Order after the Sale Hearing and granting such other and further relief as is just and proper.

16

Dated: Houston, Texas
          July 12, 2018

                                   **PORTER HEDGES LLP**

                                   By:   */s/ John F.  Higgins*
                                              John F.  Higgins
                                              State Bar No.  09597500
                                              Eric M.  English
                                              State Bar No.  24062714
                                              Aaron J.  Power
                                              State Bar No.  24058058
                                              Genevieve M. Graham
                                              State Bar No. 24085340
                                              1000 Main Street, 36th Floor
                                              Houston, Texas 77002
                                              Telephone: (713) 226-6000
                                              Fax: (713) 228-1331

                                   **PROPOSED COUNSEL FOR DEBTORS
                                   AND DEBTORS IN POSSESSION**

6721892v1

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 12, 2018, I caused a copy of the foregoing document to be served by the Electronic Case Filing System in the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Eric. M. English*
Eric M. English
