6699031v19

# Exhibit 1-5

## Purchase Agreements

*Execution Version*

---

**ASSET PURCHASE AGREEMENT**

**by and among**

**NEC MUELLER EMERGENCY CENTER, LP,**
**as Operating Seller**

**NEIGHBORS LEGACY HOLDINGS, INC.,**
**NEIGHBORS GLOBAL HOLDINGS, LLC,**
**NEIGHBORS HEALTH, LLC,**
**EDMG, LLC, and**
**NEIGHBORS PRACTICE MANAGEMENT, LLC,**
**as Corporate and Shared Services Sellers**

**and**

**AEC ER 4, LLC,**
**as Buyer**

**dated**

**SEPTEMBER 12, 2018**

---

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS AND INTERPRETIVE MATTERS ........ 2
Section 1.01 Definitions ........ 2
Section 1.02 Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement ........ 14
Section 1.03 Other Definitional and Interpretative Provisions ........ 14

ARTICLE 2 PURCHASE AND SALE ........ 15
Section 2.01 Purchase and Sale of Assets ........ 15
Section 2.02 Retained Assets ........ 18
Section 2.03 Assumption of Liabilities ........ 19
Section 2.04 Retained Liabilities ........ 20
Section 2.05 Good-Faith Deposit; Escrow ........ 21
Section 2.06 Purchase Price ........ 22
Section 2.07 Filing of Bankruptcy Cases ........ 22
Section 2.08 Closing; Closing Deliveries. ........ 22
Section 2.09 Allocation of Purchase Price. ........ 24
Section 2.10 Transfer Taxes. ........ 24

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLERS ........ 24
Section 3.01 Corporate Existence and Power ........ 24
Section 3.02 Authorization ........ 25
Section 3.03 Governmental Authorization ........ 25
Section 3.04 Title to Transferred Assets ........ 25
Section 3.05 Financial Statements and Information ........ 25
Section 3.06 Absence of Certain Developments ........ 26
Section 3.07 Brokerage Fees ........ 26
Section 3.08 Contracts. ........ 26
Section 3.09 Taxes. ........ 26
Section 3.10 Inventory ........ 27
Section 3.11 Transactions with Affiliates. ........ 27
Section 3.12 Compliance with Laws ........ 27
Section 3.13 Healthcare Laws ........ 28
Section 3.14 Legal Proceedings ........ 28
Section 3.15 Absence of Restrictions and Conflicts ........ 28
Section 3.16 Intellectual Property. ........ 29
Section 3.17 Environmental. ........ 29
Section 3.18 Real Property ........ 30
Section 3.19 Employment and Labor ........ 30
Section 3.20 Employee Benefits ........ 31
Section 3.21 Disclosures ........ 32

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ........ 32
Section 4.01 Corporate Existence and Power ........ 32
Section 4.02 Authorization ........ 32

Section 4.03 Governmental Authorization ..... 33
Section 4.04 Healthcare Laws ..... 33
Section 4.05 Legal Proceedings ..... 33
Section 4.06 Absence of Restrictions and Conflicts ..... 33
Section 4.07 Financing ..... 34
Section 4.08 Arm's Length ..... 34
Section 4.09 Finders' Fees ..... 34

ARTICLE 5 PRE-CLOSING COVENANTS OF THE PARTIES ..... 34
Section 5.01 Conduct of the Acquired Business ..... 34
Section 5.02 Bankruptcy Filings and Bidding Procedures ..... 35
Section 5.03 Actions With Respect to Contracts. ..... 36
Section 5.04 Access to Information and Lessors ..... 38
Section 5.05 Commercially Reasonable Efforts; Further Assurances ..... 38
Section 5.06 Notices of Certain Events ..... 39
Section 5.07 Rule 2002 Notice List ..... 40
Section 5.08 Ad Valorem Taxes ..... 40

ARTICLE 6 POST-CLOSING COVENANTS ..... 40
Section 6.01 Access ..... 40
Section 6.02 Employee Matters ..... 41
Section 6.03 Trade Name License Agreement and Transition Services Agreement ..... 43

ARTICLE 7 POST-CLOSING COVENANTS OF THE PARTIES ..... 43
Section 7.01 Certain Filings ..... 43
Section 7.02 Public Announcements ..... 44
Section 7.03 Confidentiality ..... 44
Section 7.04 Mail and Other Post-Closing Inquiries. ..... 44

ARTICLE 8 CONDITIONS TO CLOSING ..... 44
Section 8.01 Conditions to Obligations of Buyer and Sellers ..... 44
Section 8.02 Conditions to Obligations of Buyer ..... 45
Section 8.03 Conditions to Obligations of the Sellers ..... 46

ARTICLE 9 TERMINATION ..... 46
Section 9.01 Grounds for Termination ..... 46
Section 9.02 Effect of Termination ..... 49

ARTICLE 10 MISCELLANEOUS ..... 50
Section 10.01 Notices ..... 50
Section 10.02 Survival ..... 51
Section 10.03 Amendments and Waivers ..... 51
Section 10.04 Expenses ..... 52
Section 10.05 Successors and Assigns ..... 52
Section 10.06 Supplementation and Amendment of Schedules ..... 52
Section 10.07 Governing Law ..... 52
Section 10.08 Jurisdiction ..... 52
Section 10.09 WAIVER OF JURY TRIAL ..... 53
Section 10.10 Counterparts; Effectiveness; Third Party Beneficiaries ..... 53
Section 10.11 Entire Agreement ..... 53

Section 10.12 Severability ... 53
Section 10.13 Time of Essence ... 53
Section 10.14 Closing Actions ... 53
Section 10.15 Conflict Between Transaction Documents ... 54
Section 10.16 Time Periods ... 54
Section 10.17 Certain Acknowledgements and Limitations ... 54

EXHIBITS

| | |
|---|---|
| Exhibit A | Mueller Facility Location |
| Exhibit B | Sale Order |
| Exhibit C | Real Property Lease |

SCHEDULES

| | |
|---|---|
| Schedule 2.02(e) | Excluded Facilities |
| Schedule 3.06 | Absence of Certain Developments |
| Schedule 3.07 | Sellers' Finders' Fees |
| Schedule 3.08(a) | Seller Contracts |
| Schedule 3.08(b) | Seller Contracts - Defaults |
| Schedule 3.09(b) | Payment of Taxes |
| Schedule 3.11(a) | Transactions with Affiliates |
| Schedule 3.11(b) | Transactions with Affiliates |
| Schedule 3.12(a) | Compliance with Laws |
| Schedule 3.12(b) | Permits |
| Schedule 3.13(a) | Compliance with Healthcare Laws |
| Schedule 3.13(b) | Healthcare Laws Permits |
| Schedule 3.14 | Legal Proceedings |
| Schedule 3.16(a) | Intellectual Property Rights |
| Schedule 3.16(b) | Intellectual Property Rights - Infringement |
| Schedule 3.18(a) | Leased Real Property |
| Schedule 3.20 | ERISA Plans |
| Schedule 4.09 | Buyer's Finders' Fees |
| Schedule 5.03 | Desired 365 Contracts |

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "***Agreement***") is dated as of September 12, 2018 (the "***Execution Date***"), by and among (i) AEC ER 4, LLC, a Texas limited liability company ("***Buyer***"), and (ii) NEC Mueller Emergency Center, LP, a Texas limited partnership, the "***Operating Seller***"), (iii) Neighbors Legacy Holdings, Inc., a Texas corporation ("***Seller Parent***"), Neighbors Global Holdings, LLC, a Delaware limited liability company ("***Global Holdings***"), Neighbors Health, LLC, a Texas limited liability company ("***Neighbors Health***"), EDMG, LLC, a Texas limited liability company ("***EDMG***"), and Neighbors Practice Management, LLC, a Texas limited liability company ("***NPM***" and collectively with Seller Parent, Global Holdings, Neighbors Health and EDMG, the "***Corporate and Shared Services Sellers***" and each individually, a "***Corporate and Shared Services Seller***," and collectively with the Operating Seller, the "***Sellers***" and each individually, a "***Seller***"). Buyer and Sellers are sometimes referred to collectively herein as the "***Parties***" and singly as a "***Party***."

## RECITALS

A. The Operating Seller is engaged in the business of operating the emergency center listed on Exhibit A (the "***Mueller Facility***"), and the Corporate and Shared Services Sellers are or were engaged in performing corporate functions relative to the operation of the Mueller Facility (collectively with the business conducted by the Operating Seller at the Mueller Facility, the "***Acquired Business***").

B. At the auction conducted on August 27, 2018 (the "***Auction***"), the Sellers determined that the offer of Buyer for the Acquired Business, the Transferred Assets (as defined below), and the Specifically Assumed Liabilities (as defined below) was the highest and/or best offer received for the Acquired Business, the Transferred Assets and the Specifically Assumed Liabilities to date and constitutes a fair and adequate purchase price. The offer of the Buyer is also fair and reasonable for all purposes and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

C. On July 12, 2018, each Seller filed voluntary petitions under Chapter 11 of the Bankruptcy Code (as defined below) in the Bankruptcy Court (as defined below).

D. On the terms and conditions of this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, the Sellers desire to sell to Buyer, and Buyer desires to purchase from the Sellers, all of the Transferred Assets, and Buyer is willing to assume all of the Specifically Assumed Liabilities.

NOW, THEREFORE, in consideration of the mutual promises, representations and warranties made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the Parties hereto, intending to be legally bound, and subject only to the required approvals of the Bankruptcy Court, agree as follows:

## ARTICLE 1
## DEFINITIONS AND INTERPRETIVE MATTERS

**Section 1.01 Definitions.**

The following terms, as used herein, have the following meanings:

"***365 Contracts***" means all Contracts that may be assumed by the Debtors pursuant to Section 365 of the Bankruptcy Code.

"***Accounts Receivable***" means, as of 12:01 a.m. on the Closing Date, all accounts receivable, trade receivables, notes receivables, and all other receivables, whether accrued, current or overdue, and all rights to payment from third parties (including uncashed checks) and the full benefit of all security for such accounts or notes receivable and rights to payment of Sellers, in each case other than Intercompany Indebtedness.

"***Acquired Business***" is defined in the Recitals hereto.

"***Adverse Consequences***" means all Proceedings, charges, complaints, demands, injunctions, judgments, orders, decrees, awards, rulings, damages, penalties, fines, costs, reasonable amounts paid in settlement, Liabilities, obligations, Taxes, Liens, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses.

"***Affiliate***" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person. For such purposes, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Agreement***" is defined in the opening paragraph hereof.

"***Alternative Agreement***" means one or more definitive agreements with respect to one or more Alternative Transactions.

"***Alternative Transaction***" means a transaction or series of related transactions pursuant to which the Sellers sell all or a substantial portion of the Transferred Assets or any group of assets that includes all or a substantial portion of the Transferred Assets, from a Person other than Buyer or an Affiliate of Buyer, as the highest or best offer, in accordance with the Bidding Procedures Order or otherwise, but does not mean the sale of goods or services conducted in a manner consistent with the recent operation of the Acquired Business prior to the Petition Date.

"***Applicable Law***" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), constitution, ordinance, code, rule, regulation or Order adopted or promulgated by, and the terms of any Permit issued by, a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"***Auction***" is defined in the Recitals hereto.

"***Avoidance Actions***" is defined in Section 2.02(m).

"***Back-Up Bidder***" has the meaning set forth in the Bidding Procedures for the Sale of Debtor's Assets attached to the Bidding Procedures Order.

"***Bankruptcy Cases***" means the bankruptcy cases of the Debtors which were filed on July 12, 2018 under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

"***Bankruptcy Code***" means Title 11 of the United States Code, as amended.

"***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Bankruptcy Cases from time to time.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Southern District of Texas and the Local Rules of the United States Bankruptcy Court for the Southern District of Texas, each as in effect on the Petition Date or as thereafter amended, to the extent applicable to the Bankruptcy Cases or proceedings therein, as the case may be.

"***Bidding Procedures and Sale Motion***" means the motion dated July 12, 2018 (Docket No. 20), filed by certain of the Debtors with the Bankruptcy Court seeking, among other things, entry of the Bidding Procedures Order and the Sale Order.

"***Bidding Procedures Order***" means the order of the Bankruptcy Court, dated August 1, 2018 (Case No. 18-33836 (MI)), that approves, *inter alia*, bidding and auction procedures to be followed by the Debtors and all potential bidders for the Transferred Assets.

"***Bill of Sale***" means an instrument, in form and substance reasonably satisfactory to the Debtors and Buyer, assigning, conveying and transferring the Transferred Assets (other than the Desired 365 Contracts and the Real Property Lease) to Buyer.

"***Business Day***" means any day, excluding Saturdays, Sundays or "legal holidays" (as referenced in Bankruptcy Rule 9006(a)), on which nationally chartered commercial banks are open for business in Houston, Texas.

"***Buyer***" is defined in the opening paragraph of this Agreement.

"***Buyer Material Adverse Effect***" means a material adverse effect on the ability of Buyer to consummate the Transactions or to perform its obligations hereunder and under the other Transaction Documents to which it is or will be a Party.

"***Buyer's Transferred Employee List***" is defined in Section 6.02(b).

"***Cash Deposits***" means the total amount of any cash and negotiable instruments of the Sellers that constitute deposits securing any performance bonds, surety bonds, letters of credit, guarantees, security deposits or similar assurances outstanding as of the Closing Date, but excluding utility deposits.

"***Cash Purchase Price***" is defined in Section 2.06(a).

"***CERCLA***" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and any rules or regulations promulgated thereunder.

"***Chosen Courts***" is defined in Section 10.08.

"***CHOW***" is defined in Section 5.05(b).

"***Claim***" means a claim as defined in Section 101(5) of the Bankruptcy Code.

"***Closing***" is defined in Section 2.08(a).

"***Closing Date***" means the date of the Closing.

"***COBRA***" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"***Code***" means the United States Internal Revenue Code of 1986, as amended.

"***Confidentiality Agreement***" means the Confidentiality Agreement dated as of July 27, 2018, between Global Holdings and Neighbors Health, on the one hand, and Pahala Ventures, LLC on the other.

"***Contract***" or "***contract***" means, whether written or oral, any contract, agreement, lease, license, commitment, indenture, note, bond, sale and purchase order, instrument, or other binding arrangement or understanding, and with respect to any Contract to which a Seller is a party, such contract that Seller is permitted under the Bankruptcy Code to assume and assign or sell and transfer (including any amendments or modifications thereto).

"***Corporate and Shared Services Sellers***" is defined in the opening paragraph of this Agreement.

"***Cure Costs***" means the amount necessary to cure defaults under any Desired 365 Contract, including the Real Property Lease, and to compensate the non-debtor party for any actual pecuniary loss resulting from such defaults in order to assume and assign the Desired 365 Contract under Sections 365(a) and 365(f) of the Bankruptcy Code.

"***Debtor***" or "***Debtors***" means any Seller individually, and the Sellers, collectively, following the filing of the Bankruptcy Cases.

"***Deposit***" is defined in Section 2.05(a).

"***Desired 365 Contracts***" is defined in Section 5.03(b).

"***Effective Time***" means 12:01 a.m. local time in Houston, Texas on the day after the Closing Date.

"***Employees***" means those Persons employed by the Sellers who either (i) worked primarily for the Acquired Business or (ii) provided administrative, billing and collection or corporate services to the Mueller Facility immediately prior to the Closing, including any such individual on leave of absence.

"***End Date***" is defined in Section 9.01(b).

"***Environmental Laws***" means any Applicable Law, or any agreement with any Governmental Authority to which any Seller is a party, relating to human health and safety, the environment or to pollutants, contaminants, wastes, chemicals, or toxic or other Hazardous Materials.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" of any entity means any other entity which, together with such entity, would be treated as a single employer under Section 414 of the Internal Revenue Code.

"***ERISA Plan***" means any (i) "employee benefit plans" (as defined in Section 3(3) of ERISA) and any bonus, stock option, stock purchase, restricted stock, equity based, incentive, deferred compensation, retiree medical or life insurance, supplemental retirement, severance, change in control or other benefit plans, programs or arrangements, and all employment, termination, severance, any cafeteria plan or any holiday or vacation plan or practice or other contracts or agreements, to which the Sellers, or any of their ERISA Affiliates is a party, with respect to which the Sellers, or any of their ERISA Affiliates has any obligation to or which are maintained, contributed to or sponsored by the Sellers or any of their ERISA Affiliates for the benefit of any Employee or former employee, officer or director of the Sellers, (ii) employee benefit plan for which the Sellers could incur liability under Section 4069 of ERISA in the event such plan has been or were to be terminated and (iii) plan in respect of which the Sellers could incur liability under Section 4212(c) of ERISA.

"***Excluded Contracts***" is defined in Section 2.02(q).

"***Execution Date***" is defined in the opening paragraph of this Agreement.

"***Final Order***" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (i) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended, (ii) with respect to which no request for a stay, motion or application for reconsideration or rehearing, notice of appeal or petition for certiorari is filed within the deadline provided by applicable statute or regulation or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, and (iii) as to which the deadlines for filing such request, motion, petition, application, appeal or notice referred to in clause (ii) above have expired.

"***Final Order Deadline***" is defined in Section 5.02(c).

"***Financial Statements***" is defined in Section 3.05.

"***GAAP***" means generally accepted accounting principles in the United States, consistently applied in accordance with past practice.

"***Global Holdings***" is defined in the opening paragraph of this Agreement.

"***Governmental Authority***" means any trans-national, domestic or foreign federal, state or local, governmental unit, authority, department, court, agency or official, including any political subdivision thereof.

"***Hazardous Materials***" means chemicals, pollutants, radioactive material, contaminants, wastes, toxic or hazardous substances, materials or wastes, petroleum and petroleum products, medical waste, biohazardous waste, asbestos or asbestos-containing materials or products, polychlorinated biphenyls, lead or lead-based paints or materials, radon, fungus, mold, mycotoxins, nanoparticles or other substances that may have an adverse effect on human health or the environment.

"***Headquarters***" means the corporate headquarters of Seller Parent located at 10800 Richmond Ave., Houston, Texas 77042.

"***Healthcare Laws***" means any Applicable Law related to the regulation of the healthcare industry (including, but not limited to, the addiction treatment industry, the behavioral health industry, the hospital and other health care facilities industry, the pharmaceuticals industry and the physician practice management industry), the regulation of healthcare professionals (including, but not limited to, physicians and nurses and physician assistants), or to payment for items or services rendered, provided, dispensed, or furnished by healthcare suppliers or providers (including, but not limited to, physician practices, hospitals and other health facilities, physicians and pharmacists and other practitioners).

"***Houston Assets***" means all of the assets, properties, rights and interests of the Houston Facilities, including those that would be a "Transferred Asset," "Acquired Asset" or similar term as defined in the applicable Houston Purchase Agreement. For the avoidance of doubt, the term "Houston Assets" shall not include any of the Transferred Assets hereunder.

"***Houston Buyer***" means, collectively, the Person or Persons that acquires all or a portion of the Houston Facilities and certain related assets and the business conducted by the Houston Sellers at the purchased Houston Facilities, and assumes certain liabilities related thereto, pursuant to the terms of the Houston Purchase Agreements; *provided*, *however*, that any Person acquiring both Houston Facilities and Non-Houston Facilities shall be deemed to be a Non-Houston Buyer for purposes of this Agreement.

"***Houston Facilities***" means the emergency centers operated by certain of the Houston Sellers at the following locations: (i) Baytown, (ii) Bellaire, (iii) Crosby, (iv) Kingwood, (v) Pasadena, (vi) Pearland, (vii) Porter and (viii) Yorktown.

"***Houston IP Seller***" means Neighbors Emergency Center, LLC, a Texas limited liability company.

"***Houston Purchase Agreements***" means the Asset Purchase Agreements pursuant to which the applicable Houston Sellers sell to the applicable Houston Buyer(s) the applicable Houston Facilities and related Houston Assets, and the applicable Houston Buyer(s) assumes certain liabilities related to the operation of the Houston Facilities acquired thereunder.

"***Houston Sellers***" means, collectively, the "Sellers" under the Houston Purchase Agreements.

"***Insider***" means, any executive officer, director, governing body member, stockholder, partner or Affiliate, as applicable, of any Seller or any predecessor or Affiliate of any Seller or any individual related by marriage or adoption to any such individual or any entity in which any such Person owns any beneficial interest.

"***Intellectual Property Rights***" means (i) inventions, reduced to practice or made the subject of one or more pending patent applications, (ii) patents and patent applications (including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof) registered or applied for throughout the world, all improvements to the inventions disclosed in each such registration, patent or patent application, (iii) trademarks, service marks, trade dress, logos, domain names, trade names and corporate names (whether or not registered) in all nations throughout the world and all goodwill associated therewith, (iv) copyrights (whether or not registered) and registrations and applications for registration thereof in all nations throughout the world, (v) proprietary computer software, (including source code, object code, firmware, operating systems and specifications), (vi) trade secrets and know-how (including manufacturing and production processes and techniques and research and development information), (vii) databases and data collections, in each case solely to the extent related to seismic and geological data, (viii) copies and tangible embodiments of any of the foregoing, in whatever form, format or medium, (ix) all rights to obtain and rights to apply for patents, and to register trademarks and copyrights, (x) all rights in all of the foregoing provided by treaties, conventions and common law, and (xi) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation of any of the foregoing.

"***Intercompany Indebtedness***" means all Liabilities owed by any Seller to any other Seller or to any Affiliate of any Seller or by an Affiliate of a Seller to a Seller and which does not arise from Desired 365 Contracts.

"***Interest***" means any right, title, interest, ownership, indicia of title or ownership, right of possession, or other legal, equitable or possessory interest of any kind.

"***Inventory***" means all inventories of supplies, pharmaceuticals, drugs, food, janitorial and office supplies, replacements, spare, component parts, and other disposables and consumables owned by the Operating Seller located at or within the Mueller Facility, and any other goods held for sale or lease or furnished under contracts of service, raw materials, supplies and work in process owned by the Operating Seller and related to the Acquired Business wherever located, whether or not in transit.

"***Knowledge***" or "***knowledge***," with respect to a Seller or, collectively, Sellers, means the actual or constructive knowledge of any of the following individuals: the Chief Restructuring Officer, Chief Financial Officer, Chief Business Development Officer, the Chief Nursing Officer, the Executive Medical Director, and General Counsel of Sellers.

"***Lease Assignment***" is defined in Section 2.08(b)(iii).

"***Leased Real Property***" means, with respect to the Mueller Facility, the parcel of real property of which the Operating Seller is the lessee (together with all fixtures and improvements thereon).

"***Liabilities***" means any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any kind or nature, whether accrued or not accrued, absolute or contingent, matured or unmatured, liquidated or unliquidated, known or unknown, asserted or not asserted, determined, determinable or otherwise.

"***Licensed Intellectual Property Rights***" means all Intellectual Property Rights owned by a Third Party and licensed or sublicensed to the Sellers.

"***Licenses***" means all federal, state and local government authorizations, certificates of authority, certificates of need, provider agreements and licenses.

"***Lien***" means, with respect to any property or asset, means any claim, interest, lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mechanics' lien, materialman's lien, statutory lien or right, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, right of pre-emption, right of first refusal or other Third Party right, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Buyer is a successor, transferee, or continuation of any Seller or the Acquired Business, and (iv) any leasehold interest, license, or other right, in favor of a Third Party or an Affiliate of any Seller, to use any portion of the Transferred Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, including any "lien" as under Bankruptcy Code Section 101(37).

"***Mueller Facility Administrators***" is defined in Section 6.02(b).

"***Mueller Facility-level Employees***" is defined in Section 6.02(b).

"***Neighbors Health***" is defined in the opening paragraph of this Agreement.

"***Non-Houston Assets***" means all of the assets, properties, rights and interests of the Non-Houston Facilities, including those that would be a "Transferred Asset," "Acquired Asset" or similar term as defined in the applicable Non-Houston Purchase Agreement. For the avoidance

of doubt, the term "Non-Houston Assets" shall not include any of the Transferred Assets hereunder.

"***Non-Houston Buyer***" means, collectively, the Person or Persons that acquires all or a portion of the Non-Houston Facilities and certain related assets and the business conducted by the Non-Houston Sellers at the purchased Non-Houston Facilities, and assumes certain liabilities related thereto, pursuant to the terms of the Non-Houston Purchase Agreements, and including any Person that acquires both Houston Facilities and Non-Houston Facilities. For the avoidance of doubt, the term "Non-Houston Buyer" shall not include the Buyer hereunder.

"***Non-Houston Facilities***" means the emergency centers operated by certain of the Non-Houston Sellers at the following locations: (i) Amarillo, (ii) Beaumont, (iii) Brownsville, (iv) Eastside, (v) Harlingen, (vi) Lubbock, (vii) McAllen, (viii) Midland, (ix) Odessa, (x) Orange, (xi) Paris, (xii) Port Arthur, and (xiii) Texarkana.

"***Non-Houston Purchase Agreements***" means the Asset Purchase Agreements (other than this Agreement) pursuant to which the applicable Non-Houston Sellers sell to the applicable Non-Houston Buyer(s) the applicable Non-Houston Facilities and related Non-Houston Assets, and the applicable Non-Houston Buyer(s) assumes certain liabilities related to the operation of the Non-Houston Facilities acquired thereunder. For the avoidance of doubt, the term "Non-Houston Purchase Agreements" shall not include the this Agreement.

"***Non-Houston Sellers***" means, collectively, the "Sellers" under the Non-Houston Purchase Agreements. For the avoidance of doubt, the term "Non-Houston Sellers" shall not include the Sellers hereunder.

"***Non-Transferable Assets***" is defined in Section 5.03(e).

"***NPM***" is defined in the opening paragraph of this Agreement.

"***Operating Seller***" is defined in the opening paragraph of this Agreement.

"***Order***" means any order, judgment, injunction, edict, decree, ruling, pronouncement, determination, decision, opinion, sentence, subpoena, writ or award issued, made, entered or rendered by any court, administrative agency or other Governmental Authority or by any arbitrator.

"***ordinary course of business***" means the operation of the Acquired Business of the Sellers in the usual and ordinary course as of the Execution Date.

"***Organizational Documents***" means, with respect to any Person, the certificate or articles of incorporation, bylaws, certificate of formation or organization, partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement or any other similar organizational documents of such Person.

"***Owned Intellectual Property Rights***" means all Intellectual Property Rights owned by the Sellers.

"***Party***" or "***Parties***" is defined in the opening paragraph of this Agreement.

"***Patient Privacy Requirements***" means the applicable requirements of the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 and the implementing regulations thereunder governing the privacy of individually identifiable health information and the security of such information maintained in electronic form, or of any similar law of Texas.

"***Permits***" means all material governmental (whether federal, state or local) permits, Licenses, franchises, certificates, approvals or other similar authorizations.

"***Permitted Liens***" means (a) non-monetary liens incurred in the ordinary course of business that do not detract from the value of any underlying Transferred Asset or interfere in any material respect with the ability of Buyer to own and operate any underlying Transferred Asset in substantially the manner as owned and operated by the Sellers immediately prior to the Execution Date; (b) zoning, building or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title that do not adversely affect the value of, or the current occupancy or use of the Seller Real Property in any material respect, and (c) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures that do not materially impair or detract from the value of the Seller Real Property or interfere with the ability of the Buyer to own and operate any Transferred Asset.

"***Person***" means any person, entity or Governmental Authority of any nature whatsoever, specifically including an individual, firm, company, corporation, partnership, trust, joint venture, association, joint stock company, limited liability company, estate, unincorporated organization or other entity or organization.

"***Petition Date***" means July 12, 2018, being the date on which the Sellers filed the Bankruptcy Cases with the Bankruptcy Court.

"***Primary Houston Buyer***" means Altus Health System OpCo, LLC, a Texas limited liability company, or one or more of its Affiliates; provided, however, that if the Houston Asset Purchase Agreement to which Altus Health System OpCo, LLC is a party does not close, then the "Primary Houston Buyer" shall refer to the Back-Up Bidder for the Houston Assets to be acquired under such Houston Asset Purchase Agreement.

"***Proceeding***" means any action, claim, demand, audit, hearing, complaint, investigation, litigation, or suit commenced, brought, conducted, or heard by or before any Governmental Authority.

"***PTO Obligations***" means the Liabilities of the Sellers for the accrued vacation, sick, holiday and other paid time off and related Taxes and other payroll obligations of the Transferred Employees outstanding as of the Closing Date.

"***Purchase Price***" is defined in Section 2.06(a).

"***Purchase Price Allocation***" is defined in Section 2.09.

"***Qualified Bid Deadline***" is defined in Section 5.02(e).

"***Real Property Lease***" means all right, title, and interest of the Operating Seller in all leases, subleases, licenses, concessions, and other agreements (written or oral) and all amendments, modifications, extensions, renewals, guaranties, and other agreements with respect thereto, including the right to all security deposits and other amounts and instruments deposited by or on behalf of the Operating Seller thereunder, pursuant to which the Operating Seller holds a leasehold or sub-leasehold estate in, or is granted the right to use or occupy, the Leased Real Property. A true and correct copy of the Real Property Lease is attached hereto as Exhibit C.

"***Representatives***" means, with respect to any Person, the officers, directors, employees, members, managers, partners, investment bankers, attorneys, accountants, consultants or other advisors, agents or representatives of such Person, when acting in such capacity on behalf of such Person.

"***Retained Assets***" is defined in Section 2.02.

"***Retained Liabilities***" is defined in Section 2.04.

"***Retained Seller Mark***" means the trademark owned by the Houston IP Seller and registered with the United States Patent and Trademark Office on July 11, 2017 under Registration No. 5239995, as amended.

"***Sale Hearing Deadline***" is defined in Section 5.02(b).

"***Sale Order***" means an order of the Bankruptcy Court, substantially in the form of Exhibit B attached hereto, that approves, *inter alia*, the sale of the Transferred Assets to Buyer.

"***Sale Order Deadline***" is defined in Section 5.02(c).

"***Seller***" or "***Sellers***" is defined in the opening paragraph of this Agreement.

"***Seller Marks***" means the name "Neighbors" and all variations thereof and all related trademarks, service marks, trade dress, logos, domain names, trade names and corporate names, but excludes the Retained Seller Mark.

"***Seller Parent***" is defined in the opening paragraph of this Agreement.

"***Seller Real Property***" means the Leased Real Property.

"***Sellers Material Adverse Effect***" means, any event, change, condition or matter that, individually or in the aggregate is or could reasonably be expected to result in a material adverse change or material adverse effect on (i) the condition (financial or otherwise), business, properties, assets, or results of operations of the Acquired Business, (ii) the ability of the Sellers or the Debtors, as applicable, to conduct the Acquired Business consistent with recent history, or (iii) the ability of the Sellers or the Debtors, as applicable, to perform their obligations under the Transaction Documents in material compliance with the requirements thereof or to consummate the Transactions; *provided, however*, that to the extent any such material adverse effect results

from any of the following matters, such effect shall be disregarded and shall not be taken into account in determining whether a material adverse effect has occurred under this definition: (A) changes in financial, credit or securities markets generally, including any changes in prevailing interest rates, in each case, which do not disproportionately affect a Seller relative to other industry participants, (B) changes in general economic or political conditions in the United States or regionally, in each case, which do not disproportionately affect a Seller relative to other industry participants, (C) the announcement, pendency or consummation of the sale of the Transferred Assets, (D) the consequences of filing the Bankruptcy Cases and the impact thereof on the condition (financial or otherwise), business, properties, assets, or results of operations of the Acquired Business, (E) actions taken or omissions made after the date of this Agreement with the express written consent of Buyer, (F) changes resulting from general industry-wide conditions that do not disproportionately affect the Sellers relative to other industry participants, (G) acts of war, sabotage or terrorism or any military action, or threats thereof, or any escalation or worsening of any such acts of war, sabotage, terrorism or military actions threatened or underway as of the Execution Date, in each case, which do not disproportionately affect a Seller relative to other industry participants, (H) any natural or man-made disaster or acts of God, in each case, which do not disproportionately affect a Seller relative to other industry participants, and (I) changes in Applicable Law or accounting rules, including GAAP.

"***Sellers' Transferred Employee List***" is defined in Section 3.19(a).

"***Specifically Assumed Liabilities***" is defined in Section 2.03.

"***Subject Equipment Leases***" means the equipment leases between one or more Sellers and DataVox, Everbank and its assignees, BBVA, Wells Fargo and Siemens.

"***Subject Location***" means the Mueller Facility.

"***Subsidiary***" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at any time directly or indirectly owned by such Person.

"***T-System Contract***" means the Site Opt-In Agreement dated July 22, 2015, between T-System, Inc. and Neighbors Health.

"***Tax***" means and, with correlative meaning, "***Taxes***" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments, or other government fees, charges, including any income, alternative or add-on minimum tax, estimated, gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock, franchise, profits, license, registration, recording, documentary, escheat or unclaimed property, intangibles, conveyancing, gains, employee or other withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real or personal), environmental or windfall profit tax, customs, duty or other tax, governmental fee or other like assessment, charge or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (domestic or foreign) responsible for the imposition of any such tax, whether such Tax is disputed or not,

(ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto) or as a result of any existing express or implied agreement or arrangement (including any indemnification agreement or arrangement).

"***Tax Asset***" means any net operating loss, net capital loss, investment tax credit, foreign tax credit, charitable deduction or any other credit or tax attribute that could be carried forward or back to reduce Taxes (including deductions and credits related to alternative minimum Taxes).

"***Tax Refund***" means any refund, credit, or offset of Taxes attributable to the assets, operations or Acquired Business of the Sellers for periods prior to the Closing Date.

"***Tax Return***" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"***Third Party***" means any Person other than a Party or its Affiliates.

"***threatened***" means a Proceeding, dispute or other matter shall be deemed to have been "threatened" if any demand or statement shall have been made in writing or any notice shall have been given in writing.

"***Trade Name License Agreement***" means a definitive Trade Name License Agreement pursuant to which, (i) prior to the closing of the applicable Houston Purchase Agreement, Houston IP Seller, and (ii) at and after the closing of the applicable Houston Purchase Agreement, the Primary Houston Buyer or one of its Affiliates, grants Buyer a royalty-free license and privilege to use the Seller Marks, for transitional purposes and for all purposes in operating the Acquired Business, until the date that is 120 days following the Closing.

"***Transaction Documents***" means this Agreement, the Bill of Sale and any other agreement between or among Buyer and the Sellers that expressly states that it constitutes a Transaction Document for purposes of this Agreement, and all other agreements, documents, and instruments entered into by Buyer, on the one hand, and any of the Sellers, on the other hand, as of or after the Execution Date and at or prior to Closing in connection with the Transactions (as each such document, agreement and instrument may be amended, supplemented or modified). Each Transaction Document must be acceptable to the Buyer in its reasonable discretion.

"***Transaction Taxes***" is defined in Section 2.10.

"***Transactions***" means the transactions contemplated by this Agreement and the other Transaction Documents.

"***Transferred Assets***" is defined in Section 2.01(a).

"***Transferred Employees***" is defined in Section 6.02(a).

"***Transition Services Agreement***" means a definitive Transition Services Agreement pursuant to which the Primary Houston Buyer or one of its Affiliates shall provide certain transition services as are reasonably requested by Buyer and Affiliates in connection with the Acquired Business and the transactions contemplated hereby.

"***WARN Act***" means the Workers Adjustment & Retraining Notification Act or any similar State law.

"***Winning Bidder***" means the "Successful Bidder," as defined in the Bidding Procedures for the Sale of Debtor's Assets attached to the Bidding Procedures Order.

"***Withholding Taxes***" means all applicable federal, state or local income Taxes and applicable employment (social security, unemployment insurance and Medicare) and other withholding obligations, in each case withheld from Employees Seller prior to Closing.

**Section 1.02 Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement.** Except as otherwise expressly provided in this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Calculations in connection with the definitions, covenants and other provisions of this Agreement shall utilize GAAP, except as otherwise expressly set forth herein.

**Section 1.03 Other Definitional and Interpretative Provisions**. The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The headings and captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein and defined herein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. Except for agreements, documents and notices required to be delivered after the Execution Date pursuant to this Agreement, the phrases "Sellers have delivered," "Sellers have provided," "Sellers have made available" and phrases of similar import shall mean that, prior to the date hereof, Sellers have delivered to Buyer a hard or electronic copy of the document or information in question or have made such document available on the virtual data site relating to the Transactions no later than 3 Business Days prior to Execution Date. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law," "laws" or to a particular statute or law shall be deemed also to include any and all Applicable

Law. The word "or" will have the inclusive meaning represented by the phrase "and/or." The phrase "and/or" when used in a conjunctive phrase, shall mean any one or more of the Persons specified in or the existence or occurrence of any one or more of the events, conditions or circumstances set forth in that phrase; *provided, however,* that when used to describe the obligation of one or more Persons to do any act, it shall mean that the obligation is the obligation of each of the Persons but that it may be satisfied by performance by any one or more of them. "Shall" and "will" have equal force and effect. The Parties and their counsel have reviewed the provisions of this Agreement and have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. All references to immediately available funds or dollar amounts contained in this Agreement shall mean United States dollars. All references in this Agreement to the "Seller" or the "Sellers" shall be deemed to refer to the "Debtor" or the "Debtors," respectively, to the extent necessary in order to give effect to the intent of the Parties expressed in Section 2.07. THE PARTIES AGREE THAT THE BOLD AND/OR CAPITALIZED LETTERS IN THIS AGREEMENT CONSTITUTE CONSPICUOUS LEGENDS.

## ARTICLE 2
## PURCHASE AND SALE

**Section 2.01 Purchase and Sale of Assets.**

(a) Subject to, and on the terms and conditions of this Agreement, effective at the Effective Time, Buyer shall purchase, acquire, and accept from the Sellers, and the Sellers shall sell, convey, transfer, assign, and deliver to Buyer free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever, whether arising prior to, on or subsequent to the Petition Date, (other than Permitted Liens and Specifically Assumed Liabilities), all rights, title, and interest of every kind and nature of Sellers (including indirect and other forms of ownership), in and to all of the assets, properties, rights and interests set forth below solely to the extent related to the Acquired Business (the "***Transferred Assets***"):

(i) to the extent legally assignable, the Desired 365 Contracts and all of the Sellers' interest under the Desired 365 Contracts;

(ii) except as and to the extent relating to any Retained Assets or Retained Liabilities;

(A) any insurance proceeds payable pursuant to claims made under insurance Contracts (other than with respect to directors and officers liability insurance) with respect to matters arising prior to the Effective Time solely to the extent that such claim relates to the repair or replacement of damaged or destroyed property that constitutes the Transferred Assets and, as of the Effective Time, such proceeds have not been paid to repair or replace such damaged or destroyed property; and

(B) all rights in and under all express or implied guarantees, warranties (including manufacturers' warranties), representations, covenants, indemnities and similar rights in favor of the Sellers with respect to the Transferred Assets;

(iii) all equipment (including medical equipment and instruments), furniture, furnishings, computer hardware, communication equipment, supplies, fixtures, leasehold interests, materials, Inventory and other tangible personal property of any kind or type that is owned by the Operating Seller, used in the Acquired Business or located at or within the Mueller Facility;

(iv) all Licensed Intellectual Property Rights, to the extent transferable under the terms thereof or Applicable Law, including the Bankruptcy Code;

(v) all Owned Intellectual Property Rights and the goodwill associated therewith, excluding the Seller Marks and the Retained Mark and any Owned Intellectual Property Rights that embed or incorporate the Seller Marks and the Retained Mark;

(vi) all bank accounts, safety-deposit boxes and lock boxes;

(vii) all books and records of the Sellers, wherever located, solely to the extent relating to the Transferred Assets, including the following: sales and service records, books of account, invoices, inventory records, accounting records, Tax Returns with respect to the Transferred Assets, environmental records and studies, maintenance records, cost and pricing information, supplier lists, business plans, catalogues, quality control records and manuals, blueprints, research and development files, patent and trademark files; *provided, however,* that the Sellers shall retain a right, and to the extent any of the Transferred Assets include books and records related to the Houston Assets or the Non-Houston Assets, the Houston Buyer, the Non-Houston Buyer and their respective Representatives shall have the right, for a period of 2 years after the Closing upon reasonable notice to have reasonable access to and copying of (including through their Representatives who execute and deliver to Buyer a confidentiality agreement in form and substance acceptable to Buyer) the provisions within such materials related to the Retained Assets, the Houston Assets, the Non-Houston Assets, the Retained Liabilities, the Sellers' rights under the Transaction Documents or that are reasonably required with respect to any audit, investigation or inquiry of any Governmental Authority including taxing authorities with respect to periods prior to the Closing, so long as such access does not unreasonably interfere with the business operations of Buyer and shall be subject to any requirements or limitations imposed by the Patient Privacy Requirements; *provided further, however*, the Sellers, any Person authorized to act on behalf of the Sellers or their bankruptcy estates, and any Person to whom Retained Assets are transferred or assigned pursuant to the Bankruptcy Code or the Bankruptcy Rules (including without limitation a trustee, creditors' committee, or liquidating trust (collectively, an "***Authorized Person***")), shall have the right to access and copy any and all books and records of the Sellers as such Authorized Person, in its discretion, deems necessary to enable such Authorized Person to take any and all actions in connection with the Retained Assets as such Authorized Person is entitled and/or required to take under the Bankruptcy Code or the Bankruptcy Rules, including without limitation analyzing,

evaluating, litigating, and compromising the Avoidance Actions, in each case so long as such access does not unreasonably interfere with the business operations of Buyer and shall be subject to any requirements or limitations imposed by the Patient Privacy Requirements;

(viii) to the extent permitted by Patient Privacy Requirements, all Mueller Facility patient email addresses in Sellers' possession;

(ix) to the extent legally assignable, all Licenses and Permits, relating to the ownership or operation of the Transferred Assets;

(x) all prepaid claims, prepaid expense items and deferred charges, credits, advance payments, security, rebates, sums and fees, and other deposits (other than for Taxes, insurance and utilities) made by the Sellers to any other Person relating to the Transferred Assets, in each case other than to the extent exclusively relating to the Retained Liabilities or Retained Assets;

(xi) all rights in respect of the Leased Real Property (including the Real Property Lease associated therewith);

(xii) all goodwill associated with any Transferred Assets;

(xiii) all Cash Deposits;

(xiv) all third-party indemnities related to the Transferred Assets where any Seller is an indemnified party and the proceeds afforded thereby, in each case other than to the extent exclusively relating to the Retained Liabilities or Retained Assets;

(xv) solely to the extent related to the Acquired Business (as stated in Section 2.01(a) above), all claims, rights, defenses, offsets, recoupments, causes of action, credits, immunities or rights of set-off against Buyer and/or Third Parties that are counterparties to any of the Desired 365 Contracts that are actually assumed by the Debtors and assigned to the Buyer arising prior to the Effective Time; and

(xvi) solely to the extent related to the Acquired Business (as stated in Section 2.01(a) above), all claims, rights, defenses, offsets, recoupments, causes of action, credits, immunities or rights of set-off against Transferred Employees, including rights under employment agreements, confidentiality agreements, and non-competition agreements, other than any employees that fall within Section 2.02(i) below. For the sake of clarity and the avoidance of any doubt, Section 2.01(a)(xv) and this 2.01(a)(xvi) are subject to Section 2.02 below and expressly exclude the Retained Assets.

(b) Except for Specifically Assumed Liabilities, all Transferred Assets shall be conveyed free and clear of all Liens (other than Permitted Liens), Claims, and Interests to the maximum extent allowed by Section 363(f) of the Bankruptcy Code. Prior to the hearing to approve the Sale Order, Buyer may elect to designate any Transferred Asset as a Retained Asset by written notice to the Seller.

**Section 2.02 Retained Assets.** Notwithstanding the foregoing, Buyer shall not acquire, and the Sellers shall retain, the following assets of Sellers (the "***Retained Assets***"):

(a) all Accounts Receivable and all claims, including deposits, advances, prepaid and other current assets, rights under warranties and guaranties, rights in respect of promotional allowances, vendor rebates and to other refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether known or unknown or contingent or non-contingent), the right to receive and retain mail, Accounts Receivable payments and other communications of Sellers, and the right to bill and receive payments and other communications of Sellers; and the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

(b) (i) all cash and cash equivalents (excluding Cash Deposits), and (ii) all deposits for utilities;

(c) (i) the Houston Assets and all of the Sellers' rights under the Houston Purchase Agreements and the Transaction Documents (as such term is defined in the Houston Purchase Agreements), and (ii) the Non-Houston Assets and all of the Sellers' rights under the Non-Houston Purchase Agreements and the Transaction Documents (as such term is defined in the Non-Houston Purchase Agreements);

(d) the Excluded Contracts;

(e) the assets of the Corporate and Shared Services Sellers, including the accounts receivable thereof, to the extent such assets relate solely to the emergency facilities listed in Schedule 2.02(e), which include all of Sellers' emergency center facilities other than the Mueller Facility;

(f) the equity ownership of any Seller's Subsidiary, including the business of any such Subsidiary that is not a Seller;

(g) all Intercompany Indebtedness;

(h) all insurance Contracts (including with respect to directors and officers liability insurance) and all rights, claims and proceeds payable thereunder, including deposits, rights to discounts, credits and refunds arising from such insurance Contracts, except to the extent constituting Transferred Assets pursuant to Section 2.01(a)(ii)(A);

(i) all claims, rights, defenses, offsets, recoupments, causes of action, credits, immunities or rights of set-off of the Sellers against Third Parties, including, without limitation, against Sellers' former or current officers, directors, managers, members, unitholders, physicians, pharmacists and/or independent contractors arising prior to the Effective Time;

(j) the Organizational Documents of the Sellers and their respective, minute books, stock and ownership records and corporate seals and all other documents and records relating to the organization, maintenance, existence and federal income taxation of the Sellers or their partners;

(k) all Tax Assets, Tax deposits (including funds held by the Sellers in respect of Withholding Taxes or estimated income taxes) and Tax Refunds;

(l) all business and financial records, books, ledgers, files, plans, documents, correspondence, lists, and reports that relate solely to Retained Assets or Retained Liabilities;

(m) all rights, claims, causes of action and recoveries of Sellers under Sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 or 724 of the Bankruptcy Code (collectively, "***Avoidance Actions***") other than Avoidance Actions against the Buyer and all proceeds thereof;

(n) all ERISA Plans and assets maintained pursuant or in connection therewith;

(o) all professional retainers incurred in connection with the Bankruptcy Cases;

(p) the Seller Marks and the Retained Seller Mark and any Owned Intellectual Property Rights that embed or incorporate the Seller Marks and the Retained Seller Mark;

(q) any executory Contracts ("***Excluded Contracts***") that are not Desired 365 Contracts;

(r) all furniture, fixtures and equipment stored or maintained at the Headquarters;

(s) all motor vehicles;

(t) the T-System Contract; and

(u) all of the Sellers' rights under the Transaction Documents, including the right to receive the Purchase Price.

**Section 2.03 Assumption of Liabilities.** Except as specifically set forth in this Section 2.03, Buyer shall not assume, in connection with the Transactions or otherwise, any Liability or obligation of Sellers whatsoever, and Sellers shall retain responsibility for all Liabilities and obligations accrued as of, on, or after the Effective Time, whether or not accrued and whether or not disclosed. As the sole exception to the preceding sentence, subject to the terms and conditions set forth herein, Buyer shall assume as of the Effective Time only the following Liabilities (collectively, the "***Specifically Assumed Liabilities***"), and no others:

(a) all Liabilities arising and incurred after the Effective Time under the Desired 365 Contracts assigned to and assumed by Buyer pursuant to this Agreement, but only to the extent that such obligations are not supposed to be performed prior to the Effective Time (and expressly excluding any obligation arising out of or relating to a breach that occurred prior to the Effective Time or for amounts owing by the Sellers prior to the Effective Time);

(b) the Cure Costs, in any amount in excess of $7,816.00, for all Desired 365 Contracts (not including the Real Property Lease, for which no Cure Costs have been disclosed to Buyer); and

(c) all Liabilities incurred in providing COBRA-continuation coverage under Buyer's group health plan as set forth in Section 6.02(c).

Sellers hereby acknowledge and agree that Buyer shall not be the successor to any Seller, and Sellers acknowledge and agree that pursuant to the terms and provisions of this Agreement, except for the Specifically Assumed Liabilities, Buyer will not assume, nor in any way be liable or responsible for, any claim or Liability of any Seller or any Affiliate of a Seller (including Liabilities relating to the pre-petition or post-petition operation of the Acquired Business, the Retained Assets or to the Transferred Assets (and the use thereof)), whether relating to or arising out of the Acquired Business, the Retained Assets, the Transferred Assets or otherwise, including any Liability of a Seller or any predecessor or Affiliate of a Seller whatsoever.

The Sellers further acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement or otherwise shall not create a Specifically Assumed Liability or other Liability of Buyer, except where such disclosed obligation has been expressly assumed by Buyer as a Specifically Assumed Liability. The Transactions shall in no way expand the rights and remedies of any Third Party against the Buyer or the Sellers as compared to the rights and remedies that such Third Party would have had against the Buyer or the Sellers absent the Bankruptcy Cases or Buyer's assumption of the Specifically Assumed Liabilities. Other than the Specifically Assumed Liabilities, Buyer is not assuming and shall not be liable for any Liabilities of the Sellers or any of their Affiliates. This Section 2.03 shall not limit in any way any claims or defenses Buyer may have against any Person other than the Sellers.

**Section 2.04 Retained Liabilities.** Except for the Specifically Assumed Liabilities, Buyer is not assuming, shall not assume, and shall not be responsible for, and the Sellers expressly retain, any claims against, Liabilities or obligations whatsoever of, the Acquired Business or any Seller (the "***Retained Liabilities***"), including the following: (a) all Liabilities of the Sellers related to the Retained Assets, whether such Liabilities arise before or after the Effective Time; (b) any indebtedness, accounts payable or accrued expenses of any Seller or the Acquired Business; (c) all of the costs and expenses of the Sellers incurred in connection with the Bankruptcy Cases; (d) all of the costs and expenses of the Sellers incurred in connection with negotiating, entering into and carrying out its obligations pursuant to this Agreement or any other Transaction Document; (e) any known or unknown Liability of any Seller; (f) any Liability to refund any payment or reimbursement received by a Seller from any Third Party payor; (g) any Liability related to the Health Insurance Portability and Accountability Act of 1996; (h) any Liability relating to fraud or the federal statutes relating to health care fraud and abuse and kickbacks (including 42 U.S.C. § 1320a-7b, 42 U.S.C. § 1320a-7a, the Ethics in Patient Referrals Act, as amended, 42 U.S.C. §§ 1395nn et seq., and the federal Civil False Claims Act, 31 U.S.C. § 3729 et seq.) or related or similar statutes or the regulations promulgated pursuant to any of such statutes, and any similar applicable state laws or regulations pertaining to fraud, kickbacks, or fee splitting; (i) the responsibility for any contributions to or funding of any benefits plan, program, agreement, practice or arrangement (whether written or oral) maintained by any Seller or pursuant to which any Seller has any contribution or funding obligation for its employees,

former employees, retirees, agents, independent contractors, their beneficiaries or any other Person; (j) any Liability arising from, or with respect to, any ERISA Plan or any similar arrangement currently or previously mentioned, or contributed to, by any Seller; (k) any Liability of any Seller for any Tax of any kind or nature, including (i) any Tax which may become payable by reason of the sale and transfer of the Transferred Assets, or be imposed upon any Seller or its Affiliates by reason of receipt of the Purchase Price or relief from any Liability pursuant to or in connection with this Agreement, (ii) any Tax generated from activities of the Business on or before the Effective Time, including the Transactions, or (iii) any other Tax of any of the Sellers or any of their Affiliates under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of Contract or Legal Requirement; (l) any Liability of Sellers for any noncompliance with any Applicable Laws, including those relating to employment and labor management relations (including noncompliance under the WARN Act) and any provisions thereof relating to wages and the payment thereof, hours of work, terms of employment, collective bargaining agreements, and workers' compensation laws, arising from the Acquired Business prior to the Effective Time or otherwise arising prior to the Effective Time; (m) any Liability to distribute to any equity holder of any Seller or otherwise apply all or any part of the consideration received hereunder; (n) any and all Liabilities arising under any Healthcare Law or any other Liability in connection with, arising from or relating to the ownership, management or operation of any Seller, the Transferred Assets or the Acquired Business, or any condition in existence with respect to any Seller, the Transferred Assets or the Acquired Business, existing on or prior to the Effective Time, or any products or services sold by any Seller; (o) any Liability of any Seller for any failure to withhold all amounts required by any Applicable Law or Contract to be withheld from the wages or salaries of its employees, and any Liability for any wage arrearages, taxes or penalties for failure to comply with any of the foregoing arising prior to the Effective Time or otherwise arising from the Transferred Assets or the operation of the Acquired Business prior to the Effective Time; (p) other than as specified in Section 2.03(c) above, any Liability to employees of any Seller, including all PTO Obligations, any severance or retention obligations, and any bonus obligations arising prior to or on the Effective Time or otherwise arising from the Transferred Assets or the operation of the Acquired Business prior to the Effective Time; (q) any Liability arising out of any controversies between any Seller and its employees or former employees or any union or other collective bargaining unit representing any of its employees arising prior to the Effective Time or otherwise arising from the Transferred Assets or the operation of the Acquired Business prior to the Effective Time; and (r) all other Liabilities of the Sellers whatsoever associated with the Transferred Assets, the Acquired Business or with any other properties, rights, contracts, or other assets of the Sellers, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated, or otherwise.

**Section 2.05 Good-Faith Deposit; Escrow.**

(a) Provided this Agreement has not been terminated pursuant to Section 9.01(a) or Section 9.01(d), not later than August 31, 2018, Buyer shall have deposited with the Seller Parent as a good-faith deposit (the "***Deposit***") an amount equal to ten percent (10%) of the Cash Purchase Price (or $132,500.00). The Seller Parent shall hold the Deposit in an interest-bearing bank account. The Sellers acknowledge and agree that the Deposit shall not be an asset of the Debtors' bankruptcy estates that are created upon the filing of the Bankruptcy Cases. Upon the Closing in accordance with the terms of this Agreement and the Transaction

Documents, the Deposit (together with all interest earned thereon) will be applied against the Purchase Price in the manner provided in Section 2.06(b).

(b) If this Agreement is terminated pursuant to Section 9.01, the Seller Parent shall return the Deposit (together with all interest earned thereon) to Buyer or to retain the Deposit (together with all interest earned thereon) as a non-completion fee in accordance with Section 9.02(b).

**Section 2.06 Purchase Price.**

(a) The aggregate consideration for the sale, assignment, transfer, conveyance, and delivery of the Transferred Assets to Buyer at the Effective Time (the "***Purchase Price***") shall consist of: (i) the assumption of the Specifically Assumed Liabilities as provided above, and (ii) cash in the amount of $1,325,000.00 (the "***Cash Purchase Price***"), payable as provided in Section 2.06(b) and Section 2.07.

(b) At the Closing, Buyer will pay to the Sellers by wire transfer of immediately available funds an amount equal to (i) the Cash Purchase Price *minus* (ii) the Deposit (together with all interest thereon).

**Section 2.07 Filing of Bankruptcy Cases.** The Sellers have previously filed the Bankruptcy Cases with the Bankruptcy Court, and the Transferred Assets shall be conveyed by the Debtors free and clear of all Liens, Claims, and Interests, other than Permitted Liens. Accordingly, the Sellers obligation to consummate the transactions set forth in this Agreement (including the sale, conveyance, transfer, assignment and delivery to Buyer of the Transferred Assets) on the Closing Date will be subject to the entry of a Bidding Procedures Order and a Sale Order, each of which shall be a Final Order. Further, for purposes of clarification, with respect to the representations made by the Debtors on the Closing Date in Article 3, all references to "Seller" or the "Sellers" shall be deemed to refer to the "Debtor" or the "Debtors," respectively.

**Section 2.08 Closing; Closing Deliveries.**

(a) The closing of the Transactions (the "***Closing***") shall take place at the offices of Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002 commencing at 10:00 a.m. on the date that is three (3) Business Days following the satisfaction or written waiver of the conditions of Closing set forth in Article 8 hereof (other than those conditions which by their terms are not to be satisfied until the Closing, but subject to the waiver or fulfillment of those conditions), or such other date or location as the Parties may mutually determine. The Closing and all documentation delivered at Closing shall be effective as of the Effective Time.

(b) At the Closing, unless waived by the Sellers, Buyer shall deliver, or execute and deliver, as applicable:

(i) the Bill of Sale, duly executed by Buyer;

(ii) the Cash Purchase Price in the manner provided in Section 2.06(b);

(iii) an assignment and assumption of lease, in form and substance reasonably acceptable to Buyer, with respect to the Real Property Lease (the "***Lease Assignment***"), duly executed by Buyer, unless the assumption and assignment of the Real Property Lease is satisfied by the entry of an Order of the Bankruptcy Court as described in Section 2.08(c)(iii)(B) below;

(iv) the certificate required to be delivered by Buyer under Section 8.03(c), duly executed by Buyer; and

(v) all other documents, certificates, instruments or writings reasonably requested by Buyer in connection herewith.

(c) At the Closing, unless waived by Buyer, the Sellers shall deliver or cause to be delivered, or execute and deliver, as applicable, to the Buyer:

(i) physical possession of all of the Transferred Assets capable of passing by delivery with the intent that title in such Transferred Assets shall pass by and upon delivery;

(ii) the Bill of Sale, duly executed by the Sellers;

(iii) (A) the Lease Assignment, in form and substance reasonably acceptable to Buyer (including the terms of any security, guaranty, or adequate assurance requested by the lessor or required by the Bankruptcy Court), duly executed by the lessor and lessee, or (B) an Order of the Bankruptcy Court approving an assumption and assignment of the Real Property Lease in form and substance reasonably acceptable to Buyer and, for the avoidance of doubt, in the event that the Real Property Lease is not assigned to Buyer, Buyer may terminate this Agreement and receive a refund of its Deposit;

(iv) the certificate required to be delivered by the Sellers under Section 8.02(c), duly executed by the Sellers;

(v) affidavits meeting the requirements of Treasury Regulation § 1.1445-2(b)(2), duly executed by the Sellers;

(vi) a certified copy of the Sale Order, which order has not been reversed or modified on appeal or, if any such appeal is pending, such order shall not have been stayed;

(vii) a properly completed Texas Comptroller of Public Accounts Form 01-917, Statement of Occasional Sale, in the aggregate covering the conveyances of the Transferred Assets by Sellers to Buyer hereunder;

(viii) written evidence satisfactory to the Buyer of all consents required to be obtained from third parties in connection with the Transactions; and

(ix) all other documents, certificates, instruments or writings reasonably requested by Buyer in connection herewith.

**Section 2.09 Allocation of Purchase Price.** The Sellers and Buyer agree that the Transactions will be treated as an asset acquisition for tax purposes. Within thirty (30) calendar days after the Closing Date, Buyer shall prepare and provide a proposed allocation of the Purchase Price among the Transferred Assets (the "***Purchase Price Allocation***") to the Sellers. Such proposed Purchase Price Allocation shall be in accordance with Section 1060 of the Code and final and binding on the Parties unless, within thirty (30) calendar days after Buyer provides such proposed Purchase Price Allocation, the Sellers notify Buyer of their disagreement with any item in such proposed allocation. In the event of such notification, the Sellers and Buyer shall negotiate in good faith to resolve such dispute; *provided, however*, that if the Sellers and Buyer cannot resolve such dispute within thirty (30) calendar days then they shall be entitled to file separate allocations. Any allocation of the Purchase Price agreed to pursuant to this section shall be binding on Buyer and the Sellers for all Tax reporting purposes except that neither Party shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, claim, or similar proceedings. The Purchase Price Allocation shall be for tax purposes only, and the Purchase Price Allocation shall not have any effect on any other distribution or disbursement of monies to secured or unsecured creditors in any of the Bankruptcy Cases, if applicable.

**Section 2.10 Transfer Taxes.** All federal, state and local sales and transfer Taxes, including all state and local Taxes in connection with the transfer of the Transferred Assets, and all recording and filing fees (collectively, "***Transaction Taxes***") that may be imposed by reason of the sale, transfer, assignment and delivery of the Transferred Assets, and are not exempt under Section 1146(a) of the Bankruptcy Code shall be borne 100% by Sellers. Transaction Taxes do not include any Tax in the nature of an income tax, including any capital gains, franchise, excise, inheritance, estate, succession, or gift taxes. The Sellers and Buyer shall cooperate to minimize any such Transaction Taxes and to determine appropriate taxing authorities and amount of Transaction Taxes, if any, payable in connection with the Transactions. The Buyer shall assist Sellers reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers, jointly and severally, represent and warrant to Buyer that the statements contained in this Article 3 are true and correct on the Execution Date and will be true and correct at the Closing as of the Closing Date, and in each case solely with respect to the Acquired Business.

**Section 3.01 Corporate Existence and Power.** Each Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Each Seller has all requisite power and authority to carry on its business as now being conducted and to own, lease, and operate its properties and assets as now owned, leased or operated, and to perform all its obligations under the agreements and instruments to which it is a party or by which it is

bound. No Seller is required to be qualified to do business as a foreign corporation (or other entity) in any jurisdiction.

**Section 3.02   Authorization.**   Subject to any necessary authorization from the Bankruptcy Court, each Seller has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the Transactions.   On the Execution Date, the execution, delivery and performance by the Sellers of this Agreement and the other Transaction Documents dated the Execution Date to which the Sellers are a party and the consummation of the Transactions have been duly authorized by all necessary action on the part of the Sellers.   No other corporate or organizational proceedings on the part of a Seller are necessary to approve and authorize the execution and delivery of the Transaction Documents to which Sellers are a party and the consummation of the Transactions.   As of the Closing Date, subject to the entry of the Sale Order by the Bankruptcy Court, this Agreement and each other Transaction Document to which the Debtors will be a party on the Closing Date (assuming in each case due authorization, execution and delivery thereof by the other parties thereto) constitute valid and binding agreements of the Debtors, enforceable against the Debtors in accordance with their terms (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditors' rights generally and general principles of equity).

**Section 3.03   Governmental Authorization.**   The execution, delivery, and performance by the Sellers of this Agreement and each other Transaction Document to which they are or will be parties and the consummation by the Sellers of the Transactions require no action by or in respect of, consent of, or filing with or notification to, any Governmental Authority other than the filing of appropriate pleadings and notices with the Bankruptcy Court, the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court, and the approval of this Agreement by the Bankruptcy Court as specifically provided in this Agreement.

**Section 3.04   Title to Transferred Assets.**   At the Closing, subject to the entry of the Sale Order by the Bankruptcy Court, the Debtors shall deliver to Buyer, and Buyer will acquire, good and marketable title to (or with respect to the Leased Real Property, a valid leasehold in or rights to use the Mueller Facility or property subject to such leasehold) and rights to use all of the Transferred Assets free and clear of all Liens (other than Permitted Liens), Claims, and Interests. The Transferred Assets are sufficient for the continued conduct of the Acquired Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property, and assets necessary to conduct the Acquires Business as currently conducted.   The Houston Assets do not include any of the Transferred Assets.

**Section 3.05   Financial Statements and Information.**   Sellers have delivered to Buyer: (a) the consolidated audited balance sheet of Neighbors Global Holdings, LLC as of December 31, 2016, and the related statement of income for the year then ended, (b) with respect to the Operating Seller, its unaudited balance sheet as of December 31, 2017 and its related unaudited income statement for the year then ended, and (c) with respect to the Operating Seller, its unaudited balance sheet as of April 30, 2018 and its related unaudited income statement for the 4-month period then ended (collectively, the "***Financial Statements***"). The Financial Statements are true, correct and complete in all material respects and fairly present in all material respects the financial condition, results of operations and cash flows of Sellers as of the respective dates

thereof and for the periods referred to therein. The Financial Statements reflect the consistent application of accounting principles throughout the periods involved. The Financial Statements have been prepared from and are in accordance with the accounting records of Sellers.

**Section 3.06 Absence of Certain Developments.** Except as expressly contemplated by this Agreement or as disclosed by Seller to Buyer on Schedule 3.06, since April 30, 2018 (i) Sellers have conducted the Acquired Business only in the ordinary course of business and (ii) there has not been any event, change, occurrence or circumstance that has had or could reasonably be expected to have a Seller Material Adverse Effect.

**Section 3.07 Brokerage Fees.** Except as set forth on Schedule 3.07, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Sellers or the Debtors which is or will be entitled to any fee, commission or other compensation in connection with the Transactions. Any such fee listed on Schedule 3.07 shall be the sole responsibility of the Sellers.

**Section 3.08 Contracts.**

(a) Schedule 3.08(a) contains a correct and complete list of all Contracts that are material to the operation of the Acquired Business ("***Seller Contracts***"). The Sellers have made available to Buyer true, correct and complete copies of each Seller Contract. Except for those Seller Contracts indicated by an asterisk on Schedule 3.08(a), none of the Sellers is the licensor of any intellectual property, including any trademarks or any other property that could be the subject of an election under Section 365(n) of the Bankruptcy Code.

(b) Each Seller Contract is a valid and binding agreement of the applicable Seller and counterparty, enforceable against such Seller and counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). Except as set forth in Schedule 3.08(b), no party is in breach of or default under any Seller Contract, where such breach or default has resulted in, or could reasonably be expected to result in, loss or liability in excess of $250,000.

**Section 3.09 Taxes.**

(a) All Tax Returns required to have been filed by or with respect to the Sellers have been filed (taking into account any extension of time to file granted or obtained) and such Tax Returns are true, correct and complete in all material respects;

(b) Except as set forth on Schedule 3.09(b), all Taxes required to have been paid by or with respect to the Sellers have been paid, other than Taxes of the Sellers the payment of which is prohibited or stayed by the Bankruptcy Code;

(c) Sellers have deducted, withheld and timely paid to the appropriate Governmental Authorities all Taxes required to be deducted, withheld or paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other

similar Person of or with respect to Sellers, and Sellers have complied with all related Applicable Laws.

(d) There are no Liens with respect to Taxes on any of the Transferred Assets, other than such Liens that will be released upon entry of the Sale Order, as applicable;

(e) Buyer will not be required to include any amount in taxable income for any Tax period (or portion thereof) ending after Closing Date, as a result of transactions or events occurring with respect to Sellers, sales or receipts received by Sellers, or accounting methods employed by Sellers, prior to Closing;

(f) The Sellers have not received any written notice of any pending or threatened assessment of Taxes, or any audits, examinations, investigations, or other proceedings in respect of Taxes or Tax Returns of the Sellers; and

(g) Sellers have not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessed or a deficiency.

**Section 3.10 Inventory**. The Inventory of Sellers (a) is sufficient for the operation of the Acquired Business in the ordinary course of business, (b) consists of items that are good and merchantable, and (c) is of a quality and quantity presently usable or saleable in the ordinary course of business.

**Section 3.11 Transactions with Affiliates.** Schedule 3.11(a) sets forth a complete and correct list of all transactions to or by which the Sellers, on the one hand, and any Affiliate of the Sellers, on the other hand, is a party or are otherwise bound or subject and by which any of the Transferred Assets are bound or subject or pursuant to which the Sellers have made, since December 31, 2017, or are obligated to make, payments or incur expenses to or for the benefit of the Sellers or any Affiliate of the Sellers. Except as set forth in Schedule 3.11(b), no Seller, and, to the Knowledge of Sellers, no Affiliate of a Seller, Insider, employee, or agent of or consultant to a Seller, (a) beneficially owns, directly or indirectly, an interest in, or is a director, officer, employee or agent of or consultant to, any Person which is a competitor, supplier or customer of a Seller or the Acquired Business, or (b) directly or indirectly owns or has an interest in any property, asset or right (real or personal, tangible or intangible) which is used in, pertains to or is necessary for the operation of the Acquired Business or the Transferred Assets.

**Section 3.12 Compliance with Laws.** Except as set forth in Schedule 3.12(a), each Seller is in compliance in all material respects with the requirements of all Applicable Laws that are material to the operation of the Acquired Business. No Seller has received notice from any Governmental Authority of any pending or threatened Proceeding, or any circumstances or facts which could give rise thereto, involving the Sellers, their assets or any physician employed or engaged by the Sellers with respect to any Applicable Law. Set forth in Schedule 3.12(b) are all Permits held by Sellers with respect to the Transferred Assets, which constitute all of the Permits necessary to permit Buyer to own, operate, use, and maintain the Transferred Assets in the manner in which they are now operated and maintained or have been operated and maintained since December 31, 2017 and to conduct their businesses as now being conducted or have been operated and maintained since December 31, 2017 in compliance with all Applicable Law. All

required filings with respect to such Permits have been timely made and all required applications for renewal thereof have been timely filed. All such Permits are in full force and effect and there are no Proceedings pending or, to the Knowledge of Sellers, threatened that seek the revocation, cancellation, suspension, or adverse modification thereof.

**Section 3.13 Healthcare Laws.**

(a) Except as set forth in Schedule 3.13(a), to the Knowledge of Sellers, no Seller nor any Affiliate of a Seller is or has been in violation of any Healthcare Laws. No Seller has received notice from any Governmental Authority of any pending or threatened Proceeding, or any circumstances or facts which could give rise thereto, involving the Sellers, their assets or any physician employed or engaged by the Sellers with respect to any applicable Healthcare Law.

(b) Set forth in Schedule 3.13(b) are all Permits held by Sellers with respect to any Healthcare Laws, which constitute all of the Permits necessary to permit Buyer to own, operate, use, and maintain the Transferred Assets in the manner in which they are now operated and maintained or have been operated and maintained since December 31, 2017 and to conduct their businesses as now being conducted or have been operated and maintained since December 31, 2017 in compliance with all Healthcare Laws. All required filings with respect to such Permits have been timely made and all required applications for renewal thereof have been timely filed. All such Permits are in full force and effect, and there are no Proceedings pending or, to the Knowledge of Sellers, threatened, that seek the revocation, cancellation, suspension, or adverse modification thereof.

**Section 3.14 Legal Proceedings**. Except (a) as set forth on Schedule 3.14, and (b) for the Bankruptcy Cases, there is no Proceeding of any nature pending or, to the Knowledge of Sellers, threatened against or by any Seller or any Affiliate of any Seller relating to or affecting the Transferred Assets or the Specifically Assumed Liabilities, or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions, or which affects the execution and delivery by the Sellers of this Agreement and the other Transaction Documents to which the Sellers are or will be a party. No Seller or any Affiliate of a Seller is subject to any Order in which relief is sought relating to or affecting the Transferred Assets or the Specifically Assumed Liabilities, or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions, or which affects the execution and delivery by the Sellers of this Agreement and the other Transaction Documents to which the Sellers are or will be a party.

**Section 3.15 Absence of Restrictions and Conflicts**. The execution, delivery, and performance by the Sellers of this Agreement and the other Transaction Documents to which the Sellers are or will be a party and the consummation by the Sellers of the Transactions do not and will not (a) contravene, conflict with, or result in any violation or breach of any provision of the Sellers' Organizational Documents, (b) assuming compliance with the matters referred to in Section 3.03, contravene, conflict with or result in a violation or breach of any provision of any Applicable Law, or (c) assuming compliance with the matters referred to in Section 3.03, require any consent or other action by any Person under, constitute a default, or an event that, with or without notice or lapse of time or both, would constitute a default, under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of

any benefit to which the Sellers are entitled under any provision of any Desired 365 Contract binding upon the Sellers or by which the Transferred Assets may be bound or any Permit affecting, or relating in any way to, the Sellers, the Transferred Assets or the Acquired Business.

**Section 3.16 Intellectual Property.**

(a) The Sellers own, or have the licenses or rights to use, all Intellectual Property Rights that are necessary to operate the Acquired Business as currently conducted. Schedule 3.16(a) sets forth a complete and correct list and summary description of such Intellectual Property Rights, including whether such Intellectual Property Rights are Licensed Intellectual Property Rights or Owned Intellectual Property Rights.

(b) Except as set forth on Schedule 3.16(b), no Seller has received any notice that (i) any Seller is infringing in any material respect the Intellectual Property Rights of any Third Party or (ii) any Intellectual Property Right necessary to operate the Acquired Business as currently conducted has been terminated or will be terminated or the use of such Intellectual Property Right is in violation of any Applicable Law.

**Section 3.17 Environmental.**

(a) To the Knowledge of Sellers, the Acquired Business has been conducted in compliance with all applicable Environmental Laws.

(b) No Seller has received any notice or demand letter from any Governmental Authority or Third Party, indicating that any Seller is in violation of, or liable under, any Environmental Law.

(c) To the Knowledge of Sellers, there have been no "releases" or threats of "releases" (as defined in any Environmental Laws) of Hazardous Substances at, from, in or on the Leased Real Property. There is no on-site or off-site location to which a Seller has transported or disposed of Hazardous Substances from the Leased Real Property or arranged for the transportation or disposal of Hazardous Substances from the Leased Real Property that is or, to Sellers' Knowledge, is threatened to be the subject of any federal, state, local or foreign enforcement action or any other investigation that could lead to any claim against any Seller or the Buyer for any clean-up cost, remedial work, damage to natural resources, property damage or personal injury, including any claim under any Environmental Laws.

(d) No Seller, nor, to the Knowledge of Sellers, any other Person for whose conduct any Seller is or may be held responsible, has (A) entered into or been subject to any consent decree, compliance order or administrative order with respect to the Leased Real Property or operations thereon, (B) received notice under the citizen suit provision of any Environmental Laws in connection with the Leased Real Property or operations thereon, (C) received any request for information, notice, demand letter, administrative inquiry or formal or information complaint or claim with respect to any Hazardous Substances relating to the Leased Real Property or operations thereon, or (D) been subject to or threatened with any governmental or citizen enforcement action with respect to the Leased Real Property or operations thereon, and no Seller has any reason to believe that any of the above will be forthcoming.

(e) To the Knowledge of Sellers, no Seller or any of its Affiliates has any contingent liability in connection with any release or disposal of any Hazardous Substance from the Leased Real Property into the environment.

(f) (i) No Seller has owned, leased or operated a site that pursuant to CERCLA or any similar state or foreign Law, has been placed or is proposed to be placed by any Governmental Authority on the "National Priorities List" or similar state or foreign list, as in effect as of the Closing Date, and (ii) except as would not reasonably be expected to result in a Sellers Material Adverse Effect, no Seller has been identified by any Governmental Authority as a potentially responsible party under CERCLA or any analogous state Law with respect to any site, and no Hazardous Materials generated, transported or disposed of by or on behalf of any Seller have been found at any site where a Person has made written demand on any Seller to conduct or pay for a remedial investigation, removal or other response action pursuant to any applicable Environmental Law.

**Section 3.18 Real Property.**

(a) Schedule 3.18(a) sets forth a correct and complete legal description of the Leased Real Property. Upon entry of the Sale Order by the Bankruptcy Court, the applicable Debtor, as listed on Schedule 3.18(a), will have a valid leasehold interest in the Leased Real Property, and the leases granting such interests will be in full force and effect.

(b) Except for the Seller Real Property, Seller does not own or lease, and the Acquired Business does not occupy or otherwise require the use of, any real property. No portion of the Seller Real Property, or any building or improvement located thereon, violates any Applicable Law in any material respect, including those Applicable Laws relating to zoning, building, land use, environmental, health and safety, fire, air, sanitation and noise control. Except for the Permitted Liens and liens that will be released at or prior to the Closing, no Seller Real Property is subject to (i) any decree or order of any Governmental Authority (or, to Sellers' Knowledge, threatened or proposed order) or (ii) any rights or way, building use restrictions, exceptions, variances, reservations or limitations or any nature whatsoever. There are no condemnation, environmental, zoning or other land-use regulation proceedings, either instituted, or, to the Knowledge of Sellers, planned to be instituted, which would adversely affect the use and operation of the Seller Real Property for their intended purpose or the value of the Seller Real Property, and no Seller has received notice of any special assessment proceedings affecting the Seller Real Property. There are no third persons or parties in possession of any part of the Seller Real Property as lessees, tenants at sufferance, trespassers or otherwise. To the Knowledge of Sellers, there are no facts that would prevent Buyer from using and operating the Seller Real Property after Closing in the manner used by Sellers and the Acquired Business prior to the Closing.

**Section 3.19 Employment and Labor.**

(a) On or prior to the Execution Date, the Sellers provided Buyer with a complete and accurate list of all Employees of the Acquired Business as of the Execution Date (the "***Sellers' Transferred Employee List***"), which list shall be updated prior to the Closing in accordance with Section 6.02.

(b) No Seller is, or has been, a party to, bound by, any collective bargaining or other agreement with a labor organization representing any of the Employees. Since the date of their respective formation, there has not been, nor, to the Knowledge of Sellers, has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor activity or dispute affecting any Seller or any of the Employees. There are no unfair labor practice complaints pending against any Seller before the National Labor Relations Board or any other Governmental Authority or any current union representation questions involving employees of Sellers. Each Seller is currently in compliance with all Applicable Laws in all material respects relating to the employment of labor, including those related to wages, hours, worker classification, collective bargaining and the payment and withholding of Taxes and other sums as required by the appropriate Governmental Authority and to the Knowledge of Sellers has withheld and paid to the appropriate Governmental Authority or is holding for payment not yet due to such Governmental Authority all amounts required to be withheld from employees of such Seller and is not liable for any arrears of wages, Taxes, penalties or other sums for failure to comply with any of the foregoing. To the Knowledge of Sellers, each Seller has paid in full to all employees or adequately accrued for all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such employees. There is no claim with respect to payment of wages, salary or overtime pay that has been asserted or is now pending or, to the Knowledge of Sellers, threatened before any Governmental Authority with respect to any persons currently or formerly employed by any Seller. No Seller is a party to, otherwise bound by, any consent decree with, or citation by, any Governmental Authority relating to employees or employment practices for which Buyer could reasonably be expected to have any Liability. There is no charge or Proceeding with respect to a violation of any occupational safety or health standards that has been asserted or is now pending or, to the Knowledge of Sellers, threatened with respect to any Seller. There is no charge of discrimination in employment or employment practices, for any reason, including age, gender, race, religion or other legally protected category, which has been asserted or is now pending or, to the Knowledge of Sellers, threatened before the United States Equal Employment Opportunity Commission, or any other Governmental Authority in any jurisdiction in which any Seller has employed or currently employs any person.

**Section 3.20 Employee Benefits.**

(a) Schedule 3.20 contains a complete and accurate list of all ERISA Plans, copies of which have been made available to Buyer. Each ERISA Plan has been administered and operated in accordance with its terms and is in compliance with all applicable laws, including ERISA and the Code and the regulations thereunder in all material respects. All filings, reports and disclosures as to each ERISA Plan required to have been submitted to the Internal Revenue Service, the United States Department of Labor or to any other regulatory agency or delivered to participants therein have been duly and timely submitted or delivered.

(b) There is no Proceeding pending or, to the Knowledge of Sellers, threatened before any Governmental Authority or before any arbitrator (except claims for benefits payable in the normal operation of the ERISA Plans and Proceedings with respect to qualified domestic relations orders) involving any ERISA Plan or asserting any rights or claims to benefits under any ERISA Plan that could give rise to any material liability or for which Buyer could reasonably be expected to have any Liability.

(c) No Seller nor any ERISA Affiliate has ever maintained or contributed to an Employee Benefit Plan subject to Section 412 of the Code or Title IV of ERISA or maintained or been obligated to contribute to any "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

(d) There are no unfunded obligations under any ERISA Plan providing benefits after termination of employment to any employee of any Seller (or to any beneficiary of any such employee), including retiree health coverage and deferred compensation, but excluding continuation of health coverage required to be continued under Section 4980B of the Code or other Applicable Law and insurance conversion privileges under state law.

(e) Each Group Health Plans (as defined in 45 C.F.R. Section 160.103) of a Seller for its employees and the dependents thereof is in compliance in all material respects with, and has not violated in any respect, the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act of 1996, as amended or the provisions of the Patient Protection and Affordable Care Act of 2010, as amended, and applicable regulations and other regulatory guidance issued under such Acts. Each individual who is classified by a Seller as a non-employee, including as an independent contractor, has been properly classified for purposes of eligibility, participation and benefit accrual under each ERISA Plan.

(f) Each ERISA Plan that constitutes in any part a nonqualified deferred compensation plan within the meaning of Section 409A of the Code has been operated and maintained in operational and documentary compliance with Section 409A of the Code and applicable guidance thereunder. No payment to be made under any ERISA Plan is, or to the Knowledge of Sellers will be, subject to the penalties of Section 409A(a)(1) of the Code.

**Section 3.21 Disclosures.** No representation or warranty or other statement of Sellers contained herein, any Schedules hereto, any certificates delivered to or to be delivered pursuant hereto, or otherwise made to Buyer or its Representatives by any Seller, or any of their respective Representatives, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading. All copies of documents provided or made available to Buyer by Sellers are complete and accurate copies and include all amendments and modifications thereto.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Sellers, as of the Execution Date and as of the Closing Date, that:

**Section 4.01 Corporate Existence and Power.** Buyer is a limited liability company existing and in good standing under the laws of Texas and has full power and authority to carry on its business as now conducted.

**Section 4.02 Authorization.** The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is or will be a party and the consummation of the Transactions are within the powers of Buyer and have been duly authorized by all necessary action on the part of Buyer. Each of this Agreement and the other Transaction

Documents to which Buyer is a party have been duly executed and delivered on behalf of Buyer, and (assuming in each case due authorization, execution and delivery thereof by the other parties thereto) constitutes a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditors' rights generally and general principles of equity).

**Section 4.03   Governmental Authorization.** The execution, delivery, and performance by Buyer of this Agreement and each other Transaction Document to which Buyer is or will be a party and the consummation by Buyer of the Transactions require no action by or in respect of, consent of, or filing with or notification to, any Governmental Authority other than the filing of appropriate pleadings and notices with the Bankruptcy Court, the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court, and the approval of this Agreement by the Bankruptcy Court or as specifically provided in this Agreement.

**Section 4.04   Healthcare Laws.** Buyer has the power and authority to consummate the Transactions, to assume and maintain all Permits included in the Transferred Assets and to operate the Mueller Facility, all in accordance with all applicable Healthcare Laws. To Buyer's knowledge, there is no reason that any such Permit or filing, consent or approval of or by any Governmental Authority that is or will be necessary for the operation of the Mueller Facility by Buyer following the closing will not be provided by or obtained from such Governmental Authority without material conditions.

**Section 4.05   Legal Proceedings.** As of the Execution Date, Buyer has no actual knowledge of any Proceeding (or any basis therefor) pending against, or threatened against or affecting Buyer, any present or former officer, director or employee of Buyer or any other Person for whom Buyer may be liable or any of its respective properties, that, (a) if determined or resolved adversely in accordance with the plaintiff's demands, would reasonably be expected to have, individually or in the aggregate, a Buyer Material Adverse Effect, (b) in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions, or (c) affects the execution and delivery by Buyer of this Agreement and the other Transaction Documents to which either Buyer is or will be a party.

**Section 4.06   Absence of Restrictions and Conflicts.** The execution, delivery, and performance by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party and the consummation by Buyer of the Transactions do not and will not (a) contravene, conflict with, or result in any violation or breach of any provision of the Buyer's Organizational Documents, (b) assuming compliance with the matters referred to in Section 4.03, contravene, conflict with or result in a violation or breach of any provision of any Applicable Law, or (c) assuming compliance with the matters referred to in Section 4.03, require any consent or other action by any Person under, constitute a default, or an event that, with or without notice or lapse of time or both, would constitute a default, under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit to which Buyer is entitled under any provision of any Contract binding upon Buyer or by which its assets may be bound or any Permit affecting, or relating in any way to, Buyer or the assets or business of Buyer, with only such exceptions, in the case of each of clauses (b) and

(c), as has not had and would not reasonably be expected to result in, a Buyer Material Adverse Effect.

**Section 4.07 Financing.** Buyer has, or will have at Closing, sufficient cash and available lines of credit and other sources of available funds to enable it to perform all of its obligations under this Agreement and the other Transaction Documents to which it will be a party, including to pay the Purchase Price in accordance with the terms of this Agreement.

**Section 4.08 Arm's Length.** This Agreement and each of the other Transaction Documents to which Buyer is a party were negotiated, proposed, and entered into between the Sellers and Buyer without collusion or fraud of any kind, in good faith and from arm's-length bargaining positions.

**Section 4.09 Finders' Fees.** Except as set forth in Schedule 4.09, there is no investment banker, broker, finder or other intermediary that has been or will be retained by or authorized to act on behalf of Buyer that is or will be entitled to any fee, commission, or other compensation in connection with the Transactions.

## ARTICLE 5
## PRE-CLOSING COVENANTS OF THE PARTIES

**Section 5.01 Conduct of the Acquired Business.** From the Execution Date until the Closing or, if earlier, the termination of this Agreement, except (i) as otherwise contemplated by this Agreement, (ii) as required by any Applicable Law or any Governmental Authority or limitations resulting from the Bankruptcy Cases or orders from the Bankruptcy Court, or (iii) as otherwise consented to in writing by Buyer (such consent not to be unreasonably withheld, conditioned or delayed), the Sellers agree that they shall:

(a) conduct the Acquired Business in the ordinary course of business;

(b) use commercially reasonable efforts to: (i) maintain all of the tangible Transferred Assets in their current condition, reasonable wear and tear excepted, (ii) preserve intact the Acquired Business, and (iii) keep available the services of the current Employees and to maintain their relations and goodwill with its suppliers, customers, distributors and any others with whom or with which it has business relations;

(c) comply with Applicable Laws in all material respects;

(d) maintain their books and records in the ordinary course of business;

(e) not implement any closings or employee layoffs that could implicate the WARN Act;

(f) not merge or consolidate with or into any legal entity, dissolve, liquidate, or otherwise terminate its existence;

(g) not sell, lease, assign, transfer or otherwise dispose of any material assets or properties that would be Transferred Assets if retained by Sellers at the Effective Time, other

than (i) Inventory and materials sold, consumed or otherwise disposed of in the ordinary course of business and (ii) assets or properties that relate to or are used in the performance of shared services provided by any of the Corporate and Shared Services Sellers to any Affiliates of the Sellers in the ordinary course of business;

(h) not assume, assign, reject, terminate, waive any rights under or materially amend any executory contract or unexpired lease that is a Desired 365 Contract;

(i) not (A) increase the annual level of compensation payable or to become payable by any Seller to any of its Employees, (B) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any Employee other than with respect to the payment of "stay" or "retention" bonuses as reasonably determined by Sellers and payable solely by Sellers, (C) increase the coverage or benefits available under any (or create any new) severance pay, termination pay, vacation pay, company awards, salary continuation for disability, sick leave, deferred compensation, bonus or other incentive compensation, insurance, pension or other employee benefit plan or arrangement made to, for, or with any of the Employees or otherwise modify or amend or terminate any such plan or arrangement or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which any Seller is a party or involving any Employee;

(j) enter into any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(k) introduce any material change with respect to the operation of the Acquired Business, including any material change in the types, nature, composition or quality of products or services;

(l) not fail to keep in full force and effect present insurance policies, binders, contracts, instruments or other comparable insurance benefiting the assets of the Sellers and the conduct of the Acquired Business;

(m) not terminate, discontinue, close or dispose of any Leased Real Property or business operation of any Seller;

(n) not enter into any agreement with any other Person that limits or restricts the ability of any Seller to conduct the Business as then conducted;

(o) not enter into, create, incur or assume any obligation, take any other action, or enter into any agreement with respect to any Transferred Assets or Specifically Assumed Liabilities, in any case which are other than in a manner consistent with the recent operation of the Acquired Business prior to the Petition Date; and

(p) not commit or agree, whether in writing or otherwise, to take any action prohibited by this Section 5.01.

**Section 5.02 Bankruptcy Filings and Bidding Procedures.**

(a) Prior to the Execution Date, the Sellers filed the Bidding Procedures and Sale Motion pursuant to Sections 363 and 365 of the Bankruptcy Code seeking entry of the Bidding Procedures Order approving, among other things, (i) the bidding procedures set forth in the Bidding Procedures and Sale Motion, (ii) the schedule for the Auction and a hearing to consider approval of the sale of the Transferred Assets, and (iii) the form and manner of notice of the proposed Transactions.

(b) The Sellers shall use best efforts to cause the hearing to approve the Sale Order to take place no later than September 12, 2018 (the "***Sale Hearing Deadline***").

(c) The Sellers shall use reasonable efforts to (i) obtain entry of the Sale Order within two (2) Business Days following the hearing to approve the Sale Order (the "***Sale Order Deadline***"), (ii) cause the Sale Order to become a Final Order prior to the End Date (the "***Final Order Deadline***"), and (iii) consummate the Closing by the End Date.

(d) If reasonably practicable under the circumstances before the filing of any motions, applications, petitions, schedules, and supporting papers relating to the Transactions, Sellers will provide Buyer with reasonable opportunity to review and comment on all such documents prepared by the Sellers (including forms of Orders and notices to interested parties) prior to the filing thereof in the Bankruptcy Cases. All motions prepared by Sellers and relating directly to the Transactions to be filed on behalf of the Sellers after the Execution Date hereof must be reasonably satisfactory in form and substance to the Buyer.

(e) Sellers will promptly take such actions as are reasonably requested by Buyer to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by any Seller of its obligations under this Agreement and the Transaction Documents and demonstrating that Buyer is a good-faith buyer under Section 363(m) of the Bankruptcy Code.

(f) If entry of the Sale Order or any other orders of the Bankruptcy Court relating to the Transactions shall be appealed or otherwise challenged by any party (including by petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument), the Sellers agree to use commercially reasonable efforts to oppose such appeal, challenge, petition or motion and to obtain an expedited resolution of any such appeal, petition, or motion.

**Section 5.03 Actions With Respect to Contracts.**

(a) From and after the Execution Date until the Closing Date, Sellers shall not reject or alter (or attempt to alter) the terms of any 365 Contract to which any Seller is a party unless otherwise agreed to in writing by Buyer as provided in this Agreement. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to such 365 Contracts and take all other actions necessary to cause such 365 Contracts to be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts are Desired 365 Contracts at Closing. Sellers shall have no

obligation to Buyer to provide evidence of adequate assurance of future performance under the Desired 365 Contracts in connection with the assumption and assignment thereof by Sellers.

(b) Attached hereto as Schedule 5.03 is a list of the 365 Contracts that, as of the Execution Date, Buyer desires to be assumed by the Sellers and assigned to Buyer (collectively, the "***Desired 365 Contracts***") , and the associated Cure Costs which have been provided by the Sellers to Buyer. From time to time and at any time prior to September 19, 2018, Buyer may (i) designate any 365 Contract that has not been rejected as a Desired 365 Contract and (ii) remove the designation of any 365 Contract as a "Desired 365 Contract," in each case by providing the Sellers with an updated Schedule 5.03 clearly identifying such updated designation(s) (which updated Schedule 5.03 shall be deemed to automatically replace any prior Schedule 5.03). Buyer shall take all necessary action to effect the assumption of any Desired 365 Contract by Buyer in accordance with the Bankruptcy Code at the Closing, such assumption to be effective as of the Effective Time.

(c) At the Closing, Buyer shall pay all Cure Costs with respect to the Desired 365 Contracts in excess of $7,816. Buyer will provide evidence of adequate assurance of future performance of all of the Desired 365 Contracts so that all Desired 365 Contracts can be assumed by Buyer at the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement; *provided*, however, that if Buyer is unable to provide evidence of adequate assurance of future performance as to any Desired 365 Contract, then Schedule 5.03 shall be deemed to be amended to remove any such Desired 365 Contract; *provided, further*, that failure to provide such evidence of adequate assurance shall not be deemed to give rise to a failure of any condition of Buyer to consummation the Closing under Article 8; *provided, however*, that if the Real Property Lease is not assigned to Buyer pursuant to the Lease Assignment or the Order of the Bankruptcy Court referred to in Section 2.08(c)(iii)(B), each on terms reasonably acceptable to Buyer, in form and substance (including the terms of any security or guaranty required to effectuate the assignment), Buyer may terminate this Agreement without penalty and receive a refund of its Deposit. Buyer acknowledges and agrees that Buyer may have to provide information regarding Buyer, as well as a financial commitment of performance by Buyer with respect to the Desired 365 Contracts from and after the Closing to demonstrate adequate assurance of the performance of the Desired 365 Contracts.

(d) The Sellers agree to provide to Buyer a copy of any motion, notice, application or other court document filed with, and any proposed orders submitted to, the Bankruptcy Court seeking authorization to assume or reject any Desired 365 Contract, enter into, amend or waive any provision of any Contract, other than as permitted under Section 5.01, in advance of filing (with a reasonable opportunity to review and comment on same) all of which must be, prior to filing, in form and substance reasonably satisfactory to Buyer in all material respects.

(e) Notwithstanding anything to the contrary contained in this Agreement, if the sale, conveyance, assignment or transfer, or attempted sale, conveyance, assignment or transfer, to Buyer of any License, Permit, certificate, approval, authorization, agreement, contract, lease, or other commitment included in the Transferred Assets, other than the Real Property Lease, ("***Non-Transferable Assets***") is determined by the Bankruptcy Court to be nonassignable without consent (other than of an Affiliate of Sellers, in which case such Seller

covenants and agrees to cause such Affiliate to render such consent), the Closing shall proceed, but the Closing shall not constitute the sale, conveyance, assignment, transfer or delivery or assumption of any such Non-Transferable Asset, and this Agreement shall not constitute a sale, conveyance, assignment, transfer or delivery or assumption of any such Non-Transferable Asset, unless and until such consent is obtained; *provided, however*, the Sellers shall use commercially reasonable efforts to obtain any such consents related to the Non-Transferable Assets, and Buyer and Sellers shall reasonably cooperate with each other in any arrangement commercially reasonable to provide that Buyer shall receive the interest of the Sellers in the benefits under any such Non-Transferable Asset until such time as such consents shall have been obtained, and each of the Buyers and Sellers shall reasonably cooperate with the other party in any such commercially reasonable arrangement, including performance by the Sellers as agent if commercially reasonable to Buyer.

**Section 5.04 Access to Information and Lessors.**

(a) From the Execution Date until the Closing and subject to Applicable Law (including Patient Privacy Requirements), the Sellers shall (a) give to Buyer and its Representatives reasonable access during normal business hours to the offices, properties, books and records of the Sellers (including Tax Returns with respect to the Transferred Assets), and (b) instruct their Representatives to cooperate with Buyer in its investigations; *provided, however*, that no investigation pursuant to this Section 5.04 shall affect any representations or warranties made herein or the conditions to the obligations of the respective parties to consummate the Transactions and, provided, further, that in no event shall any Person be obligated to provide any information the disclosure of which would cause the loss of any legal privilege available to any Person relating to such information or would cause any Person to breach a confidentiality obligation to which it is bound; provided that Sellers shall use reasonable efforts to provide such information to Buyer in a manner not violative of the aforementioned. Any investigation pursuant to this Section 5.04 shall be conducted in such manner as not to interfere unreasonably with the conduct of the Acquired Business of the Sellers or their Representatives.

(b) From the Execution Date until the Closing, Sellers shall, and shall cause their Representatives to, reasonably cooperate with Buyer in its attempt to discuss the assignment of the Real Property Lease for the Subject Location and the Subject Equipment Leases, including by providing introductions to, and facilitating and participating in discussions with, the lessors or contract counterparties under such leases or contracts.

**Section 5.05 Commercially Reasonable Efforts; Further Assurances.**

(a) Subject to the terms and conditions of this Agreement and subject to the Bankruptcy Code and any orders of the Bankruptcy Court, Buyer and the Sellers each shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to consummate the Transactions, including (i) finalizing, executing and delivering all Transaction Documents prior to the Closing, (ii) preparing and filing as promptly as practicable with any Governmental Authority or other Third Party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents, and (iii) obtaining and

maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other Third Party that are necessary, proper or advisable to consummate the Transactions, including transferring any Permit to Buyer, or, if any such Permit is not transferrable, to reasonably assist Buyer in obtaining a replacement therefore. Prior to the Closing Date, the Sellers shall provide Buyer with an updated list of all Employees, by location, who have suffered an "employment loss" (as defined in the WARN Act) during the three (3) month period prior to the Closing Date. The Sellers and Buyer shall execute and deliver or cause to be executed and delivered such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the Transactions in accordance with the terms and conditions of this Agreement.

(b) To the extent required under Applicable Law or any Healthcare Laws, Buyer shall file with applicable Governmental Authorities documentation notifying such Governmental Authorities of a change of ownership ("***CHOW***") of the Mueller Facility effective as of the Closing Date. The Sellers shall assist and cooperate with Buyer to take all actions necessary to transfer the Permits (to the extent transferable) for the Mueller Facility, including the filing of CHOW documents as the seller, and any other governmental approvals necessary for Buyer to operate the Mueller Facility in the same manner as the Sellers. In addition, the Seller shall reasonably cooperate with Buyer in connection with Buyer's efforts to effect the transfer and assignment to Buyer of that certain Patient Transfer Agreement between Operating Seller and St. David's Healthcare Partnership, L.P., LLP d/b/a St. David's Medical Center including Heart Hospital of Austin, a campus of St. David's Medical Center, dated January 30, 2018. The Seller shall reasonably cooperate with Buyer in taking all actions necessary to obtain all licenses, registrations, approvals and Permits in order for Buyer to operate the Mueller Facility.

**Section 5.06 Notices of Certain Events.** Sellers shall promptly notify Buyer of:

(a) any written notice or other communication received by it from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(b) any written notice or other communication received by it from any Governmental Authority in connection with the Transactions;

(c) any Proceedings commenced or, to the Knowledge of Sellers, threatened against, relating to or involving or otherwise affecting the Sellers or Buyer, respectively, as the case may be, that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to any section of this Agreement or that relate to the consummation of the Transactions;

(d) the damage or destruction by fire or other casualty of any material assets used in the Acquired Business or any material asset used in the Acquired Business becomes the subject of any Proceeding or, to Sellers' Knowledge, threatened Proceeding for the taking thereof or any part thereof or of any right relating thereto by condemnation, eminent domain or other similar governmental action;

(e) any inaccuracy of any representation or warranty contained in this Agreement at any time during the term hereof that could reasonably be expected to cause the conditions set forth in Section 8.02(b) and Section 8.03(b) not to be satisfied; and

(f) any failure of Seller to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it hereunder.

Notwithstanding the foregoing, the delivery of any notice pursuant to this Section 5.06 shall not (x) be deemed to amend or supplement any of the Disclosure Schedules contemplated hereby, (y) be deemed to cure any breach of any representation, warranty, covenant or agreement or to satisfy any condition, or (z) limit or otherwise affect the remedies available hereunder to Buyer.

**Section 5.07 Rule 2002 Notice List.** To the extent not already included, Sellers shall add Buyer and Buyer's counsel to Sellers' so-called "Rule 2002 notice list" and otherwise provide notice to Buyer of all matters that are required to be served on each Seller's creditors pursuant to the Bankruptcy Code and Rules.

**Section 5.08 Ad Valorem Taxes.** Ad valorem real and tangible personal property taxes with respect to the Transferred Assets for the calendar year in which the Closing occurs shall be prorated between Sellers, on the one hand, and Buyer, on the other hand, as of the Closing Date based upon the applicable number of days covered by such taxes that the Transferred Assets were owned by the Sellers versus owned by the Buyer. If the amount of such Taxes with respect to any of the Transferred Assets for the calendar year in which the Closing occurs has not been determined as of the Closing Date, then the Taxes with respect to such Transferred Assets for the preceding calendar year, on the basis of no applicable discount, shall be used to calculate such prorations, with known changes in valuation applied. The prorated Taxes shall be an adjustment to the amount of cash due from Buyer at the Closing. If the actual amount of any such Taxes varies by more than $2,000 from estimates used at the Closing to prorate such Taxes, then the parties shall re-prorate such Taxes within ten (10) days following request by either Buyer or Sellers based on the actual amount of the tax bill.

## ARTICLE 6
## POST-CLOSING COVENANTS

**Section 6.01 Access.** Buyer, following the Closing, and subject to Applicable Law (including Patient Privacy Requirements), shall give to the Sellers and their Representatives reasonable access during normal business hours to the offices, books and records relating to Sellers, the Acquired Business and operations, the Transferred Assets and the Specifically Assumed Liabilities for any and all periods prior to or including the Closing Date as the Sellers and their Representatives may reasonably request and to make copies of the same in connection with (a) the preparation of Tax returns or information returns, (b) reports or other obligations by the Sellers to Governmental Authorities, (c) with respect to the administration of the Bankruptcy Cases or the winding-down of the Debtors' bankruptcy estates, (d) pursuing, prosecuting, or commencing litigation on Avoidance Actions, (e) objecting to proofs of claims or administrative expense claims, and (f) any final determination of any audit or examination, Proceeding, or determination; *provided, however*, that the obligation of Buyer to so accommodate the Sellers

and their Representatives shall be subject to (A) reasonable notice from the Sellers of any request for information, (B) the Sellers' agreement to reimburse Buyer for its out-of-pocket expenses of such accommodation, (C) non-interference with the ordinary conduct of business of Buyer, and (D) the right of Buyer to refuse any request for information that would result in a loss of privilege or constitute a breach of any confidentiality obligation of Buyer. Buyer shall preserve all such books and records for a period of seven (7) years after the Closing or such longer period as may be required by Patient Privacy Requirements; *provided, however*, that Buyer shall have the right at any time after the second anniversary of the Closing Date to request in writing that the Sellers (so long as the Sellers are in existence) take any such records and, if they do not agree to take such records within ninety (90) Business Days after receipt of the request, Buyer may dispose of such records, subject to Patient Privacy Requirements. Sellers and Buyer shall, and shall cause their respective Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided pursuant to this Section 6.01. For the avoidance of doubt, this provision is intended to, and does hereby, inure to the benefit of the successors and/or assigns of the Sellers and their Representatives including but not limited to any post-confirmation trust established in connection with the Sellers' Bankruptcy Cases.

**Section 6.02 Employee Matters.**

(a) Not later than ten (10) days prior to the anticipated Closing Date, the Sellers shall provide Buyer with (i) an updated Sellers' Transferred Employee List that identifies all Employees of the Acquired Business as of the date of such updated list; and (ii) email addresses for the individual emergency room physician independent contractors of the Acquired Business. On or after the Closing Date and subject to satisfaction of Buyer's employment-screening procedures and requirements, Buyer will offer employment to certain Employees engaged in the Acquired Business and identified on the updated Sellers' Transferred Employee List as provided in this Section 6.02 and upon such terms and conditions as Buyer may determine in its sole discretion (the "***Transferred Employees***"), including placing such employees at one of Buyer's or its Affiliates' other emergency room locations in the greater Austin area.

(b) Sellers shall provide Buyer with a true and accurate list, by date and location, of all Employee layoffs implemented by Sellers in ninety (90) days preceding the Closing. The Corporate and Shared Services Sellers shall cooperate with Buyer in permitting Buyer to interview, on a voluntary basis, the Employees so as to determine whether such Employees satisfy Buyer's hiring requirements and to communicate any information concerning employment offers and potential employment with Buyer prior to the Closing Date so that any Employees who are hired by Buyer may commence employment on the Closing Date. Not less than five (5) days before the Closing Date, Buyer shall provide the Sellers with a list of the Transferred Employees to be hired by Buyer at Closing (the "***Buyer's Transferred Employee List***"), which such list shall identify: (i) substantially all of the Mueller Facility-level employees who are nurses, radiology technicians or patient registration staff (other than Mueller Facility administrators) who are listed on the updated Sellers' Transferred Employee List ("***Mueller Facility-level Employees***"), (ii) any Mueller Facility administrator employees Buyer desires to offer employment, as Buyer may determine in its sole and absolute discretion ("***Mueller Facility Administrators***"), and upon such terms and conditions as Buyer may determine in its sole and absolute discretion, (iii) billing and collection staff employees employed by NPM, with the

number of such employees to be commensurate with patient volume as of the Closing Date, as determined by Buyer in its sole and absolute discretion ("***Billing and Collection Employees***"), and (iv) any key corporate-level employees employed by EDMG (other than Billing and Collection Employees) who Buyer desires to offer employment, as Buyer may determine in its sole and absolute discretion ("***Key Corporate-level Employees***"). Effective as of the Closing Date, the applicable Sellers shall terminate the employment of any Employees identified on the Buyer's Transferred Employee List.

(c) Buyer shall not assume, and the Sellers shall retain, any liability or obligation whatsoever of the Sellers relating to any of the ERISA Plans. The Corporate and Shared Services Sellers shall cause any ERISA Plan that is maintained solely for the benefit of Employees and their dependents and which does not cover any other employees of Sellers, their Affiliates or their ERISA Affiliates to be terminated at Closing. Buyer shall be responsible for the provision of COBRA-continuation coverage with respect to each Employee, and his or her dependents and spouse, who constitutes an "M & A qualified beneficiary" within the meaning of Treasury Regulation Section 54.4980B-9, Q&A-4 in connection with the Transactions and associated with the Transferred Assets notwithstanding that the Corporate and Shared Services Sellers or any of their ERISA Affiliates may continue a group health plan after Closing. Buyer shall in no event be responsible for the provision of COBRA-continuation coverage to qualified beneficiaries of the Sellers who are associated with the Retained Assets.

(d) The Sellers will be responsible for all Liabilities with respect to wages, salaries and employer's and employee's Withholding Taxes for the Transferred Employees that are accrued but unpaid after the Petition Date (including the PTO Obligations which shall be a Retained Liability pursuant to Section 2.04) and for all Liabilities with respect to claims by Transferred Employees or their eligible dependents for health, accident, sickness, and disability benefits that are accrued but unpaid after the Petition Date (excluding any COBRA Liabilities imposed on Buyer pursuant to Section 6.02(c)). Except as may be required under COBRA, Buyer shall have no obligation or responsibility for any claims for health, accident, sickness, and disability benefits that are incurred prior to or on the Petition Date by any Employees or their eligible dependents. Subject to limitations imposed by Applicable Law, with respect to the employee welfare benefit plans maintained by Buyer following the Closing Date in which the Transferred Employees are eligible to participate, Buyer shall use commercially reasonable efforts to (i) waive, or cause to be waived, any limitations on benefits relating to waiting periods, pre-existing condition exclusions or actively at work requirements, except to the extent that such waiting period, exclusions or requirements applied to the Transferred Employee under the corresponding ERISA Plan and (ii) recognize any deductibles and other eligible expenses that were incurred by such Transferred Employees in the plan year in which the Effective Time occurs with respect to satisfying any deductibles or out-of-pocket maximums applicable to such Transferred Employee during the applicable plan year of the comparable Buyer benefit plan, to the extent such recognition would have been given under comparable ERISA Plans prior to the Effective Time.

(e) Prior to the Closing Date, the Sellers shall be solely responsible for complying with the WARN Act and any and all obligations under other Applicable Laws requiring notice of plant closings, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Employees as a result of any action

by the Sellers or any of their Affiliates prior to the Closing Date. Sellers shall remain solely responsible for WARN Act Liabilities applicable to the Employees that are incurred on or after the Closing Date, including with respect to any Employee terminated prior to the Closing Date that, when aggregated with any Employee who is not hired or who is terminated on or after Closing or for which any WARN Act Liability is incurred, results in WARN Act Liability with respect to such Seller Employee terminated prior to Closing.

(f) Each offer of employment by Buyer to a Mueller Facility-level Employee or Billing and Collection Employee pursuant to this Section 6.02 shall initially provide such Transferred Employee with (i) total target annual cash compensation that is not substantially less favorable, on an aggregate basis, to either (A) the base salary (or hourly wages, if applicable) provided by the applicable Seller to such Employee immediately prior to the Effective Time, or (B) a market-rate base salary (or hourly wages, if applicable), as determined by Buyer in its sole and absolute discretion; and (ii) other employee benefits (excluding equity incentive compensation) which are not substantially less favorable, in the aggregate, to the employee benefits (excluding equity incentive compensation) provided to similarly-situated employees of Buyer, subject to the terms, conditions and eligibility requirements of any plan providing for such benefits. Each offer of employment by Buyer to a Mueller Facility Administrator or Key Corporate-level Employee, if any, shall be at the sole and absolute discretion of Buyer and on such terms as determined by Buyer in its sole and absolute discretion. Sellers shall afford Buyer reasonable access to Employees prior to the Closing for the purpose of conducting interviews for employment and communicating Buyer's transition plan for Employees, including a "town-hall" type meeting at the Mueller Facility.

(g) Nothing in this Agreement is intended to confer on any entity or individual who is not a party to this Agreement any rights whatsoever. This Section 6.02 shall not constitute an amendment to any employee benefit plan maintained by Buyer or a Seller, create any third-party beneficiary rights, or inure to the benefit of or be enforceable by, any employee or any Person representing the interests of employees.

**Section 6.03 Trade Name License Agreement and Transition Services Agreement.** Commencing promptly following the Execution Date, Buyer shall negotiate in good faith on the terms of the Trade Name License Agreement and the Transition Services Agreement with the Primary Houston Buyer, and shall use commercially reasonable efforts to finalize the definitive forms of such agreements by no later than the date that is fourteen (14) days following the entry of the Sale Order .

## ARTICLE 7
## POST-CLOSING COVENANTS OF THE PARTIES

**Section 7.01 Certain Filings.** The Sellers and Buyer shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the Transactions and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

**Section 7.02 Public Announcements**. The Sellers and Buyer agree that the consent (as to both form and content) of each other Party shall be obtained prior to issuing any press release or making any public statement with respect to this Agreement or the other Transaction Documents or the Transactions. Notwithstanding the foregoing, the Sellers may file this Agreement and the other Transaction Documents with the Bankruptcy Court upon execution of this Agreement if they determine that such filing is appropriate and/or may inform the Bankruptcy Court of the existence and terms of this Agreement.

**Section 7.03 Confidentiality**. Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to Closing, the Confidentiality Agreement and the provisions of this Section 7.03 shall nonetheless continue in full force and effect. This Agreement will be filed with the Bankruptcy Court, will be distributed as an exhibit to the Bidding Procedures and Sale Motion and may be included or summarized in such pleadings and documents, and that any such disclosures shall not violate this section. The Parties also agree that such disclosure or any other permitted disclosure in Section 7.03 shall not be deemed to violate any confidentiality obligations owing to any Party, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. Notwithstanding the foregoing, this Section 7.03 shall not in any way limit, to the extent required by Applicable Law, the disclosure of information by the Sellers in connection with the administration of the Bankruptcy Cases, pursuant to any provision of the Bankruptcy Code or any order of the Bankruptcy Court.

**Section 7.04 Mail and Other Post-Closing Inquiries.** The Sellers authorize Buyer on and after the Closing Date to receive and to open all mail received by Buyer relating to any of the Retained Assets or the Retained Liabilities. The Sellers shall promptly deliver to Buyer any mail or other communication received by the Sellers after the Closing Date pertaining to any of the Transferred Assets or the Specifically Assumed Liabilities. Buyer shall promptly deliver to the Sellers all other mail or communications received by Buyer or its Affiliates that relate to the Retained Assets or Retained Liabilities or to possible violations of Section 362 of the Bankruptcy Code.

## ARTICLE 8
## CONDITIONS TO CLOSING

**Section 8.01 Conditions to Obligations of Buyer and Sellers.** The obligations of Buyer and the Sellers to consummate the Closing are subject to the satisfaction of each of the following conditions:

(a) No Applicable Law shall prohibit the Transactions or the consummation of the Closing;

(b) All actions by or in respect of or filings with any Governmental Authority required to permit the consummation of the Closing shall have been taken, made or obtained; and

(c)     No Proceeding instituted by any Governmental Authority shall be pending and no injunction, order, decree or judgment of any Governmental Authority of competent jurisdiction shall be in effect, in each case which seeks to or does, as applicable, prohibit, restrain or enjoin the consummation of the Transactions; *provided, however*, that the Party seeking to rely on this Section 8.01(c) as a basis not to consummate the Closing must have used commercially reasonable efforts to cause such Proceeding to have been dismissed or resolved in favor of the Parties or to prevent the entry of such injunction, order, decree or judgment.

**Section 8.02  Conditions to Obligations of Buyer.**  The obligation of Buyer to consummate the Closing is subject to the satisfaction (or waiver by Buyer) of each of the following further conditions:

(a)     The Sellers shall have performed in all material respects all of their covenants and agreements hereunder required to be performed by them on or prior to the Closing Date;

(b)     The representations and warranties of the Sellers set forth in Article 3 of this Agreement shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Sellers Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Sellers Material Adverse Effect) at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations need not be true and correct as of the Closing Date but must be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Sellers Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Sellers Material Adverse Effect) as of such specific earlier date;

(c)     Buyer shall have received a certificate signed by an executive officer of Sellers with respect to the items set forth in Sections 8.02(a) and (b);

(d)     There shall not have been any event causing a Sellers Material Adverse Effect;

(e)     The Sellers shall have delivered or be prepared to deliver all of the items required by Section 2.08(c) and all other items required to be delivered by the Sellers as of the Closing Date pursuant to the terms and conditions of this Agreement;

(f)     The Sale Order, in form and substance acceptable to Buyer, in its reasonable discretion, shall have been entered by the Bankruptcy Court prior to the Closing and such order shall be a Final Order and in full force and effect;

(g)     Sellers shall have caused all bank accounts, safety-deposit boxes and lock boxes for Sellers to be transferred to Buyer, and shall have caused the authorized signatories on any bank accounts to be transferred to authorized signatories of Buyer; and

(h)     The Bankruptcy Court shall approve and authorize the Transactions, including the assumption and assignment of the Real Property Lease and the Desired 365 Contracts, and the Real Property Lease and the Desired 365 Contracts shall have been actually

assumed and assigned to Buyer such that the Real Property Lease and the Desired 365 Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, among other things, defaults, breaches, or claims of pecuniary losses existing as of the Closing or by reason of the Closing.

**Section 8.03 Conditions to Obligations of the Sellers.** The obligation of the Sellers to consummate the Closing is subject to the satisfaction (or waiver by the Sellers) of the following further conditions:

(a) Buyer shall have performed in all material respects all of its covenants and agreements hereunder required to be performed by it at or prior to the Closing Date;

(b) The representations and warranties of Buyer in Article 4 of this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of the Closing Date, disregarding any materiality, Buyer Material Adverse Effect or similar qualifiers, other than those representations and warranties that are made as of a specific earlier date which representations need not be true and correct as of the Closing Date but must be true and correct in all material respects as of such specific earlier date; provided, however, that the condition to Closing set forth in this Section 8.03(b) shall be deemed to be satisfied unless individually or in the aggregate, the effect of all breaches, inaccuracies and failures of such representations and warranties to be true and correct in all respects would reasonably be expected to result in a Buyer Material Adverse Effect; and

(c) Sellers shall have received a certificate signed by an executive officer of Buyer with respect to the items set forth in Sections 8.03(a) and (b);

(d) Buyer shall have delivered or be prepared to deliver all of the items required by Section 2.08(b) and all other items required to be delivered by Buyer as of the Closing Date pursuant to the terms and conditions of this Agreement; and

(e) The Sale Order shall have been entered on the docket of the Bankruptcy Court as soon as practicable and no later than the Sale Order Deadline and shall have become a Final Order by the Final Order Deadline.

## ARTICLE 9
## TERMINATION

**Section 9.01 Grounds for Termination.** Subject to the penultimate sentence of this Section 9.01, this Agreement may be terminated at any time prior to the Closing:

(a) by mutual written agreement of the Sellers and Buyer;

(b) by either the Sellers or Buyer if the Closing shall not have been consummated on or before October 31, 2018 (the "***End Date***"); *provided, however*, that if the Closing shall not have occurred on or before such date due to a material breach of any representation, warranty, covenants or agreements contained in this Agreement by Buyer, on one hand, or the Sellers, on the other, then the breaching Party may not terminate this Agreement pursuant to this Section 9.01(b);

(c) by either the Sellers or Buyer if there shall be any Applicable Law that makes consummation of the Transactions illegal or otherwise prohibited or if consummation of the Transactions would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction;

(d) by Buyer if:

(i) the Sellers shall have failed to perform or comply with any of their covenants or agreements or shall have breached any of their representations and warranties, such that the conditions set forth in Section 8.02(a) or Section 8.02(b) shall not be satisfied, and the Sellers shall have not cured such breaches and failures within fifteen (15) days after receipt of written notice from Buyer with the result that such condition remains unsatisfied;

(ii) any condition set forth in Section 8.01 or Section 8.02 shall have become incapable of being satisfied by the End Date;

(iii) the Sellers fail to consummate the Transactions, Buyer has otherwise complied with all of Buyer's obligations under this Agreement, and all of the conditions contained in Section 8.01 and Section 8.03 have been satisfied;

(iv) any event has caused a Sellers Material Adverse Effect;

(v) the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code or the Bankruptcy Court enters a Final Order appointing a trustee or an examiner with expanded powers (beyond those set forth under Section 1106(a)(3) of the Bankruptcy Code) in the Bankruptcy Cases prior to the Closing Date;

(vi) if any of the following deadlines shall have been missed; *provided, however*, that the deadline set forth in Section 9.01(d)(vi)(A) shall be subject to the Bankruptcy Court's docket, and accordingly, (I) shall be deemed extended through the date of the hearing set by the Bankruptcy Court for consideration of the applicable pleading if, after using reasonable efforts, the Sellers are unable to obtain a docket setting for such hearing prior to such deadline, (II) shall be deemed extended through the date(s) of any continued hearing set by the Bankruptcy Court for consideration of such pleading if, after using reasonable efforts, the Sellers are unable to conclude such hearing(s) prior to such deadline, and (III) shall be deemed extended as required to comply with any notice periods required under the Bankruptcy Code which, as a result of any extensions described under the foregoing clauses (I) and (II), cannot be complied with prior to such deadline:

(A) [intentionally omitted];

(B) [intentionally omitted];

(C) the hearing to approve the Transactions is not conducted by the Sale Hearing Deadline;

(D) the Sale Order is not entered by the Sale Order Deadline;

(E) the Sale Order does not become a Final Order by the End Date, unless the Sale Order is entered by the End Date but is not stayed by order of the Bankruptcy Court or of some other federal district or appeals court;

(F) the Bankruptcy Court enters an order for the appointment of a trustee or examiner with managerial powers, other than at the request of the Buyer or any of its Affiliates, under Section 1104 of the Bankruptcy Code and such trustee or examiner takes any action to interfere with or impair the Transactions;

(G) the Bankruptcy Cases are converted to cases under Chapter 7 of the Bankruptcy Code, dismissed, or any similar commencement of liquidation proceedings relating to the Sellers occurs, other than as contemplated herein;

(H) any of the Sellers executes an Alternative Agreement or takes affirmative steps to effect an Alternative Transaction; *provided* that this Agreement may not be terminated pursuant to this clause if and for so long as Buyer is the Back-Up Bidder; or

(I) [intentionally omitted]; or

(e) by the Sellers:

(i) if Buyer shall have failed to perform or comply with any of its covenants or agreements or shall have breached any of its representations and warranties, such that the conditions set forth in Section 8.03(a) or Section 8.03(b) shall not be satisfied, and Buyer shall have not cured such breaches and failures within fifteen (15) days after receipt of written notice from the Sellers with the result that such condition remains unsatisfied;

(ii) if any condition set forth in Section 8.01 or Section 8.03 shall have become incapable of being satisfied by the End Date;

(iii) the Sale Order does not become a Final Order by the End Date, unless the Sale Order is entered by the End Date but is not stayed by order of the Bankruptcy Court or of some other federal district or appeals court;

(iv) if any of the Sellers executes an Alternative Agreement or consummates an Alternative Transaction; or

(v) [intentionally omitted].

Notwithstanding the foregoing, the Sellers shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if Sellers are in breach of any of their representations and warranties or shall have failed to perform or comply with any of their covenants and agreements such that either (A) the conditions to Closing set forth in Section 8.02(a) and Section 8.02(b) shall not be satisfied or (B) such breach or failure to perform or comply by the Sellers is the primary cause of the occurrence of any event giving Sellers a right to terminate this Agreement or the failure of the Closing to have occurred. Buyer shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if Buyer is in breach of any of its respective representations and warranties or shall have failed to perform or comply with any of its respective covenants and agreements such that either (A) the conditions to closing set forth in Section 8.03(a) and Section 8.03(b) shall not be satisfied or (B) such breach or failure to perform or comply by Buyer is the primary cause of the occurrence of any event giving Buyer a right to terminate this Agreement or the failure of the Closing to have occurred.

**Section 9.02 Effect of Termination.**

(a) If any Party terminates this Agreement pursuant to Section 9.01 (other than pursuant to Section 9.01(a)), written notice thereof shall be given to the other Parties, specifying the provision of this Agreement pursuant to which termination is made, and all rights and obligations of the applicable Parties under this Agreement shall terminate (other than Section 7.03 and this Section 9.02, the provisions of Article 10 and such portions of Article 1 as are necessary to give effect to the foregoing, all of which shall survive termination of this Agreement).

(b) If this Agreement is terminated for any reason, then the Seller Parent shall promptly disburse the Deposit (together with all interest earned thereon) to the Buyer, free and clear of any claims thereon by the Sellers; *provided*, *however*, if this Agreement is validly terminated by the Sellers pursuant to (i) Section 9.01(e)(i) or Section 9.01(e)(ii) (as a result of any condition set forth in Sections 8.03(a) – (d) having become incapable of being satisfied by the End Date) or (ii) Section 9.01(b) because of the failure of Buyer to close in the instance where, as of the End Date, (A) all of the conditions set forth in Section 8.01 and Section 8.02 (excluding conditions that, by their terms, cannot be satisfied until the Closing) have been satisfied (or waived, or deemed to have been waived, by Buyer), (B) the Sellers are ready, willing and able to close, and (C) Buyer nevertheless elects not to promptly close, then the Sellers shall be entitled to terminate this Agreement and the Seller Parent shall retain the Deposit (together with all interest earned thereon) as liquidated damages. THE SELLERS AGREE THAT THE SELLERS' RIGHT TO THE PAYMENT OF THE DEPOSIT (TOGETHER WITH ALL INTEREST THEREON) AS PROVIDED IN THIS SECTION 9.02(b) SHALL BE THE SELLERS' SOLE AND EXCLUSIVE REMEDY AGAINST BUYER OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS, OR REPRESENTATIVES FOR ANY AND ALL ADVERSE CONSEQUENCES THAT MAY BE SUFFERED BY SELLERS BASED ON, RESULTING FROM, OR ARISING OUT OF OR RELATED TO THE TRANSACTIONS OR THIS AGREEMENT, INCLUDING ANY AND ALL ADVERSE CONSEQUENCES THAT MAY BE SUFFERED BASED ON, RESULTING FROM, OR ARISING OUT OF OR RELATED TO THE CIRCUMSTANCES

GIVING RISE TO TERMINATION OF THIS AGREEMENT, AND UPON PAYMENT OF THE DEPOSIT (TOGETHER WITH ALL INTEREST EARNED THEREON) TO SELLERS IN ACCORDANCE WITH THIS SECTION 9.02(b), NONE OF BUYER OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES SHALL HAVE ANY FURTHER LIABILITY OR OBLIGATION RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS.

(c) Upon termination of this Agreement, Buyer shall destroy or return to the Sellers all data, assessments and/or reports, maps and other information furnished by or on behalf of the Sellers to Buyer or prepared by or on behalf of Buyer in connection with its due diligence investigation of the Sellers, the Acquired Business, the Transferred Assets and the Specifically Assumed Liabilities, and, if Buyer elects to destroy any such information, an officer of Buyer shall certify the destruction of such information to Seller in writing.

## ARTICLE 10
## MISCELLANEOUS

**Section 10.01 Notices.** All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Buyer:

AEC ER 4, LLC
3571 Far West Blvd. Box #81
Austin, Texas 78731
Attention: Luke Padwick

with a copy to:

DuBois, Bryant & Campbell, L.L.P.
303 Colorado Street, Suite 2300
Austin, Texas 78701
Attention: Seth E. Meisel
Facsimile No.: (512) 457-8008

if to the Sellers, to:

Neighbors Legacy Holdings, Inc.
10800 Richmond Ave.
Houston, Texas 77042
Attention: Chief Restructuring Officer
Facsimile No.: (713) 436-5210

with a copy to:

Porter Hedges LLP
1000 Main, 36th Floor
Houston, Texas 77002
Attention: John F. Higgins
Facsimile No.: (713) 226-6248

or such other address, facsimile number or electronic mail address as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

**Section 10.02 Survival.** The representations and warranties contained herein and in any certificate or other writing delivered pursuant hereto shall terminate upon and not survive the Closing and there shall be no liability thereafter in respect thereof (it being understood and agreed that no Party shall have the right to bring or assert any action or claim for beach of any representation or warranty herein or in any Transaction Document after the Closing). Each covenant and agreement of the Parties hereto contained in this Agreement shall terminate upon the Closing except to the extent that performance under such covenant or agreement is to take place after Closing; in which case, such covenant shall survive the Closing until the earlier of (i) performance of such covenant or agreement in accordance with this Agreement or, if time for performance of such covenant is specified in this Agreement, 30 days following the expiration of the time period for such performance and (ii) the expiration of applicable statute of limitations with respect to any claim for any failure to perform such covenant; *provided, however*, that if a written notice of claim with respect to any covenant or agreement to be performed after Closing is given prior to the expiration of such covenant or agreement then such covenant or agreement shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

**Section 10.03 Amendments and Waivers.**

(a) Any provision of this Agreement may be amended or waived prior to Closing if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b) No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Applicable Law.

**Section 10.04 Expenses.** Except as otherwise expressly provided herein, all costs and expenses incurred in connection with this Agreement or the Transactions shall be paid by the Party incurring such cost or expense.

**Section 10.05 Successors and Assigns.** The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns; *provided, however*, that no Party (other than Buyer) may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, in whole or in part, by operation of law or otherwise, without the prior written consent of each other Party hereto. Buyer may assign its rights and obligations under this Agreement in whole, but not in part, without Sellers' consent upon ten (10) days' prior written notice to Sellers.

**Section 10.06 Supplementation and Amendment of Schedules.** For the purpose of avoiding any misunderstanding, the Sellers may, at their option, supplement the Schedules hereto in order to reflect any additional matters which, if existing, occurring or known as of the Execution Date, would have been required to be set forth or described in the Schedules (each, a "***Schedule Supplement***"). Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of Buyer's termination rights contained in Section 9.01(d) or of determining whether or not the conditions set forth in Section 8.02 have been satisfied. The inclusion of any item in the Schedules, or any references to dollar amounts, will not be deemed to be an acknowledgement or representation that such item is material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information provided in one Schedule hereto will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule hereto to which its relevance is reasonably apparent on its face.

**Section 10.07 Governing Law.** THE AGREEMENT AND ALL ACTIONS, CAUSES OF ACTION, OR CLAIMS OF ANY KIND (WHETHER AT LAW, IN EQUITY, IN CONTRACT, IN TORT, OR OTHERWISE) THAT MAY BE BASED UPON, ARISE OUT OF, OR RELATE TO THIS AGREEMENT, OR THE NEGOTIATION, EXECUTION, OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY ACTION, CAUSE OF ACTION, OR CLAIM OF ANY KIND BASED UPON, ARISING OUT OF, OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN, IN CONNECTION WITH, OR AS AN INDUCEMENT TO THIS AGREEMENT), SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

**Section 10.08 Jurisdiction.** Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to the Transaction Documents and the Transactions exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Cases remain open and (b) after the close of the Bankruptcy Cases or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Southern District of Texas or any Texas State court sitting in Houston (together with the Bankruptcy Court, the "***Chosen Courts***"), and solely in connection with claims arising under this Agreement or any other Transaction Document or the Transactions (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or

proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto, and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 10.01.

**Section 10.09 WAIVER OF JURY TRIAL.** EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 10.10 Counterparts; Effectiveness; Third Party Beneficiaries.** This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by all of the other Parties hereto. Until and unless each Party has received a counterpart hereof signed by the other Party hereto, this Agreement shall have no effect and no Party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). Notwithstanding anything to the contrary in this Agreement, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable. No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties hereto and their respective successors and assigns.

**Section 10.11 Entire Agreement.** This Agreement, the other Transaction Documents, the Bidding Procedures Order, and the Sale Order constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter hereof and thereof.

**Section 10.12 Severability.** If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated; and in lieu of each such invalid, void or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such invalid, void or unenforceable provision as may be valid, binding and enforceable.

**Section 10.13 Time of Essence.** Time is of the essence in the performance of this Agreement, except as otherwise expressly provided herein.

**Section 10.14 Closing Actions.** All deliveries, payments, and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

**Section 10.15 Conflict Between Transaction Documents.** The Parties agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition, or provision of any other agreement or document referred to herein, this Agreement shall govern and control.

**Section 10.16 Time Periods.** Unless specified otherwise, any action required hereunder to be taken within a certain number of days shall be taken within that number of calendar days (and not Business Days); provided, however, that if the last day for taking such action falls on a day that is not a Business Day, the period during which such action may be taken shall be automatically extended to the next Business Day.

**Section 10.17 Certain Acknowledgements and Limitations.**

(a) Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with this Agreement, the other Transaction Documents or the Transactions are limited to those specifically set forth in this Agreement and the other Transaction Documents. Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement and the other Transaction Documents on the basis of any legal or equitable principle or on any other basis whatsoever. Neither any equitable or legal principle nor any implied obligation of good faith or fair dealing nor any other matter requires any Party to incur, suffer or perform any act, condition or obligation contrary to the terms of this Agreement and the other Transaction Documents, whether or not existing and whether foreseeable or unforeseeable. Each of the Parties acknowledges that it would be unfair, and that it does not intend, to increase any of the obligations of the other Party on the basis of any implied obligation or otherwise.

(b) **BUYER ACKNOWLEDGES AND AGREES THAT IT HAS CONDUCTED ITS OWN INDEPENDENT DUE DILIGENCE INVESTIGATION, REVIEW AND ANALYSIS OF THE SELLERS, THE TRANSFERRED ASSETS, THE SPECIFICALLY ASSUMED LIABILITIES AND THE ACQUIRED BUSINESS IN CONNECTION WITH THE TRANSACTIONS AND HAS BEEN PROVIDED ACCESS TO THE PERSONNEL, PROPERTIES, ASSETS, PREMISES, BOOKS AND RECORDS, AND OTHER DOCUMENTS AND DATA OF THE SELLERS AND THE ACQUIRED BUSINESS FOR SUCH PURPOSE.**

(c) **EXCEPT IN THE CASE OF INTENTIONAL FRAUD, BUYER AGREES THAT, (I) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY THE SELLERS THAT ARE EXPRESSLY SET FORTH IN ARTICLE 3 OF THIS AGREEMENT, NEITHER THE SELLERS, NOR ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES HAVE MADE AND SHALL NOT BE DEEMED TO HAVE MADE TO BUYER OR TO ANY OF THEIR REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OF ANY KIND, (II) EACH OF THE SELLERS EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATIONS OR WARRANTIES, AND (III) BUYER ACKNOWLEDGES AND AGREES THAT NEITHER BUYER NOR ITS REPRESENTATIVES HAVE RELIED UPON ANY SUCH REPRESENTATIONS OR WARRANTIES.**

(d) EXCEPT AS OTHERWISE EXPRESSLY SPECIFIED IN THIS AGREEMENT, THE TRANSFERRED ASSETS AND ACQUIRED BUSINESS OF SELLERS ARE BEING ACQUIRED BY BUYER AT THE CLOSING AS A RESULT OF THIS AGREEMENT AND THE TRANSACTIONS SHALL BE ACQUIRED BY BUYER ON AN "AS IS, WHERE IS" BASIS AND IN THEIR THEN PRESENT CONDITION, AND BUYER SHALL RELY SOLELY UPON ITS OWN EXAMINATION THEREOF. IN ANY EVENT, EXCEPT AS EXPLICITLY SET FORTH HEREIN, NONE OF SELLERS OR ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES, AS THE CASE MAY BE, HAS MADE OR IS MAKING ANY REPRESENTATION, EXPRESS OR IMPLIED, AS TO THE VALUE OF ANY TRANSFERRED ASSET OR THE ACQUIRED BUSINESS BEING SO ACQUIRED, OR ANY WARRANTY OF MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR QUALITY, WITH RESPECT TO ANY OF THE TANGIBLE ASSETS BEING SO ACQUIRED, OR AS TO THE CONDITION OR WORKMANSHIP THEREOF, OR AS TO THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT. BUYER ACKNOWLEDGES AND AGREES THAT NEITHER BUYER NOR ITS REPRESENTATIVES HAVE RELIED UPON ANY REPRESENTATIONS OR WARRANTIES THAT ARE DISCLAIMED BY THE SELLERS IN THIS SECTION 10.17.

(e) EXCEPT IN THE CASE OF INTENTIONAL FRAUD, THE SELLERS AGREE THAT (I) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY BUYER THAT ARE EXPRESSLY SET FORTH IN ARTICLE 4 OF THIS AGREEMENT, NEITHER BUYER, NOR ANY OF ITS AFFILIATES OR ANY OF THEIR REPRESENTATIVES HAVE MADE AND SHALL NOT BE DEEMED TO HAVE MADE TO SELLERS OR TO ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OF ANY KIND, (II) BUYER EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATIONS OR WARRANTIES, AND (III) SELLERS ACKNOWLEDGE AND AGREE THAT NEITHER SELLERS NOR THEIR REPRESENTATIVES HAVE RELIED UPON ANY SUCH REPRESENTATIONS OR WARRANTIES.

(f) NO PERSON HAS BEEN AUTHORIZED BY THE SELLERS TO MAKE ANY REPRESENTATION OR WARRANTY RELATING TO THE SELLERS OR THEIR BUSINESS OR OPERATIONS OR ASSETS, OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS EXCEPT FOR THOSE CONTAINED HEREIN AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON.

(g) NO PERSON HAS BEEN AUTHORIZED BY BUYER TO MAKE ANY REPRESENTATION OR WARRANTY RELATING TO BUYER OR ITS BUSINESSES OR OPERATIONS, OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS EXCEPT FOR THOSE CONTAINED HEREIN AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON.

(h) **EXCEPT IN THE CASE OF INTENTIONAL FRAUD, UNDER NO CIRCUMSTANCES SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE FOR ANY SPECIAL, EXEMPLARY, PUNITIVE, REMOTE, SPECULATIVE, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LIABILITIES ARISING OUT OF ANY ACTUAL, ALLEGED OR INTENTIONAL BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY, AND NO CLAIM SHALL BE MADE OR AWARDED AGAINST ANY PARTY TO THIS AGREEMENT THEREFOR.**

*[Signatures continued on following page]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS:**

NEC MUELLER EMERGENCY CENTER, LP

By: Neighbors GP, LLC,
in its capacity as General Partner

By: ______________________________
Name: Chad J. Shandler
Title: Chief Restructuring Officer

NEIGHBORS LEGACY HOLDINGS, INC.

By: ______________________________
Name: Chad J. Shandler
Title: Chief Restructuring Officer

NEIGHBORS GLOBAL HOLDINGS, LLC

By: ______________________________
Name: Chad J. Shandler
Title: Chief Restructuring Officer

NEIGHBORS HEALTH, LLC

By: ______________________________
Name: Chad J. Shandler
Title: Chief Restructuring Officer

**SELLERS, Continued:**

EDMG, LLC

By:______________________________
Name: Chad J. Shandler
Title: Chief Restructuring Officer

NEIGHBORS PRACTICE MANAGEMENT, LLC

By:______________________________
Name: Chad J. Shandler
Title: Chief Restructuring Officer

[*Signature page to Asset Purchase Agreement (Mueller Facility)*]

**BUYER:**

AEC ER 4, LLC

By: ______________________________
Name: Luke Padwick
Title: Chief Executive Officer

[*Signature page to Asset Purchase Agreement (Mueller Facility)*]

2792199.1

# EXHIBIT A

## Mueller Facility Location

*Mueller*, 1801 East 51st St., Bldg. H, Austin, Texas 78723

**EXHIBIT B**

**Sale Order**

See attached.

# EXHIBIT C

## Real Property Lease

See attached.

# MEDICAL OFFICE LEASE

**by and between**

**LANDLORD:**

**CATELLUS MARKET DISTRICT, LLC,**
**a Delaware limited liability company**

**and**

**TENANT:**

**MUELLER EMERGENCY CENTER, LLC,**
**a Texas Limited Liability Company**

**Dated: August 30, 2013**

**TABLE OF CONTENTS**

**Page**

1. PREMISES ....... 1
   - 1.1 Premises ....... 1
   - 1.2 Common Areas ....... 1
   - 1.3 Reserved Rights ....... 1
   - 1.4 Employee Parking ....... 3
   - 1.5 License to Use Publicly Dedicated Property ....... 3
2. TERM ....... 3
   - 2.1 Commencement Date ....... 3
   - 2.2 Termination Right ....... 4
3. RENT ....... 4
   - 3.1 Base Rent ....... 4
   - 3.2 Late Charge and Interest ....... 5
   - 3.3 Security Deposit ....... 5
4. UTILITIES ....... 6
5. TAXES ....... 6
   - 5.1 Real Property Taxes ....... 6
   - 5.2 Definition of Real Property Taxes ....... 7
   - 5.3 Personal Property Taxes ....... 7
6. OPERATING EXPENSES ....... 8
   - 6.1 Operating Expenses ....... 8
   - 6.2 Definition of Operating Expenses ....... 8
7. ESTIMATED EXPENSES ....... 9
   - 7.1 Payment ....... 9
   - 7.2 Adjustment ....... 9
8. INSURANCE ....... 9
   - 8.1 Landlord ....... 9
   - 8.2 Tenant ....... 10
   - 8.3 General ....... 11
   - 8.4 Exemption of Landlord from Liability ....... 13
9. REPAIRS AND MAINTENANCE ....... 13
   - 9.1 Tenant ....... 13
   - 9.2 Landlord ....... 14

Page

10. ALTERATIONS ..... 15

10.1 Trade Fixtures; Alterations ..... 15
10.2 Property ..... 15
10.3 Tenant's Property, Removal ..... 15
10.4 Liens ..... 16
10.5 Remodel ..... 16

11. USE ..... 16

11.1 General ..... 16
11.2 Solicitation of Business ..... 17
11.3 Exclusive Use Restrictions ..... 17
11.4 Tenant's Exclusive ..... 18

12. ENVIRONMENTAL MATTERS ..... 18

12.1 Hazardous Materials ..... 18
12.2 Indemnification ..... 19

13. DAMAGE AND DESTRUCTION ..... 19

13.1 Casualty ..... 19
13.2 Tenant's Fault ..... 20~~21~~
13.3 Uninsured Casualty ..... 21
13.4 Waiver ..... 21

14. EMINENT DOMAIN ..... 21

14.1 Total Condemnation ..... 21
14.2 Partial Condemnation ..... 21
14.3 Award ..... 21
14.4 Temporary Condemnation ..... 22

15. INTENTIONALLY OMITTED ..... 22

16. DEFAULT ..... 22

16.1 Events of Defaults ..... 22
16.2 Remedies ..... 23
16.3 Cumulative ..... 25
16.4 Landlord's Duty of Care ..... 25

17. DEFAULT BY LANDLORD ..... 25

17.1 Notice to Landlord ..... 25
17.2 Mortgagee Protection ..... 26

18. ASSIGNMENT AND SUBLETTING ..... 26

18.1 Consent Required ..... 26
18.2 Procedures for Request for Consent ..... 27
18.3 Excess Consideration ..... 28
18.4 General ..... 28

Page

19. ESTOPPEL, ATTORNMENT AND SUBORDINATION ....29

19.1 Estoppel ....29
19.2 Subordination ....29
19.3 Attornment ....2930

20. INTENTIONALLY OMITTED ....30

21. LANDLORD'S LIEN ....30

22. MISCELLANEOUS ....31

22.1 General ....31
22.2 Signs ....32
22.3 Waiver ....33
22.4 Financial Statements ....33
22.5 Limitation of Liability ....33
22.6 Notices ....33
22.7 Brokerage Commission ....3334
22.8 Authorization ....34
22.9 Holding Over; Surrender ....34
22.10 Joint and Several ....3435
22.11 Covenants and Conditions ....35
22.12 Use of Name ....35
22.13 Force Majeure ....35
22.14 Consents ....35
22.15 Telecommunications Services ....3536
22.16 Guarantor ....36
22.17 Waiver of Rights under Texas Deceptive Trade Practices - Consumer Protection Act ....37
22.18 REIT Provisions ....37
22.19 Texas Tax Code Provisions ....3738
22.20 Green Building Requirement ....38
22.21 MWBE Program ....38
22.22 HIPAA ....3839
22.23 Records ....39
22.24 Addenda ....39

23. OPTION TO EXTEND ....1

23.1 Terms of Option ....1
23.2 Agreement on Base Rent ....1
23.3 Brokers' Opinions ....1

24. RIGHT OF FIRST OFFER ....2

25. FUTURE DEVELOPMENT ....3

# MEDICAL OFFICE LEASE

Effective Date: August 30th, 2013

## BASIC LEASE INFORMATION

| | |
|---|---|
| Landlord: | CATELLUS MARKET DISTRICT, LLC,<br>a Delaware limited liability company |
| Landlord's Address For Notice: | Catellus Market District, LLC<br>66 Franklin Street, Suite 200<br>Oakland, CA 94607<br>Attn: CFO |
| With copies to: | Catellus Market District, LLC<br>4550 Mueller Boulevard<br>Austin, Texas 78723<br>Attn: Executive Vice President<br><br>Allen Matkins Leck Gamble Mallory & Natsis LLP<br>1900 Main Street, Fifth Floor<br>Irvine, California 92614-7321<br>Attn: Sandra A. Jacobson, Esq. |
| Landlord's Address For Payment of Rent: | Catellus Market District, LLC<br>TO BE PROVIDED BY LANDLORD |
| Tenant: | Mueller Emergency Center, LLC, a Texas limited liability company |
| Trade Name: | Neighbors Emergency Center |
| Tenant's Address For Notice: | Mueller Emergency Center, LLC<br>c/o Neighbors Health System, Inc., its Manager<br>6030 South Rice, Suite C<br>Houston, Texas 77081<br>Attention: Dr. Setul Patel, President and Chief Executive Officer |
| Property: | Real property located approximately at the intersection of Philomena Street and Berkman Drive in the City of Austin, State of Texas upon which the Premises are located. |
| Project: | Those certain parcels of land located at the intersection of |

| | |
|---|---|
| | Philomena Street and Berkman Drive in the City of Austin, State of Texas and the buildings and Premises located thereon that share a common parking plan, as such area is more particularly described and shown on Exhibit A-2, as same may exist from time to time. |
| Premises: | Approximately 15,000 square feet as depicted on Exhibit A and located in the building. |
| Premises Address:<br>Street:<br>City and State: | <br>To Be Determined Following Construction<br>Austin, Texas 78723 |
| Term: | From the Commencement Date until the expiration of the one hundred twentieth (120th) month following the Base Rent Start Date. Tenant has one (1) option to renew this Lease for a five (5) year term in accordance with the provisions set forth in Section 23 of the Addendum attached hereto. |
| Commencement Date: | The date Landlord delivers possession of the Premises to Tenant with "Landlord's Work" (as defined in the Work Letter attached hereto as Exhibit B) (subject to minor punchlist items that Tenant has provided written notice of to Landlord within thirty (30) days of delivery, which punchlist items Landlord shall diligently complete); provided that Landlord shall be permitted to complete minor work associated with the exterior façade and site work for up to seventy-five (75) days following the Commencement Date so long as such work does not adversely affect Tenant's Work in or use of the Premises. The Commencement Date is estimated to occur in the 1st quarter of 2014. Landlord will endeavor to provide Tenant with thirty (30) days' notice (which, for this purpose, shall include notice by electronic mail) of the actual anticipated Commencement Date. |
| Base Rent Start Date: | The earlier of (i) one hundred twenty (120) days after the Commencement Date, or (ii) the date Tenant opens for business. |

Base Rent:

| Months | *Annual Base Rent |
|---|---|
| 1 - 12 | $24.51 |
| 12 - 24 | $25.12 |
| 25 - 36 | $25.75 |
| 37 - 48 | $26.39 |
| 49 - 60 | $27.05 |
| 61 - 72 | $27.73 |

| | |
|---|---|
| 73 - 84 | $28.42 |
| 85 - 96 | $29.13 |
| 97 - 108 | $29.86 |
| 109 - 120 | $30.61 |

* Base Rent shall be calculated by multiplying the per square foot rental rate by the square footage of the Premises.

Tenant's Share: 100% of the Property and Premises and 50% of the Project. Notwithstanding the foregoing or anything to the contrary herein, Tenant's Share of Real Property Taxes shall be calculated by Landlord, as determined in its commercially reasonable discretion, as one hundred percent (100%) of any separate tax bill issued for the Premises, or a share of all Real Property Taxes for the Project based on a fraction, the numerator of which is the square footage of the Premises and the denominator of which is the square footage of all of the improvements on the tax parcels that comprise the Project from time to time. Landlord shall notify Tenant of the method that shall be used to calculate Tenant's Share of Real Property Taxes from time to time.

Permitted Uses: Operation of a emergency medicine department and/or urgent care facility and associated professional office space for physicians, and no other use shall be permitted without the prior written consent of Landlord.

Security Deposit: $39,887.50

Prepaid Rent: None

Landlord's Broker: None

Tenant's Broker: Brian Novy

Guarantor(s): BELLAIRE EMERGENCY CENTER, LLC, a Texas limited liability company and KINGWOOD EMERGENCY CENTER, LLC, a Texas limited liability company

EXHIBITS

A - Depiction of Premises
A-1 - Intentionally Omitted
A-2 - Depiction and Description of Project
A-3 - Depiction of Exclusive Use Area
A-4 Depiction of Proposed Parking Garage
B - Work Letter
C - Rules and Regulations
D - Commencement Date Memorandum
E - Property Exclusives
F - Prohibited Uses
G-1 - Bellaire Emergency Center Guaranty
G-2 - Kingwood Emergency Center Guaranty

SCHEDULES

1 - Landlord's Shell Work
2 - Requirements For Tenant's Work Or Other Alterations, Improvements Or Additions By Tenant
3 - Austin Energy Green Building-Commercial Guidebook V 2010_02

The Basic Lease Information set forth above and the Exhibits attached hereto are incorporated into and made a part of the following Lease. Each reference in this Lease to any of the Basic Lease Information shall mean the respective information above and shall be construed to incorporate all of the terms provided under the particular Lease paragraph pertaining to such information. In the event of any conflict between the Basic Lease Information and the provisions of the Lease, the latter shall control.

LANDLORD (__________) AND TENANT (__________) AGREE.
initial initial

1.    PREMISES.

1.1    Premises.  Subject to the terms and conditions set forth in this Lease, Landlord hereby leases to Tenant the Premises as shown on Exhibit A attached hereto, but excluding the Common Areas and any other portion of the Property.  Landlord reserves unto itself and its designees the use of the roof, exterior walls and area beneath the floor and above the ceiling of the Premises, together with the right, from time to time, to install, maintain, use, repair and replace utility lines, tunneling, pipes, ducts, conduits, and wires and the like leading under, over or through the Premises, in a manner and in locations that will not materially interfere with Tenant's use of the Premises and patient care activities.  Prior to or following the delivery of possession of the Premises to Tenant, Landlord shall have the right to re-measure the square footage of the Premises (as measured in accordance with BOMA Standards).  If the actual square footage of the Premises is measured to be different from that stated in the Basic Lease Information, the Base Rent and Additional Rent shall be adjusted as necessary to reflect the increase or decrease in the square footage of the Premises, and such actual square footage and such adjusted Base Rent shall be set forth in an amendment to this Lease prepared by Landlord (and reasonably acceptable in form to Tenant) and promptly executed by the parties hereto.

1.2    Common Areas.  "Common Areas" shall mean all areas, facilities, utilities, equipment and services provided by Landlord within the Project (but outside the Premises), including, without limitation: all automobile parking areas, pedestrian walkways, driveways and access roads, entrances and exits, truck service ways, loading docks, landscaped areas, stairways, retaining walls, lobbies, parcel pick-up stations and all onsite or offsite areas which the owner of the Project is required to maintain under the provisions of applicable governmental requirements. Tenant and its employees and business invitees shall be entitled to use the Common Areas during the Term, in common with Landlord and with other persons authorized by Landlord from time to time to use the Common Areas, subject to the Rules and Regulations (as defined below).  Tenant expressly covenants that its use of the Common Areas shall comply with the Rules and Regulations.  Anything in this Lease to the contrary notwithstanding, it is expressly understood and agreed that the designation or use from time to time of portions of the Common Areas shall not restrict Landlord's use of such areas for such purposes as Landlord shall determine that are not inconsistent with and that do not materially impair Tenant's permitted uses of the Premises in accordance with the provisions set forth herein.

1.3    Reserved Rights.  Landlord will operate and maintain the Common Areas in such manner as determined by Landlord in its sole and absolute discretion; provided however that the use, maintenance, modification or reconfiguration of the Common Areas by Landlord shall not materially interfere with Tenant's use and enjoyment of the Premises and patient care activities in accordance with the provisions set forth herein.  Landlord reserves the right to relocate, alter, improve or adjust the size of any Common Areas from time to time, provided however that Landlord shall use reasonable efforts not to materially adversely affect Tenant's use of the Premises.  All Common Areas shall at all times be subject to the exclusive control and management of Landlord; and Landlord shall have the right from time to time to establish, modify and enforce reasonable rules and regulations with respect to the Project and the Common Areas ("Rules and Regulations").  The initial rules and regulations are attached hereto as Exhibit C. Landlord shall have the right to construct, maintain and operate lighting facilities on the Common

Areas; to police the same; from time to time to change the area, level, location and arrangement of parking areas and other facilities; to restrict parking by tenants, their officers, agents and employees to reasonably located employee parking areas; to close all or any portion of the Common Areas to such extent as may, in the opinion of Landlord's counsel, be legally sufficient to prevent a dedication thereof or the accrual of any rights to any person or the public therein; to close temporarily all or any portion of the Common Areas; to discourage non-customer parking; and to do and perform such other acts in and to the Common Areas which Landlord shall determine to be advisable to improve the convenience and use thereof by tenants, their officers, agents, employees and customers. In addition, Landlord reserves the right to enter the Premises upon reasonable notice to Tenant (except in case of an emergency) and/or to undertake the following in a manner that does not unreasonably interfere with Tenant's use of the Premises: inspect the Premises and/or the performance by Tenant of the terms and conditions thereof; install, use, maintain, repair, alter, relocate or replace any Common Areas and any pipes, ducts, conduits, wires, equipment and other facilities in the Project; record new covenants, conditions and restrictions ("New CC&Rs") affecting the Property and/or amendments to existing CC&Rs ("Existing CC&Rs") which do not unreasonably interfere with Tenant's use of the Premises in accordance with the provisions set forth herein; change the name of the Project; affix reasonable signs and displays; and show the Premises to prospective tenants.

For purposes of this Lease, the term CC&Rs shall mean all New CC&Rs and all Existing CC&Rs, including, without limitation, (i) the Mueller Master Community Covenant recorded under Document No. 2004238007 of the Official Public Records of Travis County, Texas, modified by Scrivener's Affidavit, recorded as Document No. 2005039311, Official Public Records of Travis County, Texas, First Amendment to Mueller Master Community Covenant, recorded as Document No. 2006050356, Official Public Records of Travis County, Texas, MCC Annexation Notice and Amendment to Mueller Master Community Covenant, recorded as Document No. 2006050363, Official Public Records of Travis County, Texas, Second Amendment to Mueller Master Community Covenant, recorded as Document No. 2006193523, Official Public Records of Travis County, Texas, Third Amendment to Mueller Master Community Covenant, recorded as Document No. 2009190773, Official Public Records of Travis County, Texas Fourth Amendment to Mueller Master Community Covenant, recorded as Document No. 2010193705, Official Public Records of Travis County, Texas and MCC Annexation Notice, recorded as Document No. 2013018728, Official Public Records of Travis County, Texas (collectively, "Master Declaration"), (ii) the EC/TC Community Covenant recorded under Document No. 2004238008 of the Official Public Records of Travis County, Texas, modified by Scrivener's Affidavit, recorded as Document No. 2005039312, Official Public Records of Travis County, Texas, First Amendment to Mueller EC/TC Community Covenant, recorded as Document No. 2006193524, Official Public Records of Travis County, Texas and Supplemental Covenant, recorded as Document No. 201301873, Official Public Records of Travis County, Texas (collectively, "EC/TC Declaration"); (iii) Declaration of Restrictive Covenants – Mueller Community Fee, recorded as Document No. 2006050355, Official Public Records of Travis County, Texas, modified by First Amendment to Declaration of Restrictive Covenants – Mueller Community Fee, recorded as Document No. 2006117412, Official Public Records of Travis County, Texas, Second Amendment to Declaration of Restrictive Covenants – Mueller Community Fee, recorded as Document No. 2006193525, Official Public Records of Travis County, Texas Third Amendment to Declaration of Restrictive Covenants – Mueller Community Fee, recorded as Document No. 201013995, Official Records

of Travis County, Texas and Fourth Amendment to Declaration of Restrictive Covenants – Mueller Community Fee, recorded as Document No. 2012011106, Official Records of Travis County, Texas; (iv) Notice to Purchaser of Property and Tenants within Mueller, recorded as Document No. 2007157630, Official Public Records of Travis County, Texas; (v) MCC Annexation Notice Lot 1, Block 61, Mueller Section VII Subdivision to be recorded in Official Records of Travis County, Texas; and (vi) Supplemental Covenant Lot 1, Block 61, Mueller Section VII Subdivision to be recorded in the Official Public Records of Travis County, Texas; (vii) Declaration of Covenants, Restrictions and Reciprocal Easements, recorded as Document No. 2011188242, Official Public Records of Travis County, Texas; (viii) Restrictive Covenant, recorded as Document No. 2013081939, Official Public Records of Travis County, Texas; (ix) Joint Use Access Agreement, recorded as Document No. 2013081943, Official Public Records of Travis County, Texas; and (x) Declaration of Easements and Restrictive Covenant Regarding Unified Development and Maintenance of Drainage Facilities, recorded as Document No. 2013083332, Official Public Records of Travis County, Texas. Landlord represents and warrants to Tenant that as of the date hereof, the Existing CC&R's do not preclude Tenant's contemplated uses of the Premises as set forth in the Basic Lease Information above; Landlord further represents and warrants that Landlord shall not modify, amend or supplement the CC&R's in a manner that would preclude such permitted uses; provided that any amendments by third parties shall not constitute a breach of this Section by Landlord.

1.4     Employee Parking. Tenant and its employees shall park their vehicles only in the Project. Within fifteen (15) days after taking possession of the Premises, Tenant shall furnish Landlord with a list of its and its employees' vehicle license numbers and Tenant shall thereafter notify Landlord of any change in such list within thirty (30) days after such change occurs. Tenant agrees to assume responsibility for compliance by its employees with the parking provisions contained herein. If Tenant or its employees park in other than such designated parking areas, Landlord may charge Tenant, as additional rent, and Tenant agrees to pay, Ten Dollars ($10.00) per day for each day or partial day such vehicle is parked in any area other than that designated for employee parking. Tenant hereby authorizes Landlord to attach violation stickers or notices to vehicles parked in violation of these provisions or to tow any vehicles parked in violation of this section.

1.5     License to Use Publicly Dedicated Property. If Tenant desires to use any publicly dedicated property within the Project for the installation, repair, maintenance and removal of improvements such as furniture, art, railings, signs, trash receptacles, trails, pavers, sidewalks, retaining walls, fences, trees, tree wells and grates, landscaping, irrigation systems, balconies, awnings, light fixtures, doors, cornices, and roof drains, and such use is expressly permitted in this Lease or otherwise expressly approved by Landlord (which approval Landlord may withhold in its sole and absolute discretion), Tenant must first enter into a license agreement with the City of Austin, Texas (the "City"), the form and content of which license agreement must be in all respects satisfactory to the City and Landlord, and abide by such additional rules and regulations that Landlord may impose from time to time on such usage.

2.     TERM.

2.1     Commencement Date. The Term of the Lease shall commence on the date set forth in the Basic Lease Information, and the Lease shall continue in full force and effect for the

period of time specified as the Term or until this Lease is terminated as otherwise provided herein. Notwithstanding the foregoing, if the Base Rent Start Date is a day other than the first day of a calendar month, the Term shall automatically be extended to expire on the last day of the one hundred twentieth (120th) month following the Base Rent Start Date. The Premises shall be deemed to be "Substantially Complete" on the date on which Landlord delivers written notice to Tenant of the substantial completion of "Landlord's Work" (as defined in the Work Letter), subject to any "punch list" items not materially adversely affecting Tenant's performance of "Tenant's Work" (as defined in the Work Letter) and subject to any exterior façade and site work. Tenant's occupancy of the Premises from the delivery of possession of the Premises through to the day prior to the Base Rent Start Date shall be governed by all terms and provisions of this Lease, except that Tenant shall not be liable for payment of Base Rent, Real Property Taxes or Operating Expenses prior to the Base Rent Start Date. Tenant shall, upon demand of Landlord after determination of the Commencement Date and the Base Rent Start Date, execute and deliver to Landlord a Commencement Date Memorandum in the form attached hereto as Exhibit D. If the Commencement Date does not occur by the estimated Commencement Date, this Lease shall remain in effect, Landlord shall not be subject to any liability, and the Commencement Date and Base Rent Start Date shall be as calculated pursuant to the foregoing provisions. Subject to the express covenants, representations and warranties of Landlord as set forth in this Lease, Tenant has determined that the Premises are acceptable for Tenant's use and Tenant acknowledges that, except as set forth in the Work Letter, neither Landlord nor any broker or agent has made any representations or warranties in connection with the physical condition of the Premises or their fitness for Tenant's use upon which Tenant has relied directly or indirectly for any purpose.

    2.2    Termination Right. Notwithstanding anything to the contrary contained herein, Tenant acknowledges and agrees that (a) Landlord must obtain certain approvals from the City in order to develop the Premises; and (b) Landlord must obtain its investment committee approval in order to proceed with the development of the Premises (collectively, the "Landlord Requirements"). Landlord agrees to pursue the Landlord Requirements in good faith, but Landlord does not make any representation or warranty as to whether Landlord can satisfy the Landlord Requirements. If, despite Landlord's good faith efforts, Landlord is unable to satisfy the Landlord Requirements by the date that is one hundred eighty (180) days following the mutual execution of this Lease (the "Contingency Date"), then Landlord and Tenant each shall have an independent right to terminate this Lease by delivering written notice to the non-terminating party within ten (10) business days following the Contingency Date, in which event this Lease shall terminate, and the parties shall have no further obligations to each other except for those obligations that expressly survive the termination of this Lease. Upon the satisfaction of the foregoing Landlord Requirements, neither party shall have any further right to terminate this Lease notwithstanding that the Contingency Date may not yet have occurred.

    3.    RENT.

    3.1    Base Rent. Tenant shall pay to Landlord, at Landlord's Address for Payment of Rent designated in the Basic Lease Information, or at such other address as Landlord may from time to time designate in writing to Tenant for the payment of Rent, the Base Rent, without notice, demand, offset or deduction, in advance, on the first day of each calendar month. Upon the execution of this Lease, Tenant shall pay to Landlord the Prepaid Rent (if applicable). If the Base Rent Start Date occurs on a date other than the first day of a month or if the Term expires or

this Lease terminates on a date other than the last day of a month, Base Rent shall be prorated on the basis of a thirty (30) day month. All sums other than Base Rent which Tenant is obligated to pay under this Lease shall be deemed to be additional rent due hereunder, whether or not such sums are designated "additional rent." The term "Rent" means the Base Rent and all additional rent payable hereunder.

      3.2     Late Charge and Interest. The late payment of any Rent will cause Landlord to incur additional costs, including administration and collection costs and processing and accounting expenses and increased debt service ("Delinquency Costs"). If Landlord has not received any installment of Rent within five (5) days after such amount is due, Tenant shall pay a late charge of ten percent (10%) of the delinquent amount, which is agreed to represent a reasonable estimate of the Delinquency Costs incurred by Landlord. In addition, all such delinquent amounts shall bear interest from the date such amount was due until paid in full at a rate per annum ("Applicable Interest Rate") equal to the lesser of (a) the maximum interest rate permitted by law or (b) five percent (5%) above the rate publicly announced by Bank of America, N.A. (or if Bank of America, N.A. ceases to exist, the largest bank then headquartered in the State of Texas) (the "Bank") as its "Reference Rate." If the use of the announced Reference Rate is discontinued by the Bank, then the term Reference Rate shall mean the announced rate charged by the Bank which is, from time to time, substituted for the Reference Rate. Landlord and Tenant recognize that the damage which Landlord shall suffer as a result of Tenant's failure to pay such amounts is difficult to ascertain and said late charge and interest are the best estimate of the damage which Landlord shall suffer in the event of late payment. If a late charge becomes payable for any three (3) installments of Rent within any twelve (12) month period, then the Rent shall automatically become due and payable quarterly in advance.

      3.3     Security Deposit. Upon the execution of this Lease, Tenant shall pay to Landlord the Security Deposit, in the amount set forth in the Basic Lease Information. The Security Deposit shall secure the full and faithful performance of each provision of this Lease to be performed by Tenant. Landlord shall not be required to pay interest on the Security Deposit or to keep the Security Deposit separate from Landlord's own funds. If Tenant fails to perform fully and timely all or any of Tenant's covenants and obligations hereunder, Landlord may, but without obligation, apply all or any portion of the Security Deposit toward fulfillment of Tenant's unperformed covenants and/or obligations under this Lease and/or to compensate Landlord for Landlord's documented, commercially reasonable losses and/or damages sustained as a result of Tenant's default. To the extent allowable by applicable law, Tenant hereby waives the provisions of law, now or hereafter in effect, which (i) establish the time frame by which Landlord must refund collateral or security for performance of a tenant's obligations under a lease, and/or (ii) provide that Landlord may claim from collateral or security for performance of a tenant's obligations under a lease only those sums reasonably necessary to remedy defaults in the payment of rent, to repair damage caused by Tenant or to clean the Premises, it being agreed that Landlord may, in addition, claim those sums specified elsewhere in this Lease and/or those sums reasonably necessary to compensate Landlord for any loss or damage caused by Tenant's breach of this Lease or the acts or omission of Tenant or any employee, agent, contractor or invitee of Tenant. If Landlord does so apply any portion of the Security Deposit, Tenant shall immediately pay Landlord sufficient cash to restore the Security Deposit to the then required Security Deposit amount. After Tenant vacates the Premises, upon the expiration or sooner termination of this Lease, if Tenant is not then in default, Landlord shall return to Tenant any unapplied balance of

the Security Deposit within thirty (30) days following the date on which the Premises are surrendered to Landlord by Tenant in accordance with the requirements set forth in this Lease. Should the Permitted Use be amended (in Landlord's sole and absolute discretion) to accommodate a change in the business of Tenant or to accommodate a subtenant or assignee approved by Landlord, Landlord shall have the right to increase the Security Deposit to the extent necessary, in Landlord's reasonable judgment, to account for any increased risk to the Premises or increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Tenant occurs during this Lease and following such change the financial condition of Tenant is, in Landlord's reasonable judgment, reduced, Tenant shall deposit such additional monies with Landlord as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on said change in financial condition. In no event shall Tenant be entitled to apply the Security Deposit to any Rent payment due hereunder. The right to retain the Security Deposit shall be in addition and not alternative to Landlord's other remedies under this Lease or as may be provided by law or in equity and shall not be affected by summary proceedings or other proceedings to recover possession of the Premises. In the event of a sale or transfer of Landlord's interest in the Premises or the Property or a lease by Landlord of the Property, Landlord shall have the right, upon written notice to Tenant, which notice shall provide full contact information for the purchaser, to transfer the Security Deposit to the purchaser, as the case may be, and Landlord shall be relieved of all liability to Tenant for the return of such Security Deposit. The Tenant shall look solely to the new owner or lessor for the return of the Security Deposit. The Security Deposit shall not be mortgaged, assigned or encumbered by Tenant. In the event of a permitted assignment or subletting under this Lease by Tenant, the Security Deposit shall be held by Landlord as a deposit made by the permitted assignee or subtenant and the Landlord shall have no further liability with respect to the return of the Security Deposit to the original Tenant.

4.      UTILITIES.   Tenant shall pay all charges for heat, water, gas, electricity, telephone and any other utilities used on or provided to the Premises. Tenant, at its sole cost and expense, shall pay for all sewer connection fees and capacity fees for the Premises. Landlord shall not be liable to Tenant for interruption in or curtailment of any utility service, nor shall any such interruption or curtailment of any utility service constitute constructive eviction or grounds for rental abatement except where such interruption or curtailment is caused by the gross negligence or willful misconduct of Landlord (in which event, following three (3) business days' notice to Landlord and Landlord's failure to cure, Tenant's Base Rent shall abate in proportion to the amount of the Premises that Tenant cannot use until the utilities are restored to the Premises). Tenant shall make payments for all separately metered utilities, when due, directly to the appropriate supplier. To the extent Tenant uses data and/or video services, Tenant is encouraged to subscribe and utilize the Mueller Community's telecommunications services for both high-speed data (Internet access) and video. The monthly charge for the high-speed data and video shall be established in conjunction with the network service offering by Landlord or its assignee and will be priced based on retail and commercial options as available throughout the Mueller area.

5.      TAXES.

        5.1     Real Property Taxes.   Tenant shall pay to Landlord all Real Property Taxes for the Property and Premises (or Tenant's Share of Real Property Taxes for the Project, as applicable)

for each full or partial calendar year during the Lease Term from and after the Base Rent Start Date.

5.2    Definition of Real Property Taxes. "Real Property Taxes" shall be the sum of the following: all real property taxes, assessments, supplementary taxes, escape taxes, possessory-interest taxes, business or license taxes or fees, service payments in lieu of such taxes or fees, special taxes, fees and/or charges assessed or otherwise payable under any community facilities district, special service district, tax increment finance district, public improvement district or any other special taxing district or authority, annual or periodic license or use fees, excises, transit and traffic charges, housing fund assessments, open space charges, childcare fees, school, sewer and parking fees or any other assessments, levies, fees, exactions or charges, general and special, ordinary and extraordinary, unforeseen as well as foreseen (including fees "in-lieu" of any such tax or assessment) which are assessed, levied, charged, conferred or imposed by any public authority upon the Property (or the pro-rata portion thereof relating to any real property comprising any portion of the Property) or its operations, together with all taxes, assessments or other fees imposed by any public authority or quasi-public authority upon or measured by any Rent or other charges payable hereunder, including any gross receipts tax or excise tax or so-called margin tax levied by any governmental authority with respect to receipt of rental income, or upon, with respect to or by reason of the development, possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises or any portion thereof, or documentary transfer taxes upon this transaction or any document to which Tenant is a party creating or transferring an interest in the Premises, together with any tax imposed in substitution, partially or totally, of any tax previously included within the aforesaid definition or any additional tax the nature of which was previously included within the aforesaid definition, together with any and all costs and expenses (including, without limitation, attorneys, administrative and expert witness fees and costs) of challenging any of the foregoing or seeking the reduction in or abatement, redemption or return of any of the foregoing, but only to the extent of any such reduction, abatement, redemption or return.  All references to Real Property Taxes during a particular year shall be deemed to refer to taxes accrued during such year, including supplemental tax bills regardless of when they are actually assessed and without regard to when such taxes are payable.  The obligation of Tenant to pay for Real Property Taxes (including, without limitation, any supplemental taxes) relating in whole or in part to a part of the Term of this Lease shall survive the expiration or early termination of this Lease.  In no event shall Tenant or any "Tenant Party" (as hereinafter defined) be entitled to file any property tax assessment appeal.  Except as expressly provided in this Section 5.2, nothing contained in this Lease shall require Tenant to pay any franchise, corporate, estate or inheritance tax of Landlord, Real Property Taxes assessed to Landlord based upon Landlord's ownership of any property other than the Property or any income, profits or revenue tax or charge upon the net income of Landlord or for any late payment penalties (unless such late payment is due to Tenant's failure to timely pay Real Property Taxes).  Real Property Taxes for partial years, if any, falling within the Term shall be prorated.  Tenant's obligations for Real Property Taxes for the last full and/or partial year(s) of the Term shall survive the expiration of the Term or earlier termination of the Lease.

5.3    Personal Property Taxes. Prior to delinquency, Tenant shall pay all taxes and assessments levied upon trade fixtures, alterations, additions, improvements, inventories and other personal property located and/or installed on the Premises by Tenant; and Tenant shall provide Landlord copies of receipts for payment of all such taxes and assessments.  To the extent any such

taxes are not separately assessed or billed to Tenant, Tenant shall pay the amount thereof as invoiced by Landlord.

6.    OPERATING EXPENSES.

6.1    Operating Expenses. Tenant shall pay to Landlord all Operating Expenses for each full or partial calendar year during the Lease Term.

6.2    Definition of Operating Expenses. "Operating Expenses" shall mean the total costs and expenses paid or incurred by Landlord in the management, operation, maintenance and repair of the Project and Premises, including, but not limited to all costs of: (i) maintenance, repair and replacement of heating, ventilating and air conditioning ("HVAC"), electricity, steam, water, mechanical, telephone and telecommunications systems, escalator and elevator systems and all other utilities and systems, (ii) landscaping and gardening, (iii) repaving and restriping of parking areas, (iv) repairs, and all labor and material costs related thereto, (v) security and fire protection, (vi) public address and music systems, (vii) general maintenance, trash removal, cleaning and service contracts and the cost of all supplies, tools and equipment required in connection therewith, (viii) insurance carried on the Project and Premises, including the Common Areas, or in connection with the use and/or occupancy thereof including the costs of self-insurance (or the pro rata portion thereof attributable to the Project and Premises in the event that Landlord carries blanket or umbrella policies covering more than one development), (ix) wages, salaries, payroll taxes and other labor costs and employee benefits of those employees assigned exclusively to the Project, (x) fees, charges and other costs of all independent contractors engaged by Landlord, (xi) directory revisions, (xii) charges on or surcharges imposed by any governmental agencies on or with respect to transit or automobile usage or parking facilities, (xiii) operation of any private transit system serving the Project, (xiv) the cost of any capital improvements made to the Project and Premises after the initial construction as a labor-saving or energy saving device or to effect other economies in the operation or maintenance of the Project, or made to the Project after the initial construction that are required under any governmental law or regulation that was not applicable to the Project at the time that permits for the construction thereof were obtained, such cost to be amortized over such reasonable period as Landlord shall determine, together with interest on the unamortized balance at the rate of ten percent (10%) per annum or such higher rate as may have been paid by Landlord on funds borrowed for the purpose of constructing such capital improvements, (xv) the cost of contesting the validity or applicability of any governmental enactments which may affect operating expenses, (xvi) the cost of operating the management office for the Project, including in each case the cost of office supplies, bulletins or newsletters distributed to tenants, postage, telephone expenses, maintenance and repair of office equipment, non-capital investment equipment, amortization (together with reasonable financing charges) of the cost of capital investment equipment, and rent, (xvii) the pro rata share applicable to the Project of any other costs and expenses incurred by Landlord as "Owner" of the Project under and pursuant to the CC&Rs and any declaration of covenants and cross-easements, reciprocal easement agreements, ground leases (other than ground rent due thereunder), condominium association agreements or any other public or private arrangements or agreements, from time to time affecting the Project, and (xviii) any other expenses of any kind whatsoever reasonably incurred in connection with the management, operation, maintenance and repair of the Project including, without limitation, the Premises (including roof membrane, roof covering and exterior painting) and the Common Areas (other than Real Property Taxes and any services for which

Landlord is separately and directly reimbursed by Tenant). Operating Expenses shall also include an administrative fee to Landlord for accounting and other administrative services related to the Project in an amount equal to fifteen percent (15%) of the sum of Operating Expenses and a management fee to Landlord or its designated manager for management services relating to the Project in an amount equal to four percent (4%) of the Rent owing pursuant to this Lease.

7.    ESTIMATED EXPENSES.

    7.1    Payment.    "Estimated Expenses" for any particular year shall mean Landlord's estimate of Operating Expenses and Real Property Taxes for a calendar year.  On or about the last month of each calendar year, Landlord shall give Tenant notice of the Estimated Expenses for the ensuing calendar year.  Tenant shall pay the Estimated Expenses with installments of Base Rent in monthly installments of one-twelfth (1/12th) thereof on the first day of each calendar month during such year.  If at any time Landlord reasonably determines that Operating Expenses and Real Property Taxes are projected to vary from the then Estimated Expenses, Landlord may, by notice to Tenant, revise such Estimated Expenses, and Tenant's monthly installments for the remainder of such year shall be adjusted so that by the end of such calendar year Tenant has paid to Landlord Tenant's Share of the revised Estimated Expenses for such year.

    7.2    Adjustment.    "Operating Expenses and Real Property Taxes Adjustment" (or "Adjustment") shall mean the difference between Tenant's Share of Estimated Expenses and Tenant's Share of Operating Expenses and Real Property Taxes for any calendar year.  After the end of each calendar year, Landlord shall deliver to Tenant a statement of Tenant's Share of Operating Expenses and Real Property Taxes for such calendar year, accompanied by a computation of the Adjustment.  If Tenant's payments of Tenant's Share of Estimated Expenses for such year are less than the actual Tenant's Share of Operating Expenses and Real Property Taxes for such year, then Tenant shall pay the difference within twenty (20) days after receipt of such statement.  Tenant's obligation to pay such amount shall survive the expiration of the Term or earlier termination of this Lease.  If Tenant's payments of Tenant's Share of Estimated Expenses exceed the actual Tenant's Share of Operating Expenses and Real Property Taxes for such year, then (provided that Tenant is not in default), Landlord shall apply such excess amount to future installments of Tenant's Share of Estimated Expenses for the next calendar year or, if the Term has expired or this Lease has terminated, Landlord shall refund such excess to Tenant together with delivery of such statement; provided that if Tenant is in default, Landlord may, but shall not be required to, apply such excess amount to Rent arrearages.

8.    INSURANCE.

    8.1    Landlord.    Landlord shall maintain commercial general liability insurance and insurance through individual or blanket policies insuring the Premises against fire and extended coverage (including, if Landlord elects, "all risk" coverage, earthquake/volcanic action, terrorism, flood and/or surface water insurance) for the full replacement cost of the Premises, with deductibles and the form and endorsements of such coverage as selected by Landlord, together with rental abatement insurance against loss of Rent in an amount equal to the amount of Rent for a period of at least twelve (12) months commencing on the date of loss; provided, Landlord reserves the right to self-insure with respect to any such coverage.  Landlord may also carry such

other insurance as Landlord may deem prudent or advisable, including, without limitation, liability insurance in such amounts and on such terms as Landlord shall determine.

8.2 Tenant. Tenant shall, at Tenant's expense, obtain and keep in force at all times the following insurance:

8.2.1 Commercial General Liability Insurance (Occurrence Form). A policy of commercial general liability insurance (occurrence form), having limits of not less than One Million Dollars ($1,000,000) per occurrence and Five Million Dollars ($5,000,000) aggregate per location if Tenant has multiple locations, providing coverage for, among other things, blanket contractual liability for both oral and written contracts, owners and contractors protective, premises and operations, personal and advertising injury, and products/completed operations with an "Additional Insured-Managers or Lessors of Premises Endorsement" and containing the "Amendment of the Pollution Exclusion Endorsement" for damage caused by heat, smoke or fumes from a hostile fire, and personal and advertising injury coverage, and, if necessary, Tenant shall provide for restoration of the aggregate limit and provide that the policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Tenant's indemnity obligations under this Lease. In addition, if alcoholic beverages are served, sold, consumed or obtained in the Premises, such liability insurance shall include, without limitation, coverage for liquor law liability and/or so-called "dramshop" insurance, if applicable in the state where the Premises is located.

8.2.2 Automobile Liability Insurance. To the extent Tenant will operate vehicles, commercial automobile liability insurance having a combined single limit of not less than One Million Dollars ($1,000,000) per occurrence and insuring Tenant against liability for claims arising out of ownership, maintenance, or use of any owned, hired, borrowed or non-owned automobiles.

8.2.3 Workers' Compensation and Employer's Liability Insurance. Workers' compensation insurance having limits not less than those required by applicable state statute and federal statute and covering all persons employed by Tenant in the conduct of its operations on the Premises (including the all states endorsement and, if applicable, the volunteers endorsement), together with employer's liability insurance coverage in the amount of at least One Million Dollars ($1,000,000) each accident for bodily injury by accident and One Million Dollars ($1,000,000) each employee for bodily injury by disease.

8.2.4 Umbrella Liability Insurance. Umbrella liability insurance on an occurrence basis, with minimum limits of not less than Two Million Dollars ($2,000,000) combined single limit and aggregate limit, in excess of and following the form of the underlying insurance described in Sections 8.2.1, 8.2.2 and 8.2.3 which is at least as broad as each and every area of the underlying policies. Such umbrella liability insurance shall include pay on behalf of wording, concurrency of effective dates with primary policies, blanket contractual liability, application of primary policy aggregates, and shall provide that if the underlying aggregate is exhausted, the excess coverage will drop down as primary insurance. The amounts of insurance required in Sections 8.2.1, 8.2.2, 8.2.3 and 8.2.4 may be satisfied by purchasing coverage for the limits specified or by any combination of underlying and umbrella limits, so long as the total

amount of insurance is not less than the limits specified in each of Sections 8.2.1, 8.2.2 and 8.2.3 when added to the limit specified in this Section 8.2.4.

       8.2.5   Property Insurance.  "All risk" property insurance including boiler and machinery comprehensive form, if applicable, including coverage for vandalism, malicious mischief and sprinkler leakage, covering damage to or loss of any of the personal property, fixtures, equipment, merchandise, inventory, improvements and alterations of Tenant or any Tenant Party (collectively "Tenant's Property") in an amount equal to the full replacement cost thereof (Tenant shall redetermine the same as frequently as necessary to comply herewith), and including business interruption coverage for a period of not less than twelve (12) months, together with, if the property of Tenant's invitee is to be kept in the Premises, warehouser's legal liability or bailee customers insurance for the full replacement cost of the property belonging to invitee and located in the Premises.

       8.2.6   Business Interruption.  Tenant shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Tenant for direct or indirect loss of earnings for a period of not less than twelve (12) months attributable to all peril commonly insured against by prudent tenants in the business of Tenant or attributable to prevention of access to the Premises as a result of such perils.

       8.2.7   Other Insurance.  Any other forms of insurance Landlord may require from time to time, in form and amounts and for insurance risks against which a prudent tenant of comparable size and in a comparable business would protect itself.

    8.3   General.

       8.3.1   Insurance Companies.  Insurance required to be maintained by Tenant shall be written by companies licensed to do business in the state in which the Premises are located and having a "General Policyholders Rating" of at least A:VIII (or such higher rating as may be required by a lender having a lien on the Premises) as issued by A.M. Best.

       8.3.2   Certificates of Insurance.  Tenant shall deliver to Landlord certificates of insurance for all insurance required to be maintained by Tenant on an Acord form or equivalent form acceptable to Landlord and additional insured endorsements on ISO Form CG 20 11 01 96 ("Additional Insured--Managers or Landlords of Premises") or equivalent, no later than seven (7) days prior to the date of possession of the Premises. Tenant shall, at least ten (10) days prior to expiration of the policy, furnish Landlord with certificates of renewal or "binders" thereof and additional insured endorsements. Each certificate shall expressly provide that such policies shall not be cancelable or otherwise subject to modification except after thirty (30) days prior written notice to the parties named as additional insureds in this Lease (except in the case of cancellation for nonpayment of premium in which case cancellation shall not take effect until at least ten (10) days' notice has been given to Landlord). If Tenant fails to maintain any insurance required in this Lease, Tenant shall be liable for all losses and costs suffered or incurred by Landlord (including litigation costs and attorneys' fees and expenses) resulting from said failure. Failure of Landlord to demand such certificates, endorsements or other evidence of full compliance with the insurance requirements of this Section 8, or failure of Landlord to identify a deficiency from evidence provided will not be construed as a waiver of the Tenant's obligation to maintain such

insurance. The acceptance of delivery by Tenant of any certificates, endorsements or other evidence of insurance does not constitute approval or agreement by Landlord that the insurance requirements have been met, that the insurance policies evidenced are in compliance with these requirements, or that the insurance requirements are sufficient to fully protect Tenant from liability.

8.3.3     Additional Insured. Landlord, any property management company of Landlord for the Premises and, at Landlord's request, Landlord's lender, if any, shall each be named as additional insureds on a form approved by Landlord under all of the policies required by Sections 8.2.1, 8.2.2 and 8.2.4, and said policies shall provide for severability of interest.

8.3.4     Primary Coverage. All insurance to be maintained by Tenant shall be primary, without right of contribution from insurance of any additional insured.

8.3.5     Waiver of Subrogation. Landlord and Tenant, on behalf of themselves, their property insurers, and anyone claiming by, through or under them, each hereby waives any claims against and releases the other from any liability, loss, cost, damage or expense resulting from any fire, explosion or other casualty that is covered in whole or in part by the property insurance that is required to be maintained by such waiving party under this Lease (or would have been covered but for such party's failure to maintain the insurance that is required of such party under this Lease). All insurance that is carried by either party under this Lease to insure against damage or loss to such party's property shall include provisions denying to each respective insurer rights of subrogation and recovery against the other party.

8.3.6     Notification of Incidents. Tenant shall notify Landlord within forty-eight (48) hours after discovery of the occurrence of any accidents or incidents in the Premises, the Common Areas or other portions of the Project which could give rise to a claim under any of the insurance policies required under this Section 8.

8.3.7     Tenant Indemnity. Tenant shall indemnify, protect, defend (by counsel acceptable to Landlord) and hold harmless Landlord and Landlord's affiliated entities, and each of their respective members, managers, partners, directors, officers, employees, shareholders, lenders, agents, contractors, successors and assigns from and against any and all claims, demands, judgments, causes of action, damages, penalties, fines, taxes, costs, liabilities (including, without limitation, any strict liability), losses, and expenses, (including all costs, attorneys' fees, expenses and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon), arising at any time during or after the Term as a result (directly or indirectly) of, in connection with or in any way related to (i) any default in the performance of any obligation on Tenant's part to be performed under the terms of this Lease, or (ii) Tenant's use of the Premises, the conduct of Tenant's business or any activity, work or things done, permitted or suffered by Tenant or any Tenant Party in or about the Premises, the Common Area or other portions of the Project, except for claims caused solely by Landlord's negligence or willful misconduct and not covered by the insurance maintained by Tenant (and which would not have been so covered had Tenant maintained the insurance required to be maintained by Tenant pursuant to this Lease).     TENANT ACKNOWLEDGES AND AGREES THAT ITS INDEMNITY OBLIGATIONS HEREUNDER COVER AND RELATE TO, WITHOUT LIMITATION, ANY STRICT LIABILITY OF LANDLORD AND LANDLORD'S OFFICERS,

DIRECTORS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS AND CONTRACTORS (COLLECTIVELY, THE "LANDLORD PARTIES"). The obligations of Tenant under this Section 8.4 shall survive any expiration or termination of this Lease, including, without limitation with respect to any claims or liability arising prior to such expiration or termination.

8.4    Exemption of Landlord from Liability.    Tenant, as a material part of the consideration to Landlord, hereby assumes all risk of damage to property including, but not limited to, Tenant's fixtures, equipment, furniture, stock, inventory and alterations or illness or injury to persons in, upon or about the Premises, the Common Area or other portions of the Project arising from any cause, and Tenant hereby expressly releases Landlord and waives all claims in respect thereof against Landlord, except only such claims as are caused solely by Landlord's gross negligence or willful misconduct and are not covered by the insurance maintained by Tenant (and which would not have been so covered had Tenant maintained the insurance required to be maintained by Tenant pursuant to this Lease), subject to Section 8.3.5 above. Notwithstanding anything to the contrary contained in this Lease to the contrary, Tenant hereby agrees that Landlord shall not be liable for injury to Tenant's business or any loss of income therefrom and Tenant hereby agrees that Landlord shall not be liable for damage to the property of Tenant, or injury to or illness or death of Tenant or any Tenant Party or any other person in or about the Premises, the Common Area or the Project, whether such damage, illness or injury is caused by fire, steam, electricity, gas, water or rain, or from the breakage, leakage or other defects of sprinklers, wires, appliances, ventilation, plumbing, air conditioning or lighting fixtures, or from any other cause, and whether said damage, illness or injury results from conditions arising upon the Premises, or from other sources or places, and regardless of whether the cause of such damage, illness or injury or the means of repairing the same is inaccessible to Tenant, except only damage, illness or injury caused solely by Landlord's gross negligence or willful misconduct and not covered by the insurance maintained by Tenant (and which would not have been so covered had Tenant maintained the insurance required to be maintained by Tenant pursuant to this Lease), subject to Section 8.3.5 above. TENANT ACKNOWLEDGES AND AGREES THAT ITS RELEASE OBLIGATIONS HEREUNDER COVER AND RELATE TO, WITHOUT LIMITATION, ANY STRICT LIABILITY OF LANDLORD OR THE LANDLORD PARTIES. The release provisions of this Section 8.5 shall not be construed or interpreted as in any way restricting, limiting or modifying Tenant's insurance or other obligations under this Lease and are independent of Tenant's insurance and other obligations under this Lease. The provisions of this Section 8.5 shall survive any expiration or termination of this Lease, including, without limitation with respect to any claims or liability arising prior to such expiration or termination.

9.    REPAIRS AND MAINTENANCE.

9.1    Tenant.    Tenant shall keep and maintain the Premises, including, but not limited to, floors and floor coverings, interior plumbing, electrical wiring, appliances and devices using or containing refrigerants, fixtures and equipment in good repair and in a clean and safe condition, and repair and/or replace any and all of the foregoing in a good and workmanlike manner. Without limiting the foregoing, Tenant shall, at Tenant's sole expense, (a) immediately replace all broken glass in the Premises (including, without limitation, exterior glass and glass doors) with glass equal to or in excess of the specification and quality of the original glass; and (b) repair any area damaged by Tenant, Tenant's agents, employees, invitees and visitors,

including any damage caused by any roof penetration, whether or not such roof penetration was approved by Landlord. All repairs and replacements by Tenant shall be made and performed: (a) at Tenant's cost and expense and at such time and in such manner as Landlord may designate, (b) by contractors or mechanics approved by Landlord, (c) so that same shall be at least equal in quality, value and utility to the original work or installation, (d) in a manner and using equipment and materials that will not interfere with or impair the operations, use or occupation of the surrounding property or any of the mechanical, electrical, plumbing or other systems in the Premises or the Property, and (e) in accordance with the Rules and Regulations and all Applicable Laws (as defined in Section 11). In the event Tenant fails, in the reasonable judgment of Landlord, to maintain the Premises in accordance with the obligations under the Lease, which failure continues at the end of ten (10) days following Tenant's receipt of written notice from Landlord stating the nature of the failure, Landlord shall have the right to enter the Premises and perform such maintenance, repairs or refurbishing at Tenant's sole cost and expense (including a sum for overhead to Landlord equal to ten percent (10%) of the cost of the maintenance, repairs or refurbishing). Tenant shall maintain written records of maintenance and repairs, as required by any Applicable Law, and shall use certified technicians to perform such maintenance and repairs, as so required. Without limiting the generality of the foregoing, Tenant shall maintain a customary service agreement with a licensed, experienced service provider to provide for servicing and maintenance of the heating, ventilation and air conditioning system serving the Premises not less frequently than quarterly (the "HVAC Service Agreement"). Tenant shall deliver full and complete copies of all service or maintenance contracts entered into by Tenant for the Premises to Landlord (including, without limitation, such HVAC Service Agreement) within thirty (30) days after the Commencement Date and thereafter from time to time within ten (10) days following Landlord's request.

9.2     Landlord.   Landlord shall repair or cause the repair of damage to structural portions of the Premises roof, walls, foundation and floor slab and the Common Areas within the Project; provided, if such damage is caused by an act or omission of Tenant or any of the Tenant Parties, then such repairs shall be made by Landlord at Tenant's sole expense. Landlord shall not be required to make any repair resulting from (i) any alteration or modification to the Premises or to mechanical equipment within the Premises performed by, for or because of Tenant or to special equipment or systems installed by, for or because of Tenant, (ii) the installation, use or operation of Tenant's property, fixtures and equipment, (iii) the moving of Tenant's property in or out of the Premises or in and about the Premises, (iv) Tenant's use or occupancy of the Premises in violation of Section 11 of this Lease or in the manner not contemplated by the parties at the time of the execution of this Lease, (v) the acts or omissions of Tenant or any Tenant Party, (vi) fire and other casualty, except as provided by Section 13 of this Lease or (vii) condemnation, except as provided in Section 14 of this Lease. Landlord shall have no obligation to make repairs under this Section 9.2 until a reasonable time after receipt of written notice from Tenant of the need for such repairs. There shall be no abatement of Rent during the performance of such work. Landlord shall not be liable to Tenant for injury or damage that may result from any defect in the construction or condition of the Premises, nor for any damage that may result from interruption of Tenant's use of the Premises during any repairs by Landlord unless such interruption is due to Landlord's gross negligence or willful misconduct. Notwithstanding the foregoing, Landlord (and not Tenant) shall be responsible for repairing, at Landlord's sole cost, any defects in the design and/or construction of Landlord's Work in the Premises, including, the roof structure, wall structure, foundation and floor slab. Tenant waives

any right to repair the Premises, the Property and/or the Common Areas at the expense of Landlord under any Applicable Laws. Landlord agrees to have repairs conducted by Landlord and/or Landlord's contractors to be undertaken in a manner that minimizes in all respects Tenant's patient care activities taking place in the Premises.

10. ALTERATIONS.

10.1 Trade Fixtures; Alterations. Tenant may install necessary trade fixtures, equipment and furniture in the Premises, provided that such items are installed and are removable without structural or material damage to the Premises, the Property or the Common Areas, subject to the provisions of this Section 10. Tenant shall not construct, nor allow to be constructed, any alterations or physical additions ("Alterations") in, about or to the Premises without obtaining the prior written consent of Landlord, which consent shall be conditioned upon Tenant's compliance with Landlord's requirements regarding construction of Alterations and, in the case of interior nonstructural Alterations that do not affect the Building Systems (as defined below), and only in such case, such consent otherwise shall not be unreasonably withheld. Tenant shall submit plans and specifications to Landlord with Tenant's request for approval and shall reimburse Landlord for all costs which Landlord may incur in connection with granting approval to Tenant for any such alterations and additions, including any costs or expenses which Landlord may incur in electing to have outside architects and engineers review said matters. All Alterations shall be done at Tenant's expense and, if applicable, in strict accordance with any design or construction procedure manual established by Landlord. In addition, in the event Tenant makes any alterations to the Premises that trigger or give rise to a requirement that the Common Areas or the Premises come into compliance with any governmental laws, ordinances, statutes, orders and/or regulations (such as ADA requirements), Tenant shall be fully responsible for complying, at its sole cost and expense, with same. Tenant shall file a notice of completion after completion of such work and provide Landlord with a copy thereof. Tenant shall provide Landlord with a set of "as-built" drawings for any such work.

10.2 Property. Except as provided in Section 10.3, all appurtenances, fixtures, improvements, additions and other property attached to or installed in the Premises at the commencement of or during the Term, whether temporary or permanent in nature, shall immediately be and remain the property of Landlord and at the end of the Term, all such appurtenances, fixtures, improvements, additions and property shall, at Landlord's option, either remain on the Premises without compensation to Tenant, or be removed in accordance with Section 10.3.

10.3 Tenant's Property, Removal. All furniture, equipment, store furnishings and articles of movable personal property installed in the Premises by or for the account of Tenant without expense to Landlord (except for ceiling and related fixtures, HVAC equipment and floor coverings), and which can be removed without structural or other material damage to the Premises or the Property (all of which are herein called "Tenant's Property") shall be and remain the property of Tenant and may be removed by it at any time during the Term; provided, however, that any equipment or other property for which Landlord has granted any allowance for credit to Tenant or which is a replacement for items originally provided by Landlord at Landlord's expense shall not be considered Tenant's Property. Upon the expiration of the Term or earlier termination of this Lease, Tenant shall have removed from the Premises all of Tenant's Property except such

items as the parties have agreed are to remain and to become the property of Landlord and, upon the request of Landlord, Tenant, at its sole cost and expense, shall also remove any Alterations designated by Landlord to be removed. Tenant shall repair or pay the cost of repairing any damage to the Premises or the Property resulting from such removal. Tenant's obligations under this Section 10.3 shall survive the termination of this Lease. Any items of Tenant's Property which shall remain in the Premises after the Termination Date may, at the option of Landlord, be deemed abandoned and in such case may either be retained by Landlord as its property or be disposed of, without accountability, at Tenant's expense in such manner as Landlord may see fit.

10.4 Liens. Tenant shall promptly pay and discharge all claims for labor performed, supplies furnished and services rendered at the request of Tenant and shall keep the Premises free of all mechanics' and materialmen's liens in connection therewith. Tenant shall provide at least ten (10) days prior written notice to Landlord before any labor is performed, supplies furnished or services rendered on or at the Premises and Landlord shall have the right to post on the Premises notices of non-responsibility. If any lien is filed, Tenant shall cause such lien to be released and removed within fifteen (15) days after the date of filing, and if Tenant fails to do so, Landlord may take such action as may be commercially reasonable to remove such lien and Tenant shall pay Landlord such amounts expended by Landlord together with interest thereon at the Applicable Interest Rate from the date of expenditure. Tenant shall indemnify and hold harmless Landlord from and against all commercially reasonable costs (including attorney fees and costs of litigation), losses, liabilities or causes of action arising out of or relating to any alterations, additions or improvements made by Tenant to the Premises (should Landlord permit Tenant to make such improvements), including, but not limited to, any mechanic's or materialmen's liens asserted in connection therewith.

10.5 Remodel. Landlord reserves the right, at any time and from time to time, to make alterations, additions, repairs or improvements to or in or to increase or decrease the size or area of all or any part of the Project and the fixtures and equipment therein including, without limitation, the HVAC, plumbing, electrical, fire protection, life safety, security and other mechanical, electrical and communications systems of the Premises and of the Project and (collectively, the "Building Systems"), the Common Areas and all other parts of the Premises and of the Project, and to change the arrangement and/or location of the Common Areas provided that any such alterations or additions shall not materially diminish the quality of the Property or the quality or quantity of services being provided to the Premises or adversely affect the functional utilization of the Premises. Without limitation of the foregoing, Landlord may construct additional stories on the Premises or any buildings in the Project, construct additional buildings, construct double deck, subterranean and elevated parking facilities, and expand or contract the boundaries of the Project, all as determined by Landlord in its sole discretion. Any construction activity undertaken by Landlord pursuant to this Section 10.5 shall be carried out in a manner that minimizes in all respects Tenant's patient care activities taking place in the Premises

11. USE.

11.1 General. The Premises shall be used only for the Permitted Uses set forth in the Basic Lease Information and for no other uses. Tenant's use of the Premises shall be in compliance with and subject to all applicable laws, statutes, codes, ordinances (including zoning ordinances), orders, rules, regulations, conditions of approval and requirements of all federal,

state, county, municipal and governmental authorities and all administrative or judicial orders or decrees and all permits, licenses, approvals, authorizations and other entitlements issued by governmental entities, and rules of common law, relating to or affecting the Property or the Premises or the use or operation thereof, whether now existing or hereafter enacted, including, without limitation, the Americans with Disabilities Act of 1990, 42 USC 12111 et seq. (the "ADA") as the same may be amended from time to time, all Environmental Laws (as defined in Section 12.1), and the CC&Rs or any supplement thereto recorded in any official or public records with respect to the Property or any portion thereof ("Applicable Laws"). Tenant shall comply with the Rules and Regulations attached hereto as Exhibit C, together with such additional Rules and Regulations as Landlord may from time to time prescribe. Tenant, at Tenant's sole cost and expense, shall comply with all Applicable Laws, which compliance obligation shall include the alteration of the Premises and/or any interior improvements or fixtures in order to comply with such Applicable Laws. Tenant shall be responsible for obtaining any permit, business license, certificate of occupancy, or other permits or licenses required by any governmental agency permitting Tenant's use or occupancy of the Premises. If any Applicable Laws are hereafter changed so as to require during the term of the Lease, any alteration of the Premises, or the reinforcement of any other physical modification of the Premises, Tenant shall be solely responsible for such cost and expense. Tenant shall not commit waste, overload the floors or structure of the Property, subject the Premises, the Property, or the Common Areas to any use which would damage the same or increase the risk of loss or violate any insurance coverage, permit any unreasonable odors, smoke, dust, gas, substances, noise or vibrations to emanate from the Premises, take any action which would constitute a nuisance or would disturb, obstruct or endanger any other tenants on surrounding properties, take any action which would abrogate any warranties, or use or allow the Premises to be used for any unlawful purpose. Tenant agrees to comply with the parking rules and regulations applicable within the Project and agrees to cooperate with Landlord and other tenants in the use of parking facilities. Landlord shall not be responsible for non-compliance by any other tenant or occupant with, or Landlord's failure to enforce, any of the Rules or Regulations or any other terms or provisions of such tenant's or occupant's lease. Tenant shall promptly comply with the reasonable requirements of any board of fire insurance underwriters or other similar body now or hereafter constituted. Tenant shall not do any act which shall in any way encumber the title of Landlord in and to the Premises or the Property. Tenant acknowledges and agrees that this Lease and all of the rights of Tenant under the Lease shall he subject and subordinate to the CC&Rs, and that Tenant shall at all times comply with the provisions of the CC&Rs.

11.2 Solicitation of Business. Tenant and Tenant's employees and agents shall not solicit business in the parking area or other Common Areas, nor shall Tenant distribute any handbills or other advertising matter in automobiles parked within the Common Area.

11.3 Exclusive Use Restrictions. Without limiting in any way the restriction in this Lease that the Premises be used only for the Permitted Use specified in the Basic Lease Information, in no event shall the Premises be used for any exclusive use granted by Landlord to other tenants of the adjoining shopping center prior to the date of this Lease, including those currently existing exclusive uses set forth in Exhibit E attached hereto or for any of the prohibited uses set forth on Exhibit F attached hereto.

11.4    Tenant's Exclusive.  Notwithstanding anything contained in this Lease to the contrary, provided and so long as the Premises is open and operating as an emergency and urgent care medical facility, and Tenant is not in default in its obligations under this Lease, Landlord agrees not to lease any other premises in the Mueller Market District Area depicted on Exhibit A-3 owned by Landlord (the "Exclusive Area") to another tenant (other than Tenant) whose primary use is the operation of performing emergency or urgent care medical treatment ("Tenant's Exclusive Use").  Tenant's exclusive shall not apply to premises governed by leases (1) entered into prior to the Effective Date, or (2) the premises leased to HEB Grocery Company, LP, including the "HEB Fuel Station" (as the entire HEB space may be expanded from time to time

12.    ENVIRONMENTAL MATTERS.

12.1    Hazardous Materials.  Tenant shall not cause or permit, or allow any of Tenant's employees, agents, customers, visitors, invitees, licensees, contractors, assignees or subtenants (individually, a "Tenant Party" and collectively, "Tenant Parties") to cause or permit, any Hazardous Materials to be brought upon, stored, manufactured, generated, blended, handled, recycled, managed, treated, disposed or used on, under or about the Premises, the Common Areas or the Property, except for routine office, medical (including "medical waste") and janitorial supplies in minimal, usual and customary quantities stored, managed, used and disposed of in accordance with all applicable Environmental Laws. Tenant agrees, from time to time following Landlord's written request, to provide Landlord with a list of Hazardous Materials utilized by Tenant in the Premises and evidence that Tenant is in compliance with all Applicable Laws with respect to its disposal of Hazardous Materials.  As used herein, "Hazardous Materials" means any chemical, substance, material, controlled substance, object, condition, waste, living organism or combination thereof which is or may be hazardous to human health or safety or to the environment due to its radioactivity, ignitability, corrosivity, reactivity, explosivity, toxicity, carcinogenicity, mutagenicity, phytotoxicity, infectiousness or other harmful or potentially harmful properties or effects, including, without limitation, tobacco smoke, petroleum and petroleum products, asbestos, radon, polychlorinated biphenyls (PCBs), refrigerants (including those substances defined in the Environmental Protection Agency's "Refrigerant Recycling Rule," as amended from time to time), and all of those chemicals, substances, materials, controlled substances, objects, conditions, wastes, living organisms or combinations thereof which are now or become in the future listed, defined or regulated in any manner by any Environmental Law.  As used herein, "Environmental Laws" means any and all federal, state or local environmental, health, natural resource protection, and/or safety-related laws, regulations, standards, decisions of courts, ordinances, rules, codes, orders, decrees, directives, guidelines, authorizations, permits or permit conditions, currently existing and as amended, enacted, issued or adopted in the future which are or become applicable to Tenant, the Premises, the Common Areas or the Property. Environmental Laws includes, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act, as amended.  Tenant and Tenant Parties shall comply with all Environmental Laws and promptly notify Landlord of the violation of or liability under (including, without limitation, any notice of potential violation of or liability under) any Environmental Law or the presence of any Hazardous Materials, other than office and janitorial supplies as permitted above, on the Premises.  Landlord shall have the right to enter upon and inspect the Premises and to conduct tests, monitoring and investigations.  If such tests indicate the presence of any environmental condition caused or exacerbated by Tenant or any Tenant Party or which occurred during the Term of this Lease, Tenant shall reimburse Landlord for the cost of

conducting such tests. The phrase "environmental condition" shall mean any adverse condition relating to any Hazardous Materials or the environment, including surface water, groundwater, drinking water supply, land, surface or subsurface strata or the ambient or indoor air and includes air, land and water pollutants, noise, vibration, light and odors. In the event of any such environmental condition, Tenant shall promptly take any and all steps necessary to rectify the same to Landlord's reasonable satisfaction and to the satisfaction of applicable governmental authorities and in accordance with all Environmental Laws or shall. at Landlord's election, reimburse Landlord, upon demand, for the cost to Landlord of performing rectifying and other responsive work. The reimbursement shall be paid to Landlord in advance of Landlord's performing such work, based upon Landlord's reasonable estimate of the cost thereof; and upon completion of such work by Landlord, Tenant shall pay to Landlord any shortfall within thirty (30) days after Landlord bills Tenant therefore or Landlord shall within thirty (30) days refund to Tenant any excess deposit, as the case may be.

12.2 Indemnification. In addition to the indemnity provided in Section 8.4 above, Tenant shall indemnify, protect, defend (by counsel acceptable to Landlord) and hold harmless Landlord, Landlord's affiliated entities, and each of their respective members, managers, partners, directors, officers, employees, shareholders, lenders, agents, contractors, successors and assigns (individually and collectively, "Indemnitees") from and against any and all claims, demands, judgments, causes of action, damages (including, without limitation, natural resource damages), penalties, fines, taxes, costs, liabilities (INCLUDING, WITHOUT LIMITATION, ANY STRICT LIABILITY OF INDEMNITEES UNDER ENVIRONMENTAL LAWS OR OTHERWISE), losses and expenses (including, without limitation, all costs, attorneys' fees, expenses, liabilities and court costs) arising at any time during or after the Term as a result (directly or indirectly) of, in connection with or in any way related to (a) Tenant and/or any Tenant's Party's breach of any prohibition or provision of this Section 12, or (b) the presence or release of any Hazardous Materials on, under or about the Premises or other property as a result (directly or indirectly) of Tenant's and/or any Tenant's Party's activities in connection with the Premises, the Common Areas or the Property. This indemnity shall include, without limitation, attorneys' and experts' fees and costs, costs of litigation and governmental oversight costs, the cost of any required or necessary repair, cleanup, detoxification, or other response costs, and the preparation and implementation of any closure, monitoring or other required plans, whether such action is required or necessary prior to or following the expiration or termination of this Lease. Neither the written consent by Landlord to the presence of Hazardous Materials on, under or about the Premises, nor the strict compliance by Tenant with all Environmental Laws, shall excuse Tenant from Tenant's obligation of indemnification pursuant hereto. Tenant's obligations pursuant to the foregoing indemnity shall survive the expiration of the Term or earlier termination of this Lease.

13. DAMAGE AND DESTRUCTION.

13.1 Casualty. If the Premises or other portions of the Property materially adversely affecting the ability to operate for business from the Premises should be damaged or destroyed by fire or other casualty, Tenant shall give immediate written notice to Landlord. If the substantial completion of the repair or restoration of the damage or destruction caused by such fire or other casualty does not occur within ninety (90) days following such fire or other casualty, then within ninety (90) days after the occurrence of such fire or other casualty, Landlord shall

deliver written notice (the "Casualty Repair Estimate Notice") to Tenant of Landlord's good faith estimate of the time required for substantial completion of such repair or restoration.

13.1.1    Less Than 270 Days.  If it is estimated in the Casualty Repair Estimate Notice that the substantial completion of the repair or restoration of the Premises shall occur within two hundred seventy (270) days after the occurrence of the applicable fire or other casualty, then this Lease shall not terminate and, provided that insurance proceeds are available to fully repair the damage, Landlord shall repair the Premises, except that Landlord shall not be required to rebuild, repair or replace Tenant's Property which may have been placed in, on or about the Premises by or for the benefit of Tenant.  If Tenant is required to vacate all or a portion of the Premises during Landlord's repair thereof, then the Base Rent, Tenant's Share of Real Property Taxes and Tenant's Share of Operating Expenses payable hereunder shall be abated proportionately on the basis of the size of the area of the Premises that Tenant is so required to vacate (i.e., the number of square feet of floor area of the Premises that Tenant is so required to vacate compared to the total square footage of the floor area of the Premises) from the date Tenant vacates all or a portion of the Premises that was damaged, but only during the period the Premises are unfit for occupancy.

13.1.2    Greater Than 270 Days.  If it is estimated in the Casualty Repair Estimate Notice that the substantial completion of the repair or restoration of the Premises shall not occur within two hundred seventy (270) days after the occurrence of the applicable fire or other casualty, then Landlord may terminate this Lease by giving written notice within ten (10) days after Landlord's delivery of the Casualty Repair Notice; and this Lease shall terminate and the Rent shall be abated from the date Tenant vacates the Premises.  In the event that Landlord does not elect to terminate this Lease, Landlord shall promptly commence and diligently prosecute to completion the repairs to the Premises, provided insurance proceeds are available to repair the damage (except that Landlord shall not be required to rebuild, repair or replace Tenant's Property which may have been placed in, on or about the Premises by or for the benefit of Tenant).  If Tenant is required to vacate all or a portion of the Premises during Landlord's repair thereof, then the Base Rent, Tenant's Share of Real Property Taxes and Tenant's Share of Operating Expenses payable hereunder shall be abated proportionately on the basis of the size of the area of the Premises that Tenant is so required to vacate (i.e., the number of square feet of floor area of the Premises that Tenant is so required to vacate compared to the total square footage of the floor area of the Premises) from the date Tenant vacates all or a portion of the Premises that was damaged only during the period the Premises are unfit for occupancy.

13.1.3    Casualty During the Last Year of the Lease Term.  Notwithstanding any other provisions hereof, if the Premises shall be damaged within the last year of the Lease Term, and if the cost to repair or reconstruct the portion of the Premises which was damaged or destroyed shall exceed $10,000, then, irrespective of the time necessary to complete such repair or reconstruction, Landlord shall have the right, in its sole discretion, to terminate the Lease effective upon the occurrence of such damage, in which event the Rent shall be abated from the date Tenant vacates the Premises.  The foregoing right shall be in addition to any other right and option of Landlord under this Section 13.

13.2    Tenant's Fault.  If the Premises or any other portion of the Property is damaged resulting from the negligence or breach of this Lease by Tenant or any of the Tenant Parties,

Rent shall not be reduced during the repair of such damage and Tenant shall be liable to Landlord for the cost of the repair caused thereby to the extent such cost is not covered by insurance proceeds received by Landlord.

13.3   Uninsured Casualty.  In the event that the Premises or any portion of the Property is damaged to the extent Tenant is unable to use the Premises and such damage is not covered by insurance proceeds received by Landlord or in the event that the holder of any indebtedness secured by the Premises requires that the insurance proceeds be applied to such indebtedness, then Landlord shall have the right at Landlord's option either (i) to repair such damage as soon as reasonably possible at Landlord's expense, or (ii) to give written notice to Tenant within thirty (30) days after the date of the occurrence of such damage of Landlord's intention to terminate this Lease as of the date of the occurrence of such damage.

13.4   Waiver.  With respect to any damage or destruction which Landlord is obligated to repair or may elect to repair, Tenant waives all rights to terminate this Lease pursuant to rights otherwise presently or hereafter accorded by Applicable Laws.

14.   EMINENT DOMAIN.

14.1   Total Condemnation.  If all of the Premises is condemned by eminent domain, inversely condemned or sold under threat of condemnation for any public or quasi-public use or purpose ("Condemned"), this Lease shall terminate as of the earlier of the date the condemning authority takes title to or possession of the Premises, and Rent shall be adjusted to the date of termination.

14.2   Partial Condemnation.  If any portion of the Premises or the Property is Condemned and such partial condemnation materially impairs Tenant's ability to use the Premises for Tenant's business as reasonably determined by Landlord, Landlord shall have the option of either (i) relocating Tenant to comparable space within the Property or (ii) terminating this Lease as of the earlier of the date title vests in the condemning authority or as of the date an order of immediate possession is issued and Rent shall be adjusted to the date of termination.  If such partial condemnation does not materially impair Tenant's ability to use the Premises for the business of Tenant, Landlord shall promptly restore the Premises to the extent of any condemnation proceeds recovered by Landlord, excluding the portion thereof lost in such condemnation, and this Lease shall continue in full force and effect except that after the date of such title vesting or order of immediate possession, Rent shall be adjusted as reasonably determined by Landlord.

14.3   Award.  If the Premises are wholly or partially Condemned, Landlord shall be entitled to the entire award paid for such condemnation, and Tenant waives any claim to any part of the award from Landlord or the condemning authority; provided, however, Tenant shall have the right to recover from the condemning authority such compensation as may be separately awarded to Tenant in connection with costs in removing Tenant's merchandise, furniture, fixtures, leasehold improvements and equipment to a new location.  No condemnation of any kind shall be construed to constitute an actual or constructive eviction of Tenant or a breach of any express or implied covenant of quiet enjoyment.  Landlord and Tenant hereby waive the provisions of any statutes or court decisions which provide a party to a lease with a right to

abatement of rent or termination of the lease or establish the manner of allocation of the condemnation award when leased property is condemned or taken and agree that such event shall be exclusively governed by the terms of this Lease.

14.4    Temporary Condemnation.   In the event of a temporary condemnation not extending beyond the Term, this Lease shall remain in effect, Tenant shall continue to pay Rent and Tenant shall receive any award made for such condemnation except damages to any of Landlord's property. If a temporary condemnation is for a period which extends beyond the Term, this Lease shall terminate as of the date of initial occupancy by the condemning authority and any such award shall be distributed in accordance with the preceding section. If a temporary condemnation remains in effect at the expiration or earlier termination of this Lease, Tenant shall pay Landlord the reasonable cost of performing any obligations required of Tenant with respect to the surrender of the Premises.

15.    INTENTIONALLY OMITTED.

16.    DEFAULT.

16.1    Events of Defaults.   The occurrence of any of the following events shall, at Landlord's option, constitute an "Event of Default":

16.1.1    Vacation or abandonment of the Premises for a period in excess of thirty (30) consecutive days;

16.1.2    Failure to pay Rent on the date when due and the failure continuing for a period of five (5) days after such payment is due;

16.1.3    Failure to perform Tenant's covenants and obligations hereunder (except default in the payment of Rent) where such failure continues for a period of thirty (30) days after written notice from Landlord (which notice shall be in lieu of any notice required by Applicable Laws); provided, however, if the nature of the default is such that more than thirty (30) days are reasonably required for its cure, Tenant shall not be deemed to be in default if Tenant promptly commences the cure within ten (10) days after receipt of notice and diligently and continuously prosecutes such cure to completion;

16.1.4    The making of a general assignment by Tenant for the benefit of creditors; the filing of a voluntary petition by Tenant or the filing of an involuntary petition by any of Tenant's creditors seeking the rehabilitation, liquidation or reorganization of Tenant under any law relating to bankruptcy, insolvency or other relief of debtors and, in the case of an involuntary action, the failure to remove or discharge the same within sixty (60) days of such filing; the appointment of a receiver or other custodian to take possession of substantially all of Tenant's assets or this leasehold; Tenant's insolvency or inability to pay Tenant's debts or failure generally to pay Tenant's debts when due; any court entering a decree or order directing the winding up or liquidation of Tenant or of substantially all of Tenant's assets; Tenant taking any action toward the dissolution or winding up of Tenant's affairs; the cessation or suspension of Tenant's use of the Premises; or the attachment, execution or other judicial seizure of substantially all of Tenant's assets or this leasehold;

16.1.5 The making of any material misrepresentation or omission by Tenant or any successor in interest of Tenant in any materials delivered by or on behalf of Tenant to Landlord or Landlord's lender pursuant to this Lease; or

16.1.6 The occurrence of an Event of Default set forth in Section 16.1.4 or 16.1.5 with respect to any guarantor of this Lease, if applicable.

16.2 Remedies.

16.2.1 Termination. In the event of the occurrence of any Event of Default, Landlord shall have the right to give a written termination notice to Tenant (which notice may be the notice given under Section 15.1 above, if applicahle, and which notice shall be in lieu of any notice required by Applicable Laws) and, on the date specified in such notice, this Lease shall terminate unless on or before such date all arrears of Rent and all other sums payable by Tenant under this Lease and all costs and expenses incurred by or on behalf of Landlord hereunder shall have been paid by Tenant and all other Events of Default at the time existing shall have been fully remedied to the satisfaction of Landlord.

16.2.1.1 Repossession. Following termination, without prejudice to other remedies Landlord may have, Landlord may (i) peaceably re-enter the Premises upon voluntary surrender by Tenant or remove Tenant therefrom and any other persons occupying the Premises, using such legal proceedings as may be available; (ii) repossess the Premises or relet the Premises or any part thereof for such term (which may be for a term extending beyond the Term), at such rental and upon such other terms and conditions as Landlord in Landlord's sole discretion shall determine, with the right to make reasonable alterations and repairs to the Premises; and (iii) remove all personal property therefrom. TENANT AGREES THAT LANDLORD SHALL NOT BE LIABLE FOR ANY DAMAGES RESULTING TO TENANT FROM SUCH ACTION AND ACKNOWLEDGES THAT ITS RELEASE OBLIGATIONS HEREUNDER COVER AND RELATE TO, WITHOUT LIMITATION, ANY NEGLIGENT ACTION OR OMISSION OF LANDLORD OR THE LANDLORD PARTIES.

16.2.1.2 Unpaid Rent. Landlord shall have all the rights and remedies of a landlord provided by Applicable Law, including the right to recover from Tenant: (a) the worth, at the time of award, of the unpaid Rent that had been earned at the time of termination, (b) the worth, at the time of award, of the amount by which the unpaid Rent that would have been earned after the date of termination until the time of award exceeds the amount of loss of rent that Tenant proves could have been reasonably avoided, (c) the worth, at the time of award, of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of the loss of rent that Tenant proves could have been reasonably avoided, and (d) any other amount, and court costs, necessary to compensate Landlord for all detriment proximately caused by Tenant's default. The phrase "worth, at the time of award," as used in (a) and (b) above, shall be computed at the Applicable Interest Rate, and as used in (c) above, shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of Dallas at the time of award plus one percent (1%).

16.2.2 Continuation. Even though an Event of Default may have occurred, this Lease shall continue in effect for so long as Landlord does not terminate Tenant's right to

possession; and Landlord may enforce all of Landlord's rights and remedies under this Lease, including the right to recover Rent as it becomes due. Landlord, without terminating this Lease, may, during the period Tenant is in default, enter the Premises and relet the same, or any portion thereof, to third parties for Tenant's account and Tenant shall be liable to Landlord for all costs Landlord incurs in reletting the Premises, including, without limitation, brokers' commissions, expenses of remodeling the Premises and like costs. Reletting may be for a period shorter or longer than the remaining Term. Tenant shall continue to pay the Rent on the date the same is due. No act by Landlord hereunder, including acts of maintenance, preservation or efforts to lease the Premises or the appointment of a receiver upon application of Landlord to protect Landlord's interest under this Lease, shall terminate this Lease unless Landlord notifies Tenant that Landlord elects to terminate this Lease. In the event that Landlord elects to relet the Premises, the rent that Landlord receives from reletting shall be applied to the payment of, first, any indebtedness from Tenant to Landlord other than Base Rent and Tenant's Share of Operating Expenses and Real Property Taxes; second, all costs, including maintenance, incurred by Landlord in reletting; and, third, Base Rent and Tenant's Share of Operating Expenses and Real Property Taxes under this Lease. After deducting the payments referred to above, any sum remaining from the rental Landlord receives from reletting shall be held by Landlord and applied in payment of future Rent as Rent becomes due under this Lease. In no event, and notwithstanding anything in Section 16 to the contrary, shall Tenant be entitled to any excess rent received by Landlord. If, on the date Rent is due under this Lease, the rent received from the reletting is less than the Rent due on that date, Tenant shall pay to Landlord, in addition to the remaining Rent due, all costs, including maintenance, which Landlord incurred in reletting the Premises that remain after applying the rent received from reletting as provided hereinabove. So long as this Lease is not terminated, Landlord shall have the right to remedy any default of Tenant, to maintain or improve the Premises, to cause a receiver to be appointed to administer the Premises and new or existing subleases and to add to the Rent payable hereunder all of Landlord's reasonable costs in so doing, with interest at the Applicable Interest Rate from the date of such expenditure. LANDLORD AND TENANT AGREE THAT LANDLORD SHALL HAVE NO DUTY TO RELET THE PREMISES, however, Landlord shall, to the extent required by law, seek to use reasonable efforts to mitigate Landlord's damages, which may, depending upon the circumstances, include reletting the Premises. In connection with Landlord's efforts to relet the Premises, Tenant agrees that Landlord has no obligation to: (i) relet the Premises prior to leasing any other space within the Project; (ii) relet the Premises (A) at a rental rate or otherwise on terms below market, as then determined by Landlord in its sole and absolute discretion; (B) to any entity not satisfying Landlord's then standard financial credit risk criteria; (C) for a use (1) not consistent with Tenant's use prior to the Event of Default; (2) that would violate Applicable Laws or any CC&R; (3) that would impose a greater burden upon the parking, HVAC or other facilities; and/or (4) that would involve any use of Hazardous Materials; (D) with or without advertising; (E) for the remainder of the Term or a lease term different than the Term provided Landlord shall not be required or obligated to lease any portion of the Premises for a period of time extending beyond the end of the Term of this Lease; (iii) divide the Premises, install new demising walls or otherwise reconfigure the Premises to make same more marketable; (iv) pay any leasing or other commissions arising from such reletting, unless Tenant unconditionally delivers Landlord, in good and sufficient funds, the full amount thereof in advance; (v) pay, and/or grant any allowance for, tenant finish or other costs associated with any new lease, even though same may be amortized over the applicable lease term, unless Tenant

unconditionally delivers Landlord, in good and sufficient funds, the full amount thereof in advance; and/or (vi) relet the Premises, if to do so, Landlord would be required to alter other portions of the Project, make ADA-type modifications or otherwise install or replace any sprinkler, security, safety, HVAC or other operating systems. Additionally, Landlord shall not be required to accept any tenant offered by Tenant or to observe any instructions given by Tenant relative to such reletting. Tenant's obligations hereunder shall not be diminished because of Landlord's failure to relet the Premises or to collect any rental due for a reletting.

16.2.3   Lock Out. Landlord may in compliance with applicable laws, alter the locks and any other security device or devices which allow Tenant access to the Premises, and Landlord shall not be required to provide a new key or right of access to Tenant, and restrict or terminate any right to use parking facilities associated with the Project as well as services to the Premises.     This Section 16.2.3 is intended to and shall supersede the provisions of Section 93.002 of the Texas Property Code

16.3   Cumulative. Each right and remedy of Landlord provided for herein or now or hereafter existing at law, in equity, by statute or otherwise shall be cumulative and shall not preclude Landlord from exercising any other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity, by statute or otherwise. No payment by Tenant of a lesser amount than the Rent nor any endorsement on any check or letter accompanying any check or payment as Rent shall be deemed an accord and satisfaction of full payment of Rent; and Landlord may accept such payment without prejudice to Landlord's right to recover the balance of such Rent or to pursue other remedies.

16.4   Landlord's Duty of Care. Landlord shall, in the exercise of any right or remedy of Landlord provided for under this Section 16 or otherwise by law, (i) use good faith efforts to not interfere with any active patient care activities in progress at the Premises, and (ii) refrain from removing, modifying or destroying any patient records or other Protected Health Information as defined in the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"); provided that the foregoing shall not operate to prevent Landlord from terminating the Lease in accordance with its rights set forth herein.

17.   DEFAULT BY LANDLORD.

17.1   Notice to Landlord. Landlord shall not be in default under this Lease unless Landlord fails to perform an obligation required of Landlord within a reasonable time, but in no event later than thirty (30) days after written notice by Tenant to Landlord and to each Mortgagee (defined below), specifying the nature of the alleged default; provided, however, that if the nature of the obligation is such that more than thirty (30) days are required for performance, then Landlord shall not be in default if Landlord commences performance within fifteen (15) business days and thereafter diligently prosecutes the same to completion. Except for the other provisions of this Lease that limit or restrict Tenant's remedies, Tenant's sole and exclusive remedy for Landlord's default shall be an action for damages limited to Tenant's direct, out-of-pocket losses. IN NO EVENT SHALL LANDLORD BE LIABLE OR RESPONSIBLE FOR ANY CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES. Tenant acknowledges and agrees that the remedy provided by this Section 17.1 is exclusive, and Tenant hereby irrevocably and unconditionally waives any and all other remedies, at law or in equity, including any action

that would or could create a lien on the Property or any portion thereof. The foregoing, however, shall not preclude Tenant from bringing an action for injunctive relief.

17.2     Mortgagee Protection.  Tenant agrees to give any holder of any mortgage or deed of trust secured by the Real Property, by registered or certified mail or nationally recognized overnight delivery service, a copy of any notice of default served upon the Landlord by Tenant, provided that, prior to such notice, Tenant has been notified in writing (by way of service on Tenant of a copy of assignment of rents and leases or otherwise) of the address of such holder of a mortgage or deed of trust. Tenant further agrees that if Landlord shall have failed to cure such default within thirty (30) days after such notice to Landlord (or if such default cannot be cured or corrected within that time, then such additional time as may be necessary if Landlord has commenced within such thirty (30) day period and is diligently pursuing the remedies or steps necessary to cure or correct such default), then the holder of any mortgage or deed of trust shall have an additional thirty (30) days within which to cure or correct such default (or if such default cannot be cured or corrected within that time, then such additional time as may be necessary if such holder of any mortgage or deed of trust has commenced within such thirty (30) day period and is diligently pursuing the remedies or steps necessary to cure or correct such default). Notwithstanding the foregoing, in no event shall any holder of any mortgage or deed of trust have any obligation to cure any default of the Landlord.

18.     ASSIGNMENT AND SUBLETTING.

18.1     Consent Required.  Tenant may not directly or indirectly, voluntarily or by operation of law, sell or assign all or any part of its interest in or rights with respect to the Premises or its leasehold or subleasehold estate hereunder (collectively, an "Assignment", and the person or entity which is the assignee under such an Assignment is referred to herein as an "Assignee"), or permit all or any portion of the Premises to be occupied by anyone other than itself or sublet all or any portion of the Premises (collectively, a "Sublease" and the person or entity which is entitled to occupy or sublease all or part of the Premises under such Sublease is referred to herein as a "Subtenant"), without Landlord's prior written consent in each instance, which consent shall not be unreasonably withheld. Except for such an Assignment or Sublease, Tenant may not directly or indirectly, voluntarily or by operation of law, encumber, pledge or otherwise transfer or hypothecate all or any part of its interest in or rights with respect to the Premises or its leasehold or subleasehold estate hereunder without Landlord's prior written consent in each instance, which consent shall not be unreasonably withheld. . Without limiting the circumstances in which it may be reasonable for Landlord to withhold its consent to an Assignment or Sublease, Landlord and Tenant acknowledge that it shall be reasonable for Landlord to withhold its consent in the following instances:  (i) the proposed Assignee or Subtenant is a governmental agency; (ii) in Landlord's reasonable judgment, the use of the Premises by the proposed Assignee or Subtenant would (1) entail any alterations which would lessen the value of the leasehold improvements in the Premises, (2) require increased services by Landlord or increased parking demand, (3) result in increased risk of liability to Landlord from the operation of business from the Premises (including, without limitation, increased risk of liability relating to Hazardous Materials), or (4) violate any Applicable Laws or any negative covenant as to use contained in any other lease of space or other agreement affecting the Project; (iii) in Landlord's reasonable judgment, the financial worth of the proposed Assignee or Subtenant does not meet the credit standards applied by Landlord for other tenants under leases

with comparable terms; (iv) in Landlord's reasonable judgment, the proposed Assignee or Subtenant does not have a good reputation as a tenant of property; (v) Landlord has experienced previous defaults by or is in litigation with the proposed Assignee or Subtenant; (vi) the proposed Assignment or Sublease fails to comply with the requirements of this Lease (including, without limitation, the provisions of this Section 18); (vii) Tenant is in default of any obligation of Tenant under this Lease; (viii) the proposed Assignment or Sublease would potentially adversely affect the ability of Landlord and/or its affiliates to satisfy one or more of the tests that must be satisfied in order for Landlord and/or its affiliates, as applicable, to qualify as a real estate investment trust under the Internal Revenue Code of 1986, as amended (including any successor thereto, the "Code"); or (ix) in the case of a Sublease of less than the entire Premises, if the Sublease would result in the division of the Premises into more than two separately demised subleased premises or would require access to be provided through space leased or held for lease to another tenant or improvements to be made outside of the Premises. The merger of Tenant with any other entity or the transfer of any controlling or managing ownership or beneficial interest in Tenant, or the assignment of a substantial portion of the assets of Tenant, whether or not located at the Premises, shall constitute an Assignment requiring the consent of Landlord hereunder unless such merger, assignment or transfer transaction is undertaken between Tenant and an affiliate of Tenant under common ownership and/or control with Tenant and the resulting entity has the same or better net worth than Tenant. In no event shall such merger, assignment or transfer transaction release Tenant from liability hereunder.

18.2 Procedures for Request for Consent. If Tenant desires to enter into an Assignment of this Lease or a Sublease of all or any part of the Premises, Tenant shall give Landlord written notice thereof with copies of all related documents and agreements associated with the assignment or sublease, including without limitation, the financial statements of any proposed assignee or subtenant, at least forty-five (45) days prior to the anticipated effective date of the Assignment or Sublease. Tenant shall pay Landlord's reasonable fees and costs incurred in connection with any proposed Assignment or Sublease (including, without limitation, fees and costs in connection with the review of such documentation, making investigations as to the acceptability of the proposed Assignee or Subtenant, and reasonable and necessary attorneys' fees and costs), plus an administrative fee of Five Hundred Dollars ($500.00) for each proposed Assignment or Sublease, whether or not Landlord's consent thereto is given. Landlord shall have a period of thirty (30) days following receipt of such notice and all related documents and agreements to notify Tenant in writing of Landlord's approval or disapproval of the proposed Assignment or Sublease. If Landlord fails to notify Tenant in writing of such election, Landlord shall be deemed to have disapproved such Assignment or Sublease. In the event of a proposed Assignment or a proposed Sublease for all or substantially all of the remainder of the Term, Landlord may terminate the Lease (or in the case of a proposed Sublease of less than all of the Premises, terminate the Lease with respect to the portion of the Premises proposed to be subject to the Sublease) by giving written notice to Tenant within such thirty (30) day period. If Landlord shall exercise its termination right hereunder, (a) Landlord shall have the right to enter into a lease or other occupancy agreement directly with the proposed Assignee or Subtenant, and Tenant shall have no right to any of the rents or other consideration payable by such proposed Assignee or Subtenant under such other lease or occupancy agreement, even if such rents and other consideration exceed the rent payable under this Lease by Tenant, and (b) Landlord shall have the right to lease the Premises to any other tenant, or not lease the Premises, in its sole discretion. Landlord and Tenant specifically agree that Landlord's right to terminate this Lease

under this Section is a material consideration for Landlord's agreement to enter into this Lease and such right may be exercised in Landlord's sole and absolute discretion and no test of reasonableness shall be applicable thereto. Notwithstanding anything to the contrary in this Lease, if Tenant or any proposed Assignee or Subtenant claims that Landlord has unreasonably withheld or delayed its consent under this Section or otherwise has breached or acted unreasonably under this Section, their sole remedies shall be a declaratory judgment and an injunction for the relief sought, and Tenant hereby waives the provisions of any Applicable Laws, and all other remedies, including, without limitation, any right at law or equity to terminate this Lease, on its own behalf and, to the extent permitted under all applicable laws, on behalf of the proposed Assignee or Subtenant.

18.3 Excess Consideration. In the event of any Assignment or Sublease, Landlord shall receive as Additional Rent hereunder Tenant's "Excess Consideration" derived from such Assignment or Sublease. If Tenant shall elect to enter into an Assignment or Sublease, Tenant shall use reasonable and good faith efforts to secure consideration from any such Assignee or Subtenant which would be generally equivalent to then-current market rent, but in no event shall Tenant's monetary obligations to Landlord, as set forth in this Lease, be reduced. In the event of a Sublease, "Excess Consideration" shall mean all rent, additional rent or other consideration actually received by Tenant from such Subtenant and/or actually paid by such Subtenant on behalf of Tenant in connection with the Sublease in excess of the rent, additional rent and other sums payable by Tenant under this Lease during the term of the sublease on a per square foot basis if less than all of the Premises is subleased. In the event of an Assignment, "Excess Consideration" shall mean key money, bonus money or other consideration paid by the Assignee to Tenant in connection with such Assignment, and any payment in excess of fair market value for services rendered by Tenant to Assignee or for assets, fixtures, inventory, equipment, or furniture transferred by Tenant to Assignee in connection with such Assignment. If part of the Excess Consideration shall be payable by the Assignee or Subtenant other than in cash, then Landlord's share of such non-cash consideration shall be in such form as is reasonably satisfactory to Landlord. Upon Landlord advising Tenant of any potential adverse effect of any Sublease or Assignment on the ability of Landlord and/or its affiliates, as applicable, to satisfy one or more of the tests that must be satisfied in order for Landlord and/or its affiliates to qualify as a real estate investment trust under the Code, Tenant will exercise its best efforts to structure any such Sublease or Assignment so that any Excess Consideration that becomes payable to Landlord will not have such adverse effect, and if Tenant is unable so to structure any proposed Sublease or Assignment, then Landlord shall have the right in its sole and absolute discretion to withhold its consent to the proposed Sublease or Assignment.

18.4 General. No Sublease or Assignment by Tenant nor any consent by Landlord thereto shall relieve Tenant of any obligation to be performed by Tenant under this Lease, and following any Assignment or Sublease, Tenant shall continue to be liable as a principal and not as a guarantor or surety to the same extent as though no Assignment or Sublease had been made. Any Sublease or Assignment that is not in compliance with this Section 18 shall be void and, at the option of Landlord, shall constitute a material default by Tenant under this Lease. Landlord may, without waiving any rights or remedies, collect rent from the assignee, subtenant or occupant and apply the net amount collected to the Rent herein reserved and apportion any excess rent so collected in accordance with the terms of the preceding sentence. Such acceptance of Rent shall in no event be deemed to imply that Landlord is approving a subtenant or assignee

which Landlord has not approved in writing pursuant to the requirements of this Section 18. Landlord may consent to subsequent Assignments or Subleases of this Lease or amendments or modifications to the Lease by Assignees of Tenant without notifying Tenant or any successor of Tenant and without obtaining their consent. Any Assignee of Tenant's interest in this Lease hereby agrees that (and, at Landlord's option, no permitted Assignment shall be effective until there has been delivered to Landlord a counterpart of the Assignment instrument in which the Assignee agrees that) such Assignee shall be and remain jointly and severally liable with Tenant for the payment of Rent pertaining to the Premises and for the performance of all the terms and provisions of this Lease relating thereto arising on or after the date of the Assignment. Any Subtenant of all or any portion of the Premises hereby agrees that (and, at Landlord's option it shall be a condition to the effectiveness of any Sublease that Landlord receive a counterpart of the Sublease instrument in which the Subtenant agrees that) such Sublease is subject and subordinate to this Lease and to all mortgages or deeds of trust; that Landlord may enforce the provisions of the Sublease, including (following the occurrence of any default by Tenant under this Lease which is not cured within any applicable period for cure pursuant to this Lease) collection of rent; that in the event of termination of this Lease for any reason, including, without limitation, a voluntary surrender by Tenant, or in the event of any re-entry or repossession of the Premises by Landlord, Landlord may, at its option, either (*i*) terminate the Sublease, or (*ii*) take over all of the right, title and interest of Tenant, as sublandlord, under such Sublease, in which case such Subtenant will attorn to Landlord, but that nevertheless Landlord will not (1) be liable for any previous act or omission of Tenant under such Sublease, (2) be subject to any defense or offset previously accrued in favor of the Subtenant against Tenant, or (3) be bound by any previous modification of any Sublease made without Landlord's written consent, or by any previous prepayment by Subtenant of more than one month's rent.

19. ESTOPPEL, ATTORNMENT AND SUBORDINATION.

19.1 Estoppel. Within ten (10) days after request by Landlord, Tenant shall deliver an estoppel certificate duly executed (and acknowledged if required by any lender), in a commercially reasonable form acceptable to Tenant. If Tenant fails to deliver said statement in such time period, Tenant shall be deemed to have given Landlord a power of attorney to execute such supplement on behalf of Tenant.

19.2 Subordination. This Lease shall be subject and subordinate to all ground leases, master leases and the lien of all mortgages and deeds of trust which now or hereafter affect the Premises or the Property or Landlord's interest therein, and all amendments thereto, all without the necessity of Tenant's executing further instruments to effect such subordination. If requested, Tenant shall execute and deliver to Landlord within ten (10) days after Landlord's request whatever documentation, acceptable in form to Tenant in its reasonable discretion, that may reasonably be required to further effect the provisions of this paragraph including a Subordination, Nondisturbance and Attornment Agreement in such form as may be reasonably required by the lender.

19.3 Attornment. Tenant hereby agrees that Tenant will recognize as its landlord under this Lease and shall attorn to any person succeeding to the interest of Landlord in respect of the land and the buildings governed by this Lease upon any foreclosure of any mortgage upon such land or buildings or upon the execution of any deed in lieu of foreclosure in respect to such deed

of trust. If requested, Tenant shall execute and deliver an instrument or instruments confirming its attornment as provided for herein, acceptable in form to Tenant in its reasonable discretion; provided, however, that no such beneficiary or successor- in-interest shall be bound by any payment of Base Rent for more than one (1) month in advance, or any amendment or modification of this Lease made without the express written consent of such beneficiary where such consent is required under applicable loan documents.

20.   INTENTIONALLY OMITTED.

21.   LANDLORD'S LIEN.  IN ADDITION TO THE STATUTORY LIEN, LANDLORD IS HEREBY GRANTED AND SHALL HAVE, AT ALL TIMES, A VALID SECURITY INTEREST UNDER THE UNIFORM COMMERCIAL CODE OF TEXAS (SECTION 9 OF THE TEXAS BUSINESS AND COMMERCE CODE) TO SECURE PAYMENT OF ALL RENT AND OTHER SUMS OF MONEY BECOMING DUE UNDER THIS LEASE FROM TENANT, AND TO SECURE PAYMENT OF ANY DAMAGES OR LOSS WHICH LANDLORD MAY SUFFER BY REASON OF BREACH BY TENANT OF ANY COVENANT, AGREEMENT OR CONDITION CONTAINED HEREIN, UPON ALL GOODS, WARES, EQUIPMENT, FIXTURES, FURNITURE, IMPROVEMENTS AND OTHER PERSONAL PROPERTY OF TENANT PRESENTLY OR WHICH MAY HEREAFTER BE SITUATED WITHIN THE PREMISES, EXCLUDING HOWEVER PATIENT CHARTS AND OTHER PATIENT RECORDS, AND ALL PROCEEDS THEREOF.  TENANT SHALL NOT ALLOW SUCH PROPERTY TO BE REMOVED THEREFROM WITHOUT THE PRIOR WRITTEN CONSENT OF LANDLORD UNTIL ALL ARREARAGE IN RENT AS WELL AS ANY AND ALL OTHER SUMS OF MONEY THEN DUE OR TO ACCRUE AND BECOME DUE UNDER THIS LEASE TO LANDLORD SHALL FIRST HAVE BEEN PAID AND DISCHARGED AND ALL OF THE COVENANTS, AGREEMENTS AND CONDITIONS HEREOF HAVE BEEN FULLY COMPLIED WITH AND PERFORMED BY TENANT.  To the extent that a lender obtains a valid and perfected security interest in the Collateral, Landlord hereby subordinates all right, title and interest Landlord may have or obtain in the Collateral to lender's security interest; provided, however, that this subordination shall not extend to any portion of the Collateral  which is or becomes affixed to the Premises, unless the affixed Collateral can be readily detached and removed from the Premises without material damage to the Premises; and provided, further, that this subordination shall not extend to any portion of the Collateral which is or becomes the property of Landlord under this Lease.  Upon the occurrence of an event of default by Tenant, Landlord may, in addition to any other remedies provided herein, enter upon the Premises and take possession of any and all goods, wares, equipment, fixtures, furniture, improvements and other personal property situated within the Premises, without liability for trespass or conversion, and sell the same at public or private sale, with or without having such property at the sale, after giving Tenant reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made, at which sale Landlord or its assigns may purchase unless otherwise prohibited by law.  Unless otherwise provided by law, and without intending to exclude any other manner of giving Tenant reasonable notice, the requirement of reasonable notice shall be met if such notice is given at least five (5) days before the time of any sale.  The proceeds from any such disposition, less any and all expenses connected with the taking of possession, holding and selling of the property (including reasonable attorney's fees and other expenses), shall be applied as a credit against the indebtedness secured by the security interest granted in this Section.  Any surplus shall be paid to

Tenant or as otherwise required by law; and Tenant shall pay any deficiencies immediately. Landlord shall have all of the rights and remedies of a secured party under the Texas Uniform Commercial Code and Tenant hereby consents to Landlord's filing of (and will executed if required) a financing statement in the form sufficient to perfect the security interest created herein under the provisions of the Texas Uniform Commercial Code, including, but not limited to, filing a financing statement in the Official Public Records of Travis County, Texas and with the Secretary of State of the state of organization of Tenant, or Landlord may file this Lease or a copy hereof as a financing statement. The statutory lien for rent is not hereby waived; on the contrary, the security interest herein granted shall be in addition to and supplementary of said statutory lien. This Lease is intended as and constitutes a security agreement within the meaning of the Texas Uniform Commercial Code.

22.   MISCELLANEOUS.

22.1   General.

22.1.1   Entire Agreement.   This Lease sets forth all the agreements between Landlord and Tenant concerning the Premises; and there are no agreements either oral or written other than as set forth herein.

22.1.2   Time of Essence.   Time is of the essence of this Lease. As used in this Lease, a "business day" shall mean any day which is not a Saturday, Sunday or holiday when mail is not delivered by the United States Postal Service.

22.1.3   Attorneys' Fees.   In any action or proceeding which either party brings against the other to enforce its rights hereunder, the non-prevailing party shall pay all costs incurred by the prevailing party, including, without limitation, reasonable and necessary attorneys' fees and costs. Any judgment or order entered in any final judgment shall contain a specific provision providing for the recovery of all costs and expenses of suit, including reasonable and necessary attorneys' fees (collectively "Costs") incurred in enforcing, perfecting and executing such judgment. For the purposes of this paragraph, Costs shall include, without limitation, reasonable and necessary attorneys' fees, costs and expenses incurred in (i) post-judgment motions, (ii) contempt proceeding, (iii) garnishment, levy, and debtor and third party examination, (iv) discovery, and (v) bankruptcy litigation. All references in this Lease to "attorneys' fees" shall be deemed to include imputed fees of in-house counsel, if applicable, based on commercially reasonable rates charged by comparably experienced counsel.

22.1.4   Severability.   If any provision of this Lease or the application of any such provision shall be held by a court of competent jurisdiction to be invalid, void or unenforceable to any extent, the remaining provisions of this Lease and the application thereof shall remain in full force and effect and shall not be affected, impaired or invalidated.

22.1.5   Law.   This Lease shall be construed and enforced in accordance with the laws of the state in which the Premises are located.

22.1.6   No Option.   Submission of this Lease to Tenant for examination or negotiation does not constitute an option to lease, offer to lease or a reservation of, or option for,

the Premises; and this document shall become effective and binding only upon the execution and delivery hereof by Landlord and Tenant.

22.1.7   Successors and Assigns.  This Lease shall be binding upon and inure to the benefit of the successors and assigns of Landlord and, subject to compliance with the terms of Section 18, Tenant.  Landlord shall have the absolute right to assign this Lease without the consent of Tenant.

22.1.8   Third Party Beneficiaries.  Nothing herein is intended to create any third party benefit.

22.1.9   Memorandum of Lease.  Tenant shall not record this Lease or a short form memorandum hereof without Landlord's prior written consent, which consent Landlord may withhold in Landlord's sole discretion.

22.1.10  Agency, Partnership or Joint Venture.  Nothing contained herein nor any acts of the parties hereto shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture by the parties hereto or any relationship other than the relationship of landlord and tenant.

22.1.11  Merger.  The voluntary or other surrender of this Lease by Tenant or a mutual cancellation thereof or a termination by Landlord shall not work a merger and shall, at the option of Landlord, terminate all or any existing subtenancies or may, at the option of Landlord, operate as an assignment to Landlord of any or all of such subtenancies.

22.1.12  Headings.  Section headings have been inserted solely as a matter of convenience and are not intended to define or limit the scope of any of the provisions contained therein.

22.1.13  Security Measures.  Tenant assumes all responsibility for the protection of the Premises, Tenant, its agents, employees and invitees and their property from acts of third parties.

22.2     Signs.  All signs and graphics of every kind visible in or from public view or corridors, the Common Areas or the exterior of the Premises, whether located inside or outside the Premises, shall be subject to Landlord's prior written approval, which approval may be given or withheld in Landlord's commercially reasonable discretion so long as same comply with all Applicable Laws, CC&Rs, and in compliance with Landlord's signage program and conform with the requirements of the New Construction Council.  For purposes hereof, the term "signs and graphics" includes, without limitation, all signs, designs, monuments, logos, banners, projected images, pennants, decals, advertisements, pictures, notices, lettering, graphics and decorations.  Tenant shall remove all such signs and graphics prior to the termination of this Lease.  Such installations and removals shall be made in such manner as to avoid injury or defacement of the Premises or the Property; and subject to Landlord's approval, Tenant shall repair any injury or defacement, including without limitation, discoloration caused by such installation or removal.  Any and all costs relating to Tenant's signs, including, without limitation, fabrication, installation, maintenance, removal and restoration, shall be at Tenant's sole cost and expense.

22.3    Waiver.  No waiver of any default or breach hereunder shall be implied from any omission to take action on account thereof, notwithstanding any custom and practice or course of dealing.  No waiver by either party of any provision under this Lease shall be effective unless in writing and signed by such party.  No waiver shall affect any default other than the default specified in the waiver and then such waiver shall be operative only for the time and to the extent therein stated.  Waivers of any covenant shall not be construed as a waiver of any subsequent breach of the same.

22.4    Financial Statements.  Tenant shall provide, and cause each Guarantor, if applicable, to provide to any lender, purchaser or Landlord, within ten (10) days after request, a current, accurate, audited financial statement for Tenant and Tenant's business (if such audited financial statements exist, and otherwise unaudited financial statements) and similar financial statements for Tenant and Tenant's business for each of the three (3) years prior to the current financial statement year.  Tenant shall also provide within said 10-day period such other financial information or tax returns as may be reasonably required by Landlord.  Landlord shall keep such information confidential except for disclosures required in connection with any anticipated sale or refinancing of the Property (in which event Landlord shall advise the receiving party of the confidential nature of the information that is being provided).

22.5    Limitation of Liability.  The obligations of Landlord under this Lease are not personal obligations of the individual partners, members, managers, directors, officers, shareholders, agents or employees of Landlord; and Tenant shall look solely to the Property for satisfaction of any liability of Landlord and shall not look to other assets of Landlord nor seek recourse against the assets of the individual partners, directors, officers, shareholders, agents or employees of Landlord.  Whenever Landlord transfers its interest, Landlord shall be automatically released from further performance under this Lease and from all further liabilities and expenses hereunder and the transferee of Landlord's interest shall assume all liabilities and obligations of Landlord hereunder from the date of such transfer.  Notwithstanding any contrary provision contained in this Lease, neither Landlord, nor any of the individual partners, members, directors, officers or shareholders of Landlord or any of their respective officers, employees, agents or contractors shall be liable under any circumstances for any indirect or consequential damages or any injury or damage to, or interference with, Tenant's business, including but not limited to, loss of profits, loss of rents or other revenues, loss of business opportunity, loss of goodwill or loss of use, in each case, however occurring.

22.6    Notices.  All notices to be given hereunder shall be in writing and mailed postage prepaid by certified or registered mail, return receipt requested, or delivered by personal or courier delivery, nationally-recognized overnight delivery service, or sent by facsimile, electronically confirmed (immediately followed by one of the preceding methods), to Landlord's Address and Tenant's Address, or to such other place as Landlord or Tenant may designate in a written notice given to the other party.  Notices shall be deemed served upon the first attempted delivery by the U.S. Postal Service, the courier or a recognized overnight delivery service, or upon receipt of the facsimile prior to 5 p.m. on any business day, or, if receipt is after 5 p.m., on the next business day.

22.7    Brokerage Commission.  Landlord shall pay a brokerage commission to Landlord's Broker specified in the Basic Lease Information in accordance with a separate agreement between

Landlord and Landlord's Broker.  Landlord shall have no further or separate obligation for payment of any commissions or fees to any other broker or finder.  Tenant warrants to Landlord that Tenant's sole contact with Landlord or with the Premises in connection with this transaction has been directly with Landlord, Landlord's Broker and Tenant's Broker specified in the Basic Lease Information, and that no other broker or finder can properly claim a right to a commission or a finder's fee based upon contacts between the claimant and Tenant.  Any commissions or fees payable to Tenant's Broker with respect to this transaction shall be paid by Landlord's Broker or Landlord in accordance with a separate agreement with Tenant's Broker, and Tenant shall have no obligation with respect thereto.  Subject to the foregoing, Tenant agrees to indemnify and hold Landlord harmless from any claims or liability, including reasonable attorneys' fees, in connection with a claim by any person for a real estate broker's commission, finder's fee or other compensation based upon any statement, representation or agreement of Tenant, and Landlord agrees to indemnify and hold Tenant harmless from any such claims or liability, including reasonable attorneys' fees, based upon any statement, representation or agreement of Landlord.

22.8    Authorization.  Each individual executing this Lease on behalf of Tenant and Landlord represents and warrants that he or she is duly authorized to execute and deliver this Lease and that such execution is binding upon Tenant and Landlord, respectively.

22.9    Holding Over; Surrender.

22.9.1    Holding Over.  If Tenant holds over the Premises or any part thereof after expiration of the Term, such holding over shall, at Landlord's option, constitute a month-to-month tenancy, at a rent equal to two hundred percent (200%) of the Base Rent in effect immediately prior to such holding over unless agreed otherwise by Landlord in writing and shall otherwise be on all the other terms and conditions of this Lease.  This paragraph shall not be construed as Landlord's permission for Tenant to hold over.  Acceptance of Rent by Landlord following expiration or termination shall not constitute a renewal of this Lease or extension of the Term except as specifically set forth above.  If Tenant fails to surrender the Premises upon expiration or earlier termination of this Lease, Tenant shall indemnify and hold Landlord harmless from and against all loss or liability resulting from or arising out of Tenant's failure to surrender the Premises, including, but not limited to, any amounts required to be paid to any tenant or prospective tenant who was to have occupied the Premises after the expiration or earlier termination of this Lease and any related attorneys' fees and brokerage commissions.

22.9.2    Surrender.  Upon the termination of this Lease or Tenant's right to possession of the Premises, Tenant will surrender the Premises broom clean, together with all keys, in good condition and repair, reasonable wear and tear excepted.  Tenant shall patch and fill all holes within the Premises and all penetrations of the roof shall be resealed to a watertight condition.  In no event may Tenant remove from the Premises any mechanical or electrical systems or any wiring or any other aspect of any systems within the Premises excluding, however, electrical installations associated with and necessary for the operation of any Tenant's Property.  Conditions existing because of Tenant's failure to perform maintenance, repairs or replacements shall not be deemed "reasonable wear and tear".

22.10    Joint and Several.  If Tenant consists of more than one person, the obligation of all such persons shall be joint and several.  This Section 22.10 is not intended to impose personal

liability on any Member or Manager of Tenant not otherwise accepted by such Member or Manager under the terms of a Guaranty agreement.

22.11  Covenants and Conditions.  Each provision to be performed by Tenant hereunder shall be deemed to be both a covenant and a condition.

22.12  Use of Name.  The parties further acknowledge and agree that the names Mueller and all variations thereof, are proprietary to Landlord; provided that Landlord consents to the use of the word "Mueller" in Tenant's registered legal name (so long as same is in no event used in Tenant's Trade Name).  Except as expressly provided above, Tenant shall not use any such name or any variation thereof or identify Landlord in any promotional advertising or other promotional materials to be disseminated to the public or any portion thereof or use any trademark, service mark, trade name or symbol of Landlord or that is associated with it, without Landlord's prior written consent, which may be given or withheld in Landlord's sole discretion.

22.13  Force Majeure.  For purposes of this Lease, the term "Force Majeure Event" shall mean and include the following:  any delay caused by any action, inaction, order, ruling, moratorium, regulation, statute, condition or other decision of any governmental agency having jurisdiction over any portion of the Property, over the construction anticipated to occur thereon or over any uses thereof, or by delays in inspections or in issuing approvals by private parties or permits by governmental agencies, or by fire, flood, inclement weather, strikes, lockouts or other labor or industrial disturbance (whether or not on the part of agents or employees of either party hereto engaged in the construction of the Premises), civil disturbance, order of any government, court or regulatory body claiming jurisdiction or otherwise, act of public enemy, war, riot, sabotage, blockade, embargo, failure or inability to secure materials, supplies or labor through ordinary sources by reason of shortages or priority, discovery of hazardous or toxic materials, earthquake, or other natural disaster, delays by reason of any dispute resolution process, or any cause whatsoever beyond the reasonable control (excluding financial inability) of the party whose performance is required, or any of its contractors or other representatives, whether or not similar to any of the causes hereinabove stated.

22.14  Consents.  Except as otherwise provided elsewhere in this Lease, Landlord's actual reasonable costs and expenses (including, but not limited to, architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Tenant for any Landlord consent, including but not limited to, consents to an assignment, a subletting or the presence or use of a Hazardous Material, shall be paid by Tenant upon receipt of an invoice and supporting documentation therefor.  Landlord's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Event of Default or breach by Tenant of this Lease exists, nor shall such consent be deemed a waiver of any then existing Event of Default or breach, except as may be otherwise specifically stated in writing by Landlord at the time of such consent.

22.15  Telecommunications Services.  Subject to the restrictions set forth in Section 4 hereof, if Tenant wishes to contract with or obtain service from any network cabling, data or other telecommunication provider which does not currently serve the Premises or wishes to obtain from an existing provider services which will require the installation of additional equipment, such provider must, prior to providing service, enter into a written agreement with Landlord setting

forth the terms and conditions of the access to be granted to such provider. In considering the installation of any new or additional telecommunications cabling or equipment at the Premises, Landlord will consider all relevant factors in a reasonable and non-discriminatory manner, including, without limitation, the existing availability of services at the Premises, the impact of the proposed installations upon the Premises and its operations and the available space and capacity for the proposed installations. Landlord may also consider whether the proposed service may result in interference with or interruption of other services at the Premises or other portions of the Project or the business operations of other tenants or occupants of the Premises and Project. In no event shall Landlord be obligated to incur any costs or liabilities in connection with the installation or delivery of telecommunication services or facilities at the Premises. All installations and alterations shall be subject to Landlord's prior written approval and shall be performed in accordance with the terms of Section 10 (Alterations). If Landlord approves the proposed installations in accordance with the foregoing, Landlord will deliver its standard form agreement upon request and will use commercially reasonable efforts to promptly enter into an agreement on reasonable and non-discriminatory terms with a qualified, licensed and reputable carrier confirming the terms of installation and operation of telecommunications equipment consistent with the foregoing. Landlord shall not be liable to Tenant for, and Tenant does hereby release Landlord and the Landlord Parties from, any claims, losses, costs, expenses and damages of any kind whatsoever, whether actual, consequential, direct or indirect, arising from or caused by any interruption or cessation of telecommunications services to or within the Premises and the Property, regardless of the cause of such interruption or cessation, and no such interruption or cessation shall work an abatement of Rent under this Lease. Tenant acknowledges that Tenant may elect to obtain and maintain business interruption insurance to cover any risk of loss or damage caused by any interruption or cessation of telecommunications services to or within the Premises and the Property, and Tenant agrees that if Tenant shall elect to obtain business interruption insurance covering any such loss or damage, Tenant shall cause its insurer to waive all rights of subrogation against Landlord as provided in Section 8.3 of this Lease. As between Tenant and the Landlord Parties, Tenant shall bear the sole risk of loss or damage caused by any interruption or cessation of telecommunications services to or within the Premises and the Property. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BUT SUBJECT TO THE LIMITATIONS AS STATED HEREIN, TENANT WAIVES ALL CLAIMS AGAINST LANDLORD AND THE LANDLORD PARTIES ARISING, OR ALLEGED TO ARISE, IN CONNECTION WITH TELECOMMUNICATION SERVICES.

22.16   Guarantor.  If Tenant's obligations under this Lease are guaranteed by one or more persons or entities as "Guarantor" as identified in the Basic Lease Information, then, at Landlord's option, it shall be a condition to the effectiveness of this Lease that each such Guarantor shall execute a Guaranty in the forms attached hereto as Exhibit G-1 and Exhibit G-2 (the "Guaranty"). Tenant hereby represents and warrants as follows: (a) if any such Guarantor is an entity, then such entity is duly formed and validly existing and in good standing under the laws of the state of organization as specified in the Basic Lease Information and qualified to do business in the State of Texas; (b) if any such Guarantor is an entity, such Guarantor has the power, legal capacity and authority to enter into and perform its obligations under the Guaranty and no approval or consent of any person is required in connection with the execution and performance thereof; (c) the execution and performance of Guarantor's obligations under the Guaranty will not result in or constitute any default or event that would be, or with notice or the lapse of time would be, a default, breach or violation of the organizational instruments governing Guarantor or any

agreement or any order or decree of any court or other governmental authority to which Guarantor is a party or to which it is subject; (d) Guarantor has taken all necessary action to authorize the execution, delivery and performance of the Guaranty and (e) the Guaranty constitutes the legal, valid and binding obligation of the Guarantor. Upon Landlord's request, Tenant shall provide Landlord with evidence reasonably satisfactory to Landlord confirming the foregoing representations and warranties.

22.17   Waiver of Rights under Texas Deceptive Trade Practices - Consumer Protection Act. PURSUANT TO, AND TO THE EXTENT PERMITTED BY, SECTION 17.42 OF THE TEXAS DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE ANN. SECTION 17.41, ET SEQ.), LANDLORD AND TENANT HEREBY AGREE THAT THE TEXAS DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT IS WAIVED AND SHALL HAVE NO APPLICABILITY TO THIS LEASE.   AFTER CONSULTATION WITH AN ATTORNEY OF TENANT'S OWN SELECTION, TENANT VOLUNTARILY CONSENTS TO THIS WAIVER.

22.18   REIT Provisions.

22.18.1 Landlord and Tenant agree that Rent paid to Landlord under this Lease shall qualify as "rents from real property" within the meaning of Section 856(d) of the Internal Revenue Code of 1986, as amended (the "Code") and the U.S. Department of Treasury Regulations promulgated thereunder (the "Regulations"). Should the Code or the Regulations, or interpretations thereof by the Internal Revenue Service contained in Revenue Rulings, be changed so that any Rent no longer qualifies as "rent from real property" for the purposes of Section 856(d) of the Code and the Regulations promulgated thereunder, such Rent shall be adjusted so that it will so qualify; provided, however, that any adjustments required pursuant to this Section shall be made so as to produce the equivalent (in economic terms) Rent as payable prior to such adjustment.

22.18.2 Any services which Landlord is required to furnish pursuant to the provisions of this Lease may, at Landlord's option, be furnished from time to time, in whole or in part, by employees of Landlord or the managing agent of the Project or its employees or by one or more third persons designated by Landlord. Tenant agrees that upon Landlord's written request it will enter into direct agreements with the managing agent of the Project or other parties designated by Landlord for the furnishing of any such services required to be furnished by Landlord herein, in reasonable form and content approved by Landlord, provided, however, that no such contract shall result on an estimated basis in Tenant having to pay in the aggregate more money on account of its occupancy of the Premises under the terms of this Lease, or having to receive fewer services or services of a lesser quality than it is presently entitled to receive under this Lease.

22.19   Texas Tax Code Provisions.   Tenant hereby waives any right it may have under Section 41.413 of the Texas Tax Code to protest (and Tenant hereby agrees that it shall not protest) the appraised value of all or any portion of the Premises or the Property, and Tenant further waives any right it may have under Section 42.015 of the Texas Tax Code to appeal an order of the appraisal review board with respect to all or any portion of the Premises and/or the Property. Tenant agrees that Landlord shall have the sole right to protest any appraisals of the

Premises and the Property. Tenant also hereby waives any right it may have to receive a copy of any notice received by Landlord of reappraisal of all or any portion of the Premises and/or the Property, including without limitation any notice required under Section 41.413(d) of the Texas Tax Code. Tenant agrees that Landlord shall not be liable to Tenant for any damages for Landlord's failure to send to Tenant a copy of any notice of reappraisal concerning the Premises and/or the Property, irrespective of any obligation under applicable law of Landlord to provide such notice. Notwithstanding the foregoing, if Tenant protests, challenges or appeals any valuation for property tax purposes of all or any portion of the Premises and/or the Property, and such valuation increases from the value protested, appealed or challenged, Tenant agrees to indemnify Landlord on an after-tax basis for any property taxes due as a result of such increase and for all other costs and expenses incurred by Landlord as a result thereby.

22.20   Green Building Requirement. Landlord and Tenant acknowledge that construction of the Premises must meet and comply with requirements of the three-star standards of the Austin Energy Green Building Commercial Guidebook V2010_02 (Schedule 3 to Exhibit B), as same may be amended from time to time, and the requirements set forth in Schedule 2 to Exhibit B attached hereto and/or the Silver Rating Requirements of the Leadership in Energy & Design (LEED) established by the U.S. Green Building Council, as amended from time to time ("Green Building Requirements"). Without limiting the generality of the foregoing, Tenant agrees to construct all improvements to the Premises in accordance with the Green Building Requirements and agrees to comply with all requirements imposed by the City of Austin and/or LEED in connection with the Green Building Requirements. Tenant shall hire and coordinate its construction with a commissioning agent with experience at least at two (2) other building projects to ensure that the electrical and mechanical systems are installed and calibrated correctly (Landlord agreeing to assist Tenant in connection with the hiring of the commissioning agent). Tenant acknowledges and agrees that Tenant's failure to comply with the requirements of the Green Building Requirements shall be an Event of Default hereunder, and in addition to the remedies set forth elsewhere in this Lease, following five (5) days written notice to Tenant, Landlord shall have the right, but not the obligation, to perform such work as is necessary to place Tenant's Premises into compliance with the Green Building Requirements. In such event, Tenant shall be obligated, within ten (10) days of Landlord's demand, to reimburse all of the costs and expenses incurred by Landlord to bring Tenant's Premises into compliance with the Green Building Requirements.

22.21   MWBE Program. Tenant agrees to use reasonable efforts to comply with that certain minority/women business enterprise program which Landlord has agreed to implement under the Landlord's Master Development Agreement with the City of Austin (the "MDA"). Tenant will provide to Landlord, at such times as prescribed by Landlord in order for Landlord to timely incorporate such information into Landlord's reports to City under the MDA, semi-annual reports detailing its attempted compliance with such program.

22.22   HIPAA. To the extent that Tenant notifies Landlord of same in writing, Landlord agrees to comply with all applicable provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") including, but not limited to, Privacy Rule (45 CFR Parts 160 and 164), as such are implemented and revised from time to time, including, without limitation, the American Recovery and Reinvestment Act ("ARRA") and the objectives of the guidelines establishing privacy standards as adopted by any federal regulatory agencies having

jurisdiction over Tenant's affairs (the "Privacy Guidelines"). Landlord further agrees that it will: (i) not use or disclose any confidential patient information, including, without limitation, medical records and patient charts ("PHI") obtained or accessible by it as a result of this Lease other than as permitted or required by this Lease or applicable law; (ii) use appropriate safeguards to prevent use or disclosure of such PHI except as permitted by this Lease and applicable law; (iii) mitigate, to the extent practicable, any harmful effect known to Landlord of a use or disclosure of PHI by Landlord in violation of the requirements of this Lease or applicable law; (iv) report to Tenant or the party to receive notice on behalf of Tenant under this Lease, and if required by applicable law, to regulatory authorities within two (2) days of discovery of any use or disclosure of PHI not provided for in this Lease; (v) report to Tenant or the party to receive notice on behalf of Tenant under this Lease, and if required by applicable law to regulatory authorities, within two (2) days of discovery of any security breach relating to PHI; (vi) ensure that any agents, including employees, consultants and subcontractors, who obtain or have access to PHI, agree to the same restrictions and conditions that apply to a Business Associate with respect to such PHI; (vii) not present access to PHI to the individual who has a right of access under applicable law; (viii) to the extent in Landlord's control, make PHI available for amendment and incorporate any amendments to PHI; and (ix) to the extent in Landlord's control, make available information required to provide an accounting of disclosures as required by applicable law.

22.23   Records.  Upon termination of this Lease for any reason, Landlord, if feasible, will return or destroy all PHI received from, or created or received by Landlord on behalf of Tenant that Landlord still maintains in any form and will retain no copies of such information or, if such return or destruction is not feasible, shall notify Tenant of the condition that makes the return or destruction of PHI not feasible and shall extend the protections of this Lease to the PHI and limit further uses and disclosures to those purposes that make the return or destruction of the PHI infeasible for so long as Landlord maintains such PHI. This provision shall survive the expiration or termination of this Lease.

22.24   Addenda.  The Addenda attached hereto, if any, and identified with this Lease are incorporated herein by this reference as if fully set forth herein.

[NO FURTHER TEXT ON THIS PAGE; SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties have executed this Lease as of the date set forth above.

"Landlord"

CATELLUS MARKET DISTRICT, LLC,
a Delaware limited liability company

By:____________________
Print Name:____________________
Print Title:____________________

"Tenant"

MUELLER EMERGENCY CENTER, LLC, a
Texas limited liability company

By: ____________________
Print Name: Setul Patel
Print Title: CEO

## ADDENDUM TO LEASE

THIS ADDENDUM TO MEDICAL OFFICE LEASE ("Addendum") is attached to and constitutes an integral part of the Lease between CATELLUS MARKET DISTRICT, LLC, as Landlord, and MUELLER EMERGENCY CENTER, LLC, a Texas limited liability company, as Tenant. The terms of this Addendum shall be incorporated in the Lease for all purposes. All words and phrases not specifically defined in this Addendum are as defined in the Lease. In the event of a conflict between the provisions of the Lease and the provisions of this Addendum, this Addendum shall control.

The following new Sections are hereby added to the Lease which state in their entirety as follows:

23. OPTION TO EXTEND.

23.1 Terms of Option. Provided (i) Tenant is not in default under the terms of this Lease at the time the Extension Option (as defined below) is exercised or at the commencement of each Extension Term (as defined below), (ii) Tenant is open and occupying the entire Premises, (iii) Landlord has not given more than two (2) notices of default during the prior twelve (12) month period for nonpayment of monetary obligations, (iv) original Tenant has not assigned the Lease or subleased the Premises, and (v) Tenant's tangible net worth at the time the Extension Option is exercised is sufficient in Landlord's commercially reasonable judgment to meet the obligations of the Tenant during the Extension Term, Tenant shall have the option to renew this Lease (the "Extension Option") for one (1) additional period of sixty (60) months (the "Extension Term"). The Extension Term shall be on all the terms and conditions of this Lease, except that (a) Landlord shall have no additional obligation for free rent, leasehold improvements or for any other tenant inducements for the applicable Extension Term; and (b) Base Rent shall be increased (but not decreased) to the fair market rent rate ("Market Rate") as set forth below. There shall be no additional extension terms beyond the Extension Term set forth in the Lease. Tenant must exercise the Extension Option, if at all, by giving Landlord written notice of its election to do so no earlier than twelve (12) months prior to the expiration of the Term and no later than nine (9) months prior to the expiration of the Term ("Extension Option Notice"). The Extension Option set forth herein is personal to the original Tenant executing this Lease and shall not be included in any assignment of this Lease.

23.2 Agreement on Base Rent. Landlord and Tenant shall have thirty (30) days after Landlord receives the exercise notice in which to agree on the Base Rent during the Extension Term. Notwithstanding anything in this Section 23.2 to the contrary, in no event shall the Base Rent for the Extension Term be less than the Base Rent in effect immediately prior to the applicable Extension Term.

23.3 Brokers' Opinions. If Landlord and Tenant are unable to agree upon the Base Rent for the Extension Term within such thirty (30) day period, then within fifteen (15) days after the expiration of the thirty (30) day period, each party, by giving notice to the other party, shall appoint a licensed real estate broker, with at least fifteen (15) years of experience leasing and evaluating building space comparable to the Premises in the city and county where the Premises is located to determine the Market Rent. "Market Rent" shall mean the monthly amount per square foot in the Premises for the Extension Term that a willing, non-equity new tenant would pay and a

willing landlord would accept at arm's length for space in a comparable medical office building in Austin, Texas, with comparable tenant improvements, in a comparable location, giving appropriate consideration to monthly rental rates per square foot, the presence or absence of rent escalation clauses such as operating expense and tax pass-throughs, length of lease term, size and location of premises being leased and other generally applicable terms and conditions of tenancy for a similar medical office building; provided that in no event shall Base Rent be less than the Base Rent during the last month prior to the Extension Term. If the two (2) brokers are unable to agree on the Market Rent for the applicable Extension Term within twenty (20) days, they shall select a third broker meeting the qualifications stated in this Section within five (5) days after the last day the two (2) brokers are given to set the Market Rent for the applicable Extension Term. The third broker, however selected, shall be a person who has not previously acted in any capacity for either party. Within twenty (20) days after the selection of the third broker, a majority of the brokers shall set the Market Rent for the applicable Extension Term. If a majority of the brokers is unable to set the Market Rent within the twenty (20) day period, the two (2) closest brokers shall be added together and their total divided by two (2). The resulting quotient shall be the Market Rent for the applicable Extension Term. Each party shall be responsible for the costs, charges and fees of the broker appointed by that party plus one-half of the cost of the third broker.

24. RIGHT OF FIRST OFFER. If, during the initial Term of this Lease, Landlord desires to offer the Premises for sale upon terms desired by Landlord in its sole and absolute discretion to any third party person or entity ("Person"), or if Landlord receives a bona fide offer from any Person to purchase the Premises upon terms acceptable to Landlord in its sole and absolute discretion, then, prior to offering to sell the Premises to any Person or prior to accepting any Third Party Offer to purchase the Premises, as the case may be, Landlord shall first offer Tenant the one-time right to purchase (the "Right of First Offer to Purchase") the Premises by delivering to Tenant written notice (the "First Offer Notice") of the specific terms upon which Landlord is willing to sell the Premises in its sole and absolute discretion ("Landlord's Proposal") including the price ("Offering Amount"), payment terms, conditions of title, costs of escrow and all other material terms and the proposed purchase agreement and joint escrow instructions reflecting such terms ("Purchase and Sale Agreement"). Such Offering Amount shall be net of any real estate commissions or finder's fees and shall in no event be less than the total amount of all liens and encumbrances and payoff amounts owed by Landlord on the property.

Tenant shall have twenty (20) days after its receipt of the First Offer Notice to exercise its right to purchase. If Tenant elects to exercise its Right of First Offer to Purchase, Landlord and Tenant shall execute the Purchase and Sale Agreement included in Landlord's Proposal within twenty (20) days after Landlord receives notice of Tenant's acceptance of Landlord's Proposal. If Tenant does not elect to purchase the Premises within the aforesaid 20-day period, or if, for any reason, the Purchase and Sale Agreement is not fully executed by the parties within twenty (20) days after Tenant's acceptance of Landlord's Proposal (the "Outside Date"), Tenant's Right of First Offer to Purchase under this Section 24 shall be deemed null and void and of no further force or effect and Landlord shall thereafter be entitled to offer to sell or to sell the Premises to any other Person, at any time thereafter, upon any terms desired by Landlord at its sole and absolute discretion, and without any obligation to again offer to sell the Premises to Tenant.

The rights granted to Tenant under this Section 24 are personal to Tenant and may not be exercised by or assigned to any person or entity other than the original Tenant executing this Lease. Tenant's purchase rights contained herein shall be subject and subordinate to the rights of any lender or mortgagee of the property or any successor purchaser of the property at foreclosure or by virtue of deed in lieu transfer.

Notwithstanding the foregoing, in no event shall Landlord be obligated to offer to sell the Premises to Tenant and Tenant shall have no right to exercise its rights under this Section 24, if Tenant is or has been in default under the terms of the Lease. If Tenant defaults on any of its obligations under the Lease after delivery of the Purchase and Sale Agreement, Landlord shall have no obligation to proceed or continue with the sale of the Premises to Tenant and Tenant's Right of First Offer to Purchase shall thereafter be deemed null and void and of no further force or effect. In addition, notwithstanding the foregoing, in no event shall Landlord be obligated to offer to sell the Premises to Tenant in the event the Premises is being sold or transferred to an affiliate and/or is being sold as part of a larger transaction involving more than just the Premises.

25.    FUTURE DEVELOPMENT.   Notwithstanding anything to the contrary in this Lease, Tenant acknowledges that Landlord shall have the right, but not the obligation, to build a parking garage in the Project in substantially the area shown on Exhibit A-4. Tenant acknowledges and agrees that: (i) any parking garage constructed by Landlord may or may not be located in the exact area identified on Exhibit A-4, (ii) Tenant shall always be permitted to the non-exclusive right to park in the surface parking lot in the Project and shall have the non-exclusive right to park on the ground floor of the parking garage and such other areas of the parking garage as Landlord may designate from time to time; and (iii) in connection with the construction of any parking garage, Landlord shall have the right to perform such improvements to the Project as are necessary in Landlord's reasonable discretion to accomplish the integration of the Premises into Landlord's overall development and operating plan for the Project, as established by Landlord from time to time, including, without limitation, re-landscaping and re-striping of parking areas.

# EXHIBIT A

## DEPICTION OF PREMISES



**EXHIBIT A-1**

**INTENTIONALLY OMITTED**

**EXHIBIT A-2**

**DESCRIPTION AND DEPICTION OF PROJECT**

Lots 3, 4, & 5, Block 61 of the Muller Section VII-D Subdivision, a subdivision in Travis County, Texas, according to the map or plat thereof, recorded under Document No. 201200222, Official Public Records of Travis County, Texas.

Note: Project includes both buildings
& parking areas in large box above.

**EXHIBIT A-3**

**DEPICTION OF EXCLUSIVE USE AREA**



# EXHIBIT A-4

## DEPICTION OF PROPOSED PARKING GARAGE



## EXHIBIT B

## WORK LETTER

This Work Letter ("Work Letter") is a part of that certain Medical Office Lease (the "Lease"), by and between CATELLUS MARKET DISTRICT, LLC, a Delaware limited liability company ("Landlord"), and MUELLER EMERGENCY CENTER, LLC, a Texas limited liability company ("Tenant"). Capitalized terms not defined in this Work Letter shall have the meanings given to such terms in the Lease.

1. Definitions. As used in this Work Letter, the term "Landlord's Work" shall mean the work described on Schedule 1 attached hereto. As used in this Work Letter, the term "Tenant's Work" shall mean all improvements, additions and other work not included in Landlord's Work required to construct a medical office within the Premises, which Tenant's Work shall be performed by Tenant in accordance with the provisions of this Work Letter.

2. Landlord's Work.

(a) Landlord shall hereafter cause Landlord's Work to be performed in the Premises in accordance with all Applicable Laws. Landlord shall be solely responsible for all costs of design, obtaining permits for, purchase of materials for, and construction and installation of Landlord's Work. The Landlord's Work shall be designed, engineered and constructed to comply with all Legal Requirements, including Green Building Specifications and preliminary Austin Energy Green Building program approval for the Three Star requirements. In the event that Tenant delivers written notice to Landlord within thirty (30) days following the substantial completion of Landlord's Work of any "punch list" items of incomplete or defective elements of Landlord's Work (where required repairs are not necessitated by misuse by Tenant or any Tenant Party or ordinary wear and tear), Landlord shall promptly complete or correct such "punch list" items to Tenant's reasonable satisfaction at Landlord's cost and without charge to Tenant.

(b) Any changes to Landlord's Work from as described on Schedule 1 attached hereto shall require the prior written approval of Landlord. Any such changes may only be requested by the delivery to Landlord by Tenant of a proposed written "Change Order" specifically setting forth the requested change. Landlord shall have five (5) business days from the receipt of the proposed Change Order to provide Tenant with Landlord's disapproval of the proposed change stating the reason(s) for such disapproval, or if the Landlord approves the proposed change, the following items: (i) a summary of any increase in the cost caused by such change (the "Change Order Cost"), and (ii) a statement of the number of days of any delay caused by such proposed change (the "Change Order Delay"). If Tenant approves these items, Tenant shall pay to Landlord the Change Order Cost within five (5) business days after Tenant's approval thereof, the time for completion of Tenant's Work following the Commencement Date and prior to the Base Rent Start Date referenced in Section 2.1 of the Lease shall be reduced by the number of days of such Change Order Delay, and Landlord shall promptly following receipt of such payment execute the Change Order and cause the appropriate changes to the Final Plans to be made. If Tenant fails to respond to Landlord within said five (5) business day period, or fails to pay the Change Order Cost within such five (5) business day period, the Change Order Cost and the Change Order Delay shall be deemed disapproved by Tenant and Landlord shall

have no further obligation to perform any work set forth in the proposed Change Order. The Change Order Cost shall include all costs associated with the Change Order, including, without limitation, architectural fees, engineering fees and construction costs, as conclusively determined by the Architect and the Contractor (defined in Section 7), respectively, together with a five percent (5%) fee of these costs as reimbursement for the expense of administration and coordination of such Change Order by Landlord's Representative. The Change Order Delay shall include all delays caused by the Change Order, including, without limitation, all design and construction delays, as conclusively determined by Landlord's architect and Landlord's contractor for performance of the Landlord's Work.

(c)     Shell Building Design. Landlord will design the shell building in a style that it believes is most compatible with the Market District and surrounding Mueller area and is in accordance with the Design Guidelines and NCC approvals. While Landlord welcomes input from Tenant regarding the design style for the shell building, including similar styling to some of Tenant's other buildings in its portfolio, Landlord reserves the right to design the shell building in its sole discretion.

3.     Designation of Representatives.     With respect to the construction of the Landlord's Work and the Tenant's Work, Landlord hereby designates Leo Lopez, as "Landlord's Representative", and Tenant hereby   designates Dr. Dharmesh Patel as "Tenant's Representative". Tenant hereby confirms that Tenant's Representative has full authority to act on behalf of and to bind Tenant with respect to all matters pertaining to the construction of Landlord's Work and Tenant's Work. Landlord hereby confirms that Landlord's Representative has limited authority to act on behalf of Landlord with respect to matters pertaining to the construction of Landlord's Work and Tenant's Work. Either party may change its designated representative upon five (5) days prior written notice to the other party.

4.     Tenant Delays; Force Majeure Delays. As used herein, "Tenant Delays" means any delay in the completion of Landlord's Work resulting from any or all of the following: (1) Tenant's failure to timely perform any of its material obligations pursuant to this Work Letter on or before the due date therefor, any action item which is Tenant's responsibility pursuant to this Work Letter, including Tenant's failure to grant reasonable approvals within the time frames described herein; or (2) any other act or failure to act by Tenant in default of this Lease, Tenant's employees, agents, independent contractors, consultants and/or any other person performing or required to perform services on behalf of Tenant, including interference with Landlord, or its contractors. "Force Majeure Delays" as used herein means delays resulting from the occurrence of one or more Force Majeure Events beyond the reasonable control of the party obligated for performance (financial inability excepted).

5.     Tenant's Work.

(a)     Tenant's Work.     Tenant shall diligently construct or cause to be constructed in and upon the Premises, at Tenant's sole cost and expense, the Tenant's Work, in accordance with the construction requirements set forth in Schedule 2 attached to this Work Letter and which are incorporated herein by this reference (the "Construction Requirements"). Tenant's Work, as well as Tenant's installation of furniture, fixtures and equipment in the Premises, shall be performed in a good and workmanlike manner, and shall comply with all

Applicable Laws including, without limitation, those set forth in Schedule 2. Tenant Work's shall be in full compliance with Texas Department of Licensing and Regulations (TDLR) accessibility requirements. All Tenant's Work shall be inspected by a registered accessibility specialist licensed by TDLR. All work performed by Tenant shall be in compliance with Texas Accessibility Standards (TAS) as mandated by the Texas Architectural Barriers Act (TABA). Tenant shall have the right to enter the Premises from and after the Substantial Completion of Landlord's Work to construct Tenant's Work and such entry for such purposes shall not trigger the Base Rent Start Date and shall be in compliance with the terms and conditions of the Lease. Landlord and Tenant agree to cooperate with one another and to cause their respective employees, agents and contractors to cooperate with one another to coordinate any work being performed by Landlord and/or Tenant under this Work Letter, and their respective employees, agents and contractors so as to avoid unnecessary interference and delays with the completion of the Tenant's Work.

(b)     Approval of Plans. Preparation of the plans and working drawings for Tenant's Work shall be the responsibility of Tenant. Tenant's Plans shall include, without limitation, all roof-mounted equipment, proposed signage, Green Building Specifications and preliminary Austin Energy Green Building program approval for the Three Star requirements. Tenant shall submit proposed plans and working drawings to Landlord for approval in accordance with the Construction Requirements. Landlord's approval of the "Plans" pursuant to the Construction Requirements shall not constitute, or be deemed to be, any type of representation, warranty or guaranty from Landlord regarding Tenant's Work. Tenant hereby acknowledges that notwithstanding anything in this Work Letter or the Lease to the contrary, Landlord is not making any representation, warranty or guaranty regarding the Tenant's Work and Landlord shall have no liability or obligation in connection with Tenant's Work. Tenant shall diligently pursue the design, permitting and construction of Tenant's Work immediately upon receipt of Landlord's final shell building plans.

(c)     Tenant's Work Budget. Prior to Tenant's execution of the construction contract and general conditions with Tenant's Contractor for construction of Tenant's Work (the "Contract"), Tenant shall submit the Contract and the bids of the Contractor and all subcontractors for major trades and materials suppliers for construction of the Tenant's Work, to Landlord for its confirmation of compliance with the requirements of this Work Letter (unless Landlord reasonably approves Tenant's selection of the Contractor and such subcontractors other than by a process of competitive bidding). Prior to the commencement of the construction of the Tenant's Work, and after Tenant has accepted all bids for the Tenant's Work, Tenant shall provide Landlord with a detailed breakdown, by trade, of the final estimated costs to be incurred and/or which have been incurred for Tenant's Work Allowance Costs and a construction budget (the "Construction Budget") based upon such estimated costs. Tenant shall be solely responsible for the amount of the Construction Budget (as such Construction Budget may be modified from time to time pursuant hereto).

(d)     Cost of Tenant's Work. The cost of Tenant's Work, including without limitation, the architect's and/or space planner's fees, permit, license, impact, utility hook-up and other governmental fees, the construction costs, and any additional costs due to changes required by the City, or other local, state or federal governmental agency having jurisdiction, or due to

events or conditions beyond Tenant's control, shall be borne solely by Tenant, and Landlord shall have no liability therefor.

(e)     Indemnity.  Tenant shall indemnify, protect, defend and hold Landlord harmless from and against any and all liens, liabilities, losses, damages costs, expenses, demands, actions, claims, or causes of action (including, without limitation, attorneys' fees and legal costs) arising out of or relating to the entry, use, construction or occupancy of the Premises by Tenant or its agents, employees or contractors or otherwise relating to or arising out of Tenant's Work or any part thereof.  The foregoing indemnity shall include, without limitation, reasonable attorneys' fees incurred by Landlord to defend itself and the Premises against any action or proceeding, together with reasonable attorneys' fees incurred to enforce this indemnity.

6.     Miscellaneous Construction Covenants.

(a)     Coordination with Lease.  Nothing herein contained shall be construed as (i) constituting Tenant as Landlord's agent for any purpose whatsoever, or (ii) a waiver by Landlord or Tenant of any of the terms or provisions of the Lease.  Any material default by either party with respect to any portion of this Work Letter, shall be deemed a breach of the Lease for which Landlord and Tenant shall have all the rights and remedies as in the case of a breach of the Lease by the other party.

(b)     Cooperation.  Landlord and Tenant agree to cooperate with one another and to cause their respective employees, agents and contractors to cooperate with one another to coordinate any work being performed by Landlord and/or Tenant under this Work Letter, and their respective employees, agents and contractors so as to avoid unnecessary interference and delays with the completion of the work being performed by the other party hereto.

7.     No Representations.  Landlord does not warrant that the Premises or Property or any component thereof will be free of latent defects or that it will not require maintenance and/or repair within any particular period of time, except as expressly provided herein or in the Lease. Tenant acknowledges and agrees that it shall rely solely on the warranty or guaranty, if any, from the contractor Tenant engages to perform the Tenant's Work or other material and/or service providers relative to the proper design and construction of the Tenant's Work or any component thereof.  Taking possession of the Premises by Tenant shall be conclusive evidence that: (a) Landlord's construction obligations with respect to the Premises have been completed in accordance with the plans and specifications approved by Landlord and Tenant and that the Premises, to the extent of Landlord's construction obligations with respect thereto, are in good and satisfactory condition, subject only to completion of any incomplete or corrective items specified in a "punch list" approved by Landlord and Tenant; (b) the Premises are accepted "AS IS" and "WITH ALL FAULTS"; (c) Tenant accepts the Property as suitable for the purposes for which the Premises are leased; (d) Tenant accepts the Property as being in a good and satisfactory condition; and (e) Tenant waives any defects (including latent defects) in the Premises, and Property.  Tenant acknowledges that no representations or warranties regarding the condition of the Property or any portion thereof have been made by Landlord except as may be specifically set forth herein.  LANDLORD EXPRESSLY DISCLAIMS, AND TENANT HEREBY WAIVES TO THE FULL EXTENT PERMITTED BY LAW, ANY IMPLIED WARRANTY THAT THE PREMISES ARE SUITABLE FOR TENANT'S INTENDED

COMMERCIAL PURPOSE, AND ANY AND ALL OTHER IMPLIED WARRANTIES (WHETHER ARISING BY VIRTUE OF STATUTE, CASE LAW OR OTHERWISE) AND TENANT'S OBLIGATION TO PAY RENT HEREUNDER IS NOT DEPENDENT UPON THE CONDITION OF THE PREMISES OR THE PERFORMANCE BY LANDLORD OF ITS OBLIGATIONS HEREUNDER, AND, TENANT SHALL CONTINUE TO PAY THE RENT, WITHOUT ABATEMENT, SETOFF OR DEDUCTION, NOTWITHSTANDING ANY BREACH BY LANDLORD OF ITS DUTIES OR OBLIGATIONS HEREUNDER, WHETHER EXPRESS OR IMPLIED.

**SCHEDULE 1**

**LANDLORD'S SHELL WORK**

# PRELIMINARY BUILDING SPECIFICATIONS

# Neighbors Health System, Inc.

CATELLUS

**CATELLUS DEVELOPMENT GROUP**
**4550 Mueller Blvd.**
**Austin, TEXAS 78723**

February 20, 2013

**PROJECT:** **Mueller Market District – Neighbors Emergency Center**

**LOCATION:** **Mueller Development, Austin, TX**

**DATE:** **February 20, 2013**

| | | |
|---|---|---|
| 1. | Construction Type | II-B |
| 2. | Number of Stories | One |
| 3. | Use | Medical Emergency Center |
| 4. | Use Zone | Commercial |
| 5. | Gross Building Area: | Approximately 15,000 SF |
| 6. | Est. Site Area | TBD |
| 7. | Est. Site Coverage | TBD |
| 8. | Parking Provided | Approximately 145 on-site shared with other medical user and retail users |
| 9. | Typ. Ceiling Height | Tenant Specific |
| 10. | Fire Sprinkler System | Fully Fire Sprinklered shell building. Sprinkler head drops by Tenant. |
| 11. | Electrical | 120/208 Volt, 3 Phase<br>Landlord shall provide 900 AMP/208 service brought a main disconnect at the exterior of the building. |

**GENERAL SCOPE:** All shell building and site improvements shall be complete in every respect as required to complete tenant improvement work and occupy the premises for business purposes.

**CODES:** The building shall be Type II-B. All construction shall conform to local and state codes and regulations in effect. All subgrade preparation work, reinforcing steel, concrete, and structural steel, shall be inspected by an independent testing laboratory.

**DIVISION 1 SPECIFICATION ITEMS FOR BASE SHELL**

**SHELL BUILDING GENERAL REQUIREMENTS**

All work shall be in conformance with all correct and applicable codes and regulations including ADA and OSHA Safety requirements. Developer shall be responsible for coordination of all work to be performed in conformance with the construction documents.

**DIVISION 2 SITEWORK**

Earthwork: Grading and building pad work shall be in conformance with recommendations prepared by the geotechnical engineer ECS Texas, LLP dated February 15, 2013. Soils Engineer to verify all site work specifications prior to the commencement of any rough grading. Provide all final grading of existing site as required described within bid documents to achieve conformance with new finish grade elevations.

Surveying: Provide a qualified surveyor for all site staking and surveying.

Site Utilities: All electrical, storm water, sanitary sewer, and communications conduit infrastructure shall be provided as required to service the building. Communications cabling shall be provided as necessary to service shell building fire alarm system and ground floor security systems. Additional telephone and security cabling and/or equipment shall be by Tenant.

Parking: Parking shall consist of asphalt paving supported by a flexible stone base per geotechnical engineer recommendations.. Also included will be concrete curb and gutters throughout.

Erosion Control: Maintain existing erosion control system per code.

Landscaping & Irrigation: Landscaping and irrigation shall be provided per code and Mueller specific guidelines

Sidewalks: Sidewalks shall be provided per code. Natural color, 4" nominal thickness 5' wide over 95% compacted grade, with construction joints at 6'-0" o.c., with medium broom finish at all sidewalks and building entry. See drawings for special sidewalk treatments at entrances.

Exterior Lighting: Exterior lighting shall be provided per local codes and Mueller guidelines.

**DIVISION 3 CONCRETE**

Foundations: Office structure shall include concrete drilled piers at all column locations.

Floor: Office building slab-on-grade with minimum 5" thick concrete slab, reinforced with #3 rebar at 16" o.c. or equivalent fabric reinforcing per engineer's recommendations. Minimum 3,000 PSI concrete. A vapor barrier shall be provided under throughout all slab areas.

Required control and construction joints shall be included and shall not exceed 15' on center. Pad preparation design shall be per the soils engineer and structural engineer's recommendations.

Vertical Structure: Building structure shall consist of steel tube columns, wide flange beams and girders, and open web steel joist roof structure.

**DIVISION 4 NOT APPLICABLE**

**DIVISION 5 METALS**

Structure: Steel tube or wide flange columns with closed or open web steel joists and girders per final engineering.

Roof: Metal decking over closed web wide flange or open web joists per engineer's structural drawings.

**DIVISION 6 WOOD AND PLASTICS**

Rough Carpentry: All rough carpentry shall be provided as required per final architectural detailing.

**DIVISION 7 MOISTURE AND THERMAL PROTECTION**

Membrane Roofing: Roofing membrane shall be a white 60 mil reinforced TPO roofing system as manufactured by Carlisle, Firestone, or approved equal. Minimum R-19 (stabilized) roof insulation. Manufacturer's 10 year warranty, interior fire rating of Factory Mutual Class I, and meet Factory Mutual 1-60 (or per local code) and Underwriters Class A requirements shall be provided.

Roof Drainage: Internal primary roof drains tied into underground storm system. Internal overflow drains to above grade cast bronze cow tongue spouts. Minimum roof slope to be 1/4" per foot or as per manufacturer's recommendations.

Roof Accessories: Include one roof hatch. (Minimum 2'-6" x 3'-0"). Location to be inside common area utility room. Provide OSHA approved "Ladder Up" at top of roof hatch.

Roof Insulation: Include minimum R-19 Polyisocyanurate insulation.

**DIVISION 8 DOORS AND WINDOWS**

Exterior Entry Doors: To be 3'-0" x 7'-0" narrow stile aluminum and glass system with clear anodized factory finish or as selected by architect.

Shell Bldg. Hardware: Lock and latch sets shall be equal to Schlage Heavy Duty Series with lever handle design. All storefront entry doors shall be equipped with standard pull and locks with interchangeable Best cores.

Aluminum: All extruded aluminum sections shall be 2" x 4" flush glazed. Frames at entry areas will need to be larger to accommodate interior frame structural supports.

Glass & Glazing: Clear anodized aluminum framing with 1 inch insulated tinted glazing.

Weather Stripping: All exterior doors and windows shall have continuous weather stripping. Provide thresholds, door sweeps and drip guards at exterior man doors.

**DIVISION 9 FINISHES**

Exterior: Exterior finishes are anticipated to include brick, architectural masonry, natural stone, stucco, painted concrete, galvanized metals, and painted metals, as specified.

Interior: Building interior shall remain in a "cold dark shell" condition. All building perimeter walls shall remain framed and ready for tenant insulation, electrical, drywall, and finish work. Ceilings shall be by tenant.

Painting: All exterior non-galvanized steel surfaces, hollow metal doors and frames to receive 2 coats of enamel paint.

All structural steel, embeds, and deck shall be cleaned and/or painted where prime coat is missing, compromised or construction debris has accumulated.

Gypsum & Drywall: Board thickness shall be 5/8" at vertical and 5/8" at horizontal surface applications. Provide 5/8" type "X" gypsum board at rated walls and ceilings. Include walls to deck around utility and electrical rooms.

**DIVISION 10 NOT APPLICABLE**

**DIVISION 11 EQUIPMENT**

Fire Extinguishers: BY TENANT

**DIVISION 12 NOT APPLICABLE**

**DIVISION 13 NOT APPLICABLE**

**DIVISION 14 MECHANICAL**

Plumbing: One 1 ½-inch copper domestic water supply shall be provided overhead along rear perimeter of building for Tenant connection.

6 inch sanitary sewer service shall be provided within a 5' slab leave out area along rear perimeter of building for Tenant connection.

Main gas service manifold shall be provide for Tenant use.

Fire Protection System: The shell building shall include a complete fire sprinkler system throughout with "up" sprinkler heads as required by code. Sprinkler head drops required by Tenant finish out work shall be by Tenant.

Heating: Unit heaters shall be provided for freeze protection as required by code.

**DIVISION 15 ELECTRICAL**

| | |
|---|---|
| Electrical Services: | All shell building electrical requirements shall be provided per code.<br><br>Main electrical service conduit from utility transformer to building shall be provided per Austin Energy requirements. Tenant shall be responsible for conductors, main service disconnect, and distribution panels for Tenant Use. |
| Communications: | Shell building shall include communication conduit for Tenant use. |
| Fire Alarm: | A fully addressable fire alarm system per local code throughout the building. Fire alarm system shall be designed to accept additional devices for Tenant improvements. |

## SCHEDULE 2

## REQUIREMENTS FOR TENANT'S WORK OR OTHER ALTERATIONS, IMPROVEMENTS OR ADDITIONS BY TENANT

Tenant's Work to be completed pursuant to the Work Letter and any other improvements, alterations or additions which Landlord permits Tenant to construct or have performed in the Premises at any time prior to or during the Lease Term by a contractor retained by Tenant (collectively for the purposes of this Schedule 2, "Tenant's Work"), shall comply with the requirements set forth herein. When the Tenant's Work has been properly authorized, Tenant will receive written approval and consent to proceed with the applicable Tenant's Work to the Premises in accordance with the approved Plans (as defined below). All improvements, alterations and additions to the Premises, excepting movable furniture, Tenant Property (as defined in the Lease) and trade fixtures, shall, subject to the terms of the Lease, become a part of the realty and belong to Landlord.

1. TENANT'S WORK PLANS. Prior to commencing Tenant's Work in the Premises, Tenant shall submit for Landlord's approval Tenant's Plans for the Tenant's Work, in compliance with the following:

1.1 Specifications. Tenant shall cause an architect satisfactory to Landlord ("Tenant's Architect") to prepare complete architectural plans, drawings and specifications and complete engineered mechanical, structural and electrical working drawings for all of the Tenant's Work for the Premises (collectively, the "Plans"). The Plans will show (i) the subdivision (including partitions, walls and storage areas), layout, lighting, finish and decoration work (including carpeting and other floor coverings) for the Premises; and (ii) all other aspects of and specifications for the Tenant's Work. The Plans will be submitted to Landlord for approval to confirm that they are consistent with Landlord's established building standards and specifications, and if Landlord reasonably disapproves any aspect of the Plans, Landlord shall promptly advise Tenant in writing of such disapproval and the reasons therefor. Tenant will then cause Tenant's Architect to redesign the Plans to incorporate the revisions reasonably requested by Landlord so as to make the Plans consistent with Landlord's established building standards and specifications..

1.2 Compliance. Tenant's Plans will include locations and complete dimensions, and the Tenant's Work, as shown on the Plans, will (i) be compatible with the building shell, Landlord's Work and with the design, construction and equipment of the Premises; (ii) comply with all Applicable Laws of all governmental authorities having jurisdiction, and all applicable insurance regulations; and (iii) be of a nature and quality consistent with the overall objectives of Landlord for the Property, as determined by Landlord in its reasonable but subjective discretion.

2. PLAN APPROVAL

2.1 Plan Check/Permitting. Once approved by Landlord and Tenant, Tenant shall cause Tenant's Architect to submit the Plans to the appropriate governmental agencies for plan checking and the issuance of a building permit. Austin Energy's approval of the Tenant's

Green Building plan is a prerequisite to a building permit. Tenant will cause Tenant's Architect, *subject to Landlord's approval, to make any changes to the Plans which are requested by the* applicable governmental authorities to obtain the building permit. After approval of the Plans no further changes may be made without the prior written approval of both Landlord and Tenant.

2.2 Tenant Solely Responsible for Plans. Landlord will not check Tenant's Plans or drawings for building code compliance. Approval of the Plans by Landlord is not a representation that the same are in compliance with the requirements of governing authorities, and it shall be Tenant's responsibility to meet and comply with all federal, state, and local code requirements. Approval of the Plans does not constitute assumption of responsibility by Landlord or its architect for their accuracy, sufficiency or efficiency, and Tenant shall be totally responsible for such matters.

3. CONSTRUCTION OF TENANT'S WORK

3.1 Tenant shall enter into a construction contract (the "Construction Contract") with a contractor reasonably acceptable to Landlord, on a form and in substance reasonably acceptable to Landlord and Tenant (it being expressly agreed that the scope of Landlord's review and approval rights are limited to verification that the Construction Contract contains commercially reasonable provisions including, without limitation, insurance, indemnity and warranty provisions), for the installation of the Tenant's Work in accordance with the Plans. Tenant shall supervise the completion of such work and shall use diligent efforts to secure completion of the Tenant's Work in a good and workmanlike manner in accordance with the Plans and the Construction Contract.

3.2 With respect to each project, Landlord will provide Tenant with a checklist listing the items required to be furnished to Landlord in connection with the proposed work. Tenant shall furnish to Landlord prior to, during, or upon completion of Tenant's Work, as applicable, each of the items specified in the checklist attached hereto as Attachment 1.

3.3 Each contractor shall provide proof of licensing as a general or specialty contractor in accordance with Applicable Laws. Additionally, each contractor shall furnish proof of licensing in the city or municipality wherein the construction related activity is to take place.

3.4 Tenant will use Landlord's subcontractor for mechanical, electrical, plumbing, fire sprinkler, roofing and roofing consultant provided such subcontractors' rates are competitive.

3.5 Tenant and Tenant's contractors shall comply with all local, state and federal Applicable Laws pertaining to the performance of Tenant's Work and the completed improvements and all applicable safety regulations established by Landlord or the general contractor.

3.6 Tenant shall cause its contractor to provide warranties for not less than one (1) year against defects in workmanship, materials and equipment.

3.7 Tenant shall cause "As-Built Drawings" (excluding furniture, fixtures and equipment) to be delivered to Landlord following completion of Tenant's Work. In the event

these drawings are not provided to Landlord within thirty (30) days of request, Landlord may, at its election, cause said drawings to be obtained and Tenant shall pay to Landlord, as additional rent, the cost of producing these drawings.

3.8     Prior to commencement of any Tenant's Work in the Premises, Tenant and Tenant's contractors and subcontractors shall obtain and provide Landlord with certificates evidencing Workers' Compensation, public liability and property damage insurance in amounts and forms and with companies reasonably satisfactory to Landlord. Each general contractor and subcontractor employed on the Premises shall provide Landlord with a current certificate of insurance in effect for that contractor with a thirty (30) day notice of cancellation or revocation clause. Insurance requirements are as follows:

3.8.1     Comprehensive General Liability with a $2,000,000 Combined Single Limit covering the liability of Landlord and contractor for bodily injury and property damage arising as a result of the construction of the improvements and the services performed thereunder. Landlord shall be named as an additional insured.

3.8.2     Comprehensive Automobile Liability with a $2,000,000 Combined Single Limit covering Landlord and vehicles used by contractor (and any subcontractor) in connection with the construction of the improvements.

3.8.3     Workers' Compensation and Employer's Liability as required by law, for employees of the contractor (and any subcontractors) performing work on the Premises.

3.9     The following requirements shall be incorporated as "Special Conditions" into the Construction Contract between Tenant and its contractors and a copy thereof shall be furnished to Landlord prior to the commencement of Tenant's Work:

3.9.1     Prior to start of Tenant's Work, Tenant's contractor shall provide Landlord with a construction schedule in commercially reasonable form indicating the completion dates of all phases of Tenant's Work.

3.9.2     Tenant's contractor shall be responsible for the repair, replacement or clean-up of any damage done by it to other contractors' work which specifically includes accessways to the Premises which may be concurrently used by others.

3.9.3     Tenant's contractor shall accept the Premises prior to starting any trenching operations. Any rework of sub-base or compaction required after the contractor's initial acceptance of the Premises shall be done by Tenant's contractor, which shall include the removal from the Property of any excess dirt or debris.

3.9.4     Tenant's contractor shall contain its storage of materials and its operations within the Premises and such other space as such contractor may be assigned by Landlord or Landlord's contractor. Should Tenant's contractor be assigned space outside the Premises, such contractor shall move to such other space as Landlord or Landlord's contractor shall direct from time to time to avoid interference or delays with other work.

3.9.5    Tenant's contractor shall clean up the construction area and surrounding exterior areas daily. All trash, demolition materials and surplus construction materials shall be stored within the Premises and promptly removed from the Premises and the Property and disposed of in an approved sanitation site.

3.9.6    Tenant's contractor shall provide temporary utilities, portable toilet facilities, and potable drinking water as required for its work within the Premises and shall pay to Landlord's contractor the cost of any temporary utilities and facilities provided by Landlord's contractor at Tenant's contractor's request.

3.9.7    Tenant's contractor shall notify Landlord or Landlord's project manager of any planned work to be done on weekends or other than normal job hours.

3.9.8    Tenant's contractor or subcontractors shall not post signs on any part of the Property or on the Premises, or remove any notices of nonresponsibility.

3.10    Notwithstanding anything to the contrary herein or in the Lease, Tenant shall schedule a concrete pre-pour meeting with Landlord at least twenty-four (24) hours prior to having any concrete poured.

4.    COSTS.

4.1    Tenant shall promptly pay any and all costs and expenses in connection with or arising out of the performance of Tenant's Work (including the costs of permits therefor) and shall furnish to Landlord evidence of such payment upon request. Tenant agrees that Tenant will provide for the retainage of appropriate amounts from Tenant's contractors in accordance with prudent construction draw practices during the prosecution of the Tenant's Work.

4.2    Tenant shall pay Landlord an amount equal to Landlord's actual costs incurred in connection with its plan review in an amount not to exceed Five Thousand Dollars ($5,000.00).

5.    CONTRACTOR'S BONDS. Landlord may, in Landlord's discretion, require that Tenant obtain or cause its contractor to obtain and deliver evidence thereof to Landlord payment and performance bonds covering the faithful performance of the contract for the construction of the Tenant's Work and the payment of all obligations arising thereunder. In the alternative, and at Landlord's option, Tenant may appoint Landlord as its contractor, and in so doing, Tenant shall deposit with the Landlord a sum of money equal to the entire amount of the estimated construction cost, as is required for the installation of the Tenant's Work on the Premises. If Tenant deposits with Landlord monies for construction costs, it is agreed that Landlord will not be placed in a fiduciary capacity as a trustee, or any other fiduciary title, for the sums of monies in Landlord's possession. Tenant agrees to hold Landlord harmless from any and all claims, for workmanship and installation of improvements, and for merchantability and quality of goods used for the installation of Tenant's Work, as are requested by Tenant. Any bonds obtained pursuant hereto shall be for the mutual benefit of both Landlord and Tenant as obligees and beneficiaries.

6. COMPLIANCE WITH LAWS. Tenant will construct the Tenant's Work in a safe and lawful manner. Tenant shall, at its sole cost and expense, comply with all applicable laws and all regulations and requirements of. and all licenses and permits issued by, all municipal or other governmental bodies with jurisdiction. Copies of all filed documents and all permits and licenses shall be provided to Landlord. Any portion of the Tenant's Work which is not acceptable to any applicable governmental body, agency or department, shall be promptly repaired or replaced by Tenant at Tenant's expense. Notwithstanding any failure by Landlord to object to any such Tenant's Work. Landlord shall have no responsibility therefor.

7. MECHANIC'S LIENS

7.1 Tenant shall not suffer or permit to be enforced against the Premises or any part of the Property any mechanic's, materialman's, contractor's or subcontractor's lien arising out of any work of improvement, however it may arise.

7.2 Tenant shall notify Landlord at least ten (10) days prior to the commencement of construction of any Tenant's Work and Landlord shall have the right to post and record a notice of nonresponsibility in conformity with applicable law. Within twenty (20) days following completion of Tenant's Work, Tenant shall file a Notice of Completion and deliver to Landlord an unconditional release or waiver of lien executed by each contractor, subcontractor and materialman involved in Tenant's Work.

7.3 In the event any lien is filed against the Property or any portion thereof or against Tenant's leasehold interest therein, Tenant shall obtain the release and/or discharge of said lien, or at Tenant's discretion, file a bond in an appropriate amount to absolve the Property from such lien under the provisions of the Texas Property Code, within twenty (20) days after the filing thereof. In the event Tenant fails to do so, Landlord may obtain the release and/or discharge of said lien and Tenant shall indemnify Landlord for the costs thereof, including reasonable attorneys' fees, together with interest at the Applicable Interest Rate from the date of demand. Nothing herein shall prohibit Tenant from contesting the validity of any such asserted claim, provided Tenant has furnished to Landlord a lien release bond freeing the Premises from the effect of the lien claim.

8. INDEMNITY. Tenant shall indemnify and hold harmless Landlord and the Landlord Parties from and against (but subject to any waiver of subrogation required or permitted by this Lease) any and all losses, damages, costs (including costs of suits and reasonable attorneys' fees incurred), liabilities, or cause of action arising out of the actions of Tenant, the Tenant Parties, Tenant's contractor or subcontractor during the course of the construction of the Tenant's Work, including but not limited to mechanics', materialmen's or other liens or claims (and all costs or expenses associated therewith) asserted, filed or arising out of any such work. Further, unless arising from or out of Landlord's negligence or willful wrongdoing, Landlord shall not be liable for, and Tenant (except to the extent a claim against Tenant is waived by Landlord pursuant to Section 8.3 of this Lease) shall indemnify Landlord and hold it harmless from, all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from or out of any breach under this Schedule 2 or any occurrence in, upon, at or from the Premises or the construction of the Tenant's Work or any part thereof, or occasioned in whole or in part by an act or omission of

Tenant, the Tenant Parties, Tenant's contractor or subcontractors. TENANT ACKNOWLEDGES AND AGREES THAT ITS RELEASE AND INDEMNITY OBLIGATIONS HEREUNDER COVER AND RELATE TO, WITHOUT LIMITATION, ANY NEGLIGENT ACTION OR OMISSION OF LANDLORD OR THE LANDLORD PARTIES. All materialmen, contractors, artisans, mechanics, laborers and other parties hereafter contracting with Tenant or Tenant's contractor for the furnishing of any labor, services, materials, supplies or equipment with respect to any portion of the Premises are hereby charged with notice that they must look solely to Tenant for payment of same. Without limiting the generality of the foregoing, Tenant shall repair or cause to be repaired at its expense all damage to any portion of the Property caused by Tenant's contractor, its subcontractors or their employees. Tenant shall promptly pay to Landlord, upon notice thereof from Landlord, any costs incurred by Landlord to repair any damage caused by the Tenant's contractor or subcontractors or any costs incurred by Landlord in requiring the Tenant's contractor's or subcontractor's compliance with the rules and regulations promulgated by Landlord from time to time. This indemnification provision is in addition to, and not in limitation of, the provisions of Sections 8.4 and 8.5 of this Lease.

9.     CONSTRUCTION DEFECTS.  Landlord shall have no responsibility for the Tenant's Work and Tenant will remedy, at Tenant's own expense, and be responsible for any and all defects in the Tenant's Work that may appear during or after the completion thereof whether the same shall affect the Tenant's Work in particular or any parts of the Premises in general. Tenant shall reimburse Landlord for any reasonable costs or expenses incurred by Landlord during the Term of the Lease by reason of any defect in any portion of the Tenant's Work constructed by Tenant or the contractor or subcontractors, or by reason of inadequate cleanup following completion of the Tenant's Work.

10.     BUILDING STANDARDS.  All work shall conform to Landlord's established building standards and specifications. Tenant is required to make these standards part of the construction documents.

11.     ROOF PENETRATIONS. Following the completion of the initial Tenant's Work, if improvements penetrate the roof membrane, the penetrations will be sealed per Landlord roofing specifications and inspected by a qualified contractor approved by Landlord to maintain the roof warranty. The cost of inspection and all corrective work shall be borne by Tenant. Tenant shall use Landlord's original roofing contractor.

12.     SCHEDULE OF WORK.  Tenant may be required to provide a schedule of all work to be performed, subject to Landlord approval. All costs to produce such schedule shall be borne solely by Tenant.

13.     CLEAN UP AND DISPOSAL OF CONSTRUCTION DEBRIS. Trash containers serving the Premises are provided for trash generated from customary operations only and are not to be used for disposal of construction-related materials and debris. Unapproved usage will result in a penalty assessment to the Tenant equal to the cost of an extra pick-up service as provided under the current rate schedule of regular trash removal service.

14.     INSPECTION BY LANDLORD. Landlord reserves the following rights: (i) the right of inspection prior to, during and at completion of all construction and/or demolition, and

(ii) the right to order a total stop to all improvements underway for non-compliance with any of the above criteria after thirty (30) days notice of such non-compliance and the failure of Tenant to commence and to diligently prosecute a cure of the same.

15.     GENERAL PROVISIONS

15.1     All materials, work, installations and decorations of any nature whatsoever brought on or installed in the Premises before the commencement of the Term or throughout the Term shall be at Tenant's risk, and neither Landlord nor any party acting on Landlord's behalf shall be responsible for any damage thereto or loss or destruction thereof due to any reason or cause whatsoever.

15.2     Nothing contained herein shall make or constitute Tenant as the agent of Landlord.

## ATTACHMENT 1 TO SCHEDULE 2

## ITEMS TO BE FURNISHED TO LANDLORD FOR EACH WORK OF IMPROVEMENT

1. Plans & specifications of alterations for Landlord's reasonable approval.
2. Contractor(s), address, telephone number, contact person.
3. Copy of Contractor's state and city business license.
4. Copy of building permit in advance of contractor mobilization.
5. Copy of final building inspection approval.
6. Copy of certificate of insurance naming Landlord as additional insured. Insurance to include Comprehensive General Liability, Comprehensive Auto, Workers' Compensation and Employer's Liability provided in advance of contractor mobilization.
7. Signed unconditional lien waiver in favor of Landlord from general contractor and all subcontractors with contracts pursuant to Section 5(d) of Exhibit B.
8. Schedule of work.
9. Tenant and Contractor Agreement.
10. Copy of permit Plans approved for construction.
11. Copy of as-builts upon completion of tenant improvement work.
12. Copy of recorded Notice of Completion.
13. Final Certificate of occupancy.
14. Evidence of insurance for All-Risk/Builder's Risk Insurance to the amount of improvements.
15. Contractor Schedule of Values for all 16 CSI Divisions of work in advance of construction commencement.

**SCHEDULE 3**

**AUSTIN ENERGY GREEN BUILDING-COMMERCIAL GUIDEBOOK V 2010_02**
**(it being acknowledged and agreed, however, that same may be amended from time to time)**

Available at www.austinenergy.com.

A pdf copy is also available from Landlord upon written request.

**EXHIBIT C**

**RULES AND REGULATIONS**

1. No sign, advertisement, name or notice shall be installed or displayed on any part of the outside of the Premises or in any part of the Common Area without the prior written consent of Landlord except as otherwise provided in the Lease. In no event shall Tenant have the right to install any sign or other advertising on the roof of the Premises. Landlord shall have the right to remove, at Tenant's expense and without notice, any sign or other advertising installed or displayed in violation of this rule.

2. All loading and unloading of goods shall be done only at such times, in the areas, and through the entrances designated for such purposes. The delivery or shipping of merchandise, supplies and fixtures to and from the Premises shall be subject to such rules and regulations as are necessary, in the judgment of Landlord, for the proper operation of the Premises or the Property.

3. Tenant shall not place anything or allow anything to be placed on the glass of any window, door, partition or wall which may appear unsightly from outside the Premises, in Landlord's reasonable discretion as provided in the Lease. No awnings or other projection shall be attached to the outside walls of a building without the prior written consent of Landlord except as expressly provided in Tenant's Lease.

4. Tenant shall not obstruct any sidewalks, exits, entrances, or loading docks of the Property.

5. All cleaning and janitorial services for the Premises shall be provided, at Tenant's sole cost and expense, exclusively by or through Tenant or Tenant's janitorial contractors.

6. Except as expressly provided in Tenant's Lease, Tenant shall not use or keep in the Premises any kerosene, gasoline or inflammable or combustible fluid or material other than those limited quantities necessary for the operation or maintenance of office and medical equipment. Tenant shall not use or permit to be used in the Premises any foul or noxious gas or substance, or permit or allow the Premises to be occupied or used in a manner offensive or objectionable to Landlord by reason of noise, odors or vibrations.

7. The toilet rooms, toilets, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed, and no foreign substances of any kind whatsoever shall be thrown therein. The expense of any breakage, stoppage, or damage resulting from a violation of this provision shall be borne by the Tenant, whose employees, agents or invitees shall have caused it.

8. Tenant shall not install any radio or television antenna, phonographs, loudspeaker or other device on the roof or exterior walls of a building except as expressly provided in the Lease. Tenant shall not interfere with radio or television broadcasting or reception from or in the Property. In addition, Tenant shall conduct its business in a quiet and orderly manner so as not to create unreasonable noise.

9.   Canvassing, soliciting and distribution of handbills or any other written material, and peddling in the Common Area and other portions of the Property are expressly prohibited.

10.  All garbage and refuse shall be kept in the kind of container specified by Landlord, and shall be placed outside of the Premises prepared for collection in the manner and at the times and places specified by Landlord.  If Landlord shall provide or designate a service for picking up refuse and garbage, Tenant shall use the same at Tenant's cost.  Tenant shall pay the cost of removal of any of Tenant's refuse or rubbish.

11.  Landlord will furnish Tenant with two keys to each door lock in the Premises.  Landlord may impose a reasonable charge for any additional keys.  Tenant, upon termination of its tenancy, shall deliver to Landlord the keys of all doors which have been furnished to, or otherwise procured by Tenant.

12.  Tenant assumes any and all responsibility for protecting its Premises from theft and robbery.  Such responsibility shall include keeping doors locked and other means of entry to the Premises closed.

13.  Subject to any limitations contained in Tenant's Lease, Landlord reserves the right from time to time, in Landlord's sole and absolute discretion, exercisable without liability to Tenant:  (a) to change the name of the Property; (b) to change the address of the Property, and/or (c) to install, replace or change any signs in, on or about the Common Areas of the Property; provided however, that any monument signage devoted exclusively to Tenant's business and approved by Landlord shall not thereafter be replaced, removed or altered by Landlord except upon Tenant's advance written consent.

14.  Tenant shall provide Landlord with the names of two (2) individuals, together with phone numbers and addresses, for Landlord to contact in the case of an emergency.

15.  These Rules and Regulations are in addition to, and shall not be construed to in any way modify or amend, in whole or in part, the terms, covenants, agreements and conditions of any lease of premises in the Property.

16.  Landlord reserves the right to make such other and reasonable Rules and Regulations as, in its judgment, may from time to time be needed for safety, security, care and cleanliness of the Property and for the preservation of good order therein.  Tenant agrees to abide by all such Rules and Regulations hereinabove stated and any additional rules and regulations which are adopted.

17.  Tenant shall be responsible for the observance of all of the foregoing rules by Tenant's employees, agents, clients, customers (while in the Premises), invitees or guests.

## PARKING RULES AND REGULATIONS

In addition to the foregoing rules and regulations and the parking provisions contained in the Lease to which this Exhibit C is attached, the following rules and regulations shall apply with respect to the use of the Property's parking areas.

1.      Every parker is required to park and lock his/her own vehicle. All responsibility for damage to or loss of vehicles is assumed by the parker and Landlord shall not be responsible for any such damage or loss by water, fire, defective brakes, the act or omissions of others, theft, or for any other cause.

2.      Tenant and its employees shall only park in parking areas designated by Landlord. Tenant shall not leave vehicles in the parking areas overnight nor park any vehicles in the parking areas other than automobiles, motorcycles, motor driven or non-motor driven bicycles or four wheeled trucks.

3.      No overnight or extended term storage of vehicles shall be permitted.

4.      Vehicles must be parked entirely within painted stall lines of a single parking stall.

5.      All directional signs and arrows must be observed.

6.      The speed limit within all parking areas shall be five (5) miles per hour.

7.      Parking is prohibited: (a) in areas not striped for parking; (b) in aisles; (c) where "no parking" signs are posted; (d) on ramps; (e) in cross-hatched areas; (f) fire access lanes and (g) in reserved spaces and in such other areas as may be designated by Landlord.

8.      Washing, waxing, cleaning or servicing of any vehicle in any area not specifically reserved for such purpose is prohibited.

9.      Landlord may refuse to permit any person who violates these rules to park in the parking areas, and any violation of the rules shall subject the vehicle to removal, at such vehicle owner's expense.

**EXHIBIT D**

**COMMENCEMENT DATE MEMORANDUM**

With respect to that certain Medical Office Lease ("Lease") dated August 30th, 2013, by and between Mueller Emergency Center, LLC, a Texas limited liability company ("Tenant"), and Catellus Market District, LLC, a Delaware limited liability company ("Landlord"), whereby Landlord leased to Tenant and Tenant leased from Landlord approximately 15,000 square feet of the building located at 1801E. 51st., Bldg. H ____________, Austin, Texas 78723 ("Premises"), Tenant hereby acknowledges and certifies to Landlord as follows:

(1) Landlord delivered possession of the Premises to Tenant in a Substantially completed condition on ____________________ ("Commencement Date");

(2) The Rent commenced on ________________________ ("Base Rent Start Date");

(3) The Premises contain 15,000 square feet of space; and

(4) Tenant has accepted and is currently in possession of the Premises and the Premises are acceptable for Tenant's use.

IN WITNESS WHEREOF, this Commencement Date Memorandum is executed the 30th day of August, 20 13.

"Tenant"

MUELLER EMERGENCY CENTER, LLC,
a Texas limited liability company

By:______________________________
Its:______________________________

981906.07 OC
373354-00001 7-10-13 bdw lry

**EXHIBIT E**

**PROPERTY EXCLUSIVES**

EXCLUSIVES 9(b)(1)

HEB

Except for the HEB Premises, the following shall not be permitted: food store business or food department for the storage, display, operation or sale of: (i) edible groceries, including, but not limited to meats, poultry, seafood, produce, frozen foods, dairy products, bakery products, wine, malt, alcoholic or non alcoholic beverages, and any other items of food and beverage, (ii) health and beauty products, including but not limited to hair products and supplies, cosmetics, skin and body products, vitamins, herbs, and nutritional supplements, (iii) pet food and supplies, (iv) greeting cards, gift wrapping supplies, and party products, (v) baby apparel, supplies, and furniture, (vi) tobacco products, (vii) lawn and garden products, barbeque grills and related equipment and supplies, (viii) fresh flowers, plants, floral supplies and products, (ix) non-prescription pharmaceuticals, (x) prescription pharmaceuticals or other products which are required by law to be dispensed by a registered pharmacist, (xi) gasoline or other fuel for vehicles, (xii) check cashing, payday loan(s) or paycheck advance(s), or (xiii) cellular phone(s), cellular phone accessories, and/or cellular phone services, or any of them (the items listed in (i) through (ix) above being collectively referred to as the "Restricted Items"); provided, however, the following uses shall be permitted as exceptions to the foregoing restriction:

(a) the "Incidental Sale" (as defined below) of Restricted Items (except fresh meat, poultry, seafood and produce) by a store whose principal business is not a food store, the term "Incidental Sale" of Restricted Items being defined to mean that the sale of (i) any one of the Restricted Items shall not exceed ten percent (10%) of gross sales by such store or (ii) more than one of the Restricted Items shall not exceed thirty percent (30%) of gross sales by such store in the aggregate;

(b) one (1) or more restaurants whose principal business is the sale of prepared food for on-premises consumption and whose sale of prepared food for off-premises consumption does not exceed thirty percent (30%) of any such restaurant's total gross sales (subject to the exceptions expressly set forth below with respect to particular quick service restaurants), provided that (i) no restaurants shall be permitted on the Option Tracts, and (ii) within Building "C", no individual restaurant may exceed 2,500 square feet of Floor Area and the maximum Floor Area of all restaurants situated thereon shall not exceed 5,000 square feet of Floor Area in the aggregate.

| | |
|---|---|
| | Moreover, no restaurants permitted above shall exceed the following limitations on the percentage of gross sales from such operations derived from the sale of alcoholic beverages: Building "C" – twenty percent (20%). |
| Dental Office | General and pediatric dental office |
| Great Clips | Except for the Great Clips premises, the following shall not be permitted: a unisex walk-in, discount hair salon, including, but not limited to, any salon brand owned and operated by Regis Corp, Hair Cuttery, Fantastic Sam's or Sports Clips; provided, however, that the foregoing restriction shall not prevent (a) a lease with a "full service" hair salon/spa; provided that the salon/spa is not marketed as a unisex, walk-in, discount salon/spa; (b) a lease with a salon that specializes in children's haircuts such as (without limitation) "Cool Cuts 4 Kids"; or (c) a lease with a traditional barbershop such as (without limitation) "Floyd's 99 Barbershop." |
| Liquor Store | Landlord agrees not to lease any other premises in the Shopping Center to another tenant whose "primary use" is the operation of a retail liquor store selling beer, wine or liquor for off-premises consumption. Tenant's exclusive shall not apply to any tenant in the Shopping Center that operates as a restaurant serving beer, wine or liquor as part of its overall business as a restaurant. As used herein, "primary use" shall mean the use of twenty percent (20%) or more of the floor area of any premises for the sale or display of Tenant's exclusive use items. |
| Subway | Landlord agrees not to lease any other premises in the Shopping Center owned by Landlord to another tenant whose primary business is the operation of a restaurant serving submarine sandwiches and/or deli-style sandwiches ("Tenant's Exclusive Use"). For the avoidance of doubt, in no event shall Tenant's Exclusive Use prohibit or limit the operation of a restaurant serving gyros, wraps and/or doner kebaps in the Shopping Center. Tenant's Exclusive Use shall not apply to premises governed by leases entered into prior to the Effective Date and/or to any premises shown on the Site Plan as HEB. As used herein, "primary business" shall mean the operation in question derives in excess of fifty percent (50%) of its revenues (excluding the sale of beverages) from the sales of submarine sandwiches and/or deli-style sandwiches. |
| Doner Kebaps/Kebabs | Landlord agrees not to lease any other premises in the Shopping Center owned by Landlord to another tenant whose primary business is the operation of a restaurant serving gyros, kebabs, doner kebaps or any other Mediterranean style entrees. As used |

herein, "primary business" shall mean the operation in question derives in excess of twenty percent (20%) of its revenues from the sales of gyros and/or kebabs and/or doner kebaps and/or any other Mediterranean style entrees.

| | |
|---|---|
| Pizza | Landlord agrees not to lease any other premises in the Shopping Center owned by Landlord to another tenant whose primary business is the operation of a restaurant serving pizza or wings for delivery or take-out. As used herein, "primary business" shall mean the operation in question derives in excess of twenty percent (20%) of its revenues from the sales of pizza or wings for delivery or take-out. |
| Sushi | Landlord agrees not to lease any other premises in the Shopping Center owned by Landlord to another tenant whose primary business is the operation of a restaurant whose primary sales are derived from the sale of Japanese food. As used herein, "primary business" shall mean the operation in question derives in excess of twenty percent (20%) of its revenues from the sales of Japanese food. |
| Dermatology | Landlord agrees not to lease any other premises in the Shopping Center owned by Landlord to another tenant whose primary business is the operation of a dermatology medical practice to include general, surgical and cosmetic dermatology. As used herein, "primary business" shall mean the operation in question derives in excess of fifty percent (50%) of its revenues from the exclusive use described above. |

**EXHIBIT F**

**PROHIBITED USES**

In no event shall the Premises be used for any of the following uses:

(1) Any use in violation of the Master Declaration:

(2) Any use in violation of the EC/TC Declaration:

(3) Any use in violation of the CC&Rs: and

(4) Any of the following:

(i) Fire, going out of business, relocation, bankruptcy or similar sales (unless pursuant to court order);

(ii) Operation whose principal use is a massage parlor (except for therapeutic massage clinic (such as "Massage Envy");

(iii) Tattoo parlor, body art and/or piercing parlor;

(iv) Gun range:

(v) Sports or entertainment facility;(vi) Hotel or lodging facility;

(vi) Gas station;

(5) Any purpose other than retail, office and service establishments common to first-class shopping centers of comparable size located in the Austin, Texas area. Notwithstanding the foregoing, office use shall not exceed fifteen percent (15%) of the Floor Area of the Premises. Service establishments shall not be deemed to be "office use" and shall include, but not be limited to, the business of financial institutions, investment (such as "Edward Jones"), real estate (such as "Century 21"), and insurance offices (such as "State Farm"), cleaners (such as "Jack Brown Cleaners"), barber (such as "Floyd's Barber Shop") and beauty shops (such as "Jackson Ruiz Salon"), nail salons, shoe repair shops (such as "Austin Shoe Hospital"), optical stores and optician offices (such as "LensCrafters"), individual dental stores and dental offices (including orthodontist, pediatric or similar dental offices), therapeutic massage clinic (such as "Massage Envy"), individual doctor's offices and travel agencies, children's haircut stores such as "Cool Cuts 4 Kids", tanning salon such as "Palm Beach Tan", tax preparation offices such as "Liberty Tax".

(6) No use or operation will be made, conducted or permitted on or with respect to all or any part of the Premises, for any of the following uses: any legal nuisance: any use which violates laws or requirements of governmental authorities having jurisdiction over the Property; the primary use of any building as a warehouse and distribution facility; an assembly hall; distillation operation; mobile home or trailer park, the drilling for and/or removal of subsurface substances: kennel or veterinary clinic where animals are kept overnight; school, children's day

care provider, and children's gym or play center; church; assembly hall; museum; pawn shop; movie theatre; gym or health club; game room or amusement park (provided that gamerooms that are ancillary to another primary use of a tenant of the Property shall not be prohibited if such tenant is otherwise permitted hereunder); skating rink; pool hall or billiard parlor; bowling alley; dancehall; saloon, cocktail lounge, nightclub or bar (including a restaurant which derives more than the applicable alcohol cap on a building in the Property); mortuary or funeral home; automobile body and repair shop; car wash; flea market; or adult book store selling sexually explicit material.

**EXHIBIT G-1**
**BELLAIRE EMERGENCY CENTER GUARANTY**

THIS GUARANTY OF LEASE ("Guaranty") is made as of this 30th day of August ~~July,~~ 2013 by BELLAIRE EMERGENCY CENTER, LLC, a Texas limited liability company ("Guarantor") in favor of CATELLUS MARKET DISTRICT, LLC, a Delaware limited liability company ("Landlord"), in connection with that certain retail lease of substantially even date herewith (the "Lease") pursuant to which Landlord leases to Mueller Emergency Center, LLC, a Texas limited liability company ("Tenant"), those premises generally referred to as a portion of the Mueller Market District, in the City of Austin, State of Texas, consisting of approximately 15,000 square feet of space within such building as more particularly described in the Lease (the "Premises").

A. Landlord requires this Guaranty as a condition to its execution of the Lease and the performance of the obligations to be performed under the Lease by Landlord.

B. Guarantor has agreed to provide this Guaranty to induce Landlord to enter into the Lease with Tenant and perform its obligations under the Lease.

C. Guarantor is an affiliate of Tenant, and will receive substantial commercial benefit through Tenant's execution and performance of the Lease.

In consideration of Landlord's agreement to execute the Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor does hereby agree with Landlord as follows:

1. The Lease is hereby incorporated into and made a part of this Guaranty by this reference.

2. Guarantor hereby absolutely, irrevocably and unconditionally guarantees, as a primary obligor and not as a surety, without deduction by reason of setoff, defense or counterclaim, the full and punctual payment of all sums of rent and other amounts payable under the Lease and the full and punctual performance of all terms, covenants and conditions in the Lease to be kept, performed and/or observed by Tenant. Guarantor's obligations under this Guaranty are continuing and unconditional and shall terminate only upon the earlier of (a) the full and complete payment and performance of all guaranteed obligations; or (b) the date on which Tenant has achieved "Net Cash Flow" (as defined below) for six (6) months in an amount greater than one hundred fifty percent (150%) of the six (6) month portion of the guaranteed obligations then applicable (provided that such date shall in no event be deemed to occur prior to the second (2nd) anniversary of the Base Rent Start Date of the Lease); or (c) the date on which Landlord approves a release of this Guaranty, in Landlord's sole discretion, in connection with an assignment of the Lease to a party that is not an affiliate of Guarantor. For purposes of this Guaranty, the term "Net Cash Flow" means the amount by which Tenant's monthly payments received from patients and third party payors exceeds Tenant's monthly operating expenses of EDMG, Fixed and Variable Expenses as detailed on their customary financial reporting.

3. Guarantor hereby agrees that, without the consent or demand of or notice to Guarantor and without affecting any of the obligations of Guarantor hereunder: (a) the Lease may be extended and any other term, covenant or condition of the Lease may be amended,

compromised, released or otherwise altered by Landlord and Tenant, and Guarantor does guarantee and promise to perform all of the obligations of Tenant under the Lease as so extended, amended, compromised, released or altered; (b) any guarantor of or party to the Lease may be released, substituted or added; (c) any right or remedy under the Lease may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) Landlord or any other person may deal in any manner with Tenant, any guarantor, any party to the Lease or any other person; (e) Landlord may permit Tenant to holdover the Premises beyond the Lease Term; and (f) all or any part of the Premises or of Tenant's rights or liabilities under the Lease may be sublet, assigned or assumed. Notwithstanding any of the foregoing actions, subject to the provisions set forth in Section 2 above, Guarantor shall be and remain bound by the obligations set forth in this Guaranty. Without in any way limiting the foregoing, Guarantor agrees not to unreasonably withhold its consent to any sublease, assignment of the Lease or other modification of the Lease which is agreed to by Landlord and Tenant.

4.      The obligations of Guarantor under this Guaranty are independent of the obligations of Tenant and Guarantor hereby knowingly and voluntarily waives and agrees not to assert or take advantage of: (a) any right to require Landlord to proceed against Tenant, or any other guarantor or person or to pursue any other security or remedy before proceeding against Guarantor; (b) any defense based on the genuineness, validity, regularity or enforceability of the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability of Tenant or any other person; and (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election of remedies, or otherwise) of the liability of Tenant, of the subrogation rights of Guarantor or of the right of Guarantor to proceed against Tenant for reimbursement.

5.      Guarantor hereby knowingly and voluntarily waives and agrees not to assert or take advantage of (a) any right or defense based on the absence of any or all presentments, demands (including demands for performance), notices (including notices of any adverse change in the financial status of Tenant, notices of any other facts which increase the risk to Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each and every kind; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense based on a lack of diligence or failure or delay by Landlord in enforcing its rights under this Guaranty or the Lease. In addition to the foregoing, Guarantor acknowledges and agrees that any partial payment or performance by Tenant or otherwise or other circumstance which operates to toll any statute of limitations as to Tenant shall operate to toll the statute of limitations as to Guarantor.

6.      Guarantor hereby knowingly and voluntarily waives and agrees not to assert or take advantage of any right to (a) exoneration if Landlord's actions shall impair any security or collateral of Guarantor; (b) any security or collateral held by Landlord; (c) require Landlord to proceed against or exhaust any security or collateral before proceeding against Guarantor; (d) require Landlord to pursue any right or remedy for the benefit of Guarantor.

7.      Guarantor shall not, without the prior written consent of Landlord, commence, or join with any other person in commencing, any bankruptcy, reorganization or insolvency proceeding against Tenant. Guarantor's obligations under this Guaranty shall in no way be affected by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee

of Tenant or by any disaffirmance or abandonment of the Lease or any payment under this Guaranty by a trustee of Tenant in any bankruptcy proceeding including, without limitation, any impairment, limitation, or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease resulting from the operation of any present or future provision of any federal or state bankruptcy or insolvency law or other statute or from the decision of any court. Guarantor shall file in any bankruptcy or other proceeding in which the filing of claims is required or permitted by law all claims which Guarantor may have against Tenant relating to any indebtedness of Tenant to Guarantor and will assign to Landlord all rights of Guarantor thereunder until all Lease obligations are paid in full. Landlord shall have the sole right to accept or reject any plan proposed in such proceeding and to take any other action that a party filing a claim is entitled to do relating to any indebtedness of Tenant to Landlord under the Lease. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Landlord the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Landlord all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled; provided, however, that Guarantor's obligations hereunder shall not be satisfied except to the extent that Landlord receives cash by reason of any such payment or distribution. If Landlord receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty. In the event any payment by Tenant to Landlord is held to constitute a preference, fraudulent conveyance or otherwise required to be returned by Landlord, such payment by Tenant to Landlord shall not in any way diminish Guarantor's obligations hereunder and this Guaranty shall continue to be effective. Furthermore, Landlord has no duty to disclose to Guarantor any information that Landlord may receive regarding the financial status of Tenant and Guarantor assumes full responsibility to obtain such information directly from Tenant.

8.     Until all the Tenant's obligations under the Lease are fully performed, Guarantor: (a) shall have no right of subrogation, contribution or reimbursement against the Tenant by reason of any payments or acts of performance by Guarantor under this Guaranty; (b) subordinates any liability or indebtedness of the Tenant now or hereafter held by Guarantor to the obligations of the Tenant under, arising out of or related to the Lease or Tenant's use of the Premises; and (c) acknowledges that the actions of Landlord may affect or eliminate any rights of subrogation, contribution or reimbursement of Guarantor as against Tenant without any liability or recourse against Landlord.

9.     Prior to the execution of this Guaranty and at any time during the Term of the Lease upon ten (10) business days prior written notice from Landlord, Guarantor agrees to provide Landlord with an annual financial statement of Guarantor for the current year. Guarantor's financial statements are to be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Guarantor, audited by an independent certified public accountant. Guarantor represents and warrants that all such financial statements shall be materially true and correct statements of Guarantor's financial condition and an officer of Guarantor shall certify in writing to Landlord to that effect.

10.     The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between Landlord and Guarantor relating to the Lease shall be cumulative and not alternative and such

rights, powers and remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

11.     Subject to the limitations hereinafter set forth, this Guaranty applies to, inures to the benefit of and binds all parties hereto, their heirs, devisees, legatees, executors, administrators, representatives, successors and assigns.  This Guaranty may be assigned by Landlord voluntarily or by operation of law.  Guarantor may not assign, delegate or otherwise transfer all or any part of its rights and obligations under this Guaranty without the express prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion, it being understood that Landlord is relying upon the financial strength and integrity of Guarantor in this transaction.

12.     This Guaranty shall constitute the entire agreement between Guarantor and the Landlord with respect to the subject matter hereof.  No provision of this Guaranty or right of Landlord hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord. The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof.  No course of dealing between Landlord and Tenant shall alter or affect the enforceability of this Guaranty or Guarantor's obligations hereunder.

13.     Guarantor hereby agrees to indemnify, protect, defend and hold Landlord harmless from and against, all losses, costs and expenses including, without limitation, all interest, default interest, post-petition bankruptcy interest and other post-petition obligations, late charges, court costs and attorneys' fees, which may be suffered or incurred by Landlord in enforcing or compromising any rights under this Guaranty or in enforcing or compromising the performance of Tenant's obligations under the Lease.

14.     The term "Landlord" whenever hereinabove used refers to and means the Landlord in the foregoing Lease specifically named and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee of such Lease or any part thereof, whether by assignment or otherwise. The term "Tenant" whenever hereinabove used refers to and means the Tenant in the foregoing Lease specifically named and also any assignee or subtenant of said Lease and also any successor to the interests of said Tenant, assignee or sublessee of such Lease or any part thereof, whether by assignment, sublease or otherwise including, without limitation, any trustee in bankruptcy and any bankruptcy estate of Tenant, Tenant's assignee or sublessee.

15.     If Guarantor shall become bankrupt or insolvent, or any application shall be made to have Guarantor declared bankrupt or insolvent, or Guarantor shall make an assignment for the benefit of creditors, or Guarantor shall enter into a proceeding for the dissolution of marriage, or in the event of death of Guarantor, notice of such occurrence or event shall be promptly furnished to Landlord by such Guarantor or Guarantor's fiduciary. This Guaranty shall extend to and be binding upon each Guarantor's successors and assigns, including, but not limited to, trustees in bankruptcy and Guarantor's estate.

16.     Guarantor waives any rights Guarantor has under, or any requirements imposed by, (i) Chapter 34 of the Texas Business and Commerce Code, as amended, (ii) Section 17.001 of the Texas Civil Practice and Remedies Code, as amended, and (iii) Rule 31 of the Texas Rules of Civil Procedure, as amended.

17.     Any notice, request, demand, instruction or other communication to be given to any party hereunder shall be in writing and sent by registered or certified mail, return receipt requested in accordance with the notice provisions of the Lease.  The Tenant shall be deemed Guarantor's agent for service of process and notice to Guarantor delivered to the Tenant at the address set forth in the Lease shall constitute proper notice to Guarantor for all purposes. Notices to Landlord shall be delivered to Landlord's address set forth in the Lease.  Landlord, at its election, may provide an additional notice to Guarantor at the address provided under Guarantor's signature below.

18.     If either party hereto participates in an action against the other party arising out of or in connection with this Guaranty, the prevailing party shall be entitled to have and recover from the other party reasonable attorneys' fees, collection costs and other costs incurred in and in preparation for the action.  In addition to the foregoing, Guarantor shall be responsible for any attorneys' fees, collection costs and other costs of Tenant arising out of any dispute under the Lease.  Guarantor hereby waives any right to trial by jury and further waives and agrees not to assert or take advantage of any defense based on any claim that any arbitration decision binding upon Landlord and Tenant is not binding upon Guarantor.

19.     Guarantor represents and warrants to Landlord that:  (a) this Guaranty has been duly executed and delivered to Landlord by Guarantor; (b) this Guaranty is a valid and legally binding obligation of Guarantor, enforceable in accordance with its terms, except as such validity, binding nature or enforceability may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or other laws or court decisions relating to or affecting the rights of creditors generally; (c) Guarantor has received a true, correct and complete copy of and is fully familiar with the Lease and represents and warrants that to the best of Guarantor's knowledge, all necessary action has been taken by Tenant to authorize Tenant's execution and delivery of the Lease; and (d) Tenant is under no disability in connection with its execution and delivery of the Lease and there are no defenses to Tenant's full payment and performance of all of its obligations under the Lease.  Within ten (10) business days following Landlord's request, Guarantor shall deliver to Landlord an estoppel certificate certifying, among other things, that this Guaranty is in full force and effect and has not been amended or terminated.

20.     Guarantor agrees that all questions, actions and disputes with respect to this Guaranty or the performance or enforcement thereof shall be governed by, and decided in accordance with, the laws of the State of Texas, and venue shall be set in any federal or state court located in the County where the Premises is located.

21.     Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall nevertheless be effective.

22.     Time is strictly of the essence under this Guaranty and any amendment, modification or revision hereof.

23. If more than one party executes a Guaranty of Lease guaranteeing Tenant's obligations under the Lease, then each party's obligations shall be joint and several.

THE UNDERSIGNED HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS CONTAINED IN THIS GUARANTY INCLUDING, WITHOUT LIMITATION, ALL WAIVERS CONTAINED IN THIS GUARANTY.

Executed as of the date of the Lease.

BELLAIRE EMERGENCY CENTER, LLC,
a Texas limited liability company

By: Neighbors Health System, Inc., its Manager

By: Setul Patel, MD, its President and Chief Executive Officer

Address of Guarantor:

**EXHIBIT G-2**
**KINGWOOD EMERGENCY CENTER GUARANTY**

THIS GUARANTY OF LEASE ("Guaranty") is made as of this 30th day of ~~July~~ August, 2013 by KINGWOOD EMERGENCY CENTER, LLC, a Texas limited liability company ("Guarantor") in favor of CATELLUS MARKET DISTRICT, LLC, a Delaware limited liability company ("Landlord"), in connection with that certain retail lease of substantially even date herewith (the "Lease") pursuant to which Landlord leases to Mueller Emergency Center, LLC, a Texas limited liability company ("Tenant"), those premises generally referred to as a portion of the Mueller Market District, in the City of Austin, State of Texas, consisting of approximately 15,000 square feet of space within such building as more particularly described in the Lease (the "Premises").

A. Landlord requires this Guaranty as a condition to its execution of the Lease and the performance of the obligations to be performed under the Lease by Landlord.

B. Guarantor has agreed to provide this Guaranty to induce Landlord to enter into the Lease with Tenant and perform its obligations under the Lease.

C. Guarantor is an affiliate of Tenant, and will receive substantial commercial benefit through Tenant's execution and performance of the Lease.

In consideration of Landlord's agreement to execute the Lease and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor does hereby agree with Landlord as follows:

1. The Lease is hereby incorporated into and made a part of this Guaranty by this reference.

2. Guarantor hereby absolutely, irrevocably and unconditionally guarantees, as a primary obligor and not as a surety, without deduction by reason of setoff, defense or counterclaim, the full and punctual payment of all sums of rent and other amounts payable under the Lease and the full and punctual performance of all terms, covenants and conditions in the Lease to be kept, performed and/or observed by Tenant. Guarantor's obligations under this Guaranty are continuing and unconditional and shall terminate only upon the earlier of (a) the full and complete payment and performance of all guaranteed obligations; or (b) the date on which Tenant has achieved "Net Cash Flow" (as defined below) for six (6) months in an amount greater than one hundred fifty percent (150%) of the six (6) month portion of the guaranteed obligations then applicable (provided that such date shall in no event be deemed to occur prior to the second (2nd) anniversary of the Base Rent Start Date of the Lease); or (c) the date on which Landlord approves a release of this Guaranty, in Landlord's sole discretion, in connection with an assignment of the Lease to a party that is not an affiliate of Guarantor. For purposes of this Guaranty, the term "Net Cash Flow" means the amount by which Tenant's monthly payments received from patients and third party payors exceeds Tenant's monthly operating expenses of EDMG, Fixed and Variable Expenses as detailed on their customary financial reporting.

3. Guarantor hereby agrees that, without the consent or demand of or notice to Guarantor and without affecting any of the obligations of Guarantor hereunder: (a) the Lease

may be extended and any other term, covenant or condition of the Lease may be amended, compromised, released or otherwise altered by Landlord and Tenant, and Guarantor does guarantee and promise to perform all of the obligations of Tenant under the Lease as so extended, amended, compromised, released or altered; (b) any guarantor of or party to the Lease may be released, substituted or added; (c) any right or remedy under the Lease may be exercised, not exercised, impaired, modified, limited, destroyed, or suspended; (d) Landlord or any other person may deal in any manner with Tenant, any guarantor, any party to the Lease or any other person; (e) Landlord may permit Tenant to holdover the Premises beyond the Lease Term; and (f) all or any part of the Premises or of Tenant's rights or liabilities under the Lease may be sublet, assigned or assumed. Notwithstanding any of the foregoing actions, subject to the provisions set forth in Section 2 above, Guarantor shall be and remain bound by the obligations set forth in this Guaranty. Without in any way limiting the foregoing, Guarantor agrees not to unreasonably withhold its consent to any sublease, assignment of the Lease or other modification of the Lease which is agreed to by Landlord and Tenant.

4. The obligations of Guarantor under this Guaranty are independent of the obligations of Tenant and Guarantor hereby knowingly and voluntarily waives and agrees not to assert or take advantage of: (a) any right to require Landlord to proceed against Tenant, or any other guarantor or person or to pursue any other security or remedy before proceeding against Guarantor; (b) any defense based on the genuineness, validity, regularity or enforceability of the Lease; (c) any right or defense that may arise by reason of the incapacity, lack of authority, death or disability of Tenant or any other person; and (d) any right or defense arising by reason of the absence, impairment, modification, limitation, destruction or cessation (in bankruptcy, by an election of remedies, or otherwise) of the liability of Tenant, of the subrogation rights of Guarantor or of the right of Guarantor to proceed against Tenant for reimbursement.

5. Guarantor hereby knowingly and voluntarily waives and agrees not to assert or take advantage of (a) any right or defense based on the absence of any or all presentments, demands (including demands for performance), notices (including notices of any adverse change in the financial status of Tenant, notices of any other facts which increase the risk to Guarantor, notices of non-performance and notices of acceptance of this Guaranty) and protests of each and every kind; (b) the defense of any statute of limitations in any action under or related to this Guaranty or the Lease; (c) any right or defense based on a lack of diligence or failure or delay by Landlord in enforcing its rights under this Guaranty or the Lease. In addition to the foregoing, Guarantor acknowledges and agrees that any partial payment or performance by Tenant or otherwise or other circumstance which operates to toll any statute of limitations as to Tenant shall operate to toll the statute of limitations as to Guarantor.

6. Guarantor hereby knowingly and voluntarily waives and agrees not to assert or take advantage of any right to (a) exoneration if Landlord's actions shall impair any security or collateral of Guarantor; (b) any security or collateral held by Landlord; (c) require Landlord to proceed against or exhaust any security or collateral before proceeding against Guarantor; (d) require Landlord to pursue any right or remedy for the benefit of Guarantor.

7. Guarantor shall not, without the prior written consent of Landlord, commence, or join with any other person in commencing, any bankruptcy, reorganization or insolvency proceeding against Tenant. Guarantor's obligations under this Guaranty shall in no way be

affected by any bankruptcy, reorganization or insolvency of Tenant or any successor or assignee of Tenant or by any disaffirmance or abandonment of the Lease or any payment under this Guaranty by a trustee of Tenant in any bankruptcy proceeding including, without limitation, any impairment, limitation, or modification of the liability of Tenant or the estate of Tenant in bankruptcy, or of any remedy for the enforcement of Tenant's liability under the Lease resulting from the operation of any present or future provision of any federal or state bankruptcy or insolvency law or other statute or from the decision of any court. Guarantor shall file in any bankruptcy or other proceeding in which the filing of claims is required or permitted by law all claims which Guarantor may have against Tenant relating to any indebtedness of Tenant to Guarantor and will assign to Landlord all rights of Guarantor thereunder until all Lease obligations are paid in full. Landlord shall have the sole right to accept or reject any plan proposed in such proceeding and to take any other action that a party filing a claim is entitled to do relating to any indebtedness of Tenant to Landlord under the Lease. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to Landlord the amount payable on such claim and, to the full extent necessary for that purpose, Guarantor hereby assigns to Landlord all of Guarantor's rights to any such payments or distributions to which Guarantor would otherwise be entitled; provided, however, that Guarantor's obligations hereunder shall not be satisfied except to the extent that Landlord receives cash by reason of any such payment or distribution. If Landlord receives anything hereunder other than cash, the same shall be held as collateral for amounts due under this Guaranty. In the event any payment by Tenant to Landlord is held to constitute a preference, fraudulent conveyance or otherwise required to be returned by Landlord, such payment by Tenant to Landlord shall not in any way diminish Guarantor's obligations hereunder and this Guaranty shall continue to be effective. Furthermore, Landlord has no duty to disclose to Guarantor any information that Landlord may receive regarding the financial status of Tenant and Guarantor assumes full responsibility to obtain such information directly from Tenant.

8.      Until all the Tenant's obligations under the Lease are fully performed, Guarantor: (a) shall have no right of subrogation, contribution or reimbursement against the Tenant by reason of any payments or acts of performance by Guarantor under this Guaranty; (b) subordinates any liability or indebtedness of the Tenant now or hereafter held by Guarantor to the obligations of the Tenant under, arising out of or related to the Lease or Tenant's use of the Premises; and (c) acknowledges that the actions of Landlord may affect or eliminate any rights of subrogation, contribution or reimbursement of Guarantor as against Tenant without any liability or recourse against Landlord.

9.      Prior to the execution of this Guaranty and at any time during the Term of the Lease upon ten (10) business days prior written notice from Landlord, Guarantor agrees to provide Landlord with an annual financial statement of Guarantor for the current year. Guarantor's financial statements are to be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Guarantor, audited by an independent certified public accountant. Guarantor represents and warrants that all such financial statements shall be materially true and correct statements of Guarantor's financial condition and an officer of Guarantor shall certify in writing to Landlord to that effect.

10.      The liability of Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between

Landlord and Guarantor relating to the Lease shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

11. Subject to the limitations hereinafter set forth, this Guaranty applies to, inures to the benefit of and binds all parties hereto, their heirs, devisees, legatees, executors, administrators, representatives, successors and assigns. This Guaranty may be assigned by Landlord voluntarily or by operation of law. Guarantor may not assign, delegate or otherwise transfer all or any part of its rights and obligations under this Guaranty without the express prior written consent of Landlord, which consent may be withheld in Landlord's sole and absolute discretion, it being understood that Landlord is relying upon the financial strength and integrity of Guarantor in this transaction.

12. This Guaranty shall constitute the entire agreement between Guarantor and the Landlord with respect to the subject matter hereof. No provision of this Guaranty or right of Landlord hereunder may be waived nor may any guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord. The waiver or failure to enforce any provision of this Guaranty shall not operate as a waiver of any other breach of such provision or any other provisions hereof. No course of dealing between Landlord and Tenant shall alter or affect the enforceability of this Guaranty or Guarantor's obligations hereunder.

13. Guarantor hereby agrees to indemnify, protect, defend and hold Landlord harmless from and against, all losses, costs and expenses including, without limitation, all interest, default interest, post-petition bankruptcy interest and other post-petition obligations, late charges, court costs and attorneys' fees, which may be suffered or incurred by Landlord in enforcing or compromising any rights under this Guaranty or in enforcing or compromising the performance of Tenant's obligations under the Lease.

14. The term "Landlord" whenever hereinabove used refers to and means the Landlord in the foregoing Lease specifically named and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee of such Lease or any part thereof, whether by assignment or otherwise. The term "Tenant" whenever hereinabove used refers to and means the Tenant in the foregoing Lease specifically named and also any assignee or subtenant of said Lease and also any successor to the interests of said Tenant, assignee or sublessee of such Lease or any part thereof, whether by assignment, sublease or otherwise including, without limitation, any trustee in bankruptcy and any bankruptcy estate of Tenant, Tenant's assignee or sublessee.

15. If Guarantor shall become bankrupt or insolvent, or any application shall be made to have Guarantor declared bankrupt or insolvent, or Guarantor shall make an assignment for the benefit of creditors, or Guarantor shall enter into a proceeding for the dissolution of marriage, or in the event of death of Guarantor, notice of such occurrence or event shall be promptly furnished to Landlord by such Guarantor or Guarantor's fiduciary. This Guaranty shall extend to and be binding upon each Guarantor's successors and assigns, including, but not limited to, trustees in bankruptcy and Guarantor's estate.

16.     Guarantor waives any rights Guarantor has under, or any requirements imposed by, (i) Chapter 34 of the Texas Business and Commerce Code, as amended, (ii) Section 17.001 of the Texas Civil Practice and Remedies Code, as amended, and (iii) Rule 31 of the Texas Rules of Civil Procedure, as amended.

17.     Any notice, request, demand, instruction or other communication to be given to any party hereunder shall be in writing and sent by registered or certified mail, return receipt requested in accordance with the notice provisions of the Lease. The Tenant shall be deemed Guarantor's agent for service of process and notice to Guarantor delivered to the Tenant at the address set forth in the Lease shall constitute proper notice to Guarantor for all purposes. Notices to Landlord shall be delivered to Landlord's address set forth in the Lease. Landlord, at its election, may provide an additional notice to Guarantor at the address provided under Guarantor's signature below.

18.     If either party hereto participates in an action against the other party arising out of or in connection with this Guaranty, the prevailing party shall be entitled to have and recover from the other party reasonable attorneys' fees, collection costs and other costs incurred in and in preparation for the action. In addition to the foregoing, Guarantor shall be responsible for any attorneys' fees, collection costs and other costs of Tenant arising out of any dispute under the Lease. Guarantor hereby waives any right to trial by jury and further waives and agrees not to assert or take advantage of any defense based on any claim that any arbitration decision binding upon Landlord and Tenant is not binding upon Guarantor.

19.     Guarantor represents and warrants to Landlord that:  (a) this Guaranty has been duly executed and delivered to Landlord by Guarantor; (b) this Guaranty is a valid and legally binding obligation of Guarantor, enforceable in accordance with its terms, except as such validity, binding nature or enforceability may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium or other laws or court decisions relating to or affecting the rights of creditors generally; (c) Guarantor has received a true, correct and complete copy of and is fully familiar with the Lease and represents and warrants that to the best of Guarantor's knowledge, all necessary action has been taken by Tenant to authorize Tenant's execution and delivery of the Lease; and (d) Tenant is under no disability in connection with its execution and delivery of the Lease and there are no defenses to Tenant's full payment and performance of all of its obligations under the Lease. Within ten (10) business days following Landlord's request, Guarantor shall deliver to Landlord an estoppel certificate certifying, among other things, that this Guaranty is in full force and effect and has not been amended or terminated.

20.     Guarantor agrees that all questions, actions and disputes with respect to this Guaranty or the performance or enforcement thereof shall be governed by, and decided in accordance with, the laws of the State of Texas, and venue shall be set in any federal or state court located in the County where the Premises is located.

21.     Should any one or more provisions of this Guaranty be determined to be illegal or unenforceable, all other provisions shall nevertheless be effective.

22.     Time is strictly of the essence under this Guaranty and any amendment, modification or revision hereof.

23. If more than one party executes a Guaranty of Lease guaranteeing Tenant's obligations under the Lease, then each party's obligations shall be joint and several.

THE UNDERSIGNED HAS READ AND UNDERSTANDS THE TERMS AND CONDITIONS CONTAINED IN THIS GUARANTY INCLUDING, WITHOUT LIMITATION, ALL WAIVERS CONTAINED IN THIS GUARANTY.

Executed as of the date of the Lease.

KINGWOOD EMERGENCY CENTER, LLC,
a Texas limited liability company

By: Neighbors Health System, Inc., its Manager

By: Setul Patel, MD, its President and Chief Executive Officer

Address of Guarantor:



CATELLUS

**TENANT NOTICE**

December 22, 2014

To: All Tenants

**Re: Notice of Sale of Catellus Market District, Austin, Texas**

Ladies and Gentlemen:

This notice is delivered to advise you that on December 22, 2014 the above-referenced property was sold and conveyed by CATELLUS MARKET DISTRICT, LLC, a Delaware limited liability company, to AUSTIN MUELLER MD, LLC, a Delaware limited liability company ("**Buyer**"), and that, in connection with the sale, your lease, together with any security deposit made thereunder, was assigned to Buyer. Accordingly, you are hereby authorized and directed to address any and all notices and other communications to the landlord or owner under or in connection with your lease, to Buyer's property manager at the following:

B&O Management Company, L.L.C.
801 Congress Avenue, Suite 300
Austin, Texas 78701
(512) 637-0487
Attn: Deborah Hornickel
Email: dhornickel@barshop-oles.com

New remittance information is as follows:

For check payment please use the following lockbox address:

Austin Mueller MD, LLC
P.O. Box 398190
San Francisco, CA 94139-8190

For overnight check delivery, please use the address below:

Austin Mueller MD, LLC
Dept. # 38190
3440 Walnut Street, Bldg. A, Window H
Fremont, CA 94538

For Wire payment, please use the following instructions:

| | |
|---|---|
| Beneficiary Account Name: | Austin Mueller MD, LLC |
| Beneficiary Account No.: | 41228-36356 |
| Bank Name and Address: | Wells Fargo Bank<br>420 Montgomery Street<br>San Francisco, CA 94104 |
| Wire Routing No.: | 121000248 |

For ACH payment, please use the following instructions:

| | |
|---|---|
| Beneficiary Account Name: | Austin Mueller MD, LLC |
| Beneficiary Account No.: | 41228-36356 |
| Bank Name and Address: | Wells Fargo Bank<br>420 Montgomery Street<br>San Francisco, CA 94104 |
| ACH Routing No.: | 121000248 |

Please notify the insurance carrier(s) providing insurance required under your lease the foregoing and have Austin Mueller MD, LLC and the new property manager noted above added as additional insureds.

If you have any questions regarding any of this information, please contact Buyer's property manager as set forth above.

Very truly yours,

CATELLUS MARKET DISTRICT, LLC
a Delaware limited liability company

By:________________________
Name: Greg Moore, SVP
Title:________________________