*Execution Version*

## AMENDMENT NO. 2 TO
## ASSET PURCHASE AGREEMENT

This Amendment No. 2 to the Asset Purchase Agreement (this "*Amendment*"), dated as of September 12, 2018, is entered into by and among (i) Altus Health System OpCo, LLC, a Texas limited liability company ("*OpCo Buyer*"), Altus Health System Realty, LLC, a Texas limited liability company ("*Realty Buyer*" and together with OpCo Buyer, the "*Buyers*" and each individually a "*Buyer*"), and (ii) NEC Baytown Emergency Center, LP, a Texas limited partnership, NEC Bellaire Emergency Center, LP, a Texas limited partnership, NEC Crosby Emergency Center, LP, a Texas limited partnership, NEC Kingwood Emergency Center, LP, a Texas limited partnership, NEC Pasadena Emergency Center, LP, a Texas limited partnership, NEC Pearland Emergency Center, LP, a Texas limited partnership, NEC Porter Emergency Center, LP, a Texas limited partnership, and NEC Yorktown Emergency Center, LP, a Texas limited partnership (collectively, the "*Operating Sellers*" and each individually, an "*Operating Seller*"), (iii) NEC Baytown Asset Holdings, LLC, a Texas limited liability company, NEC Kingwood Asset Holdings LLC, a Texas limited liability company, and NEC Pearland Asset Holdings, LLC, a Texas limited liability company (collectively, the "*Owned Real Property Sellers*" and each individually, an "*Owned Real Property Seller*"), (iv) Neighbors Legacy Holdings, Inc., a Texas corporation ("*Seller Parent*"), Neighbors Global Holdings, LLC, a Delaware limited liability company ("*Global Holdings*"), Neighbors Health, LLC, a Texas limited liability company ("*Neighbors Health*"), EDMG, LLC, a Texas limited liability company ("*EDMG*"), and Neighbors Practice Management, LLC, a Texas limited liability company ("*NPM*" and collectively with Seller Parent, Global Holdings, Neighbors Health and EDMG, the "*Corporate and Shared Services Sellers*" and each individually, a "*Corporate and Shared Services Seller*"), and (v) Neighbors Emergency Center, LLC, a Texas limited liability company (the "*IP Seller*" and collectively with the Operating Sellers, the Owned Real Property Sellers, and the Corporate and Shared Services Sellers, the "*Sellers*" and each individually, a "*Seller*"). Buyers and Sellers are sometimes referred to collectively herein as the "*Parties*" and singly as a "*Party*."

### RECITALS:

WHEREAS, Buyers and Sellers entered into that certain Asset Purchase Agreement, dated as of July 10, 2018, as amended by Amendment No. 1 to the Asset Purchase Agreement dated as of August 14, 2018 (as the same may be further amended, supplemented or otherwise modified from time to time, the "*Asset Purchase Agreement*"); and

WHEREAS, the Parties now wish to amend certain provisions of the Asset Purchase Agreement in accordance with Section 10.03 thereof.

NOW, THEREFORE, in consideration of the premises and the mutual promises, agreements contained herein and in the Asset Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Buyers and Sellers hereby agree as follows:

1.      Definitions. All capitalized terms used in this Amendment and not defined herein shall have the meanings assigned to them in the Asset Purchase Agreement.

2.     Amended Asset Purchase Agreement.

(a)     The Asset Purchase Agreement is hereby amended to delete the red stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the blue double-underlined text (indicated textually in the same manner as the following example: <u>double-underlined text</u>) as set forth in the Asset Purchase Agreement attached as <u>Exhibit A</u> hereto.

(b)     The Schedules to the Asset Purchase Agreement are hereby replaced in their entirety with Schedules attached as <u>Exhibit B</u> hereto.

3.     <u>Effectiveness</u>.  Except to the extent modified or amended by this Amendment, the Asset Purchase Agreement shall remain in full force and effect as originally written.

4.     <u>Terms of Asset Purchase Agreement</u>.   The scope, nature and extent of the Transferred Assets and the Specifically Assumed Liabilities are expressly set forth in the Asset Agreement.  Except as expressly set forth herein, (a) nothing contained herein will itself change, amend, extend or alter (nor should it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Asset Purchase Agreement in any manner whatsoever and (b) this Amendment does not create or establish rights, liabilities or obligations not otherwise created or existing under or pursuant to the Asset Purchase Agreement.

5.     <u>Binding Effect; Third Party Beneficiaries</u>.  All of the terms and provisions of this Amendment are binding upon, and inure to the benefit of and are enforceable by, Buyers and Sellers and their respective successors and permitted assigns.  No provision of this Amendment is intended to confer upon any Person other than Buyers and Sellers any rights or remedies hereunder.

6.     <u>Counterparts</u>. This Amendment may be executed in counterparts, each of which when executed and delivered shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. Any document or signature delivered by facsimile, email, or other means of electronic transmission (including .pdf) shall be deemed to have the same legal effect as delivery of an original signed copy of this Amendment.

7.     <u>Choice of Law</u>. This Amendment shall be governed by and construed in accordance with the internal laws of the State of Texas, without giving effect to any choice or conflict of law provision or rule (whether of the State of Texas or any other jurisdiction).

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to be executed by their respective authorized officers, all as of the day and year first above written.

**SELLERS:**

NEC BAYTOWN EMERGENCY CENTER, LP

By:  Neighbors GP, LLC,
      in its capacity as General Partner


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEC BELLAIRE EMERGENCY CENTER, LP

By:  Neighbors GP, LLC,
      in its capacity as General Partner


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEC CROSBY EMERGENCY CENTER, LP

By:  Neighbors GP, LLC,
      in its capacity as General Partner


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEC KINGWOOD EMERGENCY CENTER, LP

By:  Neighbors GP, LLC,
      in its capacity as General Partner


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


*[Signature Page to Amendment No. 2 to the Asset Purchase Agreement (Houston)]*

**SELLERS, Continued:**

NEC PASADENA EMERGENCY CENTER, LP

By:  Neighbors GP, LLC,
      in its capacity as General Partner


By:_____
Name: Chad J. Shandler
Title:  Chief Restructuring Officer


NEC PEARLAND EMERGENCY CENTER, LP

By:  Neighbors GP, LLC,
      in its capacity as General Partner


By:_____
Name: Chad J. Shandler
Title:  Chief Restructuring Officer


NEC PORTER EMERGENCY CENTER, LP

By:  Neighbors GP, LLC,
      in its capacity as General Partner


By:_____
Name: Chad J. Shandler
Title:  Chief Restructuring Officer


NEC YORKTOWN EMERGENCY CENTER, LP

By:  Neighbors GP, LLC,
      in its capacity as General Partner


By:_____
Name: Chad J. Shandler
Title:  Chief Restructuring Officer


*[Signature Page to Amendment No. 2 to the Asset Purchase Agreement (Houston)]*

**SELLERS, Continued:**

NEC BAYTOWN ASSET HOLDINGS, LLC

By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEC KINGWOOD ASSET HOLDINGS LLC

By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEC PEARLAND ASSET HOLDINGS, LLC

By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEIGHBORS LEGACY HOLDINGS, INC.

By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEIGHBORS GLOBAL HOLDINGS, LLC

By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


*[Signature Page to Amendment No. 2 to the Asset Purchase Agreement (Houston)]*

**SELLERS, Continued:**

NEIGHBORS HEALTH, LLC


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


EDMG, LLC


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEIGHBORS PRACTICE MANAGEMENT, LLC


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEIGHBORS EMERGENCY CENTER, LLC


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer

**BUYERS:**

ALTUS HEALTH SYSTEM OPCO, LLC

By: _____
Name: Taseer A. Badar
Title: President & Manager

ALTUS HEALTH SYSTEM REALTY, LLC

By: _____
Name: Taseer A. Badar
Title: President & Manager

## **Exhibit A**

Asset Purchase Agreement

(See attached).

*Composite Conformed Copy*
*Asset Purchase Agreement dated July 10, 2018*
*First Amendment dated August 14, 2018*
*Second Amendment dated September 12, 2018*

## ASSET PURCHASE AGREEMENT

### by and among

**NEC BAYTOWN EMERGENCY CENTER, LP,**
~~NEC BELLAIRE EMERGENCY CENTER, LP,~~
**NEC CROSBY EMERGENCY CENTER, LP,**
**NEC KINGWOOD EMERGENCY CENTER, LP,**
**NEC PASADENA EMERGENCY CENTER, LP,**
**NEC PEARLAND EMERGENCY CENTER, LP, and**
**NEC PORTER EMERGENCY CENTER, LP**~~, andNEC YORKTOWN EMERGENCY~~
~~CENTER, LP~~
**as Operating Sellers**

**NEC BAYTOWN ASSET HOLDINGS, LLC,**
**NEC KINGWOOD ASSET HOLDINGS LLC, and**
**NEC PEARLAND ASSET HOLDINGS, LLC**
**as Owned Real Property Sellers**

**NEIGHBORS LEGACY HOLDINGS, INC.,**
**NEIGHBORS GLOBAL HOLDINGS, LLC,**
**NEIGHBORS HEALTH, LLC,**
**EDMG, LLC, and**
**NEIGHBORS PRACTICE MANAGEMENT, LLC**
**as Corporate and Shared Services Sellers**

**NEIGHBORS EMERGENCY CENTER, LLC**
**as IP Seller**

**and**

**ALTUS HEALTH SYSTEMS OPCO, LLC**
**as Opco Buyer**

**ALTUS HEALTH SYSTEM REALTY, LLC**
**as Realty Buyer**

**dated**

**July 10, 2018**

2

6515656v9
6609932v6
6609932v9
6802857v2
6802857v8

**TABLE OF CONTENTS**

**Page**

ARTICLE 1 DEFINITIONS AND INTERPRETIVE MATTERS ........................................ 2
    Section 1.01    Definitions ........................................................................................ 2
    Section 1.02    Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement ........................................................................................ 13
    Section 1.03    Other Definitional and Interpretative Provisions ........................... 13
ARTICLE 2 PURCHASE AND SALE ...................................................................... 14
    Section 2.01    Purchase and Sale of Assets .......................................................... 14
    Section 2.02    Retained Assets ............................................................................. 16
    Section 2.03    Assumption of Liabilities .............................................................. 18
    Section 2.04    Retained Liabilities ....................................................................... 18
    Section 2.05    Good Faith Deposit ....................................................................... 19
    Section 2.06    Purchase Price ............................................................................... 19
    Section 2.07    Filing of Bankruptcy Cases ........................................................... 20
    Section 2.08    Closing; Closing Deliveries ........................................................... 20
    Section 2.09    Allocation of Purchase Price. ........................................................ 21
    Section 2.10    Transfer Taxes. .............................................................................. 22
    Section 2.11    Title Reports, Surveys and other Owned Real Property Information ........... 22
ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLERS ................... 22
    Section 3.01    Corporate Existence and Power ..................................................... 23
    Section 3.02    Authorization ................................................................................. 23
    Section 3.03    Governmental Authorization ......................................................... 23
    Section 3.04    Title to Transferred Assets ............................................................ 23
    Section 3.05    Brokerage Fees .............................................................................. 23
    Section 3.06    365 Contracts. ............................................................................... 23
    Section 3.07    Taxes. ............................................................................................ 24
    Section 3.08    Transactions with Affiliates. ......................................................... 24
    Section 3.09    Compliance with Laws .................................................................. 24
    Section 3.10    Healthcare Laws ............................................................................ 24
    Section 3.11    Legal Proceedings ......................................................................... 25
    Section 3.12    Absence of Restrictions and Conflicts .......................................... 25
    Section 3.13    Intellectual Property. ..................................................................... 25
    Section 3.14    Environmental. .............................................................................. 25
    Section 3.15    Real Property ................................................................................. 26
    Section 3.16    Employment and Labor. ................................................................. 27
    Section 3.17    No Other Representations or Warranties ........................................ 28
ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYERS ......................... 28
    Section 4.01    Corporate Existence and Power. .................................................... 28
    Section 4.02    Authorization ................................................................................. 28
    Section 4.03    Governmental Authorization ......................................................... 28
    Section 4.04    Healthcare Laws ............................................................................ 29
    Section 4.05    Legal Proceedings ......................................................................... 29

s802857v2

| | | |
|---|---|---:|
| Section 4.06 | Absence of Restrictions and Conflicts | 29 |
| Section 4.07 | Financing | 29 |
| Section 4.08 | Arm's Length | 29 |
| Section 4.09 | Finders' Fees | 29 |

**ARTICLE 5 PRE-CLOSING COVENANTS OF THE PARTIES** — 30

| | | |
|---|---|---:|
| Section 5.01 | Conduct of the Acquired Business | 30 |
| Section 5.02 | Bankruptcy Filings and Bidding Procedures | 31 |
| Section 5.03 | Assumption and Rejection of Executory Contracts and Leases. | 33 |
| Section 5.04 | Access to Information | 34 |
| Section 5.05 | Commercially Reasonable Efforts; Further Assurances | 35 |
| Section 5.06 | Notices of Certain Events | 35 |

**ARTICLE 6 POST-CLOSING COVENANTS OF BUYERS** — 36

| | | |
|---|---|---:|
| Section 6.01 | Access | 36 |
| Section 6.02 | Employee Matters | 37 |
| Section 6.03 | Trade Name License Agreement and Transition Services Agreement | 39 |

**ARTICLE 7 POST-CLOSING COVENANTS OF THE PARTIES** — 39

| | | |
|---|---|---:|
| Section 7.01 | Certain Filings | 39 |
| Section 7.02 | Public Announcements | 39 |
| Section 7.03 | Confidentiality | 39 |
| Section 7.04 | Mail and Other Post-Closing Inquiries. | 39 |
| Section 7.05 | Post-Closing Collection of Accounts Receivable. | 40 |

**ARTICLE 8 CONDITIONS TO CLOSING** — 40

| | | |
|---|---|---:|
| Section 8.01 | Conditions to Obligations of Buyers and Sellers | 40 |
| Section 8.02 | Conditions to Obligations of Buyers | 40 |
| Section 8.03 | Conditions to Obligations of the Sellers | 41 |

**ARTICLE 9 TERMINATION** — 42

| | | |
|---|---|---:|
| Section 9.01 | Grounds for Termination | 42 |
| Section 9.02 | Effect of Termination | 44 |

**ARTICLE 10 MISCELLANEOUS** — 46

| | | |
|---|---|---:|
| Section 10.01 | Notices | 46 |
| Section 10.02 | Survival | 47 |
| Section 10.03 | Amendments and Waivers | 48 |
| Section 10.04 | Expenses | 48 |
| Section 10.05 | Successors and Assigns | 48 |
| Section 10.06 | Supplementation and Amendment of Schedules | 48 |
| Section 10.07 | Governing Law | 48 |
| Section 10.08 | Jurisdiction | 49 |
| Section 10.09 | WAIVER OF JURY TRIAL | 49 |
| Section 10.10 | Counterparts; Effectiveness; Third Party Beneficiaries | 49 |
| Section 10.11 | Entire Agreement | 49 |
| Section 10.12 | Severability | 50 |
| Section 10.13 | Time of Essence | 50 |
| Section 10.14 | Certain Acknowledgements and Limitations | 50 |

ii

## EXHIBITS

| | |
|---|---|
| Exhibit A | Facility Locations |
| Exhibit B | Bidding Procedures and Sale Motion |
| Exhibit C | Bidding Procedures Order |
| Exhibit D | Sale Order |
| ~~Exhibit E~~ | ~~Transition Services Agreement—Services~~ |

## SCHEDULES

| | |
|---|---|
| Schedule 3.05 | Sellers' Finders' Fees |
| Schedule 3.06 | 365 Contracts |
| Schedule 3.07(b) | Taxes |
| Schedule 3.08 | Affiliate Transactions |
| Schedule 3.11 | Legal Proceedings |
| Schedule 3.15(a) | Owned Real Property |
| Schedule 3.15(b) | Leased Real Property |
| Schedule 3.15(c) | Real Property – Violations of Law |
| Schedule 3.15(e) | Real Property – Notices of Increases in Assessed Value |
| Schedule 3.15(f) | Real Property – Proceedings |
| Schedule 3.15(g) | Real Property – Notices of Claims |
| Schedule 3.15(h) | Real Property – Environmental Issues |
| Schedule 5.03 | Desired 365 Contracts |

6802857v2

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (as amended, modified, supplemented or amended and restated from time to time, this "*Agreement*") is dated as of July 10, 2018 (the "*Execution Date*"), by and among (i) Altus Health System OpCo, LLC, a Texas limited liability company ("*OpCo Buyer*"), Altus Health System Realty, LLC, a Texas limited liability company ("*Realty Buyer*" and together with OpCo Buyer, the "*Buyers*" and each individually a "*Buyer*"), and (ii) NEC Baytown Emergency Center, LP, a Texas limited partnership, ~~NEC Bellaire Emergency Center, LP, a Texas limited partnership,~~ NEC Crosby Emergency Center, LP, a Texas limited partnership, NEC Kingwood Emergency Center, LP, a Texas limited partnership, NEC Pasadena Emergency Center, LP, a Texas limited partnership, NEC Pearland Emergency Center, LP, a Texas limited partnership, and NEC Porter Emergency Center, LP, ~~a Texas limited partnership, and NEC Yorktown Emergency Center, LP,~~ a Texas limited partnership (collectively, the "*Operating Sellers*" and each individually, an "*Operating Seller*"), (iii) NEC Baytown Asset Holdings, LLC, a Texas limited liability company, NEC Kingwood Asset Holdings LLC, a Texas limited liability company, and NEC Pearland Asset Holdings, LLC, a Texas limited liability company (collectively, the "*Owned Real Property Sellers*" and each individually, an "*Owned Real Property Seller*"), (iv) Neighbors Legacy Holdings, Inc., a Texas corporation ("*Seller Parent*"), Neighbors Global Holdings, LLC, a Delaware limited liability company ("*Global Holdings*"), Neighbors Health, LLC, a Texas limited liability company ("*Neighbors Health*"), EDMG, LLC, a Texas limited liability company ("*EDMG*"), and Neighbors Practice Management, LLC, a Texas limited liability company ("*NPM*" and collectively with Seller Parent, Global Holdings, Neighbors Health and EDMG, the "*Corporate and Shared Services Sellers*" and each individually, a "*Corporate and Shared Services Seller*"), and (v) Neighbors Emergency Center, LLC, a Texas limited liability company (the "*IP Seller*" and collectively with the Operating Sellers, the Owned Real Property Sellers, and the Corporate and Shared Services Sellers, the "*Sellers*" and each individually, a "*Seller*"). Buyers and Sellers are sometimes referred to collectively herein as the "*Parties*" and singly as a "*Party*."

## RECITALS

A.     The Operating Sellers are engaged in the business of operating the emergency centers listed on <u>Exhibit A</u> (each a "*Facility*" and collectively, the "*Facilities*," and the business conducted by the Operating Sellers at such Facilities, the "*Acquired Business*").

B.     The Sellers have been soliciting bids for the Acquired Business, the Transferred Assets (as defined below) and the Specifically Assumed Liabilities (as defined below), and have determined that the offer of Buyers set forth below is the highest and best offer received for the Acquired Business, the Transferred Assets and the Specifically Assumed Liabilities to date and constitutes a fair and adequate purchase price.

C.     Promptly after the date hereof, each of the Sellers will file voluntary petitions under Chapter 11 of the Bankruptcy Code (as defined below) in the Bankruptcy Court (as defined below).

D.     On the terms and conditions of this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, the Sellers desire to sell to Buyers, and Buyers desire to

purchase from the Sellers, all of the Transferred Assets, and Buyers are willing to assume all of the Specifically Assumed Liabilities.

NOW, THEREFORE, in consideration of the mutual promises, representations and warranties made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged, the Parties hereto, intending to be legally bound, and subject only to the required approvals of the Bankruptcy Court, agree as follows:

## ARTICLE 1
## DEFINITIONS AND INTERPRETIVE MATTERS

**Section 1.01   Definitions**.

The following terms, as used herein, have the following meanings:

"***365 Contracts***" means, subject to the filing of the Bankruptcy Cases, all Contracts that may be assumed by the Debtors pursuant to Section 365 of the Bankruptcy Code.

"***Accounts Receivable***" means, as of the Effective Time, all accounts receivable, trade receivables, notes receivables and all other receivables, whether accrued, current or overdue, of Sellers, as of the Effective Time, in each case other than intercompany receivables.

"***Acquired Business***" is defined in the Recitals hereto.

"***Adverse Consequences***" means all Proceedings, charges, complaints, demands, injunctions, judgments, orders, decrees, awards, rulings, damages, penalties, fines, costs, reasonable amounts paid in settlement, Liabilities, obligations, Taxes, Liens, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses.

"***Affiliate***" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.  For such purposes, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Agreement***" is defined in the opening paragraph hereof.

"***Alternative Agreement***" means one or more definitive agreements with respect to one or more Alternative Transactions.

"***Alternative Transaction***" means a transaction or series of related transactions pursuant to which the Sellers sell all or a substantial portion of the Transferred Assets or any group of assets that includes all or a substantial portion of the Transferred Assets, to a Person other than Buyers or an Affiliate of Buyers, as the highest or best offer, in accordance with the Bidding Procedures Order or otherwise, but does not mean the sale of goods or services conducted in a manner consistent with the recent operation of the Acquired Business.

2

"*Applicable Law*" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), constitution, ordinance, code, rule, regulation, order, injunction or judgment adopted or promulgated by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"*Assets*" means all assets, properties and rights (including all rights and benefits under Contracts) of every nature, kind, description, tangible and intangible, whether real, personal or mixed, whether accrued, contingent or otherwise, whether now existing or hereinafter acquired, wherever located, and whether or not recorded or reflected, or required to be recorded or reflected, on a balance sheet or the books and records of any Person, and all right, title, interest and claims therein and thereto.

"*Auction*" is defined in Section 5.02(a).

"*Avoidance Actions*" is defined in Section 2.02(l).

"*Back-Up Bid*" is defined in Section 5.02(g).

"*Back-Up Bidder*" is defined in Section 5.02(g).

"*Bankruptcy Cases*" means the proposed bankruptcy cases of the Debtors which are proposed to be filed under Chapter 11 of the Bankruptcy Code with, and jointly administered by, the Bankruptcy Court.

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Bankruptcy Cases from time to time.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Southern District of Texas and the Local Rules of the United States Bankruptcy Court for the Southern District of Texas, each as in effect on the Petition Date or as thereafter amended, to the extent applicable to the Bankruptcy Cases or proceedings therein, as the case may be.

"*Bid Protections*" is defined in Section 5.02(c).

"*Bidding Procedures and Sale Motion*" means the motion, substantially in the form of Exhibit B attached hereto, to be filed by the Debtors with the Bankruptcy Court seeking, among other things, entry of the Bidding Procedures Order and the Sale Order.

"*Bidding Procedures Order*" means an order of the Bankruptcy Court, substantially in the form of Exhibit C attached hereto, that approves, *inter alia*, bidding and auction procedures to be followed by the Debtors and all potential bidders for the Transferred Assets.

"*Bill of Sale*" means an instrument, in form and substance reasonably satisfactory to the Debtors and Buyers, assigning, conveying and transferring the Transferred Assets (other than the

Desired 365 Contracts and the Real Property Leases) to OpCo Buyer (or any entity specified by the OpCo Buyer).

"*Business Day*" means any day, excluding Saturdays, Sundays or "legal holidays" (as referenced in Bankruptcy Rule 9006(a)), on which nationally chartered commercial banks are open for business in Houston, Texas.

"*Buyer(s)*" is defined in the opening paragraph of this Agreement and/or, subject to Section 10.05, its successors or assigns.

"*Buyers Material Adverse Effect*" means a material adverse effect on the ability of Buyers to consummate the Transactions or to perform its obligations hereunder and under the other Transaction Documents to which it is or will be a Party.

"*Buyer's Transferred Employee List*" is defined in Section 6.02(a).

"*Cash Deposits*" means the total amount of any cash and negotiable instruments of the Sellers that constitute deposits securing any performance bonds, surety bonds, letters of credit, guarantees, utility deposits, security deposits or similar assurances outstanding as of the Closing Date.

"*CERCLA*" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and any rules or regulations promulgated thereunder.

"*Chosen Courts*" is defined in Section 10.08.

"*CHOW*" is defined in Section 5.05(b).

"*Claim*" means a claim as defined in Section 101(5) of the Bankruptcy Code.

"*Closing*" is defined in Section 2.08(a).

"*Closing Date*" means the date of the Closing.

"*COBRA*" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and any similar State law.

"*Code*" means the United States Internal Revenue Code of 1986, as amended.

"*Confidentiality Agreement*" means the Confidentiality Agreement dated February 8, 2018, between Project Sphinx and Altus ER Holdco, L.P.

"*Contract*" means any contract, agreement, lease, indenture, note, bond, sale and purchase order, instrument or other commitment, whether oral or written (including any amendments or modifications thereto).

"*Corporate and Shared Services Seller*" is defined in the opening paragraph of this Agreement.

4

n802857v2

~~"*Crosby Operating Seller*" means NEC Crosby Emergency Center, LP, a Texas limited partnership.~~

~~"*Crosby Specified Leased Real Property*" means the Leased Real Property located at 14120 FM 2100, Crosby, Texas 77532.~~

"*Cure Costs*" means the amount necessary to cure defaults under any Desired 365 Contract and to compensate the non-debtor party for any actual pecuniary loss resulting from such defaults in order to assume and assign the Desired 365 Contract under Sections 365(a) and 365(f) of the Bankruptcy Code.

"*Debtor*" or "*Debtors*" means any Seller individually, and the Sellers, collectively, following the filing of the Bankruptcy Cases.

"*Desired 365 Contracts*" is defined in Section 5.03(a).

"*Desired Headquarters Space*" is defined in Section 2.08(c)(viii).

"*Effective Time*" means 12:01 a.m. local time in Houston, Texas on the day after the Closing Date.

"*Employees*" means those Persons employed by the Corporate and Shared Services Sellers who worked primarily for the Acquired Business immediately prior to the Closing, including any such individual on leave of absence.

"*End Date*" is defined in Section 9.01(b).

"*Environmental Laws*" means any Applicable Law or any agreement with any Governmental Authority to which any Seller is a party relating to human health and safety, the environment or to pollutants, contaminants, wastes, chemicals, or toxic or other Hazardous Materials.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*ERISA Affiliate*" of any entity means any other entity which, together with such entity, would be treated as a single employer under Section 414 of the Internal Revenue Code.

"*ERISA Plan*" means any (i) "employee benefit plans" (as defined in Section 3(3) of ERISA) and any bonus, stock option, stock purchase, restricted stock, equity based, incentive, deferred compensation, retiree medical or life insurance, supplemental retirement, severance, change in control or other benefit plans, programs or arrangements, and all employment, termination, severance, any cafeteria plan or any holiday or vacation plan or practice or other contracts or agreements, to which the Corporate and Shared Services Sellers, or any of their ERISA Affiliates is a party, with respect to which the Corporate and Shared Services Sellers, or any of their ERISA Affiliates has any obligation to or which are maintained, contributed to or sponsored by the Corporate and Shared Services Sellers or any of their ERISA Affiliates for the benefit of any Employee or former employee, officer or director of the Sellers, (ii) employee benefit plan for which the Sellers could incur liability under Section 4069 of ERISA in the event

such plan has been or were to be terminated and (iii) plan in respect of which the Corporate and Shared Services Sellers could incur liability under Section 4212(c) of ERISA.

"*Escrow Agent*" means Fidelity National Title Insurance Company, 1900 West Loop South, Suite 200, Houston, Texas 77027, Attn: Ms. Debbie Barela.

"*Excluded Contracts and Leases*" is defined in Section 2.02(o).

"*Execution Date*" is defined in the opening paragraph of this Agreement.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (i) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended, (ii) with respect to which no request for a stay, motion or application for reconsideration or rehearing, notice of appeal or petition for certiorari is filed within the deadline provided by applicable statute or regulation or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, and (iii) as to which the deadlines for filing such request, motion, petition, application, appeal or notice referred to in clause (ii) above have expired.

"*GAAP*" means generally accepted accounting principles in the United States, consistently applied in accordance with past practice.

"*Global Holdings*" is defined in the opening paragraph of this Agreement.

"*Governmental Authority*" means any transnational, domestic or foreign federal, state or local, governmental unit, authority, department, court, agency or official, including any political subdivision thereof.

"*Hazardous Materials*" means chemicals, pollutants, radioactive material, contaminants, wastes, toxic or hazardous substances, materials or wastes, petroleum and petroleum products, asbestos or asbestos-containing materials or products, polychlorinated biphenyls, lead or lead-based paints or materials, radon, fungus, mold, mycotoxins, nanoparticles or other substances that may have an adverse effect on human health or the environment.

"*Headquarters*" means the corporate headquarters of Seller Parent located at 10800 Richmond Ave., Houston, Texas 77042.

"*Headquarters Lease Landlord*" means InvestCorp Group, Ltd.

"*Healthcare Laws*" means any Applicable Law related to the regulation of the healthcare industry (including, but not limited to, the addiction treatment industry, the behavioral health industry, the hospital and other health care facilities industry, the pharmaceuticals industry and the physician practice management industry), the regulation of healthcare professionals (including, but not limited to, physicians and nurses and physician assistants), or to payment for items or services rendered, provided, dispensed, or furnished by healthcare suppliers or providers (including, but not limited to, physician practices, hospitals and other health facilities, physicians and pharmacists and other practitioners).

6

"*Highest and/or Best Bid*" is defined in Section 5.02(g).

"*Intellectual Property Rights*" means (i) inventions, reduced to practice or made the subject of one or more pending patent applications, (ii) patents and patent applications (including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof) registered or applied for throughout the world, all improvements to the inventions disclosed in each such registration, patent or patent application, (iii) trademarks, service marks, trade dress, logos, domain names, trade names and corporate names (whether or not registered) in all nations throughout the world and all goodwill associated therewith, (iv) copyrights (whether or not registered) and registrations and applications for registration thereof in all nations throughout the world, (v) proprietary computer software, (including source code, object code, firmware, operating systems and specifications), (vi) trade secrets and know-how (including manufacturing and production processes and techniques and research and development information), (vii) databases and data collections, in each case solely to the extent related to seismic and geological data, (viii) copies and tangible embodiments of any of the foregoing, in whatever form, format or medium, (ix) all rights to obtain and rights to apply for patents, and to register trademarks and copyrights, (x) all rights in all of the foregoing provided by treaties, conventions and common law, and (xi) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation of any of the foregoing.

"*Interest*" means any right, title, interest, ownership, indicia of title or ownership, right of possession, or other legal, equitable or possessory interest of any kind.

"*Inventory*" means all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables owned by the Operating Sellers located at or within any Facility, and any other goods held for sale or lease or furnished under contracts of service, raw materials, supplies and work in process owned by the Operating Sellers and related to the Acquired Business wherever located, whether or not in transit.

"*IP Seller*" is defined in the opening paragraph of this Agreement.

"*Leased Real Property*" means the parcels of real property of which any Operating Seller is the lessee (together with all fixtures and improvements thereon).

"*Liabilities*" means any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any kind or nature, whether accrued or not accrued, absolute or contingent, matured or unmatured, liquidated or unliquidated, known or unknown, asserted or not asserted, determined, determinable or otherwise.

"*Licenses*" means all federal, state and local government authorizations, certificates of authority, certificates of need, provider agreements and licenses.

"*Lien*" means, with respect to any property or asset, any mortgage, lien, interest pledge, security interest, mechanics' lien, materialman's lien, statutory lien or right, whenever granted and including any "lien" as under Bankruptcy Code Section 101(37).

7

"***Neighbors Health***" is defined in the opening paragraph of this Agreement.

"***Non-Houston Assets***" means all of the ~~"Transferred Assets" as such term is~~assets, properties, rights and interests of the Non-Houston Facilities, including those that would be a "Transferred Asset," "Acquired Asset" or similar term as defined in the applicable Non-Houston Purchase Agreement. For the avoidance of doubt, the term "Non-Houston Assets" shall not include any of the Transferred Assets hereunder.

"***Non-Houston Buyer***" means, collectively, the Person or Persons that acquires all or a portion of the Non-Houston Facilities and certain related assets and the business conducted by the Non-Houston Sellers at the purchased Non-Houston Facilities, and assumes certain liabilities related thereto, pursuant to the terms of the Non-Houston Purchase ~~Agreement~~Agreements, and including any Person that acquires both the Facilities and Non-Houston Facilities. For the avoidance of doubt, the term "Non-Houston Buyer" shall not include the Buyers hereunder.

"***Non-Houston Facilities***" the emergency ~~sellers~~centers operated by certain of the Non-Houston ~~Operating~~ Sellers at the following locations: (i) Port Arthur, (ii) Midland, (iii) Odessa, (iv) Amarillo, (v) Eastside, (vi) Brownsville, (vii) Beaumont ~~(subject to the agreement of the Non-Houston Sellers)~~, (viii) Harlingen, (ix) Mueller, (x) Orange, (xi) Texarkana, (xii) McAllen, (xiii) Lubbock ~~and~~, (xiv) Paris, (xv) Yorktown, and (xvi) Bellaire.

"***Non-Houston*** ~~*Operating Sellers*" means, collectively, NEC Port Arthur Emergency Center, LP, a Texas limited partnership, NEC Midland Emergency Center, LP, a Texas limited partnership, NEC Odessa Emergency Center, LP, a Texas limited partnership, NEC Amarillo Emergency Center, LP, a Texas limited partnership, NEC Eastside Emergency Center, LP, a Texas limited partnership, NEC Brownsville Emergency Center, LP, a Texas limited partnership, NEC Beaumont Emergency Center, LP, a Texas limited partnership (subject to inclusion in Non-Houston Purchase Agreement), NEC Harlingen Emergency Center, LP, a Texas limited partnership, NEC Mueller Emergency Center, LP, a Texas limited partnership, NEC Orange Emergency Center, LP, a Texas limited partnership, NEC Texarkana Emergency Center, LP, a Texas limited partnership, NEC McAllen Emergency Center, LP, a Texas limited partnership, NEC Lubbock Emergency Center, LP, a Texas limited partnership, and NEC Paris Emergency Center, LP, a Texas limited partnership.~~ *Purchase Agreements*" means the Asset Purchase Agreements (other than this Agreement) pursuant to which the applicable Non-Houston Sellers sell to the applicable Non-Houston Buyer(s) the applicable Non-Houston Facilities and related Non-Houston Assets, and the applicable Non-Houston Buyer(s) assumes certain liabilities related to the operation of the Non-Houston Facilities acquired thereunder. For the avoidance of doubt, the term "Non-Houston Purchase Agreements" shall not include this Agreement.

~~"*Non-Houston Purchase Agreement*" means the Asset Purchase Agreement among the Non-Houston Sellers and the Non-Houston Buyer.~~

~~"*Non-Houston Real Property Seller*" means NEC Beaumont Asset Holdings, LLC.~~

~~"*Non-Houston Shared Services Sellers*" means, collectively, Seller Parent, Global Holdings, Neighbors Health, EDMG and NPM.~~

"***Non-Houston Sellers***" means, collectively, the ~~"Sellers" under the~~ Non-Houston ~~Operating Sellers, the Non-Houston Real Property Seller and the Non-Houston Shared Services~~ ~~Sellers~~Purchase Agreements.  For the avoidance of doubt, the term "Non-Houston Sellers" shall not include the Sellers hereunder.

"***Non-Transferable Assets***" is defined in <u>Section 5.03(d)</u>.

"***NPM***" is defined in the opening paragraph of this Agreement.

"***OpCo Buyer***" is defined in the opening paragraph of this Agreement.

"***Operating Seller***" is defined in the opening paragraph of this Agreement.

"***Organizational Documents***" means, with respect to any Person, the certificate or articles of incorporation, bylaws, certificate of formation or organization, partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement or any other similar organizational documents of such Person.

"***Owned Intellectual Property Rights***" means all Intellectual Property Rights owned by the IP Seller.

"***Owned Real Property***" means the parcels of real property of which any Owned Real Property Seller is a fee title owner (together with all fixtures and improvements thereon).

"***Owned Real Property Seller***" is defined in the opening paragraph of this Agreement.

"***Party***" or "***Parties***" is defined in the opening paragraph of this Agreement.

"***Patient Privacy Requirements***" means the applicable requirements of the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 and the implementing regulations thereunder governing the privacy of individually identifiable health information and the security of such information maintained in electronic form, or of any similar law of Texas.

"***Permits***" means all material governmental (whether federal, state or local) permits, Licenses, franchises, certificates, approvals or other similar authorizations.

"***Permitted Liens***" means (a) non-monetary liens that do not detract from the value of any underlying Transferred Asset or interfere in any material respect with the ability of Buyers to own and operate any underlying Transferred Asset in substantially the manner as owned and operated by the Sellers immediately prior to the Execution Date, (b) in the case of Seller Real Property, zoning, building or other restrictions, variances, covenants, rights of way, encumbrances, easements and other minor irregularities in title, and (c) liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures.

"***Person***" means any person, entity or Governmental Authority of any nature whatsoever, specifically including an individual, firm, company, corporation, partnership, trust, joint venture,

9

association, joint stock company, limited liability company, estate, unincorporated organization or other entity or organization.

"*Petition Date*" means the date following the Execution Date on which the Sellers file the proposed Bankruptcy Cases with the Bankruptcy Court.

"*Post-Closing Tax Period*" means any taxable period beginning after the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period beginning after the Closing Date.

"*Post-Petition Accounts Payable*" means all accounts payable of the Debtors arising after the Petition Date in a manner consistent with the recent operation of the Acquired Business prior to the Petition Date.

"*Post-Petition Accrued Expenses*" means all accrued and unpaid operating expenses of the Debtors arising after the Petition Date in a manner consistent with the recent operation of the Acquired Business prior to the Petition Date.

"*Pre-Closing Tax Period*" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on or including the Closing Date.

"*Proceeding*" means any action, claim, demand, audit, hearing, complaint, investigation, litigation, or suit commenced, brought, conducted, or heard by or before any Governmental Authority.

"*Property Taxes*" is defined in Section 2.10(b).

"*PTO Obligations*" means the Liabilities of the Sellers for the accrued vacation, sick, holiday and other paid time off and related Taxes and other payroll obligations of the Transferred Employees outstanding as of the Closing Date.

"*Purchase Price*" is defined in Section 2.06(a).

"*Purchase Price Allocation*" is defined in Section 2.09.

"*Qualified Bid Deadline*" is defined in Section 5.02(e).

"*Real Property Lease*" shall mean any lease or sublease of Leased Real Property.

"*Realty Buyer*" is defined in the opening paragraph hereof.

"*Representatives*" means, with respect to any Person, the officers, directors, employees, members, managers, partners, investment bankers, attorneys, accountants, consultants or other advisors, agents or representatives of such Person, when acting in such capacity on behalf of such Person.

"*Retained Assets*" is defined in Section 2.02.

4802857v2

"***Retained Liabilities***" is defined in <u>Section 2.04</u>.

"***Retained Seller Mark***" means the trademark owned by the IP Seller and registered with the United States Patent and Trademark Office on July 11, 2017 under Registration No. 5239995, as amended.

"***Sale Order***" means an order of the Bankruptcy Court, substantially in the form of <u>Exhibit D</u> attached hereto, that approves, *inter alia*, the sale of the Transferred Assets to Buyers.

"***Second Amendment Effective Date***" means September 12, 2018, being the date of the effectiveness of Amendment No. 2 to this Agreement.

"***Seller***" or "***Sellers***" is defined in the opening paragraph of this Agreement.

"***Seller Parent***" is defined in the opening paragraph of this Agreement.

"***Seller Real Property***" means, collectively, the Leased Real Property and the Owned Real Property.

"***Sellers Material Adverse Effect***" means a material adverse effect on (i) the condition (financial or otherwise), business, properties, assets, or results of operations of the Acquired Business, (ii) the ability of the Sellers or the Debtors, as applicable, to conduct the Acquired Business consistent with recent history, or (iii) the ability of the Sellers or the Debtors, as applicable, to perform their obligations under the Transaction Documents in material compliance with the requirements thereof or to consummate the Transactions; *provided, however,* that any such material adverse effect that results from any of the following matters shall be disregarded and shall not be taken into account in determining whether a material adverse effect has occurred under this definition: (A) changes in financial, credit or securities markets generally, including any changes in prevailing interest rates, (B) changes in general economic or political conditions in the United States or regionally, (C) matters identified as having a Sellers Material Adverse Effect in the Schedules to this Agreement, (D) the announcement, pendency or consummation of the sale of the Transferred Assets, (E) the consequences of filing the Bankruptcy Cases and the impact thereof on the condition (financial or otherwise), business, properties, assets, or results of operations of the Acquired Business, (F) actions taken or omissions made after the date of this Agreement with the express written consent of Buyers, (G) changes resulting from general industry-wide conditions that do not disproportionately affect the Sellers relative to other industry participants, (H) acts of war, sabotage or terrorism or any military action, or threats thereof, or any escalation or worsening of any such acts of war, sabotage, terrorism or military actions threatened or underway as of the Execution Date, in each case, which do not disproportionately affect the Sellers relative to other industry participants, (I) any natural or man-made disaster or acts of God, in each case, which do not disproportionately affect the Sellers relative to other industry participants, and (J) changes in Applicable Law or accounting rules, including GAAP.

"***Sellers' Knowledge***" means the actual knowledge of the Chief Restructuring Officer of Neighbors Health.

"***Sellers' Transferred Employee List***" is defined in <u>Section 3.16(a)</u>.

#802857v2

"***Specifically Assumed Liabilities***" is defined in Section 2.03.

"~~***Specified Lease Assignment and Amendment***~~" ~~is defined in Section 5.03(e).~~

"~~***Specified Lease Assignment Deadline***~~" ~~is defined in Section 5.03(e).~~

"~~***Specified Lease Reduction Amount***~~" ~~means, with respect to the Specified Leased Real Property at (i) 14120 FM 2100, Crosby, Texas 77532, an amount equal to $2,900,000.00, (ii) 22678 US Hwy 59, Porter, Texas 77365, an amount equal to $1,140,000.00, and (iii) 5835 Hwy 6 North, Houston, Texas 77084, an amount equal to $930,000.00.~~

"~~***Specified Lease Reduction Option***~~" ~~is defined in Section 5.03(e).~~

"***Specified Leased Real Property***" means each of the following Leased Real Properties: (i) 14120 FM 2100, Crosby, Texas 77532, <u>and</u> (ii) 22678 US Hwy 59, Porter, Texas ~~77365, and (iii) 5835 Hwy 6 North, Houston, Texas 77084.~~<u>77365.</u>

"***Straddle Period***" means any Tax period beginning before or on and ending after the Closing Date.

"***Subsidiary***" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at any time directly or indirectly owned by such Person.

"~~***T-System Contract***~~" ~~means the Site Opt-In Agreement dated July 22, 2015, between T-System, Inc. and Neighbors Health.~~

"~~***T-System Cure Costs***~~" ~~means the amount necessary to cure defaults under the T-System Contract and to compensate T-System, Inc. for any actual pecuniary loss resulting from such defaults in order to assume and assign the T-System Contract under Sections 365(a) and 365(f) of the Bankruptcy Code.~~

"***Tax***" or "***Taxes***" means (i) all federal, state, local, foreign and other income, sales, use, ad valorem, withholding, payroll, employment, unemployment, excise, gross receipts, goods and services, add-on minimum, value added, transfer, profits, franchise, license, stamp, custom and any other similar taxes, duties or like assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto, (ii) in the case of the Sellers, Liability for the payment of any amount of the type described in clause (i) as a result of being or having been before the Closing Date a member of an affiliated, consolidated, combined or unitary group, or a party to any agreement or arrangement, as a result of which Liability of the Sellers to a Governmental Authority is determined or taken into account with reference to the activities of any other Person, and (iii) Liability of the Sellers for the payment of any amount of the type described in (i) or (ii) as a result of any existing express or implied agreement or arrangement (including an indemnification agreement or arrangement) involving the Sellers or any of their Affiliates.

"***Tax Refund***" means any refund, credit, or offset of Taxes attributable to the assets, operations or Acquired Business of the Sellers for periods prior to the Closing Date.

"***Tax Return***" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"***Third Party***" means any Person other than a Party or its Affiliates.

"***Trade Name***" means "Neighbors" and all variations thereof, but excluding the Retained Seller Mark.

"***Trade Name License Agreement***" means, with respect to each Non-Houston Buyer, a definitive Trade Name License Agreement pursuant to which, (i) prior to the Closing, IP Seller, and (ii) at and after Closing, OpCo Buyer, grants such Non-Houston Buyer, a royalty-free license and privilege to use the Trade Name, for transitional purposes, until the date that is 180 days following the closing of the Non-Houston Purchase Agreement.

"***Transaction Documents***" means this Agreement, the Bill of Sale, the Trade Name License Agreement, the Transition Services Agreement and any other agreement between or among Buyers and the Sellers that expressly states that it constitutes a Transaction Document for purposes of this Agreement, and all other agreements, documents and instruments entered into by any of the Buyers, on the one hand, and any of the Sellers, on the other hand, as of or after the Execution Date and at or prior to Closing in connection with the Transactions (as each such document, agreement and instrument may be amended, supplemented or modified).

"***Transaction Taxes***" is defined in Section 2.10.

"***Transactions***" means the transactions contemplated by this Agreement and the other Transaction Documents.

"***Transferred Assets***" is defined in Section 2.01.

"***Transferred Employees***" is defined in Section 6.02.

"***Transition Services Agreement (Debtors' Estate)***" means a definitive Transition Services Agreement, pursuant to which, OpCo Buyer or one of its Affiliates shall provide certain transition services to, and as reasonably requested by, the bankruptcy estate of the Debtors and to Neighbors Physician Group, PLLC following the Closing.

"***Transition Services Agreement*** means(***Non-Houston Buyers)***" means, with respect to each Non-Houston Buyer, a definitive Transition Services Agreement, pursuant to which, (i) if the Non-Houston Purchase Agreement closes prior to the Closing, then Non-HoustonOpCo Buyer or one of its Affiliates shall provide certain transition services to OpCo Buyer (or any entity specified by OpCo Buyer), or (ii) if the Non-Houston Purchase Agreement closes on or after the Closing, then prior to the closing of the Non-Houston Purchase Agreement, NPM, and at and after the closing of the Non-Houston Purchase Agreement, Non-Houston Buyer or one of its Affiliates, shall provide certain transition services to OpCo Buyer (or any entity specified by

13

~~OpCo Buyer), which definitive Transition Services Agreement shall cover the services listed on Exhibit E attached hereto,~~ and as reasonably requested by, such Non-Houston Buyers.

"*WARN Act*" means the Workers Adjustment & Retraining Notification Act or any similar State law.

"*Winning Bidder*" ~~has the meaning given to such term in~~ means the "Successful Bidder," as defined in the Bidding Procedures for the Sale of Debtor's Assets attached to the Bidding Procedures Order.

"*Withholding Taxes*" means all applicable federal, state or local income Taxes and applicable employment (social security, unemployment insurance and Medicare) and other withholding obligations, in each case withheld from Employees Seller prior to Closing.

**Section 1.02    Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement**. Except as otherwise expressly provided in this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Calculations in connection with the definitions, covenants and other provisions of this Agreement shall utilize GAAP, except as otherwise expressly set forth herein.

**Section 1.03    Other Definitional and Interpretative Provisions**. The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The headings and captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein and defined herein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law," "laws" or to a particular statute or law shall be deemed also to include any and all Applicable Law. The word "or" will have the inclusive meaning represented by the phrase "and/or." The phrase "and/or" when used in a conjunctive phrase, shall mean any one or more of the Persons specified in or the existence or occurrence of any one or more of the events, conditions or circumstances set forth in that phrase; *provided, however,* that when used to describe the obligation of one or more Persons to do any act, it shall mean that the obligation is the obligation of each of the Persons but that it may be satisfied by performance by any one or more of them. "Shall" and "will" have equal force and effect. The Parties and their counsel have reviewed the provisions of this Agreement and have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation

14

arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. All references to immediately available funds or dollar amounts contained in this Agreement shall mean United States dollars. If the Bankruptcy Cases are filed prior to the Closing Date, then as of the Petition Date, all references in this Agreement to the "Seller" or the "Sellers" shall be deemed to refer to the "Debtor" or the "Debtors," respectively, to the extent necessary in order to give effect to the intent of the Parties expressed in Section 2.08. THE PARTIES AGREE THAT THE BOLD AND/OR CAPITALIZED LETTERS IN THIS AGREEMENT CONSTITUTE CONSPICUOUS LEGENDS.

## ARTICLE 2
## PURCHASE AND SALE

**Section 2.01  Purchase and Sale of Assets.**

(a)     Subject to, and on the terms and conditions of this Agreement, effective at the Effective Time, Buyers shall purchase, acquire and accept from the Sellers, and the Sellers shall sell, convey, transfer, assign and deliver to Buyers, all of the Sellers' right, title and interest in and to all of the assets, properties, rights and interests set forth below solely to the extent related to the Acquired Business. subject in each case to the proviso in Section 2.02 immediately following clause (r) in such Section (the "***Transferred Assets***"):

(i)     all Accounts Receivable of the Operating Sellers;

(ii)     to the extent legally assignable, the Desired 365 Contracts and all of the Sellers' interest under the Desired 365 Contracts;

(iii)     except as and to the extent relating to any Retained Assets or Retained Liabilities and excluding all Avoidance Actions:

(A)     any insurance proceeds payable pursuant to claims made under insurance Contracts (other than with respect to directors and officers liability insurance) and with respect to matters arising prior to the Effective Time solely to the extent that such claim relates to the repair or replacement of damaged or destroyed property that constitutes the Transferred Assets and, as of the Effective Time, such proceeds have not been paid to repair or replace such damaged or destroyed property that constitutes Transferred Assets;(B) causes of action, rights of recovery, rights of setoff and rights of recoupment in favor of the Sellers; and

(B)     (C) all rights in and under all express or implied guarantees, warranties (including manufacturers' warranties), representations, covenants, indemnities and similar rights in favor of the Sellers with respect to the Transferred Assets;

(iv)     all equipment (including medical equipment and instruments), furniture, furnishings, computer hardware, communication equipment, supplies, fixtures, leasehold interests, materials, Inventory and other tangible personal property of any kind or type

15

that is owned by the Operating Sellers, used in the Acquired Business and located at or within any Facility;

(v)     to the extent legally assignable, all of the IP Seller's Owned Intellectual Property Rights and the goodwill associated herewith, but excluding the Retained Seller Mark;

(vi)     all books and records of the Sellers, wherever located, solely to the extent relating to the Transferred Assets, including the following: sales and service records, books of account, invoices, inventory records, accounting records, Tax Returns with respect to the Transferred Assets, environmental records and studies, maintenance records, cost and pricing information, supplier lists, business plans, catalogues, quality control records and manuals, blueprints, research and development files, patent and trademark files; *provided, however,* that the Sellers shall retain a right, and to the extent any of the Transferred Assets include books and records relating to the Non-Houston Assets, the Non-Houston Buyers and itstheir respective Representatives shall have the right, to have reasonable access to and copying of (including through their Representatives) the provisions within such materials related to the Retained Assets, the Non-Houston Assets, or the Retained Liabilities, the Sellers' rights under the Transaction Documents or that are reasonably required with respect to any audit, investigation or inquiry of any Governmental Authority including Taxing Authorities with respect to periods prior to the Closing; *provided further, however,* that subject to the filing of the Bankruptcy Cases, the Sellers and/or any Person authorized to act on behalf of the Sellers or their bankruptcy estates or to whom Retained Assets are transferred or assigned pursuant to the Bankruptcy Code or the Bankruptcy Rules (including without limitation a trustee, creditors' committee, or liquidating trust (collectively, an "*Authorized Person*")), shall have the right to access and copy any and all books and records of the Sellers as such Authorized Person, in its discretion, deems necessary to enable such Authorized Person to take any and all actions in connection with the Retained Assets as such Authorized Person is entitled and/or required to take under the Bankruptcy Code or the Bankruptcy Rules, including without limitation analyzing, evaluating, litigating, and compromising the Avoidance Actions, subject to any requirements or limitations imposed by the Patient Privacy Requirements;

(vii)     to the extent legally assignable, all Licenses and Permits, relating to the ownership or operation of the Transferred Assets in a manner consistent with the recent operation of the Acquired Business;

(viii)     all prepaid claims, prepaid expense items and deferred charges, credits, advance payments, security and other deposits (other than for insurance and utilities) made by the Sellers to any other Person relating to the Transferred Assets, in each case other than to the extent exclusively relating to the Retained Liabilities or Retained Assets;

(ix)     all Owned Real Property and all rights in respect of all Leased Real Property, including all of the Real Property Leases;

16

(x)   all third party indemnities related to the Transferred Assets where any Seller is an indemnified party and the proceeds afforded thereby, in each case other than to the extent exclusively relating to the Retained Liabilities or Retained Assets; and

(xi)   solely to the extent related to the Acquired Business (as stated in Section 2.01(a) above), all claims, rights, defenses, offsets, recoupments, causes of action, credits, immunities or rights of set-off against Buyers, any Affiliates of Buyers and/or Third Parties that are counterparties to any of the Desired 365 Contracts that are actually assumed by the Debtors and assigned to the Buyer arising prior to the Effective Time and related to the Transferred. For the sake of clarity and the avoidance of any doubt, this provision is subject to Section 2.02 below and expressly excludes the Retained Assets, except Avoidance Actions.

(b)   Except for Specifically Assumed Liabilities, all Transferred Assets shall, subject to the filing of the Bankruptcy Cases, be conveyed free and clear of all Liens (other than Permitted Liens), Claims, and Interests to the maximum extent allowed by Section 363(f) of the Bankruptcy Code. Subject to the filing of the Bankruptcy Cases, prior to the hearing to approve the Sale Order, Buyers may elect to designate any Transferred Asset as a Retained Asset by written notice to the Seller; *provided, however,* that any such designations by Buyers shall have no effect on Specifically Assumed Liabilities.

**Section 2.02   Retained Assets**.   Notwithstanding the foregoing, Buyers shall not acquire, and the Sellers shall retain, all other assets not otherwise included as a Transferred Asset or which are not solely related to the Acquired Business, including the following assets (the "*Retained Assets*"):

(a)   all Accounts Receivable other than those of the Operating Sellers;

(b)   cash and cash equivalents, including bank accounts, Cash Deposits and payments in transit;

(c)   the Non-Houston Assets and all of the Sellers' rights under the Non-Houston Purchase Agreements and the Transaction Documents (as such term is defined in the Non-Houston Purchase AgreementAgreements);

(d)   the equity ownership of any Seller's Subsidiary, including the business of any such Subsidiary that is not a Seller;

(e)   all intercompany receivables and other rights to receive payment from Seller Parent or any of its Affiliates (including the Sellers);

(f)   all insurance Contracts (including with respect to directors and officers liability insurance) and all rights, claims and proceeds payable thereunder, including deposits, rights to discounts, credits and refunds arising from such insurance Contracts, except to the extent constituting Transferred Assets pursuant to Section 2.01(a)(iii)(A);

(g)   all claims, rights, defenses, offsets, recoupments, causes of action, credits, immunities or rights of set-off of the Sellers against Third Parties, including, without limitation,

17

against Sellers' former or current officers, directors, managers, members, unitholders, physicians, pharmacists and/or independent contractors arising prior to the Effective Time ~~with respect to all Accounts Receivable of the Sellers, the Retained Liabilities or the Retained Assets~~;

(h)    the Organizational Documents of the Sellers and their respective, minute books, stock and ownership records and corporate seals and all other documents and records relating to the organization, maintenance, existence and federal income taxation of the Sellers or their partners;

(i)    all Tax Assets, Tax deposits (including funds held by the Sellers in respect of Withholding Taxes or estimated income taxes) and Tax Refunds (except real estate Taxes, if any, being held by the landlords or lenders pertaining to the Facilities);

(j)    all deposits for utilities;

(k)    all business and financial records, books, ledgers, files, plans, documents, correspondence, lists, and reports that relate solely to Retained Assets or Retained Liabilities;

(l)    subject to the filing of the Bankruptcy Cases, all rights, claims, causes of action and recoveries of ~~Debtors~~the Sellers under Sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 or 724 of the Bankruptcy Code (collectively, "***Avoidance Actions***") and all proceeds thereof;

(m)    all ERISA Plans and assets maintained pursuant or in connection therewith;

(n)    all rights, claims, rebates, discounts, credits and professional retainers incurred in connection with the Bankruptcy Cases;

(o)    subject to the filing of the Bankruptcy Cases, any executory Contracts or unexpired leases, ~~including~~other than the Real Property Leases ~~for each Specified Leased Real Property for which OpCo Buyer, in its sole discretion, has elected to exercise its Specified Lease Reduction Option~~ ("***Excluded Contracts and Leases***"), that are not assumed and assigned to Buyers pursuant to this Agreement, or that are otherwise terminated on or before the Effective Time;

(p)    the Retained Seller Mark;

(q)    all of the Sellers' rights under the Transaction Documents, including the right to receive the Purchase Price; and

(r)    any other assets of the Sellers not solely related to operation of the Acquired Business, including any assets related to the operation of any emergency centers (other than the Facilities) that are operated by Affiliates of Seller Parent and any assets of any emergency centers (other than the Facilities) that were formerly operated by Affiliates of Seller Parent and which are non-operated as of the Execution Date;~~provided, however, notwithstanding anything in this Agreement to the contrary (including Section 2.01), as to any Specified Leased Real Property for which OpCo Buyer, in its sole discretion, has elected to exercise its Specified~~

18

~~Lease Reduction Option, other than the Crosby Specified Leased Real Property, then with respect to each Operating Seller (other than the Crosby Operating Seller) that is the tenant of such Specified Leased Real Property (other than the Crosby Specified Leased Real Property), the Retained Assets shall include (and the Transferred Assets shall correspondingly exclude) all of such Operating Sellers' right, title and interest in and to all of its assets, properties, rights and interests related to the Acquired Business (including, without limitation, the Specified Leased Real Property, such Operating Seller's Accounts Receivable, and all equipment (including medical equipment and instruments), furniture, furnishings, computer hardware, communication equipment, supplies, fixtures, leasehold interests, materials, Inventory and other tangible personal property of any kind or type that is owned by such Operating Seller, used in the Acquired Business and located at or within such Specified Leased Real Property).~~

**Section 2.03   Assumption of Liabilities**. OpCo Buyer shall assume, on the terms and subject to the conditions set forth herein, at the Closing and as of the Effective Time, only the following Liabilities of the Sellers and solely to the extent such Liabilities relate to the Acquired Business (collectively, the "***Specifically Assumed Liabilities***"), and no others:

(a)   all Liabilities arising after the Effective Time under the Desired 365 Contracts;

(b)   ~~(i)~~ the Cure Costs for all Desired 365 Contracts (~~other than the T-System Contract and~~ including the Real Property Leases) ~~up to a maximum amount of Three Hundred Fifty Thousand and No/100 Dollars ($350,000.00) and (ii) only if OpCo Buyer hereafter elects to assume the T-System Contract, then and in that event the T-System Cure Costs (it being understood that, as of the Execution Date, OpCo Buyer does not intend to assume the T-System Contract)~~;

(c)   all Post-Petition Accounts Payable of the Operating Sellers solely to the extent related to the Transferred Assets or the Acquired Business;

(d)   all PTO Obligations;

(e)   all Post-Petition Accrued Expenses (excluding, except as specified in Section 2.03(d) and in Section 6.02, any Liabilities for payroll expenses and ERISA Plans of the Corporate and Shared Services Sellers) solely to the extent related to the Transferred Assets or the Acquired Business;

(f)   all Liabilities incurred in providing COBRA-continuation coverage under Buyer's group health plan with respect to any Employees and their dependents; and

(g)   all Liabilities of the Sellers relating to the ownership or operation of the Acquired Business and the Transferred Assets (as specified in clauses (a) – (f) of this Section 2.03) arising after the Effective Time.

**Section 2.04   Retained Liabilities**. Except for the Specifically Assumed Liabilities, Buyers are not assuming, shall not assume, and shall not be responsible for, and the Sellers expressly retain: (a) all Liabilities of the Sellers related to the Retained Assets, whether such Liabilities arise before or after the Effective Time; (b) any Liabilities of Sellers owing to Seller

19

Parent or any of its Affiliates (including the Sellers) and (c) all other Liabilities of the Sellers whatsoever associated with the Transferred Assets, the Acquired Business or with any other properties, rights, contracts, or other assets of the Sellers, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated, or otherwise (clauses (a), (b) and (c) collectively, the "***Retained Liabilities***").

**Section 2.05   Good Faith Deposit; Escrow.**

(a)   No later than ~~(i)~~ three (3) Business Days after the Execution Date, Buyers shall deposit with the Escrow Agent ~~as a~~and/or Neighbors Legacy Holdings as an initial good faith deposit ~~(the "*Deposit*") an amount equal to One Million Six Hundred Thousand and No/100 Dollars ($1,600,000.00~~an amount equal to $1,600,000.00, and (ii) three (3) Business Days after the completion of the Auction, Buyers shall deposit with the Escrow Agent as an additional good faith deposit an amount equal to $803,672.00, for an aggregate good faith deposit of $2,403,672.00 (such aggregate good-faith deposit, the "*Deposit*"). The Escrow Agent shall hold the Deposit in an interest bearing account. The Sellers acknowledge and agree that the Deposit shall not be an asset of the Debtors' bankruptcy estates following the filing of the Bankruptcy Cases. Upon the Closing in accordance with the terms of this Agreement and the Transaction Documents, the Deposit (together with all interest earned thereon) will be applied against the Purchase Price in the manner provided in <u>Section 2.06(b)</u>.

(b)   If this Agreement is terminated pursuant to <u>Section 9.01</u>, the Parties shall direct the Escrow Agent to return the Deposit (together with all interest earned thereon) to Buyers or to disburse the Sellers as a non-completion fee in accordance with <u>Section 9.02(b)</u> and <u>Section 9.02(c)</u>.

(c)   The Escrow Agent shall comply with the provisions of this Agreement and shall not disburse the Deposit (or any interest earned thereon) except in accordance with <u>Section 2.05(a)</u> or <u>Section 2.06(b)</u>. In no event shall the Escrow Agent be liable, directly or indirectly, for any damages, losses expenses arising out of its compliance with this <u>Section 2.05</u> and <u>Section 2.06(b)</u> below, other than damages, losses or expenses which result from the Escrow Agent's fraud, gross negligence or willful misconduct.

**Section 2.06   Purchase Price.**

(a)   In consideration of the transfer of the Transferred Assets and in addition to assuming the Specifically Assumed Liabilities as provided above, Buyers agree to pay or cause to be paid to the Sellers the purchase price in the amount of $49,075,544.00 (the "***Purchase Price***")~~: (i) Thirty-Two Million and No/100 Dollars ($32,000,000.00) *minus* (ii) with respect to each Specified Leased Real Property for which OpCo Buyer, in its sole discretion, has elected to exercise its Specified Lease Reduction Option, the Specified Lease Reduction Amount attributable to such Specified Leased Real Property~~.

(b)   At the Closing, Buyers will pay or cause to be paid by wire transfer of immediately available funds to the Escrow Agent (to be disbursed by Escrow Agent to the

n802857v2

Sellers), cash in an amount equal to the following$45,419,772.00, calculated as follows and without setoff, recoupment or other reduction:

   (i) the Purchase Price; *minus*

   (ii) $1,252,100.00 in respect of the Bid Protections credited towards the Purchase Price in connection with the bid made by the Buyers for the Transferred Assets at the Auction; *minus*

   (iii) (ii) the Deposit (together with all interest earned thereon), which shall be disbursed by the Escrow Agent to the Sellers.

  **Section 2.07 Filing of Bankruptcy Cases.** Following the Execution Date and prior to the Closing, the Sellers shall file the Bankruptcy Cases with the Bankruptcy Court, and the Transferred Assets shall be conveyed by the Debtors free and clear of all Liens, Claims and Interests, other than Permitted Liens, to the maximum extent allowed by Section 363(f) of the Bankruptcy Code. Accordingly, subject to the filing of the Bankruptcy Cases, the Sellers obligation to consummate the transactions set forth in this Agreement (including the sale, conveyance, transfer, assignment and delivery to Buyers of the Transferred Assets) on the Closing Date will be subject to the entry of a Bidding Procedures Order and a Sale Order, each of which shall be a Final Order, by the Bankruptcy Court. Further, for purposes of clarification, with respect to the representations made by the Debtors on the Closing Date in Article 3, all references to "Seller" or the "Sellers" shall be deemed to refer to the "Debtor" or the "Debtors," respectively.

  **Section 2.08 Closing; Closing Deliveries.**

   (a) The closing of the Transactions (the "*Closing*") shall take place at the offices of the Escrow Agent, 1900 West Loop South, Suite 200, Houston, Texas 77027 commencing at 10:00 a.m. on the date that is three (3) Business Days following the satisfaction or written waiver of the conditions of Closing set forth in Article 8 hereof (other than those conditions which by their terms are not to be satisfied until the Closing, but subject to the waiver or fulfillment of those conditions), or such other date or location as the Parties may mutually determine. The Closing and all documentation delivered at Closing shall be effective as of the Effective Time.

   (b) At the Closing, unless waived by the Sellers, Buyers shall deliver, or execute and deliver, as applicable, to the Escrow Agent:

   (i) the Bill of Sale, duly executed by OpCo Buyer;

   (ii) the Transition Services Agreement, duly executed by OpCo Buyer;

   (iii) the Trade Name License Agreement, duly executed by OpCo Buyer;

   (ii) (iv) the Purchase Price in the manner provided in Section 2.06(b);

21

(iii)   ~~(v)~~ the certificate required to be delivered by Buyers under Section 8.03(c), duly executed by Buyers;

(iv)   ~~(vi)~~ all other documents, certificates, instruments or writings reasonably requested by Buyers in connection herewith; and

(v)   ~~(vii)~~ all applicable sales/use Tax resale certificates and sale-for-lease exemption certificates dated on or before the Closing Date from Buyers certifying the exempt, excluded, or otherwise nontaxable nature of the transfer of all Inventory included among the Transferred Assets for sales/use Tax purposes.

(c)   At the Closing, unless waived by Buyers, the Sellers shall deliver or cause to be delivered, or execute and deliver, as applicable, to Escrow Agent:

(i)   the Bill of Sale, duly executed by the Sellers;

~~(ii) the Transition Services Agreement, duly executed by NPM; provided, that if the transactions contemplated by the Non-Houston Purchase Agreement have closed or are scheduled to close prior to the Closing, the Sellers shall deliver to Buyer an assignment and assumption agreement pursuant to which Non-Houston Buyer agrees to perform the obligations of NPM under the Transition Services Agreement to which NPM is a party from and after the closing of the Non-Houston Purchase Agreement;~~

~~(iii) if the transactions contemplated by the Non-Houston Purchase Agreement have closed or are scheduled to close prior to the Closing, the Trade Name License Agreement, duly executed by Non-Houston Buyer or its Affiliate;~~

(ii)   ~~(iv)~~ a Special Warranty Deed, duly executed by the Owned Real Property Sellers, transferring the Owned Real Property to the Realty Buyer;

(iii)   ~~(v)~~ the certificate required to be delivered by the Sellers under Section 8.02(c), duly executed by the Sellers;

(iv)   ~~(vi)~~ affidavits meeting the requirements of Treasury Regulation § 1.1445-2(b)(2), duly executed by the Sellers;

(v)   ~~(vii)~~ a properly completed Texas Comptroller of Public Accounts Form 01-917, Statement of Occasional Sale, in the aggregate covering the conveyances of the Transferred Assets by Sellers to Buyers hereunder;

(vi)   ~~(viii)~~ a certified copy of the Sale Order, which order shall be a Final Order; ~~and~~

(vii)   ~~(ix)~~ all other documents, certificates, instruments or writings reasonably requested by Buyers in connection herewith; and

(viii)  a lease agreement between the Headquarters Lease Landlord and the applicable Buyer, on terms reasonably acceptable to such Buyer, providing for Buyer's lease of up to 10,000 square feet of office space on the third floor of the Headquarters (the "*Desired Headquarters Space*"), duly executed by the Headquarters Lease Landlord; *provided, however*, in the event Buyers notify Sellers pursuant to Section 5.03(f) that they do not intend to enter into a lease agreement for the Desired Headquarters Space, Sellers shall provide Buyers access to and use of the Desired Headquarters Space, rent-free and for transitional purposes and for all purposes in operating the Acquired Business, for a period of up to six weeks (6) following the Closing Date.

Section 2.09  **Allocation of Purchase Price.**  The Sellers and Buyers agree that the Transactions will be treated as an asset acquisition for tax purposes.  Within thirty (30) calendar days after the Closing Date, Buyers shall prepare and provide a proposed allocation of the Purchase Price among the Transferred Assets (the "*Purchase Price Allocation*") to the Sellers. Such proposed Purchase Price Allocation shall be in accordance with Section 1060 of the Code and final and binding on the Parties unless, within thirty (30) calendar days after Buyers provide such proposed Purchase Price Allocation, the Sellers notify Buyers of their disagreement with any item in such proposed allocation.  In the event of such notification, the Sellers and Buyers shall negotiate in good faith to resolve such dispute; *provided, however*, that if the Sellers and Buyers cannot resolve such dispute within thirty (30) calendar days then they shall be entitled to file separate allocations.  Any allocation of the Final Purchase Price agreed to pursuant to this section shall be binding on Buyers and the Sellers for all Tax reporting purposes except that neither Party shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, claim, or similar proceedings.  The Purchase Price Allocation shall be for tax purposes only, and the Purchase Price Allocation shall not have any effect on any other distribution or disbursement of monies to secured or unsecured creditors in any of the Bankruptcy Cases, if applicable.

Section 2.10  **Transfer Taxes.**

(a)  Transfer Taxes.  All federal, state and local transfer Taxes, including all state and local Taxes in connection with the transfer of the Transferred Assets, and all recording and filing fees (collectively, "*Transaction Taxes*") that may be imposed by reason of the sale, transfer, assignment and delivery of the Transferred Assets, and are not exempt under Section 1146(a) of the Bankruptcy Code shall be borne one hundred percent (100%) by Sellers. Transaction Taxes do not include any Tax in the nature of an income tax, including any capital gains, franchise, excise, inheritance, estate, succession, or gift taxes.  The Sellers and Buyers shall cooperate to minimize any such Transaction Taxes and to determine appropriate taxing authorities and amount of Transaction Taxes, if any, payable in connection with the Transactions. The Sellers shall assist Buyers reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

(b)  Straddle Periods.  In the case of any Straddle Period, the amount of any real or personal property, ad valorem or similar Taxes of any Seller with respect to the Transferred Assets (the "*Property Taxes*") allocated to a the Pre-Closing Tax Period shall be the

23

amount of such Property Taxes for the entire Straddle Period, multiplied by a fraction, the numerator of which is the number of days in the Straddle Period through and including the Closing Date, and the denominator of which is the number of days in such Straddle Period. Any Property Taxes for any Straddle Period not allocated to a Pre-Closing Tax Period shall be allocable to the Post-Closing Tax Period. Sellers shall be responsible for, pay, and indemnify Buyers in respect of, any Property Taxes that are allocated to the Pre-Closing Tax Period, and Buyers shall be responsible for, pay, and indemnify Sellers in respect of, any Property Taxes allocable to the Post-Closing Tax Period.

(c)     Cooperation. Buyers and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Transferred Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any Claims, suit or proceeding relating to any Tax, and the claiming by Buyers of any federal, state or local business tax credits or incentives that Buyers may qualify for in any of the jurisdictions in which any of the Transferred Assets are located; *provided, however*, that neither Buyers nor any Seller shall be required to disclose the contents of its income Tax Returns to any Person other than the Parties. Any expenses incurred in furnishing such information or assistance pursuant to this Section 2.10(c) shall be borne by the Party requesting it.

**Section 2.11     Title Reports, Surveys and other Owned Real Property Information.** Prior to the Execution Date, the Owned Real Property Sellers have provided to Buyers the following with respect to the Owned Real Property:

(a)     title reports with respect to each parcel of Owned Real Property prepared as of a recent date prior to the Execution Date;

(b)     existing surveys, if in the possession of the Owned Real Property Sellers, with respect to each parcel of Owned Real Property;

(c)     a copy of property Tax statements for the Owned Real Property for the most recent two (2) tax years; and

(d)     if in the possession of the Owned Real Property Sellers, a copy of all maps, plats, easements, utility information and agreements, permits, licenses, certificates of occupancy, zoning letters, soil reports and tests, correspondence with or from all Governmental Authorities with authority over the Owned Real Property, environmental site assessments and studies, engineering reports, hazardous material reports, appraisal reports, and other similar matters relating to the Property.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers represent and warrant to Buyers as of the Execution Date, and the Debtors represent and warrant to Buyers as of the Closing Date, as follows.

24

6802857v2

**Section 3.01   Corporate Existence and Power**.   The Sellers are duly organized and existing under the laws of their jurisdiction of organization.

**Section 3.02   Authorization**.   On the Execution Date, the execution, delivery and performance by the Sellers of this Agreement and the other Transaction Documents dated the Execution Date to which the Sellers are a party and the consummation of the Transactions have been duly authorized by all necessary action on the part of the Sellers. As of the Closing Date, subject to the filing of the Bankruptcy Cases and the entry of the Sale Order by the Bankruptcy Court, this Agreement and each other Transaction Document to which the Debtors will be a party on the Closing Date (assuming in each case due authorization, execution and delivery thereof by the other parties thereto) constitute valid and binding agreements of the Debtors, enforceable against the Debtors in accordance with their terms (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditors' rights generally and general principles of equity).

**Section 3.03   Governmental Authorization**.   The execution, delivery and performance by the Sellers of this Agreement and each other Transaction Document to which they are or will be parties and the consummation by the Sellers of the Transactions require no action by or in respect of, or filing with or notification to, any Governmental Authority other than, subject to the filing of the Bankruptcy Cases following the Execution Date, the filing of appropriate pleadings and notices with the Bankruptcy Court, the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court, the approval of this Agreement by the Bankruptcy Court and as specifically provided in this Agreement.

**Section 3.04   Title to Transferred Assets**.   As of the Closing Date, subject to the filing of the Bankruptcy Cases and the entry of the Sale Order by the Bankruptcy Court, the Debtors shall deliver to Buyers (i) good and marketable title to all of the Transferred Assets (other than Owned Real Property and the Leased Real Property), (ii) a valid leasehold interest in the Leased Real Property, and (iii) good and indefeasible title to the Owned Real Property, in each case free and clear of all Liens (other than Permitted Liens), Claims and Interests to the maximum extent permitted by Section 363(f) of the Bankruptcy Code, other than Specifically Assumed Liabilities.

**Section 3.05   Brokerage Fees**.   Except as set forth on Schedule 3.05, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Sellers or the Debtors which is or will be entitled to any fee, commission or other compensation in connection with the Transactions.

**Section 3.06   365 Contracts**.   Schedule 3.06 contains a correct and complete list of all 365 Contracts that are material to the operation of the Acquired Business. The Sellers have made available to Buyers true, correct and complete copies of each such 365 Contract. Except for those 365 Contracts indicated by an asterisk on Schedule 3.06, none of the Sellers is the licensor of any intellectual property, including any trademarks or any other property that could be the subject of an election under Section 365(n) of the Bankruptcy Code.

**Section 3.07   Taxes.**

(a)     All material Tax Returns required to have been filed by or with respect to the Sellers have been filed (taking into account any extension of time to file granted or obtained) and such Tax Returns are true, correct and complete in all material respects;

(b)     Except as set forth on Schedule 3.07(b), all material Taxes required to have been paid by or with respect to the Sellers have been paid, other than Taxes of the Sellers the payment of which is prohibited or stayed by the Bankruptcy Code;

(c)     There are no Liens with respect to Taxes on any of the Transferred Assets of the Sellers, other than such Liens that will be released upon entry of the Sale Order, as applicable; and

(d)     The Sellers have not received any written notice of any pending or threatened assessment of Taxes, or any audits, examinations, investigations, or other proceedings in respect of Taxes or Tax Returns of the Sellers.

**Section 3.08   Transactions with Affiliates.**   Schedule 3.08 sets forth a complete and correct list of all transactions to or by which the Sellers, on the one hand, and any Affiliate of the Sellers, on the other hand, are a party or are otherwise bound or subject, and by which any of the Transferred Assets are bound or subject.

**Section 3.09   Compliance with Laws.**   The Sellers are in compliance in all respects with the requirements of Applicable Laws (other than Healthcare Laws, as to which the Sellers' sole representations and warranties are set forth in Section 3.10, and Environmental Laws, as to which the Sellers' sole representations and warranties are set forth in Section 3.14), except (a) for matters of non-compliance that would not reasonably be expected to have a Sellers Material Adverse Effect, (b) instances in which such requirement of Applicable Law is being contested in good faith by appropriate proceedings diligently conducted, or (c) where compliance with such Applicable Law is excused or stayed by the Bankruptcy Code or by order of the Bankruptcy Court.

**Section 3.10   Healthcare Laws.**

(a)     The Sellers are currently in material compliance with all applicable Healthcare Laws.   No Seller has received notice from any Governmental Authority of any pending or threatened Proceeding, or any circumstances or facts which could give rise thereto, involving the Sellers, their assets or any physician employed or engaged by the Sellers with respect to any applicable Healthcare Law.

(b)     Each Seller is in possession of all Permits, notices or other authorizations necessary or required under any Healthcare Law for such Seller to own, lease and operate its properties and to carry on the Acquired Business and activities as currently conducted, except as would not, individually or in the aggregate, reasonably be expected to result in a Sellers Material Adverse Effect. To Sellers' Knowledge, each Permit that is held by a Seller is valid and in full

26

force and effect, and no revocation, withdrawal, rescission, suspension, modification, termination or cancellation of any such Permit is pending or threatened.

**Section 3.11**   **Legal Proceedings**.  Except (a) as set forth on Schedule 3.11, (b) for the Bankruptcy Cases and (c) for any matters that otherwise will not be resolved by the Sale Order without any Liability or restriction applicable to (or adverse effect on) Buyers or the Transferred Assets, there is no Proceeding of any nature pending or, to any Seller's Knowledge, threatened against or by such Seller (i) relating to or affecting the Transferred Assets or the Specifically Assumed Liabilities, (ii) if determined or resolved adversely in accordance with the plaintiff's demands, would reasonably be expected to have, individually or in the aggregate, a Sellers Material Adverse Effect, (iii) in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions, or (iv) affects the execution and delivery by the Sellers of this Agreement and the other Transaction Documents to which the Sellers are or will be a party.

**Section 3.12**   **Absence of Restrictions and Conflicts**.  The execution, delivery and performance by the Sellers of this Agreement and the other Transaction Documents to which the Sellers are or will be a party and the consummation by the Sellers of the Transactions do not and will not (a) contravene, conflict with, or result in any violation or breach of any provision of the Sellers' Organizational Documents, (b) assuming compliance with the matters referred to in Section 3.03, contravene, conflict with or result in a violation or breach of any provision of any Applicable Law, or (c) assuming compliance with the matters referred to in Section 3.03, require any consent or other action by any Person under, constitute a default, or an event that, with or without notice or lapse of time or both, would constitute a default, under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit to which the Sellers are entitled under any provision of any Contract binding upon the Sellers or by which the Transferred Assets may be bound or any Permit affecting, or relating in any way to, the Sellers, the Transferred Assets or the Acquired Business, with only such exceptions, in the case of each of clauses (b) or (c), as has not had and would not reasonably be expected to result in, a Seller Material Adverse Effect.

**Section 3.13**   **Intellectual Property**.

(a)   The Sellers own, or have the licenses or rights to use, all Intellectual Property Rights that are necessary to operate the Acquired Business as currently conducted, including with respect to the Trade Name, except where the failure to so own, or to have any such license or right, would not reasonably be expected to result in a Seller Material Adverse Effect.

(b)   The IP Seller has not received from any Third Party a claim in writing that the IP Seller is infringing in any material respect the Intellectual Property Rights of such Third Party, except for the Retained Seller Mark.

**Section 3.14**   **Environmental**.

(a)   To the Sellers' Knowledge, the Acquired Business has been conducted in compliance with all applicable Environmental Laws, except for such noncompliance as would

27

not, individually or in the aggregate, reasonably be expected to result in a Sellers Material Adverse Effect.

(b)     No Seller has received any written notice or demand letter from any Governmental Authority or Third Party, indicating that such Seller is in violation of, or liable under, any Environmental Law, which violation or liability has not heretofore been resolved with such Governmental Authority or Third Party and which violation or liability would reasonably be expected to result, individually or in the aggregate, in a Sellers Material Adverse Effect.

(c)     (i) No Seller has owned, leased or operated a site that pursuant to CERCLA or any similar state or foreign Law, has been placed or is proposed to be placed by any Governmental Authority on the "National Priorities List" or similar state or foreign list, as in effect as of the Closing Date, and (ii) except as would not reasonably be expected to result in a Sellers Material Adverse Effect, no Seller has been identified by any Governmental Authority as a potentially responsible party under CERCLA or any analogous state Law with respect to any site, and no Hazardous Materials generated, transported or disposed of by or on behalf of any Seller have been found at any site where a Person has made written demand on any Seller to conduct or pay for a remedial investigation, removal or other response action pursuant to any applicable Environmental Law.

**Section 3.15   Real Property.**

(a)     Schedule 3.15(a) sets forth a correct and complete legal description of the Owned Real Property together with the owner thereof. Upon entry of the Sale Order by the Bankruptcy Court, the applicable Debtor, as listed on Schedule 3.15(a), will have good and indefeasible fee simple title to the Owned Real Property, subject only to Permitted Liens.

(b)     Schedule 3.15(b) sets forth a correct and complete legal description of the Leased Real Property. Upon entry of the Sale Order by the Bankruptcy Court, the applicable Debtor, as listed on Schedule 3.15(b), will have a valid leasehold interest in the Leased Real Property, and the leases granting such interests will be in full force and effect.

(c)     No portion of the Seller Real Property, or any building or improvement located thereon, violates any Applicable Law, including those Applicable Laws relating to zoning, building, land use, environmental, health and safety, fire, air, sanitation and noise control, except as set forth on Schedule 3.15(c) and for such violations as would not reasonably be expected to result in a Sellers Material Adverse Effect. Except as set forth on Schedule 3.15(c) and for the Permitted Liens and Liens that will be released at or prior to the Closing, no Seller Real Property is subject to (i) any decree or order of any Governmental Authority (or, to the Sellers' Knowledge, threatened or proposed order) or (ii) any rights or way, building use restrictions, exceptions, variances, reservations or limitations or any nature whatsoever.

(d)     The Owned Real Property Sellers now have good and indefeasible fee simple title to the Owned Real Property, and no other party has any rights in, or to acquire, the Owned Real Property. To the Sellers' Knowledge, there are no private land use restrictions (excluding any applicable zoning ordinances) affecting the Owned Real Property which prohibit the Owned Real Property from being used as an emergency room or emergency center.

28

(e)     To the Sellers' Knowledge, there have been no assessments for public improvements which have been made against or which affect the Owned Real Property and which have not heretofore been completed, assessed and paid, and there have been no public improvements which have been planned or ordered to be made against or which affect the Owned Real Property. Except as set forth on Schedule 3.15(e), the Owned Real Property Sellers have not received any written notice of a proposed increase in the assessed value of the Owned Real Property or any Taxes or assessments affecting the Owned Real Property. To the Sellers' Knowledge, the Owned Real Property Sellers have not been receiving any special Tax treatment for the Owned Real Property or any special use or reduced valuation for the Owned Real Property or any special use or reduced valuation for the Owned Real Property.

(f)     Except as set forth on Schedule 3.15(f), there are no suits, actions or proceedings (including any proposed zoning changes or condemnation proceedings) pending or, to the Sellers' Knowledge, threatened that affect the Owned Real Property.

(g)     Except as set forth on Schedule 3.15(g), the Owned Real Property Sellers have received no written notices of any claims, demands, litigation, proceedings or governmental investigations, pending or threatened, against or related to the Owned Real Property or which could affect the Owned Real Property Sellers' interest in the Owned Real Property or the Owned Real Property Sellers' ability to perform its obligations under the Contract concerning the Owned Real Property.

(h)     To the Sellers' Knowledge, there are not now, nor have there ever been, any underground or leaking tanks, including associated piping, on, under or at the Owned Real Property. Except as set forth on Schedule 3.15(h), neither the Owned Real Property Sellers, the Operating Sellers, nor any agent, employee or representative thereof, have caused or permitted materials to be disposed of on, under or at the Owned Real Property, which materials, if known to be present, would require cleanup, removal or some other remedial action under any Environmental Law. Except as set forth on Schedule 3.15(h), the Owned Real Property Sellers have not received written notice of any violation of any Environmental Law on the Owned Real Property which may directly or indirectly affect the Owned Real Property. To the Sellers' Knowledge, no Hazardous Materials have been released or discharged onto the Owned Real Property by the Owned Real Property Sellers or the Operating Sellers or at the Owned Real Property Sellers' and the Operating Sellers' direction, or to the Sellers' Knowledge, by any other Person.

(i)     On the date of the Closing, the Owned Real Property shall be free of any lease or other right of possession or claim of right of possession by any person or entity other than Realty Buyer.

**Section 3.16   Employment and Labor.**

(a)     On or prior to the Execution Date, the Sellers provided OpCo Buyer with a complete and accurate list of all Employees of each Acquired Business as of the Execution Date (the "***Sellers' Transferred Employee List***"), which list shall be updated prior to the Closing in accordance with Section 6.02.

29

(b)     The Sellers are not a party to, bound by, any collective bargaining or other agreement with a labor organization representing any of the Employees.  Since the date of their respective formation, there has not been, nor, to the Sellers' Knowledge, has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor activity or dispute affecting any Seller or any of the Employees.

**Section 3.17   No Other Representations or Warranties.**   Except for the representations and warranties contained in this Article 3 (as modified by the Schedules hereto), none of the Sellers or any other Person makes any express or implied representation or warranty with respect to the Sellers, the Acquired Business, the Transferred Assets, the Specifically Assumed Liabilities or the Transactions, and each Seller disclaims any other representations and warranties, whether made by any Seller, any Affiliate of the Sellers or any of their respective Representatives.  Except for the representations and warranties contained in this Article 3 (as modified by the Schedules hereto), the Sellers expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Transferred Assets or the Specifically Assumed Liabilities (including any implied or express warranty of merchantability or fitness for a particular purpose).

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYERS

Buyers represent and warrant to the Sellers, as of the Execution Date and as of the Closing Date, that:

**Section 4.01   Corporate Existence and Power.**   OpCo Buyer is a Texas limited liability company existing and in good standing under the laws of Texas and has full power and authority to carry on its business as now conducted.  Realty Buyer is a Texas limited liability company existing and in good standing under the laws of Texas and has full power and authority to carry on its business as now conducted.

**Section 4.02   Authorization.**   The execution, delivery and performance by each of the Buyers of this Agreement and the other Transaction Documents to which it is or will be a party and the consummation of the Transactions are within the powers of Buyers and have been duly authorized by all necessary action on the part of Buyers.  Each of this Agreement and the other Transaction Documents to which any of the Buyers are party have been duly executed and delivered on behalf of Buyers, and (assuming in each case due authorization, execution and delivery thereof by the other parties thereto) constitutes a valid and binding agreement of Buyers, enforceable against Buyers in accordance with its terms (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditors' rights generally and general principles of equity).

**Section 4.03   Governmental Authorization.**   The execution, delivery and performance by Buyers of this Agreement and each other Transaction Document to which Buyers are or will be a party and the consummation by Buyers of the Transactions require no action by or in respect of, or filing with or notification to, any Governmental Authority other than, subject to the filing of the Bankruptcy Cases following the Execution Date, the filing of appropriate pleadings and notices with the Bankruptcy Court, the entry of the Bidding Procedures Order and the Sale Order

n8028574-2

by the Bankruptcy Court, and the approval of this Agreement by the Bankruptcy Court or as specifically provided in this Agreement.

Section 4.04   **Healthcare Laws**.   OpCo Buyer has the power and authority to consummate the Transactions, to assume and maintain all Permits included in the Transferred Assets and to operate the Facilities, all in accordance with all applicable Healthcare Laws.  To OpCo Buyer's knowledge, there is no reason that any such Permit or filing, consent or approval of or by any Governmental Authority that is or will be necessary for the operation of the Facilities by OpCo Buyer following the closing will not be provided by or obtained from such Governmental Authority without material conditions.

Section 4.05   **Legal Proceedings**.  As of the Execution Date, there is no Proceeding (or any basis therefor) pending against, or, to the knowledge of Buyers, threatened against or affecting Buyers, any present or former officer, director or employee of Buyers or any other Person for whom Buyers may be liable or any of its respective properties, that, (a) if determined or resolved adversely in accordance with the plaintiff's demands, would reasonably be expected to have, individually or in the aggregate, a Buyers Material Adverse Effect, (b) in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions, or (c) affects the execution and delivery by Buyers of this Agreement and the other Transaction Documents to which either Buyer is or will be a party.

Section 4.06   **Absence of Restrictions and Conflicts**.  The execution, delivery and performance by Buyers of this Agreement and the other Transaction Documents to which any of the Buyers is or will be a party and the consummation by Buyers of the Transactions do not and will not (a) contravene, conflict with, or result in any violation or breach of any provision of the Buyers' Organizational Documents, (b) assuming compliance with the matters referred to in Section 4.03, contravene, conflict with or result in a violation or breach of any provision of any Applicable Law, or (c) assuming compliance with the matters referred to in Section 4.03, require any consent or other action by any Person under, constitute a default, or an event that, with or without notice or lapse of time or both, would constitute a default, under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit to which Buyers are entitled under any provision of any Contract binding upon Buyers or by which its assets may be bound or any Permit affecting, or relating in any way to, Buyers or the assets or business of Buyers, with only such exceptions, in the case of each of clauses (b) and (c), as has not had and would not reasonably be expected to result in, a Buyers Material Adverse Effect.

Section 4.07   **Financing**.  Buyers have, and will have at Closing, sufficient cash and available lines of credit and other sources of available funds to enable it to perform all of its obligations under this Agreement and the other Transaction Documents to which they will be a party, including to pay the  Purchase Price in accordance with the terms of this Agreement.

Section 4.08   **Arm's Length**.   This Agreement and each of the other Transaction Documents to which Buyers are party were negotiated, proposed and entered into between the Sellers and Buyers without collusion or fraud of any kind, in good faith and from arm's-length bargaining positions.

6802857v2

**Section 4.09    Finders' Fees**.    There is no investment banker, broker, finder or other intermediary which has been or will be retained by or authorized to act on behalf of Buyers which is or will be entitled to any fee, commission or other compensation in connection with the Transactions.

**ARTICLE 5**
**PRE-CLOSING COVENANTS OF THE PARTIES**

**Section 5.01    Conduct of the Acquired Business**.    From the Execution Date until the Closing or, if earlier, the termination of this Agreement, except (i) as otherwise required or permitted by this Agreement or any of the other Transaction Documents, (ii) as required by any Contract existing as of the Execution Date to which a Seller is a party and which has been made available to Buyers and which has not been rejected prior to Closing, (iii) as required by any Applicable Law or any Governmental Authority or any requirements or, subject to the filing of the Bankruptcy Cases, limitations resulting from the Bankruptcy Cases or orders from the Bankruptcy Court, or (iv) as otherwise consented to in writing by Buyers (such consent not to be unreasonably withheld, conditioned or delayed), the Sellers agree that they shall:

        (a)    use commercially reasonable efforts to conduct the Acquired Business in a manner consistent with the recent operation of the Acquired Business prior to the Petition Date;

        (b)    use commercially reasonable efforts to maintain all of the tangible Transferred Assets in their current condition, reasonable wear and tear excepted;

        (c)    comply with Applicable Laws, except for matters of non-compliance as would not reasonably be expected to have a Sellers Material Adverse Effect;

        (d)    maintain their books and records in the usual, regular and ordinary manner;

        (e)    not merge or consolidate with or into any legal entity, dissolve, liquidate, or otherwise terminate its existence;

        (f)    not sell, lease, assign, transfer or otherwise dispose of any material assets or properties that would be Transferred Assets if retained by Sellers at the Effective Time, other than (i) Inventory and materials sold, consumed or otherwise disposed of in a manner consistent with the recent operation of the Acquired Business prior to the Petition Date and (ii) assets or properties that relate to or are used in the performance of shared services provided by any of the Sellers to any of the other Sellers or their Affiliates;

        (g)    not assume, assign, reject, terminate or materially amend any executory contract or unexpired lease that is a Desired 365 Contract;

        (h)    not fail to keep in full force and effect present insurance policies, binders, contracts, instruments or other comparable insurance benefiting the assets of the Sellers and the conduct of the Acquired Business;

32

(i)      not enter into any agreement or execute an instrument that materially adversely affects title to the Owned Real Property without the prior review and approval of the Realty Buyer;

(j)      not enter into, create, incur or assume any obligation, take any other action, or enter into any agreement with respect to any Transferred Assets or Specifically Assumed Liabilities, in any case which are other than in a manner consistent with the recent operation of the Acquired Business prior to the Petition Date; and

(k)      not commit or agree, whether in writing or otherwise, to take any action prohibited by this Section 5.01.

### Section 5.02   **Bankruptcy Filings and Bidding Procedures**.

(a)      No later than July 19, 2018, the Sellers shall file petitions commencing the Bankruptcy Cases, and no later than three (3) days after the Petition Date, the Sellers shall file the Bidding Procedures and Sale Motion pursuant to Sections 363 and 365 of the Bankruptcy Code seeking entry of the Bidding Procedures Order approving, among other things, (i) the bidding procedures set forth in the Bidding Procedures and Sale Motion, including the establishment of the Qualified Bid Deadline (as defined below), (ii) the schedule for an auction (the "*Auction*") and a hearing to consider approval of the sale of the Transferred Assets, (iii) the Bid Protections (as defined below), and (iv) the form and manner of notice of the proposed Transactions.

(b)      The Sellers shall use commercially reasonable efforts to obtain entry of the Bidding Procedures Order, which Bidding Procedures Order shall be reasonably acceptable to Buyers.

(c)      If, and to the extent, so provided in Section 9.02(d), Buyers shall be entitled to an amount equal to three percent (3%) of the Purchase Price, and Buyers' reasonable, documented out-of-pocket fees, costs and expenses (the "*Reimbursable Expenses*") incurred, owed or paid to Third Parties in an aggregate amount not greater than ~~Three Hundred Twenty Thousand and No/100 Dollars~~ ($320,000.00) (including investment adviser fees and expenses, investment banking and financing fees and expenses, attorneys' fees and expenses, consulting fees and expenses, accounting fees and expenses and Buyers' out-of-pocket expenses) in the evaluation of a bid for the Acquired Business, the Transferred Assets and the Specifically Assumed Liabilities, the negotiations and execution of this Agreement and the other Transaction Documents, and efforts related to consummation of the transaction contemplated hereby (the "*Bid Protections*"); *provided, however*, Buyers shall present supporting documentation with respect to all Reimbursable Expenses for which it desires reimbursement. Any dispute regarding the reasonableness of the Bid Protections shall be resolved by the Bankruptcy Court.

(d)      The Sellers and their respective Affiliates and Representatives shall be permitted to market and solicit inquiries, proposals, offers or bids from, any Person other than Buyers regarding an Alternative Transaction, and may take any other affirmative action in connection therewith (including (i) entering into any Alternative Agreement (or letter-of-intent with respect thereto), (ii) issuing press releases, placing advertisements or making other releases or disclosures in connection therewith), or (iii) seeking approval of the Bankruptcy Court for any

Alternative Transaction), and nothing in this Agreement will, or is intended to, in any way be deemed to restrict such actions or efforts. None of the Sellers nor any of their respective Affiliates or Representatives shall have any liability to Buyers or any of its Affiliates or Representatives, either under or relating to this Agreement or any Applicable Law, by virtue of entering into or seeking Bankruptcy Court approval of such an Alternative Agreement (or letter-of-intent with respect thereto) provided that Buyers are paid the Bid Protections to the extent required to be paid pursuant to Section 9.02(d) at the time provided for therein.

(e)     The bidding procedures set forth in the Bidding Procedures Order shall require that all "qualified bids" (as determined pursuant to the Bidding Procedures Order) be submitted by no later than August 22, 2018 (the "*Qualified Bid Deadline*").

(f)     The bidding and auction procedures set forth in the Bidding Procedures Order shall require the following: (a) any proposed Alternative Agreement shall be in the form of this Agreement, shall be accompanied by a good faith deposit of ~~One Million Six Hundred Thousand and No/100 Dollars ($1,600,000.00)~~$1,600,000.00, and shall provide for a purchase price equal to the sum of Buyer's Purchase Price *plus* the Bid Protections as calculated in Section 5.02(c) *plus* ~~Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00)~~$250,000.00. Subject to the adjustment of the Purchase Price pursuant to Section 2.06(a)(ii), the initial overbid amount for the Transferred Assets, as determined in accordance with the Bidding Procedures Order, shall be ~~Thirty-Three Million Five Hundred Thirty Thousand and No/100 Dollars ($33,530,000.00)~~$33,530,000.00. After the initial overbid, all further overbids must be in increments of ~~One Hundred Fifty Thousand and No/100 Dollars ($150,000.00)~~$150,000.00.

(g)     The Auction shall take place no later than three (3) Business Days following the Qualified Bid Deadline. At the conclusion of the Auction, the Sellers will announce the highest and/or best qualified bid (the "*Highest and/or Best Bid*") submitted by a Qualified Bidder (as defined in the Bid Procedures Motion) and the next highest and/or best qualified bid (the "*Back-Up Bid*") submitted by a Qualified Bidder (the "*Back-Up Bidder*"). The Sellers will seek approval of the Highest and/or Best Bid at the hearing on the Bidding Procedures and Sale Motion. If for any reason, Buyers are selected as the Back-Up Bidder, and the Qualified Bidder submitting the Highest and/or Best Bid fails to timely consummate the purchase of the Transferred Assets, the Sellers may seek to consummate a sale to Buyers pursuant to this Agreement without further approval by the Bankruptcy Court. If Buyers are selected as the Back-Up Bidder, its Back-Up Bid and the obligation of Buyers to consummate the Transactions shall remain open and in full force, including with respect to the Deposit, until the close of a sale of the Transferred Assets to the Person making the Highest and/or Best Bid.

(h)     The Sellers shall use best efforts to cause the hearing to approve the Sale Order ~~shall~~to take place no later than ~~two (2) Business Days following the Auction.~~September 12, 2018.

(i)     The Sellers shall use reasonable efforts to (i) obtain entry of the Sale Order, and (ii) cause the Sale Order to become a Final Order prior to the End Date.

(j)     If entry of the Bidding Procedures Order, the Sale Order or any other orders of the Bankruptcy Court relating to the Transactions shall be appealed or otherwise

challenged by any party (including by petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument), the Sellers agree to diligently oppose such appeal, challenge, petition or motion and to use all commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

**Section 5.03** **Assumption and Rejection of Executory Contracts and Leases**.

(a)     ~~By no later than July 24, 2018.~~On the Second Amendment Effective Date, (i) Buyers shall provide the Sellers with Schedule 5.03 to this Agreement, which shall be a list of the 365 Contracts that, as of such date, Buyers desire to be assumed by the Sellers and assigned to Buyers and shall include all of the Real Property Leases (collectively, the "*Desired 365 Contracts*"). ~~Not later than twenty (20) days after the delivery of such Schedule 5.03,~~, and (ii) the Sellers shall provide Buyers with a schedule of the Cure Costs with respect to the 365 Contracts (including the Desired 365 Contracts) as of ~~the Petition Date. At~~such date. From time to time and at any time prior to ~~three (3) days before the Qualified Bid Deadline,~~September 13, 2018, Buyers may (~~i~~y) designate any 365 Contract that has not been rejected as a Desired 365 Contract and (~~ii~~z) remove the designation of any 365 Contract as a "Desired 365 Contract," (other than the Real Property Leases) in each case by providing the Sellers with an updated Schedule 5.03 clearly identifying such updated designation(s) (which updated Schedule 5.03 shall be deemed to automatically replace any prior Schedule 5.03). ~~Promptly upon Buyers being selected as the Winning Bidder.~~ Buyers shall take all necessary action to effect the assumption by Sellers of any Desired 365 Contract and assignment to Buyers in accordance with the Bankruptcy Code at the Closing, such assumption to be effective as of the Effective Time.

(b)     At the Closing, Buyers shall pay ~~(i)~~ all Cure Costs with respect to the Desired 365 Contracts (~~other than the T-System Contract and~~including the Real Property Leases) ~~and (ii) only if OpCo Buyer hereafter elects to assume the T-System Contract, then and in that event, the T-System Cure Costs, in each case subject to the limitations in Section 2.03(b,~~ all of which shall be assumed). Buyers will provide evidence of adequate assurance (but not any personal guaranty of any obligations) of future performance of all of the Desired 365 Contracts so that all Desired 365 Contracts can be assumed by Buyers at the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement; *provided*, however, that if Buyers are unable to provide evidence of adequate assurance of future performance as to any Desired 365 Contract, then Schedule 5.03 shall be deemed to be amended to remove any such Desired 365 Contract; *provided, further*, that failure to provide evidence of such adequate assurance shall not be deemed to give rise to a failure of any condition of Buyers to consummation the Closing under Article 8. In that regard, Buyers acknowledge and agree that Buyers may have to provide information regarding Buyers, as well as a financial commitment of performance by Buyers with respect to the Desired 365 Contracts from and after the Closing to demonstrate adequate assurance of the performance of the Desired 365 Contracts.

(c)     The Sellers agree to provide to Buyers a copy of any motion, notice, application or other court document filed with, and any proposed orders submitted to, the Bankruptcy Court seeking authorization to assume or reject any Desired 365 Contract, enter into, amend or waive any provision of any Contract, other than as permitted under Section 5.01, in advance of filing (with a reasonable opportunity to review and comment on same) all of which

35

must be, prior to filing, in form and substance reasonably satisfactory to Buyers in all material respects.

(d)     Notwithstanding anything to the contrary contained in this Agreement, if the sale, conveyance, assignment or transfer, or attempted sale, conveyance, assignment or transfer, to Buyers of any License, Permit, certificate, approval, authorization, agreement, contract, lease, or other commitment included in the Transferred Assets ("**Non-Transferable Assets**") is determined by the Bankruptcy Court to be nonassignable without consent (other than of an Affiliate of Sellers, in which case such Seller covenants and agrees to cause such Affiliate to render such consent), the Closing shall proceed, but the Closing shall not constitute the sale, conveyance, assignment, transfer or delivery or assumption of any such Non-Transferable Asset, and this Agreement shall not constitute a sale, conveyance, assignment, transfer or delivery or assumption of any such Non-Transferable Asset, unless and until such consent is obtained; *provided, however*, the Sellers shall use commercially reasonable efforts to obtain any such consents related to the Non-Transferable Assets, and Buyers and Sellers shall reasonably cooperate with each other in any arrangement commercially reasonable to provide that Buyers shall receive the interest of the Sellers in the benefits under any such Non-Transferable Asset until such time as such consents shall have been obtained, and each of the Buyers and Sellers shall reasonably cooperate with the other party in any such commercially reasonable arrangement, including performance by the Sellers as agent if commercially reasonable to Buyers.

(e)     ~~With respect to each Specified Leased Real Property, by no later than five (5) Business Days prior to the Qualified Bid Deadline (a "*Specified Lease Assignment Deadline*"), Sellers shall deliver~~As of the Second Amendment Effective Date, Sellers have delivered to OpCo Buyer an assignment and assumption of lease, landlord's consent and amendment of lease ~~(a "*Specified Lease Assignment and Amendment*")~~, duly executed by the applicable Operating Seller and the applicable landlord of each Specified Leased Real Property, pursuant to which, subject to the approval of the Bankruptcy Court and effective as of the Closing, (i) such Operating Seller assigns its leasehold interest in such Specified Leased Real Property to the OpCo Buyer (or any entity specified by the OpCo Buyer) and (ii) such landlord agrees to amend the existing lease with respect to such Specified Leased Real Property to accomplish the following: the initial term of such Real Property Lease shall be five (5) years, with the lessee having two options to extend the term of such Real Property Lease for five (5) year periods~~; provided, however, with respect to any Specified Leased Real Property, if a Specified Lease Assignment and Amendment is not delivered by the Specified Lease Assignment Deadline, OpCo Buyer, in its sole discretion, may elect by written notice delivered to Sellers by no later than one (1) Business Day following the Specified Lease Assignment Deadline to either (y) waive the requirement of Sellers to deliver such Specified Lease Assignment and Amendment or (z) reduce the Purchase Price by an amount equal to the Specified Lease Reduction Amount attributable to such Specified Leased Real Property and designate all of the Transferred Assets of the Operating Seller that is the tenant under such Specified Leased Real Property as Retained Assets (the "Specified Lease Reduction Option"), other than the Transferred Assets of the Crosby Operating Seller which shall remain Transferred Assets notwithstanding OpCo Buyer's exercise of its Specified Lease Reduction Option with respect to the Crosby Specified Leased Real Property~~, except that in the case of the lease for the premises located at 14120 FM 2100, Crosby, Texas 77532, the option to extend shall be for seven (7) year periods.

36

(f) By no later than fourteen (14) Business Days following the Execution Date, Buyers shall provide Sellers with Buyers' proposed terms (including rent and term) for their lease of the Desired Headquarters Space in sufficient detail so as to enable Sellers to initiate discussions, on Buyers' behalf, with the Headquarters Lease Landlord regarding such proposed lease agreement. By no later than ten (10) Business Days prior to the Closing Date, Buyers shall provide Sellers with written notice as to whether they have finalized a definitive lease agreement with the Headquarters Lease Landlord with respect to the Desired Headquarters Space or, if no such lease agreement has been finalized, whether Buyers will require access to and use of the Desired Headquarters Space in accordance with the proviso set forth in Section 2.08(c)(viii) and the length of time for which such access and use shall be required (which shall not exceed six (6) weeks following the Closing Date).

**Section 5.04    Access to Information.**  From the Execution Date until the Closing and subject to Applicable Law (including Patient Privacy Requirements), the Sellers shall (a) give to Buyers and their Representatives reasonable access during normal business hours to the offices, properties, books and records of the Sellers (including Tax Returns with respect to the Transferred Assets), and (b) instruct their Representatives to cooperate with Buyers in its investigations; *provided, however,* that in no event shall any Person be obligated to provide any information the disclosure of which would cause the loss of any legal privilege available to any Person relating to such information or would cause any Person to breach a confidentiality obligation to which it is bound.  Any investigation pursuant to this <u>Section 5.04</u> shall be conducted in such manner as not to interfere unreasonably with the conduct of the Acquired Business of the Sellers or their Representatives.

**Section 5.05    Commercially Reasonable Efforts; Further Assurances.**

(a)    Subject to the terms and conditions of this Agreement and subject to the Bankruptcy Code and any orders of the Bankruptcy Court, Buyers and the Sellers each shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to consummate the Transactions, including (i) finalizing, executing and delivering all Transaction Documents prior to the Closing, (ii) preparing and filing as promptly as practicable with any Governmental Authority or other Third Party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents, and (iii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other Third Party that are necessary, proper or advisable to consummate the Transactions; *provided, however,* that the reasonable efforts of any Party hereto shall not include (A) except as expressly set forth in this Agreement, entering into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Authority in connection with the Transactions or (B) divesting or otherwise holding separate (including by establishing a trust or otherwise) any assets of the Sellers or Buyers.  Prior to the Closing Date, the Sellers shall provide Buyers with an updated list of all Employees, by location, who have suffered an "employment loss" (as defined in the WARN Act) during the three (3) month period prior to the Closing Date. The Sellers and Buyers shall execute and deliver or cause to be executed and delivered such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to

37

consummate or implement expeditiously the Transactions in accordance with the terms and conditions of this Agreement.

(b)     To the extent required under Applicable Law or any Healthcare Laws, Buyers shall file with applicable Governmental Authorities documentation notifying such Governmental Authorities of a change of ownership ("*CHOW*") of the Facilities effective as of the Closing Date. The Sellers shall assist and cooperate with Buyers to take all actions necessary to transfer the Permits (to the extent transferable) for the Facilities, including the filing of CHOW documents as the seller, and any other governmental approvals necessary for Buyers to operate the Facilities in the same manner as the Sellers. Buyers shall take all actions necessary to obtain all licenses, registrations, approvals and Permits in order for OpCo Buyer to operate the Facilities.

**Section 5.06   Notices of Certain Events**.  Each of the Sellers, on the one hand and Buyers, on the other hand, shall promptly notify the other of:

(a)     any written notice or other communication received by it from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(b)     any written notice or other communication received by it from any Governmental Authority in connection with the Transactions;

(c)     any Proceedings commenced or, in the case of the Sellers, to Sellers' Knowledge, or in the case of Buyers, to their knowledge, threatened against, relating to or involving or otherwise affecting the Sellers or Buyers, respectively, as the case may be, that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to any section of this Agreement or that relate to the consummation of the Transactions;

(d)     in the case of the Sellers, the damage or destruction by fire or other casualty of any material assets used in the Acquired Business or any material asset used in the Acquired Business becomes the subject of any Proceeding or, to Sellers' Knowledge, threatened Proceeding for the taking thereof or any part thereof or of any right relating thereto by condemnation, eminent domain or other similar governmental action;

(e)     any inaccuracy of any representation or warranty contained in this Agreement at any time during the term hereof that could reasonably be expected to cause the conditions set forth in Section 8.02(b) and Section 8.03(b) not to be satisfied, in the case of Buyers, to its knowledge, or in the case of the Sellers, to Sellers' Knowledge; and

(f)     any failure of that Party to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it hereunder; *provided, however*, that the delivery of any notice pursuant to this Section 5.06 shall not limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

## ARTICLE 6
## POST-CLOSING COVENANTS OF BUYERS

**Section 6.01   Access.**   Buyers, following the Closing, and subject to Applicable Law (including Patient Privacy Requirements), shall give to the Sellers and their Representatives reasonable access during normal business hours to the offices, books and records relating to Sellers, the Acquired Business and operations, the Transferred Assets and the Specifically Assumed Liabilities for any and all periods prior to or including the Closing Date as the Sellers and their Representatives may reasonably request and to make copies of the same in connection with (a) the preparation of Tax returns or information returns, (b) reports or other obligations by the Sellers to Governmental Authorities, (c) with respect to the administration of the Bankruptcy Cases or the winding-down of the Debtors' bankruptcy estates, (d) pursuing, prosecuting, or commencing litigation on Avoidance Actions, (e) objecting to proofs of claims or administrative expense claims, and (f) any final determination of any audit or examination, Proceeding, or determination; *provided, however*, that the obligation of Buyers to so accommodate the Sellers and their Representatives shall be subject to (A) reasonable notice from the Sellers of any request for information, (B) the Sellers' agreement to reimburse Buyers for their out-of-pocket expenses of such accommodation, (C) non-interference with the ordinary conduct of business of Buyers, and (D) the right of Buyers to refuse any request for information that would result in a loss of privilege or constitute a breach of any confidentiality obligation of Buyers. Buyers shall preserve all such books and records for a period of seven (7) years after the Closing or such longer period as may be required by Patient Privacy Requirements; *provided, however*, that Buyers shall have the right at any time after the second anniversary of the Closing Date to request in writing that the Sellers (so long as the Sellers are in existence) take any such records and, if they do not agree to take such records within ninety (90) Business Days after receipt of the request, Buyers may dispose of such records, subject to Patient Privacy Requirements. Buyers shall, and shall cause their Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided pursuant to this Section 6.01. For the avoidance of doubt, this provision is intended to, and does hereby, inure to the benefit of the successors and/or assigns of the Sellers and their Representatives including but not limited to any post-confirmation trust established in connection with the Sellers' Bankruptcy Cases.

**Section 6.02   Employee Matters.**

(a)      Not later than fifteen (15) days prior to the anticipated Closing Date, the Sellers shall provide OpCo Buyer with an updated Sellers' Transferred Employee List that identifies all Employees of the Acquired Business as of the date of such updated list. On or after the Closing Date and subject to satisfaction of OpCo Buyer's employment screening procedures and requirements, OpCo Buyer shall offer employment to each Employee engaged in the Acquired Business and identified on the updated Sellers' Transferred Employee List, upon such terms and conditions as OpCo Buyer may determine in its sole discretion (the "*Transferred Employees*"), subject to this Section 6.02. The Corporate and Shared Services Sellers shall cooperate with OpCo Buyer in permitting Opco Buyer to interview, on a voluntary basis, the Employees so as to determine whether such Employees satisfy OpCo Buyer's hiring requirements and to communicate any information concerning employment offers and potential employment with OpCo Buyer prior to the Closing Date so that any Employees who are hired by OpCo Buyer may commence employment on the Closing Date. Not less than ten (10) days

6802857v2

before the Closing Date, OpCo Buyer shall provide the Sellers with a list of the Transferred Employees to be hired by OpCo Buyer at Closing (the "*OpCo Buyer's Transferred Employee List*"), which schedule shall identify all Transferred Employees other than those that did not satisfy OpCo Buyer's screening procedures and hiring requirements. Effective as of the Closing Date, the Sellers shall terminate the employment of any Employees identified on the OpCo Buyer's Transferred Employee List.

(b)     Except with respect to the Specifically Assumed Liabilities, Buyers shall not assume, and the Corporate and Shared Services Sellers shall retain, any liability or obligation whatsoever of the Corporate and Shared Services Sellers relating to any of the ERISA Plans. Buyer shall be responsible for group health continuation coverage under COBRA with respect to all Employees and their dependents and any other individual who is an "M & A qualified beneficiary" within the meaning of Treasury Regulation Section 54.4980B-9, Q&A-4 in connection with the Transactions and associated with the Transferred Assets notwithstanding that the Corporate and Shared Services Sellers or any of their ERISA Affiliates may continue a group health plan after Closing. The Corporate and Shared Services Sellers shall cause any ERISA Plan that is maintained solely for the benefit of Employees and their dependents and which does not cover any other employees of Sellers, their Affiliates or their ERISA Affiliates to be terminated at Closing.

(c)     Each offer of employment by Buyer to an Employee pursuant to this Section 6.02 shall initially provide each Transferred Employee with (i) total target annual cash compensation which is not substantially less favorable, on an aggregate basis, to either (A) the base salary (or hourly wages, if applicable) provided by the applicable Seller to such Employee immediately prior to the Effective Time, or (B) a market-rate base salary (or hourly wages, if applicable), as determined by Buyer in its sole and absolute discretion; and (ii) other employee benefits (excluding equity incentive compensation) which are not substantially less favorable, in the aggregate, to the employee benefits (excluding equity incentive compensation) provided to similarly-situated employees of Buyer, subject to the terms, conditions and eligibility requirements of any plan providing for such benefits. For purposes of eligibility and vesting under each benefit plan of Buyer in which such Transferred Employees are eligible to participate following the Closing Date, Transferred Employees will be given credit for all service with the Sellers, and any Subsidiaries or predecessor employers for which the Sellers credited service, *provided* such credit is permitted under the terms of the applicable plans and does not result in duplication of benefits or the accrual of benefits under a defined benefit pension plan. Buyer will give each Transferred Employee credit for such Transferred Employee's balance of paid time off with the Corporate and Shared Services Sellers as of the Closing Date.

(d)     The Sellers will remain responsible for all Liabilities with respect to wages, salaries and employer's and employee's Withholding Taxes for the Transferred Employees that are accrued but unpaid after the Petition Date (excluding the PTO Obligations which shall be an Assumed Liability pursuant to Section 2.03) and for all Liabilities with respect to claims by Transferred Employees or their eligible dependents for health, accident, sickness, and disability benefits that are accrued but unpaid after the Petition Date (excluding any Liabilities under COBRA for Employees and their dependents). Except as may be required under COBRA, Buyers shall have no obligation or responsibility for any claims for health, accident, sickness, and disability benefits that are incurred prior to or on the Petition Date by any

40

Employees or their eligible dependents, or in the case of Employees who are not Transferred Employees or their eligible dependents both before and after the Closing Date. Subject to limitations imposed by Applicable Law, with respect to the employee welfare benefit plans maintained by Buyers following the Closing Date in which the Transferred Employees are eligible to participate, Buyers shall use commercially reasonable efforts to (i) waive, or cause to be waived, any limitations on benefits relating to waiting periods, pre-existing condition exclusions or actively at work requirements, except to the extent that such waiting period, exclusions or requirements applied to the Transferred Employee under the corresponding ERISA Plan and (ii) recognize any deductibles and other eligible expenses that were incurred by such Transferred Employees in the plan year in which the Effective Time occurs with respect to satisfying any deductibles or out-of-pocket maximums applicable to such Transferred Employee during the applicable plan year of the comparable OpCo Buyer benefit plan, to the extent such recognition would have been given under comparable ERISA Plans prior to the Effective Time.

(e)     Prior to the Closing Date, the Sellers shall be solely responsible for complying with the WARN Act and any and all obligations under other Applicable Laws requiring notice of plant closings, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Employees as a result of any action by the Sellers or any of their Affiliates prior to the Closing Date. OpCo Buyer shall be solely responsible for WARN Act Liabilities applicable to the Employees that are incurred on or after the Closing Date, including with respect to any Employee terminated prior to the Closing Date that, when aggregated with any Employee is not hired or who is terminated on or after Closing or for which any WARN Act Liability is incurred, results in WARN Act Liability with respect to such Employee terminated prior to Closing.

(f)     Nothing in this Agreement is intended to confer on any entity or individual who is not a party to this Agreement any rights whatsoever. This Section 6.02 shall not constitute an amendment to any employee benefit plan maintained by Opco Buyer or a Seller, create any third party beneficiary rights, or inure to the benefit of or be enforceable by, any employee or any Person representing the interests of employees.

Section 6.03  **Trade Name License Agreements and Transition Services Agreements**. Commencing promptly following the ~~Execution~~Second Amendment Effective Date, ~~Sellers and~~ OpCo Buyer shall negotiate in good faith with (a) the applicable Non-Houston Buyer on the terms of ~~the~~each Trade Name License Agreement and each Transition Services Agreement (Non-Houston Buyer) and (b) the Sellers on the terms of the Transition Services Agreement (Debtors' Estate), and shall use commercially reasonable efforts to finalize the definitive forms of such agreements by no later than the date that is ~~three (3) days prior to the Qualified Bid Deadline~~fourteen (14) days following the entry of the Sale Order.

## ARTICLE 7
## POST-CLOSING COVENANTS OF THE PARTIES

Section 7.01  **Certain Filings**. The Sellers and Buyers shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the Transactions

41

and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

**Section 7.02  Public Announcements.** The Sellers and Buyers agree that the consent (as to both form and content) of each other Party shall be obtained prior to issuing any press release or making any public statement with respect to this Agreement or the other Transaction Documents or the Transactions. Notwithstanding the foregoing, subject to the filing of the Bankruptcy Cases, the Sellers may file this Agreement and the other Transaction Documents with the Bankruptcy Court upon execution of this Agreement if they determine that such filing is appropriate and/or may inform the Bankruptcy Court of the existence and terms of this Agreement.

**Section 7.03  Confidentiality.** Buyers acknowledge and agree that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyers pursuant to this Agreement. If this Agreement is, for any reason, terminated prior to Closing, the Confidentiality Agreement and the provisions of this Section 7.03 shall nonetheless continue in full force and effect. This Agreement will be filed with the Bankruptcy Court, will be distributed as an exhibit to the Bidding Procedures and Sale Motion and may be included or summarized in such pleadings and documents, and that any such disclosures shall not violate this section. The Parties also agree that such disclosure or any other permitted disclosure in Section 7.03 shall not be deemed to violate any confidentiality obligations owing to any Party, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. Notwithstanding the foregoing, this Section 7.03 shall not in any way limit, to the extent required by Applicable Law, the disclosure of information by the Sellers in connection with the administration of the Bankruptcy Cases, pursuant to any provision of the Bankruptcy Code or any order of the Bankruptcy Court.

**Section 7.04  Mail and Other Post-Closing Inquiries.** The Sellers authorize Buyers on and after the Closing Date to receive and to open all mail received by Buyers relating to any of the Retained Assets or the Retained Liabilities. The Sellers shall promptly deliver to Buyers any mail or other communication received by the Sellers after the Closing Date pertaining to any of the Transferred Assets or the Specifically Assumed Liabilities. Buyers shall promptly deliver to the Sellers all other mail or communications received by Buyers or their Affiliates that relate to the Retained Assets or Retained Liabilities or to possible violations of Section 362 of the Bankruptcy Code.

**Section 7.05  Post-Closing Collection of Accounts Receivable.** After the Closing Date, Buyers shall have the right and authority to collect for their own account all Accounts Receivable that are included in the Transferred Assets. Sellers shall promptly transfer and deliver to Buyers any cash or other property which such Sellers may receive in respect of such Accounts Receivable that constitute Transferred Assets and any other amounts received by Sellers that constitute Transferred Assets for any period after the Closing Date.

## ARTICLE 8
## CONDITIONS TO CLOSING

**Section 8.01   Conditions to Obligations of Buyers and Sellers**.  The obligations of Buyers and the Sellers to consummate the Closing are subject to the satisfaction of each of the following conditions:

(a)   No Applicable Law shall prohibit the Transactions or the consummation of the Closing;

(b)   All actions by or in respect of or filings with any Governmental Authority required to permit the consummation of the Closing shall have been taken, made or obtained; and

(c)   No Proceeding instituted by any Governmental Authority shall be pending and no injunction, order, decree or judgment of any Governmental Authority of competent jurisdiction shall be in effect, in each case which seeks to or does, as applicable, prohibit, restrain or enjoin the consummation of the Transactions; *provided, however*, that the Party seeking to rely on this Section 8.01(c) as a basis not to consummate the Closing must have used commercially reasonable efforts to cause such Proceeding to have been dismissed or resolved in favor of the Parties or to prevent the entry of such injunction, order, decree or judgment.

**Section 8.02   Conditions to Obligations of Buyers**.  The obligation of Buyers to consummate the Closing is subject to the satisfaction (or waiver by Buyers) of each of the following further conditions:

(a)   The Sellers shall have performed in all material respects all of their covenants and agreements hereunder required to be performed by them on or prior to the Closing Date;

(b)   The representations and warranties of the Sellers set forth in Article 3 of this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of the Closing Date, disregarding any materiality, Sellers Material Adverse Effect or similar qualifiers, other than those representations and warranties that are made as of a specific earlier date which representations need not be true and correct as of the Closing Date but must be true and correct in all material respects as of such specific earlier date; *provided, however*, that the condition to Closing set forth in this Section 8.02(b) shall be deemed to be satisfied unless individually or in the aggregate, the effect of all breaches, inaccuracies and failures of such representations and warranties to be true and correct in all respects would reasonably be expected to result in a Sellers Material Adverse Effect;

(c)   Buyers shall have received a certificate signed by an executive officer of Sellers with respect to the items set forth in Sections 8.02(a) and (b);

(d)   There shall not have been any event causing a Sellers Material Adverse Effect;

43

(e)   The Sellers shall have delivered or be prepared to deliver all of the items required by Section 2.08 and all other items required to be delivered by the Sellers as of the Closing Date pursuant to the terms and conditions of this Agreement;

(f)   [intentionally omitted]; and

(g)   The Sale Order, in form and substance reasonably acceptable to Buyers, shall have been entered by the Bankruptcy Court prior to the Closing and such order shall be a Final Order and in full force and effect.

Section 8.03   **Conditions to Obligations of the Sellers**.  The obligation of the Sellers to consummate the Closing is subject to the satisfaction (or waiver by the Sellers) of the following further conditions:

(a)   Buyers shall have performed in all material respects all of their covenants and agreements hereunder required to be performed by them at or prior to the Closing Date;

(b)   The representations and warranties of Buyers in Article 4 of this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of the Closing Date, disregarding any materiality, Buyers Material Adverse Effect or similar qualifiers, other than those representations and warranties that are made as of a specific earlier date which representations need not be true and correct as of the Closing Date but must be true and correct in all material respects as of such specific earlier date; provided, however, that the condition to Closing set forth in this Section 8.03(b) shall be deemed to be satisfied unless individually or in the aggregate, the effect of all breaches, inaccuracies and failures of such representations and warranties to be true and correct in all respects would reasonably be expected to result in a Buyers Material Adverse Effect; and

(c)   Sellers shall have received a certificate signed by an executive officer of Buyers with respect to the items set forth in Sections 8.03(a) and (b);

(d)   Buyers shall have delivered or be prepared to deliver all of the items required by Section 2.08 and all other items required to be delivered by Buyers as of the Closing Date pursuant to the terms and conditions of this Agreement; and

(e)   The Sale Order in form and substance reasonably acceptable to Sellers, shall have been entered by the Bankruptcy Court prior to the Closing and such order shall be a Final Order and in full force and effect.

## ARTICLE 9
## TERMINATION

Section 9.01   **Grounds for Termination**.  Subject to the penultimate sentence of this Section 9.01, this Agreement may be terminated at any time prior to the Closing:

(a)   by mutual written agreement of the Sellers and Buyers;

44

(b)   by either the Sellers or Buyers if the Closing shall not have been consummated on or before October 31, 2018 (as extended, the "*End Date*"); *provided, however,* that if the Closing shall not have occurred on or before such date due to a material breach of any representation, warranty, covenants or agreements contained in this Agreement by Buyers, on one hand, or the Sellers, on the other, then the breaching Party may not terminate this Agreement pursuant to this Section 9.01(b); *provided, further,* that if the condition set forth in Section 8.01(b) shall not have been satisfied or duly waived by the fifth (5th) Business Day prior to October 31, 2018, then either Sellers or Buyers may, by written notice delivered to the other Parties, extend the End Date to a date not later than December 31, 2018 (and in the case of such extension, any reference to the End Date in any other provision of this Agreement shall be a reference to the End Date, as extended);

(c)   by either the Sellers or Buyers if there shall be any Applicable Law that makes consummation of the Transactions illegal or otherwise prohibited or if consummation of the Transactions would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction;

(d)   by Buyers if:

(i)   the Sellers shall have failed to perform or comply with any of their covenants or agreements or shall have breached any of their representations and warranties, such that the conditions set forth in Section 8.02(a) and Section 8.02(b) shall not be satisfied, and the Sellers shall have not cured such breaches and failures within fifteen (15) days after receipt of written notice from Buyers with the result that such condition remains unsatisfied;

(ii)   any condition set forth in Section 8.01 or Section 8.02 shall have become incapable of being satisfied by the End Date;

(iii)   the Sellers fail to consummate the Transactions, Buyers have otherwise complied with all of Buyers' obligations under this Agreement, and all of the conditions contained in Section 8.01 and Section 8.03 have been satisfied;

(iv)   any event has caused a Sellers Material Adverse Effect;

(v)   the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code or the Bankruptcy Court enters a Final Order appointing a trustee or an examiner with expanded powers (beyond those set forth under Section 1106(a)(3) of the Bankruptcy Code) in the Bankruptcy Cases prior to the Closing Date;

(vi)   if any of the following deadlines shall have been missed; *provided, however,* that the deadline set forth in Section 9.01(d)(vi)(A) shall be subject to the Bankruptcy Court's docket, and accordingly, (I) shall be deemed extended through the date of the hearing set by the Bankruptcy Court for consideration of the applicable pleading if, after using reasonable efforts, the Sellers are unable

45

to obtain a docket setting for such hearing prior to such deadline, (II) shall be deemed extended through the date(s) of any continued hearing set by the Bankruptcy Court for consideration of such pleading if, after using reasonable efforts, the Sellers are unable to conclude such hearing(s) prior to such deadline, and (III) shall be deemed extended as required to comply with any notice periods required under the Bankruptcy Code which, as a result of any extensions described under the foregoing clauses (I) and (II), cannot be complied with prior to such deadline:

(A)     the Sale Order does not become a Final Order by the End Date, unless the Sale Order is entered by the End Date but is not stayed by order of the Bankruptcy Court or of some other federal district or appeals court;

(B)     the Bankruptcy Court enters an order for the appointment of a trustee or examiner with managerial powers, other than at the request of the Buyers or any of its Affiliates, under Section 1104 of the Bankruptcy Code and such trustee or examiner takes any action to interfere with or impair the transactions contemplated by this Agreement;

(C)     the Bankruptcy Cases are converted to cases under Chapter 7 of the Bankruptcy Code, dismissed, or any similar commencement of liquidation proceedings relating to the Sellers occurs, other than as contemplated herein;

(D)     any of the Sellers executes an Alternative Agreement or takes affirmative steps to effect an Alternative Transaction; *provided* that this Agreement may not be terminated pursuant to this clause if and for so long as Buyers are the Back-Up Bidder; or

(E)     Buyers are not the Winning Bidder at the Auction pursuant to the Bidding Procedures Order; *provided* that this Agreement may not be terminated pursuant to this clause if and for so long as Buyers are the Back-Up Bidder; or

(e)     by the Sellers:

(i)     if Buyers shall have failed to perform or comply with any of its covenants or agreements or shall have breached any of its representations and warranties, such that the conditions set forth in Section 8.03(a) and Section 8.03(b) shall not be satisfied, and Buyers shall have not cured such breaches and failures within fifteen (15) days after receipt of written notice from the Sellers with the result that such condition remains unsatisfied;

(ii)     if any condition set forth in Section 8.01 or Section 8.03 shall have become incapable of being satisfied by the End Date;

46

(iii) the Sale Order does not become a Final Order by the End Date, unless the Sale Order is entered by the End Date but is not stayed by order of the Bankruptcy Court or of some other federal district or appeals court;

(iv) if any of the Sellers executes an Alternative Agreement or takes affirmative steps to effect an Alternative Transaction; or

(v) if Buyers are not the Winning Bidder at the Auction pursuant to the Bidding Procedures Order.

Notwithstanding the foregoing, the Sellers shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if the Sellers are in breach of any of their representations and warranties or shall have failed to perform or comply with any of their covenants and agreements such that either (A) the conditions to Closing set forth in Section 8.038.02(a) and Section 8.038.02(b) shall not be satisfied or (B) such breach or failure to perform or comply by the Sellers is the primary cause of the occurrence of any event giving Sellers a right to terminate this Agreement or the failure of the Closing to have occurred.  Buyers shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if Buyers are in breach of any of their respective representations and warranties or shall have failed to perform or comply with any of their respective covenants and agreements such that either (A) the conditions to closing set forth in Section 8.028.03(a) and Section 8.028.03(b) shall not be satisfied or (B) such breach or failure to perform or comply by Buyer is the primary causes of the occurrence of any event giving Buyers a right to terminate this Agreement or the failure of the Closing to have occurred.

### Section 9.02   Effect of Termination.

(a)   If any Party terminates this Agreement pursuant to Section 9.01 (other than pursuant to Section 9.01(a)), written notice thereof shall be given to the other Parties, specifying the provision of this Agreement pursuant to which termination is made, and all rights and obligations of the applicable Parties under this Agreement shall terminate (other than Section 7.03 and this Section 9.02, the provisions of Article 10 and such portions of Article 1 as are necessary to give effect to the foregoing, all of which shall survive termination of this Agreement); provided, however, that notwithstanding anything herein to the contrary, if such termination shall result from the willful and knowing (i) failure of either Party to fulfill a condition to the performance of the obligations of the other Party, (ii) failure to perform a covenant or agreement of this Agreement or (iii) breach by any Party hereto of any representation, warranty, covenant or agreement contained herein, such Party shall be fully liable for any and all Adverse Consequences incurred or suffered by the other Party as a result of such failure or breach.

(b)   If this Agreement is terminated for any reason, then the Parties shall promptly direct the Escrow Agent to disburse the Deposit to the Buyers, free and clear of any claims thereon by the Sellers; provided, however, if this Agreement is terminated by the Sellers pursuant to (i) Section 9.01(e)(i) or Section 9.01(e)(ii) (as a result of any condition set forth in Section 8.03(a), Section 8.03(b), Section 8.03(c) or Section 8.03(d) having become incapable of being satisfied by the End Date) or (ii) Section 9.01(b) because of the failure of Buyers to close in the instance where, as of the End Date, (A) all of the conditions set forth in Section 8.01 and

47

Section 8.02 (excluding conditions that, by their terms, cannot be satisfied until the Closing) have been satisfied (or waived, or deemed to have been waived, by Buyers), (B) the Sellers are ready, willing and able to close, and (C) Buyers nevertheless elect not to promptly close, the Sellers would not have any adequate remedy at law and would suffer damages that are not practicable to ascertain, and in the case of either clause (i) or (ii) of this Section 9.02(b), the Sellers shall be entitled to terminate this Agreement, and the Parties shall promptly direct the Escrow Agent to disburse the Deposit Amount to the Sellers as liquidated damages. The Sellers agree that, to the fullest extent permitted by Applicable Law, the Sellers' right to the payment of such Deposit Amount as provided in this Section 9.02(d) shall be the sole and exclusive remedy against Buyers or any of its Affiliates or any of their respective stockholders, partners, members or Representatives for any and all Adverse Consequences that may be suffered based upon, resulting from or arising out of the circumstances giving rise to such termination, and upon payment of the Deposit Amount to Sellers in accordance with this Section 9.02(b), none of Buyers or any of their Affiliates or any of their respective stockholders, partners, members or Representatives shall have any further liability or obligation relating to or arising out of this Agreement or the Transactions except as provided in Section 9.02(a).

(c)     Notwithstanding Section 9.02(b), if this Agreement is terminated by (i) Buyers pursuant to Section 9.01(d)(vi)(D) or Section 9.01(d)(vi)(E) or (ii) the Sellers pursuant to Section 9.01(e)(iv) or Section 9.01(e)(v), then the Escrow Agent shall retain the Deposit until the earlier to occur of (i) the consummation of an Alternative Transaction or (ii) the End Date, at which time the Parties shall promptly direct the Escrow Agent to disburse the Deposit to the Buyers, free and clear of any claims thereon by the Sellers.

(d)     In addition to the remedies in Section 9.02(b), Buyers shall be entitled to the following remedies without further order of the Bankruptcy Court: the Sellers shall pay to Buyers, and Buyers shall be entitled to receive the Bid Protections if and only if Buyers are not in default or breach of any of the terms of this Agreement and either (i) Buyers terminate this Agreement pursuant to Section 9.01(d)(vi)(D) or Section 9.01(d)(vi)(E), or (ii) the Sellers terminate this Agreement pursuant to Section 9.01(e)(iv) or Section 9.01(e)(v). If owed pursuant to the immediately preceding sentence, the Bid Protections shall be treated as an allowed administrative expense claim in the Bankruptcy Cases pursuant to Section 503(b)(1)(A) of the Bankruptcy Code and shall be payable from the deposit made, but only up to the amount of such deposit, and/or the sale proceeds paid by the Third Party buyer in the Alternative Transaction upon the earlier to occur of the consummation of the Alternative Transaction or when such deposit is otherwise forfeited to the Sellers. Notwithstanding anything to the contrary contained in this Agreement, the Bid Protections shall be subject to a carve out from any lien, security interest or superpriority administrative expense claim with respect to the proceeds of any Alternative Transaction pursuant to Sections 105, 363, 364, 503(b) or 507 of the Bankruptcy Code in the Bankruptcy Cases.

(e)     Upon termination of this Agreement, Buyers shall destroy or return to the Sellers all data, assessments and/or reports, maps and other information furnished by or on behalf of the Sellers to Buyers or prepared by or on behalf of Buyers in connection with its due diligence investigation of the Sellers, the Acquired Business, the Transferred Assets and the Specifically Assumed Liabilities, and, if Buyers elect to destroy any such information, an officer of Buyers shall certify the destruction of such information to Seller in writing.

48

## ARTICLE 10
## MISCELLANEOUS

**Section 10.01 Notices**.   All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Buyers:

Altus Health System OpCo, LLC
Altus Health System Realty, LLC
11233 Shadow Creek Parkway, Suite 313
Pearland, Texas 77584
Attention:  Taseer A. Badar, CEO
Facsimile No:  (713) 231-2131
E-mail:  shah@ztcorporate.com

with a copy to:

Anwar-i-Qadeer & Associates, P.C.
50 Briar Hollow Lane, Suite 230 West
Houston, Texas 77027
Attention:  Anwar-i-Qadeer
Facsimile No:  (713) 622-8704
E-mail: qadeer@qadeerlaw.com

and to:

The Gerger Law Firm PLLC
2211 Norfolk Street, Suite 517
Houston, Texas 77098
Attention:  Alan Gerger
Facsimile No:  (888) 317-0281
E-mail:  asgerger@gergerlaw.com

if to the Sellers, to:

Neighbors Legacy Holdings, Inc.
10800 Richmond Ave.
Houston, Texas 77042
Attention:  Chief Restructuring Officer
Facsimile No.:  (713) 436-5210
E-mail; cshandler@neighborshealth.com

6802857v2

with a copy to:

Porter Hedges LLP
1000 Main, 36th Floor
Houston, Texas 77002
Attention: John F. Higgins
Facsimile No.: (713) 226-6248
E-mail: jhiggins@porterhedges.com

or such other address, facsimile number or electronic mail address as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

Section 10.02 **Survival**. The representations and warranties contained herein and in any certificate or other writing delivered pursuant hereto shall terminate upon and not survive the Closing and there shall be no liability thereafter in respect thereof (it being understood and agreed that no Party shall have the right to bring or assert any action or claim for beach of any representation or warranty herein or in any Transaction Document after the Closing). Each of the covenants and agreements of the Parties hereto contained in this Agreement shall terminate upon the Closing except to the extent that performance under such covenant or agreement is to take place after Closing, in which case such covenant shall survive the Closing until the earlier of (i) performance of such covenant or agreement in accordance with this Agreement or, if time for performance of such covenant is specified in this Agreement, thirty (30) days following the expiration of the time period for such performance and (ii) the expiration of applicable statute of limitations with respect to any claim for any failure to perform such covenant; *provided, however,* that if a written notice of claim with respect to any covenant or agreement to be performed after Closing is given prior to the expiration of such covenant or agreement then such covenant or agreement shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

Section 10.03 **Amendments and Waivers**.

(a)     Any provision of this Agreement may be amended or waived prior to Closing if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b)     No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Applicable Law.

50

Section 10.04 **Expenses**.  Except as otherwise expressly provided herein, all costs and expenses incurred in connection with this Agreement or the Transactions shall be paid by the Party incurring such cost or expense.

Section 10.05 **Successors and Assigns**.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns; *provided, however*, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, in whole or in part, by operation of law or otherwise, without the prior written consent of each other Party hereto.

Section 10.06 **Supplementation and Amendment of Schedules**.  For the purpose of avoiding any misunderstanding, the Sellers may, at their option, supplement the Schedules hereto in order to reflect any additional matters which, if existing, occurring or known as of the Execution Date, would have been required to be set forth or described in the Schedules (each, a "*Schedule Supplement*").  Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of Buyers' termination rights contained in Section 9.01(d) or of determining whether or not the conditions set forth in Section 8.02 have been satisfied; *provided, however*, if Buyers have the right to, but do not elect to, terminate this Agreement within five (5) days of its receipt of such Schedule Supplement, then Buyers shall be deemed to have irrevocably waived any right to terminate this Agreement with respect to such matter.  The inclusion of any item in the Schedules, or any references to dollar amounts, will not be deemed to be an acknowledgement or representation that such item is material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information provided in one Schedule hereto will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule hereto to which its relevance is reasonably apparent on its face.

Section 10.07 **Governing Law**.  THE AGREEMENT AND ALL ACTIONS, CAUSES OF ACTION, OR CLAIMS OF ANY KIND (WHETHER AT LAW, IN EQUITY, IN CONTRACT, IN TORT, OR OTHERWISE) THAT MAY BE BASED UPON, ARISE OUT OF, OR RELATE TO THIS AGREEMENT, OR THE NEGOTIATION, EXECUTION, OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY ACTION, CAUSE OF ACTION, OR CLAIM OF ANY KIND BASED UPON, ARISING OUT OF, OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN, IN CONNECTION WITH, OR AS AN INDUCEMENT TO THIS AGREEMENT), SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

Section 10.08 **Jurisdiction**.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to the Transaction Documents and the transactions contained in or contemplated by the Transaction Documents, exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Cases remain open and (b) if the Bankruptcy Cases are never filed, or after the close of the Bankruptcy Cases or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Southern District of Texas or any Texas State court sitting in Houston (together with the Bankruptcy Court, the "*Chosen Courts*"), and solely in connection with claims arising under this

Agreement or any other Transaction Document or the Transactions (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto, and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 10.01.

Section 10.09 **WAIVER OF JURY TRIAL**. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.10 **Counterparts; Effectiveness; Third Party Beneficiaries**. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by all of the other Parties hereto. Until and unless each Party has received a counterpart hereof signed by the other Party hereto, this Agreement shall have no effect and no Party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). Notwithstanding anything to the contrary in this Agreement, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable. No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties hereto and their respective successors and assigns.

Section 10.11 **Entire Agreement**. This Agreement, the other Transaction Documents, the Bidding Procedures Order, and the Sale Order constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter hereof and thereof.

Section 10.12 **Severability**. If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated; and in lieu of each such invalid, void or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such invalid, void or unenforceable provision as may be valid, binding and enforceable.

Section 10.13 **Time of Essence**. Time is of the essence in the performance of this Agreement, except as otherwise expressly provided herein.

8802857v2

Section 10.14 <u>Certain Acknowledgements and Limitations</u>.

(a)   Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with this Agreement, the other Transaction Documents or the Transactions are limited to those specifically set forth in this Agreement and the other Transaction Documents.  Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement and the other Transaction Documents on the basis of any legal or equitable principle or on any other basis whatsoever.  Neither any equitable or legal principle nor any implied obligation of good faith or fair dealing nor any other matter requires any Party to incur, suffer or perform any act, condition or obligation contrary to the terms of this Agreement and the other Transaction Documents, whether or not existing and whether foreseeable or unforeseeable.  Each of the Parties acknowledges that it would be unfair, and that it does not intend, to increase any of the obligations of the other Party on the basis of any implied obligation or otherwise.

(b)   BUYERS ACKNOWLEDGE AND AGREE THAT THEY HAVE CONDUCTED THEIR OWN INDEPENDENT DUE DILIGENCE INVESTIGATION, REVIEW AND ANALYSIS OF THE SELLERS, THE TRANSFERRED ASSETS, THE SPECIFICALLY ASSUMED LIABILITIES AND THE ACQUIRED BUSINESS IN CONNECTION WITH THE TRANSACTIONS AND HAVE BEEN PROVIDED ACCESS TO THE PERSONNEL, PROPERTIES, ASSETS, PREMISES, BOOKS AND RECORDS, AND OTHER DOCUMENTS AND DATA OF THE SELLERS AND THE ACQUIRED BUSINESS FOR SUCH PURPOSE.

(c)   BUYERS   AGREE   THAT,   (I)   EXCEPT   FOR   THE REPRESENTATIONS AND WARRANTIES MADE BY THE SELLERS THAT ARE EXPRESSLY SET FORTH IN <u>ARTICLE 3</u> OF THIS AGREEMENT, NEITHER THE SELLERS, NOR ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES HAVE MADE AND SHALL NOT BE DEEMED TO HAVE MADE TO BUYERS OR TO ANY OF THEIR REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OF ANY KIND, (II) EACH OF THE SELLERS EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATIONS OR WARRANTIES, AND (III) BUYERS ACKNOWLEDGE AND AGREE THAT NEITHER BUYERS NOR THEIR   REPRESENTATIVES   HAVE   RELIED   UPON   ANY   SUCH REPRESENTATIONS OR WARRANTIES.

(d)   EXCEPT AS OTHERWISE EXPRESSLY SPECIFIED IN THIS AGREEMENT, THE TRANSFERRED ASSETS AND ACQUIRED BUSINESS OF SELLERS ARE BEING ACQUIRED BY BUYERS AT THE CLOSING AS A RESULT OF THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE ACQUIRED BY BUYERS ON AN "<u>AS IS, WHERE IS</u>" BASIS AND IN THEIR THEN PRESENT CONDITION, AND BUYERS SHALL RELY SOLELY UPON ITS OWN EXAMINATION THEREOF.  IN ANY EVENT, EXCEPT AS EXPLICITLY SET FORTH HEREIN, NONE OF SELLERS OR ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES, AS THE CASE MAY BE, HAS MADE OR IS MAKING ANY REPRESENTATION, EXPRESS OR IMPLIED, AS TO THE VALUE OF ANY TRANSFERRED ASSET OR THE ACQUIRED

53

BUSINESS BEING SO ACQUIRED, OR ANY WARRANTY OF MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR QUALITY, WITH RESPECT TO ANY OF THE TANGIBLE ASSETS BEING SO ACQUIRED, OR AS TO THE CONDITION OR WORKMANSHIP THEREOF, OR AS TO THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT. BUYERS ACKNOWLEDGE AND AGREE THAT NEITHER BUYERS NOR THEIR REPRESENTATIVES HAVE RELIED UPON ANY REPRESENTATIONS OR WARRANTIES THAT ARE DISCLAIMED BY THE SELLERS IN THIS SECTION 10.14.

(e) THE SELLERS AGREE THAT EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY BUYERS THAT ARE EXPRESSLY SET FORTH IN ARTICLE 4 OF THIS AGREEMENT, NEITHER BUYERS, NOR ANY OF THEIR STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES HAVE MADE AND SHALL NOT BE DEEMED TO HAVE MADE TO SELLERS OR TO ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OF ANY KIND.

(f) NO PERSON HAS BEEN AUTHORIZED BY THE SELLERS TO MAKE ANY REPRESENTATION OR WARRANTY RELATING TO THE SELLERS OR THEIR BUSINESS OR OPERATIONS OR ASSETS, OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS EXCEPT FOR THOSE CONTAINED HEREIN AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON.

(g) NO PERSON HAS BEEN AUTHORIZED BY BUYERS TO MAKE ANY REPRESENTATION OR WARRANTY RELATING TO BUYERS OR THEIR BUSINESSES OR OPERATIONS, OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS EXCEPT FOR THOSE CONTAINED HEREIN AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON.

(h) UNDER NO CIRCUMSTANCES SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE FOR ANY SPECIAL, EXEMPLARY, PUNITIVE, REMOTE, SPECULATIVE, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LIABILITIES ARISING OUT OF ANY ACTUAL, ALLEGED OR INTENTIONAL BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY, AND NO CLAIM SHALL BE MADE OR AWARDED AGAINST ANY PARTY TO THIS AGREEMENT THEREFOR.

*[Signatures continued on following page]*

4-802857-2

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS:**

NEC BAYTOWN EMERGENCY CENTER, LP

By:   Neighbors GP, LLC,
        in its capacity as General Partner

By: ~~_____~~
~~Name: Chad J. Shandler~~
~~Title:   Chief Restructuring Officer~~

~~NEC BELLAIRE EMERGENCY CENTER, LP~~

~~By:   Neighbors GP, LLC,~~
~~        in its capacity as General Partner~~

By: _____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer

NEC CROSBY EMERGENCY CENTER, LP

By:   Neighbors GP, LLC,
        in its capacity as General Partner

By: _____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer

NEC KINGWOOD EMERGENCY CENTER, LP

By:   Neighbors GP, LLC,
        in its capacity as General Partner

By: _____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer

*[Signature page to Asset Purchase Agreement (Houston)]*

**SELLERS, Continued:**

NEC PASADENA EMERGENCY CENTER, LP

By:   Neighbors GP, LLC,
     in its capacity as General Partner

By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer

NEC PEARLAND EMERGENCY CENTER, LP

By:   Neighbors GP, LLC,
     in its capacity as General Partner

By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer

NEC PORTER EMERGENCY CENTER, LP

By:   Neighbors GP, LLC,
     in its capacity as General Partner

By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer

~~NEC YORKTOWN EMERGENCY CENTER, LP~~

~~By:   Neighbors GP, LLC,~~
~~in its capacity as General Partner~~

~~By:_____~~
~~Name: Chad J. Shandler~~
~~Title:   Chief Restructuring Officer~~

*[Signature page to Asset Purchase Agreement (Houston)]*

**SELLERS, Continued:**

NEC BAYTOWN ASSET HOLDINGS, LLC


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEC KINGWOOD ASSET HOLDINGS LLC


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEC PEARLAND ASSET HOLDINGS, LLC


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEIGHBORS LEGACY HOLDINGS, INC.


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEIGHBORS GLOBAL HOLDINGS, LLC


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer

**SELLERS, Continued:**

NEIGHBORS HEALTH, LLC


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


EDMG, LLC


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEIGHBORS PRACTICE MANAGEMENT, LLC


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer


NEIGHBORS EMERGENCY CENTER, LLC


By:_____
Name: Chad J. Shandler
Title:   Chief Restructuring Officer

*[Signature page to Asset Purchase Agreement (Houston)]*

**BUYERS:**

ALTUS HEALTH SYSTEM OPCO, LLC


By: _____
Name:  Taseer A. Badar
Title:  President & Manager


ALTUS HEALTH SYSTEM REALTY, LLC


By: _____
Name:  Taseer A. Badar
Title:  President & Manager

**RECEIPT**

On this day, July 10, 2018, the undersigned Escrow Agent acknowledges receipt of: (a) the Asset Purchase Agreement affixed hereto; and (b) a cash deposit in the amount of $1,600,000.00.   By its signature below, the Escrow Agent hereby agrees to be bound by the terms of Section 2.05 and 2.06 of the Asset Purchase Agreement and, to the extent required to give effect thereto, Article 10 of the Asset Purchase Agreement.

<u>Escrow Agent</u>:  Fidelity National Title Insurance Company

By: _____
Name: _____
Title: _____

<u>Address</u>:      1900 West Loop South
Suite 200
Houston, Texas 77027

*[Signature page to Asset Purchase Agreement (Houston)]*

## EXHIBIT A

### Facility Locations

1.  *Baytown*, 6051 Garth Road, Baytown, Texas 77521

~~2.   *Bellaire*, 5413 S. Rice Ave., Houston, Texas 77081~~

2.  ~~3.~~*Crosby*, 14120 FM 2100, Crosby, Texas 77532

3.  ~~4.~~*Kingwood*, 1120 Kingwood Drive, Kingwood, Texas 77339

4.  ~~5.~~*Pasadena*, 7215 Fairmont Parkway, Pasadena, Texas 77505

5.  ~~6.~~*Pearland*, 11130 Broadway Street, Pearland, Texas 77584

6.  ~~7.~~*Porter*, 22678 US Hwy 59, Porter, Texas 77365

~~8.   *Yorktown*, 5835 Hwy 6 North, Houston, Texas 77084~~

## **Exhibit B**

Schedules to Asset Purchase Agreement

(See attached).