*Execution Version*

---

**ASSET PURCHASE AGREEMENT**

**by and among**

**NEC BELLAIRE EMERGENCY CENTER, LP,**
**NEC YORKTOWN EMERGENCY CENTER, LP**
**NEC MIDLAND EMERGENCY CENTER, LP,**
**NEC ODESSA EMERGENCY CENTER, LP,**
**NEC TEXARKANA EMERGENCY CENTER, LP, and**
**NEC PARIS EMERGENCY CENTER, LP,**
as Operating Sellers

**NEIGHBORS LEGACY HOLDINGS, INC.,**
**NEIGHBORS GLOBAL HOLDINGS, LLC,**
**NEIGHBORS HEALTH, LLC,**
**EDMG, LLC, and**
**NEIGHBORS PRACTICE MANAGEMENT, LLC,**
as Corporate and Shared Services Sellers

**and**

**GREATER TEXAS EMERGENCY CENTERS LLC, as nominee for various LLCs to be**
**designated as the acquiring entities (collectively referred to as "BUYER")**
as Buyer

**dated**

**September 13, 2018**

---

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS AND INTERPRETIVE MATTERS .................................................. 2
    Section 1.01    Definitions ............................................................................................... 2
    Section 1.02    Accounting Terms; Utilization of GAAP for Purposes of Calculations Under
        Agreement ............................................................................................. 14
    Section 1.03    Other Definitional and Interpretative Provisions ................................... 14

ARTICLE 2 PURCHASE AND SALE ........................................................................................ 15
    Section 2.01    Purchase and Sale of Assets .................................................................. 15
    Section 2.02    Retained Assets ...................................................................................... 18
    Section 2.03    Assumption of Liabilities ...................................................................... 20
    Section 2.04    Retained Liabilities ................................................................................ 21
    Section 2.05    Good-Faith Deposit; Escrow ................................................................. 22
    Section 2.06    Purchase Price ........................................................................................ 23
    Section 2.07    Filing of Bankruptcy Cases ................................................................... 23
    Section 2.08    Closing; Closing Deliveries. .................................................................. 23
    Section 2.09    Allocation of Purchase Price. ................................................................. 25
    Section 2.10    Transfer Taxes. ...................................................................................... 25

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLERS ..................... 26
    Section 3.01    Corporate Existence and Power ............................................................. 26
    Section 3.02    Authorization ......................................................................................... 26
    Section 3.03    Governmental Authorization ................................................................. 26
    Section 3.04    Title to Transferred Assets .................................................................... 26
    Section 3.05    Financial Statements and Information ................................................... 27
    Section 3.06    Absence of Certain Developments ........................................................ 27
    Section 3.07    Brokerage Fees ....................................................................................... 27
    Section 3.08    Contracts. ............................................................................................... 27
    Section 3.09    Taxes. ..................................................................................................... 28
    Section 3.10    Inventory ................................................................................................ 28
    Section 3.11    Transactions with Affiliates. .................................................................. 28
    Section 3.12    Compliance with Laws .......................................................................... 29
    Section 3.13    Healthcare Laws. .................................................................................... 29
    Section 3.14    Legal Proceedings ................................................................................. 29
    Section 3.15    Absence of Restrictions and Conflicts .................................................. 30
    Section 3.16    Intellectual Property. .............................................................................. 30
    Section 3.17    Environmental. ....................................................................................... 30
    Section 3.18    Real Property ......................................................................................... 31
    Section 3.19    Employment and Labor ......................................................................... 32
    Section 3.20    Employee Benefits ................................................................................. 32
    Section 3.21    Disclosures ............................................................................................. 33

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 34
    Section 4.01    Corporate Existence and Power ............................................................. 34
    Section 4.02    Authorization ......................................................................................... 34

Section 4.03     Governmental Authorization ............................................................. 34
Section 4.04     Healthcare Laws ........................................................................... 34
Section 4.05     Legal Proceedings ......................................................................... 34
Section 4.06     Absence of Restrictions and Conflicts ................................................ 35
Section 4.07     Financing ................................................................................... 35
Section 4.08     Arm's Length .............................................................................. 35
Section 4.09     Finders' Fees .............................................................................. 35

ARTICLE 5 PRE-CLOSING COVENANTS OF THE PARTIES ......................................... 35
Section 5.01     Conduct of the Acquired Business ..................................................... 35
Section 5.02     Bankruptcy Filings and Bidding Procedures ......................................... 37
Section 5.03     Actions With Respect to Contracts. .................................................... 38
Section 5.04     Access to Information and Lessors ..................................................... 39
Section 5.05     Commercially Reasonable Efforts; Further Assurances ............................ 39
Section 5.06     Notices of Certain Events ............................................................... 40
Section 5.07     Rule 2002 Notice List .................................................................... 41
Section 5.08     Ad Valorem Taxes ........................................................................ 41

ARTICLE 6 POST-CLOSING COVENANTS ................................................................ 41
Section 6.01     Access ....................................................................................... 41
Section 6.02     Employee Matters ......................................................................... 42
Section 6.03     Trade Name License Agreement and Transition Services Agreements ........ 44

ARTICLE 7 POST-CLOSING COVENANTS OF THE PARTIES ....................................... 44
Section 7.01     Certain Filings ............................................................................. 44
Section 7.02     Public Announcements ................................................................... 44
Section 7.03     Confidentiality ............................................................................ 45
Section 7.04     Mail and Other Post-Closing Inquiries. ............................................. 45

ARTICLE 8 CONDITIONS TO CLOSING ................................................................... 45
Section 8.01     Conditions to Obligations of Buyer and Sellers .................................... 45
Section 8.02     Conditions to Obligations of Buyer ................................................... 46
Section 8.03     Conditions to Obligations of the Sellers ............................................. 47

ARTICLE 9 TERMINATION .................................................................................... 47
Section 9.01     Grounds for Termination ................................................................ 47
Section 9.02     Effect of Termination .................................................................... 50

ARTICLE 10 MISCELLANEOUS .............................................................................. 51
Section 10.01    Notices ...................................................................................... 51
Section 10.02    Survival ..................................................................................... 52
Section 10.03    Amendments and Waivers ............................................................... 53
Section 10.04    Expenses .................................................................................... 53
Section 10.05    Successors and Assigns ................................................................... 53
Section 10.06    Supplementation and Amendment of Schedules .................................... 53
Section 10.07    Governing Law ............................................................................ 53
Section 10.08    Jurisdiction ................................................................................ 54
Section 10.09    WAIVER OF JURY TRIAL .............................................................. 54
Section 10.10    Counterparts; Effectiveness; Third Party Beneficiaries ........................... 54
Section 10.11    Entire Agreement ......................................................................... 54

Section 10.12    Severability ................................................................................................. 54
Section 10.13    Time of Essence .......................................................................................... 55
Section 10.14    Closing Actions........................................................................................... 55
Section 10.15    Conflict Between Transaction Documents ................................................... 55
Section 10.16    Time Periods ............................................................................................... 55
Section 10.17    Certain Acknowledgements and Limitations............................................... 55

iii

EXHIBITS

Exhibit A          Facility Locations
Exhibit B          Sale Order
Exhibit C          Notice of Highest and Best Bids


SCHEDULES
Schedule 2.01(a)(iv)     Motor Vehicles
Schedule 2.01(a)(v)      Furniture and Medical Equipment (Headquarters)
Schedule 2.02(d)         Excluded Facilities
Schedule 3.06            Absence of Certain Developments
Schedule 3.07            Sellers' Finders' Fees
Schedule 3.08(a)         Seller Contracts
Schedule 3.08(b)         Seller Contracts - Defaults
Schedule 3.09(b)         Payment of Taxes
Schedule 3.11(a)         Transactions with Affiliates
Schedule 3.11(b)         Transactions with Affiliates
Schedule 3.12(a)         Compliance with Laws
Schedule 3.12(b)         Permits
Schedule 3.13(a)         Compliance with Healthcare Laws
Schedule 3.13(b)         Healthcare Laws Permits
Schedule 3.14            Legal Proceedings
Schedule 3.16(a)         Intellectual Property Rights
Schedule 3.16(b)         Intellectual Property Rights - Infringement
Schedule 3.18            Leased Real Property
Schedule 3.20            ERISA Plans
Schedule 4.09            Buyer's Finders' Fees
Schedule 5.03            Desired 365 Contracts

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "***Agreement***") is dated as of September 13, 2018 (the "***Execution Date***"), by and among (i) Greater Texas Emergency Centers LLC, a Texas limited liability company, as nominee for various acquiring entities to be designated as buyers hereunder (individually and collectively, "***Buyer***"), and (ii) NEC Bellaire Emergency Center, LP, a Texas a Texas limited partnership, NEC Yorktown Emergency Center, LP, a Texas limited partnership, NEC Midland Emergency Center, LP, a Texas limited partnership, NEC Odessa Emergency Center, LP, a Texas limited partnership, NEC Texarkana Emergency Center, LP, a Texas limited partnership, and NEC Paris Emergency Center, LP, a Texas limited partnership (collectively, the "***Operating Sellers***" and each individually, an "***Operating Seller***"), and (iii) Neighbors Legacy Holdings, Inc., a Texas corporation ("***Seller Parent***"), Neighbors Global Holdings, LLC, a Delaware limited liability company ("***Global Holdings***"), Neighbors Health, LLC, a Texas limited liability company ("***Neighbors Health***"), EDMG, LLC, a Texas limited liability company ("***EDMG***"), and Neighbors Practice Management, LLC, a Texas limited liability company ("***NPM***" and collectively with Seller Parent, Global Holdings, Neighbors Health and EDMG, the "***Corporate and Shared Services Sellers***" and each individually, a "***Corporate and Shared Services Seller***," and collectively with the Operating Sellers  the "***Sellers***" and each individually, a "***Seller***").  Buyer and Sellers are sometimes referred to collectively herein as the "***Parties***" and singly as a "***Party***."

## RECITALS

A.      The Operating Sellers are or were engaged in the business of operating the emergency centers listed on <u>Exhibit A</u> (each a "***Facility***" and collectively, the "***Facilities***"), and the Corporate and Shared Services Sellers are or were engaged in performing corporate functions relative to the operation of the Facilities (collectively with the business conducted by the Operating Sellers at the Facilities, the "***Acquired Business***").

B.      At the auction conducted on August 27, 2018 (the "***Auction***"), the Sellers determined that the offer of Buyer for the Acquired Business, the Transferred Assets (as defined below), and the Specifically Assumed Liabilities (as defined below) was the highest and/or best offer received for the Acquired Business, the Transferred Assets and the Specifically Assumed Liabilities and constitutes a fair and adequate purchase price.  The offer of the Buyer is also fair and reasonable for all purposes and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

C.      On July 12, 2018, each Seller filed voluntary petitions under Chapter 11 of the Bankruptcy Code (as defined below) in the Bankruptcy Court (as defined below).

D.      On the terms and conditions of this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, the Sellers desire to sell to Buyer, and Buyer desires to purchase from the Sellers, all of the Transferred Assets, and Buyer is willing to assume all of the Specifically Assumed Liabilities.

NOW, THEREFORE, in consideration of the mutual promises, representations and warranties made herein and other good and valuable consideration, the receipt and sufficiency of

1

which are hereby mutually acknowledged, the Parties hereto, intending to be legally bound, and subject only to the required approvals of the Bankruptcy Court, agree as follows:

## ARTICLE 1
## DEFINITIONS AND INTERPRETIVE MATTERS

**Section 1.01   Definitions**.

The following terms, as used herein, have the following meanings:

"***365 Contracts***" means all Contracts that may be assumed by the Debtors pursuant to Section 365 of the Bankruptcy Code.

"***Accounts Receivable***" means, as of 12:01 a.m. on the Closing Date, all accounts receivable, trade receivables, notes receivables, and all other receivables, whether accrued, current or overdue, and all rights to payment from third parties (including uncashed checks) and the full benefit of all security for such accounts or notes receivable and rights to payment of Sellers, in each case other than Intercompany Indebtedness.

"***Acquired Business***" is defined in the Recitals hereto.

"***Acquiring Entity***" means each entity formed by Buyer to receive title to certain of the Transferred Assets as designed by Buyer.

"***Adverse Consequences***" means all Proceedings, charges, complaints, demands, injunctions, judgments, orders, decrees, awards, rulings, damages, penalties, fines, costs, reasonable amounts paid in settlement, Liabilities, obligations, Taxes, Liens, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses.

"***Affiliate***" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.  For such purposes, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"***Agreement***" is defined in the opening paragraph hereof.

"***Alternative Agreement***" means one or more definitive agreements with respect to one or more Alternative Transactions.

"***Alternative Transaction***" means a transaction or series of related transactions pursuant to which the Sellers sell all or a substantial portion of the Transferred Assets or any group of assets that includes all or a substantial portion of the Transferred Assets, from a Person other than Buyer or an Affiliate of Buyer, as the highest or best offer, in accordance with the Bidding Procedures Order or otherwise, but does not mean the sale of goods or services conducted in a manner consistent with the recent operation of the Acquired Business prior to the Petition Date.

"*Applicable Law*" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), constitution, ordinance, code, rule, regulation or Order adopted or promulgated by, and the terms of any Permit issued by, a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"*Auction*" is defined in the Recitals hereto.

"*Avoidance Actions*" is defined in Section 2.02(m).

"*Back-Up Bidder*" has the meaning set forth in the Bidding Procedures for the Sale of Debtor's Assets attached to the Bidding Procedures Order.

"*Bankruptcy Cases*" means the bankruptcy cases of the Debtors (other than the Beaumont Sellers) which were filed on July 12, 2018 under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court and which are all jointly administered by the Bankruptcy Court.

"*Bankruptcy Code*" means Title 11 of the United States Code, as amended.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Bankruptcy Cases from time to time.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, the Official Bankruptcy Forms, the Federal Rules of Civil Procedure, the Local Rules of the United States District Court for the Southern District of Texas and the Local Rules of the United States Bankruptcy Court for the Southern District of Texas, each as in effect on the Petition Date or as thereafter amended, to the extent applicable to the Bankruptcy Cases or proceedings therein, as the case may be.

"*Bellaire Operating Seller*" means NEC Bellaire Emergency Center, LP, a Texas limited partnership.

"*Bidding Procedures and Sale Motion*" means the motion, dated July 12, 2018 (Docket No. 20) filed by certain of the Debtors with the Bankruptcy Court seeking, among other things, entry of the Bidding Procedures Order and the Sale Order.

"*Bidding Procedures Order*" means the order of the Bankruptcy Court, dated August 1, 2018 (Case No. 18-33836 (MI)), that approves, *inter alia*, bidding and auction procedures to be followed by the Debtors and all potential bidders for the Transferred Assets.

"*Bill of Sale*" means an instrument, in form and substance reasonably satisfactory to the Debtors and Buyer, assigning, conveying and transferring the Transferred Assets (other than the Desired 365 Contracts and the Real Property Leases) to Buyer.

"*Business Day*" means any day, excluding Saturdays, Sundays or "legal holidays" (as referenced in Bankruptcy Rule 9006(a)), on which nationally chartered commercial banks are open for business in Houston, Texas.

"*Buyer*" is defined in the opening paragraph of this Agreement.

"***Buyer Material Adverse Effect***" means a material adverse effect on the ability of Buyer to consummate the Transactions or to perform its obligations hereunder and under the other Transaction Documents to which it is or will be a Party.

"***Buyer's Transferred Employee List***" is defined in <u>Section 6.02(b)</u>.

"***Cash Deposits***" means the total amount of any cash and negotiable instruments of the Sellers that constitute deposits securing any performance bonds, surety bonds, letters of credit, guarantees, security deposits or similar assurances outstanding as of the Closing Date, but excluding utility deposits.

"***Cash Purchase Price***" is defined in <u>Section 2.06(a)</u>.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and any rules or regulations promulgated thereunder.

"***Chosen Courts***" is defined in <u>Section 10.08</u>.

"***CHOW***" is defined in <u>Section 5.05(b)</u>.

"***Claim***" means a claim as defined in Section 101(5) of the Bankruptcy Code.

"***Closing***" is defined in <u>Section 2.08(a)</u>.

"***Closing Date***" means the date of the Closing.

"***COBRA***" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"***Code***" means the United States Internal Revenue Code of 1986, as amended.

"***Confidentiality Agreement***" means the Confidentiality Agreement dated as of February 5, 2018, between Round Table Medical Consultants, LLC,  Neighbors Global Holdings, LLC and Neighbors Legacy Holdings, Inc.

"***Contract***" or "***contract***" means, whether written or oral, any contract, agreement, lease, license, commitment, indenture, note, bond, sale and purchase order, instrument, or other binding arrangement or understanding, and with respect to any Contract to which a Seller is a party, such contract that Seller is permitted under the Bankruptcy Code to assume and assign or sell and transfer (including any amendments or modifications thereto).

"***Corporate and Shared Services Sellers***" is defined in the opening paragraph of this Agreement.

"***Cure Costs***" means the amount necessary to cure defaults under any Desired 365 Contract, including the Real Property Leases, and to compensate the non-debtor party for any actual pecuniary loss resulting from such defaults in order to assume and assign the Desired 365 Contract under Sections 365(a) and 365(f) of the Bankruptcy Code.

"***Debtor***" or "***Debtors***" means any Seller individually, and the Sellers, collectively, following the filing of the Bankruptcy Cases.

"***Deposit***" is defined in <u>Section 2.05(a)</u>.

"***Desired 365 Contracts***" is defined in <u>Section 5.03(b)</u>.

"***Desired Headquarters Space***" is defined in <u>Section 2.08(c)(iv)</u>.

"***Effective Time***" means 12:01 a.m. local time in Houston, Texas on the day after the Closing Date.

"***Employees***" means those Persons employed by the Sellers who either (i) worked primarily for the Acquired Business or (ii) provided administrative, billing and collection or corporate services to the Facilities immediately prior to the Closing, including any such individual on leave of absence.

"***End Date***" is defined in <u>Section 9.01(b)</u>.

"***Environmental Laws***" means any Applicable Law, or any agreement with any Governmental Authority to which any Seller is a party, relating to human health and safety, the environment or to pollutants, contaminants, wastes, chemicals, or toxic or other Hazardous Materials.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***ERISA Affiliate***" of any entity means any other entity which, together with such entity, would be treated as a single employer under Section 414 of the Internal Revenue Code.

"***ERISA Plan***" means any (i) "employee benefit plans" (as defined in Section 3(3) of ERISA) and any bonus, stock option, stock purchase, restricted stock, equity based, incentive, deferred compensation, retiree medical or life insurance, supplemental retirement, severance, change in control or other benefit plans, programs or arrangements, and all employment, termination, severance, any cafeteria plan or any holiday or vacation plan or practice or other contracts or agreements, to which the Sellers, or any of their ERISA Affiliates is a party, with respect to which the Sellers, or any of their ERISA Affiliates has any obligation to or which are maintained, contributed to or sponsored by the Sellers or any of their ERISA Affiliates for the benefit of any Employee or former employee, officer or director of the Sellers, (ii) employee benefit plan for which the Sellers could incur liability under Section 4069 of ERISA in the event such plan has been or were to be terminated and (iii) plan in respect of which the Sellers could incur liability under Section 4212(c) of ERISA.

"***Excluded Contracts***" is defined in <u>Section 2.02(q)</u>.

"***Execution Date***" is defined in the opening paragraph of this Agreement.

"***Final Order***" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (i) which has not been reversed, stayed,

modified, amended, enjoined, set aside, annulled or suspended, (ii) with respect to which no request for a stay, motion or application for reconsideration or rehearing, notice of appeal or petition for certiorari is filed within the deadline provided by applicable statute or regulation or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, and (iii) as to which the deadlines for filing such request, motion, petition, application, appeal or notice referred to in clause (ii) above have expired.

"*Final Order Deadline*" is defined in <u>Section 5.02(c)</u>.

"*Financial Statements*" is defined in <u>Section 3.05.</u>

"*GAAP*" means generally accepted accounting principles in the United States, consistently applied in accordance with past practice.

"*Global Holdings*" is defined in the opening paragraph of this Agreement.

"*Governmental Authority*" means any trans-national, domestic or foreign federal, state or local, governmental unit, authority, department, court, agency or official, including any political subdivision thereof.

"*Hazardous Materials*" means chemicals, pollutants, radioactive material, contaminants, wastes, toxic or hazardous substances, materials or wastes, petroleum and petroleum products, medical waste, biohazardous waste, asbestos or asbestos-containing materials or products, polychlorinated biphenyls, lead or lead-based paints or materials, radon, fungus, mold, mycotoxins, nanoparticles or other substances that may have an adverse effect on human health or the environment.

"*Headquarters*" means the corporate headquarters of Seller Parent located at 10800 Richmond Ave., Houston, Texas 77042.

"*Headquarters Lease Landlord*" means InvestCorp Group, Ltd.

"*Healthcare Laws*" means any Applicable Law related to the regulation of the healthcare industry (including, but not limited to, the addiction treatment industry, the behavioral health industry, the hospital and other health care facilities industry, the pharmaceuticals industry and the physician practice management industry), the regulation of healthcare professionals (including, but not limited to, physicians and nurses and physician assistants), or to payment for items or services rendered, provided, dispensed, or furnished by healthcare suppliers or providers (including, but not limited to, physician practices, hospitals and other health facilities, physicians and pharmacists and other practitioners).

"*Houston Assets*" means all of the assets, properties, rights and interests of the Houston Facilities, including those that would be a "Transferred Asset," "Acquired Asset" or similar term as defined in the applicable Houston Purchase Agreement.  For the avoidance of doubt, the term "Houston Assets" shall not include any of the Transferred Assets hereunder.

"**_Houston Buyers_**" means, collectively, the Person or Persons that acquires all or a portion of the Houston Facilities and certain related assets and the business conducted by the Houston Sellers at the purchased Houston Facilities, and assumes certain liabilities related thereto, pursuant to the terms of the Houston Purchase Agreements; _provided_, _however_, that any Person acquiring both Houston Facilities and Non-Houston Facilities shall be deemed to be a Non-Houston Buyer for purposes of this Agreement.

"**_Houston Facilities_**" means the emergency centers operated by certain of the Houston Sellers at the following locations: (i) Baytown, (ii) Crosby, (iii) Kingwood, (iv) Pasadena, (v) Pearland, and (vi) Porter.

"**_Houston IP Seller_**" means Neighbors Emergency Center, LLC, a Texas limited liability company.

"**_Houston Purchase Agreements_**" means the Asset Purchase Agreements pursuant to which the applicable Houston Sellers sell to the applicable Houston Buyer(s) the applicable Houston Facilities and related Houston Assets, and the applicable Houston Buyer(s) assumes certain liabilities related to the operation of the Houston Facilities acquired thereunder.  For the avoidance of doubt, the term "Houston Purchase Agreements" shall not include this Agreement.

"**_Houston Sellers_**" means, collectively, the "Sellers" under the Houston Purchase Agreements.

"**_Insider_**" means, any executive officer, director, governing body member, stockholder, partner or Affiliate, as applicable, of any Seller or any predecessor or Affiliate of any Seller or any individual related by marriage or adoption to any such individual or any entity in which any such Person owns any beneficial interest.

"**_Intellectual Property Rights_**" means (i) inventions, reduced to practice or made the subject of one or more pending patent applications, (ii) patents and patent applications (including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations thereof) registered or applied for throughout the world, all improvements to the inventions disclosed in each such registration, patent or patent application, (iii) trademarks, service marks, trade dress, logos, domain names, trade names and corporate names (whether or not registered) in all nations throughout the world and all goodwill associated therewith, (iv) copyrights (whether or not registered) and registrations and applications for registration thereof in all nations throughout the world, (v) proprietary computer software, (including source code, object code, firmware, operating systems and specifications), (vi) trade secrets and know-how (including manufacturing and production processes and techniques and research and development information), (vii) databases and data collections, in each case solely to the extent related to seismic and geological data, (viii) copies and tangible embodiments of any of the foregoing, in whatever form, format or medium, (ix) all rights to obtain and rights to apply for patents, and to register trademarks and copyrights, (x) all rights in all of the foregoing provided by treaties, conventions and common law, and (xi) all rights to sue or recover and retain damages and costs and attorneys' fees for past, present and future infringement or misappropriation of any of the foregoing.

"***Intercompany Indebtedness***" means all Liabilities owed by any Seller to any other Seller or to any Affiliate of any Seller or by an Affiliate of a Seller to a Seller and which does not arise from Desired 365 Contracts.

"***Interest***" means any right, title, interest, ownership, indicia of title or ownership, right of possession, or other legal, equitable or possessory interest of any kind.

"***Inventory***" means all inventories of supplies, pharmaceuticals, drugs, food, janitorial and office supplies, replacements, spare, component parts, and other disposables and consumables owned by the Operating Sellers located at or within any Facility, and any other goods held for sale or lease or furnished under contracts of service, raw materials, supplies and work in process owned by the Operating Sellers and related to the Acquired Business wherever located, whether or not in transit.

"***Knowledge***" or "***knowledge***," with respect to a Seller or, collectively, Sellers, means the actual or constructive knowledge of any of the following individuals: the Chief Restructuring Officer, Chief Financial Officer, Chief Business Development Officer, the Chief Nursing Officer, the Executive Medical Director, and General Counsel of Sellers.

"***Leased Real Property***" means, with respect to each Facility, the parcels of real property of which any Operating Seller is the lessee (together with all fixtures and improvements thereon).

"***Liabilities***" means any direct or indirect liability, indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any kind or nature, whether accrued or not accrued, absolute or contingent, matured or unmatured, liquidated or unliquidated, known or unknown, asserted or not asserted, determined, determinable or otherwise.

"***Licensed Intellectual Property Rights***" means all Intellectual Property Rights owned by a Third Party and licensed or sublicensed to the Sellers.

"***Licenses***" means all federal, state and local government authorizations, certificates of authority, certificates of need, provider agreements and licenses.

"***Lien***" means, with respect to any property or asset, means any claim, interest, lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mechanics' lien, materialman's lien, statutory lien or right, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, right of pre-emption, right of first refusal or other Third Party right, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that Buyer is a successor, transferee, or continuation of any Seller or the Acquired Business, and (iv) any leasehold interest, license, or other right, in favor of a Third Party or an Affiliate of any Seller, to use any portion of the Transferred Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown, including any "lien" as under Bankruptcy Code Section 101(37).

"***Neighbors Health***" is defined in the opening paragraph of this Agreement.

"***Non-Houston Assets***" means all of the assets, properties, rights and interests of the Non-Houston Facilities, including those that would be a "Transferred Asset," "Acquired Asset" or similar term as defined in the applicable Non-Houston Purchase Agreement.  For the avoidance of doubt, the term "Non-Houston Assets" shall not include any of the Transferred Assets hereunder.

"***Non-Houston Buyer***" means, collectively, the Person or Persons that acquires all or a portion of the Non-Houston Facilities and certain related assets and the business conducted by the Non-Houston Sellers at the purchased Non-Houston Facilities, and assumes certain liabilities related thereto, pursuant to the terms of the Non-Houston Purchase Agreements, and including any Person that acquires both Houston Facilities and Non-Houston Facilities.  For the avoidance of doubt, the term "Non-Houston Buyer" shall not include the Buyer hereunder.

"***Non-Houston Facilities***" means the emergency centers operated by certain of the Non-Houston Sellers at the following locations: (i) Amarillo, (ii) Beaumont, (iii) Brownsville, (iv) Eastside, (v) Harlingen, (vi) Lubbock, (vii) McAllen, (viii) Mueller, (ix) Orange, and (x) Port Arthur.

"***Non-Houston Purchase Agreements***" means the Asset Purchase Agreements (other than this Agreement) pursuant to which the applicable Non-Houston Sellers sell to the applicable Non-Houston Buyer(s) the applicable Non-Houston Facilities and related Non-Houston Assets, and the applicable Non-Houston Buyer(s) assumes certain liabilities related to the operation of the Non-Houston Facilities acquired thereunder.  For the avoidance of doubt, the term "Non-Houston Purchase Agreements" shall not include this Agreement.

"***Non-Houston Sellers***" means, collectively, the "Sellers" under the Non-Houston Purchase Agreements.  For the avoidance of doubt, the term "Non-Houston Sellers" shall not include the Sellers hereunder.

"***Non-Transferable Assets***" is defined in Section 5.03(e).

"***NPM***" is defined in the opening paragraph of this Agreement.

"***Operating Seller***" is defined in the opening paragraph of this Agreement.

"***Order***" means any order, judgment, injunction, edict, decree, ruling, pronouncement, determination, decision, opinion, sentence, subpoena, writ or award issued, made, entered or rendered by any court, administrative agency or other Governmental Authority or by any arbitrator.

"***ordinary course of business***" means the operation of the Acquired Business of the Sellers in the usual and ordinary course as of the Execution Date.

"***Organizational Documents***" means, with respect to any Person, the certificate or articles of incorporation, bylaws, certificate of formation or organization, partnership agreement, limited partnership agreement, operating agreement, limited liability company agreement or any other similar organizational documents of such Person.

"*Owned Intellectual Property Rights*" means all Intellectual Property Rights owned by the Sellers.

"*Party*" *or* "*Parties*" is defined in the opening paragraph of this Agreement.

"*Patient Privacy Requirements*" means the applicable requirements of the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act of 1996, as amended by the American Recovery and Reinvestment Act of 2009 and the implementing regulations thereunder governing the privacy of individually identifiable health information and the security of such information maintained in electronic form, or of any similar law of Texas.

"*Permits*" means all material governmental (whether federal, state or local) permits, Licenses, franchises, certificates, approvals or other similar authorizations.

"*Person*" means any person, entity or Governmental Authority of any nature whatsoever, specifically including an individual, firm, company, corporation, partnership, trust, joint venture, association, joint stock company, limited liability company, estate, unincorporated organization or other entity or organization.

"*Petition Date*" means July 12, 2018, being the date on which the Sellers (other than the Beaumont Sellers) filed the Bankruptcy Cases with the Bankruptcy Court.

"*Post-Petition Accounts Payable*" means all accounts payable of the Bellaire Operating Seller and the Yorktown Operating Seller arising after the Petition Date in a manner consistent with the recent operation of the Acquired Business prior to the Petition Date.

"*Post-Petition Accrued Expenses*" means all accrued and unpaid operating expenses of the Debtors arising after the Petition Date in a manner consistent with the recent operation of the Acquired Business prior to the Petition Date.

"*Primary Houston Buyer*" means Altus Health System OpCo, LLC, a Texas limited liability company, or one or more of its Affiliates; provided, however, that if the Houston Asset Purchase Agreement to which Altus Health System OpCo, LLC is a party does not close, then the "Primary Houston Buyer" shall refer to the Back-Up Bidder for the Houston Assets to be acquired under such Houston Asset Purchase Agreement

"*Proceeding*" means any action, claim, demand, audit, hearing, complaint, investigation, litigation, or suit commenced, brought, conducted, or heard by or before any Governmental Authority.

"*PTO Obligations*" means the Liabilities of the Sellers incurred in the ordinary course of business for the accrued vacation, sick, holiday and other paid time off and related Taxes and other payroll obligations of the Transferred Employees outstanding as of the Closing Date.

"*Purchase Price*" is defined in <u>Section 2.06(a)</u>.

"*Purchase Price Allocation*" is defined in <u>Section 2.09</u>.

"***Qualified Bid Deadline***" is defined in Section 5.02(e).

"***Real Property Lease***" means all right, title, and interest of any Operating Seller in all leases, subleases, licenses, concessions, and other agreements (written or oral) and all amendments, modifications, extensions, renewals, guaranties, and other agreements with respect thereto, including the right to all security deposits and other amounts and instruments deposited by or on behalf of an Operating Seller thereunder, pursuant to which an Operating Seller holds a leasehold or sub-leasehold estate in, or is granted the right to use or occupy, a Leased Real Property.

"***Rejected Leased Real Properties***" is defined in Section 2.01(c).

"***Representatives***" means, with respect to any Person, the officers, directors, employees, members, managers, partners, investment bankers, attorneys, accountants, consultants or other advisors, agents or representatives of such Person, when acting in such capacity on behalf of such Person.

"***Retained Assets***" is defined in Section 2.02.

"***Retained Liabilities***" is defined in Section 2.04.

"***Retained Seller Mark***" means the trademark owned by the Houston IP Seller and registered with the United States Patent and Trademark Office on July 11, 2017 under Registration No. 5239995, as amended.

"***Sale Hearing Deadline***" is defined in Section 5.02(b).

"***Sale Order***" means an order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer,  similar to the form of Exhibit B attached hereto, that approves, *inter alia*, the sale of the Transferred Assets to Buyer.

"***Sale Order Deadline***" is defined in Section 5.02(c).

"***Seller***" or "***Sellers***" is defined in the opening paragraph of this Agreement.

"***Seller Marks***" means the name "Neighbors" and all variations thereof and all related trademarks, service marks, trade dress, logos, domain names, trade names and corporate names, but excludes the Retained Seller Mark.

"***Seller Parent***" is defined in the opening paragraph of this Agreement.

"***Sellers Material Adverse Effect***" means, any event, change, condition or matter that, individually or in the aggregate is or could reasonably be expected to result in a material adverse change or material adverse effect on (i) the condition (financial or otherwise), business, properties, assets, or results of operations of the Acquired Business, (ii) the ability of the Sellers or the Debtors, as applicable, to conduct the Acquired Business consistent with recent history, or (iii) the ability of the Sellers or the Debtors, as applicable, to perform their obligations under the Transaction Documents in material compliance with the requirements thereof or to consummate

the Transactions; *provided, however*, that to the extent any such material adverse effect results from any of the following matters, such effect shall be disregarded and shall not be taken into account in determining whether a material adverse effect has occurred under this definition: (A) changes in financial, credit or securities markets generally, including any changes in prevailing interest rates, in each case, which do not disproportionately affect a Seller relative to other industry participants, (B) changes in general economic or political conditions in the United States or regionally, in each case, which do not disproportionately affect a Seller relative to other industry participants, (C) the announcement, pendency or consummation of the sale of the Transferred Assets, (D) the consequences of filing the Bankruptcy Cases and the impact thereof on the condition (financial or otherwise), business, properties, assets, or results of operations of the Acquired Business, (E) actions taken or omissions made after the date of this Agreement with the express written consent of Buyer, (F) changes resulting from general industry-wide conditions that do not disproportionately affect the Sellers relative to other industry participants, (G) acts of war, sabotage or terrorism or any military action, or threats thereof, or any escalation or worsening of any such acts of war, sabotage, terrorism or military actions threatened or underway as of the Execution Date, in each case, which do not disproportionately affect a Seller relative to other industry participants, (H) any natural or man-made disaster or acts of God, in each case, which do not disproportionately affect a Seller relative to other industry participants, and (I) changes in Applicable Law or accounting rules, including GAAP.

"*Sellers' Transferred Employee List*" is defined in Section 3.19(a).

"*Specifically Assumed Liabilities*" is defined in Section 2.03.

"*Subject Equipment Leases*" means the equipment leases between one or more Sellers and DataVox, Everbank and its assignees, BBVA, Wells Fargo and Siemens.

"*Subject Locations*" means the following Facilities: (i) Midland, (ii) Odessa, (iii) Texarkana, (iv) Bellaire, (v) Yorktown and (vi) Paris.

"*Subsidiary*" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at any time directly or indirectly owned by such Person.

"*T-System Contract*" means the Site Opt-In Agreement dated July 22, 2015, between T-System, Inc. and Neighbors Health.

"*Tax*" means and, with correlative meaning, "*Taxes*" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments, or other government fees, charges, including any income, alternative or add-on minimum tax, estimated, gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock, franchise, profits, license, registration, recording, documentary, escheat or unclaimed property, intangibles, conveyancing, gains, employee or other withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real or personal), environmental or windfall profit tax, customs, duty or other tax, governmental fee or other like assessment, charge or tax of any kind whatsoever, together with any interest, penalty,

12

addition to tax or additional amount imposed by any Governmental Authority (domestic or foreign) responsible for the imposition of any such tax, whether such Tax is disputed or not, (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto) or as a result of any existing express or implied agreement or arrangement (including any indemnification agreement or arrangement).

"*Tax Asset*" means any net operating loss, net capital loss, investment tax credit, foreign tax credit, charitable deduction or any other credit or tax attribute that could be carried forward or back to reduce Taxes (including deductions and credits related to alternative minimum Taxes).

"*Tax Refund*" means any refund, credit, or offset of Taxes attributable to the assets, operations or Acquired Business of the Sellers for periods prior to the Closing Date.

"*Tax Return*" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"*Third Party*" means any Person other than a Party or its Affiliates.

"*threatened*" means a Proceeding, dispute or other matter shall be deemed to have been "threatened" if any demand or statement shall have been made in writing or any notice shall have been given in writing.

"*Trade Name License Agreement*" means a definitive Trade Name License Agreement pursuant to which, (i) prior to the closing of the applicable Houston Purchase Agreement, Houston IP Seller, and (ii) at and after the closing of the applicable Houston Purchase Agreement, the Primary Houston Buyer or one of its Affiliates, grants Buyer a royalty-free license and privilege to use the Seller Marks, for transitional purposes and for all purposes in operating the Acquired Business, until the date that is 120 days following the Closing.

"*Transaction Documents*" means this Agreement, the Bill of Sale and any other agreement between or among Buyer and the Sellers that expressly states that it constitutes a Transaction Document for purposes of this Agreement, and all other agreements, documents, and instruments entered into by Buyer, on the one hand, and any of the Sellers, on the other hand, as of or after the Execution Date and at or prior to Closing in connection with the Transactions (as each such document, agreement and instrument may be amended, supplemented or modified). Each Transaction Document must be acceptable to the Buyer in its reasonable discretion.

"*Transaction Taxes*" is defined in Section 2.10.

"*Transactions*" means the transactions contemplated by this Agreement and the other Transaction Documents.

13

"***Transferred Assets***" is defined in <u>Section 2.01(a)</u>.

"***Transferred Employees***" is defined in <u>Section 6.02(a)</u>.

"***Transition Services Agreement***" means a definitive Transition Services Agreement pursuant to which the Primary Houston Buyer or one of its Affiliates, shall provide certain transition services as are reasonably requested by Buyer and its Affiliates in connection with the Acquired Business and the transactions contemplated hereby.

"***WARN Act***" means the Workers Adjustment & Retraining Notification Act or any similar State law.

"***Winning Bidder***" means the "Successful Bidder," as defined in the Bidding Procedures for the Salle of Debtor's Assets attached to the Bidding Procedures Order.

"***Withholding Taxes***" means all applicable federal, state or local income Taxes and applicable employment (social security, unemployment insurance and Medicare) and other withholding obligations, in each case withheld from Employees Seller prior to Closing.

"***Yorktown Operating Seller***" means NEC Yorktown Emergency Center, LP, a Texas a Texas limited partnership.

**Section 1.02   Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement**.  Except as otherwise expressly provided in this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  Calculations in connection with the definitions, covenants and other provisions of this Agreement shall utilize GAAP, except as otherwise expressly set forth herein.

**Section 1.03   Other Definitional and Interpretative Provisions**.  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The headings and captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to Articles, Sections, Exhibits and Schedules of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein and defined herein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.  "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  Except for agreements, documents and notices required to be delivered after the Execution Date pursuant to this Agreement, the phrases "Sellers have delivered," "Sellers have provided," "Sellers have made available" and phrases of similar import shall mean that, prior to the date hereof, Sellers have delivered to Buyer a hard or electronic copy of the document or information in question or have made such document available on the virtual data site relating to the Transactions no later than 3 Business Days prior to Execution Date.

14

References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law," "laws" or to a particular statute or law shall be deemed also to include any and all Applicable Law. The word "or" will have the inclusive meaning represented by the phrase "and/or." The phrase "and/or" when used in a conjunctive phrase, shall mean any one or more of the Persons specified in or the existence or occurrence of any one or more of the events, conditions or circumstances set forth in that phrase; *provided, however,* that when used to describe the obligation of one or more Persons to do any act, it shall mean that the obligation is the obligation of each of the Persons but that it may be satisfied by performance by any one or more of them. "Shall" and "will" have equal force and effect. The Parties and their counsel have reviewed the provisions of this Agreement and have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. All references to immediately available funds or dollar amounts contained in this Agreement shall mean United States dollars. All references in this Agreement to the "Seller" or the "Sellers" shall be deemed to refer to the "Debtor" or the "Debtors," respectively, to the extent necessary in order to give effect to the intent of the Parties expressed in <u>Section 2.07</u>. THE PARTIES AGREE THAT THE BOLD AND/OR CAPITALIZED LETTERS IN THIS AGREEMENT CONSTITUTE CONSPICUOUS LEGENDS.

**ARTICLE 2**
**PURCHASE AND SALE**

**Section 2.01   Purchase and Sale of Assets**.

(a)      Subject to, and on the terms and conditions of this Agreement, effective at the Effective Time, Buyer shall purchase, acquire, and accept from the Sellers, and the Sellers shall sell, convey, transfer, assign, and deliver to Buyer free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever, whether arising prior to, on or subsequent to the Petition Date, (other than Specifically Assumed Liabilities), all rights, title, and interest of every kind and nature of Sellers (including indirect and other forms of ownership), in and to all of the assets, properties, rights and interests set forth below solely to the extent related to the Acquired Business (the "***Transferred Assets***"):

(i)      to the extent legally assignable, the Desired 365 Contracts and all of the Sellers' interest under the Desired 365 Contracts;

(ii)      except as and to the extent relating to any Retained Assets or Retained Liabilities;

(A)      any insurance proceeds payable pursuant to claims made under insurance Contracts (other than with respect to directors and officers liability insurance) with respect to matters arising prior to the Effective Time solely to the extent that such claim relates to the repair or replacement of damaged or destroyed property that constitutes the Transferred Assets and, as of the Effective Time, such

15

proceeds have not been paid to repair or replace such damaged or destroyed property; and

(B)     all rights in and under all express or implied guarantees, warranties (including manufacturers' warranties), representations, covenants, indemnities and similar rights in favor of the Sellers with respect to the Transferred Assets;

(iii)     all equipment (including medical equipment and instruments), furniture, furnishings, computer hardware, communication equipment, supplies, fixtures, leasehold interests, materials, Inventory and other tangible personal property of any kind or type that is owned by the Operating Sellers, used in the Acquired Business or located at or within any Facility;

(iv)     all motor vehicles, including the 30 motor vehicles and 2 trailers listed in Schedule 2.01(a)(iv);

(v)     (A) the furniture and medical equipment stored on the second floor of the Headquarters and listed in Schedule 2.01(a)(v) and (B) the furniture, fixtures and equipment located at the Desired Headquarters Space;

(vi)     all Licensed Intellectual Property Rights, to the extent transferable under the terms thereof or Applicable Law, including the Bankruptcy Code;

(vii)     all Owned Intellectual Property Rights and the goodwill associated therewith, excluding the Seller Marks and the Retained Mark and any Owned Intellectual Property Rights that embed or incorporate the Seller Marks and the Retained Mark;

(viii)     all bank accounts, safety-deposit boxes and lock boxes;

(ix)     all books and records of the Sellers, wherever located, solely to the extent relating to the Transferred Assets, including the following: sales and service records, books of account, invoices, inventory records, accounting records, Tax Returns with respect to the Transferred Assets, environmental records and studies, maintenance records, cost and pricing information, supplier lists, business plans, catalogues, quality control records and manuals, blueprints, research and development files, patent and trademark files; *provided, however,* that the Sellers shall retain a right, and to the extent any of the Transferred Assets include books and records related to the Houston Assets or the Non-Houston Assets, the Houston Buyer, the Non-Houston Buyer and their respective Representatives shall have the right, for a period of 2 years after the Closing upon reasonable notice to have reasonable access to and copying of (including through their Representatives who execute and deliver to Buyer a confidentiality agreement in form and substance acceptable to Buyer) the provisions within such materials related to the Retained Assets, the Houston Assets, the Non-Houston Assets, the Retained Liabilities, the Sellers' rights under the Transaction Documents or that are reasonably required with respect to any audit, investigation or inquiry of any Governmental Authority including taxing authorities with respect to periods prior to the Closing, so long as such access does not unreasonably interfere with the business operations of Buyer and shall be subject to any requirements or limitations imposed by the Patient Privacy Requirements; *provided further, however*, that the Sellers,

16

any Person authorized to act on behalf of the Sellers or their bankruptcy estates, and any Person to whom Retained Assets are transferred or assigned pursuant to the Bankruptcy Code or the Bankruptcy Rules (including without limitation a trustee, creditors' committee, or liquidating trust (collectively, an "***Authorized Person***")), shall have the right to access and copy any and all books and records of the Sellers as such Authorized Person, in its discretion, deems necessary to enable such Authorized Person to take any and all actions in connection with the Retained Assets as such Authorized Person is entitled and/or required to take under the Bankruptcy Code or the Bankruptcy Rules, including without limitation analyzing, evaluating, litigating, and compromising the Avoidance Actions, in each case so long as such access does not unreasonably interfere with the business operations of Buyer and shall be subject to any requirements or limitations imposed by the Patient Privacy Requirements;

(x)     to the extent legally assignable, all Licenses and Permits, relating to the ownership or operation of the Transferred Assets;

(xi)     all prepaid claims, prepaid expense items and deferred charges, credits, advance payments, security, rebates, sums and fees, and other deposits (other than for Taxes, insurance and utilities) made by the Sellers to any other Person relating to the Transferred Assets, in each case other than to the extent exclusively relating to the Retained Liabilities or Retained Assets;

(xii)     all goodwill associated with any Transferred Assets;

(xiii)     all Cash Deposits;

(xiv)     all third-party indemnities related to the Transferred Assets where any Seller is an indemnified party and the proceeds afforded thereby, in each case other than to the extent exclusively relating to the Retained Liabilities or Retained Assets;

(xv)     solely to the extent related to the Transferred Assets, Post-Petition Accounts Payable, Post-Petition Accrued Expenses and PTO Obligations (as stated in Section 2.01(a) above), all claims, rights, defenses, offsets, recoupments, causes of action, credits, immunities or rights of set-off against Buyer and/or Third Parties that are counterparties to any of the Desired 365 Contracts that are actually assumed by the Debtors and assigned to the Buyer arising prior to the Effective Time;

(xvi)     solely to the extent related to the Transferred Assets (as stated in Section 2.01(a) above) all claims, rights, defenses, offsets, recoupments, causes of action, credits, immunities or rights of set-off against Transferred Employees, including rights under employment agreements, confidentiality agreements, and non-competition agreements other than any employees that fall within Section 2.02(i) below.  For the sake of clarity and the avoidance of any doubt, Section 2.01(a)(xv) and this Section 2.01(a)(xvi) are subject to Section 2.02 below and expressly exclude the Retained Assets; and

(xvii)     all Accounts Receivable of the Bellaire Operating Seller.

17

(b)     Except for Specifically Assumed Liabilities, all Transferred Assets shall be conveyed free and clear of all Liens, Claims, and Interests to the maximum extent allowed by Section 363(f) of the Bankruptcy Code.  Prior to the hearing to approve the Sale Order, Buyer may elect to designate any Transferred Asset as a Retained Asset by written notice to the Seller.

(c)     At any time prior to September 30, 2018, Buyer may provide written notice to Sellers that Buyer has elected to (i) remove from the Transferred Assets up to four (4) Leased Real Properties (including the associated Real Property Leases) attributable to Subject Locations (the "***Rejected Leased Real Properties***"), and (ii) designate such Rejected Leased Real Properties as Retained Assets.  In the event that Buyer exercises its right under this Section 2.01(c), (i) all of the assets, properties, rights and interests of Sellers attributable to each Rejected Leased Real Property (including, for the avoidance of doubt, Accounts Receivable of the applicable Operating Seller generated from such Subject Location and the furniture, fixtures and equipment residing thereon) shall remain Transferred Assets, (ii) there shall be no change in the Purchase Price as a result of the designation of such Rejected Leased Real Properties as Retained Assets, (iii) Buyer shall be responsible for the closing costs attributable to shutting-down the operations at such Rejected Leased Real Properties in the amount of $75,000 for each of the Rejected Leased Real Properties, and Buyer shall promptly pay to Sellers such amount upon the exercise of its election to remove such Rejected Leased Real Properties under this Section 2.01(c), (iv) Buyer shall continue to use its commercially reasonable efforts to  obtain all approvals, consents, registrations, Permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other Third Party that are necessary, proper or advisable to consummate the Transactions, and (v) Buyer shall not, and shall direct its Affiliates and their respective directors, officers, employees, agents and Representatives not to, disclose to any Person that Buyer has designated any Leased Real Property as a Rejected Leased Real Property.

**Section 2.02   Retained Assets**.  Notwithstanding the foregoing, Buyer shall not acquire, and the Sellers shall retain, the following assets of Sellers (the "***Retained Assets***"):

(a)     except as provided in Section 2.01(a)(xvii), all Accounts Receivable (including, for the avoidance of doubt, all Accounts Receivable of the Yorktown Operating Seller) and all claims, including deposits, advances, prepaid and other current assets, rights under warranties and guaranties, rights in respect of promotional allowances, vendor rebates and to other refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether known or unknown or contingent or non-contingent), the right to receive and retain mail, Accounts Receivable payments and other communications of Sellers, and the right to bill and receive payments and other communications of Sellers; and the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

(b)     (i) all cash and cash equivalents (excluding Cash Deposits), and (ii) all deposits for utilities;

(c)     (i) the Houston Assets and all of the Sellers' rights under the Houston Purchase Agreements and the Transaction Documents (as such term is defined in the Houston Purchase Agreements), and (ii) the Non-Houston Assets and all of the Sellers' rights under the

18

Non-Houston Purchase Agreements and the Transaction Documents (as such term is defined in the Non-Houston Purchase Agreements);

(d)     the Excluded Contracts;

(e)     the assets of the Corporate and Shared Services Sellers, including the accounts receivable thereof, to the extent such assets relate solely to the emergency center facilities listed in Schedule 2.02(e);

(f)     the equity ownership of any Seller's Subsidiary, including the business of any such Subsidiary that is not a Seller;

(g)     all Intercompany Indebtedness;

(h)     all insurance Contracts (including with respect to directors and officers liability insurance) and all rights, claims and proceeds payable thereunder, including deposits, rights to discounts, credits and refunds arising from such insurance Contracts, except to the extent constituting Transferred Assets pursuant to Section 2.01(a)(ii)(A);

(i)     all claims, rights, defenses, offsets, recoupments, causes of action, credits, immunities or rights of set-off of the Sellers against Third Parties, including, without limitation, against the Sellers' former or current officers, directors, managers, members, unitholders, physicians, pharmacists and/or independent contractors arising prior to the Effective Time;

(j)     the Organizational Documents of the Sellers and their respective, minute books, stock and ownership records and corporate seals and all other documents and records relating to the organization, maintenance, existence and federal income taxation of the Sellers or their partners;

(k)     all Tax Assets, Tax deposits (including funds held by the Sellers in respect of Withholding Taxes or estimated income taxes) and Tax Refunds;

(l)     all business and financial records, books, ledgers, files, plans, documents, correspondence, lists, and reports that relate solely to Retained Assets or Retained Liabilities;

(m)     all rights, claims, causes of action and recoveries of the Sellers under Sections 506(c), 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), 553 or 724 of the Bankruptcy Code (collectively, "*Avoidance Actions*") other than Avoidance Actions against the Buyer and all proceeds thereof;

(n)     all ERISA Plans and assets maintained pursuant or in connection therewith;

(o)     all professional retainers incurred in connection with the Bankruptcy Cases;

(p)     the Seller Marks and the Retained Seller Mark and any Owned Intellectual Property Rights that embed or incorporate the Seller Marks and the Retained Seller Mark;

(q)     any executory Contracts ("***Excluded Contracts***") that are not Desired 365 Contracts;

(r)     all furniture, fixtures and equipment stored or maintained at the Headquarters other than as specified in <u>Section 2.01(a)</u>;

(s)     all Leased Real Properties (including the Real Property Leases associated therewith) that are designated as Rejected Leased Real Properties;

(t)     any executory Contracts or unexpired leases, including the Real Property Leases that are rejected by Buyer pursuant to <u>Section 2.01(c)</u> and that are not assumed and assigned to Buyer pursuant to this Agreement, or that are otherwise terminated on or before the Effective Time;

(u)     the T-System Contract; and

(v)     all of the Sellers' rights under the Transaction Documents, including the right to receive the Purchase Price.

**Section 2.03   Assumption of Liabilities**.  Except as specifically set forth in this <u>Section 2.03</u>, Buyer shall not assume, in connection with the Transactions or otherwise, any Liability or obligation of Sellers whatsoever, and Sellers shall retain responsibility for all Liabilities and obligations accrued as of, on, or after the Effective Time, whether or not accrued and whether or not disclosed. As the sole exception to the preceding sentence, subject to the terms and conditions set forth herein, Buyer shall assume as of the Effective Time only the following Liabilities (collectively, the "***Specifically Assumed Liabilities***"), and no others:

(a)     all Liabilities arising and incurred after the Effective Time under the Desired 365 Contracts assigned to and assumed by Buyer pursuant to this Agreement, but only to the extent that such obligations are not supposed to be performed prior to the Effective Time (and expressly excluding any obligation arising out of or relating to a breach that occurred prior to the Effective Time or for amounts owing by the Sellers prior to the Effective Time and any amounts attributable to any period prior to the Effective Time, including the reconciliation of payments made on an estimated basis pursuant to the terms of any lease for Leased Real Property);

(b)     the Cure Costs for all Desired 365 Contracts (excluding the Cure Costs for any Real Property Leases) solely to the extent assumed by Buyer;

(c)     all Liabilities incurred in providing COBRA-continuation coverage under Buyer's group health plan as set forth in <u>Section 6.02(c)</u>;

(d)     (i) all Post-Petition Accounts Payable of the Bellaire Operating Seller and the Yorktown Operating Seller, and (ii) all Post-Petition Accrued Expenses of the Bellaire Operating Seller and the Yorktown Operating Seller (excluding, except as specified in <u>Section 2.03(e)</u> and in <u>Section 6.02</u>, any Liabilities for payroll expenses and ERISA Plans of the Corporate and Shared Services Sellers), in each case solely to the extent related to the Transferred Assets or the Acquired Business, and with the aggregate amount of the Specifically Assumed Liabilities

assumed by the Buyer pursuant to clauses (i) and (ii) of this <u>Section 2.03(d)</u> not to exceed $300,000; and

        (e)     all PTO Obligations of the Bellaire Operating Seller and the Yorktown Operating Seller, in the aggregate amount not to exceed $42,412.

Sellers hereby acknowledge and agree that Buyer shall not be the successor to any Seller, and Sellers acknowledge and agree that pursuant to the terms and provisions of this Agreement, except for the Specifically Assumed Liabilities, Buyer will not assume, nor in any way be liable or responsible for, any claim or Liability of any Seller or any Affiliate of a Seller (including Liabilities relating to the pre-petition or post-petition operation of the Acquired Business, the Retained Assets or to the Transferred Assets (and the use thereof)), whether relating to or arising out of the Acquired Business, the Retained Assets, the Transferred Assets or otherwise, including any Liability of a Seller or any predecessor or Affiliate of a Seller whatsoever.

The Sellers further acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement or otherwise shall not create a Specifically Assumed Liability or other Liability of Buyer, except where such disclosed obligation has been expressly assumed by Buyer as a Specifically Assumed Liability. The Transactions shall in no way expand the rights and remedies of any Third Party against the Buyer or the Sellers as compared to the rights and remedies that such Third Party would have had against the Buyer or the Sellers absent the Bankruptcy Cases or Buyer's assumption of the Specifically Assumed Liabilities. Other than the Specifically Assumed Liabilities, Buyer is not assuming and shall not be liable for any Liabilities of the Sellers or any of their Affiliates. This <u>Section 2.03</u> shall not limit in any way any claims or defenses Buyer may have against any Person other than the Sellers.

       **Section 2.04  Retained Liabilities**.  Except for the Specifically Assumed Liabilities, Buyer is not assuming, shall not assume, and shall not be responsible for, and the Sellers expressly retain, any claims against, Liabilities or obligations whatsoever of, the Acquired Business or any Seller (the "***Retained Liabilities***"), including the following: (a) all Liabilities of the Sellers related to the Retained Assets, whether such Liabilities arise before or after the Effective Time; (b) any indebtedness, accounts payable or accrued expenses of any Seller or the Acquired Business; (c) all of the costs and expenses of the Sellers incurred in connection with the Bankruptcy Cases; (d) all of the costs and expenses of the Sellers incurred in connection with negotiating, entering into and carrying out its obligations pursuant to this Agreement or any other Transaction Document; (e) any known or unknown Liability of any Seller; (f) any Liability to refund any payment or reimbursement received by a Seller from any Third Party payor; (g) any Liability related to the Health Insurance Portability and Accountability Act of 1996; (h) any Liability relating to fraud or the federal statutes relating to health care fraud and abuse and kickbacks (including 42 U.S.C. § 1320a-7b, 42 U.S.C. § 1320a-7a, the Ethics in Patient Referrals Act, as amended, 42 U.S.C. §§ 1395nn et seq., and the federal Civil False Claims Act, 31 U.S.C. § 3729 et seq.) or related or similar statutes or the regulations promulgated pursuant to any of such statutes, and any similar applicable state laws or regulations pertaining to fraud, kickbacks, or fee splitting; (i) the responsibility for any contributions to or funding of any benefits plan, program, agreement, practice or arrangement (whether written or oral) maintained by any Seller or pursuant to which any Seller has any contribution or funding obligation for its employees, former employees, retirees, agents, independent contractors, their beneficiaries or any other Person; (j) any Liability arising

21

from, or with respect to, any ERISA Plan or any similar arrangement currently or previously mentioned, or contributed to, by any Seller; (k) any Liability of any Seller for any Tax of any kind or nature, including (i) any Tax which may become payable by reason of the sale and transfer of the Transferred Assets, or be imposed upon any Seller or its Affiliates by reason of receipt of the Purchase Price or relief from any Liability pursuant to or in connection with this Agreement, (ii) any Tax generated from activities of the Business on or before the Effective Time, including the Transactions, or (iii) any other Tax of any of the Sellers or any of their Affiliates under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of Contract or Legal Requirement; (l) any Liability of Sellers for any noncompliance with any Applicable Laws, including those relating to employment and labor management relations (including noncompliance under the WARN Act) and any provisions thereof relating to wages and the payment thereof, hours of work, terms of employment, collective bargaining agreements, and workers' compensation laws, arising from the Acquired Business prior to the Effective Time or otherwise arising prior to the Effective Time; (m) any Liability to distribute to any equity holder of any Seller or otherwise apply all or any part of the consideration received hereunder; (n) any and all Liabilities arising under any Healthcare Law or any other Liability in connection with, arising from or relating to the ownership, management or operation of any Seller, the Transferred Assets or the Acquired Business, or any condition in existence with respect to any Seller, the Transferred Assets or the Acquired Business, existing on or prior to the Effective Time, or any products or services sold by any Seller; (o) any Liability of any Seller for any failure to withhold all amounts required by any Applicable Law or Contract to be withheld from the wages or salaries of its employees, and any Liability for any wage arrearages, taxes or penalties for failure to comply with any of the foregoing arising prior to the Effective Time or otherwise arising from the Transferred Assets or the operation of the Acquired Business prior to the Effective Time; (p) other than as specified in Section 2.03(e) above, any Liability to employees of any Seller, including all PTO Obligations, any severance or retention obligations, and any bonus obligations arising prior to or on the Effective Time or otherwise arising from the Transferred Assets or the operation of the Acquired Business prior to the Effective Time; (q) any Liability arising out of any controversies between any Seller and its employees or former employees or any union or other collective bargaining unit representing any of its employees arising prior to the Effective Time or otherwise arising from the Transferred Assets or the operation of the Acquired Business prior to the Effective Time; and (r) all other Liabilities of the Sellers whatsoever associated with the Transferred Assets, the Acquired Business or with any other properties, rights, contracts, or other assets of the Sellers, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated, or otherwise.

**Section 2.05   Good-Faith Deposit; Escrow**.

(a)      Provided this Agreement has not been terminated pursuant to Section 9.01(a) or Section 9.01(d), as of the Execution Date, Buyer has deposited with the Seller Parent as a good-faith deposit (the "***Deposit***") an amount equal to $550,000.00; it being agreed no additional amount is required in order to satisfy Buyer's obligations with regard to the Deposit.  The Seller Parent shall hold the Deposit in an interest-bearing bank account.  The Sellers acknowledge and agree that the Deposit shall not be an asset of the Debtors' bankruptcy estates that are created upon the filing of the Bankruptcy Cases.  Upon the Closing in accordance with the terms of this

Agreement and the Transaction Documents, the Deposit (together with all interest earned thereon) will be applied against the Purchase Price in the manner provided in Section 2.06(b).

(b)     If this Agreement is terminated pursuant to Section 9.01, the Seller Parent shall return the Deposit (together with all interest earned thereon) to Buyer or to retain the Deposit (together with all interest earned thereon) as a non-completion fee in accordance with Section 9.02(b).

**Section 2.06   Purchase Price**.

(a)     The aggregate consideration for the sale, assignment, transfer, conveyance, and delivery of the Transferred Assets to Buyer at the Effective Time (the "***Purchase Price***") shall consist of: (i) the assumption of the Specifically Assumed Liabilities as provided above, and (ii) cash in the amount of $6,600,000.00 (the "***Cash Purchase Price***"), payable as provided by Section 2.06(b) and Section 2.07.

(b)     At the Closing, Buyer will pay to the Sellers by wire transfer of immediately available funds an amount equal to (i) the Cash Purchase Price *minus* (ii) the Deposit (together with all interest thereon).

**Section 2.07   Filing of Bankruptcy Cases**.   The Sellers have previously filed the Bankruptcy Cases with the Bankruptcy Court, and the Transferred Assets shall be conveyed by the Debtors free and clear of all Liens, Claims, and Interests.   Accordingly, the Sellers obligation to consummate the transactions set forth in this Agreement (including the sale, conveyance, transfer, assignment and delivery to Buyer of the Transferred Assets) on the Closing Date will be subject to the entry of a Bidding Procedures Order and a Sale Order, each of which shall be a Final Order.   Further, for purposes of clarification, with respect to the representations made by the Debtors on the Closing Date in Article 3, all references to "Seller" or the "Sellers" shall be deemed to refer to the "Debtor" or the "Debtors," respectively.

**Section 2.08   Closing; Closing Deliveries.**

(a)     The closing of the Transactions (the "***Closing***") shall take place at the offices of Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Teas 77002 commencing at 10:00 a.m. on the date that is three (3) Business Days following the satisfaction or written waiver of the conditions of Closing set forth in Article 8 hereof (other than those conditions which by their terms are not to be satisfied until the Closing, but subject to the waiver or fulfillment of those conditions), or such other date or location as the Parties may mutually determine.   The Closing and all documentation delivered at Closing shall be effective as of the Effective Time.

(b)     At the Closing, unless waived by the Sellers, Buyer shall deliver, or execute and deliver, as applicable:

(i)     Separate Bills of Sale, in form and substance acceptable to Buyer, conveying a portion of the Transferred Assets to each Acquiring Entity as designated by Buyer, and duly executed by each Acquiring Entity;

(ii)    the Cash Purchase Price in the manner provided in Section 2.06(b);

23

(iii)   an assignment and assumption of lease, in form and substance reasonably acceptable to Buyer, with respect to each Real Property Lease (other than Rejected Leased Real Properties) (the "***Lease Assignments***"), duly executed by each applicable Acquiring Entity, unless the assignment of the Real Property Leases is satisfied by the entry of the Sale Order;

(iv)   the certificate required to be delivered by Buyer under <u>Section 8.03(c)</u>, duly executed by Buyer; and

(v)   all other documents, certificates, instruments or writings reasonably requested by Buyer in connection herewith.

(c)   At the Closing, unless waived by Buyer, the Sellers shall deliver or cause to be delivered, or execute and deliver, as applicable, to the Buyer:

(i)   physical possession of all of the Transferred Assets capable of passing by delivery with the intent that title in such Transferred Assets shall pass by and upon delivery;

(ii)   Separate Bills of Sale, executed by Seller, in form and substance acceptable to Buyer, conveying a portion of the Transferred Assets to each Acquiring Entity as designated by Buyer;

(iii)   the Lease Assignments, each duly executed by the applicable lessor and lessee, unless the assignment of the Real Property Leases is satisfied by the entry of the Sale Order;

(iv)   a lease agreement between the Headquarters Lease Landlord and Buyer, on terms reasonably acceptable to Buyer, providing for Buyer's lease of up to 10,000 square feet of office space on the third floor of the Headquarters (the "***Desired Headquarters Space***"), duly executed by the Headquarters Lease Landlord; *provided*, *however*, in the event Buyer notifies Sellers pursuant to <u>Section 5.04(c)</u> that it does not intend to enter into a lease agreement for the Desired Headquarters Space, Sellers shall provide Buyer access to and use of the Desired Headquarters Space, rent-free and for transitional purposes and for all purposes in operating the Acquired Business, for a period of up to six weeks (6) following the Closing Date;

(v)   the certificate required to be delivered by the Sellers under <u>Section 8.02(c)</u>, duly executed by the Sellers;

(vi)   certificates of title and, unless the transfer of the motor vehicle titles are satisfied by the entry of the Sale Order, title transfer documents to all titled owned motor vehicles that constitute Transferred Assets, in form and substance acceptable to Buyer;

(vii)   affidavits meeting the requirements of Treasury Regulation § 1.1445-2(b)(2), duly executed by the Sellers;

24

(viii) a certified copy of the Sale Order, which order has not been reversed or modified on appeal or, if any such appeal is pending, such order shall not have been stayed;

(ix) a properly completed Texas Comptroller of Public Accounts Form 01-917, Statement of Occasional Sale, in the aggregate covering the conveyances of the Transferred Assets by Sellers to Buyer hereunder;

(x) written evidence satisfactory to the Buyer of all consents required to be obtained from third parties in connection with the Transactions; and

(xi) all other documents, certificates, instruments or writings reasonably requested by Buyer in connection herewith.

**Section 2.09  Allocation of Purchase Price.**  The Sellers and Buyer agree that the Transactions will be treated as an asset acquisition for tax purposes.  Within thirty (30) calendar days after the Closing Date, Buyer shall prepare and provide a proposed allocation of the Purchase Price among the Transferred Assets (the "***Purchase Price Allocation***") to the Sellers.  Such proposed Purchase Price Allocation shall be in accordance with Section 1060 of the Code and final and binding on the Parties unless, within thirty (30) calendar days after Buyer provides such proposed Purchase Price Allocation, the Sellers notify Buyer of their disagreement with any item in such proposed allocation.  In the event of such notification, the Sellers and Buyer shall negotiate in good faith to resolve such dispute; *provided, however*, that if the Sellers and Buyer cannot resolve such dispute within thirty (30) calendar days then they shall be entitled to file separate allocations.  Any allocation of the Purchase Price agreed to pursuant to this section shall be binding on Buyer and the Sellers for all Tax reporting purposes except that neither Party shall be unreasonably impeded in its ability and discretion to negotiate, compromise and/or settle any Tax audit, claim, or similar proceedings.  The Purchase Price Allocation shall be for tax purposes only, and the Purchase Price Allocation shall not have any effect on any other distribution or disbursement of monies to secured or unsecured creditors in any of the Bankruptcy Cases, if applicable.

**Section 2.10  Transfer Taxes**. All federal, state and local sales and transfer Taxes, including all state and local Taxes in connection with the transfer of the Transferred Assets, and all recording and filing fees (collectively, "***Transaction Taxes***") that may be imposed by reason of the sale, transfer, assignment and delivery of the Transferred Assets, and are not exempt under Section 1146(a) of the Bankruptcy Code shall be borne 100% by Sellers.  Transaction Taxes do not include any Tax in the nature of an income tax, including any capital gains, franchise, excise, inheritance, estate, succession, or gift taxes.  The Sellers and Buyer shall cooperate to minimize any such Transaction Taxes and to determine appropriate taxing authorities and amount of Transaction Taxes, if any, payable in connection with the Transactions.  The Buyer shall assist Sellers reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers, jointly and severally, represent and warrant to Buyer that the statements contained in this Article 3 are true and correct on the Execution Date and will be true and correct at the Closing as of the Closing Date, and in each case solely with respect to the Acquired Business.

**Section 3.01   Corporate Existence and Power**.  Each Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Each Seller has all requisite power and authority to carry on its business as now being conducted and to own, lease, and operate its properties and assets as now owned, leased or operated, and to perform all its obligations under the agreements and instruments to which it is a party or by which it is bound. No Seller is required to be qualified to do business as a foreign corporation (or other entity) in any jurisdiction.

**Section 3.02   Authorization**.   Subject to any necessary authorization from the Bankruptcy Court, each Seller has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the Transactions.  On the Execution Date, the execution, delivery and performance by the Sellers of this Agreement and the other Transaction Documents dated the Execution Date to which the Sellers are a party and the consummation of the Transactions have been duly authorized by all necessary action on the part of the Sellers.  No other corporate or organizational proceedings on the part of a Seller are necessary to approve and authorize the execution and delivery of the Transaction Documents to which Sellers are a party and the consummation of the Transactions.  As of the Closing Date, subject to the entry of the Sale Order by the Bankruptcy Court, this Agreement and each other Transaction Document to which the Debtors will be a party on the Closing Date (assuming in each case due authorization, execution and delivery thereof by the other parties thereto) constitute valid and binding agreements of the Debtors, enforceable against the Debtors in accordance with their terms (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditors' rights generally and general principles of equity).

**Section 3.03   Governmental Authorization**.  The execution, delivery, and performance by the Sellers of this Agreement and each other Transaction Document to which they are or will be parties and the consummation by the Sellers of the Transactions require no action by or in respect of, consent of, or filing with or notification to, any Governmental Authority other than the filing of appropriate pleadings and notices with the Bankruptcy Court, the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court, and the approval of this Agreement by the Bankruptcy Court as specifically provided in this Agreement.

**Section 3.04   Title to Transferred Assets**.  At the Closing, subject to the entry of the Sale Order by the Bankruptcy Court, the Debtors shall deliver to each Acquiring Entity as directed by Buyer, and  each Acquiring Entity will acquire, good and marketable title to the Leased Real Property, including a valid leasehold in or rights to use such Facilities or property subject to such leasehold and rights to use all of the Transferred Assets free and clear of all Liens, Claims, and Interests. The Transferred Assets are sufficient for the continued conduct of the Acquired Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute

26

all of the rights, property, and assets necessary to conduct the Acquires Business as currently conducted.  The Houston Assets do not include any of the Transferred Assets.

**Section 3.05   Financial Statements and Information**.  Sellers have delivered to Buyer: (a) the consolidated audited balance sheet of Neighbors Global Holdings, LLC as of December 31, 2016, and the related statement of income for the year then ended, (b) with respect to each of the Operating Sellers, its unaudited balance sheet as of December 31, 2017 and its related unaudited income statement for the year then ended, and (c) with respect to each of the Operating Sellers, its unaudited balance sheet as of April 30, 2018 and its related unaudited income statement for the 4-month period then ended (collectively, the "***Financial Statements***"). The Financial Statements are true, correct and complete in all material respects and fairly present in all material respects the financial condition, results of operations and cash flows of Sellers as of the respective dates thereof and for the periods referred to therein. The Financial Statements reflect the consistent application of accounting principles throughout the periods involved. The Financial Statements have been prepared from and are in accordance with the accounting records of Sellers.

**Section 3.06   Absence of Certain Developments**.  Except as expressly contemplated by this Agreement or as disclosed by Seller to Buyer on Schedule 3.06, since April 30, 2018 (i) Sellers have conducted the Acquired Business only in the ordinary course of business including the timely satisfaction of all Post-Petition Accounts Payable and Post-Petition Accrued Expenses and (ii) there has not been any event, change, occurrence or circumstance that has had or could reasonably be expected to have a Seller Material Adverse Effect.

**Section 3.07   Brokerage Fees**.  Except as set forth on Schedule 3.07, there is no investment banker, broker, finder or other intermediary which has been retained by or is authorized to act on behalf of the Sellers or the Debtors which is or will be entitled to any fee, commission or other compensation in connection with the Transactions.  Any such fee listed on Schedule 3.07 shall be the sole responsibility of the Sellers.

**Section 3.08   Contracts**.

(a)   Schedule 3.08(a) contains a correct and complete list of all Contracts that are material to the operation of the Acquired Business ("***Seller Contracts***").  The Sellers have made available to Buyer true, correct and complete copies of each Seller Contract.  Except for those Seller Contracts indicated by an asterisk on Schedule 3.08(a), none of the Sellers is the licensor of any intellectual property, including any trademarks or any other property that could be the subject of an election under Section 365(n) of the Bankruptcy Code.

(b)   Each Seller Contract is a valid and binding agreement of the applicable Seller and counterparty, enforceable against such Seller and counterparty in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Except as set forth in Schedule 3.08(b), no party is in breach of or default under any Seller Contract, where such breach or default has resulted in, or could reasonably be expected to result in, loss or liability in excess of $250,000.

27

**Section 3.09   Taxes**.

(a)      All Tax Returns required to have been filed by or with respect to the Sellers have been filed (taking into account any extension of time to file granted or obtained) and such Tax Returns are true, correct and complete in all material respects;

(b)      Except as set forth on Schedule 3.09(b), all Taxes required to have been paid by or with respect to the Sellers have been paid, other than Taxes of the Sellers the payment of which is prohibited or stayed by the Bankruptcy Code;

(c)      Sellers have deducted, withheld and timely paid to the appropriate Governmental Authorities all Taxes required to be deducted, withheld or paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other similar Person of or with respect to Sellers, and Sellers have complied with all related Applicable Laws.

(d)      There are no Liens with respect to Taxes on any of the Transferred Assets, other than such Liens that will be released upon entry of the Sale Order, as applicable;

(e)      Buyer will not be required to include any amount in taxable income for any Tax period (or portion thereof) ending after Closing Date, as a result of transactions or events occurring with respect to Sellers, sales or receipts received by Sellers, or accounting methods employed by Sellers, prior to Closing;

(f)      The Sellers have not received any written notice of any pending or threatened assessment of Taxes, or any audits, examinations, investigations, or other proceedings in respect of Taxes or Tax Returns of the Sellers; and

(g)      Sellers have not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessed or a deficiency.

**Section 3.10   Inventory**.  The Inventory of Sellers (a) is sufficient for the operation of the Acquired Business in the ordinary course of business, (b) consists of items that are good and merchantable, and (c) is of a quality and quantity presently usable or saleable in the ordinary course of business.

**Section 3.11   Transactions with Affiliates**.  Schedule 3.11(a) sets forth a complete and correct list of all transactions to or by which the Sellers, on the one hand, and any Affiliate of the Sellers, on the other hand, is a party or are otherwise bound or subject and by which any of the Transferred Assets are bound or subject or pursuant to which the Sellers have made, since December 31, 2017, or are obligated to make, payments or incur expenses to or for the benefit of the Sellers or any Affiliate of the Sellers. Except as set forth in Schedule 3.11(b), no Seller, and, to the Knowledge of Sellers, no Affiliate of a Seller, Insider, employee, or agent of or consultant to a Seller, (a) beneficially owns, directly or indirectly, an interest in, or is a director, officer, employee or agent of or consultant to, any Person which is a competitor, supplier or customer of a Seller or the Acquired Business, or (b) directly or indirectly owns or has an interest in any property, asset or right (real or personal, tangible or intangible) which is used in, pertains to or is necessary for the operation of the Acquired Business or the Transferred Assets.

Section 3.12    **Compliance with Laws**.  Except as set forth in Schedule 3.12(a), each Seller is in compliance in all material respects with the requirements of all Applicable Laws that are material to the operation of the Acquired Business.  No Seller has received notice from any Governmental Authority of any pending or threatened Proceeding, or any circumstances or facts which could give rise thereto, involving the Sellers, their assets or any physician employed or engaged by the Sellers with respect to any Applicable Law.  Set forth in Schedule 3.12(b) are all Permits held by Sellers with respect to the Transferred Assets, which constitute all of the Permits necessary to permit Buyer to own, operate, use, and maintain the Transferred Assets in the manner in which they are now operated and maintained or have been operated and maintained since December 31, 2017 and to conduct their businesses as now being conducted or have been operated and maintained since December 31, 2017 in compliance with all Applicable Law.  All required filings with respect to such Permits have been timely made and all required applications for renewal thereof have been timely filed. All such Permits are in full force and effect and there are no Proceedings pending or, to the Knowledge of Sellers, threatened that seek the revocation, cancellation, suspension, or adverse modification thereof.

Section 3.13    **Healthcare Laws**.

(a)    Except as set forth in Schedule 3.13(a), to the Knowledge of Sellers, no Seller nor any Affiliate of a Seller is or has been in violation of any Healthcare Laws.  No Seller has received notice from any Governmental Authority of any pending or threatened Proceeding, or any circumstances or facts which could give rise thereto, involving the Sellers, their assets or any physician employed or engaged by the Sellers with respect to any applicable Healthcare Law.

(b)    Set forth in Schedule 3.13(b) are all Permits held by Sellers with respect to any Healthcare Laws, which constitute all of the Permits necessary to permit Buyer to own, operate, use, and maintain the Transferred Assets in the manner in which they are now operated and maintained or have been operated and maintained since December 31, 2017 and to conduct their businesses as now being conducted or have been operated and maintained since December 31, 2017 in compliance with all Healthcare Laws.  All required filings with respect to such Permits have been timely made and all required applications for renewal thereof have been timely filed. All such Permits are in full force and effect, and there are no Proceedings pending or, to the Knowledge of Sellers, threatened, that seek the revocation, cancellation, suspension, or adverse modification thereof.

Section 3.14    **Legal Proceedings**.  Except (a) as set forth on Schedule 3.14, and (b) for the Bankruptcy Cases, there is no Proceeding of any nature pending or, to the Knowledge of Sellers, threatened against or by any Seller or any Affiliate of any Seller relating to or affecting the Transferred Assets or the Specifically Assumed Liabilities, or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions, or which affects the execution and delivery by the Sellers of this Agreement and the other Transaction Documents to which the Sellers are or will be a party. No Seller or any Affiliate of a Seller is subject to any Order in which relief is sought relating to or affecting the Transferred Assets or the Specifically Assumed Liabilities, or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions, or which affects the execution and delivery by the Sellers of this Agreement and the other Transaction Documents to which the Sellers are or will be a party.

**Section 3.15   Absence of Restrictions and Conflicts**. The execution, delivery, and performance by the Sellers of this Agreement and the other Transaction Documents to which the Sellers are or will be a party and the consummation by the Sellers of the Transactions do not and will not (a) contravene, conflict with, or result in any violation or breach of any provision of the Sellers' Organizational Documents, (b) assuming compliance with the matters referred to in Section 3.03, contravene, conflict with or result in a violation or breach of any provision of any Applicable Law, or (c) assuming compliance with the matters referred to in Section 3.03, require any consent or other action by any Person under, constitute a default, or an event that, with or without notice or lapse of time or both, would constitute a default, under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit to which the Sellers are entitled under any provision of any Desired 365 Contract binding upon the Sellers or by which the Transferred Assets may be bound or any Permit affecting, or relating in any way to, the Sellers, the Transferred Assets or the Acquired Business.

**Section 3.16   Intellectual Property.**

(a)     The Sellers own, or have the licenses or rights to use, all Intellectual Property Rights that are necessary to operate the Acquired Business as currently conducted. Schedule 3.16(a) sets forth a complete and correct list and summary description of such Intellectual Property Rights, including whether such Intellectual Property Rights are Licensed Intellectual Property Rights or Owned Intellectual Property Rights.

(b)     Except as set forth on Schedule 3.16(b), no Seller has received any notice that (i) any Seller is infringing in any material respect the Intellectual Property Rights of any Third Party or (ii) any Intellectual Property Right necessary to operate the Acquired Business as currently conducted has been terminated or will be terminated or the use of such Intellectual Property Right is in violation of any Applicable Law.

**Section 3.17   Environmental.**

(a)     To the Knowledge of Sellers, the Acquired Business has been conducted in compliance with all applicable Environmental Laws.

(b)     No Seller has received any notice or demand letter from any Governmental Authority or Third Party, indicating that any Seller is in violation of, or liable under, any Environmental Law.

(c)     To the Knowledge of Sellers, there have been no "releases" or threats of "releases" (as defined in any Environmental Laws) of Hazardous Substances at, from, in or on the Leased Real Property. There is no on-site or off-site location to which a Seller has transported or disposed of Hazardous Substances from the Leased Real Property or arranged for the transportation or disposal of Hazardous Substances from the Leased Real Property that is or, to Sellers' Knowledge, is threatened to be the subject of any federal, state, local or foreign enforcement action or any other investigation that could lead to any claim against any Seller or the Buyer for any clean-up cost, remedial work, damage to natural resources, property damage or personal injury, including any claim under any Environmental Laws.

30

(d)      No Seller, nor, to the Knowledge of Sellers, any other Person for whose conduct any Seller is or may be held responsible, has (A) entered into or been subject to any consent decree, compliance order or administrative order with respect to the Leased Real Property or operations thereon, (B) received notice under the citizen suit provision of any Environmental Laws in connection with the Leased Real Property or operations thereon, (C) received any request for information, notice, demand letter, administrative inquiry or formal or information complaint or claim with respect to any Hazardous Substances relating to the Leased Real Property or operations thereon, or (D) been subject to or threatened with any governmental or citizen enforcement action with respect to the Leased Real Property or operations thereon, and no Seller has any reason to believe that any of the above will be forthcoming.

(e)      To the Knowledge of Sellers, no Seller or any of its Affiliates has any contingent liability in connection with any release or disposal of any Hazardous Substance from the Leased Real Property into the environment.

(f)      (i) No Seller has owned, leased or operated a site that pursuant to CERCLA or any similar state or foreign Law, has been placed or is proposed to be placed by any Governmental Authority on the "National Priorities List" or similar state or foreign list, as in effect as of the Closing Date, and (ii) except as would not reasonably be expected to result in a Sellers Material Adverse Effect, no Seller has been identified by any Governmental Authority as a potentially responsible party under CERCLA or any analogous state Law with respect to any site, and no Hazardous Materials generated, transported or disposed of by or on behalf of any Seller have been found at any site where a Person has made written demand on any Seller to conduct or pay for a remedial investigation, removal or other response action pursuant to any applicable Environmental Law.

**Section 3.18   Real Property**.

(a)      <u>Schedule 3.18</u> sets forth a correct and complete legal description of the Leased Real Property.  Upon entry of the Sale Order by the Bankruptcy Court, the applicable Debtor, as listed on <u>Schedule 3.18</u>, will have a valid leasehold interest in the Leased Real Property, and the leases granting such interests will be in full force and effect.

(b)      Except for the Leased Real Property, Seller does not own or lease, and the Acquired Business does not occupy or otherwise require the use of, any real property.  No portion of the Leased Real Property, or any building or improvement located thereon, violates any Applicable Law in any material respect, including those Applicable Laws relating to zoning, building, land use, environmental, health and safety, fire, air, sanitation and noise control.  Except for the liens that will be released at or prior to the Closing, no Leased Real Property is subject to (i) any decree or order of any Governmental Authority (or, to Sellers' Knowledge, threatened or proposed order) or (ii) any rights or way, building use restrictions, exceptions, variances, reservations or limitations or any nature whatsoever.  There are no condemnation, environmental, zoning or other land-use regulation proceedings, either instituted or, to the Knowledge of Sellers, planned to be instituted, which would adversely affect the use and operation of the Leased Real Property for their intended purpose or the value of the Leased Real Property, and no Seller has received notice of any special assessment proceedings affecting the Leased Real Property.  There are no third persons or parties in possession of any part of the Leased Real Property as lessees,

31

tenants at sufferance, trespassers or otherwise. To the Knowledge of Sellers, there are no facts that would prevent Buyer from using and operating the Leased Real Property after Closing in the manner used by Sellers and the Acquired Business prior to the Closing.

**Section 3.19   Employment and Labor**.

(a)     On or prior to the Execution Date, the Sellers provided Buyer with a complete and accurate list of all Employees of the Acquired Business as of the Execution Date (the "*Sellers' Transferred Employee List*"), which list shall be updated prior to the Closing in accordance with Section 6.02.

(b)     No Seller is, or has been, a party to, bound by, any collective bargaining or other agreement with a labor organization representing any of the Employees. Since the date of their respective formation, there has not been, nor, to the Knowledge of Sellers, has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor activity or dispute affecting any Seller or any of the Employees. There are no unfair labor practice complaints pending against any Seller before the National Labor Relations Board or any other Governmental Authority or any current union representation questions involving employees of Sellers. Each Seller is currently in compliance with all Applicable Laws in all material respects relating to the employment of labor, including those related to wages, hours, worker classification, collective bargaining and the payment and withholding of Taxes and other sums as required by the appropriate Governmental Authority and to the Knowledge of Sellers has withheld and paid to the appropriate Governmental Authority or is holding for payment not yet due to such Governmental Authority all amounts required to be withheld from employees of such Seller and is not liable for any arrears of wages, Taxes, penalties or other sums for failure to comply with any of the foregoing. To the Knowledge of Sellers, each Seller has paid in full to all employees or adequately accrued for all wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such employees. There is no claim with respect to payment of wages, salary or overtime pay that has been asserted or is now pending or, to the Knowledge of Sellers, threatened before any Governmental Authority with respect to any persons currently or formerly employed by any Seller. No Seller is a party to, otherwise bound by, any consent decree with, or citation by, any Governmental Authority relating to employees or employment practices for which Buyer could reasonably be expected to have any Liability. There is no charge or Proceeding with respect to a violation of any occupational safety or health standards that has been asserted or is now pending or, to the Knowledge of Sellers, threatened with respect to any Seller. There is no charge of discrimination in employment or employment practices, for any reason, including age, gender, race, religion or other legally protected category, which has been asserted or is now pending or, to the Knowledge of Sellers, threatened before the United States Equal Employment Opportunity Commission, or any other Governmental Authority in any jurisdiction in which any Seller has employed or currently employs any person.

**Section 3.20   Employee Benefits**.

(a)     Schedule 3.20 contains a complete and accurate list of all ERISA Plans, copies of which have been made available to Buyer. Each ERISA Plan has been administered and operated in accordance with its terms and is in compliance with all applicable laws, including ERISA and the Code and the regulations thereunder in all material respects. All filings, reports

and disclosures as to each ERISA Plan required to have been submitted to the Internal Revenue Service, the United States Department of Labor or to any other regulatory agency or delivered to participants therein have been duly and timely submitted or delivered.

(b)    There is no Proceeding pending or, to the Knowledge of Sellers, Threatened before any Governmental Authority or before any arbitrator (except claims for benefits payable in the normal operation of the ERISA Plans and Proceedings with respect to qualified domestic relations orders) involving any ERISA Plan or asserting any rights or claims to benefits under any ERISA Plan that could give rise to any material liability or for which Buyer could reasonably be expected to have any Liability.

(c)    No Seller nor any ERISA Affiliate has ever maintained or contributed to an Employee Benefit Plan subject to Section 412 of the Code or Title IV of ERISA or maintained or been obligated to contribute to any "multiemployer plan" (as defined in Section 4001(a)(3) of ERISA).

(d)    There are no unfunded obligations under any ERISA Plan providing benefits after termination of employment to any employee of any Seller (or to any beneficiary of any such employee), including retiree health coverage and deferred compensation, but excluding continuation of health coverage required to be continued under Section 4980B of the Code or other Applicable Law and insurance conversion privileges under state law.

(e)    Each Group Health Plans (as defined in 45 C.F.R. Section 160.103) of a Seller for its employees and the dependents thereof is in compliance in all material respects with, and has not violated in any respect, the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act of 1996, as amended or the provisions of the Patient Protection and Affordable Care Act of 2010, as amended, and applicable regulations and other regulatory guidance issued under such Acts. Each individual who is classified by a Seller as a non-employee, including as an independent contractor, has been properly classified for purposes of eligibility, participation and benefit accrual under each ERISA Plan.

(f)    Each ERISA Plan that constitutes in any part a nonqualified deferred compensation plan within the meaning of Section 409A of the Code has been operated and maintained in operational and documentary compliance with Section 409A of the Code and applicable guidance thereunder. No payment to be made under any ERISA Plan is, or to the Knowledge of Sellers will be, subject to the penalties of Section 409A(a)(1) of the Code.

**Section 3.21  Disclosures**.  No representation or warranty or other statement of Sellers contained herein, any Schedules hereto, any certificates delivered to or to be delivered pursuant hereto, or otherwise made to Buyer or its Representatives by any Seller, or any of their respective Representatives, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading. All copies of documents provided or made available to Buyer by Sellers are complete and accurate copies and include all amendments and modifications thereto.

# ARTICLE 4
# REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Sellers, as of the Execution Date and as of the Closing Date, that:

**Section 4.01   Corporate Existence and Power**.  Buyer is a limited liability company existing and in good standing under the laws of Texas and has full power and authority to carry on its business as now conducted.

**Section 4.02   Authorization**.  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is or will be a party and the consummation of the Transactions are within the powers of Buyer and have been duly authorized by all necessary action on the part of Buyer.  Each of this Agreement and the other Transaction Documents to which Buyer is a party have been duly executed and delivered on behalf of Buyer, and (assuming in each case due authorization, execution and delivery thereof by the other parties thereto) constitutes a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms (subject to applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditors' rights generally and general principles of equity).

**Section 4.03   Governmental Authorization**.  The execution, delivery, and performance by Buyer of this Agreement and each other Transaction Document to which Buyer is or will be a party and the consummation by Buyer of the Transactions require no action by or in respect of, consent of, or filing with or notification to, any Governmental Authority other than the filing of appropriate pleadings and notices with the Bankruptcy Court, the entry of the Bidding Procedures Order and the Sale Order by the Bankruptcy Court, and the approval of this Agreement by the Bankruptcy Court or as specifically provided in this Agreement.

**Section 4.04   Healthcare Laws**.  Buyer has the power and authority to consummate the Transactions, to assume and maintain all Permits included in the Transferred Assets and to operate the Facilities, all in accordance with all applicable Healthcare Laws.  To Buyer's knowledge, there is no reason that any such Permit or filing, consent or approval of or by any Governmental Authority that is or will be necessary for the operation of the Facilities by Buyer following the closing will not be provided by or obtained from such Governmental Authority without material conditions.

**Section 4.05   Legal Proceedings.**   As of the Execution Date, Buyer has no actual knowledge of any Proceeding (or any basis therefor) pending against, or threatened against or affecting Buyer, any present or former officer, director or employee of Buyer or any other Person for whom Buyer may be liable or any of its respective properties, that, (a) if determined or resolved adversely in accordance with the plaintiff's demands, would reasonably be expected to have, individually or in the aggregate, a Buyer Material Adverse Effect, (b) in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions, or (c) affects the execution and delivery by Buyer of this Agreement and the other Transaction Documents to which either Buyer is or will be a party.

6807763v7

**Section 4.06   Absence of Restrictions and Conflicts**.  The execution, delivery, and performance by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party and the consummation by Buyer of the Transactions do not and will not (a) contravene, conflict with, or result in any violation or breach of any provision of the Buyer's Organizational Documents, (b) assuming compliance with the matters referred to in Section 4.03, contravene, conflict with or result in a violation or breach of any provision of any Applicable Law, or (c) assuming compliance with the matters referred to in Section 4.03, require any consent or other action by any Person under, constitute a default, or an event that, with or without notice or lapse of time or both, would constitute a default, under, or cause or permit the termination, cancellation, acceleration or other change of any right or obligation or the loss of any benefit to which Buyer is entitled under any provision of any Contract binding upon Buyer or by which its assets may be bound or any Permit affecting, or relating in any way to, Buyer or the assets or business of Buyer, with only such exceptions, in the case of each of clauses (b) and (c), as has not had and would not reasonably be expected to result in, a Buyer Material Adverse Effect.

**Section 4.07   Financing**.  Buyer has, or will have at Closing, sufficient cash and available lines of credit and other sources of available funds to enable it to perform all of its obligations under this Agreement and the other Transaction Documents to which it will be a party, including to pay the Purchase Price in accordance with the terms of this Agreement.

**Section 4.08   Arm's Length**.   This Agreement and each of the other Transaction Documents to which Buyer is a party were negotiated, proposed, and entered into between the Sellers and Buyer without collusion or fraud of any kind, in good faith and from arm's-length bargaining positions.

**Section 4.09   Finders' Fees**.  Except as set forth in Schedule 4.09, there is no investment banker, broker, finder or other intermediary that has been or will be retained by or authorized to act on behalf of Buyer that is or will be entitled to any fee, commission, or other compensation in connection with the Transactions.

## ARTICLE 5
## PRE-CLOSING COVENANTS OF THE PARTIES

**Section 5.01   Conduct of the Acquired Business**.  From the Execution Date until the Closing or, if earlier, the termination of this Agreement, except (i) as otherwise contemplated by this Agreement, (ii) as required by any Applicable Law or any Governmental Authority or limitations resulting from the Bankruptcy Cases or orders from the Bankruptcy Court, or (iii) as otherwise consented to in writing by Buyer (such consent not to be unreasonably withheld, conditioned or delayed), the Sellers agree that they shall:

(a)      conduct the Acquired Business in the ordinary course of business;

(b)      use commercially reasonable efforts to: (i) maintain all of the tangible Transferred Assets in their current condition, reasonable wear and tear excepted, (ii) preserve intact the Acquired Business, and (iii) keep available the services of the current Employees  and to maintain their relations and goodwill with its suppliers, customers, distributors and any others with whom or with which it has business relations;

(c)     comply with Applicable Laws in all material respects;

(d)     maintain their books and records in the ordinary course of business;

(e)     not implement any closings or employee layoffs that could implicate the WARN Act;

(f)     not merge or consolidate with or into any legal entity, dissolve, liquidate, or otherwise terminate its existence;

(g)     not sell, lease, assign, transfer or otherwise dispose of any material assets or properties that would be Transferred Assets if retained by Sellers at the Effective Time, other than (i) Inventory and materials sold, consumed or otherwise disposed of in the ordinary course of business and (ii) assets or properties that relate to or are used in the performance of shared services provided by any of the Corporate and Shared Services Sellers to any Affiliates of the Sellers in the ordinary course of business;

(h)     not assume, assign, reject, terminate, waive any rights under or materially amend any executory contract or unexpired lease that is a Desired 365 Contract;

(i)     not (A) increase the annual level of compensation payable or to become payable by any Seller to any of its Employees, (B) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any Employee other than with respect to the payment of "stay" or "retention" bonuses as reasonably determined by Sellers and payable solely by Sellers, (C) increase the coverage or benefits available under any (or create any new) severance pay, termination pay, vacation pay, company awards, salary continuation for disability, sick leave, deferred compensation, bonus or other incentive compensation, insurance, pension or other employee benefit plan or arrangement made to, for, or with any of the Employees or otherwise modify or amend or terminate any such plan or arrangement or (D) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which any Seller is a party or involving any Employee;

(j)     enter into any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization;

(k)     introduce any material change with respect to the operation of the Acquired Business, including any material change in the types, nature, composition or quality of products or services;

(l)     not fail to keep in full force and effect present insurance policies, binders, contracts, instruments or other comparable insurance benefiting the assets of the Sellers and the conduct of the Acquired Business;

(m)     not terminate, discontinue, close or dispose of any Leased Real Property or business operation of any Seller;

(n)     not enter into any agreement with any other Person that limits or restricts the ability of any Seller to conduct the Business as then conducted;

36

(o)        not enter into, create, incur or assume any obligation, take any other action, or enter into any agreement with respect to any Transferred Assets or Specifically Assumed Liabilities, in any case which are other than in a manner consistent with the recent operation of the Acquired Business prior to the Petition Date; and

(p)        not commit or agree, whether in writing or otherwise, to take any action prohibited by this Section 5.01.

**Section 5.02    Bankruptcy Filings and Bidding Procedures**.

(a)        Prior to the Execution Date, the Sellers  filed the Bidding Procedures and Sale Motion pursuant to Sections 363 and 365 of the Bankruptcy Code seeking entry of the Bidding Procedures Order approving, among other things, (i) the bidding procedures set forth in the Bidding Procedures and Sale Motion, including the establishment of the Qualified Bid Deadline (as defined below), (ii) the schedule for the Auction and a hearing to consider approval of the sale of the Transferred Assets, (iii) certain bid protections, and (iv) the form and manner of notice of the proposed Transactions.

(b)        The Sellers shall use best efforts to cause the hearing to approve the Sale Order to take place no later than September 12, 2018 (the "***Sale Hearing Deadline***").

(c)        The Sellers shall use reasonable efforts to (i) obtain entry of the Sale Order within two (2) Business Days following the hearing to approve the Sale Order (the "***Sale Order Deadline***"), (ii) cause the Sale Order to become a Final Order prior to the End Date (the "***Final Order Deadline***"), and (iii) consummate the Closing by the End Date.

(d)        If reasonably practicable under the circumstances before the filing of any motions, applications, petitions, schedules, and supporting papers relating to the Transactions, Sellers will provide Buyer with reasonable opportunity to review and comment on all such documents prepared by the Sellers (including forms of Orders and notices to interested parties) prior to the filing thereof in the Bankruptcy Cases.  All motions prepared by Sellers and relating directly to the Transactions to be filed on behalf of the Sellers after the Execution Date hereof must be reasonably satisfactory in form and substance to the Buyer.

(e)        Sellers will promptly take such actions as are reasonably requested by Buyer to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by any Seller of its obligations under this Agreement and the Transaction Documents and demonstrating that Buyer is a good-faith buyer under Section 363(m) of the Bankruptcy Code.

(f)        If entry of the Sale Order or any other orders of the Bankruptcy Court relating to the Transactions shall be appealed or otherwise challenged by any party (including by petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument), the Sellers agree to use commercially reasonable efforts to oppose such appeal, challenge, petition or motion and to obtain an expedited resolution of any such appeal, petition, or motion.

**Section 5.03    Actions With Respect to Contracts.**

(a)    From and after the Execution Date until the Closing Date, Sellers shall not reject or alter (or attempt to alter) the terms of any 365 Contract to which any Seller is a party unless otherwise agreed to in writing by Buyer as provided in this Agreement.  Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to such 365 Contracts and take all other actions necessary to cause such 365 Contracts to be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts are Desired 365 Contracts at Closing.  Sellers shall have no obligation to Buyer to provide evidence of adequate assurance of future performance under the Desired 365 Contracts in connection with the assumption and assignment thereof by Sellers.

(b)    By no later than September 30, 2018, Buyer shall provide Sellers with Schedule 5.03 to this Agreement, which shall be a list of the 365 Contracts that, as of such date, Buyer desires to be assumed by the Sellers and assigned to Buyer (collectively, the "***Desired 365 Contracts***"), and the associated Cure Costs which have been provided by the Sellers to Buyer.  At the Closing, Buyer shall pay all Cure Costs with respect to the Desired 365 Contracts (excluding the Cure Costs for any Real Property Leases).  For the sake of clarity and avoidance of any doubt at Closing, Sellers shall pay all Cure Costs with respect to the Desired 365 Contracts for any Real Property Leases.  Buyer will provide evidence of adequate assurance of future performance of all of the Desired 365 Contracts so that all Desired 365 Contracts can be assumed Buyer at the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement; *provided*, however, that if Buyer is unable to provide evidence of adequate assurance of future performance as to any Desired 365 Contract, then Schedule 5.03 shall be deemed to be amended to remove any such Desired 365 Contract; *provided*, *further*, that failure to provide such evidence of adequate assurance shall not be deemed to give rise to a failure of any condition of Buyer to consummation the Closing under Article 8.  In that regard, Buyer acknowledges and agrees that Buyer may have to provide information regarding Buyer, as well as a financial commitment of performance by Buyer with respect to the Desired 365 Contracts from and after the Closing to demonstrate adequate assurance of the performance of the Desired 365 Contracts.

(c)    The Sellers agree to provide to Buyer a copy of any motion, notice, application or other court document filed with, and any proposed orders submitted to, the Bankruptcy Court seeking authorization to assume or reject any Desired 365 Contract, enter into, amend or waive any provision of any Contract, other than as permitted under Section 5.01, in advance of filing (with a reasonable opportunity to review and comment on same) all of which must be, prior to filing, in form and substance reasonably satisfactory to Buyer in all material respects.

(d)    Notwithstanding anything to the contrary contained in this Agreement, if the sale, conveyance, assignment or transfer, or attempted sale, conveyance, assignment or transfer, to Buyer of any License, Permit, certificate, approval, authorization, agreement, contract, lease, or other commitment included in the Transferred Assets ("***Non-Transferable Assets***") is determined by the Bankruptcy Court to be nonassignable without consent (other than of an Affiliate of  Sellers, in which case such Seller covenants and agrees to cause such Affiliate to render such consent), the Closing shall proceed, but the Closing shall not constitute the sale, conveyance, assignment, transfer or delivery or assumption of any such Non-Transferable Asset,

and this Agreement shall not constitute a sale, conveyance, assignment, transfer or delivery or assumption of any such Non-Transferable Asset, unless and until such consent is obtained; *provided, however*, the Sellers shall use commercially reasonable efforts to obtain any such consents related to the Non-Transferable Assets, and Buyer and Sellers shall reasonably cooperate with each other in any arrangement commercially reasonable to provide that Buyer shall receive the interest of the Sellers in the benefits under any such Non-Transferable Asset until such time as such consents shall have been obtained, and each of the Buyers and Sellers shall reasonably cooperate with the other party in any such commercially reasonable arrangement, including performance by the Sellers as agent if commercially reasonable to Buyer.

**Section 5.04   Access to Information and Lessors**.

(a)   From the Execution Date until the Closing and subject to Applicable Law (including Patient Privacy Requirements), the Sellers shall (a) give to Buyer and its Representatives reasonable access during normal business hours to the offices, properties, books and records of the Sellers (including Tax Returns with respect to the Transferred Assets), and (b) instruct their Representatives to cooperate with Buyer in its investigations; *provided, however*, that no investigation pursuant to this Section 5.04 shall affect any representations or warranties made herein or the conditions to the obligations of the respective parties to consummate the Transactions and, provided, further, that in no event shall any Person be obligated to provide any information the disclosure of which would cause the loss of any legal privilege available to any Person relating to such information or would cause any Person to breach a confidentiality obligation to which it is bound; provided that Sellers shall use reasonable efforts to provide such information to Buyer in a manner not violative of the aforementioned.  Any investigation pursuant to this Section 5.04 shall be conducted in such manner as not to interfere unreasonably with the conduct of the Acquired Business of the Sellers or their Representatives.

(b)   From the Execution Date until the Closing, Sellers shall, and shall cause their Representatives to, reasonably cooperate with Buyer in its attempt to discuss terms (including rent) of the office leases for the Subject Locations and the Subject Equipment Leases, including by providing introductions to, and facilitating and participating in discussions with, the lessors or contract counterparties under such leases or contracts.

(c)   By no later than September 14, 2018, Buyer shall provide Sellers with Buyer's proposed terms (including rent and term) for its lease of the Desired Headquarters Space in sufficient detail so as to enable Sellers to commence discussions with the Headquarters Lease Landlord regarding such proposed lease agreement.  By no later than September 28, 2018, Buyer shall provide Sellers with written notice as to whether it has finalized a definitive lease agreement with the Headquarters Lease Landlord with respect to the Desired Headquarters Space or, if no such lease agreement has been finalized, whether Buyer will require access to and use of the Desired Headquarters Space in accordance with the proviso set forth in Section 2.08(c)(iv) and the length of time for which such access and use shall be required (which shall not exceed six (6) weeks following the Closing Date).

**Section 5.05   Commercially Reasonable Efforts; Further Assurances**.

(a)   Subject to the terms and conditions of this Agreement and subject to the

Bankruptcy Code and any orders of the Bankruptcy Court, Buyer and the Sellers each shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to consummate the Transactions, including (i) finalizing, executing and delivering all Transaction Documents prior to the Closing, (ii) preparing and filing as promptly as practicable with any Governmental Authority or other Third Party all documentation to effect all necessary filings, notices, petitions, statements, registrations, submissions of information, applications and other documents, and (iii) obtaining and maintaining all approvals, consents, registrations, permits, authorizations and other confirmations required to be obtained from any Governmental Authority or other Third Party that are necessary, proper or advisable to consummate the Transactions, including transferring any Permit to Buyer, or, if any such Permit is not transferrable, to reasonably assist Buyer in obtaining a replacement therefore. Prior to the Closing Date, the Sellers shall provide Buyer with an updated list of all Employees, by location, who have suffered an "employment loss" (as defined in the WARN Act) during the three (3) month period prior to the Closing Date. The Sellers and Buyer shall execute and deliver or cause to be executed and delivered such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the Transactions in accordance with the terms and conditions of this Agreement.

(b)     To the extent required under Applicable Law or any Healthcare Laws, Buyer shall file with applicable Governmental Authorities documentation notifying such Governmental Authorities of a change of ownership ("**CHOW**") of the Facilities effective as of the Closing Date. The Sellers shall assist and cooperate with Buyer to take all actions necessary to transfer the Permits (to the extent transferable) for the Facilities, including the filing of CHOW documents as the seller, and any other governmental approvals necessary for Buyer to operate the Facilities in the same manner as the Sellers. Buyer shall take all actions necessary to obtain all licenses, registrations, approvals and Permits in order for Buyer to operate the Facilities.

**Section 5.06   Notices of Certain Events**. Sellers shall promptly notify Buyer of:

(a)     any written notice or other communication received by it from any Person alleging that the consent of such Person is or may be required in connection with the Transactions;

(b)     any written notice or other communication received by it from any Governmental Authority in connection with the Transactions;

(c)     any Proceedings commenced or, to the Knowledge of Sellers, threatened against, relating to or involving or otherwise affecting the Sellers or Buyer, respectively, as the case may be, that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to any section of this Agreement or that relate to the consummation of the Transactions;

(d)     the damage or destruction by fire or other casualty of any material assets used in the Acquired Business or any material asset used in the Acquired Business becomes the subject of any Proceeding or, to Sellers' Knowledge, threatened Proceeding for the taking thereof or any part thereof or of any right relating thereto by condemnation, eminent domain or other similar governmental action;

(e) any inaccuracy of any representation or warranty contained in this Agreement at any time during the term hereof that could reasonably be expected to cause the conditions set forth in Section 8.02(b) and Section 8.03(b) not to be satisfied; and

(f) any failure of Seller to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it hereunder.

Notwithstanding the foregoing, the delivery of any notice pursuant to this Section 5.06 shall not (x) be deemed to amend or supplement any of the Disclosure Schedules contemplated hereby, (y) be deemed to cure any breach of any representation, warranty, covenant or agreement or to satisfy any condition, or (z) limit or otherwise affect the remedies available hereunder to Buyer.

Section 5.07   Rule 2002 Notice List.  To the extent not already included, Sellers shall add Buyer and Buyer's counsel to Sellers' so-called "Rule 2002 notice list" and otherwise provide notice to Buyer of all matters that are required to be served on each Seller's creditors pursuant to the Bankruptcy Code and Rules.

Section 5.08   Ad Valorem Taxes. Ad valorem real and tangible personal property taxes with respect to the Transferred Assets for the calendar year in which the Closing occurs shall be prorated between Sellers, on the one hand, and Buyer, on the other hand, as of the Closing Date based upon the applicable number of days covered by such taxes that the Transferred Assets were owned by the Sellers versus owned by the Buyer. If the amount of such Taxes with respect to any of the Transferred Assets for the calendar year in which the Closing occurs has not been determined as of the Closing Date, then the Taxes with respect to such Transferred Assets for the preceding calendar year, on the basis of no applicable discount, shall be used to calculate such prorations, with known changes in valuation applied. The prorated Taxes shall be an adjustment to the amount of cash due from Buyer at the Closing. If the actual amount of any such Taxes varies by more than $2,000 from estimates used at the Closing to prorate such Taxes, then the parties shall re-prorate such Taxes within ten (10) days following request by either Buyer or Sellers based on the actual amount of the tax bill.

## ARTICLE 6
## POST-CLOSING COVENANTS

Section 6.01   Access.  Buyer, following the Closing, and subject to Applicable Law (including Patient Privacy Requirements), shall give to the Sellers and their Representatives reasonable access during normal business hours to the offices, books and records relating to Sellers, the Acquired Business and operations, the Transferred Assets and the Specifically Assumed Liabilities for any and all periods prior to or including the Closing Date as the Sellers and their Representatives may reasonably request and to make copies of the same in connection with (a) the preparation of Tax returns or information returns, (b) reports or other obligations by the Sellers to Governmental Authorities, (c) with respect to the administration of the Bankruptcy Cases or the winding-down of the Debtors' bankruptcy estates, (d) pursuing, prosecuting, or commencing litigation on Avoidance Actions, (e) objecting to proofs of claims or administrative expense claims, and (f) any final determination of any audit or examination, Proceeding, or determination; *provided, however*, that the obligation of Buyer to so accommodate the Sellers and their Representatives shall be subject to (A) reasonable notice from the Sellers of any request for

41

information, (B) the Sellers' agreement to reimburse Buyer for its out-of-pocket expenses of such accommodation, (C) non-interference with the ordinary conduct of business of Buyer, and (D) the right of Buyer to refuse any request for information that would result in a loss of privilege or constitute a breach of any confidentiality obligation of Buyer. Buyer shall preserve all such books and records for a period of seven (7) years after the Closing or such longer period as may be required by Patient Privacy Requirements; *provided, however,* that Buyer shall have the right at any time after the second anniversary of the Closing Date to request in writing that the Sellers (so long as the Sellers are in existence) take any such records and, if they do not agree to take such records within ninety (90) Business Days after receipt of the request, Buyer may dispose of such records, subject to Patient Privacy Requirements. Sellers and Buyer shall, and shall cause their respective Representatives to, abide by the terms of the Confidentiality Agreement with respect to any access or information provided pursuant to this Section 6.01. For the avoidance of doubt, this provision is intended to, and does hereby, inure to the benefit of the successors and/or assigns of the Sellers and their Representatives including, but not limited to any post-confirmation trust established in connection with the Sellers' Bankruptcy Cases; *provided*, that such use is not for any aspect that would be deemed competitive with the Acquired Business.

**Section 6.02   Employee Matters**.

(a)        Not later than ten (10) days prior to the anticipated Closing Date, the Sellers shall provide Buyer with an updated Sellers' Transferred Employee List that identifies all Employees of the Acquired Business as of the date of such updated list. On or after the Closing Date and subject to satisfaction of Buyer's employment-screening procedures and requirements, Buyer will offer employment to certain Employees engaged in the Acquired Business and identified on the updated Sellers' Transferred Employee List as provided in this Section 6.02 and upon such terms and conditions as Buyer may determine in its sole discretion (the "***Transferred Employees***").

(b)        Sellers shall provide Buyer with a true and accurate list, by date and location, of all Employee layoffs implemented by Sellers in ninety (90) days preceding the Closing. The Corporate and Shared Services Sellers shall cooperate with Buyer in permitting Buyer to interview, on a voluntary basis, the Employees so as to determine whether such Employees satisfy Buyer's hiring requirements and to communicate any information concerning employment offers and potential employment with Buyer prior to the Closing Date so that any Employees who are hired by Buyer may commence employment on the Closing Date. Not less than five (5) days before the Closing Date, Buyer shall provide the Sellers with a list of the Transferred Employees to be hired by Buyer at Closing (the "***Buyer's Transferred Employee List***"), which such list shall identify: (i) substantially all of the Facility-level employees (other than Facility administrators) who are listed on the updated Sellers' Transferred Employee List ("***Facility-level Employees***"), (ii) any Facility administrator employees Buyer desires to offer employment, as Buyer may determine in its sole and absolute discretion ("***Facility Administrators***"), and upon such terms and conditions as Buyer may determine in its sole and absolute discretion, (iii) billing and collection staff employees employed by NPM, with the number of such employees to be commensurate with patient volume as of the Closing Date, as determined by Buyer in its sole and absolute discretion ("***Billing and Collection Employees***"), and (iv) any key corporate-level employees employed by EDMG (other than Billing and Collection Employees) who Buyer desires to offer employment, as Buyer may determine in its sole and absolute discretion

42

("***Key Corporate-level Employees***").  Effective as of the Closing Date, the applicable Sellers shall terminate the employment of any Employees identified on the Buyer's Transferred Employee List.

(c)     Buyer shall not assume, and the Sellers shall retain, any liability or obligation whatsoever of the Sellers relating to any of the ERISA Plans.  The Corporate and Shared Services Sellers shall cause any ERISA Plan that is maintained solely for the benefit of Employees and their dependents and which does not cover any other employees of Sellers, their Affiliates or their ERISA Affiliates to be terminated at Closing.  Buyer shall be responsible for the provision of COBRA-continuation coverage with respect to each Employee, and his or her dependents and spouse, who constitutes an "M & A qualified beneficiary" within the meaning of Treasury Regulation Section 54.4980B-9, Q&A-4 in connection with the Transactions and associated with the Transferred Assets notwithstanding that the Corporate and Shared Services Sellers or any of their ERISA Affiliates may continue a group health plan after Closing.  Buyer shall in no event be responsible for the provision of COBRA-continuation coverage to qualified beneficiaries of the Sellers who are associated with the Retained Assets.

(d)     The Sellers will be responsible for all Liabilities with respect to wages, salaries and employer's and employee's Withholding Taxes for the Transferred Employees that are accrued but unpaid after the Petition Date (including the PTO Obligations which, except to the extent assumed pursuant to Section 2.03(e), shall be a Retained Liability pursuant to Section 2.04) and for all Liabilities with respect to claims by Transferred Employees or their eligible dependents for health, accident, sickness, and disability benefits that are accrued but unpaid after the Petition Date (excluding any COBRA Liabilities imposed on Buyer pursuant to Section 6.02(c)).  Except as may be required under COBRA, Buyer shall have no obligation or responsibility for any claims for health, accident, sickness, and disability benefits that are incurred prior to or on the Petition Date by any Employees or their eligible dependents.  Subject to limitations imposed by Applicable Law, with respect to the employee welfare benefit plans maintained by Buyer following the Closing Date in which the Transferred Employees are eligible to participate, Buyer shall use commercially reasonable efforts to (i) waive, or cause to be waived, any limitations on benefits relating to waiting periods, pre-existing condition exclusions or actively at work requirements, except to the extent that such waiting period, exclusions or requirements applied to the Transferred Employee under the corresponding ERISA Plan and (ii) recognize any deductibles and other eligible expenses that were incurred by such Transferred Employees in the plan year in which the Effective Time occurs with respect to satisfying any deductibles or out-of-pocket maximums applicable to such Transferred Employee during the applicable plan year of the comparable Buyer benefit plan, to the extent such recognition would have been given under comparable ERISA Plans prior to the Effective Time.

(e)     Prior to the Closing Date, the Sellers shall be solely responsible for complying with the WARN Act and any and all obligations under other Applicable Laws requiring notice of plant closings, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Employees as a result of any action by the Sellers or any of their Affiliates prior to the Closing Date.  Sellers shall remain solely responsible for WARN Act Liabilities applicable to the Employees that are incurred on or after the Closing Date, including with respect to any Employee terminated prior to the Closing Date that, when aggregated with any Employee who is not hired or who is terminated on or after Closing or for

which any WARN Act Liability is incurred, results in WARN Act Liability with respect to such Seller Employee terminated prior to Closing.

(f)     Each offer of employment by Buyer to a Facility-level Employee or Billing and Collection Employee pursuant to this Section 6.02 shall initially provide such Transferred Employee with (i) total target annual cash compensation that is not substantially less favorable, on an aggregate basis, to either (A) the base salary (or hourly wages, if applicable) provided by the applicable Seller to such Employee immediately prior to the Effective Time, or (B) a market-rate base salary (or hourly wages, if applicable), as determined by Buyer in its sole and absolute discretion; and (ii) other employee benefits (excluding equity incentive compensation) which are not substantially less favorable, in the aggregate, to the employee benefits (excluding equity incentive compensation) provided to similarly-situated employees of Buyer, subject to the terms, conditions and eligibility requirements of any plan providing for such benefits.  Each offer of employment by Buyer to a Facility Administrator or Key Corporate-level Employee, if any, shall be at the sole and absolute discretion of Buyer and on such terms as determined by Buyer in its sole and absolute discretion. Sellers shall afford Buyer reasonable access to Employees prior to the Closing for the purpose of conducting interviews for employment and communicating Buyer's transition plan for Employees, including a "town-hall" type meeting at each Facility.

(g)     Nothing in this Agreement is intended to confer on any entity or individual who is not a party to this Agreement any rights whatsoever. This Section 6.02 shall not constitute an amendment to any employee benefit plan maintained by Buyer or a Seller, create any third-party beneficiary rights, or inure to the benefit of or be enforceable by, any employee or any Person representing the interests of employees.

**Section 6.03   Trade Name License Agreement and Transition Services Agreements**. Commencing promptly following the Execution Date Buyer shall negotiate in good faith on the terms of the Trade Name License Agreement and the Transition Services Agreement with the Primary Houston Buyer, and shall use commercially reasonable efforts to finalize the definitive forms of such agreements by no later than the date that is fourteen (14) days following the entry of the Sale Order.

## ARTICLE 7
## POST-CLOSING COVENANTS OF THE PARTIES

**Section 7.01   Certain Filings**.  The Sellers and Buyer shall cooperate with one another (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any material contracts, in connection with the consummation of the Transactions and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

**Section 7.02   Public Announcements**.  The Sellers and Buyer agree that the consent (as to both form and content) of each other Party shall be obtained prior to issuing any press release or making any public statement with respect to this Agreement or the other Transaction Documents or the Transactions. Notwithstanding the foregoing, the Sellers may file this Agreement and the

other Transaction Documents with the Bankruptcy Court upon execution of this Agreement if they determine that such filing is appropriate and/or may inform the Bankruptcy Court of the existence and terms of this Agreement.

**Section 7.03   Confidentiality**.  Buyer acknowledges and agrees that the Confidentiality Agreement remains in full force and effect and, in addition, covenants and agrees to keep confidential, in accordance with the provisions of the Confidentiality Agreement, information provided to Buyer pursuant to this Agreement.  If this Agreement is, for any reason, terminated prior to Closing, the Confidentiality Agreement and the provisions of this Section 7.03 shall nonetheless continue in full force and effect.  This Agreement will be filed with the Bankruptcy Court, will be distributed as an exhibit to the Bidding Procedures and Sale Motion and may be included or summarized in such pleadings and documents, and that any such disclosures shall not violate this section.  The Parties also agree that such disclosure or any other permitted disclosure in Section 7.03 shall not be deemed to violate any confidentiality obligations owing to any Party, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.  Notwithstanding the foregoing, this Section 7.03 shall not in any way limit, to the extent required by Applicable Law, the disclosure of information by the Sellers in connection with the administration of the Bankruptcy Cases, pursuant to any provision of the Bankruptcy Code or any order of the Bankruptcy Court.

**Section 7.04      Mail and Other Post-Closing Inquiries.**  The Sellers authorize Buyer on and after the Closing Date to receive and to open all mail received by Buyer relating to any of the Retained Assets or the Retained Liabilities.  The Sellers shall promptly deliver to Buyer any mail or other communication received by the Sellers after the Closing Date pertaining to any of the Transferred Assets or the Specifically Assumed Liabilities.  Buyer shall promptly deliver to the Sellers all other mail or communications received by Buyer or its Affiliates that relate to the Retained Assets or Retained Liabilities or to possible violations of Section 362 of the Bankruptcy Code.

# ARTICLE 8
# CONDITIONS TO CLOSING

**Section 8.01   Conditions to Obligations of Buyer and Sellers**.  The obligations of Buyer and the Sellers to consummate the Closing are subject to the satisfaction of each of the following conditions:

(a)   No Applicable Law shall prohibit the Transactions or the consummation of the Closing;

(b)   All actions by or in respect of or filings with any Governmental Authority required to permit the consummation of the Closing shall have been taken, made or obtained; and

(c)   No Proceeding instituted by any Governmental Authority shall be pending and no injunction, order, decree or judgment of any Governmental Authority of competent jurisdiction shall be in effect, in each case which seeks to or does, as applicable, prohibit, restrain or enjoin the consummation of the Transactions; *provided, however*, that the Party seeking to rely on this Section 8.01(c) as a basis not to consummate the Closing must have used commercially

reasonable efforts to cause such Proceeding to have been dismissed or resolved in favor of the Parties or to prevent the entry of such injunction, order, decree or judgment.

**Section 8.02   Conditions to Obligations of Buyer**.   The obligation of Buyer to consummate the Closing is subject to the satisfaction (or waiver by Buyer) of each of the following further conditions:

(a)   The Sellers shall have performed in all material respects all of their covenants and agreements hereunder required to be performed by them on or prior to the Closing Date;

(b)   The representations and warranties of the Sellers set forth in <u>Article 3</u> of this Agreement shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Sellers Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Sellers Material Adverse Effect) at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations need not be true and correct as of the Closing Date but must be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Sellers Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Sellers Material Adverse Effect) as of such specific earlier date;

(c)   Buyer shall have received a certificate signed by an executive officer of Sellers with respect to the items set forth in <u>Sections 8.02(a)</u> and <u>(b)</u>;

(d)   There shall not have been any event causing a Sellers Material Adverse Effect;

(e)   The Sellers shall have delivered or be prepared to deliver all of the items required by <u>Section 2.08(c)</u> and all other items required to be delivered by the Sellers as of the Closing Date pursuant to the terms and conditions of this Agreement;

(f)   The Sale Order, in form and substance acceptable to Buyer, in its reasonable discretion, shall have been entered by the Bankruptcy Court prior to the Closing and such order shall be a Final Order and in full force and effect;

(g)   Sellers shall have caused all bank accounts, safety-deposit boxes and lock boxes for Sellers to be transferred to Buyer, and shall have caused the authorized signatories on any bank accounts to be transferred to authorized signatories of Buyer; and

(h)   The Sale Order shall approve and authorize the Transactions, including the assumption and assignment of the Desired 365 Contracts, and the Desired 365 Contracts shall have been actually assumed and assigned to Buyer such that the Desired 365 Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Buyer, among other things, defaults, breaches, or claims of pecuniary losses existing as of the Closing or by reason of the Closing.

**Section 8.03   Conditions to Obligations of the Sellers**.  The obligation of the Sellers to consummate the Closing is subject to the satisfaction (or waiver by the Sellers) of the following further conditions:

(a)   Buyer shall have performed in all material respects all of its covenants and agreements hereunder required to be performed by it at or prior to the Closing Date;

(b)   The representations and warranties of Buyer in Article 4 of this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of the Closing Date, disregarding any materiality, Buyer Material Adverse Effect or similar qualifiers, other than those representations and warranties that are made as of a specific earlier date which representations need not be true and correct as of the Closing Date but must be true and correct in all material respects as of such specific earlier date; provided, however, that the condition to Closing set forth in this Section 8.03(b) shall be deemed to be satisfied unless individually or in the aggregate, the effect of all breaches, inaccuracies and failures of such representations and warranties to be true and correct in all respects would reasonably be expected to result in a Buyer Material Adverse Effect; and

(c)   Sellers shall have received a certificate signed by an executive officer of Buyer with respect to the items set forth in Sections 8.03(a) and (b);

(d)   Buyer shall have delivered or be prepared to deliver all of the items required by Section 2.08(b) and all other items required to be delivered by Buyer as of the Closing Date pursuant to the terms and conditions of this Agreement; and

(e)   The Sale Order shall have been entered on the docket of the Bankruptcy Court as soon as practicable and no later than the Sale Order Deadline and shall have become a Final Order by the Final Order Deadline.

## ARTICLE 9
## TERMINATION

**Section 9.01   Grounds for Termination**.  Subject to the penultimate sentence of this Section 9.01, this Agreement may be terminated at any time prior to the Closing:

(a)   by mutual written agreement of the Sellers and Buyer;

(b)   by either the Sellers or Buyer if the Closing shall not have been consummated on or before October 31, 2018 (the "***End Date***"); *provided, however*, that if the Closing shall not have occurred on or before such date due to a material breach of any representation, warranty, covenants or agreements contained in this Agreement by Buyer, on one hand, or the Sellers, on the other, then the breaching Party may not terminate this Agreement pursuant to this Section 9.01(b);

(c)   by either the Sellers or Buyer if there shall be any Applicable Law that makes consummation of the Transactions illegal or otherwise prohibited or if consummation of the Transactions would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction;

47

(d)   by Buyer if:

(i)      the Sellers shall have failed to perform or comply with any of their covenants or agreements or shall have breached any of their representations and warranties, such that the conditions set forth in Section 8.02(a) or Section 8.02(b) shall not be satisfied, and the Sellers shall have not cured such breaches and failures within fifteen (15) days after receipt of written notice from Buyer with the result that such condition remains unsatisfied;

(ii)     any condition set forth in Section 8.01 or Section 8.02 shall have become incapable of being satisfied by the End Date;

(iii)    the Sellers fail to consummate the Transactions, Buyer has otherwise complied with all of Buyer's obligations under this Agreement, and all of the conditions contained in Section 8.01 and Section 8.03 have been satisfied;

(iv)    any event has caused a Sellers Material Adverse Effect;

(v)     the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code or the Bankruptcy Court enters a Final Order appointing a trustee or an examiner with expanded powers (beyond those set forth under Section 1106(a)(3) of the Bankruptcy Code) in the Bankruptcy Cases prior to the Closing Date;

(vi)    if any of the following deadlines shall have been missed; *provided, however*, that the deadline set forth in Section 9.01(d)(vi)(A) shall be subject to the Bankruptcy Court's docket, and accordingly, (I) shall be deemed extended through the date of the hearing set by the Bankruptcy Court for consideration of the applicable pleading if, after using reasonable efforts, the Sellers are unable to obtain a docket setting for such hearing prior to such deadline, (II) shall be deemed extended through the date(s) of any continued hearing set by the Bankruptcy Court for consideration of such pleading if, after using reasonable efforts, the Sellers are unable to conclude such hearing(s) prior to such deadline, and (III) shall be deemed extended as required to comply with any notice periods required under the Bankruptcy Code which, as a result of any extensions described under the foregoing clauses (I) and (II), cannot be complied with prior to such deadline:

(A)    [intentionally omitted];

(B)    [intentionally omitted];

(C)    the hearing to approve the Transactions is not conducted by the Sale Hearing Deadline;

(D)    the Sale Order is not entered by the Sale Order Deadline;

48

(E)     the Sale Order does not become a Final Order by the End Date, unless the Sale Order is entered by the End Date but is not stayed by order of the Bankruptcy Court or of some other federal district or appeals court;

(F)     the Bankruptcy Court enters an order for the appointment of a trustee or examiner with managerial powers, other than at the request of the Buyer or any of its Affiliates, under Section 1104 of the Bankruptcy Code and such trustee or examiner takes any action to interfere with or impair the Transactions;

(G)     the Bankruptcy Cases are converted to cases under Chapter 7 of the Bankruptcy Code, dismissed, or any similar commencement of liquidation proceedings relating to the Sellers occurs, other than as contemplated herein;

(H)     any of the Sellers executes an Alternative Agreement or takes affirmative steps to effect an Alternative Transaction; *provided* that this Agreement may not be terminated pursuant to this clause if and for so long as Buyer is the Back-Up Bidder; or

(I)     [intentionally omitted]; or

(e)     by the Sellers:

(i)     if Buyer shall have failed to perform or comply with any of its covenants or agreements or shall have breached any of its representations and warranties, such that the conditions set forth in Section 8.03(a) or Section 8.03(b) shall not be satisfied, and Buyer shall have not cured such breaches and failures within fifteen (15) days after receipt of written notice from the Sellers with the result that such condition remains unsatisfied;

(ii)     if any condition set forth in Section 8.01 or Section 8.03 shall have become incapable of being satisfied by the End Date;

(iii)     the Sale Order does not become a Final Order by the End Date, unless the Sale Order is entered by the End Date but is not stayed by order of the Bankruptcy Court or of some other federal district or appeals court;

(iv)     if any of the Sellers executes an Alternative Agreement or consummates an Alternative Transaction; or

(v)     [intentionally omitted].

Notwithstanding the foregoing, the Sellers shall not be permitted to terminate this Agreement pursuant to this Section 9.01 if Sellers are in breach of any of their representations and warranties or shall have failed to perform or comply with any of their covenants and agreements

49

such that either (A) the conditions to Closing set forth in <u>Section 8.02(a)</u> and <u>Section 8.02(b)</u> shall not be satisfied or (B) such breach or failure to perform or comply by the Sellers is the primary cause of the occurrence of any event giving Sellers a right to terminate this Agreement or the failure of the Closing to have occurred.  Buyer shall not be permitted to terminate this Agreement pursuant to this <u>Section 9.01</u> if Buyer is in breach of any of its respective representations and warranties or shall have failed to perform or comply with any of its respective covenants and agreements such that either (A) the conditions to closing set forth in <u>Section 8.03(a)</u> and <u>Section 8.03(b)</u> shall not be satisfied or (B) such breach or failure to perform or comply by Buyer is the primary cause of the occurrence of any event giving Buyer a right to terminate this Agreement or the failure of the Closing to have occurred.

     **Section 9.02    Effect of Termination**.

     (a)     If any Party terminates this Agreement pursuant to <u>Section 9.01</u> (other than pursuant to <u>Section 9.01(a)</u>), written notice thereof shall be given to the other Parties, specifying the provision of this Agreement pursuant to which termination is made, and all rights and obligations of the applicable Parties under this Agreement shall terminate (other than <u>Section 7.03</u> and this <u>Section 9.02</u>, the provisions of <u>Article 10</u> and such portions of <u>Article 1</u> as are necessary to give effect to the foregoing, all of which shall survive termination of this Agreement).

     (b)     If this Agreement is terminated for any reason, then the Seller Parent shall promptly disburse the Deposit (together with all interest earned thereon) to the Buyer, free and clear of any claims thereon by the Sellers; *provided*, *however*, if this Agreement is validly terminated by the Sellers pursuant to (i) <u>Section 9.01(e)(i)</u> or <u>Section 9.01(e)(ii)</u> (as a result of any condition set forth in <u>Sections 8.03(a)</u> – <u>(d)</u> having become incapable of being satisfied by the End Date) or (ii) <u>Section 9.01(b)</u> because of the failure of Buyer to close in the instance where, as of the End Date, (A) all of the conditions set forth in <u>Section 8.01</u> and <u>Section 8.02</u> (excluding conditions that, by their terms, cannot be satisfied until the Closing) have been satisfied (or waived, or deemed to have been waived, by Buyer), (B) the Sellers are ready, willing and able to close, and (C) Buyer nevertheless elects not to promptly close, then the Sellers shall be entitled to terminate this Agreement and the Seller Parent shall retain the Deposit (together with all interest earned thereon) as liquidated damages.  THE SELLERS AGREE THAT THE SELLERS' RIGHT TO THE PAYMENT OF THE DEPOSIT (TOGETHER WITH ALL INTEREST THEREON) AS PROVIDED IN THIS <u>SECTION 9.02(b)</u> SHALL BE THE SELLERS' SOLE AND EXCLUSIVE REMEDY AGAINST BUYER OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS, OR REPRESENTATIVES FOR ANY AND ALL ADVERSE CONSEQUENCES THAT MAY BE SUFFERED BY SELLERS BASED ON, RESULTING FROM, OR ARISING OUT OF OR RELATED TO THE TRANSACTIONS OR THIS AGREEMENT, INCLUDING ANY AND ALL ADVERSE CONSEQUENCES THAT MAY BE SUFFERED BASED ON, RESULTING FROM, OR ARISING OUT OF OR RELATED TO THE CIRCUMSTANCES GIVING RISE TO TERMINATION OF THIS AGREEMENT, AND UPON PAYMENT OF THE DEPOSIT (TOGETHER WITH ALL INTEREST EARNED THEREON) TO SELLERS IN ACCORDANCE WITH THIS <u>SECTION 9.02(b)</u>, NONE OF BUYER OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES SHALL HAVE ANY FURTHER LIABILITY OR

OBLIGATION RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS.

(c)       Upon termination of this Agreement, Buyer shall destroy or return to the Sellers all data, assessments and/or reports, maps and other information furnished by or on behalf of the Sellers to Buyer or prepared by or on behalf of Buyer in connection with its due diligence investigation of the Sellers, the Acquired Business, the Transferred Assets and the Specifically Assumed Liabilities, and, if Buyer elects to destroy any such information, an officer of Buyer shall certify the destruction of such information to Seller in writing.

(e)       Sellers acknowledge that five separate buyers were the successful bidders for various of Sellers' Houston Facilities and Non-Houston Facilities referenced in the Notice of Highest and Best Bids filed with the Bankruptcy Court at Docket No. 324 and attached hereto as Exhibit C.  Notwithstanding anything contained herein to the contrary, if a buyer, other than the Buyer defined herein, fails to close on the Houston Facilities or Non-Houston Facilities that it bid on pursuant to the applicable Houston Purchase Agreement or Non-Houston Purchase Agreement, and Seller decides to sell all of the Houston Facilities and the Non-Houston Facilities to the Back-Up Bidder, then the Seller Parent shall disburse to Buyer its $550,000 Deposit made prior to the Auction.

## ARTICLE 10
## MISCELLANEOUS

**Section 10.01 Notices**.  All notices, requests and other communications to any party hereunder shall be in writing (including email) and shall be given,

if to Buyer:

Greater Texas Emergency Centers LLC

c/o Round Table Medical Consultants, LLC
11490 Westheimer, Suite 1000
Houston, Texas 77077
Attn:  Dr. Aaron Braun (abraun@ercare24.com)
          Dr. Kanti Bansal (kbansal@ercare24.com)
          Dr. Hashibul Hannan (hannan@ercare24.com)

with a copy to:       Braun, Browne & Associates, P.C.
300 Saunders Road, Suite 100
Riverwoods, Illinois 60015
Attention:       Sheldon Braun, Esq.
E-Mail: sbraun@bbapc.com

And

Hoover Slovacek, LLP
5051 Westheimer, Suite 1200
Houston, Texas 77056

51

Attention:  Edward L. Rothberg
E-Mail: rothberg@hooverslovacek.com

if to the Sellers, to:

Neighbors Legacy Holdings, Inc.
10800 Richmond Ave.
Houston, Texas 77042
Attention:  Chief Restructuring Officer
Facsimile No.:  (713) 436-5210

with a copy to:

Porter Hedges LLP
1000 Main, 36th Floor
Houston, Texas 77002
Attention:  John F. Higgins
Facsimile No.: (713) 226-6248

or such other address, facsimile number or electronic mail address as such party may hereafter specify for the purpose by notice to the other parties hereto.  All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt.  Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

**Section 10.02 Survival**.  The representations and warranties contained herein and in any certificate or other writing delivered pursuant hereto shall terminate upon and not survive the Closing and there shall be no liability thereafter in respect thereof (it being understood and agreed that no Party shall have the right to bring or assert any action or claim for beach of any representation or warranty herein or in any Transaction Document after the Closing).  Each covenant and agreement of the Parties hereto contained in this Agreement shall terminate upon the Closing except to the extent that performance under such covenant or agreement is to take place after Closing; in which case, such covenant shall survive the Closing until the earlier of (i) performance of such covenant or agreement in accordance with this Agreement or, if time for performance of such covenant is specified in this Agreement, 30 days following the expiration of the time period for such performance and (ii) the expiration of applicable statute of limitations with respect to any claim for any failure to perform such covenant; *provided*, *however*, that if a written notice of claim with respect to any covenant or agreement to be performed after Closing is given prior to the expiration of such covenant or agreement then such covenant or agreement shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

**Section 10.03 Amendments and Waivers**.

(a)     Any provision of this Agreement may be amended or waived prior to Closing if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b)     No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Applicable Law.

**Section 10.04 Expenses**.   Except as otherwise expressly provided herein, all costs and expenses incurred in connection with this Agreement or the Transactions shall be paid by the Party incurring such cost or expense.

**Section 10.05 Successors and Assigns**.   The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns; *provided, however*, that no Party (other than Buyer) may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, in whole or in part, by operation of law or otherwise, without the prior written consent of each other Party hereto.  Buyer may assign its rights and obligations under this Agreement in whole, but not in part, without Sellers' consent upon ten (10) days' prior written notice to Sellers.

**Section 10.06 Supplementation and Amendment of Schedules**.   For the purpose of avoiding any misunderstanding, the Sellers may, at their option, supplement the Schedules hereto in order to reflect any additional matters which, if existing, occurring or known as of the Execution Date, would have been required to be set forth or described in the Schedules (each, a "**Schedule Supplement**").  Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of Buyer's termination rights contained in Section 9.01(d) or of determining whether or not the conditions set forth in Section 8.02 have been satisfied. The inclusion of any item in the Schedules, or any references to dollar amounts, will not be deemed to be an acknowledgement or representation that such item is material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information provided in one Schedule hereto will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule hereto to which its relevance is reasonably apparent on its face.

**Section 10.07 Governing Law**.   THE AGREEMENT AND ALL ACTIONS, CAUSES OF ACTION, OR CLAIMS OF ANY KIND (WHETHER AT LAW, IN EQUITY, IN CONTRACT, IN TORT, OR OTHERWISE) THAT MAY BE BASED UPON, ARISE OUT OF, OR RELATE TO THIS AGREEMENT, OR THE NEGOTIATION, EXECUTION, OR PERFORMANCE OF THIS AGREEMENT (INCLUDING ANY ACTION, CAUSE OF ACTION, OR CLAIM OF ANY KIND BASED UPON, ARISING OUT OF, OR RELATED TO ANY REPRESENTATION OR WARRANTY MADE IN, IN CONNECTION WITH, OR AS AN

INDUCEMENT TO THIS AGREEMENT), SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

**Section 10.08 Jurisdiction**.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to the Transaction Documents and the Transactions exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Cases remain open and (b)  after the close of the Bankruptcy Cases or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Southern District of Texas or any Texas State court sitting in Houston (together with the Bankruptcy Court, the "***Chosen Courts***"), and solely in connection with claims arising under this Agreement or any other Transaction Document or the Transactions (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto, and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with <u>Section 10.01</u>.

**Section 10.09 WAIVER OF JURY TRIAL**.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THE TRANSACTION DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 10.10 Counterparts; Effectiveness; Third Party Beneficiaries**.   This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.   This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by all of the other Parties hereto.   Until and unless each Party has received a counterpart hereof signed by the other Party hereto, this Agreement shall have no effect and no Party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication). Notwithstanding anything to the contrary in this Agreement, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by facsimile or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.  No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the Parties hereto and their respective successors and assigns.

**Section 10.11 Entire Agreement**.  This Agreement, the other Transaction Documents, the Bidding Procedures Order, and the Sale Order constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the Parties with respect to the subject matter hereof and thereof.

**Section 10.12 Severability**.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated; and in lieu of each

such invalid, void or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such invalid, void or unenforceable provision as may be valid, binding and enforceable.

**Section 10.13 Time of Essence**.  Time is of the essence in the performance of this Agreement, except as otherwise expressly provided herein.

**Section 10.14 Closing Actions**.  All deliveries, payments, and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

**Section 10.15 Conflict Between Transaction Documents**.  The Parties agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition, or provision of any other agreement or document referred to herein, this Agreement shall govern and control.

**Section 10.16 Time Periods**.  Unless specified otherwise, any action required hereunder to be taken within a certain number of days shall be taken within that number of calendar days (and not Business Days); provided, however, that if the last day for taking such action falls on a day that is not a Business Day, the period during which such action may be taken shall be automatically extended to the next Business Day.

**Section 10.17 Certain Acknowledgements and Limitations**.

(a)    Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with this Agreement, the other Transaction Documents or the Transactions are limited to those specifically set forth in this Agreement and the other Transaction Documents.  Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement and the other Transaction Documents on the basis of any legal or equitable principle or on any other basis whatsoever.  Neither any equitable or legal principle nor any implied obligation of good faith or fair dealing nor any other matter requires any Party to incur, suffer or perform any act, condition or obligation contrary to the terms of this Agreement and the other Transaction Documents, whether or not existing and whether foreseeable or unforeseeable. Each of the Parties acknowledges that it would be unfair, and that it does not intend, to increase any of the obligations of the other Party on the basis of any implied obligation or otherwise.

(b)    **BUYER ACKNOWLEDGES AND AGREES THAT IT HAS CONDUCTED ITS OWN INDEPENDENT DUE DILIGENCE INVESTIGATION, REVIEW AND ANALYSIS OF THE SELLERS, THE TRANSFERRED ASSETS, THE SPECIFICALLY ASSUMED LIABILITIES AND THE ACQUIRED BUSINESS IN CONNECTION WITH THE TRANSACTIONS AND HAS BEEN PROVIDED ACCESS TO THE PERSONNEL, PROPERTIES, ASSETS, PREMISES, BOOKS AND RECORDS, AND OTHER DOCUMENTS AND DATA OF THE SELLERS AND THE ACQUIRED BUSINESS FOR SUCH PURPOSE.**

(c)     EXCEPT IN THE CASE OF INTENTIONAL FRAUD, BUYER AGREES THAT, (I) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY THE SELLERS THAT ARE EXPRESSLY SET FORTH IN <u>ARTICLE 3</u> OF THIS AGREEMENT, NEITHER THE SELLERS, NOR ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES HAVE MADE AND SHALL NOT BE DEEMED TO HAVE MADE TO BUYER OR TO ANY OF THEIR REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OF ANY KIND, (II) EACH OF THE SELLERS EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATIONS OR WARRANTIES, AND (III) BUYER ACKNOWLEDGES AND AGREES THAT NEITHER BUYER NOR ITS REPRESENTATIVES HAVE RELIED UPON ANY SUCH REPRESENTATIONS OR WARRANTIES.

(d)     EXCEPT AS OTHERWISE EXPRESSLY SPECIFIED IN THIS AGREEMENT, THE TRANSFERRED ASSETS AND ACQUIRED BUSINESS OF SELLERS ARE BEING ACQUIRED BY BUYER AT THE CLOSING AS A RESULT OF THIS AGREEMENT AND THE TRANSACTIONS SHALL BE ACQUIRED BY BUYER ON AN "<u>AS IS</u>, <u>WHERE IS</u>" BASIS AND IN THEIR THEN PRESENT CONDITION, AND BUYER SHALL RELY SOLELY UPON ITS OWN EXAMINATION THEREOF. IN ANY EVENT, EXCEPT AS EXPLICITLY SET FORTH HEREIN, NONE OF SELLERS OR ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES, AS THE CASE MAY BE, HAS MADE OR IS MAKING ANY REPRESENTATION, EXPRESS OR IMPLIED, AS TO THE VALUE OF ANY TRANSFERRED ASSET OR THE ACQUIRED BUSINESS BEING SO ACQUIRED, OR ANY WARRANTY OF MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR QUALITY, WITH RESPECT TO ANY OF THE TANGIBLE ASSETS BEING SO ACQUIRED, OR AS TO THE CONDITION OR WORKMANSHIP THEREOF, OR AS TO THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT.  BUYER ACKNOWLEDGES AND AGREES THAT NEITHER BUYER NOR ITS REPRESENTATIVES HAVE RELIED UPON ANY REPRESENTATIONS OR WARRANTIES THAT ARE DISCLAIMED BY THE SELLERS IN THIS <u>SECTION 10.17</u>.

(e)     EXCEPT IN THE CASE OF INTENTIONAL FRAUD, THE SELLERS AGREE THAT (I) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY BUYER THAT ARE EXPRESSLY SET FORTH IN <u>ARTICLE 4</u> OF THIS AGREEMENT, NEITHER BUYER, NOR ANY OF ITS AFFILIATES OR ANY OF THEIR REPRESENTATIVES HAVE MADE AND SHALL NOT BE DEEMED TO HAVE MADE TO SELLERS OR TO ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OF ANY KIND, (II) BUYER EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATIONS OR WARRANTIES, AND (III) SELLERS ACKNOWLEDGE AND AGREE THAT NEITHER SELLERS NOR THEIR REPRESENTATIVES HAVE RELIED UPON ANY SUCH REPRESENTATIONS OR WARRANTIES.

(f)     NO PERSON HAS BEEN AUTHORIZED BY THE SELLERS TO MAKE ANY REPRESENTATION OR WARRANTY RELATING TO THE SELLERS OR THEIR BUSINESS OR OPERATIONS OR ASSETS, OR OTHERWISE IN

CONNECTION WITH THE TRANSACTIONS EXCEPT FOR THOSE CONTAINED HEREIN AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON.

(g)   NO PERSON HAS BEEN AUTHORIZED BY BUYER TO MAKE ANY REPRESENTATION OR WARRANTY RELATING TO BUYER OR ITS BUSINESSES OR OPERATIONS, OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS EXCEPT FOR THOSE CONTAINED HEREIN AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON.

(h)   EXCEPT IN THE CASE OF INTENTIONAL FRAUD, UNDER NO CIRCUMSTANCES SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE FOR ANY SPECIAL, EXEMPLARY, PUNITIVE, REMOTE, SPECULATIVE, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LIABILITIES ARISING OUT OF ANY ACTUAL, ALLEGED OR INTENTIONAL BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY, AND NO CLAIM SHALL BE MADE OR AWARDED AGAINST ANY PARTY TO THIS AGREEMENT THEREFOR.

*[Signatures continued on following page]*

6807763v7

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SELLERS:**

NEC BELLAIRE EMERGENCY CENTER, LP

By:  Neighbors GP, LLC,
     in its capacity as General Partner

By: _____
Name:     Chad J. Shandler
Title:     Chief Restructuring Officer

NEC YORKTOWN EMERGENCY CENTER, LP

By:  Neighbors GP, LLC,
     in its capacity as General Partner

By: _____
Name:     Chad J. Shandler
Title:     Chief Restructuring Officer

NEC MIDLAND EMERGENCY CENTER, LP

By:  Neighbors GP, LLC,
     in its capacity as General Partner

By: _____
Name:     Chad J. Shandler
Title:     Chief Restructuring Officer

NEC ODESSA EMERGENCY CENTER, LP

By:  Neighbors GP, LLC,
     in its capacity as General Partner

By: _____
Name:     Chad J. Shandler
Title:     Chief Restructuring Officer

*[Signature page to Asset Purchase Agreement (Greater Texas)]*

**SELLERS, Continued:**

NEC TEXARKANA EMERGENCY CENTER, LP

By: Neighbors GP, LLC,
    in its capacity as General Partner

By: _____
Name:       Chad J. Shandler
Title:      Chief Restructuring Officer


NEC PARIS EMERGENCY CENTER, LP

By: Neighbors GP, LLC,
    in its capacity as General Partner

By: _____
Name:       Chad J. Shandler
Title:      Chief Restructuring Officer

**SELLERS, Continued:**

NEIGHBORS LEGACY HOLDINGS, INC.

By:_____
Name:        Chad J. Shandler
Title:         Chief Restructuring Officer


NEIGHBORS GLOBAL HOLDINGS, LLC

By:_____
Name:        Chad J. Shandler
Title:         Chief Restructuring Officer


NEIGHBORS HEALTH, LLC

By:_____
Name:        Chad J. Shandler
Title:         Chief Restructuring Officer


[*Signature page to Asset Purchase Agreement (Greater Texas)*]

**SELLERS, Continued:**

EDMG, LLC

By:_____

Name:     Chad J. Shandler

Title:      Chief Restructuring Officer


NEIGHBORS PRACTICE MANAGEMENT, LLC

By:_____

Name:     Chad J. Shandler

Title:      Chief Restructuring Officer

**BUYER:**

Greater Texas Emergency Centers LLC,
a Texas limited liability company

By:    Braun Medical Services, PA, its manager

By:_____
Aaron Braun, Manager

By:    Kanti Bansal MD, PA, its manager

By:_____
Kanti Bansal, Manager

By:    Hannan Tabassum Family, LP, its manager

By:_____
Hashibul Hannan, Manager,
Hannan Tabassum Management LLC

*[Signature page to Asset Purchase Agreement (Greater Texas)]*

6807763v7

Scanned by CamScanner

**EXHIBIT A**

**Facility Locations**

1.      *Bellaire,* 5413 S. Rice Ave., Houston, Texas 77081

2.      *Yorktown*, 5835 Hwy 6 North, Houston, Texas 77084

3.      *Midland*, 5409 West Wadley Avenue, Midland, Texas 79707

4.      *Odessa*, 2713 North Grandview Ave., Odessa, Texas 79762

5.      *Texarkana*, 2001 Mall Drive, Texarkana, Texas 75503

6.      *Paris*, 3055 NE Loop 286, Paris, Texas 75460

**EXHIBIT B**

**Sale Order**

See attached.



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
09/12/2018

| | |
|---|---|
| **In re:** | § Chapter 11 |
| | § |
| **NEIGHBORS LEGACY HOLDINGS, INC.,** | § Case No. 18-33836 |
| *et al.,* | § |
| | § (Jointly Administered) |
| **Debtors.**[1] | § |

**ORDER (A) APPROVING THE SALE OF DEBTORS' ASSETS FREE AND CLEAR OF
ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING
THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**
[Relates to Docket No. 20]

The above-referenced debtors and debtors-in-possession (collectively, the "Debtors")

filed their motion (the "Motion")[2] for entry of an order (this "Order") approving the sale (the

"Sale") of Debtors' assets free and clear of all liens, claims, encumbrances, and interests. This

Order approves: (a) the separate Sales of the Debtors' assets, as specified further herein, to Altus

Health Systems OPCO, LLC and Altus Health System Realty, LLC; AEC ER 4, LLC;

Exceptional H.C., Inc.; Greater Texas Emergency Centers, LLC; and Tenet Business Services

Corporation (or any permitted assignee) (each a "Buyer", and, collectively, the "Buyers")

pursuant to the respective Asset Purchase Agreements between the Debtors and each of the

Buyers (as such agreements may have been and may be amended, restated or supplemented,

---

1   Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four
    digits of their tax identification numbers is not provided herein. A complete list of such information may be
    obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/neighbors. The
    location of Debtors' principal place of business and the Debtors' service address is: 10800 Richmond Avenue,
    Houston, Texas 77042.

2   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion
    or the applicable Purchase Agreement (as defined herein), as applicable; *provided* that in the event of any
    conflict with respect to the meaning of a capitalized term between the Motion and any Purchase Agreement, the
    meaning ascribed to such term in the applicable Purchase Agreement shall control.

collectively, the "Purchase Agreements" and, each a "Purchase Agreement")[3]; and (b) the assumption and assignment of executory contracts and unexpired leases.

The Debtors filed their *Notice of Entry of Order (A) Authorizing and Scheduling an Auction for the Sale of Debtors' Assets and (B) Approving Auction and Bid Procedures, Including Payment of Bid Protections* (the "Bid Procedures Order") [Docket No. 203] stating that the Debtors would conduct an auction (the "Auction") for the Assets in the event that the Debtors received a Qualified Bid prior to the Bid Deadline; and the Debtors, having conducted the Auction, filed their *Notice of Highest and Best Bids* [Docket No. 324] identifying the Buyers as the bidders submitting the highest and best bids for the Assets in accordance with the Bid Procedures Order.

The Court finds that the relief requested in the Motion is in the best interests of the Debtors and their estates and all other parties in interest and, having reviewed the Motion and having heard the statements and evidence in support of the relief requested therein at a hearing before the Court on August 8, 2018, where the Court considered and approved entry of the Bid Procedures Order (the "Bid Procedures Hearing") and the hearing before the Court that commenced on September 6, 2018, where the Court considered entry of this Order (the "Sale Hearing"), the Court further finds that the legal and factual bases set forth in the Motion, at the Bid Procedures Hearing, and at the Sale Hearing establish just cause for the relief granted herein. Pursuant to Bankruptcy Rule 7052, made applicable by Bankruptcy Rule 9014, the Court makes the following **FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

---

[3] The Purchase Agreements are attached hereto as Exhibits A-E.

2

### Jurisdiction and Venue

A.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N), and (O).  Venue in this district is allowed under 28 U.S.C. § 1408.

### Statutory Predicates

B.     The statutory and other legal bases for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014.  The consummation of the transactions contemplated by the Purchase Agreements and this Order (collectively, the "Transactions") is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and the Debtors and the Buyers and their affiliates have complied with all of the applicable requirements of such sections and rules in respect of the Transactions.

### Notice

C.     As evidenced by the affidavits and/or certificates of service filed with the Court, proper, timely, adequate, and sufficient notice of, *inter alia*, the Motion, the Bid Procedures,[4] the Auction, the Sale (and the Transactions contemplated in connection therewith), the assumption and assignment to the Buyers of the Desired 365 Contracts, the proposed cure costs with respect to any defaults under the Desired 365 Contracts (the "Cure Costs"), the Sale Hearing, and all deadlines related thereto, have been provided, as relevant, in accordance with sections 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and in compliance with the Bid Procedures Order to all creditors, parties-in-interest, and other interested persons and entities.

---

[4] For the avoidance of doubt, the term "Bid Procedures" in this Order shall mean the Bid Procedures approved by the Bid Procedures Order.

6699031v19

D.      In accordance with the Bid Procedures Order, the Debtors served the Cure Notice on each of the non-Debtor counterparties to the Desired 365 Contracts. The service of the Cure Notice was sufficient under the circumstances and in full compliance with the Bid Procedures Order, and no further notice need be provided in respect of the Debtors' assumption and assignment to the Buyers of the Desired 365 Contracts or the Cure Costs. All non-Debtor counterparties to the Desired 365 Contracts have had an adequate opportunity to object to the assumption and assignment of the Desired 365 Contracts and the Cure Costs.

E.      The notice described in the foregoing paragraphs is good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bid Procedures, the Auction, the Sale (and the Transactions contemplated in connection therewith), the assumption and assignment to the Buyers of the Desired 365 Contracts, the Cure Costs, the Sale Hearing, and all deadlines related thereto is or shall be required.

### Marketing and Sale Process

F.      The Sale of the Assets to the Buyers is duly authorized pursuant to sections 363(b)(1) and 363(f) of the Bankruptcy Code and Bankruptcy Rule 6004(f). As demonstrated by (i) testimony and other evidence proffered or adduced at the Bid Procedures Hearing and the Sale Hearing and (ii) the representations of counsel made on the record at the Bid Procedures Hearing and the Sale Hearing, the Debtors and their professionals, agents, and other representatives have marketed the Assets and conducted all aspects of the sale process in good faith and, where applicable, in compliance with the Bid Procedures and the Bid Procedures Order. The marketing process undertaken by the Debtors and their professionals, agents and other representatives with respect to the Assets has been adequate and appropriate and reasonably calculated to maximize value for the benefit of all stakeholders. The Bid Procedures

4

and the Auction were duly noticed, were substantively and procedurally fair to all parties, and were conducted in a diligent, non-collusive, fair and good-faith manner. The Purchase Agreements collectively constitute, in the aggregate, the highest and best offers for the Assets.

G.     The Bid Deadline passed at 5:00 p.m. (prevailing Central Time), on August 22, 2018. The Debtors conducted an Auction commencing on August 27, 2018 and concluding on August 28, 2018, in accordance with the Bid Procedures and Bid Procedures Order. On August 29, 2018, at Docket No. 324, the Debtors filed their *Notice of Highest and Best Bids* identifying the Buyers as the Successful Bidders submitting the highest and best bids for the Assets in accordance with the Bid Procedures Order. As established by the record of the Bid Procedures Hearing and the Sale Hearing, the bidding and related procedures established by the Bid Procedures Order have been complied with in all material respects by the Debtors and the Buyers and all of their affiliates. The Bid Procedures afforded a full, fair and reasonable opportunity for Qualified Bidders to make a higher or otherwise better offer to purchase the Assets, and no such offer was received by the Debtors.

### Corporate Authority

H.     The Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541 of the Bankruptcy Code. The Debtors (i) have full corporate power and authority to execute the Purchase Agreements and all other documents contemplated thereby, and the Sale to the Buyers has been duly and validly authorized by all necessary corporate action, (ii) have all of the corporate power and authority necessary to consummate the Sale and the Transactions contemplated by the Purchase Agreements, (iii) have taken all corporate action necessary to authorize and approve the Purchase Agreements and the consummation by the Debtors of the Sale and the Transactions contemplated

thereby, and (iv) require no consents or approvals, other than those expressly provided for in the Purchase Agreements, to consummate the Transactions.

### Highest and Best Bid; Business Judgment

I.  The Debtors have demonstrated a sufficient basis to enter into the Purchase Agreements, sell the Assets on the terms outlined therein, and assume and assign the Desired 365 Contracts to the Buyers under sections 363 and 365 of the Bankruptcy Code. All such actions are appropriate exercises of the Debtors' business judgment and are in the best interests of the Debtors, their creditors, their estates and other parties in interest. Approval of the Sale pursuant to the Purchase Agreements at this time is in the best interests of the Debtors, their creditors, their equity interest holders, their estates, and all other parties in interest.

J.  The offers of the Buyers, upon the terms and conditions set forth in the Purchase Agreements, including the total consideration to be realized by the Debtors thereunder, (i) collectively constitute the highest and best offer received by the Debtors as a result of their marketing process, including through the Bid Procedures and the Auction, (ii) are in the best interests of the Debtors, their creditors, their equity interest holders, their estates and other parties in interest, and (iii) constitute full and adequate consideration, is fair and reasonable and constitute reasonably equivalent value, fair consideration, and fair value for the Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and under the laws of any state, territory, or possession of the United States, or the District of Columbia. Taking into consideration all relevant factors and circumstances, no other person or entity has offered to purchase the Assets for greater economic value to the Debtors or their estates.

K.  There has been no showing that any of the Debtors or Buyers (i) has entered into the Purchase Agreements or proposes to consummate the Transactions for the purposes of

6

hindering, delaying, or defrauding the Debtors' present or future creditors or (ii) is entering into the Purchase Agreements or proposing to consummate the Transactions fraudulently, for the purpose of statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

L.     The sale of the Assets outside a chapter 11 plan pursuant to the Purchase Agreements neither impermissibly restructures the rights of the Debtors' creditors or equity interest holders nor impermissibly dictates the terms of a chapter 11 plan of the Debtors. The sale of the Assets does not constitute a *sub rosa* chapter 11 plan.

### Opportunity to Object

M.     A reasonable opportunity to object or be heard with respect to the Motion, the Bid Procedures, the Auction, the Sale (and the Transactions contemplated in connection therewith), the assumption and assignment to the Buyers of the Desired 365 Contracts, the Cure Costs, the Sale Hearing, and all deadlines related thereto has been afforded to all creditors, equity holders, parties-in-interest, and other interested persons and entities.

### Good Faith Purchaser; Arm's Length Sale

N.     The Purchase Agreements were negotiated, proposed, and entered into by the Debtors and the Buyers without collusion, in good faith, and from arm's length bargaining positions. Neither the Debtors, the Buyers, nor any parent or affiliate of the Buyers has engaged in any conduct that would cause or permit the Purchase Agreements or the Sale to be avoided or otherwise challenged under section 363(n) of the Bankruptcy Code.

7

O.      Each Buyer is a good-faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions (including, without limitation, the Purchase Agreements and the assumption and assignment of the Desired 365 Contracts to the Buyers or their affiliates), unless such authorization is duly stayed pending such appeal prior to the Closing (as defined in the Purchase Agreements).

P.      Neither the Buyers nor any of their affiliates, members, officers, directors, shareholders or any of their respective successors or assigns is an "insider" or "affiliate" of any of the Debtors, as those terms are defined in sections 101(31) and 101(2) of the Bankruptcy Code, and the Buyers and their professionals, agents and other representatives have complied in all respects with the Bid Procedures Order and all other applicable orders of this Court with respect to the Purchase Agreements.

**Free and Clear Transfer Required by Buyers**

Q.      If the Debtors did not sell the Assets free and clear of all Liens, Claims, and Interests, such a sale would have yielded substantially lower value for the Debtors' estates, with less certainty than the Sale. The Buyers would not have submitted bids or entered into the Purchase Agreements, and would not consummate the Sale, thus adversely affecting the Debtors, their estates, and their creditors, if each of the Sale and the assumption and assignment of the Desired 365 Contracts to the Buyers were not free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever, or if the Buyers would, or in the future could, be liable for any liabilities other than as agreed in the Purchase Agreements. For the avoidance of doubt, neither the Buyers nor any of their affiliates shall have any responsibility whatsoever with respect to the

8

Retained Liabilities, which shall remain the responsibility of the Debtors before, on, and after the Closing.

R.     As of the Closing, pursuant and subject to the terms of the Purchase Agreements and this Order, the transfer of the Assets and the Sale will effect a legal, valid, enforceable, and effective transfer of the Assets and will vest the Buyers with all of the Debtors' rights, title, and interests in the Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever except for the Specifically Assumed Liabilities.

## Satisfaction of Section 363(f)

S.     The Debtors may sell the Assets free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever, including any rights or claims based on any putative successor or transferee liability, as set forth herein, because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. All parties in interest, including, without limitation, any holders of Liens, Claims, and/or Interests, and any non-Debtor counterparties to the Desired 365 Contracts, who did not object, or who withdrew their objection, to the Sale, the Motion, the assumption and assignment of the applicable Desired 365 Contract or the associated Cure Cost are deemed to have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Liens, Claims, or Interests and non-Debtor parties to Desired 365 Contracts that did not object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code or are adequately protected by having their Liens, Claims, or Interests, if any, attach to the portion of the Sale Proceeds (as defined below) received by the Debtors ultimately attributable to the Assets against which they assert an interest, in the order of their priority, with the same validity, force

9

and effect, if any, which they now have against such Assets, subject to any claims and defenses the Debtors or their estates may possess with respect thereto.

### No Successorship

T.      Neither the Buyers nor any of their affiliates are successors to the Debtors or their estates by reason of any theory of law or equity, and neither the Buyers nor any of their affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, except as otherwise expressly provided in the Purchase Agreements. No liability or obligation of any of the Debtors shall be binding on any of the Buyers except for those liabilities and obligations of the Debtors that are expressly (A) assigned by the Debtors and (B) are assumed by the Buyers, in writing pursuant to the terms and conditions of the applicable Purchase Agreement. Any liability or obligation other than as described in the preceding sentence shall not be binding on the Buyers, nor shall the Buyers have any liability therefor. Except as expressly set forth in the Purchase Agreements, the transfer of the Assets to the Buyers under the Purchase Agreements shall not result in the Buyers having any liability or responsibility for (i) any Interest against the Debtors or against an insider of the Debtors, (ii) the satisfaction in any manner, whether at law or in equity, whether by payment, setoff, loss of rights or remedies or otherwise, directly or indirectly, of any Claim, Lien, or Interest, or (iii) to third parties or the Debtors, except as is expressly set forth in the Purchase Agreements. Without limiting the effect or scope of the foregoing, the transfer of the Assets from the Debtors to the Buyers does not and will not subject the Buyers or their affiliates, successors or assigns or their respective properties (including the Assets) to any liability for Interests against the Debtors or the Debtors' Interests in such Assets by reason of such transfer under the laws of the United States or any state, territory, possession thereof, or the District of Columbia applicable to the

10

Transactions, including, without limitation, any bulk transfer laws, successor liability or similar theories. The Buyers are not a continuation of the Debtors or their respective estates and there is no continuity between the Buyers and the Debtors. The Buyers are not holding themselves out to the public as a continuation of the Debtors or their respective estates and the Transactions do not amount to a consolidation, merger or de facto merger of the Buyers and any of the Debtors and nothing in this Order shall be interpreted to deem the Buyers as the successor to the Debtors under any state law successor liability doctrine with respect to any liabilities under environmental laws or regulations for penalties for days of violation prior to Closing. Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under applicable non-bankruptcy law.

### Assigned Contracts and Assigned Leases

U.    The Debtors have demonstrated (i) that it is an exercise of their sound business judgment to assume the Desired 365 Contracts and assign them to the Buyers in connection with the consummation of the Sale and (ii) that the assumption and assignment of the Desired 365 Contracts to the Buyers is in the best interests of the Debtors, their estates, their equity interest holders, their creditors, and other parties in interest. The Desired 365 Contracts being assigned to the Buyers are an integral part of the Assets being purchased by the Buyers and, accordingly, such assumption, assignment and cure of any defaults under the Desired 365 Contracts are reasonable and enhance the value of the Debtors' estates. Each and every provision of the Desired 365 Contracts or applicable non-bankruptcy law that purport to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Desired 365 Contract have been satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code. Any non-Debtor counterparty to a Desired 365 Contract that has not actually

11

filed with the Court an objection to such assumption and assignment in accordance with the terms of the Motion is deemed to have consented to such assumption and assignment. Notwithstanding any other provision of this Order, the objections to certain proposed Cure Costs, including objections to proposed adequate assurance of future performance, [Docket Nos. 265, 270, 273, 284, 285, 288, 290, 291, 295, 296, 297, 298, 299, 300, 302, 303][5] (collectively, the "Cure Cost Objections") shall be heard by the Court on September 24, 2018, at 9:00 a.m. (Central Time), and the rights of any party that filed a Cure Cost Objection are hereby preserved and reserved in all respects with respect to any executory contract or unexpired lease that may constitute a Desired 365 Contract under the applicable Purchase Agreement.

### Cure Costs and Adequate Assurance

V.    The Debtors and the Buyers, as applicable, have, including by way of entering into their respective Purchase Agreements and agreeing to the provisions relating to the Desired 365 Contracts therein, (i) cured, or provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Desired 365 Contracts within the meaning of section 365(b)(1)(A) of the Bankruptcy Code and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Desired 365 Contracts within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and each Buyer has, based upon the record of these proceedings, including the evidence proffered by the Debtors at the Bid Procedures Hearing and the Sale Hearing, provided adequate assurance of its future performance of and under the Desired 365 Contracts pursuant to sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.  The Buyers promise under the Purchase Agreements to perform the obligations under the Desired

---

[5] The Debtors expressly reserve their right to contest the timeliness of any Cure Cost Objections.

6699031v19

365 Contracts after the Closing shall constitute adequate assurance of future performance under the Desired 365 Contracts being assigned to the Buyers within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code. The Cure Costs are hereby found to be the sole amounts necessary to cure any and all defaults under the Desired 365 Contracts under section 365(b) of the Bankruptcy Code and, upon payment of the portion of the Cure Costs with respect to which they are liable under the Purchase Agreements, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall have no further liability under the Desired 365 Contracts whatsoever other than to the Buyers pursuant to the Purchase Agreements.

### Time Is of the Essence; Waiver of Stay

W.      Time is of the essence in consummating the Sale. In order to maximize the value of the Assets, it is essential that the sale and assignment of the Assets occur within the time constraints set forth in the Purchase Agreements. Accordingly, there is cause to waive the stays contemplated by Bankruptcy Rules 6004 and 6006.

## NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

### Objections Overruled

1.      Except with respect to the Cure Objections, all objections to the entry of this Order or to the relief granted herein, whether filed, stated on the record before this Court which could have been raised but were not or otherwise, which have not been withdrawn, waived, or settled, and all reservations of rights included therein, are denied and overruled on the merits. All objections to the entry of this Order or to the relief granted herein that were not timely filed are hereby forever barred.

2.      Notice of the Motion, the Bid Procedures, the Auction, the Sale (and the Transactions contemplated in connection therewith), the assumption and assignment to the Buyer of the Desired 365 Contracts, the Cure Costs, the Sale Hearing, and all deadlines related thereto

13

was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

## Approval of the Purchase Agreements

3.     The following, together with any amendments, if any, thereto, which collectively constitute the Purchase Agreements for purposes of this Order, including all of the terms and conditions thereof, are hereby approved:

i.     NEC Baytown Emergency Center, LP, NEC Crosby Emergency Center, LP, NEC Kingwood Emergency Center, LP, NEC Pasadena Emergency Center, LP, NEC Pearland Emergency Center, LP, and NEC Porter Emergency Center, LP, as Operating Sellers, NEC Baytown Asset Holdings, LLC, NEC Kingwood Asset Holdings, LLC, and NEC Pearland Asset Holdings, LLC as Owned Real Property Sellers, Neighbors Legacy Holdings, Inc., Neighbors Global Holdings, LLC, Neighbors Health, LLC, EDMG, LLC, and Neighbors Practice Management, LLC as Corporate and Shared Services Sellers, Neighbors Emergency Center, LLC as IP Seller, and Altus Health Systems OPCO, LLC, as Opco Buyer, Altus Health System Realty, LLC, as Realty Buyer dated July 10, 2018, attached as **Exhibit 1**;

ii.    NEC Mueller Emergency Center, LP, as Operating Seller and Neighbors Legacy Holdings, Inc., Neighbors Global Holdings, LLC, Neighbors Health, LLC, EDMG, LLC, and Neighbors Practice Management, LLC, as Corporate and Shared Services Sellers, and AEC ER 4, LLC, as Buyer dated September 12, 2018, attached as **Exhibit 2**;

iii.   NEC Amarillo Emergency Center, LP, NEC Beaumont Emergency Center, LP, NEC Lubbock Emergency Center, LP, NEC McAllen Emergency Center, LP, NEC Orange Emergency Center, LP, NEC Port Arthur Emergency Center, LP, as Operating Sellers, NEC Beaumont Asset Holdings, LLC, as Owned Real Property Seller, and Neighbors Legacy Holdings, Inc., Neighbors Global Holdings, LLC, Neighbors Health, LLC, EDMG, LLC, and Neighbors Practice Management, LLC, as Corporate and Shared Services Sellers, and Exceptional H.C., Inc., as Buyer, dated September 12, 2018, attached as **Exhibit 3**;

iv.    NEC Bellaire Emergency Center, LP, NEC Yorktown Emergency Center, LP, NEC Midland Emergency Center, LP NEC Odessa Emergency Center, LP, NEC Texarkana Emergency Center, LP, NEC Paris Emergency Center, LP, as Operating Sellers, and Neighbors Legacy Holdings, Inc., Neighbors Global Holdings, LLC, Neighbors Health, LLC, EDMG, LLC, and Neighbors Practice Management, LLC, as Corporate

and Shared Services Sellers, and Greater Texas Emergency Centers, LLC, as nominee for various LLCs to be designated as the acquiring entities (collectively referred to as "BUYER") as Buyer, dated September [___], 2018, attached as **Exhibit 4**; and

v.   NEC Eastside Emergency Center, LP, NEC Brownsville Emergency Center, LP, and NEC Harlingen Emergency Center, LP, as Operating Sellers, and Neighbors Legacy Holdings, Inc., Neighbors Global Holdings, LLC, Neighbors Health, LLC, EDMG, LLC, and Neighbors Practice Management, LLC, as Corporate and Shared Services Sellers, and Tenet Business Services Corporation, as Buyer, dated September 12, 2018, attached as **Exhibit 5**.

4.      Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors are authorized to sell the Assets to the respective Buyers subject to the terms of their respective Purchase Agreements and this Order and take any and all actions necessary to fulfill their obligations under, and comply with the terms of, the Purchase Agreements and to consummate the Sale pursuant to and in accordance with the terms and conditions of the Purchase Agreements and this Order, without further leave of the Court. The Debtors are further authorized to pay, without further order of this Court, whether before, at, or after the Closing, any expenses or costs that are required to be paid in order to consummate the Transactions contemplated by the Purchase Agreements or perform their obligations under the Purchase Agreements, including breakup fees, and reimbursement of expenses, owed to the Stalking Horse Bidders (as defined in the Bid Procedures). For the avoidance of doubt, in the event that the Transaction with Altus Health Systems OPCO LLC and Altus Health Systems Realty LLC ("Altus") fails to close, Altus shall be entitled to receive Bid Protections to the extent provided in the Bid Procedures Order and the Altus Purchase Agreement.

5.      The Debtors are authorized, in accordance with the Purchase Agreements, to execute and deliver, and empowered to perform under, consummate, and implement, the Purchase Agreements, together with all additional instruments, documents, and other agreements

15

that may be reasonably necessary or desirable to implement the Purchase Agreements, and to take all further actions as may be reasonably requested by the Buyers for the purpose of assigning, transferring, granting, conveying and conferring to the Buyers or reducing to possession, the Assets, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreements.

6.      Subject to the terms and conditions of this Order, all entities that are in possession of some or all of the Assets on the Closing Date are directed to surrender possession of such Assets to the Buyers or their assignees on the Closing Date.

7.      The Buyers and the Debtors have no obligation to proceed with the Closing unless and until all conditions precedent to their respective obligations to do so, as set forth in their respective Purchase Agreements, have been met, satisfied or waived in accordance with the terms of their respective Purchase Agreements.

8.      Subject to the terms of the *Final Order (A) Authorizing Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code and Granting Adequate Protection, and (B) Authorizing Debtor to Obtain Postpetition Financing and Granting Liens and Superpriority Claims*, upon consummation of the Sale, all cash proceeds of the Sale (the "Sale Proceeds") transferred to the Debtors shall be paid by the Debtors to the DIP Agent and, thereafter, to the Agent, to be applied to the obligations owing under their applicable credit facilities, provided that upon the Closing, the Debtors shall be permitted to retain a portion of the sale proceeds sufficient to satisfy all costs and expenses set forth in a revised Budget to be reasonably acceptable to the DIP Agent and the Agent covering the time period from the Closing until the effective date of any plan confirmed by the Court. All Liens, Claims, and Interests will attach to

6699031v19

the Sale Proceeds to the same extent and with the same priority as existed prior to consummation of the Sale.

9. At the conclusion of the Auction, the Debtors selected Nitya Health Operations LLC and Nitya Health RE LLC to be the "Back-up Bidder" (the "Nitya Back-up Bidder") as defined in the Bid Procedures, for certain facilities[6] and Greater Texas Emergency Center, LLC to be the Back-up Bidder (the "Greater Texas Back-up Bidder" and together with the Nitya Back-up Bidder, the "Back-up Bidders") for the Debtors' Yorktown facility (excluding accounts receivable).

10. Notwithstanding anything to the contrary herein, the form of the Asset Purchase Agreement with Greater Texas is not finally approved by this Order. Final approval will be at a hearing to be conducted on September 14, 2018 at 10:00 a.m. If the Debtors and Greater Texas have not agreed on the form of the Asset Purchase Agreement by that time, the Court will dictate the terms and both Greater Texas and the Debtors have agreed to be bound by the Court's determination. The rights of parties-in-interest to object to the final form of Asset Purchase Agreement (as dictated by the Court or otherwise) is preserved in this Order, but must be exercised at the September 14, 2018 hearing or is waived.

11. Notwithstanding anything to the contrary herein, the form of the Asset Purchase Agreement with the Back-up Bidders will be considered at a telephonic hearing on September 18, 2018 at 1:30 p.m. If the parties have not agreed on the form of the Asset Purchase Agreement by that time, the Court will schedule further proceedings on that issue, consistent with the terms of this Order.

---

[6] The Nitya Back-Up Bidder is the Back-Up Bidder for Baytown, Bellaire, Crosby, Kingwood, Pearland, Pasadena, Porter, Amarillo, Beaumont, Brownsville, Eastside, Harlingen, McAllen, Midland, Mueller, Odessa, Paris, Port Arthur, Texarkana.

6699031v19

12. In the event that Debtors accept the bids of the Back-up Bidders, in accordance with the terms hereof and on the terms and conditions of the Back-up Purchase Agreements, the Debtors shall be permitted to close a sale to the Back-up Bidders. Further in the event that the Debtors close a sale transaction with the Back-up Bidders (the "Back-up Transaction") this Order and all relief granted herein and all protections afforded hereby shall apply to the Back-up Bidders as the buyers in such Back-up Transaction, and the Back-up Bidders shall be considered "Buyers" for purposes hereof and shall also apply to such Back-up Transaction with full force and effect and such Back-up Transaction shall be considered a "Transaction" for all purposes hereof.

### Binding Effect of Order

13. This Order and the Purchase Agreements shall be binding upon all creditors of, and equity interest holders in, the Debtors and any and all other parties in interest, including, without limitation, any and all holders of Liens, Claims, and Interests (including holders of any rights or claims based on any putative successor or transferee liability) of any kind or nature whatsoever, all non-Debtor parties to the Desired 365 Contracts, the Buyers, the Debtors and their affiliates and subsidiaries, and any trustee or successor trustee appointed in the Debtors' Chapter 11 Cases or upon a conversion to chapter 7 under the Bankruptcy Code or any subsequent bankruptcy that may be filed by the Debtors. The Purchase Agreements and the Transactions are not subject to rejection or avoidance (whether through any avoidance, fraudulent transfer, preference or recovery, claim, action or proceeding arising under chapter 5 of the Bankruptcy Code or under any similar state or federal law or any other cause of action) by the Debtors, any chapter 7 or chapter 11 trustee of the Debtors' bankruptcy estates or any other person or entity. The Purchase Agreements, this Order, and the Debtors' obligations therein and herein shall not be altered, impaired, amended, rejected, discharged or otherwise affected by any

18

chapter 11 plan proposed or confirmed in these bankruptcy cases, any order confirming any chapter 11 plan, or any subsequent order of this Court without the prior written consent of the Buyers, to the extent of any conflict between this Order or any Purchase Agreement and such future plan or order, the terms of this Order and the applicable Purchase Agreement shall control.

## Amendments to Purchase Agreements

14.     The Purchase Agreements and any related agreements, documents, or other instruments may be modified, amended, supplemented or restated by the parties thereto in a writing signed by both parties and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, supplement or restatement does not have a material adverse effect on the Debtors' estates.

## Transfer of the Assets Free and Clear

15.     The Buyers shall assume and be liable for only those liabilities expressly assumed by Buyers pursuant to the Purchase Agreements.  Except as expressly permitted or otherwise specifically provided for in the Purchase Agreements or this Order, pursuant to sections 105(a), 363(b), 363(f), and 365(b) of the Bankruptcy Code, upon the Closing, the Assets shall be transferred to the Buyers free and clear of any and all Liens, Claims, and Interests of any kind or nature whatsoever. For purposes of this Order, "Liens," "Claims," and "Interests" shall mean:

      a.     any and all encumbrances, charges, liens (statutory or otherwise), claims, mortgages, leases, subleases, hypothecations, deeds of trust, pledges, security interests, options, rights of use or possession, rights of first offer or first refusal (or any other type of preferential arrangement), rights of consent, rights of offset, setoff and recoupment, successor liability, interests or rights under any agreement that is not a Desired 365 Contract, encroachments, encumbrances, restrictions on transferability of any type, any dedication under any gathering, transportation, treating, purchasing or similar agreement that is not assumed by or assigned to the Buyer, any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors' or the Buyer's interest in the Assets, any

similar rights, and third-party interests or any other restrictions or limitations of any kind with respect to the Assets (collectively, "Liens");

b.  any and all claims as defined in section 101(5) of the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code, including, without limitation, (i) any and all claims or causes of action based on or arising under any labor, employment or pension laws, labor or employment agreements, including any employee claims related to worker's compensation, occupational disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA (as defined below), (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code and of any similar state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§2101 et seq.), (ii) any rights under any pension or multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974 (as amended, "ERISA"), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability, (iii) any and all claims or causes of action based upon or relating to any putative successor or transferee liability, (iv) any rights related to intercompany loans and receivables between the Debtors and any non-Debtor subsidiary or affiliate, (v) any and all claims or causes of action based upon or relating to any unexpired and executory contract or unexpired lease to which a Debtor is a party that is not a Desired 365 Contract that will be assumed and assigned pursuant to this Order and the Purchase Agreement, (vi) any and all claims or causes of action based upon or relating to any bulk sales or similar law, (vii) any and all claims or causes of action based upon or relating to any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing, including, without limitation, any ad valorem taxes assessed by any applicable taxing authority, and (viii) any and all other claims, causes of action, proceedings, warranties, guaranties, rights of recovery, setoff, recoupment, rights, remedies, obligations, liabilities, counterclaims, cross-

claims, third party claims, demands, restrictions, responsibilities, or contribution, reimbursement, subrogation, or indemnification claims or liabilities based on or relating to any act or omission of any kind or nature whatsoever asserted against any of the Debtors or any of their respective affiliates, subsidiaries, directors, officers, agents, successors or assigns in connection with or relating to the Debtors, their operations, their business, their liabilities, the Debtors' marketing and bidding process with respect to the Assets, the Assigned Contracts, the Assets, or the Transactions contemplated by the Purchase Agreement (collectively, "Claims"); and

c.     any and all equity or other interests of any kind or nature whatsoever in or with respect to (x) any of the Debtors or their respective affiliates, subsidiaries, successors or assigns, (y) the Assets, or (z) the Assigned Contracts or Assigned Leases (collectively, "Interests");

whether in law or in equity, known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, direct or indirect, and whether arising by agreement, understanding, law, equity or otherwise, and whether occurring or arising before, on or after the Petition Date, or occurring or arising prior to the Closing. Any and all such Liens, Claims, and Interests shall attach to the portion of the Sale Proceeds received by the Debtors ultimately attributable to the Assets against which they assert an interest, in the order of their priority, with the same validity, force, and effect, if any, which they now have against such Assets, subject to any claims, defenses and objections, if any, that the Debtors or their estates may possess with respect thereto.

16.     Subject to and upon the occurrence of the Closing Date, except for the express rights and obligations of the Debtors and the Buyers under the Purchase Agreements after the Closing Date and any claims arising therefrom, the Debtors, their estates, and their successors or assigns, including any trustee under the Bankruptcy Code, to the extent permitted by law, are hereby deemed to have irrevocably and unconditionally released, remised, and forever

21

discharged each Buyer (and, with respect to each such Buyer, each of such Buyer's equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacity as such with respect to each such Buyer in its capacity as the Buyer under the Applicable Purchase Agreement, and not with respect to any other capacity or relationship with the Debtors) from any and all any and all claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens ,indemnities, guaranties, and franchises of any kind or character whatsoever (including (x) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law, (y) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code, and (z) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code, except to the extent asserted defensively in connection with any claim or interest asserted in the bankruptcy cases), in each case whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise, including any derivative claims, asserted on behalf of the Debtors that such entity would have been legally entitled to assert (whether individually or collectively) or which the Debtors, their affiliates, their estates, or their successors or assigns might now or subsequently may have, in each case based on or relating to, or in any manner arising from, in whole or in part, the actions of the Buyer with respect to the Debtors, their postpetition business or operations, these chapter 11 cases, the Assets, the Desired 365 Contracts that are actually

assumed by the Debtors and assigned to the Buyer, the Auction, the Sale, the negotiation and documentation thereof, the transactions contemplated thereby, and the agreements and ancillary documents memorializing and effectuating such sale(including, without limitation, the Purchase Agreement, but excluding the express rights and obligations of the Debtors and the Buyer under the Purchase Agreement after the Closing Date).

17.     Buyers shall comply with (a) any internal privacy policy of the Debtors in effect as of Closing, and (b) the Health Insurance Portability and Accountability Act of 1995 and any similar laws or regulations applicable to the Debtors, to ensure that personally identifiable information, including any individually identifiable health information, is protected to the extent required under applicable law.

### Vesting of Assets in the Buyers

18.     The transfer of the Assets to the Buyers pursuant to the Purchase Agreements shall constitute a legal, valid, and effective transfer of the Assets on the Closing, and shall vest the Buyers with all of the Debtors' rights, title and interests in the Assets free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever. Upon releasing of any Liens, the Liens will attach to the Sale Proceeds received by the Debtors in the order and priority that existed prior to such releases.

19.     Each Buyer is hereby authorized in connection with the consummation of the Sale, but subject to the terms of the applicable Purchase Agreement, to allocate the Assets, including the Desired 365 Contracts, among its affiliates, agents, designees, assigns, and/or successors, in a manner as it in its sole discretion deems appropriate, and to assign, lease, sublease, license, sublicense, transfer, or otherwise dispose of any of the Assets, including the Desired 365 Contracts, to its affiliates, designees, assignees and/or successors with all of the

23

rights and protections accorded to the Buyers under this Order and the Purchase Agreements with respect thereto, and the Debtors shall cooperate with and take all actions reasonably requested by the Buyer (at Buyer's expense unless otherwise provided in the Purchase Agreement) to effectuate any of the foregoing.

## Police and Regulatory Power of Governmental Units

20.     Nothing in this Order or any of the Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the date of entry of this Order. Nothing in this Order or the Purchase Agreements authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Assets on account of the filing or pendency of these Chapter 11 Cases or, to the extent provided by section 525 of the Bankruptcy Code, the consummation of the Transactions contemplated by the Purchase Agreements, including, without limitation, the Sale and the Debtors' assumption and assignment of the Desired 365 Contracts to the Buyers. Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

21.     This Order does not authorize any Buyer to operate in violation of applicable state law or regulation.  The Court expresses no view on whether the future operations will be

undertaken in a manner consistent with state law and will have no future supervisory role with respect to such operations; that is a matter left to the State of Texas.

**Assumption and Assignment of Assigned Contracts and Assigned Leases**

22.    Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtors' assumption and assignment to the Buyers of the Desired 365 Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

23.    The Debtors are hereby authorized, in accordance with the Purchase Agreements, and in accordance with sections 105(a) and 365 of the Bankruptcy Code, to (i) assume and assign to the Buyers the Desired 365 Contracts, effective upon and subject to the occurrence of the Closing, free and clear of all Liens, Claims, and Interests of any kind or nature whatsoever, which Desired 365 Contracts, by operation of this Order, shall be deemed assumed and assigned to the Buyers effective as of the Closing, and (ii) execute and deliver to the Buyers such documents or other instruments as the Buyers may deem necessary to assign and transfer the Desired 365 Contracts to the Buyers.

24.    Subject to the immediately preceding paragraph:

    a.    The Debtors are authorized to and shall assume all of the Desired 365 Contracts in accordance with section 365 of the Bankruptcy Code.

    b.    The Debtors are authorized to and shall assign each Desired 365 Contract to the Buyers in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Desired 365 Contract that prohibit or condition the assignment of such Desired 365 Contract on the consent of the non-Debtor counterparty thereto or allow the non-Debtor counterparty to such Assigned Contract or Assigned Lease to terminate, recapture, impose any penalty, condition, any renewal or extension, require a net worth requirement, or modify any term or condition upon the assignment of such Desired 365 Contract, shall constitute unenforceable anti-assignment provisions which are expressly preempted under section 365 of the Bankruptcy Code and be void and of no force or effect.

25

c.     All requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption and assignment of the Desired 365 Contracts by the Debtors to the Buyers have been satisfied.

d.     Upon the Closing, the Desired 365 Contracts shall be transferred and assigned to, and remain in full force and effect for the benefit of, the Buyers in accordance with their respective terms, notwithstanding any provision in any such Desired 365 Contract (including those of the type described in sections 365(b)(2), 365(e)(1) and 365(f) of the Bankruptcy Code) that prohibits, restricts, limits, or conditions such assignment or transfer.

e.     After the Debtors' transfer and assignment of the Desired 365 Contracts to the Buyers, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyers shall be fully and irrevocably vested in all right, title, and interest of each Desired 365 Contract free and clear of Liens, Claims, and Interests, and all non-Debtor counterparties to the Desired 365 Contracts are barred and enjoined from asserting against the Buyers or their assets, among other things, defaults, breaches or claims of pecuniary losses existing as of Closing or by reason of Closing.

f.     Any portion of any Assigned Lease which purports to permit a landlord thereunder to cancel the remaining term of such Assigned Lease if the Debtors discontinue their use or operation of the leased premises is void and of no force or effect, and shall not be enforceable against the Buyers, or their assignees and sublessees; and the landlords under any such Assigned Lease shall not have the right to cancel or otherwise modify the Assigned Lease or increase the rent, assert any claim or impose any penalty by reason of such discontinuation, the Debtors' cessation of operations, the assignment of such Assigned Lease to the Buyers, or the interruption of business activities at any of the leased premises.

g.     The failure of the Debtors to enforce at any time prior to the Closing Date one or more terms or conditions of any Desired 365 Contract shall not be a waiver of such terms or conditions, or of the Buyers' rights to enforce every term and condition of the Desired 365 Contracts.

h.     There shall be no rent accelerations, assignment fees, increases, or any other fees charged to any Buyer as a result of the assumption, assignment, and sale of the Desired 365 Contracts.

25.     All defaults and all other obligations of the Debtors under the Desired 365 Contracts occurring, arising or accruing prior to the assignment thereof to the Buyers at Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified

6699031v19

in section 365(b)(2) of the Bankruptcy Code) are deemed to have been cured or satisfied by the payment of the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Desired 365 Contract set forth in a Cure Notice, which was served in compliance with the Bid Procedures Order, and is set forth on the schedule attached hereto as **Exhibit 6** (the "Cure Costs"), and which Cure Costs were satisfied, or shall be satisfied as soon as practicable, by the Debtors or by the Buyers, as the case may be, as provided in the Purchase Agreements. For all Desired 365 Contracts for which a Cure Notice was served, the Debtors and the Buyer, as applicable, are each authorized and directed to pay their respective portion of all Cure Costs required to be paid by such parties in accordance with the Purchase Agreement upon the Closing. Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any liability under any Desired 365 Contract that arises on or after the Closing Date, whether as a result of breach of a Desired 365 Contract on or after the Closing Date or otherwise other than to the Buyers pursuant to the Purchase Agreements.

### Ad Valorem Taxes

26. The ad valorem tax liens of Brazoria County Tax Office, Crosby ISD, Crosby MUD, Harris County MUD #276, Humble ISD, City of Houston, Alief ISD, Valley Ranch MUD #1, Wichita County, Lubbock Central Appraisal District, Midland County, Tyler ISD, Potter County Tax Office, Angelina County, Cameron County, Cypress-Fairbanks ISD, City of El Paso, Ector CAD, Galveston County, Gregg County, City of Harlingen, Harlingen CISD, Harris County, Hidalgo County, Jefferson County, City of McAllen, Montgomery County, Orange County, Smith County, Texas City ISD, and Tom Green CAD (collectively, the "Taxing Authorities") for the 2018 tax year are hereby expressly retained against the Assets until payment is made to fully satisfy the 2018 ad valorem taxes, and any penalties or interest which may ultimately accrue to those 2018 taxes.

27

27.     Paragraph 46 of the *Final Order (A) Authorizing Use of Cash Collateral Pursuant to Section 363(c) of the Bankruptcy Code and Granting Adequate Protection, and (B) Authorizing Debtor to Obtain Postpetition Financing and Granting Liens and Superpriority Claims* (Doc. No. 193) (the "Final DIP Order") is incorporated by reference as if fully set forth herein. In addition, the liens, if any, currently held by Brazoria County Tax Office, Crosby ISD, Crosby MUD, Harris County MUD #276, Humble ISD, City of Houston, Alief ISD, Valley Ranch MUD #1, Wichita County, Lubbock Central Appraisal District, Midland County, Tyler ISD, Potter County Tax Office (collectively, the "Additional Taxing Authorities") shall be subject to and entitled to the protections in paragraph 46 of the Final DIP Order. For the avoidance of doubt, from the proceeds of the sale of any of the Debtors' assets located in the state of Texas that secure the claims filed by the Additional Taxing Authorities, unless modified as set forth in paragraph 46 of the Final DIP Order, the additional amount of $333,828.14 shall be set aside by the Debtors in the Taxing Authority Segregated Account (as defined in the Final DIP Order).

## No Successorship or Transferee Liability

28.     Neither the Buyers nor any of their affiliates are or shall be deemed, as a result of the consummation of the Transactions contemplated herein, to: (a) be legal successors to the Debtors or their estates by reason of any theory of law or equity, (b) have, *de facto* or otherwise, merged with or into the Debtors, or (c) be an alter ego or a mere continuation or substantial continuation or successor of the Debtors in any respect. Neither the Buyers nor any of their affiliates shall assume or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, except as otherwise expressly provided in the Purchase Agreements or this Order. Without limiting the effect or scope of the foregoing, as a result of the closing of the Transactions, except as set forth in the Purchase Agreements, the Buyers shall have no

28

successor, derivative or vicarious liabilities of any kind or character, including, but not limited to, federal, state or other tax liabilities, U.S. or foreign pension liabilities, or liabilities based on any theory of successor or transferee liability, antitrust, environmental, labor law, alter ego, veil piercing, continuity of enterprise, mere continuation, product line, de facto merger or substantial continuity, whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, recorded or unrecorded, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise with respect to the Debtors or any obligations of the Debtors, including, but not limited to, in the case of liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing, except as set forth in the Purchase Agreements, or any taxes in connection with, or in any way relating to the cancellation of debt of the Debtors or their affiliates, or otherwise as a result of the Transactions.

## Modification of the Automatic Stay

29.     The automatic stay provisions of section 362 of the Bankruptcy Code are lifted and modified to the extent necessary to implement the terms and conditions of the Purchase Agreements and the provisions of this Order, without further order of the Court, including to allow:  (i) the Buyers to give the Debtors any notice provided for in the Purchase Agreements, and (ii) the Buyers and the Debtors take any and all actions permitted by the applicable Purchase Agreements in accordance with the terms and conditions thereof.

## Release of Liens By Creditors; Collection of Assets

30.     Except as expressly provided to the contrary in this Order or in the Purchase Agreements, each holder of any valid Lien, Claim or Interest against the Assets including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory

authorities, lenders, trade creditors, litigation claimants and other persons holding Lien, Claims, or Interests of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise), arising under or out of, in connection with, or in any way relating to, the Debtors, the Assets, the operation of the Debtors' businesses before the Closing or the transfer of the Debtors' interests in the Assets to the Buyers shall, as of the Closing, be deemed to have waived and released such Lien, Claim or Interest, without regard to whether such holder has executed or filed any applicable release, and such Lien, Claim or Interest shall automatically, and with no further action by any party, attach to the portion of the Sale Proceeds received by the Debtors ultimately attributable to the Assets against which they assert an interest, in the order of their priority, with the same validity, force, and effect, if any, which they now have against such Assets, subject to any claims, defenses and objections, if any, that the Debtors, their estates, or any other party in interest may possess with respect thereto. All such entities referenced in the preceding sentence shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Liens, Claims, or Interests against the Buyers, their successor and assigns, their affiliates and representatives or their interests in the Assets. Notwithstanding the foregoing, any such holder of such a Lien, Claim or Interest is directed to execute and deliver any waivers, releases, or other related documentation reasonably requested by the Debtors or the Buyers to evidence the release of its Liens, Claims, or Interests in the Assets. Any person or entity that has filed any financing statements, mortgages, deeds of trust, mechanic's liens, *lis pendens*, or any other documents or

agreements evidencing a Lien on the Debtors or any of the Assets conveyed pursuant to the Purchase Agreements and this Order is directed to deliver to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Liens which the person or entity has with respect to the Debtors or the Assets or otherwise.

31.    In the event that such termination statements, instruments of satisfaction, or releases of all Liens are not filed in accordance with the foregoing paragraph, the Debtors and the Buyers are hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens in the Assets of any kind or nature whatsoever.

### Effect of Recordation of Order

32.    This Order, if filed, registered, or otherwise recorded, shall be effective as a conclusive determination that, upon the Closing, all Liens, Claims and Interests of any kind or nature whatsoever existing as to the Assets prior to the Closing have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected; provided that this Order shall be binding and effective regardless of whether any such filing, registration or recordation occurs.    The Liens, Claims and Interests that are unconditionally released, discharged, and terminated pursuant to this Order include, without limitation, those certain Liens, Claims, and Interests evidenced by the financing statements (as they pertain to the Assets), mortgages, deeds of trust, mechanic's liens, *lis pendens*, notations of liens on certificates of title etc.

33.    This Order, if filed, registered, or otherwise recorded, shall be binding upon and shall govern the acts of all persons and entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars

31

of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, local officials, notaries, protonotaries, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to, the Assets; provided that this Order shall be binding and effective regardless of whether any such filing, registration or recordation occurs.

34.     Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Purchase Agreements, including, without limitation, recordation of this Order.

### Prohibition of Actions Against the Buyers

35.     Except for the Specifically Assumed Liabilities or as expressly permitted or otherwise specifically provided for in the Purchase Agreements or this Order, the Buyers and their affiliates shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Assets or otherwise.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the Purchase Agreements, the Buyers and their affiliates shall not be liable for any Claims against the Debtors or any of their predecessors or affiliates, and the Buyers and their affiliates shall have no successor or vicarious liabilities of any kind or character including, without limitation, any theory of antitrust, warranty, product liability, environmental, successor or transferee liability, labor law, ERISA, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors, including, without limitation,

6699031v19

liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Debtors' business prior to the Closing or any claims under the WARN Act or any claims related to wages, benefits, severance or vacation pay owed to employees or former employees of the Debtors.

36.    Effective upon the Closing, with the sole exception of any enforcement of rights related to the Specifically Assumed Liabilities, all persons and entities shall be, and hereby are, forever barred and estopped from (a) taking any action that would adversely affect or interfere with the ability of the Debtors to transfer the Assets to the Buyers in accordance with the terms of this Order and the Purchase Agreements and (b) asserting, prosecuting, or otherwise pursuing, whether in law or in equity, in any judicial, administrative, arbitral or other proceeding, any Liens, Claims or Interests of any kind or nature whatsoever against the Buyers and their successors, designees, assigns, or property, or the Assets conveyed under this Order in accordance with the Purchase Agreements.

## No Interference

37.    Following the Closing, no holder of a Lien, Claim and/or Interest in or against the Debtors or the Assets shall interfere with any Buyer's title to or use and enjoyment of the Assets based on or related to such Lien, Claim, and/or Interest or based on any actions the Debtors may take in their chapter 11 cases.  Moreover, following the entry of this Order, no unsuccessful Bidder (including the Back Up Bidder, and their respective officers, directors, employees, owners and representatives) will directly or indirectly interfere with the Buyers' consummation of the transactions contemplated in the Purchase Agreements and/or contact any of the Buyers to influence them with respect to fulfilling their obligations under their respective Purchase Agreements.

33

6699031v19

## Retention of Jurisdiction

38.     This Court retains jurisdiction prior to, on, and after Closing to, among other things, interpret, enforce and implement the terms and provisions of this Order and the Purchase Agreements, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, without limitation, retaining jurisdiction to: (a) compel delivery of the Assets or performance of other obligations owed to the Buyers; (b) compel performance of obligations owed to the Debtors and/or the Buyers; (c) resolve any disputes arising under or related to the Purchase Agreements; (d) interpret, implement, and enforce the provisions of this Order; (e) compel delivery of any waivers, releases, or other related documentation reasonably requested by the Debtors or the Buyers to evidence the release of any Liens, Claims, or Interests in the Assets; (f) protect the Buyers and their affiliates against (i) any Liens, Claims and Interests in or against the Debtors, the Buyers, or the Assets of any kind or nature whatsoever and (ii) any creditors, equity interest holders, or other parties in interest regarding the turnover of the Assets to the Buyers that may be in their possession; and (g) protect the Buyers and the Debtors and their affiliates against any liabilities (other than any liabilities retained by the Debtors under the Purchase Agreements) in any way relating to the Assets arising on or after the Closing Date other than to the Buyers pursuant to the Purchase Agreements.

## No Stay of Order

39.     Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Buyers are free to close the Sale under the Purchase Agreements at any time pursuant to the terms

34

thereof. The Sale transactions contemplated by the Purchase Agreements are undertaken by the Buyers in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Buyers (including the assumption and assignment by the Debtor of any of the Assigned Contracts or Assigned Leases), unless such authorization is duly stayed pending such appeal.

### Good Faith Purchasers

40.     The Sales contemplated by the Purchase Agreements is undertaken by the Buyers in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and the Buyers have acted without collusion in undertaking the Sale and Transactions contemplated by the Purchase Agreements. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Buyers (including the assumption and assignment by the Debtors of any of the Desired 365 Contracts), unless such authorization is duly stayed pending such appeal. Each Buyer is a buyer in good faith of the Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

41.     There has been no showing that the Debtors or the Buyers engaged in any action or inaction that would cause or permit the Transactions to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

### Inconsistencies with Prior Orders, Pleadings or Agreements

42.     To the extent of any conflict between the Purchase Agreements and this Order, the terms of the Purchase Agreements shall govern the rights and obligations of the parties thereto. To the extent this Order is inconsistent or conflicts with any prior order or pleading in

35

these Chapter 11 Cases, the terms of this Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale. For the avoidance of doubt, if the Debtors' chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code, the Order shall be binding on the chapter 7 trustee in such chapter 7 cases.

### Failure to Specify Provisions

43.     The failure to specifically reference any particular provisions of the Purchase Agreements or other related documents in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement and other related documents be authorized and approved in their entirety.

### Non-Severability

44.     The provisions of this Order are non-severable and mutually dependent.


Dated: ___9-12___, 2018
      **Houston, Texas**

**MARVIN ISGUR**
**UNITED STATES BANKRUPTCY JUDGE**

36

**EXHIBIT C**

**Notice of Highest and Best Bids**

See attached.

Case 18-33836 Document 484-1 Filed in TXSB on 09/14/18 Page 107 of 164
Case 18-33836 Document 324 Filed in TXSB on 09/14/18 Page 107 of 164
Docket #0324  Date Filed: 08/29/2018

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| **In re:** | § |
|  | § **Chapter 11** |
|  | § |
| **NEIGHBORS LEGACY HOLDINGS, INC.,** | § **Case No.  18-33836 (MI)** |
| *et al.*, | § |
|  | § **(Jointly Administered)** |
| **Debtors.¹** | § |

## <u>NOTICE OF HIGHEST AND BEST BIDS</u>
(Relates to Docket Nos.  20 and 203)

On August 8, 2018, the United States Bankruptcy Court for the Southern District of Texas entered the Order (A) Authorizing and Scheduling an Auction for the Sale of Debtors' Assets and (B) Approving Auction and Bid Procedures, Including Payment of Bid Protections [Docket No. 203] (the "<u>Bidding Procedures Order</u>").

The Debtors received Qualified Bids² from the following parties:

1.      AEC ER 4, LLC;

2.      Altus Health Systems OPCO, LLC and Altus Health System Realty, LLC;

3.      ER Acquisition Holdings, LLC;

4.      Exceptional H.C. Inc.;

5.      Fostre, Inc.;

6.      Greater Texas Emergency Centers LLC;

7.      Nitya Capital LLC;

---

¹ Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/neighbors. The location of Debtors' principal place of business and the Debtors' service address is: 10800 Richmond Avenue. Houston, Texas 77042.

² Defined terms shall have the same meaning as that ascribed to them in the Bidding Procedures Order and the Bidding Procedures.

6790257v2



1833836180829000000000004

8.   Tenet Business Services Corporation; and

9.   Universal Health Services, Inc.

Because the Debtors received multiple Qualified Bids from Qualified Bidders, the Debtors conducted an auction on August 27, 2018.

The Highest and Best Bids were presented by the following bidders (the "Winning Bidders"):

| Name of Winning Bidder | Location(s) |
|---|---|
| Altus Health Systems OPCO, LLC and Altus Health System Realty, LLC | Baytown, Crosby, Kingwood, Pearland, Pasadena and Porter |
| AEC ER 4, LLC | Mueller |
| Exceptional H.C. Inc. | Lubbock, Orange, Port Arthur, Beaumont, Amarillo, McAllen |
| Greater Texas Emergency Centers LLC | Bellaire, Yorktown, Odessa, Midland, Texarkana, Paris |
| Tenet Business Services Corporation | Brownsville, Eastside, Harlingen |

The Debtors will seek approval of Asset Purchase Agreements with the Winning Bidders at the Sale Hearing on September 6, 2018 at 2:30 p.m.

**Dated: August 29, 2018.**

**PORTER HEDGES LLP**

By:   */s/ John F.  Higgins*
John F.  Higgins
State bar No.  09597500
Eric M.  English
State bar No.  24062714
Genevieve M. Graham
State bar No. 24085340
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Fax: (713) 228-1331

**PROPOSED COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**

2

*Final Version*

**DISCLOSURE SCHEDULES**

**to**

**ASSET PURCHASE AGREEMENT**

**by and among**

**NEC BELLAIRE EMERGENCY CENTER, LP,**
**NEC YORKTOWN EMERGENCY CENTER, LP,**
**NEC MIDLAND EMERGENCY CENTER, LP,**
**NEC ODESSA EMERGENCY CENTER, LP,**
**NEC TEXARKANA EMERGENCY CENTER, LP, and**
**NEC PARIS EMERGENCY CENTER, LP,**
**as Operating Sellers**

**NEIGHBORS LEGACY HOLDINGS, INC.,**
**NEIGHBORS GLOBAL HOLDINGS, LLC,**
**NEIGHBORS HEALTH, LLC,**
**EDMG, LLC, and**
**NEIGHBORS PRACTICE MANAGEMENT, LLC,**
**as Corporate and Shared Services Sellers**

**and**

**GREATER TEXAS EMERGENCY CENTERS LLC,**
**as Buyer**

**dated**

**September 13, 2018**

## Schedules

The following constitutes the Disclosure Schedules (these "*Schedules*") referred to in the Asset Purchase Agreement (the "*Agreement*"), dated as of September 13, 2018, by and among (i) Greater Texas Emergency Centers LLC, a Texas  limited liability company, as nominee for various acquiring entities to be designated as buyers in the Agreement (individually and collectively, "*Buyer*"), (ii) NEC Bellaire Emergency Center, LP, a Texas limited partnership, NEC Yorktown Emergency Center, LP, a Texas limited partnership, NEC Midland Emergency Center, LP, a Texas limited partnership, NEC Odessa Emergency Center, LP, a Texas limited partnership, NEC Texarkana Emergency Center, LP, a Texas limited partnership, and NEC Paris Emergency Center, LP, a Texas limited partnership (collectively, the "*Operating Sellers*" and each individually, an "*Operating Seller*"), and (iii) Neighbors Legacy Holdings, Inc., a Texas corporation, Neighbors Global Holdings, LLC, a Delaware limited liability company, Neighbors Health, LLC, a Texas limited liability company, EDMG, LLC, a Texas limited liability company and Neighbors Practice Management, LLC, a Texas limited liability company (collectively, the "*Corporate and Shared Services Sellers*" and each individually, a "*Corporate and Shared Services Seller*", and together with the Operating Sellers, the "*Sellers*" and each individually, a "*Seller*").  Buyer and the Sellers are sometimes referred to collectively herein as the "*Parties*" and singly as a "*Party*."

Capitalized terms used in these Schedules but not defined herein shall have the meanings ascribed to such terms in the Agreement.  Information provided in one Schedule hereto will suffice, without repetition or cross reference, as a disclosure of such information in any other Schedule hereto to which its relevance is reasonably apparent on its face.  The reference to or listing, description, disclosure or other inclusion of any item or other matter, including, without limitation, any charge, violation, breach or Liability, in these Schedules shall not be construed to be an admission or suggestion that such item or matter constitutes a violation of, breach or default under, any Contract or otherwise.  No disclosure in these Schedules relating to any possible breach or violation of any agreement, law or regulation shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.  Nothing in these Schedules shall be deemed adequate to disclose an exception to a representation or warranty herein unless the Schedule identifies the exception with reasonable particularity and describes the relevant facts in reasonable detail.  The inclusion of any item in these Schedules, or any references to dollar amounts, will not be deemed to be an acknowledgement or representation that such item is material, to establish any standard of materiality or to define further the meaning of such terms for purposes of the Agreement.  Furthermore, the inclusion of a particular item of information in these Schedules shall not be taken as an admission that such disclosure is required to be made under the terms of any of such representations and warranties.  Headings have been inserted on the sections of these Schedules for convenience of reference only and shall be ignored in the construction or interpretation of these Schedules as set forth in the Agreement.

**<u>Schedule 3.06</u>**

**Absence of Certain Developments**

None.

## <u>Schedule 3.07</u>

### Sellers' Finders' Fees

Neighbors Global Holdings, LLC and Neighbors Legacy Holdings, Inc., collectively with its direct and indirect subsidiaries, have engaged Houlihan Lokey to provide investment banking services in connection with the Transactions.

**<u>Schedule 3.08(a)</u>**

**Seller Contracts**

[See attached.]

Attachment to Schedule 3.08(a)
Contracts (Bellaire)

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Department |
|---|---|---|---|---|---|---|---|---|
| Admiral Linen Service, Inc. | Neighbors Legacy Holdings, Inc. d/b/a Neighbors Emergency Center or Neighbors Health, LLC d/b/a Neighbors Emergency Center | Rental Agreement | 11/4/2015 | 5 years | 11/03/20 | 06/11/18 | 28 | Operations |
| Airgas, Inc. | Neighbors Health, LLC f/k/a Neighbors Health System, LLC | Strategic Accounts Sales Agreement | 4/14/2016 | 5 years | 04/13/21 | 06/11/18 | 34 | Operations |
| ALSCO, Inc. Admiral Linen and Uniform Service, Inc. | Neighbors Legacy Holdings, Inc. d/b/a Neighbors Emergency Center or Neighbors Health, LLC d/b/a Neighbors Emergency Center | Linen and/or Uniform Rental Service Agreement | 11/19/2015 | 36 months | 11/18/18 | 06/11/18 | 5 | Operations |
| AT&T | Neighbors Health, LLC | Phone Services Contract ID - 8550343 AT&T Fiber Broadband Bundle Express Agreement | 9/28/2017 | 2 years | 9/27/2019 | 06/11/18 | 15 | IT |
| BBVA Compass Financial Corporation | Neighbors Global Holdings, LLC | 00619-0012 Proteus XR Radiographic & Optima | 01/01/17 | 60 months | 01/01/22 | 06/11/18 | 42 | Equipment Leases |
| BeaconMedaes, LLC | NEC Bellaire Emergency Center, LP | Service Quotation: BTSBK17-0081-00 Medical Gas Preventative Plan Quote Summary | 9/28/2017 | 1 year | 09/27/18 | 06/11/18 | 3 | Operations |
| Central Bank of St. Louis (formerly All Points Solution, Inc. d/b/a 3i International and TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc.) | Neighbors Global Holdings, LLC | 41404494 Various IT products | 07/31/16 | 63 months | 10/31/21 | 06/11/18 | 40 | Equipment Leases |
| CHCA West Houston, L.P.  d/b/a West Houston Medical Center | NEC Bellaire Emergency Center, LP d/b/a Neighbors Emergency Center | Laboratory Services Agreement | 4/3/2018 | 1 year | 04/02/19 | 06/11/18 | 9 | Clinical |
| Clear Channel Outdoor | Neighbors Health, LLC and NEC Bellaire Emergency Center, LP | Contract # 9947610 | 1/1/2018 | 13- 4 week campaigns | 12/31/2018 | 06/11/18 | 6 | Marketing |
| Clinical Diagnostic Solutions, Inc. | NEC Bellaire Emergency Center, LP | Service Support Agreement for the Medonic Series Hematology Analyzer | 8/18/2017 | 1 year | 8/17/2018 | 06/11/18 | 2 | Clinical |
| Comcast Cable Communications Management, LLC | Neighbors Legacy Holdings, Inc. d/b/a Neighbors Health System, Inc. d/b/a Neighbors Emergency Center | MSA ID # TX-328093-MJUNG SO ID # TX-328093-MJUNG Comcast Enterprise Services Sales Order Form Internet and cable services | 7/8/2016 | 36 months | 7/7/2019 | 06/11/18 | 12 | IT |
| CH Retail Fund 1/Houston Uptown Crossing, L.P. | NEC Bellaire Emergency Center, LP | Lease Agreement | 10/1/2014 | 10 years | 8/31/2021 | 06/11/18 | 38 | Facility lease |
| DataVox, Inc. | NEC Bellaire Emergency Center, LP | 1167618 Toshiba Phone System | 07/11/16 | 48 months | 07/11/20 | 06/11/18 | 25 | Equipment Leases |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. | NEC Bellaire Emergency Center, LP (erroneously referred to as "NEC Bellaire Emergency Clinic") | 41043323 (3) WC5335PH Copier Printer Scanner Fax , (1) WC4260 Copier Printer Scanner Fax | 04/15/14 | 60 months | 04/15/19 | 6/11/2018 | 10 | Equipment Leases |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerly All Points Solution, Inc. d/b/a 3i International) | NEC Bellaire Emergency Center, LP | 20156490 (1) Xerox WorkCenter 5335, (3) Xerox WorkCenter 5335 | 05/15/14 | 63 months | 08/15/19 | 6/11/2018 | 14 | Equipment Leases |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerly All Points Solution, Inc. d/b/a 3i International) | NEC Bellaire Emergency Center, LP | 20178971 (7) Xerox WC5335PT | 01/05/15 | 60 months | 01/04/19 | 6/11/2018 | 6 | Equipment Leases |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerly All Points Solution, Inc. d/b/a 3i International) | NEC Bellaire Emergency Center, LP | 20164601 (2) WC5335 Xerox Copier Printer Scanner Fax, (1) WC7835 Color Copier Printer Scanner Fax, (1) WC4260 Copier Printer Scanner Fax | 09/30/14 | 60 months | 09/30/19 | 6/11/2018 | 15 | Equipment Leases |

Attachment to Schedule 3.08(a)
Contracts (Bellaire)

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Department |
|---|---|---|---|---|---|---|---|---|
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerly All Points Solution, Inc. d/b/a 3i International) | NEC Bellaire Emergency Center, LP | 20186043 (3) Xerox ColorQube 8700X | 03/10/15 | 60 months | 03/10/20 | 6/11/2018 | 20 | Equipment Leases |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerly All Points Solution, Inc. d/b/a 3i International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41343967 (2) Xerox 3655/XM, (1) Xerox 33215, (1) Xerox 6655/XM, (1) Xerox 3320/DNI, (1) Xerox 5335/PH | 05/10/16 | 63 months | 08/10/21 | 06/11/18 | 37 | Equipment Leases |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerly All Points Solution, Inc. d/b/a 3i International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41262035 (2) Xerox WC 3655, (1) Xerox WC6655, (1) Xerox Phaser 3325, (1) Xerox Phaser 3320 (2) 097s40625 | 11/14/15 | 63 months | 02/14/21 | 06/11/18 | 32 | Equipment Leases |
| Frontier Utilities | NEC Bellaire Emergency Center, LP (erroneously referred to as "Neighbors Emergency Center, LLC") | Enrollment Authorization Quote # Q155640 Commercial (Texas) - Fixed Rate Plan | 6/7/2016 | 5 years | 06/07/21 | 06/11/18 | 35 | Operations |
| Medicus Laboratory Information Systems | NEC Bellaire Emergency Center, LP | Annual Software Support Agreement | 7/28/2017 | 1 year | 7/28/2018 | 06/11/18 | 1 | Clinical |
| Medicus Laboratory Information Systems | NEC Bellaire Emergency Center, LP | Annual Software Support Agreement | 7/23/2017 | 1 year | 7/22/2019 | 06/11/18 | 13 | Clinical |
| Megan Anderson | NEC Bellaire Emergency Center, LP | Consultant Pharmacist Service Agreement | 10/9/2015 | Until terminated | Until terminated | 06/11/18 | Until terminated | Clinical |
| Multiplan, Inc. | Neighbors Physician Group, PLLC ("Neighbors Emergency Center" is assumed name) | MPI Participating Ancillary Agreement | 2/15/2016 | 1 year | 02/14/19 | 06/11/18 | 8 | NPM |
| Novarad Corporation | Neighbors Health, LLC | Customer License Agreement | 6/23/2017 | 3 years | 6/22/2020 | 06/11/18 | 24 | Radiology |
| Omnicell, Inc. | NEC Bellaire Emergency Center, LP | Quote - 43932 | 6/1/2018 | 12 months | 5/31/2019 | 06/11/18 | 11 | Operations |
| Passport Health Communications, Medical Present Value Inc. and Search America Inc. (collectively referred as "Experian Health") | NEC Bellaire Emergency Center, LP | Presidio End User Agreement | 12/7/2017 | 36 months | 12/06/20 | 06/11/18 | 29 | NPM |
| ProStar Services, Inc. d/b/a Parks Coffee | NEC Bellaire Emergency Center, LP d/b/a Neighbors Emergency Center | Equipment Agreement & Customer Information Account: 23009 Brand/Model/Serial: Keurig, B-150, M0071877 | 11/13/2014 | 1 year | 11/12/18 | 06/11/18 | 5 | Operations |
| Protection One, a division of ADT, LLC | Neighbors Health, LLC | National Accounts Master Security Systems and Services Agreement - Multi-Location | 12/18/2017 | 5 years | 12/17/22 | 06/11/18 | 54 | Operations |
| Republic Waste Services of Texas, Ltd | NEC Bellaire Emergency Center, LP d/b/a Neighbors Emergency Center | Agreement Number : A161355085 Account Number : 85147 Customer Service Agreement | 8/4/2016 | 36 months | 8/3/2019 | 06/11/18 | 13 | Operations |
| Roshal Imaging Services, Inc. | NEC Bellaire Emergency Center, LP | Professional Services Agreement | 11/14/2011 | 3 years | 11/14/2018 | 6/11/2018 | 5 | Radiology |
| Signature Financial, LLC (formerly All Points Solution, Inc. d/b/a 3i International and TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc.) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41343964 Various IT products | 05/01/16 | 63 months | 08/01/21 | 06/11/18 | 37 | Equipment Leases |
| Southwest Precision Printers, LLC | Neighbors Health, LLC | Agreement | 5/1/2016 | 2 years | 5/1/2019 | 06/11/18 | 10 | Marketing |
| T-System, Inc. | Neighbors Health, LLC | Site Opt-In Agreement | 7/22/2015 | 5 years | 07/21/20 | 06/11/18 | 25 | Clinical |
| Universal Hospital Services, Inc. | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. d/b/a Neighbors Emergency Center | Agreement # UHS -09926 Master Services Agreement | 9/1/2014 | Until 08/31/2018 | 8/31/2018 | 06/11/18 | 2 | Operations |
| UpToDate, Inc. | Neighbors Health, LLC | Contract No: 001-00-38997449 | 6/1/2016 | 1 year subscription | 08/31/18 | 06/11/18 | 2 | Clinical |
| Ventus Wireless, LLC | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | Managed Services Agreement 4G LTE | 9/18/2015 | 2 years | 9/17/2018 | 06/11/18 | 3 | IT |
| West Houston Radiology Associates, LLP | Neighbors Health, LLC d/b/a Neighbors Emergency Center | Professional Services Agreement | 7/9/2017 | Until terminated | Until terminated | 06/11/18 | Until terminated | Radiology |
| West Physics Consulting, LLC | Neighbors Health, LLC | Physics Service Agreement | 1/18/2017 | 3 years | 1/7/2020 | 06/11/18 | 18 | Radiology |

**Attachment to Schedule 3.08(a)**
**Contracts (Bellaire)**

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Department |
|---|---|---|---|---|---|---|---|---|
| Wolters Kluwer Clinical Drug Information, Inc. | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | Wolters Kluwer Clinical Drug Information Software License Agreement | 6/15/2015 | 3 years | 6/14/2018 | 06/11/18 | 0 | Clinical |

Attachment to Schedule 3.08(a)
Contracts (Yorktown)

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Department |
|---|---|---|---|---|---|---|---|---|
| Admiral Linen Service, Inc. | Neighbors Legacy Holdings, Inc. d/b/a Neighbors Emergency Center or Neighbors Health, LLC d/b/a Neighbors Emergency Center | Rental Agreement | 11/4/2015 | 5 years | 11/03/20 | 06/11/18 | 28 | Operations |
| Airgas, Inc. | Neighbors Health, LLC f/k/a Neighbors Health System, LLC | Strategic Accounts Sales Agreement | 4/14/2016 | 5 years | 04/13/21 | 06/11/18 | 34 | Operations |
| ALSCO, Inc. Admiral Linen and Uniform Service, Inc. | Neighbors Legacy Holdings, Inc. d/b/a Neighbors Emergency Center or Neighbors Health, LLC d/b/a Neighbors Emergency Center | Linen and/or Uniform Rental Service Agreement | 11/19/2015 | 36 months | 11/18/18 | 06/11/18 | 5 | Operations |
| ARC Houston Healthcare, DST | NEC Yorktown Emergency Center, LP f/k/a NEC Yorktown Emergency Center, LLC | Lease Agreement | 11/14/2013 | 15 years | 10/31/2029 | 06/11/18 | 136 | Facility Leases |
| AT&T | Neighbors Health, LLC | Phone Services Contract ID - 8550343 AT&T Fiber Broadband Bundle Express Agreement | 9/28/2017 | 2 years | 9/27/2019 | 06/11/18 | 15 | IT |
| BBVA Compass Financial Corporation | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 00529-0003 Del Medical Digital U-arm, Mindray DPM CS, Mindray M7 Dicom, Central Station Network of Hardwi, GS LS 16 Used Tube | 04/01/15 | 60 months | 04/01/20 | 06/11/18 | 21 | Equipment Leases |
| BeaconMedaes, LLC | NEC Yorktown Emergency Center, LP | Service Quotation: BTSBK17-0091-00 Medical Gas Preventative Plan Quote Summary | 9/28/2017 | 1 year | 09/27/18 | 06/11/18 | 3 | Operations |
| Clear Channel Outdoor | Neighbors Health, LLC and NEC Yorktown Emergency Center, LP | Contract for Outdoor Advertising | 3/26/2018 | 13- 4 week campaigns | 3/25/2019 | 06/11/18 | 9 | Marketing |
| Clear Channel Outdoor | Neighbors Health, LLC and NEC Yorktown Emergency Center, LP | Contract for Outdoor Advertising | 6/19/2017 | 15-4 week campaigns | 8/12/2018 | 06/11/18 | 2 | Marketing |
| Clinical Diagnostic Solutions, Inc. | NEC Yorktown Emergency Center, LP | Service Support Agreement for the Medonic Series Hematology Analyzer | 1/8/2018 | 1 year | 1/7/2019 | 06/11/18 | 6 | Clinical |
| DataVox, Inc. | NEC Yorktown Emergency Center, LP d/b/a Neighbors Emergency Center | 998668 Toshiba Telephone System | 02/18/15 | 48 months | 02/18/19 | 06/11/18 | 8 | Equipment Leases |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerly All Points Solution, Inc. d/b/a 3i International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41262155 (2) Xerox WC 3655, (1) Xerox WC6655, (1) Xerox Phaser 3325, (1) Xerox Phaser 3320 (2) 097s40625 | 11/14/15 | 63 months | 02/14/21 | 06/11/18 | 32 | Equipment Leases |
| GAMMA Waste Systems, LLC | NEC Yorktown Emergency Center, LP d/b/a Neighbors Emergency Center (erroneously referred to as "NEC 24-Copperfield Emergency Center") | Service Agreement | 10/24/2014 | 60 months | 10/23/19 | 06/11/18 | 16 | Operations |
| Medicus Laboratory Information Systems | NEC Yorktown Emergency Center, LP | Annual Software Support Agreement | 7/20/2017 | 1 year | 7/19/2018 | 06/11/18 | 1 | Clinical |
| Medicus Laboratory Information Systems | NEC Yorktown Emergency Center, LP | Annual Software Support Agreement | 7/21/2018 | 1 year | 7/20/2019 | 06/11/18 | 13 | Clinical |
| Megan Anderson | NEC Yorktown Emergency Center, LP | Consultant Pharmacist Service Agreement | 10/9/2015 | Until terminated | Until terminated | 06/11/18 | Until terminated | Clinical |
| Multiplan, Inc. | Neighbors Physician Group, PLLC ("Neighbors Emergency Center" is assumed name) | MPI Participating Ancillary Agreement | 2/15/2016 | 1 year | 02/14/19 | 06/11/18 | 8 | NPM |
| Novarad Corporation | Neighbors Health, LLC | Customer License Agreement | 6/23/2017 | 3 years | 6/22/2020 | 06/11/18 | 24 | Radiology |
| Omnicell, Inc. | NEC Yorktown Emergency Center, LP | Quote - 43892 | 6/1/2018 | 12 months | 5/31/2019 | 06/11/18 | 11 | Operations |
| Passport Health Communications, Medical Present Value Inc. and Search America Inc. (collectively referred as "Experian Health") | NEC Yorktown Emergency Center, LP | Presido End User Agreement | 9/22/2017 | 36 months | 09/21/20 | 06/11/18 | 27 | NPM |
| ProStar Services, Inc d/b/a Parks Coffee | NCE Yorktown Emergency Center, LP d/b/a Neighbors Emergency Center | Equipment Agreement & Customer Information Account: 22924 Brand/Model/Serial: Keurig, B-3000, F0113351 | 11/3/2014 | 1 year | 11/02/18 | 06/11/18 | 4 | Operations |

Attachment to Schedule 3.08(a)
Contracts (Yorktown)

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Department |
|---|---|---|---|---|---|---|---|---|
| Protection One, a division of ADT, LLC | Neighbors Health, LLC | National Accounts Master Security Systems and Services Agreement - Multi-Location | 12/18/2017 | 5 years | 12/17/22 | 06/11/18 | 54 | Operations |
| Roshal Imaging Services, Inc. | NEC Yorktown Emergency Center, LP | Professional Services Agreement | 10/13/2014 | 3 years | 10/12/2018 | 06/11/18 | 4 | Radiology |
| Southwest Precision Printers, LLC | Neighbors Health, LLC | Agreement | 5/1/2016 | 2 years | 5/1/2019 | 06/11/18 | 10 | Marketing |
| T-System, Inc. | Neighbors Health, LLC | Site Opt-In Agreement | 7/22/2015 | 5 years | 07/21/20 | 06/11/18 | 25 | Clinical |
| UpToDate, Inc. | Neighbors Health, LLC | Contract No: 001-00-38997449 | 6/1/2016 | 1 year subscription | 08/31/18 | 06/11/18 | 2 | Clinical |
| Ventus Wireless, LLC | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | Managed Services Agreement 4G LTE | 9/18/2015 | 2 years | 9/17/2018 | 06/11/18 | 3 | IT |
| Waste Management, Inc. | NEC Yorktown Emergency Center, LP d/b/a Neighbors Emergency Center | WM Agreement # S0005082175 | 10/7/2014 | 3 Years | 10/06/18 | 06/11/18 | 3 | Operations |
| West Houston Radiology Associates, LLP | Neighbors Health, LLC d/b/a Neighbors Emergency Center | Professional Services Agreement | 7/9/2017 | Until terminated | Until terminated | 06/11/18 | Until terminated | Radiology |
| West Physics Consulting, LLC | Neighbors Health, LLC | Physics Service Agreement | 1/18/2017 | 3 years | 1/7/2020 | 06/11/18 | 18 | Radiology |
| Wolters Kluwer Clinical Drug Information, Inc. | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | Wolters Kluwer Clinical Drug Information Software License Agreement | 6/15/2015 | 3 years | 6/14/2018 | 06/11/18 | 0 | Clinical |

Attachment to Schedule 3.08(a)
Midland

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Comments | Department |
|---|---|---|---|---|---|---|---|---|---|
| Admiral Linen Service, Inc. | Neighbors Legacy Holdings, Inc. d/b/a Neighbors Emergency Center or Neighbors Health, LLC d/b/a Neighbors Emergency Center | Rental Agreement | 11/4/2015 | 5 years | 11/03/20 | 08/31/18 | 26 | Automatic renewal for successive 5 year periods unless notified in writing by customer 60 days in advance of the expiration of the then current term that customer does not wish to renew. | Operations |
| Airgas, Inc. | Neighbors Health, LLC f/k/a Neighbors Health System, LLC | Strategic Accounts Sales Agreement | 4/14/2016 | 5 years | 04/13/21 | 08/31/18 | 31 | Automatic renewal thereafter for successive one year terms. | Operations |
| ALSCO, Inc. Admiral Linen and Uniform Service, Inc. | Neighbors Legacy Holdings, Inc. d/b/a Neighbors Emergency Center or Neighbors Health, LLC d/b/a Neighbors Emergency Center | Linen And/Or Uniform Rental Service Agreement | 11/19/2015 | 36 months | 11/18/18 | 08/31/18 | 2 | Automatic renewal for consecutive 12 months periods thereafter unless either party gives the termination notice. | Operations |
| AT&T | Neighbors Health, LLC | Phone services Contract ID - 8550343 AT&T Fiber Broadband Bundle Express Agreement | 9/28/2017 | 2 years | 9/27/2019 | 08/31/18 | 12 | Autorenewal month-to-month until terminated with 30 days notice. | IT |
| BeaconMedaes, LLC | NEC Midland Emergency Center, LP | Service Quotation: BT5BK17-0054-00 Medical Gas Preventative Plan Quote Summary | 9/28/2017 | 1 year | 09/27/18 | 08/31/18 | 0 | The agreement can be cancelled by either party with 30 days written notice. I used the signing date as the "start date" / effective date. | Operations |
| Clinical Diagnostic Solutions, Inc. | NEC Midland Emergency Center, LP | Service Support Agreement for the Medonic Series Hematology Analyzer | 11/7/2017 | 1 year | 11/7/2018 | 08/31/18 | 2 | | Clinical |
| DataVox, Inc. | NEC Midland Emergency Center, LP | 025-1077636-000 Toshiba Telephone System | 08/08/15 | 48 months | 08/08/19 | 08/31/18 | 11 | | Equipment Leases |
| Ector County Hospital District d/b/a Medical Center Hospital | NEC Midland Emergency Center, LP d/b/a Neighbors Emergency Center | Laboratory Services Agreement | 9/1/2017 | 1 year | 08/31/18 | 08/31/18 | 0 | Automatic renewal for additional one (1) year terms. | Clinical |
| GAMMA Waste Systems, LLC | NEC Midland Emergency Center, LP (erroneolsly referred to as "NEC 24-Midland") | Service Agreement | 8/3/2015 | 60 months | 08/02/20 | 08/31/18 | 23 | Medical Waste Services. Automatic renewal for the same period, unless cancelled by a written notice 30 days prior to the expiration. | Operations |
| Midland County Hospital District d/b/a Midland Memorial Hospital | NEC Midland Emergency Center, LP | Laboratory Services Agreement | 9/1/2017 | 1 year | 08/31/18 | 08/31/18 | 0 | Automatic renewal for additional one (1) year terms. | Clinical |
| Midland Rockhounds Professional Club | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. OR Neighbors Health, LLC f/k/a Neighbors Health System, LLC (erroneously referred to as "Neighbors Health Systems") | Advertising Contract | 10/1/2015 | 3 years | 9/30/2018 | 08/31/18 | 0 | 2015-2018. Sponsorship stadium scoreboard and sponsorship nights. This contract is non-cancelable. | Marketing |
| Nathaniel Ehni | NEC Midland Emergency Center, LP | Consultant Pharmacist Service Agreement | 9/5/2015 | Until terminated | Until terminated | 08/31/18 | Until terminated | Contract continues until terminated by either party  with at least 30 days advanced written notice of termination. | Clinical |
| Novarad Corporation | Neighbors Health, LLC | Customer License Agreement | 6/23/2017 | 3 years | 6/22/2020 | 08/31/18 | 21 | Renewed automatically for 1 year if not terminated.  Used signing date as effective date. | Radiology |
| Omnicell, Inc. | NEC Midland Emergency Center, LP | Quote - 43896 | 6/1/2018 | 12 months | 5/31/2019 | 08/31/18 | 9 | | Operations |
| Passport Health Communications, Medical Present Value Inc. and Search America Inc. (collectively referred to as "Experian Health") | NEC Midland Emergency Center, LP | Presido End User Agreement | 11/14/2017 | 36 months | 11/13/20 | 08/31/18 | 26 | Automatically renewal for unlimited number of 12 month periods. Terminated by either party with a 90 day written termination notice. | NPM |
| ProStar Services, Inc. d/b/a Parks Coffee | NEC Midland Emergency Center, LP | Equipment Agreement & Customer Information Account: 25437 Brand/Model/Serial: Keurig, B-150, M0019560; and Brand/Model/Serial: Newco,  20:1LP3, NB00002749 | 9/26/2015 | 1 year | 09/25/18 | 08/31/18 | 0 | Automatically renewed each year thereafter in successive one year terms, unless ProStar notified 30 days prior to the anniversary date of their intent to terminate. Unsigned contract, unknown effective date. Assumed the opening date of the facility to be effective date. | Operations |
| Protection One, a division of ADT, LLC | Neighbors Health, LLC | National Accounts Master Security Systems and Services Agreement - Multi-Location | 12/18/2017 | 5 years | 12/17/22 | 08/31/18 | 51 | Automatic renewal for successive one year, unless terminated. | Operations |
| Republic Waste Services of Texas, Ltd. | NEC Midland Emergency Center, LP d/b/a Neighbors Emergency Center | Agreement Number : A15546995 Account Number : 888-1009347 Customer Service Agreement | 9/26/2015 | 36 months | 9/25/2018 | 08/31/18 | 0 | Automatic renewal thereafter for additional terms of 36 months unless terminated. Used opening date as effective date because illegible. | Operations |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC | 1-MHACK1 - Multix Fusion Digital Service Quote Nr: 1-L358YF Rev 2 Service Agreement: Silver Contract | 1/8/2018 | 7 years | 1/7/2025 | 08/31/18 | 76 | | Radiology |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC | 1-MH82GE - Somatom Scope Service Quote Nr: 1-L3QHPC Rev 2 Service Agreement : Gold contract | 1/8/2018 | 7 years | 1/7/2025 | 08/31/18 | 76 | | Radiology |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC | 1-MGV4GH-P300 Service Quote Nr: 1-L3MS32 Rev 2 Service Agreement -Gold contract | 3/1/2018 | 7 years | 2/28/2025 | 08/31/18 | 77 | Facility -Midland | Radiology |

Attachment to Schedule 3.08(a)
Midland

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Comments | Department |
|---|---|---|---|---|---|---|---|---|---|
| Southwest Precision Printers, LLC | Neighbors Health, LLC | Agreement | 5/1/2016 | 2 years | 5/1/2019 | 08/31/18 | 8 | Agreement expires on 04/30/2018. Agreement renews automatically for 1 year, unless reviewed and a new contract is signed. Southwest Precision Printer are the current owners. They bought the business from Page/International Communications, a division of Nationwide Argosy Solutions, LLC, Inc. The agreement can be terminated by either party, for any reason, upon 60 days advanced written notice to the non-terminating party. | Marketing |
| Spirit MTA REIT, L.P. | NEC Midland Emergency Center, LP | Lease Agreement | 11/20/2014 | 12 years | 09/30/27 | 08/31/18 | 108 | Lease expires on 09/30/2027. | Facility Lease |
| The Lamar Companies | Neighbors Health, LLC and NEC Midland Emergency Center, LP | Contract # 2818999 | 7/3/2017 | 13 weeks- 4 week campaigns | 7/1/2018 | 08/31/18 | #NUM! | Billboards -7410. Contract can be cancelled 60 days out from the start date and the customer will be responsible for the next two billing periods. | Marketing |
| The Lamar Companies | Neighbors Health, LLC and NEC Midland Emergency Center, LP | Contract # 2818999 | 7/6/2018 | 3 weeks- 4 week campaigns | 10/7/2018 | 08/31/18 | 1 | Billboards - 64.  Contract can be cancelled 60 days out from the start date and the customer will be responsible for the next two billing periods. | Marketing |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerly All Points Solution, Inc. d/b/a 3i International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41262040 (1) Xerox WC6655XM, (2) Xerox WorkCenter 5335, (1) Xerox 3325DN, (1) Xerox Phaser 3320DNI | 11/14/15 | 63 months | 02/14/21 | 08/31/18 | 29 | Undisputed. Used Commencement Date provided by EverBank. | Equipment Leases |
| T-System, Inc. | Neighbors Health, LLC | Site Opt-In Agreement | 8/11/2015 | 5 years | 08/10/20 | 08/31/18 | 23 | 5 years Automatic renewal, until terminated. | Clinical |
| UpToDate, Inc. | Neighbors Health, LLC | Contract No: 001-00-38997449 | 6/1/2016 | 1 year subscription | 08/31/18 | 08/31/18 | 0 | Original subscription effective from 06/01/2016 to 5/31/2017. Addendum No: 001-00-38997449 entered on June 1, 2016 extended subscription from 06/01/2017 to 5/31/2018.  Amendment entered on May 17, 2018 extended subscription from 06/01/2018 to 8/31/2018. | Clinical |
| Ventus Wireless, LLC | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | Managed Services Agreement 4G LTE | 9/18/2015 | 2 years | 9/17/2018 | 08/31/18 | 0 | Automatic Renewal for additional 1 year terms unless terminated [Evergreen Agreement]. | IT |
| Wells Fargo Equipment Finance, Inc. | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 001-0459248-101 Siemens Medical Equipment: (1) Somatom Scope CT(1) Acuson P300 Ultra Sound System and (1) Multix Fusion - Digital X-Ray | 09/21/15 | 60 months | 09/21/20 | 08/31/18 | 24 | "Rent Commencement Date" blank so used Supplement date for Beginning Term. | Equipment Leases |
| West Houston Radiology Associates, LLP | Neighbors Health, LLC d/b/a Neighbors Emergency Center | Professional Services Agreement | 7/9/2017 | Until terminated | Until terminated | 08/31/18 | Until terminated | Agreement continues until terminated by either party , or by mutual agreement. | Radiology |
| West Physics Consulting, LLC | Neighbors Health, LLC | Physics Service Agreement | 1/18/2017 | 3 years | 1/7/2020 | 08/31/18 | 16 | Contract automatically renewed thereafter for successive for 3 years unless terminated by either party. | Radiology |
| Windstream | Neighbors Health, LLC f/k/a Neighbors Health System, LLC | Ethernet internet bundle Proposal | 8/5/2015 | 36 months | 8/23/2018 | 08/31/18 | #NUM! | Automatically renews for successive one year terms until terminated. | IT |

6718347v1

Page 2 of 2

Attachment to Schedule 3.08(a)
Odessa

| Vendor/Lessor | | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Comments | Department |
|---|---|---|---|---|---|---|---|---|---|
| Admiral Linen Service, Inc. | Neighbors Legacy Holdings, Inc. d/b/a Neighbors Emergency Center or Neighbors Health, LLC d/b/a Neighbors Emergency Center | Rental Agreement | 11/4/2015 | 5 years | 11/03/20 | 08/31/18 | 26 | Automatic renewal for successive 5 year periods unless notified in writing by customer 60 days in advance of the expiration of the then current term that customer does not wish to renew. | Operations |
| Airgas, Inc. | Neighbors Health, LLC f/k/a Neighbors Health System, LLC | Strategic Accounts Sales Agreement | 4/14/2016 | 5 years | 04/13/21 | 08/31/18 | 31 | | Operations |
| ALSCO, Inc. Admiral Linen and Uniform Service, Inc. | Neighbors Legacy Holdings, Inc. d/b/a Neighbors Emergency Center or Neighbors Health, LLC d/b/a Neighbors Emergency Center | Linen And/Or Uniform Rental Service Agreement | 11/19/2015 | 36 months | 11/18/18 | 08/31/18 | 2 | Automatic renewal for consecutive 12 months periods thereafter unless either party gives the termination notice. | Operations |
| AT&T | Neighbors Health, LLC | Phone services Contract ID - 8550343 AT&T Fiber Broadband Bundle Express Agreement | 9/28/2017 | 2 years | 9/27/2019 | 08/31/18 | 12 | Autorenewal month-to-month until terminated with 30 days notice. | IT |
| BeaconMedaes, LLC | NEC Odessa Emergency Center, LP | Service Quotation: BTSBK17-0051-00 Medical Gas Preventative Plan Coverage Summary | 9/28/2017 | 1 year | 09/27/18 | 08/31/18 | 0 | The agreement can be cancelled by either party with 30 days written notice. I used the signing date as the "start date" / effective date. | Operations |
| Cable ONE Business Services | NEC Odessa Emergency Center, LP d/b/a Neighbors Emergency Center | Account - 2340600273101 Business Services Agreement 2 Fax lines, D3 Enterprise, D3 Statics Ips, Installation and Business News Information | 8/24/2015 | 3 years | 8/23/2018 | 08/31/18 | #NUM! | Telephone and Data Services provided | IT |
| Cecilia Brown | NEC Odessa Emergency Center, LP | Lease Agreement | 2/10/2015 | 12 years | 12/31/2027 | 08/31/18 | 112 | Commencement Date is the earlier of 150 days after the delivery date or the date Tenant opens for business in the building. | Facility Lease |
| Central Bank of St. Louis (formerly TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. and All Points Solution, Inc. d/b/a 3i International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41261960 Various IT products | 09/25/15 | 63 months | 12/25/20 | 08/31/18 | 27 | Disputed. Used signing date on page 8 of the agreement. | Equipment Leases |
| Clinical Diagnostic Solutions, Inc. | NEC Odessa Emergency Center, LP | Service Support Agreement for the Medonic Series Hematology Analyzer | 1/16/2018 | 1 year | 1/15/2019 | 08/31/18 | 4 | | Clinical |
| DataVox, Inc. | NEC Odessa Emergency Center, LP | 010-1095182-000 Toshiba Telephone System | 10/26/15 | 48 months | 10/26/19 | 08/31/18 | 13 | | Equipment Leases |
| Frontier Utilities | NEC Odessa Emergency Center, LP (erroneously referred to as "Neighbors Emergency Center, LLC") | Enrollment Authorization Quote # Q146719 Commercial (Texas) - Fixed Rate Plan | 5/6/2016 | 5 years | 05/03/21 | 08/31/18 | 32 | Address: 2731 N GRANDVIEW AVE UNIT CNTR ODESSA TX 79762-6952 Fixed Energy | Operations |
| Frontier Utilities | NEC Odessa Emergency Center, LP (erroneously referred to as "Neighbors Emergency Center, LLC") | Enrollment Authorization Quote # Q146719 Commercial (Texas) - Fixed Rate Plan | 5/6/2016 | 5 years | 05/03/21 | 08/31/18 | 32 | Address: 2731 N GRANDVIEW AVE HLTS 2 ODESSA TX 79762-6952 Fixed Energy | Operations |
| GAMMA Waste Systems, LLC | NEC Odessa Emergency Center, LP (erroneously referred to as "NEC 24 - Odessa") | Service Agreement | 1/6/2016 | 60 months | 01/05/20 | 08/31/18 | 16 | Medical Waste Services. Automatic renewal for the same period, unless cancelled by a written notice 30 days prior to the expiration. | Operations |
| Medicus Laboratory Information Systems | NEC Odessa Emergency Center, LP | Annual Software Support Agreement | 12/17/2017 | 1 year | 12/16/2018 | 08/31/18 | 3 | | Clinical |
| Nathaniel Ehni | NEC Odessa Emergency Center, LP | Consultant Pharmacist Service Agreement | 12/19/2015 | Until terminated | Until terminated | 08/31/18 | Until terminated | Contract continues until terminated by either party with at least 30 days advanced written notice of termination. | Clinical |
| Novarad Corporation | Neighbors Health, LLC | Customer License Agreement | 6/23/2017 | 3 years | 6/22/2020 | 08/31/18 | 21 | Renewed automatically for 1 year if not terminated. Used signing date as effective date. | Radiology |
| Omnicell, Inc. | NEC Odessa Emergency Center, LP | Quote - 43897 | 6/1/2018 | 12 months | 5/31/2019 | 08/31/18 | 9 | | Operations |
| Passport Health Communications, Medical Present Value Inc. and Search America Inc. (collectively referred to as "Experian Health") | NEC Odessa Emergency Center, LP | Presido End User Agreement | 11/14/2017 | 36 months | 11/13/20 | 08/31/18 | 26 | Automatically renewal for unlimited number of 12 month periods. Terminated by either party with a 90 day written termination notice. | NPM |
| ProStar Services, Inc. d/b/a Parks Coffee | NEC Odessa Emergency Center, LP d/b/a Neighbors Emergency Center | Equipment Agreement & Customer Information Account: 25924 Brand/Model/Serial: Keurig, B-150, M0071250; and Brand/Model/Serial: Newco, 20:1LP3, NB00003019 | 12/15/2015 | 1 year | 12/14/18 | 08/31/18 | 3 | Automatically renewed each year thereafter in successive one year terms, unless ProStar notified 30 days prior to the anniversary date of their intent to terminate. | Operations |
| Protection One, a division of ADT, LLC | Neighbors Health, LLC | National Accounts Master Security Systems and Services Agreement - Multi-Location | 12/18/2017 | 5 years | 12/17/22 | 08/31/18 | 51 | Automatic renewal for successive one year, unless terminated. | Operations |
| Republic Waste Services of Texas, Ltd. | NEC Odessa Emergency Center, LP d/b/a Neighbors Emergency Center | Agreement Number : A15741968 Account Number : 688-1009748 Customer Service Agreement | 12/19/2015 | 36 months | 12/18/2018 | 08/31/18 | 3 | Automatic renewal thereafter for additional terms of 36 months unless terminated. Used opening date as effective date because illegible. | Operations |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC | 1-MHACK1 - Multix Fusion Digital Service Quote Nr: 1-L358YF Rev 2 Service Agreement: Silver Contract | 1/8/2018 | 7 years | 1/7/2025 | 08/31/18 | 76 | | Radiology |

Attachment to Schedule 3.08(a)
Odessa

| Vendor/Lessor | | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Comments | Department |
|---|---|---|---|---|---|---|---|---|---|
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC | 1-MH82GE - Somatom Scope Service Quote Nr: 1-L3QHPC Rev 2 Service Agreement : Gold contract | 1/8/2018 | 7 years | 1/7/2025 | 08/31/18 | 76 | | Radiology |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC | 1-MGV4GH-P300 Service Quote Nr: 1-L3MS32 Rev 2 Service Agreement -Gold contract | 1/8/2018 | 7 years | 1/7/2025 | 08/31/18 | 76 | | Radiology |
| Southwest Precision Printers, LLC | Neighbors Health, LLC | Agreement | 5/1/2016 | 2 years | 5/1/2019 | 08/31/18 | 8 | Agreement expires on 04/30/2018. Agreement renews automatically for 1 year, unless reviewed and a new contract is signed. Southwest Precision Printer are the current owners. They bought the business from Page/International Communications, a division of Nationwide Argosy Solutions, LLC, Inc. The agreement can be terminated by either party, for any reason, upon 60 days advanced written notice to the non-terminating party. | Marketing |
| The Lamar Companies | Neighbors Health, LLC and NEC Odessa Emergency Center, LP | Contract # 2830930 | 10/23/2017 | 13 weeks- 4 week campaigns | 10/21/2018 | 08/31/18 | 1 | Billboards - 300.  Contract can be cancelled 60 days out from the start date and the customer will be responsible for the next two billing periods. | Marketing |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerely All Points Solution, Inc. d/b/a 3i International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41262033 (1) Xerox WC6655XM, (2) Xerox WC3655X (1) Xerox 3325DN, (1) Xerox Phaser 3320DNI | 11/14/15 | 63 months | 02/14/21 | 08/31/18 | 29 | Undisputed. Used Commencement Date provided by EverBank. | Equipment Leases |
| T-System, Inc. | Neighbors Health, LLC | Site Opt-In Agreement | 10/15/2015 | 5 years | 10/14/20 | 08/31/18 | 25 | 5 years Automatic renewal, until terminated. | Clinical |
| UpToDate, Inc. | Neighbors Health, LLC | Contract No: 001-00-38997449 | 6/1/2016 | 1 year subscription | 08/31/18 | 08/31/18 | 0 | Original subscription effective from 06/01/2016 to 5/31/2017. Addendum No: 001-00-38997449 entered on June 1, 2016 extended subscription from 06/01/2017 to 5/31/2018. Amendment entered on May 17, 2018 extended subscription from 06/01/2018 to 8/31/2018. | Clinical |
| Ventus Wireless, LLC | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | Managed Services Agreement 4G LTE | 9/18/2015 | 2 years | 9/17/2018 | 08/31/18 | 0 | Automatic Renewal for additional 1 year terms unless terminated [Evergreen Agreement]. | IT |
| Wells Fargo Equipment Finance, Inc. | Neighbors Legacy Holdings, Inc. | 459248-103 Siemens Medical Equipment: (1) Somatom Scope CT(1) Acuson P300 Ultra Sound System and (1) Multix Fusion - Digital X-Ray | 12/02/15 | 60 months | 12/02/20 | 08/31/18 | 27 | "Rent Commencement Date" blank so used Supplement date for Beginning Term | Equipment Leases |
| West Houston Radiology Associates, LLP | Neighbors Health, LLC d/b/a Neighbors Emergency Center | Professional Services Agreement | 7/9/2017 | Until terminated | Until terminated | 08/31/18 | Until terminated | Agreement continues until terminated by either party , or by mutual agreement. | Radiology |
| West Physics Consulting, LLC | Neighbors Health, LLC | Physics Service Agreement | 1/18/2017 | 3 years | 1/7/2020 | 08/31/18 | 16 | Contract automatically renewed thereafter for successive for 3 years unless terminated by either party. | Radiology |

Attachment to Schedule 3.08(a)
Texarkana

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Comments | Department |
|---|---|---|---|---|---|---|---|---|---|
| Admiral Linen Service, Inc. | Neighbors Legacy Holdings, Inc. d/b/a Neighbors Emergency Center or Neighbors Health, LLC d/b/a Neighbors Emergency Center | Rental Agreement | 11/4/2015 | 5 years | 11/03/20 | 08/31/18 | 26 | Automatic renewal for successive 5 year periods unless notified in writing by customer 60 days in advance of the expiration of the then current term that customer does not wish to renew. | Operations |
| Airgas, Inc. | Neighbors Health, LLC f/k/a Neighbors Health System, LLC | Strategic Accounts Sales Agreement | 4/14/2016 | 5 years | 04/13/21 | 08/31/18 | 31 | Automatic renewal thereafter for successive one year terms. | Operations |
| ALSCO, Inc. Admiral Linen and Uniform Service, Inc. | Neighbors Legacy Holdings, Inc. d/b/a Neighbors Emergency Center or Neighbors Health, LLC d/b/a Neighbors Emergency Center | Linen And/Or Uniform Rental Service Agreement | 11/19/2015 | 36 months | 11/18/18 | 08/31/18 | 2 | Automatic renewal for consecutive 12 months periods thereafter unless either party gives the termination notice. | Operations |
| BBVA Compass Financial Corporation | Neighbors Global Holdings, LLC | 00619-0009 System Multix Fusion wi-D YMAT, Somatom Scope, P300 Ultrasound System | 09/01/16 | 60 months | 09/01/21 | 08/31/18 | 36 | Lease Beginning and Ending Term obtained from BBVA SLV schedule provided by BBVA. | Equipment Leases |
| BeaconMedaes, LLC | NEC Texarkana Emergency Center, LP | Service Quotation: BTSBK17-0044-00 Medical Gas Preventative Plan Quote Summary | 9/28/2017 | 1 year | 09/27/18 | 08/31/18 | 0 | The agreement can be cancelled by either party with 30 days written notice. I used the signing date as the "start date" / effective date. | Operations |
| Cable ONE Business Services | NEC Texarkana Emergency Center d/b/a Neighbors Emergency Center | Account - 2345020000101 Business Services Agreement <br><br> D3 Enterprise, D3 Statics Ips, Installation and Business News Information | 4/11/2016 | 3 years | 4/10/2019 | 08/31/18 | 7 | | IT |
| Central Bank of St. Louis (formerly TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. and All Points Solution, Inc. d/b/a 3i International) | Neighbors Global Holdings, LLC | 41404518 Various IT products | 07/31/16 | 63 months | 10/31/21 | 08/31/18 | 38 | Disputed. Used Commencement Date provided by EverBank. | Equipment Leases |
| Comcast Cable Communications Management, LLC | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. d/b/a Neighbors Emergency Center | MSA ID # TX-328093-MJUNG SO ID # TX-328093-MJUNG Comcast Enterprise Services Sales Order Form Internet and cable services | 7/18/2016 | 36 months | 7/17/2019 | 08/31/18 | 10 | | IT |
| DataVox, Inc. | NEC Texarkana Emergency Center, LP | 016-1145322-000 Toshiba Telephone System | 04/20/16 | 48 months | 04/20/20 | 08/31/18 | 19 | | Equipment Leases |
| David L. Osborn, Trustee of the Margaret M. Nobmann Family Trust, a California trust | NEC Texarkana Emergency Center, LP | Lease Agreement | 7/23/2015 | 12 years | 7/31/2028 | 08/31/18 | 119 | Commencement Date is the earlier of 150 days after the delivery date or the date Tenant opens for business in the building. Certificate of Commencement Date to be opening date of the center. Effective and ending date to be confirmed. | Facility Leases |
| Fairway Outdoor Funding, LLC | NEC Texarkana Emergency Center, LP and Neighbors Health LLC | Media Display Order | 3/26/2018 | 13 - 4 week campaigns | 3/25/2019 | 08/31/18 | 6 | Billboard - 1857.  This contract is non-cancelable by the Advertiser Agency, or by its successors or permitted assigns. | Marketing |
| LaSandra Winters | NEC Texarkana Emergency Center, LP | Consultant Pharmacist Service Agreement | 6/28/2016 | Until terminated | Until terminated | 08/31/18 | Until terminated | Contract continues until terminated by either party  with at least 30 days advanced written notice of termination. | Clinical |
| Medicus Laboratory Information Systems | NEC Texarkana Emergency Center, LP | Annual Software Support Agreement | 6/28/2017 | 1 year | 6/27/2018 | 08/31/18 | #NUM! | | Clinical |
| Medicus Laboratory Information Systems | NEC Texarkana Emergency Center, LP | Annual Software Support Agreement | 6/28/2018 | 1 year | 6/27/2019 | 08/31/18 | 9 | | Clinical |
| Novarad Corporation | Neighbors Health, LLC | Customer License Agreement | 6/23/2017 | 3 years | 6/22/2020 | 08/31/18 | 21 | Renewed automatically for 1 year if not terminated. Used signing date as effective date. | Radiology |
| Omnicell, Inc. | NEC Texarkana Emergency Center, LP | Quote - 43925 | 6/1/2018 | 12 months | 5/31/2019 | 08/31/18 | 9 | | Operations |
| Passport Health Communications, Medical Present Value Inc. and Search America Inc. (collectively referred to as "Experian Health") | NEC Texarkana Emergency Center, LP | Presido End User Agreement | 12/21/2017 | 36 months | 12/20/20 | 08/31/18 | 27 | Automatically renewal for unlimited number of 12 month periods. Terminated by either party with a 90 day written termination notice. | NPM |
| ProStar Services, Inc. d/b/a Parks Coffee | NEC Texarkana Emergency Center, LP d/b/a Neighbors Emergency Center | Equipment Agreement & Customer Information Account: 27579 Brand/Model/Serial: Keurig, B-150, M0059896; and Brand/Model/Serial: Keurig, B-150, J0080557 | 6/22/2016 | 1 year | 06/21/19 | 08/31/18 | 9 | Automatically renewed each year thereafter in successive one year terms, unless ProStar notified 30 days prior to the anniversary date of their intent to terminate. | Operations |
| Protection One, a division of ADT, LLC | Neighbors Health, LLC | National Accounts Master Security Systems and Services Agreement - Multi-Location | 12/18/2017 | 5 years | 12/17/22 | 08/31/18 | 51 | Automatic renewal for successive one year, unless terminated. | Operations |
| Reliance Mechanical Contractors | NEC Texarkana Emergency Center, LP | Preventative Maintenance Package | 12/18/2017 | 12 months | 12/17/18 | 08/31/18 | 3 | HVAC preventative maintenance program. Only Texarkana uses this service. Agreement continues unless terminated. | Operations |
| Roshal Imaging Services, Inc. | NEC Texarkana Emergency Center, LP | Professional Services Agreement | 7/1/2016 | 3 years | 6/30/2019 | 08/31/18 | 9 | Automatic renewal on year to year term, unless terminated by either party in writing prior to the expiration date. Number of days for cancelling the agreement not specified, must be terminated prior to the expiration date. | Radiology |

Attachment to Schedule 3.08(a)
Texarkana

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Comments | Department |
|---|---|---|---|---|---|---|---|---|---|
| Shipp Outdoor, LLC | NEC Texarkana Emergency Center, LP | Billboard Advertising Contract | 4/1/2018 | 13 - 4 week campaigns | 4/1/2019 | 08/31/18 | 7 | Digital - I504x416 72 DPI JPG. Automatic renewal with similar terms unless cancellation is received 60 days prior to the termination of this agreement. | Marketing |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC d/b/a Neighbors Emergency Center | 1-DD6B6O - Acuson NX3 Ultrasound System | 7/21/2016 | 36 months | 7/20/2019 | 8/31/2018 | 10 | New warranty for Acuson NX3 starts 07/21/19. | Radiology |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC | 1-MHACK1 - Multix Fusion Digital Service Quote Nr: 1-L358YF Rev 2 Service Agreement: Silver Contract | 6/10/2018 | 7 years | 6/9/2025 | 08/31/18 | 81 | | Radiology |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC | 1-MH82GE - Somatom Scope Service Quote Nr: 1-L3QHPC Rev 2 Service Agreement : Gold contract | 6/3/2018 | 7 years | 6/2/2025 | 08/31/18 | 81 | | Radiology |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC | 1-MGTRGU - Acuson NX3 Service Quote Nr: 1-L320QX Rev 3 Service Agreement - Performance Private Plan V2 | 7/21/2019 | 7 years | 7/20/2026 | 08/31/18 | 94 | | Radiology |
| Southwest Precision Printers, LLC | Neighbors Health, LLC | Agreement | 5/1/2016 | 2 years | 5/1/2019 | 08/31/18 | 8 | Agreement expires on 04/30/2018. Agreement renews automatically for 1 year, unless reviewed and a new contract is signed. Southwest Precision Printer are the current owners. They bought the business from Page/International Communications, a division of Nationwide Argosy Solutions, LLC, Inc. The agreement can be terminated by either party, for any reason, upon 60 days advanced written notice to the non-terminating party. | Marketing |
| Stericycle, Inc. | Neighbors Health, LLC | Multi-Site Service Agreement | 4/1/2017 | 36 months | 03/31/20 | 08/31/18 | 19 | Medical waste services. Automatic renewal for the same period, unless cancelled by a written notice 60 days prior to the expiration. | Operations |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerly All Points Solution, Inc. d/b/a 3I International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41336625 (1) Xerox WC5335, (+K104:K1062) Xerox WC3655X, (1) Xerox WC6655XM (1) Xerox 3325DN, (1) Xerox Phaser 3320DNI | 05/07/16 | 63 months | 08/07/21 | 08/31/18 | 35 | Undisputed. Used Commencement Date provided by EverBank. | Equipment Leases |
| T-System, Inc. | Neighbors Health, LLC | Site Opt-In Agreement | 12/15/2015 | 5 years | 12/14/20 | 08/31/18 | 27 | 5 years Automatic renewal, until terminated. | Clinical |
| Unifi Equipment Finance, Inc. (formerly TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. and All Points Solution, Inc. d/b/a 3I International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41336614 Various IT Products | 05/01/16 | 63 months | 08/01/21 | 08/31/18 | 35 | Disputed. Used Commencement Date provided by EverBank. | Equipment Leases |
| UpToDate, Inc. | Neighbors Health, LLC | Contract No: 001-00-38997449 | | 6/1/2018 1 year subscription | 08/31/18 | 08/31/18 | 0 | Original subscription effective from 06/01/2016 to 5/31/2017. Addendum No: 001-00-38997449 entered on June 1, 2016 extended subscription from 06/01/2017 to 5/31/2018. Amendment entered on May 17, 2018 extended subscription from 06/01/2018 to 8/31/2018. | Clinical |
| Ventus Wireless, LLC | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | Managed Services Agreement 4G LTE | 9/18/2015 | 2 years | 9/17/2018 | 08/31/18 | 0 | Automatic Renewal for additional 1 year terms unless terminated [Evergreen Agreement]. | IT |
| West Houston Radiology Associates, LLP | Neighbors Health, LLC d/b/a Neighbors Emergency Center | Professional Services Agreement | 7/9/2017 | Until terminated | Until terminated | 08/31/18 | Until terminated | Agreement continues until terminated by either party , or by mutual agreement. | Radiology |
| West Physics Consulting, LLC | Neighbors Health, LLC | Physics Service Agreement | 1/18/2017 | 3 years | 1/7/2020 | 08/31/18 | 16 | Contract automatically renewed thereafter for successive for 3 years unless terminated by either party. | Radiology |

Attachment to Schedule 3.08(a)
Paris

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Comments | Department |
|---|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | Neighbors Health, LLC f/k/a Neighbors Health System, LLC | Strategic Accounts Sales Agreement | 4/14/2016 | 5 years | 04/13/21 | 08/31/18 | 31 | Automatic renewal thereafter for successive one year terms. | Operations |
| Aramark Uniform Services, a division of Aramark Uniform & Career Apparel, LLC | NEC Paris Emergency Center, LP | Service Agreement | 6/21/2017 | 60 months | 06/20/22 | 08/31/18 | 45 | Automatic renewal for the same term, unless either party terminates the agreement. | Operations |
| AT&T | Neighbors Health, LLC | Phone services Contract ID - 8550343 AT&T Fiber Broadband Bundle Express Agreement | 9/28/2017 | 2 years | 9/27/2019 | 08/31/18 | 12 | Autorenewal month-to-month until terminated with 30 days notice. | IT |
| BeaconMedaes, LLC | NEC Paris Emergency Center, LP | Service Quotation: BTSBK18-0010-00 Medical Gas Preventative Plan Quote Summary | 1/23/2018 | 1 year | 01/22/19 | 08/31/18 | 4 | The agreement can be cancelled by either party with 30 days written notice. I used the signing date as the "start date" / effective date. | Operations |
| Clinical Diagnostic Solutions, Inc. | NEC Paris Emergency Center, LP | Service Support Agreement for the Medonic Series Hematology Analyzer | 6/1/2018 | 1 year | 5/31/2019 | 08/31/18 | 9 | | Clinical |
| Comcast Cable Communications Management, LLC | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. d/b/a Neighbors Emergency Center | MSA ID # TX-328093-MJUNG SO ID # TX-328093-MJUNG-7073816 Comcast Enterprise Services Sales Order Form Internet and cable services | 9/1/2016 | 36 months | 8/31/2019 | 08/31/18 | 12 | | IT |
| DiscoverOUTDOOR.com LP | NEC Paris Emergency Center, LP | Bulletin Contract | 6/1/2018 | 12 months | 5/31/2019 | 08/31/18 | 9 | Billboard - Hwy 82 (renewal). Contract is renewed or cancelled in writing no less than 60 days prior to expiration. | Marketing |
| Frontier Utilities | NEC Paris Emergency Center, LP d/b/a Neighbors Emergency Center | Enrollment Authorization Quote # Q213150 Commercial (Texas) - Fixed Rate Plan | 12/7/2016 | 4 years and 6 months | 06/07/21 | 08/31/18 | 33 | Fixed Energy | Operations |
| NEC Central Texas Healthcare Management, LLC | NEC Paris Emergency Center, LP | Management and Administrative Services Agreement | 9/15/2017 | Until terminated | Until terminated | 08/31/18 | Until terminated | Evergreen Agreement, until terminated by either party. The terminating party must provide written notice to the non-terminating party not less than 90 days prior to the next succeeding anniversary of the Effective Date. | Management |
| Neighbors Health, LLC | NEC Paris Emergency Center, LP | Amended and Restated Management and Administrative Services Agreement | 5/13/2016 | Until terminated | Until terminated | 08/31/18 | Until terminated | Evergreen Agreement, until terminated by either party. The terminating party must provide written notice to the non-terminating party not less than 90 days prior to the next succeeding anniversary of the Effective Date. | Management |
| Novarad Corporation | Neighbors Health, LLC | Customer License Agreement | 6/23/2017 | 3 years | 6/22/2020 | 08/31/18 | 21 | Renewed automatically for 1 year if not terminated. Used signing date as effective date. | Radiology |
| Omnicell, Inc. | NEC Paris Emergency Center, LP | Quote - 43933 | 6/1/2018 | 12 months | 5/31/2019 | 08/31/18 | 9 | | Operations |
| Passport Health Communications, Medical Present Value Inc. and Search America Inc. (collectively referred to as "Experian Health") | NEC Paris Emergency Center, LP | Presido End User Agreement | 10/30/2017 | 36 months | 10/29/20 | 08/31/18 | 25 | Automatically renewal for unlimited number of 12 month periods. Terminated by either party with a 90 day written termination notice. | NPM |
| Primary Media | Neighbors Health, LLC and NEC Paris Emergency Center, LP | Contract for Outdoor Advertising | 6/14/2018 | 13 - 4 week campaigns | 6/12/2019 | 08/31/18 | 9 | Billboards - 643B.1, 648A.1. . This contract can be cancelled at anytime with a written 90 day notice. | Operations |
| ProStar Services, Inc. d/b/a Parks Coffee | NEC Paris Emergency Center, LP d/b/a Neighbors Emergency Center | Equipment Agreement & Customer Information Account: 26386 Brand/Model/Serial: Keurig, B-150, M0152398; and Brand/Model/Serial: Bloomfield, 8572, 11I4754 | 6/7/2017 | 1 year | 06/06/19 | 08/31/18 | 9 | Automatically renewed each year thereafter in successive one year terms, unless ProStar notified 30 days prior to the anniversary date of their intent to terminate. The contract does not have Lessee name. Considered the Lessee to be same as other facilities. The Lessee name confirmed by Christina Moore. | Operations |
| Protection One, a division of ADT, LLC | Neighbors Health, LLC | National Accounts Master Security Systems and Services Agreement - Multi-Location | 12/18/2017 | 5 years | 12/17/22 | 08/31/18 | 51 | Automatic renewal for successive one year, unless terminated. | Operations |
| Quality Care ER Paris, LLC | NEC Paris Emergency Center, LP d/b/a Neighbors Emergency Center | Clinical Radiology Services Agreement | 3/19/2018 | 1 year | 3/19/2019 | 08/31/18 | 6 | Signed on 03/19/2018. | Radiology |
| Quality Care ER Paris, LLC | NEC Paris Emergency Center, LP d/b/a Neighbors Emergency Center | Clinical Radiology Services Agreement | 3/19/2018 | 1 year | 3/19/2019 | 08/31/18 | 6 | As per Legal, we have reciprocal agreements with this company so there should be 2 agreements total. Signed on 05/14/2018. | Radiology |
| RKMS Paris LLC | NEC Paris Emergency Center, LP | Lease Agreement | 5/31/2016 | 12 years | 4/30/2029 | 08/31/18 | 127 | Effective date as per lease agreement is "the date this lease is executed by all of the parties to this lease." The lease was executed on 05/31/2016. Commencement Date is the earlier of 150 days after the delivery date or the date Tenant opens for business in the building. Expiry of lease 04/30/2029. Commencement and Expiry Dates obtained from Certificate of Commencement Date. | Facility Lease |
| Roshal Imaging Services, Inc. | NEC Paris Emergency Center, LP | Professional Services Agreement | 6/15/2017 | 3 years | 6/14/2020 | 08/31/18 | 21 | Automatic renewal on year to year term, unless terminated by either party in writing prior to the expiration date. Number of days for cancelling the agreement not specified, must be terminated prior to the expiration date. | Radiology |
| Sanitation Solutions | NEC Paris Emergency Center, LP | Service Agreement | 4/7/2017 | 36 months | 03/22/20 | 08/31/18 | 18 | Automatic renewal thereafter for additional terms of 12 months unless terminated. | Operations |
| Siemens Financial Services, Inc. | NEC Paris Emergency Center, LP | Master Equipment Lease Agreement dated 6/14/17 | N/A | N/A | N/A | 08/31/18 | N/A | | Equipment Leases |
| Siemens Financial Services, Inc. | NEC Paris Emergency Center, LP | 36518-54082 (1) Multix Fusion wireless detector | 06/15/17 | 60 months | 06/15/22 | 08/31/18 | 45 | Receiving invoices for loan payment. | Equipment Leases |
| Siemens Financial Services, Inc. | NEC Paris Emergency Center, LP | 36517-54081 (1) Acuson NX 3 Ultrasound System | 06/15/17 | 60 months | 06/15/22 | 08/31/18 | 45 | Signed on 05/06/2014. Terms depends on each individual lease. | Equipment Leases |

6718347v1

Attachment to Schedule 3.08(a)
Paris

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Comments | Department |
|---|---|---|---|---|---|---|---|---|---|
| Siemens Financial Services, Inc. | NEC Paris Emergency Center, LP | 36516-54080 (1) Somatom Scope (16-slice) | 06/15/17 | 60 months | 06/15/22 | 08/31/18 | 45 | Signed on 03/22/2016. Terms depends on each individual lease. | Equipment Leases |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC d/b/a Neighbors Emergency Center | 1-DCKNIM- Multix Fusion | 12/28/2016 | 24 months | 12/27/2018 | 8/31/2018 | 3 | New Multix Fusion warranty starts on 12/28/2018. | Radiology |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC d/b/a Neighbors Emergency Center | 1-DD6OCU- Acuson NX3 | 7/18/2017 | 36 months | 7/17/2020 | 8/31/2018 | 22 | NX3 warranty starts on 07/18/2020. | Radiology |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC | 1-MHACK1 - Multix Fusion Digital Service Quote Nr: 1-L358YF Rev 2 Service Agreement: Silver Contract | 12/28/2018 | 7 years | 12/27/2025 | 08/31/18 | 87 | | Radiology |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC | 1-MH82GE - Somatom Scope Service Quote Nr: 1-L3QHPC Rev 2 Service Agreement : Gold contract | 6/27/2018 | 7 years | 6/26/2025 | 08/31/18 | 81 | | Radiology |
| Siemens Medical Solutions USA, Inc. | Neighbors Health, LLC | 1-MGTRGU - Acuson NX3 Service Quote Nr: 1-L320QX Rev 3 Service Agreement - Performance Private Plan V2 | 7/18/2020 | 7 years | 7/17/2027 | 08/31/18 | 106 | | Radiology |
| Southwest Precision Printers, LLC | Neighbors Health, LLC | Agreement | 5/1/2016 | 2 years | 5/1/2019 | 08/31/18 | 8 | Agreement expires on 04/30/2018. Agreement renews automatically for 1 year, unless reviewed and a new contract is signed. Southwest Precision Printer are the current owners. They bought the business from Page/International Communications, a division of Nationwide Argosy Solutions, LLC, Inc. The agreement can be terminated by either party, for any reason, upon 60 days advanced written notice to the non-terminating party. | Marketing |
| Stericycle, Inc. | Neighbors Health, LLC | Multi-Site Service Agreement | 4/1/2017 | 36 months | 03/31/20 | 08/31/18 | 19 | Medical waste services.  Automatic renewal for the same period, unless cancelled by a written notice 60 days prior to the expiration. | Operations |
| Suddenlink Business | NEC Paris Emergency Center, LP | Account no - 100-7256822-01 Commercial Service Order & Agreement   Loyalty Bundle, Business Internet Modem Rental, 5 Static IP, Unlimited Business Class Phone - 1st Line and Loyalty Bundle - Unlimited Business Class Phone -additional Line and Commercial Video Play3 Discount | 12/1/2016 | 36 months | 11/30/2019 | 08/31/18 | 14 | Automatic renewal for successive one year periods unless prior notice of non-renewal is delivered by either party. | IT |
| Tracy D. Attebury | NEC Paris Emergency Center, LP | Independent Contractor Agreement | 6/12/2017 | 1 year | 06/11/19 | 08/31/18 | 9 | Auto renewal for additional one year. Contract continuities until terminated by either party  with at least 10 days advanced written notice of termination. | Clinical |
| T-System, Inc. | Neighbors Health, LLC | Site Opt-In Agreement | 12/07/16 | 5 years | 12/06/21 | 8/31/2018 | 39 | 5 years Automatic renewal, until terminated. . | Clinical |
| Universal Hospital Service, Inc. | NEC Paris Emergency Center, LP | Agreement # UHS -15211 Letter of Commitment | 7/1/2017 | Until 08/31/2018 | 8/31/2018 | 08/31/18 | 0 | Initial term was one year. The master agreement amended on 10/15/2015 and the contract is effective till 08/31/2018. | Operations |
| UpToDate, Inc. | Neighbors Health, LLC | Contract No: 001-00-38997449 | 6/1/2016 | 1 year subscription | 08/31/18 | 08/31/18 | 0 | Original subscription effective from 06/01/2016 to 5/31/2017. Addendum No: 001-00-38997449 entered on June 1, 2016 extended subscription from 06/01/2017 to 5/31/2018. Amendment entered on May 17, 2018 extended subscription from 06/01/2018 to 8/31/2018. | Clinical |
| West Houston Radiology Associates, LLP | Neighbors Health, LLC d/b/a Neighbors Emergency Center | Professional Services Agreement | 7/9/2017 | Until terminated | Until terminated | 08/31/18 | Until terminated | Agreement continues until terminated by either party , or by mutual agreement. | Radiology |
| West Physics Consulting, LLC | Neighbors Health, LLC | Physics Service Agreement | 1/18/2017 | 3 years | 1/7/2020 | 08/31/18 | 16 | Contract automatically renewed thereafter for successive for 3 years unless terminated by either party. | Radiology |

## **Schedule 3.08(b)**

### **Seller Contracts – Defaults**

[See attached.]

**Attachment to Schedule 3.08(b)**
**Bellaire Contracts**

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date |
|---|---|---|---|---|---|
| BBVA Compass Financial Corporation | Neighbors Global Holdings, LLC | 00619-0012<br>Proteus XR Radiographic & Optima | 01/01/17 | 60 months | 01/01/22 |
| Central Bank of St. Louis (formerly All Points Solution, Inc. d/b/a 3i International and TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc.) | Neighbors Global Holdings, LLC | 41404494<br>Various IT products | 07/31/16 | 63 months | 10/31/21 |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. | NEC Bellaire Emergency Center, LP (erroneously referred to as "NEC Bellaire Emergency Clinic") | 41043323<br>(3) WC5335PH Copier Printer Scanner Fax , (1) WC4260 Copier Printer Scanner Fax | 04/15/14 | 60 months | 04/15/19 |
| Signature Financial, LLC (formerly All Points Solution, Inc. d/b/a 3i International and TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc.) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41343964<br>Various IT products | 05/01/16 | 63 months | 08/01/21 |
| T-System, Inc. | Neighbors Health, LLC | Site Opt-In Agreement | 7/22/2015 | 5 years | 07/21/20 |

**Attachment to Schedule 3.08(b)**
**Yorktown Contracts**

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date |
|---|---|---|---|---|---|
| BBVA Compass Financial Corporation | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 00529-0003 Del Medical Digital U-arm, Mindray DPM CS, Mindray M7 Dicom, Central Station Network of Hardwi, GS LS 16 Used Tube | 04/01/15 | 60 months | 04/01/20 |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerly All Points Solution, Inc. d/b/a 3i International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41262155 (2) Xerox WC 3655, (1) Xerox WC6655, (1) Xerox Phaser 3325, (1) Xerox Phaser 3320 (2) 097s40625 | 11/14/15 | 63 months | 02/14/21 |
| T-System, Inc. | Neighbors Health, LLC | Site Opt-In Agreement | 7/22/2015 | 5 years | 07/21/20 |

**Midland Contracts**

Updated

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Comments | Department |
|---|---|---|---|---|---|---|---|---|---|
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerely All Points Solution, Inc. d/b/a 3i International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41262040 (1) Xerox WC6655XM, (2) Xerox WorkCenter 5335, (1) Xerox 3325DN, (1) Xerox Phaser 3320DNi | 11/14/15 | 63 months | 02/14/21 | 09/04/18 | 29 | Undisputed. Used Commencement Date provided by EverBank. | Equipment Leases |
| T-System, Inc. | Neighbors Health, LLC | Site Opt-In Agreement | 8/11/2015 | 5 years | 08/10/20 | 09/04/18 | 23 | 5 years Automatic renewal, until terminated. | Clinical |
| Wells Fargo Equipment Finance, Inc. | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 001-0459248-101 Siemens Medical Equipment: (1) Somatom Scope CT(1) Acuson P300 Ultra Sound System and (1) Multix Fusion - Digital X-Ray | 09/21/15 | 60 months | 09/21/20 | 09/04/18 | 24 | "Rent Commencement Date" blank so used Supplement date for Beginning Term. | Equipment Leases |

**Odessa Contracts**

Updated

| Vendor/Lessor | | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Comments | Department |
|---|---|---|---|---|---|---|---|---|---|
| Central Bank of St. Louis (formerly TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. and All Points Solution, Inc. d/b/a 3i International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41261960 Various IT products | 09/25/15 | 63 months | 12/25/20 | 09/04/18 | 27 | Disputed. Used signing date on page 8 of the agreement. | Equipment Leases |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerely All Points Solution, Inc. d/b/a 3i International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41262033 (1) Xerox WC665SXM, (2) Xerox WC3655X (1) Xerox 332SDN, (1) Xerox Phaser 3320DNI | 11/14/15 | 63 months | 02/14/21 | 09/04/18 | 29 | Undisputed. Used Commencement Date provided by EverBank. | Equipment Leases |
| T-System, Inc. | Neighbors Health, LLC | Site Opt-In Agreement | 10/15/2015 | 5 years | 10/14/20 | 09/04/18 | 25 | 5 years Automatic renewal, until terminated. | Clinical |
| Wells Fargo Equipment Finance, Inc. | Neighbors Legacy Holdings, Inc. | 459248-103 Siemens Medical Equipment: (1) Somatom Scope CT(1) Acuson P300 Ultra Sound System and (1) Multix Fusion - Digital X-Ray | 12/02/15 | 60 months | 12/02/20 | 09/04/18 | 26 | "Rent Commencement Date" blank so used Supplement date for Beginning Term | Equipment Leases |

**Texarkana Contracts**

Updated

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Comments | Department |
|---|---|---|---|---|---|---|---|---|---|
| BBVA Compass Financial Corporation | Neighbors Global Holdings, LLC | 00619-0009 System Multix Fusion wi-D YMAT, Somatom Scope, P300 Ultrasound System | 09/01/16 | 60 months | 09/01/21 | 09/04/18 | 35 | Lease Beginning and Ending Term obtained from BBVA SLV schedule provided by BBVA. | Equipment Leases |
| TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. (formerly All Points Solution, Inc. d/b/a 3i International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41336625 (1) Xerox WC535S, (+K104:K1062) Xerox WC365SX, (1) Xerox WC665SXM (1) Xerox 3325DN, (1) Xerox Phaser 3320DNI | 05/07/16 | 63 months | 08/07/21 | 09/04/18 | 35 | Undisputed. Used Commencement Date provided by EverBank. | Equipment Leases |
| T-System, Inc. | Neighbors Health, LLC | Site Opt-In Agreement | 12/15/2015 | 5 years | 12/14/20 | 09/04/18 | 27 | 5 years Automatic renewal, until terminated. | Clinical |
| Unifi Equipment Finance, Inc. (formerly TIAA Commercial Finance, Inc. f/k/a EverBank Commercial Finance, Inc. and All Points Solution, Inc. d/b/a 3i International) | Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc. | 41336614 Various IT Products | 05/01/16 | 63 months | 08/01/21 | 09/04/18 | 34 | Disputed. Used Commencement Date provided by EverBank. | Equipment Leases |

**Paris Contracts**

Updated

| Vendor/Lessor | NEC Entity | Agreement Name or No. | Effective Date | Term | Ending Date | Today's date | Remaining Months | Comments | Department |
|---|---|---|---|---|---|---|---|---|---|
| Siemens Financial Services, Inc. | NEC Paris Emergency Center, LP | Master Equipment Lease Agreement dated 6/14/17 | N/A | N/A | N/A | 09/04/18 | N/A | | Equipment Leases |
| Siemens Financial Services, Inc. | NEC Paris Emergency Center, LP | 36518-54082 (1) Multix Fusion wireless detector | 06/15/17 | 60 months | 06/15/22 | 09/04/18 | 45 | Receiving invoices for loan payment. | Equipment Leases |
| Siemens Financial Services, Inc. | NEC Paris Emergency Center, LP | 36517-54081 (1) Acuson NX 3 Ultrasound System | 06/15/17 | 60 months | 06/15/22 | 09/04/18 | 45 | Signed on 05/06/2014. Terms depends on each individual lease. | Equipment Leases |
| Siemens Financial Services, Inc. | NEC Paris Emergency Center, LP | 36516-54080 (1) Somatom Scope (16-slice) | 06/15/17 | 60 months | 06/15/22 | 09/04/18 | 45 | Signed on 03/22/2016. Terms depends on each individual lease. | Equipment Leases |
| T-System, Inc. | Neighbors Health, LLC | Site Opt-In Agreement | 12/07/16 | 5 years | 12/06/21 | 9/4/2018 | 39 | 5 years Automatic renewal, until terminated. . | Clinical |

## <u>Schedule 3.09(b)</u>

**Payment of Taxes**

Sellers have filed for extensions with the State of Texas with respect to the payment of their franchise Taxes.

## Schedule 3.11(a)

### Transactions with Affiliates

**Corporate and Shared Service Sellers**

1.      Intellectual Property License Agreement by and between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.) and Neighbors Emergency Center, LLC, dated as of January 1, 2013.

**Bellaire**

2.      Intellectual Property Sublicense Agreement by and between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.) and NEC Bellaire Emergency Center, LP, dated as of January 1, 2013.

3.      Business Services Subcontract by and between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.), as Manager of NEC Bellaire Emergency Center, LP, and Neighbors Practice Management, LLC, dated effective as of May 1, 2014.

4.      Management and Administrative Services Agreement by and between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.) and NEC Bellaire Emergency Center, LP, dated effective as of November 16, 2015.

**Yorktown**

5.      Intellectual Property Sublicense Agreement by and between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.) and NEC Yorktown Emergency Center, LP, dated January 1, 2014.

6.      Business Services Subcontract by and between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.), as Manager of NEC Yorktown Emergency Center, LP, and Neighbors Practice Management, LLC, dated effective as of May 1, 2014.

7.      Management and Administrative Services Agreement by and between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.) and NEC Yorktown Emergency Center, LP, dated effective as of November 16, 2015.

**Midland**

8.      Intellectual Property Sublicense Agreement dated December 3, 2014 between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.) and NEC Midland Emergency Center, LP.

9.      Management and Administrative Services Agreement dated November 16, 2015 between Neighbors Health System, LLC (n/k/a Neighbors Health, LLC) and NEC Midland Emergency Center, LP.

10.     Business Services Subcontract dated June 1, 2015 between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.), as Manager of NEC Midland Emergency Center, LP, and Neighbors Practice Management, LLC.

**Odessa**

11.     Intellectual Property Sublicense Agreement dated December 3, 2014 between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.) and NEC Odessa Emergency Center, LP.

12.     Management and Administrative Services Agreement dated November 16, 2015 between Neighbors Health System, LLC (n/k/a Neighbors Health, LLC) and NEC Odessa Emergency Center, LP.

13.     Business Services Subcontract dated June 1, 2015 between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.), as Manager of NEC Odessa Emergency Center, LP, and Neighbors Practice Management, LLC.

**Texarkana**

14.     Intellectual Property Sublicense Agreement dated July 6, 2015 between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.) and NEC Texarkana Emergency Center, LP.

15.     Management and Administrative Services Agreement dated November 16, 2015 between Neighbors Health System, LLC (n/k/a Neighbors Health, LLC) and NEC Texarkana Emergency Center, LP.

16.     Business Services Subcontract dated July 6, 2015 between Neighbors Health System, Inc. (n/k/a Neighbors Legacy Holdings, Inc.), as Manager of NEC Texarkana Emergency Center, LP, and Neighbors Practice Management, LLC.

**Paris**

17.     Intellectual Property Sublicense Agreement dated May 12, 2016 between Neighbors Health, LLC and NEC Paris Emergency Center, LP.

18.     Management and Administrative Services Agreement dated May 12, 2016 between Neighbors Health, LLC and NEC Paris Emergency Center, LP.

19.     Business Services Subcontract dated May 12, 2016 between Neighbors Health, LLC, as Manager of NEC Paris Emergency Center, LP, and Neighbors Practice Management, LLC.

## Schedule 3.11(b)

### Insiders

A press release issued by STAT Emergency Center of Laredo ("**STAT Laredo**") identifies Dr. Thomas Vo, Dr. Michael Chang, and Dr. Paul Alleyne as managing partners of STAT Laredo. Dr. Vo, Dr. Chang and Dr. Alleyne are each directors of Neighbors Legacy Holdings, Inc., Neighbors Global Holdings, Inc. and Neighbors Health, LLC.

## **Schedule 3.12(a)**

### **Compliance with Laws**

Not applicable.

**<u>Schedule 3.12(b)</u>**

**Permits**

1.  See attached.

2.  See Schedule 3.13(b).

| Facility Name | Facility Address | State of Texas License Number | License Expiration Date | Burglar Alarm Permit Expiration Date | Fire Marshal Inspection 2017 | PASS/FAIL | Fire Marshal Inspection 2018 | PASS/FAIL | Annual Generator PM | Semi Annual Ice Machine PM | EOM HVAC PM | Annual O2 Manifold & Vacuum Pump PM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bellaire | 5413 S. Rice Ave., Houston, TX 77081 | 160271 | 8/31/18 | 2/13/2019 | 4/9/2017 | PASS | 5/9/2018 | PASS | 5/23/2018 | 4/1/2018 | 4/17/2018 | 12/29/2017 |
| | | | | | | | | | | | | |
| Yorktown | 5835 HWY 6 North, Houston, TX 77084 | 160130 | 10/31/18 | 3/31/2019 | 3/17/2017 | PASS | 4/3/2018 | PASS | 5/9/2018 | 2/1/2018 | 3/9/2018 | 2/7/2018 |

| Facility Name | Facility Address | Burglar Alarm Permit Expiration Date | Fire Marshal Inspection 2017 | PASS/FAIL | Fire Marshal Inspection 2018 | PASS/FAIL | Annual Generator PM | Semi Annual Ice Machine PM | EOM HVAC PM | Annual O2 Manifold & Vacuum Pump PM | Panic Alarm Permit | Policy # | Certificate of Occupancy | Policy # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Midland | 5409 West Wadley, Midland, TX 79707 | 5/16/2020 | Need Copy | | 6/25/2018 | PASS | 6/26/2018 | 1/18/2018 | 5/15/2018 | 11/7/2017 | 5/4/2018 | 25041 | 9/30/2015 | COM15-0000002 |
| Odessa | 2731 N. Grandview Ave., Odessa, TX 79762 | 2/14/2020 | 2/24/2017 | PASS | 2/27/2018 | PASS | 5/29/2018 | 1/18/2018 | 5/15/2018 | 11/7/2017 | 2/14/2020 | 16061 | | |
| Paris | 3055 NE Loop 286, Paris, TX 75460 | Not Required | 1/19/2017 | PASS | Due | | 6/19/2018 | 1/1/2018 | 5/18/2018 | 5/15/2018 | | | 1/23/2017 | NCOM-16-0874 |
| Texarkana | 2001 Mall Dr., Texarkana, TX 75503 | 3/31/2019 | 8/31/2017 | PASS | 2/13/2018 | PASS | 5/23/2018 | 2/1/2018 | 11/1/2017 | 11/30/2017 | 3/31/2019 | A-2520 | 6/15/2016 | |

## **Schedule 3.13(a)**

### **Compliance with Healthcare Laws**

None.

**Schedule 3.13(b)**

**Healthcare Laws Permits**

| Facility | License | Number | Expiration Date |
|----------|---------|--------|-----------------|
| Bellaire | CLIA | 45D2023652 | 02/08/19 |
| Bellaire | DEA | FB3418995 | 08/07/19 |
| Bellaire | TDSHS | 160271 | 08/31/18 |
| Bellaire | TSBP | 28097 | 06/30/20 |
| Bellaire | X-RAY | R41551 | 06/30/24 |
| Midland | CLIA | 45D2101542 | 10/18/18 |
| Midland | COLA | 26593 | 05/10/20 |
| Midland | DEA | FN5671006 | 10/31/18 |
| Midland | TDSHS | 160188 | 09/30/19 |
| Midland | TSBP | 30172 | 08/31/19 |
| Midland | X-RAY | R40436 | 09/30/23 |
| Odessa | CLIA | 45D2103122 | 10/18/18 |
| Odessa | COLA | 26624 | 05/11/20 |
| Odessa | DEA | FN5768215 | 10/31/18 |
| Odessa | TDSHS | 160215 | 12/31/19 |
| Odessa | TSBP | 30279 | 10/31/19 |
| Odessa | X-RAY | R40690 | 12/31/23 |
| Paris | CLIA | 45D2123019 | 12/11/18 |
| Paris | COLA | 28140 | 05/11/20 |
| Paris | DEA | FN6942242 | 10/31/20 |
| Paris | TDSHS | 160327 | 07/31/19 |
| Paris | TSBP | 31377 | 04/30/19 |
| Paris | X-RAY | R42133 | 12/31/24 |
| Texarkana | CLIA | 45D2112361 | 05/30/19 |
| Texarkana | COLA | 27216 | 05/18/19 |
| Texarkana | DEA | FN6326397 | 10/31/19 |
| Texarkana | TDSHS | 160259 | 06/30/20 |
| Texarkana | TSBP | 30895 | 06/30/20 |
| Texarkana | X-RAY | R41248 | 05/31/24 |
| Yorktown | CLIA | 45D2082018 | 10/06/19 |
| Yorktown | COLA | 25706 | 06/12/19 |
| Yorktown | DEA | FN4933924 | 10/30/20 |
| Yorktown | TDSHS | 160130 | 10/31/18 |
| Yorktown | TSBP | 29574 | 10/31/18 |
| Yorktown | X-RAY | R39265 | 09/30/22 |

**Schedule 3.14**

**Legal Proceedings**

| Seller | Case |
|---|---|
| NEC Bellaire Emergency Center, LP | Case No. 1:17-cv-06089-JSR; Signature Financial LLC vs. Neighbors Global Holdings, LLC, NEC Lufkin Emergency Center, LP, NEC Greeley Emergency Center, LP, NEC West Warwick Emergency Center, LP, NEC Lubbock Emergency Center, LP, Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc., Neighbors Health, LLC f/k/a Neighbors Health System, LLC and NEC Bellaire Emergency Center, LP; In the United States District Court, Southern District of New York |
| NEC Bellaire Emergency Center, LP<br><br>NEC Texarkana Emergency Center, LP | Cause No. 2017-31786; Neighbors Legacy Holdings, Inc. f/k/a Neighbors Health System, Inc., Neighbors Health, LLC f/k/a Neighbors Health System, LLC, NEC Texas City Emergency Center, LP, NEC Tyler Emergency Center, LP, NEC Eastside Emergency Center, LP, NEC Port Arthur Emergency Center, LP, NEC Kingwood Emergency Center, LP, NEC Amarillo Emergency Center, LP, NEC Harlingen Emergency Center, LP, NEC Brownsville Emergency Center, LP, NEC McAllen Emergency Center, LP, EDMG, LLC, NEC College Station Emergency Center, LP, NEC Longview Emergency Center, LP, NEC Bellaire Emergency Center, LP, NEC Wichita Falls Emergency Center, LP, NEC Texarkana Emergency Center, LP, Neighbors Global Holdings, LLC, NEC San Angelo Emergency Center, LP, NEC Lufkin Emergency Center, LP, NEC Greeley Emergency Center, LP, NEC West Warwick Emergency Center, LP, NEC Lubbock Emergency Center, LP, Neighbors GP, LLC vs. All Points Solutions, Inc. d/b/a 3i International, EverBank Commercial Finance, Inc., Signature Financial, LLC, Susquehanna Commercial Finance, Inc., Central Bank of St. Louis, Unifi Equipment Finance, Inc. and Chris Mitchell; In the |

16

| Seller | Case |
|---|---|
|  | 164th Judicial District Court of Harris County, Texas |
| NEC Bellaire Emergency Center, LP<br><br>NEC Odessa Emergency Center, LP<br><br>NEC Texarkana Emergency Center, LP | Case No. 4:17-cv-02214-ERW; Central Bank of St. Louis vs. NEC Amarillo Emergency Center, LP, NEC Bellaire Emergency Center, LP, NEC Brownsville Emergency Center, LP, NEC College Station Emergency Center, LP, NEC Harlingen Emergency Center, LP, NEC Odessa Emergency Center, LP, NEC Porter Emergency Center, LP, NEC Texarkana Emergency Center, LP, Texas City Emergency Center, LP, NEC Wichita Falls Emergency Center, LP, Neighbors Global Holdings, LLC, Neighbors Health, LLC f/k/a Neighbors Health System, LLC, Neighbors Legacy Holdings, Inc.; In the United States District Court for the Eastern District of Missouri |
| Neighbors Health, LLC | Cause NO. DC 18-00876; JL Parker Plumbing, Inc. v. Gerald H. Phipps, Inc. d/b/a GH Phipps Construction Co. and RKMS Grand Prairie LLC; In the 68th Judicial District Court of Dallas County, Texas |

**Schedule 3.16(a)**

**Intellectual Property Rights**

The Houston IP Seller has granted the Operating Sellers a license to use the Seller Marks pursuant to the applicable Contracts listed on Schedule 3.11(a) hereto.

## Schedule 3.18(a)

**Owned Real Property**

None.

## **Schedule 3.18(b)**

**Leased Real Property**

NEC Bellaire Emergency Center, LP – see Annex 3.18(b)(i)

NEC Yorktown Emergency Center, LP see Annex 3.18(b)(ii)

NEC Midland Emergency Center, LP—see Annex 3.18(b)(iii)

NEC Odessa Emergency Center, LP—see Annex 3.18(b)(iv)

NEC Texarkana Emergency Center, LP—see Annex 3.18(b)(v)

NEC Paris Emergency Center, LP—see Annex 3.18(b)(vi)

## Annex 3.18(b)(i)

See attached.

## LEGAL DESCRIPTION

A TRACT OR PARCEL CONTAINING 1.7005 ACRES OR 74,074 SQUARE FEET OF LAND, BEING A PORTION OF UNRESTRICTED RESERVE "B" OF UPTOWN CROSSING RETAIL SECTION 1, MAP OR PLAT RECORDED UNDER FILM CODE NO. 665182 OF THE HARRIS COUNTY MAP RECORDS, SITUATED IN THE HARRY SANDERSON SURVEY, ABSTRACT NO. 725 AND THE T.W. HOUSE SURVEY, A-1044, HARRIS COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS, WITH ALL BEARINGS BASED ON THE TEXAS STATE PLANE COORDINATE SYSTEM, SOUTH CENTRAL ZONE (NAD 83):

BEGINNING AT A 5/8 INCH IRON ROD WITH CAP ST. AMPED "BROWN & GA Y" FOUND ON THE EAST RIGHT-OF-WAY (R.O.W.) LINE OF SOUTH RICE AVENUE (PLATTED AS RICE AVENUE, CALLED 90' WIDE) AS RECORDED UNDER VOLUME 3, PG. 60, H.C.M.R. AND MARKING A WEST CORNER OF UNRESTRICTED RESERVE "A" OF SAID UPTOWN CROSSING RETAIL SECTION 1 AND THE MOST WESTERLY NORTHWEST CORNER OF SAID RESTRICTED RESERVE "B" AND OF THE HEREIN DESCRIBED TRACT;

THENCE, DEPARTING THE EAST R.O.W. LINE OF SAID SOUTH RICE AVENUE AND ALONG THE COMMON LINE BETWEEN SAID RESERVES "A" AND "B", NORTH 42 DEGREES 37 MINUTES 21 SECONDS EAST, A DISTANCE OF 31.11 FEET TO A 1/2 INCH IRON PIPE WITH CAP STAMPED "BROWN & GAY" FOUND MARKING AN ANGLE POINT OF SAID UNRESTRICTED RESERVE "A" AND THE MOST NORTHERL Y NORTHWEST CORNER OF SAID UNRESTRICTED RESERVE "B" AND OF THE HEREIN DESCRIBED TRACT;

THENCE, CONTINUING ALONG SAID COMMON LINE NORTH 87 DEG. 37 MIN. 21 SEC. EAST, A DISTANCE OF 148.00 FEET TO A 1/2 INCH IRON PIPE FOUND MARKING AN ANGLE POINT OF SAID UNRESTRICTED RESERVE "A" AND THE MOST NORTHERLY NORTHEAST CORNER OF SAID UNRESTRICTED RESERVE "B" AND THE HEREIN DESCRIBED TRACT;

THENCE, CONTINUING ALONG SAID COMMON LINE, SOUTH 47 DEG. 22 MIN. 39 SEC. EAST, A DISTANCE OF 56.57 FEET TO A 1/2 INCH IRON PIPE WITH CAP STAMPED "BROWN & GAY" FOUND MARKING AN ANGLE POINT OF SAID UNRESTRICTED RESERVE "A" AND THE MOST EASTERLY NORTHEAST CORNER OF SAID UNRESTRICTED RESERVE "B" AND THE HEREIN DESCRIBED TRACT;

THENCE, CONTINUING ALONG SAID COMMON LINE, SOUTH 02 DEG. 22 MIN. 29 SEC. EAST, A DISTANCE OF 259.32 FEET TO A 5/8 INCH IRON ROD WITH CAP STAMPED "WINDROSE LAND SERVICES" SET MARKING AN EAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, OVER AND ACROSS SAID UNRESTRICTED RESERVE "B", SOUTH 87 DEG. 37 MIN. 21 SEC. WEST, A DISTANCE OF 16.50 FEET TO A5/8 INCH IRON ROD WITH CAP STAMPED "WINDROSE LAND SERVICES" SET MARKING AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, SOUTH 02 DEG. 22 MIN. 39 SEC. EAST, A DISTANCE OF 72.80 FEET TO A 5/8 INCH IRON ROD WITH CAP STAMPED "WINDROSE LAND SERVICES" SET MARKING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEG. 37 MIN. 21 SEC. WEST, A DISTANCE OF 159.59 FEET TO A 5/8 INCH IRON ROD WITH CAP STAMPED "I "WINDROSE LAND SERVICES" SET MARKING THE SOUTHWEST OF THE HEREIN DESCRIBED D TRACT;

CORNER

THENCE, NORTH 02 DEG. 22 MIN. 39 SEC. WEST, A DISTANCE OF 53.99 FEET TO A 5/8 INCH IRON ROD WITH CAP STAMPED "WINDROSE LAND SERVICES" SET MARKING AN INTERIOR CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, SOUTH 87 DEG. 36 MIN. 38 SEC. WEST, A DISTANCE OF 33.91 FEET TO A 5/8 INCH IRON ROD WITH CAP STAMPED "WINDROSE LAND SERVICES" SET ON THE EAST R.O.W. LINE OF SAID SOUTH RICE AVENUE AND MARKING A WEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE, ALONG THE EAST R.O.W. LINE OF SAID SOUTH RICE AVENUE, NORTH 02 DEG. 22 MIN. 39 SEC. WEST, A DISTANCE OF 296.14 FEET TO THE PLACE OF BEGINNING, AND CONTAINING 1.7005 ACRES OR 74,074 SQUARE FEET OF LAND, AS SHOWN ON JOB NO. 43604, PREPARED BY WINDROSE LAND SERVICES, INC.

## Annex 3.18(b)(ii)

See attached.

## LEGAL DESCRIPTION OF PROPERTY

A tract of land containing 1.836 acres being out of Restricted Reserve "B", Block 2, Yorktown Crossing, Section 1, recorded in Film Code No. 600047, Harris County Map Records, Texas and being more particularly described by metes and bounds as follows;

BEGINNING, at a found five eighths inch iron rod with cap stamped "CCI", marking the northeast corner of the tract herein described and being in the west line of State Highway 6, (100 foot wide);

1. THENCE, South 02 degrees 19 minutes 46 seconds East, along the east line of the tract herein described and the west line of said State Highway 6, for a distance of 161.25 feet to a set five eighths inch iron rod with cap stamped "CCI", marking the southeast corner of the tract herein described;

2. THENCE, South 87 degrees 39 minutes 15 seconds West, over and across said Restricted Reserve "B" and along the south line of the tract herein described, for a distance of 483.09 feet to a set five eighths inch iron rod with cap stamped "CCI", marking the southwest corner of the tract herein described, being in the east line of Homma Drive (60 foot wide and being in a non-tangent curve to the right;

3. THENCE, for an arc length of 80.25 feet, along the east line of said Homma Drive, the west line of Restricted Reserve "B" and following a curve to the right, having a radius of 281.29 feet, a chord bearing of North 10 degrees 31 minutes 50 seconds West and a chord distance of 79.98 feet to a set five eighths inch iron rod with cap stamped "CCI";

4. THENCE, North 02 degrees 19minutes 55 seconds West, continuing along the east line of said Homma Drive and the west line of Restricted Reserve "B", for a distance of 84.22 feet to a set five eighths inch iron rod with cap stamped "CCI", marking the northwest corner of the tract herein described;

5. THENCE, North 87 degrees 54 minutes 04 seconds East, along the north line of the tract herein described, for a distance of 494.50 feet to the POINT OF BEGINNING.

## **Annex 3.18(b)(iii)**

See attached.

**EXHIBIT A**
**LEGAL DESCRIPTION OF PROPERTY**

Being the SURFACE ESTATE ONLY IN AND TO LOT SEVENTY ONE B (71B), BLOCK FIFTEEN (15), FINAL PLAT GRASSLAND ESTATES SECTION 22, an addition to the City of Midland, Midland County, Texas, according to the map or plat thereof, recorded in Cabinet G, Page 55, Plat Records, Midland County, Texas.

1



## **Annex 3.18(b)(iv)**

See attached.

# LEGAL DESCRIPTION

FIELD NOTE DESCRIPTION OF THE SURVEY OF AN 0.97-ACRE TRACT OF LAND OUT OF LOT 29, BLOCK 2, REPLAT OF 3.78 ACRES OUT OF GULF PARK NO. 13, BLOCK 2, SPRINGDALE ADDITION, AN ADDITION TO THE CITY OF ODESSA, AS PER PLAT OF RECORD IN CABINET "A", PAGE 145D, PLAT RECORDS, ECTOR COUNTY, TEXAS SAID 0.97-ACRE TRACT DESCRIBED MORE FULLY BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A MAG NAIL FOUND IN THE WEST RIGHT OF WAY LINE OF GRANDVIEW AVENUE FOR THE NORTHEAST CORNER OF THIS TRACT;

THENCE SOUTH 13°58'32"E. 150.57 FEET ALONG THE WEST RIGHT OF WAY LINE OF GRANDVIEW AVENUE TO A MAG NAIL SET FOR THE SOUTHEAST CORNER OF THIS TRACT;

THENCE SOUTH 75°59'58" WEST 259.53 FEET TO A CORNER OF A TOWER SITE FOR THE MOST SOUTHERLY SOUTHWEST CORNER OF THIS TRACT;

THENCE NORTH 13°56'51" WEST 49.35 FEET ALONG THE WEST LINE OF SAID TOWER SITE TO A POINT FOR A CORNER OF THIS TRACT;

THENCE SOUTH 76°14'56" WEST 28.96 FEET ALONG THE NORTH LINE OF SAID TOWER SITE TO A POINT FOR THE MOST WESTERLY SOUTHWEST CORNER OF THIS TRACT;

THENCE NORTH 14°11'17" WEST 101.44 FEET TO A MAG NAIL SET FOR THE NORTHWEST CORNER OF THIS TRACT;

THENCE NORTH 76°04'13" EAST 288.84 FEET TO THE PLACE OF BEGINNING.

**<u>Annex 3.18(b)(v)</u>**

See attached.

# EXHIBIT A
## LEGAL DESCRIPTION OF THE PROPERTY

Property Description
1.238 Acres
Bowie County, Texas

All that certain lot, tract or parcel of land lying and situated in the R. G. Connan Headright Survey, Abstract 733, Bowie County, Texas, being part of that certain tract of land described as Lot No. 1, Lavender Posco Addition, recorded in Volume 8622, Page 217 of the Real Property Records of Bowie County, Texas, and being more particularly described by metes and bounds as follows:

BEGINNING at a 1/2 inch steel rod (control monument), found for a corner, the Northeast Corner of the said Lot No. 1, the Northwest Corner of that certain tract of land described as 0.143 acres in the deed from City of Texarkana, Texas to Posco Oil Co., Inc., dated July 12, 1989, recorded in Volume 1352, Page 246 of the Real Property Records of Bowie County, Texas, lying in the South right-of-way line of Interstate 30;

THENCE South 11 degrees 14 minutes 47 seconds East a distance of 50.51 feet along the East line of said Lot No. 1 and the West line of the said 0.143 acre tract, to a mag nail, found for a corner, the Southwest Corner of the said 0.143 acre tract, the Northwest Corner of that certain tract of land described as 0.449 acres in the deed from Jim Lindsey, et ux to Posco Oil Co., Inc., dated December 27, 1983, recorded in Volume 713, Page 379 of the Deed Records of Bowie County, Texas, lying in the East line of the said Lot No. 1;

THENCE South 03 degrees 32 minutes 25 seconds East a distance of 157.59 feet along the East line of the said Lot No. 1 and the West line of the said 0.449 acre tract, to a 1/2 inch steel rod, capped MTG 101011-00, set for a corner, lying in the East line of the said Lot No. 1 and the West line of the said 0.449 acre tract, at an angle point;

THENCE North 85 degrees 34 minutes 39 seconds East a distance of 9.13 feet along the East line of the said Lot No. 1 and the West line of the said 0.449 acre tract, to a 1/2 inch steel rod, capped MTG 101011-00, set for a corner, lying in the East line of the said Lot No. 1 and the West line of the said 0.449 acre tract, at an angle point;

THENCE North 87 degrees 10 minutes 39 seconds East a distance of 5.90 feet along the East line of the said Lot No. 1 and the West line of the said 0.449 acre tract, to a X cut in concrete, set for a corner, lying in the East line of the said Lot No. 1 and the West line of the said 0.449 acre tract, at an angle point;

THENCE South 07 degrees 19 minutes 53 seconds East a distance of 20.29 feet along the East line of the said Lot No. 1 and the West line of the said 0.449 acre tract, to a 1/2 inch steel rod, capped MTG 101011-00, set for a corner, lying in the East line of the said Lot No. 1 and the West line of the said 0.449 acre tract, at an angle point;

THENCE North 69 degrees 00 minutes 23 seconds West a distance of 4.37 feet, to a 1/2 inch steel rod, capped MTG 101011-00, set for a corner, at the beginning of a circular curve to the left, tangent to the said line;

THENCE in a Northwesterly direction along the arc of the said circular curve a distance of 8.12 feet, with a delta angle of 2 degrees 26 minutes 33 seconds, a radius of 190.50 feet, a chord bearing of North 70 degrees 13 minutes 40 seconds West, and a chord distance of 8.12 feet, to a 1/2 inch steel rod, capped MTG 101011-00, set for a corner, at the end of the said circular curve;

THENCE North 71 degrees 26 minutes 57 seconds West, tangent to the said circular curve, a distance of 15.66 feet, to a , inch steel rod, capped MTG 101011-00, set for a corner, at the beginning of a circular curve to the left, tangent to the said line;

1

THENCE in a Southwesterly direction along the arc of the said circular curve a distance of 215.31 feet, with a delta angle of 37 degrees 57 minutes 26 seconds, a radius of 325.00 feet, a chord bearing of South 89 degrees 34 minutes 20 seconds West, and a chord distance of 211.39 feet, to a 1/2 inch steel rod, capped MTG 101011-00, set for a corner, at the end of the said circular curve;

THENCE North 19 degrees 55 minutes 12 seconds West a distance of 17.72 feet, to a 1/2 inch steel rod, capped MTG 101011-00, set for a corner, at the beginning of a circular curve to the left, tangent to the said line;

THENCE in a Northwesterly direction along the arc of the said circular curve a distance of 58.00 feet, with a delta angle of 16 degrees 36 minutes 56 seconds, a radius of 200.00 feet, a chord bearing of North 28 degrees 13 minutes 40 seconds West, and a chord distance of 57.80 feet, to a 1/2 inch steel rod, capped MTG 101011-00, set for a corner, at the end of the said circular curve and at the beginning of a circular curve to the right;

THENCE in a Northwesterly direction along the arc of the said circular curve a distance of 132.41 feet, with a delta angle of 37 degrees 55 minutes 56 seconds, a radius of 200.00 feet, a chord bearing of North 17 degrees 34 minutes 10 seconds West, and a chord distance of 130.00 feet, to a X cut in concrete, set for a corner, at the end of the said circular curve;

THENCE North 01 degrees 23 minutes 48 seconds East, tangent to the said circular curve, a distance of 31.40 feet, to a X cut in concrete, lying in the North line of the said Lot No. 1 and the South right-of-way line of said Interstate 30;

THENCE South 85 degrees 31 minutes 50 seconds East a distance of 160.25 feet along the North line of said Lot No. 1 and the South right-of-way line of said Interstate 30, to a TxDOT right-of-way marker (control monument), found for a corner, at an angle point;

THENCE North 86 degrees 02 minutes 32 seconds East (basis of bearings) a distance of 113.13 feet, to the point of beginning and containing 1.238 acres of land, at the time of this survey.

This description is based on the survey and plat made by Jeffrey A. Wood, Registered Professional Land Surveyor No. 6220, on June 2, 2015.

2

**<u>Annex 3.18(b)(vi)</u>**

See attached.

**Exhibit "A"**
**Legal Description of Land**

Being 1.470 acres of land situated within the corporate limits of the City of Paris, Lamar County, Texas, said 1.470 acres being out of the Joseph Leech Survey, Abstract Number 524 as well as being part of a called 2.9398 acre tract of land conveyed from David R. Robinson and wife Brenda Robinson to B.C. Muthappa and Devahrata Ganguly on December 10, 2010 recorded in Lamar County Clerk's Document Number 084198-2010 and also being all of a called 1.470 acre tract of land platted as Lot 1, Block A, Oak Ridge 318 Addition as filed in Envelope 455-D of the Plat Records of Lamar County Texas. The said 1.470 acres being more fully described by metes and bounds as follows:

Beginning at a broken concrete right-of-way monument found at the Southwest corner of the aforementioned called 2.9398 acre Muthappa & Ganguly tract and at the Southwest corner of the aforementioned Lot 1, Block A Oak Ridge 318 Addition, and said monument also being the Southeast corner of Lot 1, Block A of Kushi & Esha Addition 318 as recorded in Envelope 408-A of the Plat Records of Lamar County, Texas, and said monument also being in the North right-of-way line of Loop 286 at TxDOT right-of-way Station 208+00;

Thence N 01° 41' 42" E, along the West boundary line of the aforementioned called 2.9398 Muthappa & Ganguly tract, a distance of 278.56 feet to a 1/2 inch capped (Whitley) iron rod found at the Northwest corner of the aforementioned Lot 1, Block A Oak Ridge 318 Addition, said rod also being the Southwest corner of a called 1.470 acre tract of land conveyed from Devahrata Ganguly and B. C. Muthappa to Haresh Patel on June 27, 2014 as recorded in Lamar County Clerk's Document Number 115798-2014, and platted as Lot 2, Block A, Oak Ridge 318 Addition as filed in the aforementioned Envelope 455-D;

Thence N 87° 30' 53" E, along the common boundary line of the aforementioned Lot 1 and Lot 2, a distance of 247.99 feet to a 1/2 inch capped (Whitley) iron rod found at the Northeast corner of said Lot 1 and at the Southeast corner of said Lot 2, said rod also being located in the current East boundary line of a called 19.19 acre tract of land conveyed from Virginia Burnett to David R. Robinson on October 15, 2008 and recorded in Lamar County Clerk's Document Number 063847-2008;

Thence S 10° 26' 41" W, along the East boundary line of the aforementioned Lot 1 and the current West boundary line of the aforementioned David Robinson tract, a distance of 313.52 feet to a 5/8 inch iron rod found at the Southeast corner of said Lot 1, said rod also being in the North right-of-way line of Loop 286;

Thence N 74° 30' 10" W, along the North right-of-way of Loop 286 and the South boundary line of the aforementioned Lot 1, a distance of 96.26 feet to a 1/2 inch capped (Whitley) iron rod found;

[EXHIBIT A – SNDA]

Thence S 86° 27' 25" W, along the North right-of-way line of Loop 286 and the South boundary line of the aforementioned Lot 1, a distance of 106.60 feet to the Point of Beginning and containing 1.470 acres of land.

[EXHIBIT A – SNDA]

**Schedule 3.20**

**ERISA Plans**

1.  401(k) for EDMG, LLC

2.  401(k) for Neighbors Practice Management, LLC

## **Schedule 4.09**

**Buyer's Finders' Fees**

None.