# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **NEIGHBORS LEGACY HOLDINGS, INC.**, *et al.*, | § | **Case No. 18-33836 (MI)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |

## SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION OF NEIGHBORS LEGACY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PORTER HEDGES LLP**
John F. Higgins
Eric M. English
Genevieve M. Graham
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone:   (713) 226-6648
Facsimile:   (713) 226-6628
Email:   jhiggins@porterhedges.com
   eenglish@porterhedges.com
   ggraham@porterhedges.com

*Counsel to the Debtors and Debtors in Possession*

Dated: February 20, 2019

---

[1] Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/neighbors. The location of Debtors' principal place of business and the Debtors' service address is: 10800 Richmond Avenue. Houston, Texas 77042.

THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN (AS DEFINED HEREIN) UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE"). THIS DISCLOSURE STATEMENT [HAS BEEN APPROVED] BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE SOLICITATION OF VOTES, THE DEBTORS EXPECT TO PROMPTLY SEEK ORDERS OF THE BANKRUPTCY COURT (A) APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND (B) CONFIRMING THE PLAN.

### DISCLOSURE STATEMENT, DATED FEBRUARY 20, 2019

**Solicitation of Votes on the
Plan of Liquidation of**

### NEIGHBORS LEGACY HOLDINGS, INC., AND ITS DEBTOR AFFILIATES

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., CENTRAL TIME, ON MARCH 20, 2019, UNLESS EXTENDED BY THE DEBTORS (AS DEFINED HEREIN). THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS FEBRUARY 15, 2019 (THE "VOTING RECORD DATE").**

---

---

### RECOMMENDATION BY THE DEBTORS

**The board of managers, members, or partners, as applicable, of Neighbors Legacy Holdings, Inc. and each of its affiliated Debtors (as of the date hereof) have unanimously approved the transactions contemplated by the Solicitation and the Plan and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.**

---

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

UNTIL SUCH TIME AS THE DEBTORS CONSUMMATE THE SALE OF ALL OR SUBSTANTIALLY ALL OF THEIR ASSETS, AS FURTHER DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTORS INTEND TO OPERATE THEIR BUSINESSES IN THE ORDINARY COURSE AND HAVE OBTAINED AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL EMPLOYEES OF ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR

OBJECTING TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................. 1

II. OVERVIEW OF THE DEBTORS' OPERATIONS ....................................................... 3
    A.    The Debtors' Business ......................................................................................... 3
    B.    The Debtors' Organizational Structure ............................................................... 5
    C.    The Debtors' Capital Structure ........................................................................... 6

III. KEY EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11 CASES ......... 8
    A.    Increased Competition in the Industry ................................................................ 8
    B.    Compression of Insurance Payor Reimbursements ............................................. 8
    C.    Excessive Overhead ............................................................................................ 9
    D.    Costs Associated with Closed and Never-Opened Emergency Centers ............... 9
    E.    Attempts at Out-of-Court Restructuring ............................................................. 9
    F.    Prepetition Marketing of the Debtors' Assets and Negotiation of the
          Stalking Horse Bids .......................................................................................... 12

IV. MATERIAL EVENTS DURING THE CHAPTER 11 CASES ........................................... 13
    A.    Commencement of Chapter 11 Cases and First Day Motions ............................ 13
    B.    Other Significant Matters .................................................................................. 16
    C.    Bidding Procedures and Sale ............................................................................ 17
    D.    Retention of Professionals ................................................................................ 19

V. SUMMARY OF THE PLAN ......................................................................................... 19

VI. ACCEPTANCE REQUIREMENTS .............................................................................. 24
    A.    Acceptance or Rejection of this Plan ................................................................ 25
    B.    Subordination of Series LLC Claims ................................................................ 25
    C.    Confirmation of this Plan Pursuant to Section 1129(b) of the Bankruptcy
          Code .................................................................................................................. 26
    D.    Controversy Concerning Impairment ................................................................ 26

VII. MEANS FOR IMPLEMENTATION OF THE PLAN .................................................... 26
    A.    Deemed Consolidation ...................................................................................... 26
    B.    Transactions Effective as of the Effective Date ................................................ 27
    C.    The Liquidating Trust ....................................................................................... 27
    D.    The Unsecured Creditor Trust .......................................................................... 28
    E.    Certain Powers and Duties of the Liquidating Trust and Liquidating
          Trustee .............................................................................................................. 28
    F.    Certain Powers and Duties of the Unsecured Creditor Trust and Unsecured
          Creditor Trustee ............................................................................................... 29
    G.    Federal Income Tax Treatment of the Plan Trusts for the Liquidating and
          Unsecured Creditor Trust Assets; Tax Reporting and Tax Payment
          Obligations ....................................................................................................... 30
    H.    Authority to Pursue, Settle, or Abandon Retained Causes of Action ................. 31
    I.    Liquidating Trust's Accounting for Certain Recoveries ..................................... 32

i

J.      Filing of Monthly and Quarterly Reports .............................................. 32
K.      Corporate Existence; Compliance with Transition Services Agreements ........... 32
L.      Directors and Officers of the Debtors ................................................. 33
M.      Corporate Authorization ............................................................... 33
N.      Effectuating Documents and Further Transactions ................................... 33
O.      Employee Agreements ................................................................. 33
P.      Exemption from Certain Taxes and Fees ............................................ 34
Q.      Duration of the Plan Trusts ........................................................... 34
R.      Wind Down of Plan Trusts ............................................................ 34

VIII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........... 34
A.      Treatment of Executory Contracts and Unexpired Leases ..................... 34
B.      Preexisting Obligations to the Debtors Under Executory Contracts and
        Unexpired Leases ..................................................................... 35
C.      Rejection Damages Claim ............................................................. 35
D.      Reservation of Rights ................................................................. 35

IX. PROVISIONS GOVERNING DISTRIBUTIONS ........................................... 35
A.      Timing and Calculation of Amounts to Be Distributed; Entitlement to
        Distributions ........................................................................... 35
B.      Plan Trustees .......................................................................... 37
C.      No De Minimis Distributions Required ............................................. 37
D.      Disputed Claims Reserve ............................................................. 37
E.      Distributions on Account of Claims Allowed After the Effective Date ............. 38
F.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ........... 38
G.      Compliance with Tax Requirements/Allocations .................................. 39
H.      Claims Paid or Payable by Third Parties ............................................ 39
I.      Allocation of Plan Distributions between Principal and Interest ..................... 40

X. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ........................................................................... 40
A.      Allowance and Disallowance of Claims ............................................. 40
B.      Prosecution of Objections to Claims ................................................ 40
C.      Deadline to Object to Claims ........................................................ 41
D.      Estimation of Claims .................................................................. 41
E.      Amendments to Claims ............................................................... 41
F.      Distributions After Allowance ....................................................... 41

XI. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE
EFFECTIVE DATE ............................................................................. 42
A.      Conditions Precedent to Confirmation ............................................. 42
B.      Conditions Precedent to the Effective Date ........................................ 42
C.      Waiver of Conditions ................................................................. 43
D.      Effect of Nonoccurrence of Conditions ............................................ 43

XII. SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS ................. 43
A.      Compromise and Settlement of Claims, Interests, and Controversies ................. 43

ii

B.      RELEASES BY THE DEBTORS ..................................................................... 44
C.      RELEASES BY HOLDERS OF CLAIMS AND INTERESTS........................... 44
D.      EXCULPATION................................................................................................ 45
E.      INJUNCTION ................................................................................................... 45
F.      Setoffs ............................................................................................................... 46
G.      Recoupment ....................................................................................................... 46

XIII. BINDING NATURE OF PLAN ..................................................................................... 46

XIV. RETENTION OF JURISDICTION ................................................................................ 47

XV. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN........................ 49
A.      Modifications and Amendments ........................................................................ 49
B.      Effect of Confirmation on Modifications .......................................................... 49
C.      Revocation or Withdrawal of the Plan .............................................................. 49
D.      Substantial Consummation of the Plan ............................................................. 49

XVI. MISCELLANEOUS PROVISIONS ............................................................................... 50
A.      Bar Date for Administrative Claims ................................................................. 50
B.      Successors and Assigns...................................................................................... 50
C.      Reservation of Rights ........................................................................................ 50
D.      Service of Documents ........................................................................................ 50
E.      Dissolution of Committee .................................................................................. 51
F.      Nonseverability of Plan Provisions................................................................... 51
G.      Return of Security Deposits ............................................................................... 52
H.      Term of Injunctions or Stays............................................................................. 52
I.      Entire Agreement ............................................................................................... 52
J.      Exhibits .............................................................................................................. 52
K.      Votes Solicited in Good Faith ........................................................................... 52
L.      Conflicts ............................................................................................................. 52
M.      Filing of Additional Documents ........................................................................ 53

XVII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................. 53
A.      Introduction........................................................................................................ 53
B.      Certain U.S. Federal Income Tax Consequences of Payment of Allowed
        Claims for the Debtors Pursuant to the Plan ..................................................... 54
C.      Certain U.S. Federal Income Tax Consequences of Payment of Allowed
        Claims for Holders of Allowed Claims Pursuant to the Plan ........................... 55
D.      Certain Consequences for Holders of Allowed Other Secured Claims,
        Allowed Prepetition Secured Loan Claims and Allowed General
        Unsecured Claims .............................................................................................. 56
E.      Certain Tax Consequences for Beneficiaries of the Plan Trusts........................ 57
F.      Importance of Obtaining Professional Tax Assistance ...................................... 62

XVIII. CERTAIN RISK FACTORS TO BE CONSIDERED...................................................... 62
A.      Certain Bankruptcy Law Considerations ........................................................... 63
B.      Additional Factors Affecting Recoveries........................................................... 64

C.      Additional Factors ........................................................................................ 64

XIX. VOTING PROCEDURES AND REQUIREMENTS ........................................... 65
    A.      Parties Entitled To Vote ................................................................ 65
    B.      Voting Deadline .............................................................................. 66
    C.      Voting Procedures .......................................................................... 67
    D.      Waivers of Defects, Irregularities, etc. ......................................... 68

XX. CONFIRMATION OF THE PLAN ....................................................................... 68
    A.      Confirmation Hearing ..................................................................... 68
    B.      Requirements for Confirmation of the Plan ................................... 68

XXI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN ........................................................................................................................ 72
    A.      Alternative Plan ............................................................................. 72
    B.      Sale of All or Substantially All Assets Under Section 363 of the
             Bankruptcy Code ............................................................................ 72
    C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law .................... 72

XXII. INFORMAL OBJECTION OF GERALD H. PHIPPS, INC. ........................... 73

XXIII. CONCLUSION AND RECOMMENDATION .............................................. 73

6790233v15

## EXHIBITS

Exhibit A      Plan

Exhibit B      Liquidation Analysis

6790233v15

# I.
## INTRODUCTION

The Debtors submit this Disclosure Statement in connection with the Solicitation of votes on the *First Amended Joint Plan of Liquidation of Neighbors Legacy Holdings, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated February 20, 2019 (as may be amended from time to time, the "Plan," attached hereto as **Exhibit A**). Capitalized terms used in this Disclosure Statement, but not otherwise defined herein, have the meanings ascribed to such terms in the Plan. To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan governs.

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. The fundamental purpose of a chapter 11 case is to formulate a plan so as to maximize recoveries to its creditors. With this purpose in mind, businesses sometimes use chapter 11 as a means to conduct asset sales and other forms of liquidation. Whether the aim is reorganization or liquidation, a chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors and equity holders with respect to their claims against, and equity interests in, a debtor's bankruptcy estate.

The Debtors are commencing this Solicitation after extensive discussions over the past several months with certain of their key creditor constituencies, including with the Prepetition Agent and the Committee. In connection with these negotiations, the DIP Lenders and the Committee agreed to support the sale of substantially all of the Debtors' assets, with the proceeds of such sales to be distributed, as set forth in the Plan, entirely to Holders of Prepetition Loan Claims, other than the distributions to be provided under, and pursuant to, the Plan to holders of Other Priority Claims, Other Secured Claims, and General Unsecured Claims and certain reserves to be funded to pay administrative expenses and to fund the Debtors' post-sale wind-down.

The Plan contemplates that any assets remaining in the Debtors' Estates as of the Effective Date will vest in a Liquidating Trust for liquidation for the benefit of Holders of Allowed Claims as set forth in the Plan and the Liquidating Trust Agreement. The Liquidating Trust is to be managed by a Liquidating Trustee. The Liquidating Trustee will be responsible for taking the necessary and appropriate actions to administer the remaining assets of the Debtors' estates, and to proceed with an orderly, expeditious, and efficient wind-down and distribution of the remaining assets of the Debtors in accordance with the terms of the Plan.

The Debtors believe that the distributions under the Plan will provide all Holders of Claims against and Interests in the Debtors at least the same recovery on account of Allowed Claims and Allowed Interests as would a liquidation of the Debtors' assets conducted under chapter 7 of the Bankruptcy Code. Furthermore, distributions under the Plan to Holders of Claims and Interests would be made more quickly than distributions by a chapter 7 trustee and a chapter 7 trustee would charge a substantial fee, reducing the amount available for distribution on account of Allowed Claims and Interests. Thus, the Debtors believe that confirmation and consummation of the Plan is in the best interests of all Holders of Claims and Interests.

**THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL CREDITORS AND INTEREST HOLDERS**.

Under the Bankruptcy Code, only Holders of Claims in "impaired" Classes are entitled to vote on the Plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under the Plan unless (a) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Class 3 (Prepetition Secured Loan Claims) and Class 4 (General Unsecured Claims) are the only Classes that are impaired and whose votes to accept or reject the Plan are being solicited.

The following table summarizes (a) the treatment of Claims and Interests under the Plan, (b) which Classes are impaired by the Plan, (c) which Classes are entitled to vote on the Plan, and (d) the estimated recoveries for holders of Claims and Interests. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Section V— Summary of the Plan below.

2

| Class | Claim/Interest | Status | Voting Rights |
|:---:|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Prepetition Secured Loan Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Neighbors Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

PLEASE TAKE NOTE OF THE FOLLOWING KEY DATES AND DEADLINES FOR THE CHAPTER 11 CASES:

| | |
|:---:|:---:|
| Voting Record Date | February 15, 2019 |
| Deadline to vote to accept or reject the Plan and to object to confirmation of the Plan | 5:00 p.m. (Prevailing Central Time) on March 20, 2019 |
| Confirmation Hearing | 9:30 a.m. (Prevailing Central Time) on March 22, 2019 |

## II.
## OVERVIEW OF THE DEBTORS' OPERATIONS

### A.    The Debtors' Business

The Debtors opened their first Emergency Center in Bellaire, Texas in 2009.  At that time, the state of Texas did not license freestanding emergency centers and the Debtors were required to partner with hospitals to obtain licensure.  In June 2010, the Texas legislature enacted Title 25, Chapter 131 of the Texas Administrative Code, which authorized for the first time independent licensure for freestanding emergency rooms.  Thereafter, the Debtors were able to open additional freestanding emergency rooms without the requirement to partner with hospitals.

6790233v15

From 2011 to 2013, the Debtors gradually expanded by adding four new facilities in the Houston metropolitan area.  In 2014, the Debtors added two additional Houston locations and expanded into Austin, opening two Austin Emergency Centers.  In 2015 and 2016, the Debtors expanded into new Texas markets as well as markets outside of Texas, including Arizona, Colorado, and Rhode Island.  The Debtors financed their expansion in large part through a $150 million credit facility obtained in November 2015, as discussed in more detail below.

As of the Petition Date, the Debtors operated 22 free-standing emergency centers (the "Emergency Centers") throughout Texas and provided support for the Emergency Centers at a corporate headquarters located in the Westchase area of Houston.  Together with their non-debtor subsidiaries and affiliates, the Debtors' corporate network (the "Neighbors Network") consisted of approximately 115 entities organized under the laws of various states.  The Debtors leased the real property for most of the Emergency Centers and their corporate headquarters, and own the real property associated with four of their centers.[2] In total, as of the Petition Date, Neighbors Network employed or engaged as independent contractors approximately 900 physicians, nurses, radiology technicians, laboratory professionals, and administrative staff on either a full- or part-time basis (collectively, the "Employees").  Approximately 140 of the Employees worked at the Debtors' corporate headquarters. The corporate Employees performed various functions for the Debtors, including billing, coding, collection of accounts receivable, finance, human resources, marketing, information technologies ("IT"), and administrative tasks.

The remainder—and the vast majority—of the Debtors' Employees worked at the various Emergency Centers, which are located throughout Texas, as shown in the chart below.

| Facility No. | Continuing |
|---|---|
| 4001 | Bellaire |
| 4002 | Kingwood |
| 4003 | Baytown |
| 4004 | Pasadena |
| 4005 | Pearland |
| 4007 | Beaumont |
| 4008 | Mueller |
| 4009 | Yorktown |
| 4010 | Crosby |
| 4011 | Orange |
| 4013 | Midland |
| 4015 | Edgemere |
| 4016 | Port Arthur |
| 4018 | Odessa |
| 4019 | Harlingen |
| 4020 | Amarillo |
| 4021 | Porter |
| 4022 | Brownsville |
| 4023 | McAllen |
| 4026 | Texarkana |
| 4031 | Lubbock |
| 4035 | Paris |

---

[2] The Debtors owned the real property for their Kingwood, Baytown, Pearland, and Beaumont Centers.

*Neighbors' 22 Open Facilities, as of the Petition Date (the "Open Facilities")*

The Debtors generated revenues by collecting payments from patients and insurance providers in satisfaction of services rendered at the Emergency Centers. The Debtors billed patients and insurance companies for the services provided (the "Billed Charges").[3] Thereafter, the Debtors negotiated with the payor (which may involve appeals) to arrive at a "Final Allowable" claim amount. That obligation was then divided between the insurance provider and the patient, based on the patient's specific health plan, and paid to the Debtors. On average for 2017, the total amount collected by the Debtors was approximately 36% of the Billed Charges.

### B.     The Debtors' Organizational Structure

On the Petition Date, the Debtors' Emergency Centers were structured as separate limited partnerships with Neighbors GP, LLC as the general partner of each. The limited partners for each Emergency Center were organized as separate series LLCs (series 100 through series 153) (collectively, the "Series LLCs") existing as part of NHS Emergency Centers, LLC. NHS Emergency Centers, LLC houses the Series LLCs and owns 99% of Emergency Centers (LPs). A series LLC is a form of a limited liability company in which each "series" operates as its own, unique entity so that the series are separate from each other, and from NHS Emergency Centers, LLC, for liability purposes. NHS Emergency Centers, LLC is a Debtor, but the underlying Series LLCs are non-Debtors.

Each of the series LLCs are owned by a combination of "Class A" physicians, which are the original nine founding physicians,[4] and "Class B" physicians, which are physicians that have purchased interests in profits and losses in specific series LLCs ("Series LLC Interests"). The Class B physicians typically worked shifts at the Emergency Centers where they owned Purchased Interests. In connection with purchasing their interests in one or more Emergency Centers, the Class B physicians were entitled to a corresponding number of monthly 24-hour shifts at such centers. In addition to being eligible to receive distributions related to their Purchased Interests, Class B physicians received compensation for working their respective shifts.[5] As of the Petition Date, there were approximately 125 Class B physicians.

Management and corporate functions for each of the Emergency Centers were provided by separate Debtor entities, as follows:

    a.   EDMG, LLC – provided staffing and back office support to the Emergency Centers, Neighbors Physician Group, PLLC, and Neighbors Practice Management, LLC, including payroll, human resources, IT, and accounting;

    b.   Neighbors Practice Management, LLC – provided billing, coding, and revenue cycle management to the Emergency Centers and Neighbors Physician Group, PLLC;

---

[3] While the Debtors were able to accept Medicare or Medicaid patients, as required for emergent care, the Debtors would not bill Medicare or Medicaid.

[4] Not all nine founding physicians are participants in every series LLC.

[5] The physician contractors were paid on an hourly basis by Neighbors Physicians Group, PLLC.

      c.   <u>Neighbors Emergency Center, LLC</u> – held intellectual property assets;

      d.   <u>Neighbors Health LLC</u> – provided management services to all of the Debtors pursuant to management agreements; and

      e.   <u>Neighbors Physician Group, PLLC</u> – provided physician staffing in the Emergency Centers.

**C.**     **The Debtors' Capital Structure**

      a.   Pre-Petition Credit Agreement

On November 19, 2015, Neighbors Global Holdings, LLC ("<u>Neighbors</u>"), as borrower, entered into a Credit Agreement (as amended, restated, or supplemented the "<u>Prepetition Credit Agreement</u>") with the lenders from time to time party thereto (collectively, the "<u>Prepetition Lenders</u>"); KeyBank National Association (the "<u>Prepetition Agent</u>"), as administrative agent, swing line lender, and issuing bank; KeyBanc Capital Markets Inc., as joint lead arranger and a joint bookrunner; Compass Bank Association, as joint lead arranger, a joint bookrunner, and sole syndication agent; and LegacyTexas Bank, as the documentation agent (together with the Prepetition Lenders and the Prepetition Agent the "<u>Prepetition Secured Parties</u>").

Simultaneously with the execution of the Prepetition Credit Agreement, various subsidiary affiliates, as guarantors (the "<u>Guarantors</u>"), entered into a Guaranty dated November 19, 2015 (as amended, restated, or supplemented, the "<u>Guaranty</u>"),[6] with the Prepetition Agent.

The Prepetition Credit Agreement provided the Debtors with a revolving credit facility in an initial aggregate principal amount of up to $30 million.  On May 9, 2017, Neighbors, the Prepetition Lenders, and the Prepetition Agent entered into the Waiver, Consent and Amendment No. 3, reducing availability under the revolving credit facility to $27 million. The maturity date for the revolving cash borrowings under the Prepetition Credit Agreement was November 19, 2020. Neighbors never drew on the revolving credit facility.

The Prepetition Credit Agreement also provided the Debtors with (a) a term loan facility in an aggregate principal amount of $100 million and (b) a delayed draw term loan facility in the aggregate principal amount of $20 million (with any borrowings incurred under the delayed draw term loan facility automatically becoming part of the term loan facility). The maturity date for the term loan under the Prepetition Credit Agreement was November 19, 2020.  On the date that the Prepetition Credit Agreement funded, November 19, 2015, Neighbors drew $100 million on the term loan facility.  In September 2016, Neighbors drew $20 million on the delayed draw term loan facility.

---

[6] Since November 19, 2015, the date of the Guaranty, through the Petition Date, guarantors have been added through joinder agreements.  As of the Petition Date, with the exception of Neighbors Physician Group – Rhode Island, LLC, all of the entities in the Neighbors Network, including each Emergency Center, have guaranteed the Prepetition Credit Agreement.

The Debtors, from time to time, addressed issues arising under the Prepetition Credit Agreement with the Prepetition Lenders.  Specifically, Neighbors entered into three amendments to the Prepetition Credit Agreement:

(a) <u>July 5, 2016, Amendment No. 1</u> – Neighbors, the Prepetition Lenders, and the Prepetition Agent entered into Amendment No. 1 to the Credit Agreement, dated July 5, 2016, pursuant to which the Prepetition Lenders waived certain events of default under the Prepetition Credit Agreement (including, without limitation, failure to comply with certain disclosure and delivery requirements), and certain Guarantors joined the Guaranty and the Security Agreement (as defined in the Prepetition Credit Agreement).

(b) <u>September 9, 2016, Amendment No. 2</u> – Neighbors, the Prepetition Lenders, and the Prepetition Agent entered into a Waiver, Consent and Amendment No. 2 to the Credit Agreement, dated September 9, 2016, pursuant to which the Prepetition Lenders waived certain events of default under the Prepetition Credit Agreement (including, without limitation, failure to deliver certain financial statements).

(c) <u>May 9, 2017, Amendment No. 3</u> – Neighbors, the Prepetition Lenders, and the Prepetition Agent entered into a Waiver, Consent and Amendment No. 3 to the Credit Agreement, dated May 9, 2017, pursuant to which the Prepetition Lenders waived certain events of default under the Prepetition Credit Agreement (including, without limitation, failure to comply with the fixed charge coverage ratio), amended certain covenants and related provisions to allow Neighbors to operate without being in default, accommodated the conversion of Neighbors Physician Group, LLC, a Texas limited liability company, from one entity type to another, and required the contribution of additional capital from its equity holders in the form of shareholder loans.

The obligations under the Prepetition Credit Agreement were secured by substantially all of the Debtors' assets.  In particular, pursuant to (a) the Amended and Restated Pledge and Security Agreement dated May 9, 2017 (the "<u>Security Agreement</u>"), and (b) the Deeds of Trust, Assignments of Leases and Rents, Security Agreement and UCC Financing Statements for Fixture Filings, in each case dated November 19, 2015 (the "<u>Deeds of Trust</u>", and together with the Security Agreement, collectively, the "<u>Prepetition Financing Agreements</u>"), all amounts outstanding under the Prepetition Credit Agreement were secured by a first-priority security interest (the "<u>Prepetition Liens</u>") in substantially all of the Debtors' existing and future assets (collectively, the "<u>Prepetition Collateral</u>"), other than certain excluded payroll accounts and deposit accounts.  In addition, the obligations under the Prepetition Credit Agreement were guaranteed by the Guarantors.  Accordingly, as of the Petition Date, other than any payroll accounts or deposit accounts that may have been excluded as collateral, pursuant to the Security Agreement, as of the Petition Date, the Debtors did not have any unencumbered cash or assets.

b.   Equipment Leases

The Debtors leased their radiology equipment, including CT machines, x-ray equipment, and ultrasound machines.  The Debtors' primary equipment lessors were BBVA Compass and Wells Fargo. Prepetition, the Debtors entered into an agreement with BBVA Compass regarding return of equipment at Closed Centers and the impact on BBVA Compass's claims against the Debtors.  The Debtors also leased non-medical equipment, such as monitors and computer equipment from various parties.

c.   Outstanding Vendor Obligations

The Debtors utilized a broad range of vendors to provide medical supplies and other items necessary to operate the Emergency Centers.  On the Petition Date, the Debtors' aggregate accounts payable to vendors was approximately $12.8 million.

d.   Equity

NLH, which is the parent company of all of the Debtors, except Neighbors Physician Group, PLLC ("NPG"), is owned by nine individual shareholders who were the founders of the business: Paul Alleyne, Michael Chang, Andy Chen, Cyril Gilman, Henderson Quang, Darmesh Patel, Hitesh Patel, Setul Patel, and Tom Vo.  NPG is owned by the same nine shareholders.

## III.
## KEY EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11 CASES

### A.   Increased Competition in the Industry

Beginning in 2016, the Debtors experienced increased competition in the industry in the form of traditional hospital emergency rooms, hospital outpatient departments, other freestanding emergency centers and urgent care facilities.  Despite growth in net revenue from opening new facilities, the Debtors experienced significant declining earnings before interest, tax, depreciation, and amortization ("EBITDA") since 2015.  For example, the Debtors' consolidated EBITDA dropped from $49 million in 2015, to $45 million in 2016, to $10.3 million[7] in 2017. This drop was caused, in part, by the increased competition in the industry, which led to lower patient volumes per Emergency Center.  As of the Petition Date, for the Emergency Centers opened prior to 2016, the average claims per day fell from approximately 13 in the first quarter of 2017 to approximately 10.  For Emergency Centers opened during 2016, as of the Petition Date, there were, on average, fewer than 10 claims per day.  This marked reduction in patient volume led to a strain at previously profitable locations and underperformance at new locations.

### B.   Compression of Insurance Payor Reimbursements

In addition to increased competition in the industry, the Debtors' liquidity crisis was caused by a challenging insurance payor environment, which significantly reduced allowed reimbursement as well as collection rates.  The net patient service revenue collected as a percentage of gross billings continued to decrease over time because insurance payors

---

[7] Consolidated EBITDA of $10.3 million included restructuring expenses of $3.8 million.

increasingly reduced or denied the Emergency Centers' claims. This was largely the result of insurance companies increasingly classifying the services provided as "non-emergent," rather than "emergent" care.

## C.     Excessive Overhead

The Debtors' aggressive growth strategy included significant investments in their infrastructure to support future Emergency Centers. These investments included a new corporate headquarters in Houston, a significant marketing spend, and increased employee headcount. As the Debtors were forced to shift away from a growth strategy, they have closed underperforming facilities and elected not to open new facilities. As a result, the Debtors' overhead costs have become inconsistent with the current size of their business. Although the Debtors made significant corporate overhead expense reductions in 2017, including reductions in force and spending cuts, corporate overhead remained out of proportion to the Petition Date level of operations primarily due to the high costs of unutilized headquarters space.

## D.     Costs Associated with Closed and Never-Opened Emergency Centers

The Debtors' obligations still included costs related to the Closed Centers – specifically, and significantly, the Debtors' unexpired lease obligations. As of the Petition Date, the Debtors had future non-cancelable obligation commitments for operating and capital leases of approximately $90 million.

The Debtors primary real property landlord on closed and never-opened centers was Read King, Inc. ("Read King"). Prepetition, the Debtors (and certain principals of the Debtors) partnered with Read King to develop new locations for Emergency Centers. In many instances, the arrangement included Read King identifying a property; Neighbors executing a long-term lease (typically 12 years); Read King financing the purchase of the real property and the building shell; Neighbors building out the interior, opening the site, and paying rent to Read King (the "RK Leases").

As tenants under the RK Leases, the Emergency Centers were subject to a Master Guaranty of Leases (the "Master Guaranty"), which provides that the tenant Emergency Centers under the RK Leases were guarantors of all the RK Leases. Based on these cross-guarantees, as guarantors of the RK Leases, the tenant Emergency Centers were jointly and severally liable for default of any of the other Emergency Centers.

## E.     Attempts at Out-of-Court Restructuring

In the fourth quarter of 2016, certain of the Debtors fell out of compliance with certain covenants under the Prepetition Credit Agreement. After significant negotiations, the Debtors and the Prepetition Agent agreed on an amendment to the Prepetition Credit Agreement. In the summer of 2017, the enterprise experienced continued underperformance and cash strain, which resulted in additional covenant defaults.

Beginning in the fourth quarter of 2016 and continuing into 2017, Debtors implemented various expense reduction initiatives, including an aggregate reduction in senior management salaries, eliminating certain corporate headquarters positions, reductions in marketing expenses

9

across all Emergency Centers, reductions in expenditures for corporate office supplies and food, and corporate travel reductions.

As of the fourth quarter of 2017, these cost reductions generated annualized cost savings of almost $22 million (approximately $18,000 average reduction in overhead costs per month at each of the individual Emergency Centers).  Additionally, based on the significant headwinds facing the business, the Debtors closed 13 underperforming Emergency Centers (the "Closed Centers") and elected not to open 8 centers that had been in various stages of planning and preparation for opening.

| Facility No. | Closed | Facility No. | Never Opened |
|---|---|---|---|
| 4006 | Lakeline | 4034 | Aurora |
| 4012 | Zaragoza | 4037 | Victoria |
| 4014 | Tyler | 4039 | Lake Jackson |
| 4017 | Texas City | 4040 | El Paso #3 |
| 4024 | Wichita Falls | 4041 | Grand Prairie |
| 4025 | Longview | 4042 | Pueblo |
| 4027 | San Angelo | 4044 | Tucson |
| 4028 | College Station | 4046 | Lafayette |
| 4029 | Lufkin | | |
| 4030 | West Warwick | | |
| 4032 | Greeley | | |
| 4036 | Kerrville | | |
| 4038 | Amarillo South | | |

*Neighbors Closed and Never-Opened Locations*

During this process, the Debtors also engaged Chad J. Shandler (the "Chief Restructuring Officer" or "CRO") as CRO and his duties included evaluating the existing business model, recommending the closure of unprofitable locations, negotiating with Key Bank, negotiating with vendors and real property lessors, negotiating with real property lessors, and assessing other areas of change within the business

In addition to retaining Shandler as CRO, the Debtors' retained his firm, CohnReznick[8], to lead efforts to facilitate the Debtors' restructuring efforts, which included the following advisory services:

   a.   evaluating and assessing the Company's operating performance and strategy;

---

[8] On September 1, 2018, the Debtors' CRO joined FTI Consulting ("FTI").  On September 29, 2018, at Docket No. 540, the Debtors filed their Application to Employ FTI to continue the designation of Chad J. Shandler as the Debtors' CRO.  On October 24, 2018, at Docket No. 580, the Court entered its Order Approving the Retention of FTI as of September 1, 2018.

     b.    assessing projected EBITDA and net cash flow by facility and corporate entity service provider;

     c.    evaluating a go forward strategy to continue or close facilities;

     d.    assisting management with cost saving initiatives including the reduction of corporate personnel and streamlining the organization by realigning responsibilities;

     e.    providing assistance and analysis in determining DIP financing size and requirements;

     f.    assisting in the development of strategy relating to patients and vendors;

     g.    providing accounting and financial advisory and support services; evaluating cash management controls and procedures; assisting with the management of cash disbursements and vendor relationships;

     h.    implementing controls and procedures to conserve cash;

     i.    assisting in the preparation of weekly and monthly reports;

     j.    analyzing actual results  in comparison to cash forecasts and financial projections;

     k.    assisting the Debtors' with the data and information gathering relating to third party due diligence for potential transactions with financial and strategic buyers; and

     l.    advising and assisting the Debtors' and other professionals retained by the Debtors' in developing and executing a Chapter 11 strategy including section 363 sales.

In addition, CohnReznick assisted the Debtors in improving their Revenue Cycle Management, which included:

     a.    the supervision and management of the claims processing;

     b.    payment and revenue generation performed by the billing and collection departments;

     c.    implementation of improvements in charge capture, pricing and coding;

     d.    development of accounts receivable coverage strategies;

     e.    development of high priority, cash driving, work lists for account follow up staff;

     f.    implementation of outsourced vendor coverage for previously uncovered accounts receivable including worker's compensation, liability and commercial underpays;

g.  development of productivity standards and measurement tools; and

h.  facilitation of the transition to a new and enhanced revenue cycle management system software to improve billing accuracy and follow-up.

Prior to the Petition Date, the Debtors closed 7 underperforming Emergency Centers resulting in annual cost savings of at least $3.2 million and reduced corporate overhead, primarily headcount reductions, resulting in approximately $3.4 million in annual savings. In addition, the decision not to open a center resulted in a savings of approximately $400,000 in pre-opening costs and an additional $1.1 million of projected EBITDA losses due to operating inefficiencies and the lack of market awareness sustained by new centers in its first year of operations.[9]

In late 2017 and early 2018 the Debtors engaged in discussions with all categories of stakeholders, including its secured lenders, landlords, employees, and vendors.

After carefully considering all available strategic alternatives, and in consultation with the Prepetition Agent, the Debtors concluded that it was in the best interests of their creditors and other stakeholders to market their assets for sale and prepare for a chapter 11 bankruptcy case.

## F.  Prepetition Marketing of the Debtors' Assets and Negotiation of the Stalking Horse Bids

On January 2, 2018, in conjunction with their ongoing discussions with the Prepetition Agent, the Debtors retained Houlihan Lokey ("Houlihan") as their investment banker. Thereafter, Houlihan and the Debtors began a marketing process that included, among other things:

a.  Establishing a data room with relevant documents about the Debtors' businesses, financial status and operations;

b.  Negotiating and executing non-disclosure agreements with interested parties;

c.  Preparing a Confidential Information Presentation ("CIP");

d.  Approaching strategic and financial buyers with industry and/or "special situations" experience;

e.  Approaching Class A and B holders that had expressed an interest in participating in the sale process;

f.  Marketing the Debtors as 1) an entire portfolio, 2) by individual market, and 3) by individual facility;

---

[9] The decision to not open a facility takes into consideration many factors including, but not limited to, the competitive landscape and the negative impact on operating cash flow before an emergency center achieves the volume and profitability to contribute to system-wide performance.

g. Having numerous informal discussions with bidders regarding the Debtors' business and bidder due diligence;

h. Holding management presentations with 3 parties;

i. Conducting site visits with 3 parties;

j. Analyzing bids, negotiating asset purchase agreements and selecting the Stalking Horse Bidder (defined below);

Houlihan initially contacted 127 parties. Sixty-one parties signed non-disclosure agreements and were granted access to the data room. Thereafter, Debtors and Houlihan solicited indications of interest ("IOI") with a deadline of February 16, 2018. Eighteen parties submitted IOI, ranging from interest in a whole-system bid to bids on specific Emergency Centers. Houlihan spent a substantial amount of time providing feedback and guidance to parties that submitted IOI. The Debtors' and Houlihan further provided supplemental due diligence and had numerous telephone conferences, in person meetings, 3 management presentations, and 3 site visits at the Debtors' headquarters in Houston or at various Emergency Centers.

The Debtors' counsel, with input from Houlihan, prepared a form of asset purchase agreement to serve as the baseline agreement for all bidders. Stalking horse candidates were required to provide an asset purchase agreement marked against the Debtors' version by April 9, 2018. The Debtors received five formal bids. Two bids were whole-system bids for substantially all of the Debtors' assets. Two bids were for some or all of the Debtors' Houston locations. One bid was for the Debtors' Midland and Odessa locations.

After evaluating all of the bids and consulting with their advisors and with the Prepetition Agent, the Debtors selected Altus Health Systems OPCO, LLC and Altus Health System Realty, LLC ("Altus") as the stalking horse bidder (the "Houston Stalking Horse Bidder") for Houston assets.

## IV.
## MATERIAL EVENTS DURING THE CHAPTER 11 CASES

On July 12, 2018, the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Set forth below is a summary of certain material events that have occurred since the Petition Date.

### A.   Commencement of Chapter 11 Cases and First Day Motions

Prior to the closing of sales for substantially all of the Debtors' assets, the Debtors operated in the ordinary course during the pendency of the Chapter 11 Cases. To facilitate the prompt and efficient implementation of the Plan through the Chapter 11 Cases, the Debtors' Chapter 11 Cases have been assigned to the same bankruptcy judge and administered jointly. The Debtors filed various motions seeking relief from the Bankruptcy Court to facilitate a smooth business transition through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations (the "First Day Motions"). The following is a brief overview of the relief

the Bankruptcy Court granted shortly after the Petition Date in order to maintain their operations in the ordinary course.

### a. Cash Management System

The Debtors maintain a complex centralized cash management system designed to receive, monitor, aggregate, and distribute cash. At a hearing before the Bankruptcy Court on July 13, 2018 (the "First Day Hearing"), at Docket No. 37, the Bankruptcy Court granted the Debtors interim authority to continue the use of their existing cash management system, bank accounts, and related business forms to avoid a disruption in the Debtors' operations and facilitate the efficient administration of the Chapter 11 Cases. Thereafter, on August 1, 2018, the Bankruptcy Court conducted a further hearing to consider granting the relief requested in certain of the Debtors' First Day Motions on a final basis (the "Second Day Hearing"). The Bankruptcy Court, at Docket No. 197, granted the Debtors authority to continue the use of their existing cash management system, bank accounts, and related business forms on a final basis at the Second Day Hearing.  On November 2, 2018, at Docket No. 599, the Court entered the Supplemental Agreed Order Extending the Deadline by Which the Debtors Must Comply with Section 345(b) of the Bankruptcy Code, which extends the Debtors' deadline to comply with section 345(b) to November 30, 2018.

### b. Approval of DIP Financing and Use of Cash Collateral

To address their working capital needs and fund their chapter 11 efforts, the Debtors required the use of cash that is subject to liens (the "Cash Collateral") granted in favor of the Prepetition Agent under the DIP Credit Agreement.  The Debtors requested authority to continue to use the Cash Collateral in the ordinary course of business subject to certain restrictions.  On July 13, 2018, at Docket No. 39, the Bankruptcy Court entered an order approving the Debtors' Cash Collateral motion on an interim basis.  On August 8, 2018, at Docket No. 193, the Bankruptcy Court entered an order granting the Debtors authority to use Cash Collateral on a final basis.

On August 8, 2018, at Docket No. 193, the Court approved the DIP Credit Agreement, provided by the DIP Agent for itself and certain parties identified as the DIP Lenders in the form of a post-petition senior secured loan facility with a commitment in an aggregate principal amount of up to $24,000,000, comprised of a revolving loan up to $8,000,000 and a roll-up of $16,000,000.

The DIP Facility provided liquidity that was unavailable from any other source and allowed the Debtors to transition into bankruptcy while trying to continue to market their assets. The DIP Facility enabled the Debtors to have a smooth entry into chapter 11, continue operations, and pursue a sale process that would maximize value for the Debtors' estates.

The Final DIP Order also includes a settlement carve-out from the sale of the Debtors' assets for the benefit of unsecured creditors.  Specifically, the DIP Secured Parties agree to allocation of $275,000 (as defined in the Plan, the "GUC Settlement Cash") of the proceeds from the sale of the Debtors' assets will be allocated exclusively for the initial funding of the Unsecured Creditor Trust; and not sharing, on account of their deficiency claims, in the first

14

$1,000,000 of net distributions from the Unsecured Creditor Trust on account of General Unsecured Claims provided that the next $125,000 of such distributions are paid solely to the DIP Secured Parties.

c.   Utilities

In the ordinary course of business, the Debtors incur certain expenses related to essential utility services, such as electricity, gas, water, and telecommunications.  Accordingly, on July 12, 2018, the Debtors requested, and on July 19, 2018, the Court entered its Order (i) approving Debtors' adequate assurance of payment to utility companies, (ii) establishing procedures for resolving objections, and (iii) prohibiting utility companies from altering, refusing or discontinuing service.

d.   Insurance

The maintenance of certain insurance coverage is essential to the Debtors' operations and is required by laws, various regulations, financing agreements, and revenue contracts.  The Debtors believe that the satisfaction of their obligations relating to their insurance policies, whether arising pre- or post-petition, is necessary to maintain the Debtors' relationships with their insurance providers and to ensure the continued availability and commercially reasonable pricing of such insurance coverage.  Accordingly, on August 1, 2018, the Bankruptcy Court granted the Debtors the authority to continue to honor their obligations under their existing policies and programs.

e.   Employee Wages and Benefits

The Debtors' Workforce is comprised of three primary groups: (i) Employees, including part-time and full-time employees, (ii) the Physicians, and (iii) Pharmacists.  The Workforce's skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many instances, the Workforce includes highly-trained medical professionals who are not easily replaced.  To minimize the uncertainty and potential distractions associated with the Chapter 11 Cases, at the First Day Hearing, the Court granted the Debtors the authority, on an interim basis, to continue to honor their obligations to their workforce in the ordinary course of business, including (a) the payment of prepetition wages, and (b) the continuation of the Debtors' benefit programs and policies. On August 8, 2018, the Bankruptcy Court granted this relief on a final basis.  On November 20, 2018, at Docket No. 684, the Court entered the Agreed Supplemental Order Authorizing the Debtors to Continue to Pay Certain Postpetition Severance Obligations to Noninsiders.

f.   Protect Confidential Information

As healthcare providers, the Debtors are subject to certain regulations regarding patient confidentiality.  To ensure that the Debtors could comply with the Bankruptcy Code while still meeting their regulatory obligations and maintaining patient confidentiality, the Debtors requested authority to file Redacted Patient Schedules, to the extent required.  The Court authorized the filing of Redacted Patient Schedules by its order at Docket No. 38.

g.   Pay Prepetition Patient Refunds

In the ordinary course of business, health care facilities like the Debtors receive overpayments on patient accounts.  The patient refunds are not part of the Debtors' estates. Accordingly, on August 6, 2018, the Court authorized the Debtors to pay up to $15,000, in the aggregate, to all patients who overpaid for procedures prior to the Petition Date.

**B.      Other Significant Matters**

a.   Bar Date

On July 12, 2018, the Court entered an order granting complex case treatment of the Debtors' chapter 11 bankruptcy case and establishing a deadline for filing proofs of claim.  On October 5, 2018, at Docket No. 551, the Debtors filed their Notice of Deadlines for Filing Proofs of Claim.  The deadline for governmental units to file proofs of claim is 180 days after the Petition Date, or January 8, 2019 (the "Governmental Unit Bar Date").  The deadline for all other parties to file proofs of claim is 90 days after the first date set for the meeting of creditors, or November 14, 2018 (the "Bar Date").

b.   Reject Unexpired Leases for Closed Centers

To preserve estate value, the Debtors moved to reject certain unexpired leases for both real and personal property at Debtors' Closed and Never-Opened Centers. On August 8, 2018, at Docket Nos. 200 and 201, the Court entered Orders Rejecting the Debtors' real and personal property leases at the Debtors' Closed and Never-Opened Centers.

c.   Appointment of Committee

On July 23, 2018, the U.S. Trustee appointed the Committee.  The Committee is composed of Read King, Inc., UCP Texas Limited, Ltd., The Don Levin Trust, XtreMed Enterprise, LLC, and Southwest Precision Printers, LP.

d.   Appointment of Patient Care Ombudsman

On August 8, 2018, pursuant to 11 U.S.C. § 333, the U.S. Trustee appointed Susan N. Goodman as the Patient Care Ombudsman.  The Patient Care Ombudsman filed the following reports:

| DOCKET NO. | REPORT |
|---|---|
| 594 | Patient Care Ombudsman's Second Consolidated Report for All Locations |
| 488 | First Interim Report for Northeast Texas – Paris and Texarkana Locations |
| 487 | First Interim Report for Golden Triangle – Beaumont, Orange, and Port Arthur Locations |
| 486 | First Interim Report for Houston Metro – Crosby, Copperfield, Baytown, Bellaire, Kingwood, Pasadena, Pearland, and Porter Locations |
| 335 | First Interim Report for South Texas – Harlingen, McAllen, and Brownsville |
| 334 | First Interim Report for Austin/Mueller Location |
| 333 | First Interim Report for West Texas – Amarillo, Lubbock, Midland, Odessa, |

16

| and El Paso |
|---|

### e.   Key Employee Retention Plan

Throughout the bankruptcy process, the Debtors lost a number of key employees who were critical to the Debtors' operations.  To combat key employee attrition, the Debtors created a non-insider Key Employee Retention Plan ("Non-Insider KERP"), which the Court approved on August 17, 2018, at Docket No. 253.  The Non-Insider KERP pays approximately 67 Critical Employees an additional week's salary for every month worked post-petition, with various limitations, not to exceed, in the aggregate, $272,000.

### C.      Bidding Procedures and Sale

The Debtors filed a motion to schedule an auction, approve bid procedures, approve the Houston Stalking Horse Bidder, approve payment of bid protections, and approve the sale of the Debtors' assets [Docket No. 20] (the "Sale Motion").  On August 8, 2018, the Court entered its Order (the "Bid Procedures Order"), which approved bid procedures, including a bid deadline (the "Qualified Bid Deadline") of August 22, 2018, approved Altus (the "Houston Stalking Horse Bidder") as the stalking horse bidder for the Debtors' Houston locations and authorized the Debtors to select other stalking horse bidders for the Debtors' non-Houston locations, scheduled an auction for 10:00 a.m. on August 27, 2018, and approved the payment of bid protections.

On July 23, 2018, the Debtors designated Fostre, Inc. as the stalking horse bidder (the "Non-Houston Stalking Horse Bidder") for the Debtors' non-Houston locations.  Collectively, the Houston and Non-Houston Stalking Horse Bidders agreed to purchase substantially all of the Debtors' assets for approximately $37 million.

### a.   Auction

The Debtors received nine qualified bids by the Qualified Bid Deadline.  The nine qualified bidders and their counsel attended the auction.  The auction started at approximately 10:00 a.m. on August 27, 2018, and concluded at approximately 10:00 a.m. on August 28, 2018.  At the conclusion of the auction, the Debtors selected the highest and best bid, which was a consortium bid with five separate bidders, for substantially all of the Debtors' assets at a purchase price of approximately $74 million with bids as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| **Consortium Bid Summary** | | | | | | |
| **PURCHASER** | **Altus Health** | **Austin Emergency Center** | **Exceptional Healthcare** | **Greater Texas / Signature Care** | **Tenet** | **Total Combined Winning Bid** |
| Facilities Purchase | 1) Baytown<br>2) Crosby<br>3) Pearland<br>4) Pasadena<br>5) Porter<br>6) Kingwood<br>- Bellaire A/R | 1) Mueller | 1) Beaumont<br>2) Port Arthur<br>3) Orange<br>4) Lubbock<br>5) Amarillo<br>6) McAllen | 1) Midland<br>2) Odessa<br>3) Paris<br>4) Texarkana<br>5) Yorktown (excl. A/R)<br>6) Bellaire (excl. A/R) | 1) Harlingen<br>2) Brownsville<br>3) Eastside | - 8 Houston Facilities<br>- 14 Non-Houston Facilities |
| **PURCHASE PRICE** | 49,325,544 | 1,325,000 | 9,970,000 | 6,350,000 | 7,087,272 | 74,057,816 |

The Debtors additionally selected two Back-up Bidders for certain Houston and Non-Houston locations.  The Debtors selected Nitya Capital, LLC ("Nitya") to be the Back-up Bidder for the Debtors' Baytown, Bellaire, Crosby, Kingwood, Pearland, Pasadena, Porter, Amarillo, Beaumont, Brownsville, Eastside, Harlingen, McAllen, Midland, Mueller, Odessa, Paris, Port Arthur, and Texarkana locations.  The Debtors selected Greater Texas Emergency Center, LLC ("Greater Texas") to be the Back-up Bidder for the Debtors' Yorktown facility (excluding accounts receivables).

        b.   Approval of the Sale

On September 12, 2018, at Docket No. 482, the Court entered its Order (the "Sale Order") approving the sale of the Debtors' assets, but reserving approval of the Sale to Greater Texas and reserving approval of the Nitya Back-up Bidder.  On September 14, 2018, at Docket No. 484, the Court approved the sale of the Debtors' Bellaire, Yorktown, Odessa, Midland, Texarkana, and Paris facilities to Greater Texas.  On September 24, 2018, at Docket No. 524, the Court entered its Order regarding objections to the Debtors' proposed assumption and assignment of executory contracts and unexpired leases.

On September 28, 2018, the Court approved Nitya as the Back-up Bidder for the Debtors' Baytown, Bellaire, Crosby, Kingwood, Pearland, Pasadena, Porter, Amarillo, Beaumont, Brownsville, Eastside, Harlingen, McAllen, Midland, Mueller, Odessa, Paris, Port Arthur, and Texarkana locations.  On October 24, 2018, at Docket No. 582, the Debtors filed the executed Asset Purchase Agreement for the Back-up Bidder.

        c.   Sale Closings

Pursuant to the Sale Order and the approved Asset Purchase Agreements, the Debtors have sold substantially all of their assets through five separate Purchase Agreements, as outlined below:

18

| BUYER | CLOSING DATE | DOCKET NO. OF NOTICE |
|---|---|---|
| AEC ER 4, LLC | October 31, 2018 | 601 |
| Tenet Business Services Corporation | October 31, 2018 | 601 |
| Altus Health Systems OPCO, LLC and Altus Health System Realty, LLC | November 5, 2018 | 637 |
| Greater Texas Emergency Centers, LLC | November 5, 2018 | 637 |
| Exceptional H.C., Inc. | November 13, 2018 | 680 |

    d.  Reject Unexpired Leases for Sold Centers

To preserve estate value, for certain unexpired leases that no Buyer assumed pursuant to the Purchase Agreements, the Debtors moved to reject certain unexpired leases for personal property at Debtors' remaining centers. On November 6, 2018, the Court entered its Order Granting Debtors' Emergency Third Omnibus Motion to Authorize and Approve the Rejection of Certain Unexpired Leases and Executory Contracts. (Docket No. 596). On November 20, 2018, the Court entered its Order Granting Debtors' Emergency Fourth Omnibus Motion to Authorize and Approve the Rejection of Certain Unexpired Leases and Executory Contracts. (Docket No. 683).

**D.    Retention of Professionals**

The Debtors retained Porter Hedges LLP as their general bankruptcy and restructuring counsel, CohnReznick[10] as their financial advisor, and Houlihan Lokey as their investment banker. Additionally, the Committee has retained Cole Schotz P.C. as its counsel and GlassRatner Advisory & Capital Group, LLC as its financial advisor.

**V.**
**SUMMARY OF THE PLAN**

This section of the Disclosure Statement summarizes the Plan, a copy of which is attached hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

**A.    Administrative Claims, DIP Claims, Priority Claims**

    1.    General Administrative Claims

Except with respect to Administrative Claims that are Professional Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors or the

---

[10] On August 31, 2018, the Debtors' CRO left CohnReznick and joined FTI Consulting ("FTI"). On September 29, 2018, at Docket No. 540, the Debtors filed their Application to Employ FTI to continue the designation of Chad J. Shandler as the Debtors' CRO. On October 24, 2018, at Docket No. 580, the Court entered its Order Approving the Retention of FTI as of September 1, 2018.

Liquidating Trustee agree to less favorable treatment for such Holder's Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be paid in full in Cash from the Administrative Claims Reserve or the Liquidating Trust Cash on the later of (i) the Effective Date or as soon as reasonably practical thereafter, (ii) the date on which such Administrative Claim becomes an Allowed Claim; or (iii) such other date as the Liquidating Trustee and the Holder of the Allowed Administrative Claim shall agree. Allowed Administrative Claims that are not secured by a valid, perfected, postpetition Lien are not entitled to postpetition interest or legal fees and expenses. For the avoidance of doubt, Holders of an Administrative Claim shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

2.  Administrative Claim Reserve Amount

On or before the Effective Date, the Debtors shall provide the Liquidating Trustee with an estimated amount of Administrative Claims, other than Professional Fee Claims, that are accrued and unpaid as of the Effective Date. The Liquidating Trustee shall promptly establish the Administrative Claims Reserve in an amount not less than the Debtors' estimate. The DIP Secured Parties and the Prepetition Secured Parties shall have a security interest in all funds in the Administrative Claim Reserve and, to the extent any funds remain in the Administrative Claims Reserve after payment in full of all Allowed Administrative Claims, other than Professional Fee Claims, the Liquidating Trustee shall disburse any remaining funds to the DIP Agent, or to the extent that the DIP Claims have been satisfied in full, to the Prepetition Agent.

3.  Professional Fee Escrow

Each holder of a Professional Fee Claim shall be paid in respect of such Professional Fee Claim in Cash from the Professional Fee Escrow, in full, promptly after Bankruptcy Court approval of the Professional Fee Claim by a Final Order. Final fee applications for any Professional Fee Claim shall be filed within forty-five (45) days of the Effective Date and such applications and objections thereto (if any) shall be filed in accordance with and comply in all respects with the Bankruptcy Code, the Bankruptcy Rules, and applicable local rules. Upon payment in full of all Allowed Professional Fee Claims, any balance of Cash remaining in the Professional Fee Escrow shall be Available Cash. For the avoidance of doubt, Holders of a Professional Fee Claim shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

4.  Professional Fee Reserve Amount

At least five (5) days prior to the Effective Date all Professionals shall provide the Debtors with an estimate of outstanding fees owed through the Effective Date and the Debtors shall estimate the amount to be reserved (the "Professional Fee Reserve Amount").

5.  DIP Claims

To the extent not already satisfied prior to the Effective Date, the DIP Claims shall be deemed Allowed Claims under the Plan. The DIP Claims shall be satisfied in full, on the Effective Date, by the termination of all commitments under the DIP Credit Agreement, and indefeasible payment in full in Cash to the DIP Agent, as agent for the DIP Secured Parties, of

all outstanding obligations thereunder. Until satisfied in full, the DIP Secured Parties shall retain all rights, Claims, and Liens available pursuant to the DIP Credit Agreement and the Final DIP Order.  For the avoidance of doubt, the DIP Claims shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

6.      Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors or the Liquidating Trustee agree to less favorable treatment for such Holder's Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will be paid in full in Cash from the Disputed Claims Reserve established by the Liquidating Trustee in an amount equal to the amount of such Allowed Priority Tax Claim on the latest of: (i) the Effective Date or as soon as reasonably practical thereafter, (ii) the date on which such Priority Tax Claim becomes an Allowed Claim; or (iii) such other date as the Liquidating Trustee and the holder of the Allowed Priority Tax Claim shall agree.  For the avoidance of doubt, Holders of Priority Tax Claims shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

7.      Statutory Fees

On the Effective Date, the Debtors shall pay all fees due and payable pursuant to section 1930 of the Judicial Code prior to the Effective Date. After the Effective Date, the Liquidating Trustee shall pay any and all such fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Liquidating Trustee shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a schedule of disbursements made by the Liquidating Trustee during the applicable period, attested to by an authorized representative of the Liquidating Trustee.

**B.      Classification and Treatment of Claims and Interests**

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

## C.     Treatment of Claims and Interests

a.  **Class 1:**     Other Priority Claims

(a)     *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtors or the Liquidating Trustee agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive Cash from the Liquidating Trust Cash equal to the amount of the Allowed Other Priority Claim.   For the avoidance of doubt, Holders of Class 1 Allowed Other Priority Claims shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

(b)     *Voting*: Class 1 is Unimpaired. Holders of Class 1 Other Priority Claims are deemed to accept the Plan pursuant to section 1126(f) and are not entitled to vote to accept or reject the Plan.

b.  **Class 2:**     Other Secured Claims

(a)     *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim and the Debtors or the Liquidating Trustee agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive either (i) Cash from the Liquidating Trust Cash in an amount equal to the proceeds of the collateral securing such Holder's Allowed Other Secured Claim after satisfaction in full of all superior liens up to the Allowed Amount of the Allowed Other Secured Claim; or (ii) to the extent the amount of an Allowed Other Secured Claim is greater than the value of the collateral securing such Allowed Other Secured Claim and there are no Liens on such collateral senior to the Lien held by or for the benefit of the Holder of such Allowed Other Secured Claim, solely the collateral securing such Allowed Other Secured Claim in full and final satisfaction of such Claim.   For the avoidance of doubt, Holders of Class 2 Allowed Other Secured Claims shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

(b)     *Voting*: Class 2 is Unimpaired. Holders of Class 2 Other Secured Claims are deemed to accept the Plan pursuant to section 1126(f) and are not entitled to vote to accept or reject the Plan.

c.  Class 3:      Prepetition Secured Loan Claims

    (a)      *Treatment*: Each Holder of a Prepetition Secured Loan Claim shall receive all Available Cash, plus the proceeds of the Remaining Prepetition Collateral up to the amount of the Prepetition Loan Claim outstanding after all payments made pursuant to the Final DIP Order.   For the avoidance of doubt, Holders of Class 3 Prepetition Secured Loan Claims shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

    (b)      *Voting*: Class 3 is Impaired. The Holders of Class 3 Prepetition Secured Loan Claims are entitled to vote to accept or reject the Plan.

d.  Class 4:      General Unsecured Claims

    (a)      *Treatment*: Pro Rata share of the Unsecured Creditor Trust Interests.   For the sake of clarify, the Holder of the Prepetition Deficiency Claim shall receive its Pro Rata share of the Unsecured Creditor Trust Interests; *provided, however*, the Distributions on account of such interest shall be limited as follows: (i) Prepetition Deficiency Claim will not receive any recovery from the first $1,000,000 of Distributions from the Unsecured Creditor Trust Cash; (ii) Prepetition Deficiency Claim will receive the entire amount of the first $125,000 of Distributions after the first $1,000,000 of Distributions from the Unsecured Creditor Trust Cash; and (iii) Prepetition Deficiency Claim will share Pro Rata with other General Unsecured Claims on any Distributions from the Unsecured Creditor Trust Cash over $1,125,000.

    (b)      *Voting*: Class 4 is Impaired. Holders of Class 4 General Unsecured Claims are entitled to vote to accept or reject the Plan.

e.  Class 5:      Section 510(b) Claims

    (a)      *Treatment*: Class 5 Section 510(b) Claims, including all Series LLC Claims, shall be subordinated to General Unsecured Claims pursuant to section 510(b) of the Bankruptcy Code.  Each holder of a Class 5 Section 510(b) Claim shall receive it Pro Rata share of the Unsecured Creditor Trust Cash, if any, after all Claims in Class 4 have been satisfied in full.

    (b)      *Voting*: Class 5 is Impaired under the Plan. Each holder of a Section 510(b) Claim will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of a Section 510(b) Claim will not be entitled to vote to accept or reject the Plan.

f.  Class 6:    Intercompany Claims

   (a)  *Treatment*: Class 6 Intercompany Claims shall be cancelled and discharged, with the Holders of such Class 6 Intercompany Claims receiving no Distribution on account of such Intercompany Claims.

   (b)  *Voting*: Class 6 is Impaired. Holders of Class 6 Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

g.  Class 7:    Intercompany Interests

   (a)  *Treatment*: Class 7 Intercompany Interests shall be cancelled and discharged, with the Holders of such Class 7 Intercompany Interests receiving no Distribution on account of such Intercompany Interests.

   (b)  *Voting*: Class 7 is Impaired. Holders of Class 7 Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

h.  Class 8:    Neighbors Equity Interests

   (a)  *Treatment*: Class 8 Neighbors Equity Interests shall be cancelled and discharged, with the Holders of such Class 8 Neighbors Equity Interests receiving no Distribution on account of such Neighbors Equity Interests.

   (b)  *Voting*: Class 8 is Impaired. Holders of Class 8 Neighbors Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of Neighbors Equity Interests are not entitled to vote to accept or reject the Plan.

# VI.
## ACCEPTANCE REQUIREMENTS

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, (a) an impaired class of claims has accepted a chapter 11 plan if the holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in such class actually voting have voted to accept the plan and (b) an impaired class of interests has accepted the plan if the holders of at least two-thirds in amount of the allowed interests in such class actually voting have voted to accept the plan.

6790233v15

A.    **Acceptance or Rejection of this Plan**

a.   Voting Classes

Classes 2, 3 and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

b.   Deemed Acceptance of the Plan

Class 1 is Unimpaired under the Plan and therefore is deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code

c.   Deemed Rejection of the Plan

Classes 5, 6, 7, and 8 are Impaired under the Plan and are not entitled to receive or retain any property on account of the Claims and Interests in Classes 5, 6, 7, and 8. Therefore, Classes 5, 6, 7, and 8 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

B.    **Subordination of Series LLC Claims**

The Plan proposes to subordinate any Series LLC Claims, which include claims related to the purchase of any Series LLC interest, pursuant to section 510(b) of the Bankruptcy Code, which provides that:

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b). "Section 510(b) serves to effectuate one of the general principles of corporate and bankruptcy law: that creditors are entitled to be paid ahead of shareholders in the distribution of corporate assets." *In re SeaQuest Diving, LP*, 579 F.3d 411, 417 (5th Cir. 2009) (quoting *In re Am. Wagering, Inc.*, 493 F.3d 1067, 1071 (9th Cir. 2007)).

"Section 510(b) requires the subordination of three distinct categories of claims: (1) a claim arising from rescission of a purchase or sale of a security of the debtor (the rescission category); (2) a claim for damages arising from the purchase or sale of a security of the debtor (the damages category); and (3) a claim for reimbursement or contribution allowed under 11 U.S.C. § 502 on account of either (1) or (2)." *SeaQuest Diving, LP*, 579 F.3d at 418; *In re Caprock Oil Tools, Inc.*, 585 B.R. 823, 827 (Bankr. S.D. Tex. 2018).

The holders of the Series LLC Claims' Interests qualify as a "security" under section 101(49) of the Bankruptcy Code because the interests are either a "transferable share" or they fall within the broad residual category as debt or equity interests commonly known as securities. 11 U.S.C. § 101(49)(A)(viii), (xiv); *see also In re Alta+Cast, LLC,* 301 B.R. 150, 154–55

25

(Bankr. D. Del. 2003) (holding that a claim based on the debtor's failure to purchase claimant's LLC membership interest was subject to mandatory subordination).

The Series LLC Claims may arise from the purchase of a security of an affiliate of the Debtors. For a claim to "arise from" the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale. *SeaQuest Diving, LP*, 579 F.3d at 421 (citing *In re Telegroup, Inc.*, 281 F.3d 133, 142 (3d Cir. 2002)). A claim arising from the purchase or sale of a security may include a claim predicated on post-issuance conduct, such as claims for breach of contract, fraud, breach of fiduciary duties, and money-had-and-received. *See id.*; *see also In re Am. Hous. Found.*, 785 F.3d 143, 153 (5th Cir. 2015), *as revised* (June 8, 2015) (affirming bankruptcy court decision subordinating claims for fraud, breach of fiduciary duties, and money-had-and-received). Similarly, this Court has interpreted section 510(b) broadly to include claims that arise during the course of a claimant's ownership of a security. *See In re Deep Marine Holdings, Inc.*, No. 09-39313 (MI), 2011 WL 160595, at *4 (Bankr. S.D. Tex. Jan. 19, 2011) (subordinating claims asserting the right of appraisal, fraud, and an accounting because the claims were causally linked to the defendants' status as shareholders of the debtor).

Here, Series LLC Claims are defined to include only claims asserted by holders of Series LLC Interests in their capacity as holders of such interests. Thus, these claims necessarily have a causal link to the holders' status as security holders of the Debtors, and must be subordinated to General Unsecured Claims pursuant to section 510(b) of the Bankruptcy Code.

### C.    Confirmation of this Plan Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors may seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code.

### D.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests (or any Class of Claims or Interests) are Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date.

### VII.
### MEANS FOR IMPLEMENTATION OF THE PLAN

In addition to applicable provisions set forth elsewhere in the Plan, the following shall constitute the means of execution and implementation of this Plan.

### A.    Deemed Consolidation

The Plan is being proposed as a joint plan of liquidation for all of the Debtors. The Plan constitutes a motion for deemed consolidation of the Debtors and their respective Estates solely for purposes of voting on the Plan, confirming the Plan, and making Distributions pursuant to the Plan. Deemed consolidation is a condition precedent to Confirmation. Consolidation of the Debtors' Estates is for the limited purpose of making Distributions to holders of Allowed Claims to ease an administrative burden on the Debtors, their Estates, and the Plan Trustees. Accordingly, voting on the Plan shall be conducted and counted on a consolidated basis. On the

26

Effective Date, (a) the assets of the Debtors will be merged and/or treated as if they are merged for the purpose of paying Allowed Claims against the Debtors; (b) any Claim filed or asserted against any of the Debtors will be deemed a Claim against all of the Debtors, solely for the purposes of voting and Distributions pursuant to the Plan (and any duplication of claims arising from both primary operative documents and guaranty and/or other secondary obligations shall be eliminated and all such claims against the Debtors shall be treated as a single claim that eliminates such duplications); and (c) all Intercompany Claims and Interests will be eliminated. Except as set forth in this paragraph, such consolidation shall not affect the legal and corporate structure of the Debtors nor affect Causes of Action, including Avoidance Actions. In addition, such consolidation shall not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code. For avoidance of doubt, and notwithstanding anything to the contrary herein, all Retained Causes of Action are preserved as they existed immediately before the Effective Date for the Unsecured Creditor Trustee to prosecute on behalf of the Unsecured Creditor Trust, and all recoveries by the Unsecured Creditor Trust, based upon, *inter alia*, Causes of Actions, shall be accounted for on a consolidated basis. The deemed consolidation under this Plan shall not affect or impair any valid, perfected and unavoidable Lien to which the assets of any Debtors are subject in the absence of deemed consolidation under this Plan; *provided, however*, the deemed consolidation shall not cause any such Lien to secure any Claim which such Lien would not otherwise secure absent such deemed consolidation. Holders of Allowed Claims or Allowed Equity Interests who assert identical Claims against or Equity Interests in multiple Debtors shall be entitled to only a single satisfaction of such Claims or Equity Interests.

The Debtors believe that deemed consolidation will minimize costly disputes over allocation of assets to be distributed and it will also facilitate the compromise reached among the Debtors, the Committee, the Prepetition Agent, the DIP Agent, the Secured Creditors (as defined in the Final DIP Order), and the DIP Lenders as embodied in paragraph 45 of the Final DIP Order.

The Deemed Consolidation set forth herein is a part of the overall Plan package agreed to by the Prepetition Agent, the DIP Agent and the Committee, and accordingly, is required by those parties.

### B.    Transactions Effective as of the Effective Date

The transactions contemplated by the Plan shall be approved and effective as of the Effective Date, without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their board of directors, their stockholders, or any other person or entity.

### C.    The Liquidating Trust

On or before the Effective Date, the Liquidating Trustee shall execute the Liquidating Trust Agreement and cause the Liquidating Trust to accept, on behalf of the beneficiaries thereof, (a) all Liquidating Trust Cash and (b) all other Liquidating Trust Assets.  For the avoidance of doubt, the permits, licenses, regulatory authorizations, approvals, and any other asset or attribute necessary to comply with the Debtors' duties under the Transition Services

Agreements will be retained by the Liquidating Debtors and not transferred to the Liquidating Trust; *provided however*, that the Liquidating Trustee will be the representative of the Liquidating Debtors for all purposes as further set forth in section IV.K hereof. As of the Effective Date, all assets vested in the Liquidating Trust shall be transferred and conveyed free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

On the Effective Date, the Liquidating Trust will be deemed created and effective without any further action by the Bankruptcy Court or any party. The Liquidating Trust shall be established for the primary purpose of liquidating its assets (as applicable) and for making Distributions in accordance with the Plan and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

### D.     The Unsecured Creditor Trust

On or before the Effective Date, the Unsecured Creditor Trustee shall execute the Unsecured Creditor Trust Agreement and cause the Unsecured Creditor Trust to accept, on behalf of the beneficiaries thereof, (i) the GUC Settlement Cash, (ii) Retained Causes of Action and (iii) claims under and proceeds of D&O Policies.  As of the Effective Date, all assets vested in the Unsecured Creditor Trust and all assets dealt with in the Plan shall be transferred and conveyed free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

On the Effective Date, the Unsecured Creditor Trust will be deemed created and effective without any further action by the Bankruptcy Court or any party. The Unsecured Creditor Trust shall be established for the primary purpose of administering the Unsecured Creditor Trust Assets and making all distributions to the Unsecured Creditor Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Unsecured Creditor Trust.

### E.     Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee

The Liquidating Trustee shall be the exclusive trustee of the assets of the Liquidating Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (b) supervise the receipt, deposit, and reconciliation of accounts receivable collected by the Purchasers, including any payment to Purchasers, including the ability to enforce any applicable Purchase Agreement or Transition Services Agreement; (c) reasonably cooperate to provide the Purchasers with information relevant to the Purchasers' collection of accounts receivable; (d) administer all of the Debtors' employee claims under the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA") (e) pay taxes and other obligations incurred by the Liquidating Trust; (f) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist the Liquidating Trustee; (g) calculate and implement Distributions to be made under the Plan to Holders of Claims, including Administrative Claims and Priority Claims, other than

Class 4 Claims; (h) reconcile, object to and resolve issues involving all Claims, other than Class 4 Claims; and (i) undertake all administrative functions of the Chapter 11 Cases that are not granted to the Unsecured Creditor Trustee, including the ultimate closing of the Chapter 11 Cases; *provided, however*, the Liquidating Trustee shall not compromise, settle or affect any Avoidance Actions or Retained Cause of Action in connection with its duties under this Plan or the Liquidating Trust Agreement.

On the Effective Date, the Liquidating Trust shall also have the power, right, and responsibility to take possession of all books, records, and files of the Debtors and the Estates, including all Patient Records not sold pursuant to the Sale and provide for the retention and storage of such books, records, and files pursuant to this Plan and Bankruptcy Code section 351 (as applicable) until such time as the Liquidating Trustee determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required.  After the Effective Date, the Liquidating Trust shall (i) give the Unsecured Creditor Trust reasonable access to all books, records and files of the Debtors and the Estates including, without limitation, direct logon authority to access emails, accounting records, shared drives and other documents necessary to accomplish the duties of the Unsecured Creditor Trust and (ii) not destroy or abandon any such books, records and files without obtaining the consent of the Unsecured Creditor Trust.  In the event the Liquidating Trust is dissolved before the Unsecured Creditor Trust, the Unsecured Creditor Trust shall have the right to take possession of the books, records and files of the Debtors and Estates and maintain such books, records and files at the expense of the Unsecured Creditor Trust.

All expenses incurred by the Liquidating Trust and the Liquidating Trustee shall be the responsibility of and paid by the Liquidating Trust, in accordance with the Plan and the Liquidating Trust Agreement.

In no event later than three (3) months following the Effective Date and on a quarterly basis thereafter until all Liquidating Trust Cash has been released or paid out in accordance with the Plan, the Liquidating Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients, and dates of all Distributions made by the Liquidating Trustee under the Plan through each applicable reporting period.

### F.  Certain Powers and Duties of the Unsecured Creditor Trust and Unsecured Creditor Trustee

The Unsecured Creditor Trustee shall be the exclusive trustee of the assets of the Unsecured Creditor Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Unsecured Creditor Trustee shall be specified in the Unsecured Creditor Trust Agreement and shall include the authority and responsibility to: (a) prosecute, compromise, and settle, in accordance with the specific terms of the Unsecured Creditor Trust Agreement, Retained Causes of Action; (b) reconcile, object to and resolve issues involving Class 4 Claims; (c) pay taxes and other obligations incurred by the Unsecured Creditor Trust; (d) calculate and implement Distributions to be made under the Plan to Holders of Class 4 Claims; and (e) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist the Unsecured Creditor Trustee.

29

All expenses incurred by the Unsecured Creditor Trust and the Unsecured Creditor Trustee shall be the responsibility of and paid by the Unsecured Creditor Trust, in accordance with the Plan and the Unsecured Creditor Trust Agreement.

In no event later than three (3) months following the Effective Date and on a quarterly basis thereafter until all Unsecured Creditor Trust Cash has been released or paid out in accordance with the Plan, the Unsecured Creditor Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients, and dates of all Distributions made by the Unsecured Creditor Trustee under the Plan through each applicable reporting period.

### G. Federal Income Tax Treatment of the Plan Trusts for the Liquidating and Unsecured Creditor Trust Assets; Tax Reporting and Tax Payment Obligations

For U.S. federal income tax purposes, it is intended that the Plan Trusts be classified as liquidating trusts under Treasury Regulation Section 301.7701-4. Accordingly, for U.S. federal income tax purposes, it is intended that the beneficiaries of the Plan Trusts be treated as if they had received a Distribution from the Estates of an undivided interest in the assets of the Plan Trusts (to the extent of the value of their respective shares therein) and then contributed such interests to the Plan Trusts.

#### a. Plan Trusts' Assets Treated as Owned by Beneficiaries of Plan Trusts

For all U.S. federal income tax purposes, all parties shall treat the transfer of assets (net of any applicable liabilities) to the Plan Trusts for the benefit of the beneficiaries thereof as (a) a transfer by the Debtors of the assets of the Plan Trusts (net of any applicable liabilities) directly to the beneficiaries of the Plan Trusts (to the extent of the value of their respective shares in the assets of the Liquidating Trust), followed by (b) the transfer of the assets of the Plan Trusts (net of any applicable liabilities) by the beneficiaries of the Plan Trusts (to the extent of the value of their respective share in the assets of the Plan Trusts) to the Plan Trusts in exchange for the beneficial interests in the Plan Trusts. Accordingly, for U.S. federal income tax purposes, the Plan Trusts shall be treated as grantor trusts, and the beneficiaries of the Plan Trusts shall be treated as the grantors of the Plan Trusts and the owners of the assets thereof.

#### b. Tax Reporting

The Plan Trusts shall be responsible for filing all federal, state, local and foreign tax returns, including, but not limited to, any documentation related thereto for current or former employees, vendors or contractors of the Debtors, for the Debtors and the Plan Trusts. The Plan Trustees shall file all tax returns for the Plan Trusts as grantor trusts pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with this Article V.F. Within a reasonable time following the end of the taxable year, the Plan Trustees shall send to each holder of a beneficial interest appearing on its record during such year, a separate statement setting forth such holder's share of items of income, gain, loss, deduction or credit and each such holder shall report such items on their federal income tax returns. The Plan Trustees may provide each such holder of a beneficial interest with a copy of the Form 1041 for the Plan Trusts (without attaching any other holder's Schedule K-1 or other applicable information form) along with such holder's Schedule

K-1 or other applicable information form in order to satisfy the foregoing requirement. The Plan Trustees shall allocate the taxable income, gain, loss, deduction or credit of their respective Plan Trust with respect to each holder of a beneficial interest to the extent required by the IRC and applicable law.

As soon as possible after the Effective Date, each Plan Trust shall make a good faith valuation of the assets of their respective Plan Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes. Each Plan Trust shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Plan Trust that are required by any taxing authority.

The Plan Trusts may request an expedited determination of the tax obligations of the Plan Trusts under Bankruptcy Code Section 505(b) for all returns filed for, or on behalf of, the Plan Trusts for all taxable periods through the dissolution of the Plan Trusts.

The Plan Trusts shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions made by the Plan Trusts shall be subject to any such withholding and reporting requirements.

    c.   Payment of Taxes

The Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Debtors including Priority Tax Claims, Other Secured Claims and Administrative Claims, in addition to any taxes imposed on the Liquidating Trust or its assets; *provided that* the Unsecured Creditor Trust shall be responsible for payments of any taxes imposed on the Unsecured Creditor Trust. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve associated with the Unsecured Creditor Trust is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the Unsecured Creditor Trust allocable to, or retained on account of, Disputed Claims, such taxes shall be (a) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (b) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Unsecured Creditor Trust as a result of the resolutions of such Disputed Claims.

### H.    Authority to Pursue, Settle, or Abandon Retained Causes of Action

From and after the Effective Date, prosecution and settlement of all Retained Causes of Action shall be the sole responsibility of the Unsecured Creditor Trustee pursuant to the Plan, the Confirmation Order, and the Unsecured Creditor Trust Agreement. From and after the Effective Date, the Unsecured Creditor Trustee shall have exclusive rights, powers, and interests of the Estates to pursue, settle, or abandon such Retained Causes of Action as the sole representative of the estates pursuant to section 1123(b)(3) of the Bankruptcy Code, subject to any approval or consultation rights set forth in the Unsecured Creditor Trust Agreement. Confirmation of this Plan effects no settlement, compromise, waiver or release of any Claim, Cause of Action, Right of Action or claim for relief unless this Plan or the Confirmation Order specifically and unambiguously so provides.  The non-disclosure or non-discussion of any particular Claim, Cause of Action, Right of Action or claim for relief is not and shall not be construed as a

settlement, compromise, waiver, or release of any such Claim, Cause of Action, Right of Action or claim for relief.

The Unsecured Creditor Trust reserves and retains any and all claims and rights against any Persons, other than those specifically released herein, including the Retained Causes of Action, whether such claims and rights arose before, on or after the Petition Date, the Confirmation Date, the Effective Date, and/or the Distribution Record Date, including, without limitation, any and all Causes of Action, Retained Causes of Actions, and/or claims for relief that the Unsecured Creditor Trust may have against (i) any insurer and/or insurance policies, including the D&O Policies, in which either the Debtors and/or their current or former personnel have an insurable or other interest in or right to make a claim against, any other of the Debtors' insurers; (ii) current and former directors, members, managers, officers, shareholders, holders of a Series LLC Interest, holders of a Neighbors Equity Interest, and employees, or (iii) any recipient of a pre or post-petition transfer that may be recovered as an Avoidance Action, Retained Cause of Action, other Cause of Action or otherwise. The entry of the Confirmation Order shall not constitute *res judicata* or otherwise bar, estop or inhibit any actions by the Unsecured Creditor Trustee relating to any claims, Causes of Action referred to in this Section or otherwise. On the Effective Date, the Unsecured Creditor Trustee shall be substituted as a party of record in all pending litigation brought by or against the Debtors, except for any actions related to the enforcement of Liquidating Trust Assets.

The Liquidating Trustee reserves and retains any and all claims and rights against any and all third parties to enforce the Liquidating Trust Assets whether such claims and rights arose before, on or after the Petition Date, the Confirmation Date, the Effective Date, and/or the Distribution Record Date; *provided, however,* the Liquidating Trustee shall not compromise, settle or affect any Avoidance Actions or Retained Cause of Action in connection with the resolution of claims relating to the Transition Services Agreements or collection of accounts receivable.

## I.  Liquidating Trust's Accounting for Certain Recoveries

For all recoveries received, other than those related to the collection of accounts receivable, the sale of tangible personal property, or those received pursuant to any action filed to enforce the Transition Services Agreement, the Liquidating Trustee shall provide notice of any such recovery to the Unsecured Creditor Trustee. The Bankruptcy Court retains the exclusive jurisdiction to determine title to any such recovery.

## J.  Filing of Monthly and Quarterly Reports

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports for each Plan Trust shall be the responsibility of the applicable Plan Trustee until such time as each respective Plan Trust Terminates.

## K.  Corporate Existence; Compliance with Transition Services Agreements

On and after the Effective Date, the Debtors will be referred to as the Liquidating Debtors.  The Liquidating Debtors shall remain in existence and will not be dissolved until each Liquidating Debtor satisfies its duties under the applicable Transition Services Agreements.

After each Liquidating Debtor satisfies its duties under any applicable Transition Services Agreements, such Liquidating Debtor shall be deemed dissolved without any further action by any party. Notwithstanding anything herein to the contrary, the Liquidating Debtors will retain, and the Debtors and the Liquidating Debtors will not transfer to the Liquidating Trust or the Unsecured Creditor Trust, all permits, licenses, regulatory authorizations, approvals, status and any other asset or attribute necessary to comply with their duties under the Transition Services Agreements. The Liquidating Trustee shall be the legal representative and sole manager of the Liquidating Debtors and is hereby vested with the authority to take all actions necessary or appropriate with respect to the Liquidating Debtors, including but not limited to the authority granted to Neighbors Health LLC or any other Debtor entity under any management agreement and any authority granted to each Liquidating Debtor under such entity's organizational documents or operating agreements.

## L.    Directors and Officers of the Debtors

On and after the Effective Date, the board of managers or directors of each Debtor shall be terminated and all of the officers and directors of the Debtors, to the extent they have not already done so, shall be deemed to have resigned from their respective positions with the Debtors, as applicable.

## M.    Corporate Authorization

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders, directors, members, or managers of one or more of the Debtors shall be deemed to have occurred and shall be in effect from and after the Effective Date without any requirement of further action by the stockholders, directors, members, or managers of the Debtors. After the Effective Date, to the extent necessary, the Plan Trustees shall have all authority to address any and all matters that would have required the approval of, and to act on behalf of, the stockholders, directors, members, or managers of one or more of the Debtors, including performing the Debtors' obligations under the Transition Services Agreements.

## N.    Effectuating Documents and Further Transactions

Prior to the Effective Date, the Debtors shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan. After the Effective Date, the Plan Trusts shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan.

## O.    Employee Agreements

All employment, severance, retirement, indemnification, and other similar employee-related agreements or arrangements in place with the Debtors' employees that has not been previously terminated shall be deemed terminated as of the Effective Date.

P.      **Exemption from Certain Taxes and Fees**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate or personal property transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

Q.      **Duration of the Plan Trusts**

The Plan Trusts shall have an initial term of five (5) years from the Effective Date, *provided however,* that, if warranted by the facts and circumstances, and subject to the approval of the Court, upon a finding that an extension of the term of either Plan Trust is necessary to accomplish the purpose of the respective Plan Trust, the applicable Plan Trustee shall be authorized to extend the Plan Trust for six (6) months or longer provided that such extension is approved by the Bankruptcy Court within six (6) months of the beginning of such extended term. Either Plan Trust may be terminated earlier than its scheduled termination if (a) the Bankruptcy Court has entered a Final Order closing the Case pursuant to section 350(a) of the Bankruptcy Code or (b) the applicable Plan Trustee has administered all of the Plan Trust's Assets and performed all other duties required by this Plan and the applicable Plan Trust Agreement.

R.      **Wind Down of Plan Trusts**

After the termination of each of the Plan Trusts and for the purpose of liquidating and winding down the affairs of the Plan Trusts, the Plan Trustees shall continue to act as such over their respective Plan Trust until their duties have been fully performed. Prior to the final Distribution of the remaining Plan Trusts' Assets, the Plan Trustees shall be entitled to reserve from the Plan Trusts' Assets any and all amounts required to provide for their own reasonable costs and expenses, in accordance with the terms of the Plan Trusts' Agreements, until such time as the winding down of the Plan Trusts is completed. Upon termination of each of the Plan Trusts, the respective Plan Trustee shall retain for a period of three years the books, records, lists of the Beneficiaries, the registry of claims and Beneficiaries, and other documents and files that have been delivered to or created by the Plan Trustees. Except as otherwise specifically provided herein, upon the termination of each of the Plan Trusts, the Plan Trustees and the respective Plan Trusts' professionals and agents shall have no further duties or obligations hereunder.

## VIII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      **Treatment of Executory Contracts and Unexpired Leases**

As of the Effective Date, the Debtors shall be deemed to have rejected all Executory Contracts and Unexpired Leases that (1) have not been previously rejected, assumed, or assumed and assigned, including in connection with the Sale, and (2) have not expired under their own terms prior to the Effective Date.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the foregoing rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

### B. Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.

### C. Rejection Damages Claim

All Claims arising from the rejection of Executory Contracts or Unexpired Leases must be Filed with the clerk of the Bankruptcy Court and served upon the Unsecured Creditor Trustee within thirty (30) days of the occurrence of the Effective Date. Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a Class 4 General Unsecured Claim. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within the time required by this section will be forever barred from assertion against the Debtors, the Estates, the property of the Debtors, or the Plan Trusts.

### D. Reservation of Rights

Nothing contained in this Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

## IX.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A. Disclosure Regarding Potential Range of Distributions to Unsecured Creditors

Pursuant to the Plan, $275,000 has been allocated from the DIP Secured Parties' Collateral for the Initial Funding of the Unsecured Creditor Trust. It is anticipated that such funds will be used to investigate and pursue potential claims and Causes of Action, the proceeds of which would inure to the benefit of the Unsecured Creditor Trust Beneficiaries. However, if there are no net recoveries from the activities of the Unsecured Creditor Trust, it is possible that there will be no distribution to Unsecured Creditor Trust Beneficiaries, including Holders of Allowed General Unsecured Claims. For the avoidance of doubt, the $275,000 Initial Funding is not expected to be directly distributed to creditors.

Below is a table summarizing potential recoveries to Holders of Allowed Unsecured Claims at different levels of potential recovery, taking into the account the Secured Parties' agreements set forth above regarding allocation of proceeds. The table assumes, for purposes of illustration only, that all claims scheduled and filed in these Cases are treated as Allowed Claims.

The table also assumes, for purposes of illustration only, that certain hypothetical amounts are recovered by the Unsecured Creditor Trust.

| Projected Incremental Distribution | | Cumulative Projected Distribution | | Cumulative Recovery | | | |
|---|---|---|---|---|---|---|---|
| | | | | Projected Class 4 (excluding Class 3 Deficiency Claim) (a) | | Projected Class 3 Deficiency Claim (b) | |
| | | | | $ | % | $ | % |
| $ | - | $ | - | $ | - | 0.00% | $ | - | 0.00% |
| | 250,000 | | 250,000 | | 250,000 | 0.44% | | - | 0.00% |
| | 250,000 | | 500,000 | | 500,000 | 0.88% | | - | 0.00% |
| | 250,000 | | 750,000 | | 750,000 | 1.32% | | - | 0.00% |
| | 250,000 | | 1,000,000 | | 1,000,000 | 1.75% | | - | 0.00% |
| | 125,000 | | 1,125,000 | | 1,000,000 | 1.75% | | 125,000 | 0.32% |
| | 125,000 | | 1,250,000 | | 1,073,754 | 1.88% | | 176,246 | 0.45% |
| | 250,000 | | 1,500,000 | | 1,221,262 | 2.14% | | 278,738 | 0.70% |
| | 250,000 | | 1,750,000 | | 1,368,770 | 2.40% | | 381,230 | 0.96% |
| | 250,000 | | 2,000,000 | | 1,516,278 | 2.66% | | 483,722 | 1.22% |

*(a) Projected Class 4 (excluding Class 3 Deficiency Claim) is $57.0 million.*

*(b) Projected Class 3 Deficiency Claim $39.6 million.*

## B.      Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions

### a.   Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the Distributions that this Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Article VII. Except as otherwise provided herein, Holders of Claims shall not be entitled to postpetition interest, dividends, or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

### b.   Entitlement to Distributions

On and after the Effective Date, the Plan Trustees shall be authorized (but not directed) to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date. Accordingly, the Plan Trustees will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute property, notices, and other documents only to those Holders of Allowed Claims who are Holders of such Claims (or participants therein) as of the close of business on the Distribution Record Date.

### C. Plan Trustees

The Unsecured Creditor Trustee shall make all Distributions under the Plan on account of Class 4 Allowed General Unsecured Claims. The Liquidating Trustee shall make all other Distributions under the Plan. The Plan Trustees shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. For purposes of Distribution on account of the Prepetition Secured Loan Claims and the DIP Claims, the Prepetition Agent and the DIP Agent, respectively (a) shall be deemed to be the Holder of all Prepetition Secured Loan Claims and DIP Claims and (b) are hereby directed to make Distributions to the Holders of Prepetition Secured Loan Claims and DIP Claims. In accordance with the foregoing, the delivery of any applicable property to be distributed to Holders of Prepetition Secured Loan Claims and Holders of DIP Claims to the Prepetition Agent and DIP Agent, respectively, shall satisfy all applicable Distribution obligations under the Plan.

### D. No De Minimis Distributions Required

No Distribution shall be required to be made hereunder to any Holder of a Claim unless such Holder is to receive in such Distribution at least $50.00, or unless such Distribution is the final Distribution to such Holder pursuant to this Plan. The Plan Trustees shall retain any such Distribution not made in accordance with the provisions of this section. Any Distribution not made in accordance with this section shall be held in trust for the relevant Holder until the earlier of (i) the date the next Distribution is scheduled to be made to such Holder, or (ii) the final Distribution to such Holder.

### E. Disputed Claims Reserve

On or prior to the Effective Date, the Plan Trustees shall be authorized to establish Disputed Claims Reserves, each of which shall be administered by the applicable Plan Trustee, respectively. The Unsecured Creditor Trustee may, but shall not be required to, hold Cash in its Disputed Claims Reserve from the GUC Settlement Cash in trust for the benefit of the Holders of General Unsecured Claims ultimately determined to be Allowed after the Effective Date. The Unsecured Creditor Trustee shall distribute the amounts (net of any expenses, including any taxes relating thereto) from its Disputed Claims Reserve, as provided herein, as applicable Disputed Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Disputed Claims as such amounts would have been distributable had such Disputed Claims been Allowed Claims as of the Effective Date. The Liquidating Trustee may hold Cash in its Disputed Claims Reserve in trust for the benefit parties entitled to receive payments from the Liquidating Trust Cash to the extent they hold Claims ultimately determined to be Allowed after the Effective Date. The Liquidating Trustee shall distribute the amounts (net of any expenses, including any taxes relating thereto) from its Disputed Claims Reserve, as provided herein, as applicable Disputed Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Disputed Claims as such amounts would have been distributable had such Disputed Claims been Allowed Claims as of the Effective Date. To the extent any cash remains in the Liquidating Trust's Disputed Claims Reserve after satisfaction of all applicable Disputed Claims, such remaining amount shall be paid to the Holders of the Class 3 Prepetition Secured Loan Claims.

F.    **Distributions on Account of Claims Allowed After the Effective Date**

    a.    Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

    b.    Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by either Plan Trustee, (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such Disputed Claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order.

G.    **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

    a.    Delivery of Distributions in General

Except as otherwise provided herein, the Plan Trustees shall make Distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Proof of Claim filed by such Holder or the Debtors' Schedules.

    b.    Undeliverable Distributions and Unclaimed Property

        i.    Failure to Claim Undeliverable Distributions

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the respective Plan Trustee has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest; provided, however, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the respective Plan Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

        ii.    Failure to Present Checks

Checks issued by either Plan Trustee on account of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the issuance of such check. Requests for reissuance of any check shall be made directly to the applicable Plan Trustee by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred and eighty (180) days after the

issuance of such check shall have its Claim for such un-negotiated check discharged and shall be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the applicable Plan Trust. In such cases, any Cash held for payment on account of such Claims shall be property of the applicable Plan Trust, free of any Claims of such Holder with respect thereto. Nothing contained herein shall require either Plan Trustee to attempt to locate any Holder of an Allowed Claim.

### H.      Compliance with Tax Requirements/Allocations

In connection with this Plan, to the extent applicable, the Plan Trustees shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Plan Trustees shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms they believe are reasonable and appropriate. Each Plan Trustee reserves the right to allocate all Distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

### I.      Claims Paid or Payable by Third Parties

#### a.      Claims Paid by Third Parties

The Debtors or either Plan Trustee, as applicable, shall reduce a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor. To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the applicable Plan Trustee, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the Effective Date.

#### b.      Claims Payable by Third Parties

No Distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

c.   Applicability of Insurance Policies

Except as otherwise provided in this Plan, Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Retained Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**J.     Allocation of Plan Distributions between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest (or original issue discount) thereon, such Distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest (or original issue discount).

**X.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

**A.     Allowance and Disallowance of Claims**

Except as expressly provided herein or any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), the Plan Trusts after Consummation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date.

Except as provided herein or otherwise agreed, any and all proofs of Claim Filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.

**B.     Prosecution of Objections to Claims**

The Liquidating Trustee shall have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment any objections to Administrative or Priority Claims as permitted under this Plan. From and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Administrative or Priority Claim without approval of the Bankruptcy Court. The Liquidating Trustee may also resolve any Disputed Administrative or Priority Claim outside the Bankruptcy Court under applicable governing law.

40

With regard to all Claims other than Administrative and Priority Claims, the Unsecured Creditor Trustee shall have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. From and after the Effective Date, the Unsecured Creditor Trustee may settle or compromise any Disputed Claim, which is not an Administrative or Priority Claim, without approval of the Bankruptcy Court. The Liquidating Trustee may also resolve any Disputed Claim, which is not an Administrative or Priority Claim, outside the Bankruptcy Court under applicable governing law.

### C.    Deadline to Object to Claims

Unless otherwise ordered by the Bankruptcy Court, the Plan Trustees shall file all objections to Claims by no later than 180 days after the Effective Date, except to the extent that such Claims are filed on or after the Effective Date, in which case, the Plan Trustees shall have until the later of 180 days after the Effective Date or 90 days after such claim is filed to file an objection to same.  Notwithstanding the foregoing, if either Plan Trustee determines that an extension of time is warranted, the Plan Trustee may seek the Bankruptcy Court's approval to extend such time by a period of an additional 90 days, without prejudice to the Plan Trustee's request to seek additional time upon a showing of good cause.

### D.    Estimation of Claims

The Unsecured Creditor Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Unsecured Creditor Trustee has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Unsecured Creditor Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

### E.    Amendments to Claims

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Court and the applicable Plan Trustee, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Court.

### F.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as reasonably practicable after the date that the order or judgment of the

Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the applicable Plan Trustee shall provide to the Holder of such Claim the Distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

**XI.**
**CONDITIONS PRECEDENT TO CONFIRMATION OF THE**
**PLAN AND THE EFFECTIVE DATE**

### A.   Conditions Precedent to Confirmation

It shall be a condition to Confirmation that the following provisions, terms, and conditions are satisfied (or waived pursuant to the provisions of Article IX.C hereof, except that entry of the Confirmation Order may not be waived), and Confirmation shall occur on the date upon which the last of such conditions are so satisfied and/or waived.

  a.   All provisions, terms and conditions hereof are approved in the Confirmation Order.

  b.   A Confirmation Order shall have been entered by the Bankruptcy Court, in form and substance acceptable to the Debtors, that approves the deemed consolidation of the Debtors for distribution and Plan voting purposes.

  c.   The Confirmation Order shall provide that, among other things, the Debtors and the Plan Trustees, as applicable, are authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing, and consummating the other contracts, instruments, and other agreements or documents created in connection with or described in this Plan.

  d.   All other actions, documents and agreements necessary to implement the Plan shall have been effected or executed.

  e.   All required consents, approvals, and authorizations, if any, have been obtained.

### B.   Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following provisions, terms, and conditions are satisfied (or waived pursuant to the provisions of Article IX.C hereof), and the Effective Date shall occur on the date upon which the last of such conditions are so satisfied and/or waived.

  a.   The Debtors shall have transferred the GUC Settlement Cash to the Unsecured Creditor Trust.

  b.   The Debtors shall have transferred all remaining Cash to the Liquidating Trust, including the Professional Fee Escrow.

c.  The Confirmation Order shall be a Final Order in form and substance acceptable to the Debtors and the Plan Trustees, each in their respective sole discretion. The Confirmation Order shall provide that, among other things, the Debtors and the Plan Trustees, as applicable, are authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, and other agreements or documents created in connection with or described in this Plan.

d.  The Plan Trusts' Agreements shall have been executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

e.  All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

## C.   Waiver of Conditions

Each of the conditions to Confirmation and to Consummation set forth in this Article IX may be waived with the consent of the Debtors without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

## D.   Effect of Nonoccurrence of Conditions

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders or any other Entity in any respect.

## XII.
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

## A.   Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any Distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and

43

Holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Plan Trustees may compromise and settle Claims against them and Causes of Action against other Entities, except for Claims and Causes of Action relating to the Retained Causes of Action, which may be compromised and settled by the Unsecured Creditor Trustee.

### B.      RELEASES BY THE DEBTORS

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, the Released Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever been released and discharged by the Debtors and the Estates from any and all past or present Claims, Interests, indebtedness and obligations, rights, suits, losses, damages, injuries, costs, expenses, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, asserted or unasserted, suspected or unsuspected, accrued or unaccrued, fixed, contingent, pending or threatened, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract violations of federal or state laws or otherwise, those causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtors, the Estates, or their Affiliates would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date*; provided, however,* that the foregoing "*Debtor Releases*" shall not operate to waive or release any Causes of Action of any Debtor: arising from claims for fraud, gross negligence, or willful misconduct; *provided, further,* the foregoing "*Debtor Releases*" shall not release the Debtors' current and former subsidiaries, Affiliates, directors, members, managers, officers, principals, partners, agents, employees, shareholders, holders of Series LLC Interests, holders of Neighbors Equity Interests. Notwithstanding anything to the contrary in the foregoing, the "Debtor Releases" set forth in this paragraph do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed in connection with the Plan.**

### C.      RELEASES BY HOLDERS OF CLAIMS AND INTERESTS

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtors and the other Released Parties from any and all past or present Claims, Interests, indebtedness and obligations, rights, suits, losses, damages, injuries, costs, expenses, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of**

44

a Debtor, whether known or unknown, foreseen or unforeseen, asserted or unasserted, suspected or unsuspected, accrued or unaccrued, fixed, contingent, pending or threatened, existing or hereafter arising, in law, equity, or otherwise, whether for tort, fraud, contract violations of federal or state laws or otherwise, those causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; *provided*, *however*, that the foregoing release shall not operate to waive or release any Causes of Action of any Releasing Party: arising from claims for fraud, gross negligence, or willful misconduct *provided, further,* the foregoing release shall not release the Debtors' current and former subsidiaries, Affiliates, directors, members, managers, officers, principals, partners, agents, employees, shareholders, holders of Series LLC Interests, holders of Neighbors Equity Interests. Notwithstanding anything to the contrary in the foregoing, the "Third Party Releases" set forth in this paragraph do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed in connection with the Plan.

### D.    EXCULPATION

To the fullest extent permitted by applicable law no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim, except for those that are determined in a final order to have constituted actual fraud, gross negligence, willful misconduct, or criminal conduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

### E.    INJUNCTION

Except for obligations issued pursuant to the Plan, from and after the Effective Date, all Entities who hold or may hold Claims or Interests and the Releasing Parties are permanently enjoined from taking any of the following actions against the Debtors or any Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Nothing in the Plan or the

**Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors, as applicable, and any such Entity agree in writing that such Entity will: (a) waive all Claims against the Debtors and the Estates related to such action and (b) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

### F. Setoffs

Except as otherwise expressly provided for in the Plan, each Debtor and the Plan Trustees (as applicable), pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the Distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any Distribution is made on account of such Allowed Claim or Allowed Interest), any Retained Causes of Action of any nature that such Debtor, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such Retained Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Debtor or Unsecured Creditor Trustee of any such Retained Causes of Action that such Debtor or Unsecured Creditor Trustee may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Retained Cause of Action of the Debtor unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.

### G. Recoupment

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Retained Cause of Action of the Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date.

## XIII.
## BINDING NATURE OF PLAN

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

6790233v15

# XIV.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, and this Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

1. allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that Distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to Retained Causes of Action;

7. adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

47

9.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions and other provisions contained in Article X and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VII;

13.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.    enter an order or final decree concluding or closing the Chapter 11 Cases;

16.    adjudicate any and all disputes arising from or relating to Distributions under the Plan;

17.    consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

22.     enforce all orders previously entered by the Bankruptcy Court; and

23.     adjudicate all other matters over with the Bankruptcy Court has jurisdiction.

## XV.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### A.     Modifications and Amendments

Subject to the limitations and rights contained in this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

### B.     Effect of Confirmation on Modifications

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### C.     Revocation or Withdrawal of the Plan

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw this Plan subject to the terms hereof, or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (x) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (y) prejudice in any manner the rights of the Debtors or any other Entity; or (z) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

### D.     Substantial Consummation of the Plan

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

# XVI.
## MISCELLANEOUS PROVISIONS

### A.    Bar Date for Administrative Claims

No Administrative Claim, other than Professional Fees and U.S. Trustee fees, will be paid unless the holder of such Administrative Claim has filed an application for payment of such Administrative Claim on or before the Administrative Claim Bar Date.  Upon the filing of any application for payment, the Entity seeking payment of an Administrative Claim shall provide notice by United States Mail in accordance with the Bankruptcy Rules.  Any Administrative Claim, other than Professional Fees and U.S. Trustee fees, not filed in accordance with this section shall be barred and the Debtors, the Plan Trusts and the Plan Trustees shall have no liability for payment of any such Administrative Claim.

### B.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

### C.    Reservation of Rights

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

### D.    Service of Documents

Any pleading, notice, or other document required by this Plan to be served on or delivered to the Debtors shall be sent by overnight mail to:

Neighbors Legacy Holdings, Inc.
c/o FTI Consulting
Three Times Square
9th Floor
New York, NY 10036
Attn:          Chad J. Shandler
Telephone:     (212) 841-9349
Email:             chad.shandler@fticonsulting.com

with copies to:

Porter Hedges LLP
1000 Main, 36th Floor
Houston, Texas 77002
Attn:   John F. Higgins
        Eric M. English
        Genevieve M. Graham
Telephone:     (713) 226-6648
Facsimile:     (713) 226-6628
Email: jhiggins@porterhedges.com
        eenglish@porterhedges.com
        ggraham@porterhedges.com

Cole Schotz P.C.
301 Commerce Street
Suite 1700
Fort Worth, Texas 76102
Attn: Michael D. Warner
Telephone: (817) 810-5250
Facsimile: (817) 977-1611
Email: mwarner@coleschotz.com

**E.      Dissolution of Committee**

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except for purposes of filing applications for Professional compensation in accordance with Article II.A.2 of this Plan.

**F.      Nonseverability of Plan Provisions**

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided* that any such alteration or interpretation must be in form and substance acceptable to the Debtors, the Committee, and the Prepetition Lenders; *provided, further*, that the Debtors may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

6790233v15

### G.     Return of Security Deposits

Unless the Debtors have agreed otherwise in a written agreement or stipulation approved by the Bankruptcy Court, all security deposits provided by the Debtors to any Person or Entity at any time after the Petition Date shall be returned to the Debtors within twenty (20) days after the Effective Date, without deduction or offset of any kind.

### H.     Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### I.     Entire Agreement

Except as otherwise indicated herein, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### J.     Exhibits

All exhibits hereto are incorporated into and are a part of the Plan as if set forth in full in the Plan. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

### K.     Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

### L.     Conflicts

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and

control. In the event of a conflict between any provision of the Plan and the Confirmation Order, the Confirmation Order shall govern and control.

### M.    Filing of Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

### XVII.
### CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

A description of the United States ("U.S.") federal income tax consequences of the Plan for the Debtors and Holders of Allowed Claims is provided in this Article XVII. This description is based on the IRC, Treasury Regulations promulgated thereunder, judicial decisions, and Internal Revenue Service ("IRS") rulings and practices, all as in effect on the date of this Disclosure Statement and all subject to change (possibly with retroactive effect). A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of any distribution under the Plan. Therefore, any subsequent changes in the foregoing authorities or in their respective interpretations could cause the U.S. federal income tax consequences of the Plan to differ materially from any consequences described herein.

The U.S. federal income tax consequences of the Plan are complex and in important respects uncertain. No IRS ruling has been requested or will be requested by the Debtors; no opinion has been requested by the Debtors from the Debtors' counsel concerning any federal, state, local or non-U.S. tax consequences of the Plan; no representations are being made by the Debtors' counsel regarding the particular federal, state, local or non-U.S. tax consequences of the Plan to the Debtors and Holders of Allowed Claims; no assurances can be given by the Debtors' counsel that the IRS would not assert, or that a court of competent jurisdiction would not sustain, a different and/or contrary position from any position discussed herein; and no federal, state, local or non-U.S. tax opinion is given by this Article XVII or this Disclosure Statement.

This description does not cover all aspects of U.S. federal income taxation that may be relevant to the Debtors and Holders of Allowed Claims. For example, this description does not address issues of special concern to certain types of taxpayers, such as broker-dealers, insurance companies, financial institutions, tax-exempt organizations and non-U.S. taxpayers, nor does it address federal, state, local or non-U.S. tax consequences to Holders of Interests in the Debtors. In addition, this description does not discuss state, local or non-U.S. tax consequences of the Plan or the U.S. federal income tax consequences to Holders of Allowed Claims who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or who are deemed to reject the Plan.   In addition, this description does not address the U.S. federal income tax consequences of the Plan to persons that are not "U.S. persons" as defined in Section 7701(a)(30) of the IRC.

This description assumes that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with

their form. If any of the various debt and other arrangements to which the Debtors are parties are not respected in accordance with their form, the U.S. federal income tax consequences of the Plan could be materially different from any consequences described herein. If a partnership (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) is a beneficial owner of Claims, the treatment of a partner in the partnership will generally depend upon the status of the partner and the business activities of the partnership. Accordingly, partnerships and their partners should consult with their own tax advisors about the U.S. federal income tax consequences of the Plan.

**FOR THE FOREGOING REASONS, THE DESCRIPTION PROVIDED IN THIS ARTICLE XVII IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES OF EACH DEBTOR AND HOLDER OF ALLOWED CLAIMS. ALL DEBTORS AND HOLDERS OF ALLOWED CLAIMS ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### B.    Certain U.S. Federal Income Tax Consequences of Payment of Allowed Claims for the Debtors Pursuant to the Plan

#### a.    Cancellation of Indebtedness

In general, absent an exception, the Debtors will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of outstanding indebtedness for total consideration less than the amount of such indebtedness. Generally, the amount of COD Income realized and recognized is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any other consideration given.

A Debtor that is an S-Corp (as defined in Section 1361 of the IRC) will not, however, be required to include any amount of COD Income in gross income if the Debtor is under the jurisdiction of a court in a case arising under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to such case. *See* Section 108(d)(7) of the IRC. We believe that one of the Debtors may be treated as an S-Corp. Instead, because of such exclusion, the Debtor must reduce its respective tax attributes by the amount of COD Income that the Debtor excluded from gross income. Generally, tax attributes will be reduced in the following order: (a) net operating losses and net operating loss carryovers, (b) certain tax credit carryovers, (c) net capital losses and capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), (e) passive activity loss and credit carryovers, and (f) foreign tax credit carryovers. However, a Debtor with COD Income may elect first to reduce the basis of their respective depreciable assets.

As a result of having debt reduced in connection with chapter 11 of the Bankruptcy Code, a Debtor that is an S-Corp generally will not recognize COD Income from the discharge of indebtedness pursuant to the Plan; however, the Debtor that is an S-Corp expects that, subject to the limitations discussed herein, the Debtor will be required to make material reductions in

certain tax attributes. Because the Plan provides that Holders of certain Allowed Claims may receive Cash, the amount of COD Income realized and recognized will depend on the actual amount of Cash paid to such Holders in satisfaction of such Allowed Claims. Therefore, such amounts cannot be known with certainty as of the date of this Disclosure Statement.

Any Debtor that is classified as a partnership for U.S. federal income tax purposes and that recognizes COD Income would allocate such COD Income among its partners in the taxable year in which the Effective Date occurs. The exceptions to recognizing COD Income under Section 108 of the IRC, including for entities that are in bankruptcy or that are insolvent, are not available to a Debtor that is a partnership; rather, such exceptions would apply at the partner level. *See* Section 108(d)(6) of the IRC.

**ALL PERSONS THAT ARE PARTNERS IN ANY DEBTOR THAT IS CLASSIFIED AS A PARTNERSHIP FOR U.S. FEDERAL INCOME TAX PURPOSES ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

  C.  **Certain U.S. Federal Income Tax Consequences of Payment of Allowed Claims for Holders of Allowed Claims Pursuant to the Plan**

    a.  In General

The U.S. federal income tax consequences of the Plan for Holders of Allowed Claims will depend on, *inter alia*: (i) the consideration to be received by such Holders, (ii) whether such Holders report income according to the accrual or cash method, (iii) whether such Holders receive distributions under the Plan in more than one taxable year, (iv) whether such Holders' Claims are Allowed or Disputed on the Effective Date, and (v) whether such Holders have previously taken bad debt deductions or worthless security deductions with respect to any such Allowed Claims.

    b.  Recognition of Gain or Loss

In general, a Holder of an Allowed Claim should recognize gain or loss in an amount equal to the difference between the amount realized under the Plan in respect of any Allowed Claim and the Holder's adjusted tax basis in such Allowed Claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary gain or loss, depending upon (i) the nature of the Allowed Claim and the Holder, (ii) the length of time the Holder held such Allowed Claim, and (iii) whether such Allowed Claim was acquired at a market discount.

If the Holder of an Allowed Claim realizes a capital loss, any deduction of such loss may be subject to limitation. The Holder's aggregate tax basis for any property received, and any property deemed received, under the Plan will generally equal the fair market value of the property received. The Holder's amount realized generally will equal the sum of any Cash received and the fair market value of any other property received, or any other property deemed received, by the Holder under the Plan on the Effective Date or subsequent distribution date, less

55

the amount (if any) allocable to the Allowed Claim for interest, which will generally be treated as interest income.

> **D.     Certain Consequences for Holders of Allowed Other Secured Claims, Allowed Prepetition Secured Loan Claims and Allowed General Unsecured Claims**

> a.  In General

Except to the extent that Holders of Allowed Other Secured Claims and the Debtors or the Unsecured Creditor Trustee agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive either (i) Cash in an amount equal to the proceeds of the collateral securing such Holder's Allowed Other Secured Claim after satisfaction in full of all superior liens up to the Allowed Amount of the Allowed Other Secured Claim, or (ii) to the extent the amount of an Allowed Other Secured Claim is greater than the value of the collateral securing such Allowed Other Secured Claim and there are no Liens on such collateral senior to the Lien held by or for the benefit of the Holder of such Allowed Other Secured Claim, solely the collateral securing such Allowed Other Secured Claim in full and final satisfaction of such Other Allowed Secured Claim.

Each Holder of a Class 3 Prepetition Secured Loan Claim shall receive all Available Cash up to the amount of the Prepetition Loan Claim outstanding after all payments made pursuant to the Final DIP Order and the proceeds of any Prepetition Collateral that was not included in the Sale. Each Holder of a Class 4 General Unsecured Claim shall receive its Pro Rata share of the Unsecured Creditor Trust Cash; *provided*, *however*, that any Prepetition Deficiency Claim will (i) not receive any recovery from the first $1,000,000 of Distributions from the Unsecured Creditor Trust Cash, (ii) receive the entire amount of the first $125,000 of Distributions after the first $1,000,000 of Distributions from the Unsecured Creditor Trust Cash, and (iii) share Pro Rata with other General Unsecured Claims on any Distributions from the Unsecured Creditor Trust Cash over $1,125,000.

Holders of Allowed Other Secured Claims, Prepetition Secured Loan Claims and General Unsecured Claims that receive Cash will be treated as receiving distributions under the Plan in a taxable exchange under Section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each Holder of such Allowed Claims should recognize gain or loss equal to the difference between the (a) sum of Cash received in exchange for such Allowed Claim, and (b) each such Holder's adjusted basis, (if any) in such Allowed Claim. Each Holder's ability to deduct any loss recognized on the exchange of an Allowed Claim will depend on each such Holder's own circumstances and may be limited under the IRC.

> b.  Distributions After Effective Date

If a Holder of an Allowed Claim receives a distribution pursuant to the Plan subsequent to the Effective Date, the installment sale rules of the IRC may apply to any gain recognized unless the Holder elects out of the installment sale rules under Section 453 of the Code. Special

rules may apply to installment sales in which the total amount to be realized is contingent, and some of these special rules may, in certain circumstances, provide for disadvantageous recovery of tax basis. Furthermore, a portion of any such future distribution may be treated as imputed interest under the imputed interest provisions of the IRC. Such imputed interest may accrue over time, in which case the Holder may be required to include such imputed interest in gross income prior to actual distribution. However, any loss and a portion of any gain realized by may be subject to deferral.

Any Holder of an Allowed Claim that receives the right to participate in any distributions of either Plan Trust after the Effective Date is strongly urged to consult his, her or its own tax advisor with respect to the application of the installment sale rules and any imputed interest with respect to deferred future payments.

      c.   Accrued Interest

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest (or original issue discount) thereon, any such Distribution shall be allocated to the principal amount of the Allowed Claim first and then, to the extent the consideration exceeds the principal amount of the Allowed Claim, to the portion of such Allowed Claim representing accrued but unpaid interest (or original issue discount).

Accordingly, to the extent that any amount received by a Holder of an Allowed Claim under the Plan is attributable to accrued but unpaid interest and such interest has not previously been included in the Holder's gross income, such amount would generally be taxable as ordinary interest income. The Holder may be able to recognize a deductible loss to the extent that any accrued interest on the debt instrument constituting an Allowed Claim was previously so included in gross income but was not paid in full by the Debtors. However, the extent to which any such amount will be attributable to accrued but untaxed interest in unclear.

      d.   Bad Debt Deduction and/or Worthless Securities Deduction

A Holder of an Allowed Claim who receives in respect of such Allowed Claim an amount less than the Holder's tax basis in such Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under Section 166(a) of the IRC or a worthless securities deduction under Section 165(g) of the IRC. The rules governing the character, timing and amount of bad debt deductions and worthless securities deductions place considerable emphasis on the particular facts and circumstances of any affected Holder, the obligor and the financial instrument with respect to which any such deduction is claimed.

**E.**    **Certain Tax Consequences for Beneficiaries of the Plan Trusts**

      a.   In General

Pursuant to the Plan, each of the Plan Trusts is intended to qualify as a "liquidating trust" under Treasury Regulation 301.7701-4 for U.S. federal income tax purposes. Accordingly, the Plan intends that the beneficiaries of the Plan Trusts be treated as if they had received a

Distribution from the Estates of an undivided interest in the applicable Plan Trust's Assets (to the extent of the value of their respective shares therein) and then contributed such interests to the applicable Plan Trust. Generally, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through type entity). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS has issued guidelines that set forth the general criteria for obtaining a ruling as to the grantor status of a liquidating trust under a chapter 11 bankruptcy plan.

Pursuant to the Plan, the Plan Trusts have been or will be structured with the intention of complying with the foregoing general criteria. In conformity with IRS guidance, all parties (including, without limitation, the Debtors, the Plan Trustees, and the beneficiaries of the Plan Trusts) are required to treat each Plan Trust as a grantor trust of which the beneficiaries of either Plan Trust are the owners and grantors (this treatment may differ from the treatment of the Disputed Claims Reserves, to the extent established). This discussion assumes that the Plan Trusts will be so respected for U.S. federal income tax purposes.

Importantly, no ruling from the IRS has been or will be requested and no opinion of the Debtors' counsel has been or will be requested concerning the tax status of the Plan Trusts as grantor trusts. Accordingly, there can be no assurances that the IRS would not take a different and/or contrary position from the position described in this Article XVII. If the IRS were to challenge successfully the grantor trust tax status of either Plan Trust, the U.S. federal income tax consequences to the applicable Plan Trust and its beneficiaries could vary materially from those discussed in this Article XVII (including the potential for an entity-level tax on income of the applicable Plan Trust).

b.   Tax Reporting for Assets Allocable to Unsecured Creditor Trust

The Unsecured Creditor Trustee shall be responsible for any taxes imposed on the Unsecured Creditor Trust or the Unsecured Creditor Trust Assets. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve associated with the Unsecured Creditor Trust is insufficient to pay the portion of any such taxes attribute to the taxable income arising from the Unsecured Creditor Trust Assets allocable to, or retained on the account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Unsecured Creditor Trust as a result of the resolutions of such Disputed Claims. The Unsecured Creditor Trustee shall file all tax returns for the Unsecured Creditor Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). Within a reasonable time following the end of the taxable year, the Unsecured Creditor Trustee shall send to each Holder of a beneficial interest appearing on its record during such year, a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and each such Holder shall report such items on their respective federal tax returns. The Unsecured Creditor Trustee may provide each Holder of a beneficial interest with a copy of the Form 1041 for the Unsecured Creditor Trust (without attaching any other Holder's Schedule K-1 or other applicable information form) along with the Holder's Schedule K-1 or other applicable information form. The Unsecured Creditor Trustee shall allocate the taxable income, gain, loss deduction or credit of the Unsecured Creditor Trust with

respect to each Holder of a beneficial interest to the extent required by the IRC and any other applicable law.

Pursuant to the Plan, the Unsecured Creditor Trustee will in good faith value the Unsecured Creditor Trust Assets. The Unsecured Creditor Trustee shall make the respective values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Unsecured Creditor Trust (including, without limitation, the Debtors, the Unsecured Creditor Trustee and the beneficiaries of the Unsecured Creditor Trust) for all U.S. federal income tax purposes. The Unsecured Creditor Trust may request an expedited determination of the tax obligations of the Unsecured Creditor Trust under Bankruptcy Code Section 505(b) for all returns filed for, or on behalf of, the Unsecured Creditor Trust for all taxable periods through the dissolution of the Unsecured Creditor Trust.

Allocations of taxable income of the Unsecured Creditor Trust (other than income allocable to the Dispute Claims Reserve associated with the Unsecured Creditor Trust, to the extent established) among the beneficiaries of the Unsecured Creditor Trust shall be determined by reference to the manner in which an amount of Cash equal to such income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Unsecured Creditor Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Disputed Claims Reserve associated with the Unsecured Creditor Trust, to the extent established as discussed below) to the beneficiaries of the Unsecured Creditor Trust, adjusted for prior income and loss and taking into account all prior and concurrent distributions from such Unsecured Creditor Trust. Similarly, taxable loss of the Unsecured Creditor Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining assets of the Unsecured Creditor Trust. The tax book value of the assets of the Unsecured Creditor Trust for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations promulgated thereunder, and any other applicable administrative and judicial authorities. The effect of the foregoing allocation is to allocate taxable income or loss (*i.e.*, the tax impact of receipts and expenditures) in a partnership-type manner, due to the varying tiers of beneficiaries in the Unsecured Creditor Trust.

Taxable income or loss allocated to each beneficiary of the Unsecured Creditor Trust will be treated as income or loss with respect to each beneficiary's undivided interest in the Unsecured Creditor Trust Assets, and not as income or loss with respect to any prior Allowed Claim. The character of any income and the character of and ability to use any loss will depend on the particular situation of each beneficiary. The Unsecured Creditor Trustee will comply with all applicable governmental tax withholding and reporting requirements imposed by any Governmental Unit, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Unsecured Creditor Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes.

c.   Tax Reporting for Assets Allocable to Liquidating Trust

The Liquidating Trustee shall be responsible for filing all federal, state, local and foreign tax returns, including, but not limited to, any documentation related thereto for current or former employees, vendors or contractors of the Debtors, for the Debtors and the Liquidating Trust. In addition, the Liquidating Trustee shall be responsible for payments of all Allowed tax obligations of the Debtors, including Priority Tax Claims, Other Secured Claims and Administrative Claims, in addition to any taxes imposed on the Liquidating Trust or the Liquidating Trust Assets. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve associated with the Liquidating Trust is insufficient to pay the portion of any such taxes attribute to the taxable income arising from the Liquidating Trust Assets allocable to, or retained on the account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Liquidating Trust as a result of the resolutions of such Disputed Claims. The Liquidating Trustee shall file all tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). Within a reasonable time following the end of the taxable year, the Liquidating Trustee shall send to each Holder of a beneficial interest appearing on its record during such year, a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and each such Holder shall report such items on their respective federal tax returns. The Liquidating Trustee may provide each Holder of a beneficial interest with a copy of the Form 1041 for the Liquidating Trust (without attaching any other Holder's Schedule K-1 or other applicable information form) along with the Holder's Schedule K-1 or other applicable information form. The Liquidating Trustee shall allocate the taxable income, gain, loss deduction or credit of the Liquidating Trust with respect to each Holder of a beneficial interest to the extent required by the IRC and any other applicable law.

Pursuant to the Plan, the Liquidating Trustee will in good faith value the Liquidating Trust Assets. The Liquidating Trustee shall make the respective values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Debtors, the Creditor Trustee and the beneficiaries of the Liquidating Trust) for all U.S. federal income tax purposes. The Liquidating Trust may request an expedited determination of the tax obligations of the Liquidating Trust under Bankruptcy Code Section 505(b) for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

Allocations of taxable income of the Liquidating Trust (other than income allocable to the Dispute Claims Reserve associated with the Liquidating Trust, to the extent established) among the beneficiaries of the Liquidating Trust shall be determined by reference to the manner in which an amount of Cash equal to such income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Disputed Claims Reserve associated with the Liquidating Trust, to the extent established as discussed below) to the beneficiaries of the Liquidating Trust, adjusted for prior income and loss and taking into account all prior and concurrent distributions from such Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating

distribution of the remaining assets of the Liquidating Trust. The tax book value of the assets of the Liquidating Trust for this purpose shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations promulgated thereunder, and any other applicable administrative and judicial authorities. The effect of the foregoing allocation is to allocate taxable income or loss (*i.e.*, the tax impact of receipts and expenditures) in a partnership-type manner, due to the varying tiers of beneficiaries in the Liquidating Trust.

Taxable income or loss allocated to each beneficiary of the Liquidating Trust will be treated as income or loss with respect to each beneficiary's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to any prior Allowed Claim. The character of any income and the character of and ability to use any loss will depend on the particular situation of each beneficiary. The Liquidating Trustee will comply with all applicable governmental tax withholding and reporting requirements imposed by any Governmental Unit, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Liquidating Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes.

d.   Tax Reporting for Assets Allocable to the Disputed Claims Reserves

On or prior to the Effective Date, the Plan Trustees shall be authorized to establish Disputed Claims Reserves, each of which shall be administered by the applicable Plan Trustee, respectively. The Unsecured Creditor Trustee may, but shall not be required to, hold Cash in its Disputed Claims Reserve from the GUC Settlement Cash in trust for the benefit of the Holders of General Unsecured Claims ultimately determined to be Allowed after the Effective Date. The Liquidating Trustee may, but shall not be required to, hold Cash in its Disputed Claims Reserve in trust for the benefit of the parties entitled to receive payments from the Liquidating Trust Cash to the extent they hold Claims ultimately determined to be allowed after the Effective Date.

If a Disputed Claims Reserve is established by either Plan Trustee, subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the applicable Plan Trustee so requests one, or the receipt of an adverse determination by an IRS upon audit if not contested by the applicable Plan Trustee), the applicable Plan Trustee will (i) elect to treat any assets allocable to, or retained on account of, Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. In such case, all parties (including, without limitation, the Debtors, the applicable Plan Trustee and the beneficiaries of the applicable Plan Trust) will be required to report for all U.S. federal income tax and other applicable purposes consistently with such treatment.

If treated as a "disputed ownership fund" for U.S. federal income tax purposes, the Disputed Claims Reserves will be subject to annual taxation on a separate entity basis on any net income earned after the Effective Date with respect to assets allocated to the applicable Disputed Claims Reserves, and all actual and constructive distributions from such Disputed Claims

Reserve (which distributions will be net of the related expenses, including any taxes relating thereto) will be treated as received by Holders in respect of their Allowed Claims as if distributed by the Debtors. In such case, any actual or constructive distributions from the applicable Disputed Claims Reserve to Holders of Allowed Claims (including to previously Allowed Claims in the event a Disputed Claim is disallowed) will be treated for U.S. federal income tax purposes as if received directly from the Debtors on the original Claim in respect of which the interest in the applicable Plan Trust was issued. Thus, a Holder of an Allowed Claim must be careful to differentiate between the tax treatment of actual or constructive distributions from the applicable Disputed Claims Reserve and the tax treatment of distributions out of assets of the applicable Plan Trust to which the Holder is already considered the direct owner for U.S. federal income tax purposes. Holders should consult their own tax advisors with respect to the U.S. federal income tax consequences of the Plan based on their own circumstances if the applicable Disputed Claims Reserve is established.

e.   Information Reporting and Withholding

Under the backup withholding rules of the IRC, a Holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the Holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that such taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. A Holder of an Allowed Claim may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

F.   **Importance of Obtaining Professional Tax Assistance**

The foregoing discussion in this Article XVII (i) is intended only as a summary of certain U.S. federal income tax consequences of the Plan, (ii) does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular Holder of an Allowed Claim in light of such Holder's particular circumstances and tax situation, and (iii) is not a substitute for consultation with a tax professional. The foregoing discussion is for informational purposes only and should not be considered tax advice. The U.S. federal income tax consequences of the Plan are complex and in many cases uncertain. Accordingly, all Holders of Allowed Claims are strongly urged to consult with their own tax advisors about the federal, state, local and applicable foreign income and other tax consequences of the Plan, including with respect to any applicable tax reporting and record keeping requirements.

## XVIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference

hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation.

**A.     Certain Bankruptcy Law Considerations**

a.   General

While the Debtors believe that the Chapter 11 Cases will be efficient and will not be materially harmful to the value of their assets, the Debtors cannot be certain that this will be the case. Further, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on subsequent ownership of the Debtors' assets or on the amount of distributable value available to holders of Claims or Interests.

b.   Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Voting Classes voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan or other proceeding.

c.   Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur within 30 calendar days after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX.C of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

d.   Conversion to Chapter 7 Cases

If no chapter 11 plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Section X.C hereof, as well as the Liquidation Analysis attached hereto as **Exhibit B**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

e.   Risk of Re-solicitation of the Plan

There can be no assurance that the Bankruptcy Court will not require modifications to the Plan that would necessitate re-solicitation of votes from the Holders of Class 3 Prepetition Secured Loan Claims and Class 4 General Unsecured Claims. Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan in the event votes are re-solicited. Re-solicitation could delay confirmation of the Plan, and if the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan or other proceeding.

**B.      Additional Factors Affecting Recoveries**

a.   Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary from the assumptions underlying the projected recoveries discussed in this Disclosure Statement, and the variation may be material.

b.   Other Contract Payment Obligations Could Be More than Projected

There can be no assurance that the estimated cure amounts or other payment obligations of the Debtors arising or otherwise resulting from the assumption of executory contracts or unexpired leases will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially. Such cure amounts or payment obligations could be significant and material and, if the Debtors are unsuccessful in challenging such amounts, confirmation or the effectiveness of the Plan may be jeopardized.

**C.      Additional Factors**

a.   Debtors Could Withdraw Plan

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

b.   Debtors Have No Duty To Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

c.   No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this

Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

        d.   No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Equity Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning its Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

        e.   No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

        f.   Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Section VI thereof.

## XIX.
## VOTING PROCEDURES AND REQUIREMENTS

### A.     Parties Entitled To Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code conclusively presumes the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the plan. Further, to avoid the cost of soliciting votes on a plan, impaired classes of claims and interests may be presumed to reject the plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (i) claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan; and (ii) interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in dollar amount of the interests that cast ballots for acceptance or rejection of the plan.

Prepetition Secured Loan Claims in Class 3 and General Unsecured Claims in Class 4 are Impaired under the Plan and entitled to vote to accept or reject the Plan.

### B.    Voting Deadline

Before voting to accept or reject the Plan, each holder of an Allowed Other Priority Claim, an Other Secured Claim, an Allowed Prepetition Secured Loan Claim, an Allowed General Unsecured Claims, or an Allowed Pre-Petition Term Claim (an "Eligible Holder") should carefully review the Plan attached hereto as **Exhibit A**. All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

Ballots will be provided for holders of Voting Claims as of the Voting Record Date (i.e., February 15, 2019) to vote to accept or reject the Plan. Only Classes 3 and 4 are entitled to vote on the Plan.

Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots. The Debtors have engaged Kurtzman Carson Consultants, LLC as their voting agent (the "Voting Agent") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.

FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 5:00 P.M., PREVAILING CENTRAL TIME, ON **MARCH 20, 2019**, UNLESS EXTENDED BY THE DEBTORS. IF YOU HOLD YOUR CLAIMS THROUGH A NOMINEE, PLEASE FOLLOW THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE FOR RETURNING YOUR VOTING INSTRUCTIONS. UNLESS OTHERWISE INSTRUCTED, PLEASE RETURN YOUR BENEFICIAL HOLDER BALLOT TO YOUR NOMINEE, OR YOUR VOTE WILL NOT BE COUNTED.

Delivery of a Ballot by facsimile, e-mail or any other electronic means will not be accepted. If you vote by mail, your Ballot must be returned by the Voting Deadline with an original signed copy, by first class mail, overnight courier, or personal delivery, to:

Neighbors Ballot Processing Center
c/o KCC
2335 Alaska Avenue
El Segundo, CA 90245

Eligible Holders may also vote via KCC's online voting portal, as described more fully in the voting instructions supplied with the Ballots.

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN **MARCH 20, 2019, AT 5:00 P.M.** (PREVAILING CENTRAL TIME). ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED. THE DEBTORS MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT SUCH VOTERS TO CURE ANY SUCH DEFECTS IN THE BALLOTS. THE FAILURE TO VOTE DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN. AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.

### C. Voting Procedures

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "Solicitation Package") to record holders of Other Priority Claims, Other Secured Claims, Prepetition Secured Loan Claims, General Unsecured Claims, and Pre-Petition Term Claims. Each Eligible Holder must submit its own Ballot.

Holders of Prepetition Secured Loan Claims should provide all of the information requested by the Ballot. Holders of Prepetition Secured Loan Claims should complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot to the Voting Agent.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Voting Record Date and the Petition Date including, without limitation, interest.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline, together with any other documents required by such Ballot, the Debtors may reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

The delivery of an accepting Ballot pursuant to the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction,

releases, and exculpations set forth in Article X therein. All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

The Plan Supplement, once Filed, will be made available for review on the website of the Voting Agent at http://www.kccllc.net/neighbors. The Debtors reserve the right to modify, amend, supplement, restate or withdraw the Plan Supplement after it is Filed. The Debtors will File and make available on the Voting Agent's website site any modified, amended, supplemented or restated Plan Supplement as promptly as possible.

### D.     Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## XX.
## CONFIRMATION OF THE PLAN

### A.     Confirmation Hearing

A hearing is scheduled for March 22, 2019, at 9:30 a.m. (prevailing Central time) to consider confirmation of the Plan (the "Confirmation Hearing").

### B.     Requirements for Confirmation of the Plan

a.   Requirements of Section 1129(a) of the Bankruptcy Code

1.   General Requirements.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)   the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)   the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)   the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)   any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)   with respect to each Class of Claims or Interests, each Holder of an impaired Claim or impaired Equity Interest has either accepted the Plan or will receive or retain under the Plan, on account of such Holder's Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vi)   except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(vii)   except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after

69

the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

(viii)   at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class; and

(ix)   all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

2.   Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all Holders of Impaired Claims and Interests will receive property with a value not less than the value such Holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to Holders of Impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit B**.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit B** is solely for the purpose of disclosing to Holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Bankruptcy Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 3. Feasibility

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. The Plan proposed by the Debtors provides for a liquidation of the Debtors' remaining assets and a distribution of Cash to creditors in accordance with the priority scheme of the Bankruptcy Code and the terms of the Plan. The Plan also provides for appropriate reserves for payment of Other Secured Claims and administrative and priority claims and mechanisms for consummation of distributions to all Holders of Claims entitled to payment. Thus, the Debtors believe that, following consummation of the Plan, there will be no need for further liquidation or reorganization.

### b. Additional Requirements for Non-Consensual Confirmation

As to Classes 6, 7 and 8, which are presumed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class that rejects or is presumed to reject the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes, pursuant to section 1129(b) of the Bankruptcy Code. Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

### 1. Unfair Discrimination Test

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it satisfies the "fair and equitable" requirement. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for nonconsensual Confirmation of the Plan.

# XXI.
## ALTERNATIVES TO CONFIRMATION AND
## CONSUMMATION OF THE PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.        Alternative Plan

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a chapter 11 plan has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets. The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.        Sale of All or Substantially All Assets Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could nevertheless consummate their current marketing and sale process or could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell all or substantially all their assets under section 363 of the Bankruptcy Code through a new process. Holders of Prepetition Secured Loan Claims could be entitled to credit bid on any property to which their security interest is attached, and to offset their Claims against the purchase price of the property. In addition, all liens and security interests in the Debtors' assets generally would attach to the proceeds of any sale of the Debtors' assets. After these Claims are satisfied, the remaining funds could be used to pay holders of Prepetition Secured Loan Claims, Other Priority Claims, Other Secured Claims and unsecured Claims and Interests. Upon analysis and consideration of this alternative, the Debtors do not believe a sale of all or substantially all of their assets under section 363 of the Bankruptcy Code without the benefits of the Plan would yield a higher recovery for holders of Claims and Interests than consummating sales separately from pursuit and implementation of the Plan.

### C.        Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of holders of allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit B**.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan and no distribution to equity holders because of

6790233v15

the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtors' Chapter 11 Cases.

# XXII.
## INFORMAL OBJECTION OF GERALD H. PHIPPS, INC.

Gerald H. Phipps, Inc. raised an informal objection and requested that the following be inserted into this Disclosure Statement.  The Debtors did not prepare the statement, and do not agree with the statement. The Gerald H. Phipps, Inc. statement is as follows:

> Gerald H. Phipps, Inc. ("Phipps") intends to assert direct claims against the Debtors' officers and directors arising under Chapter 162 of the Texas Property Code related to the construction of the Amarillo South Location and the Grand Prairie Location in 2016 and 2017.  Phipps asserts that such claims are not property of the bankruptcy estate.  Phipps alleges that Phipps' claims (and subsequent losses and damages) only affected Phipps and were not a general injury to all creditors.  The Debtors' Disclosure Statement and Plan purport to transfer Retained Causes of Action[11] and claims under and the proceeds of D&O Policies to the Unsecured Creditor Trust. Phipps alleges that the Disclosure Statement and Plan fail to identify and distinguish that direct (and not derivative) D&O Claims of creditors are not transferred to the Unsecured Creditor Trust.  See *Seven Seas Pet., Inc.,* 522 F.3d 575, 588–89 (5th Cir. 2008).

The Debtors do not adopt or agree with the above statement. The Committee does not support the above statement or the conclusions raised therein.

All parties, including Phipps and the to be appointed Unsecured Creditor Trustee on behalf of the Unsecured Creditor Trust reserve all their respective rights post-confirmation relating to Phipps' assertion that it has direct claims against the Debtors' officers and directors and that such claims are not property of the bankruptcy estates including, without limitation, the right to oppose, contest or otherwise challenge any action taken by Phipps to assert such direct claims against the Debtors' officers and directors after the Effective Date of the Plan.

# XXIII.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the Holders of Claims in Classes 3 and 4 to vote in favor thereof.

Dated: February 20, 2019

Houston, Texas

---

[11] Unless otherwise identified herein, defined terms shall have the meaning ascribed to them in the Debtors' Disclosure Statement and Plan.

6790233v15

**NEIGHBORS LEGACY HOLDINGS, INC.**
**and each of its Debtor Affiliates**


By:    */s/ Chad J. Shandler*
Name:  Chad J. Shandler
Title:   Chief Restructuring Officer

**EXHIBIT A**

**<u>Plan</u>**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **NEIGHBORS LEGACY HOLDINGS, INC.,** *et al.*, | § | **Case No. 18-33836 (MI)** |
| | § | |
| **Debtors.[1]** | § | **(Jointly Administered)** |
| | § | |

## FIRST AMENDED JOINT PLAN OF LIQUIDATION OF NEIGHBORS LEGACY HOLDINGS, INC. AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**PORTER HEDGES LLP**
John F. Higgins
Eric M. English
Genevieve M. Graham
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone:  (713) 226-6648
Facsimile:  (713) 226-6628
Email:      jhiggins@porterhedges.com
            eenglish@porterhedges.com
            ggraham@porterhedges.com

*Counsel to the Debtors and Debtors in Possession*

Dated: February 20, 2019

---

[1] Due to the large number of Debtors in these chapter 11 cases, a complete list of the Debtors and the last four digits of their tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/neighbors. The location of Debtors' principal place of business and the Debtors' service address is: 10800 Richmond Avenue, Houston, Texas 77042.

## TABLE OF CONTENTS

ARTICLE I.    DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW ................................ 1
- A.    Defined Terms ................................................................................. 1
- B.    Rules of Interpretation ................................................................. 15
- C.    Computation of Time .................................................................... 16
- D.    Governing Law .............................................................................. 16
- E.    Reference to Monetary Figures .................................................... 17

ARTICLE II.    ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS ...................................................................................... 17
- A.    Administrative Claims .................................................................. 17
- B.    DIP Claims .................................................................................... 18
- C.    Priority Tax Claims ....................................................................... 18
- D.    Statutory Fees ................................................................................ 18

ARTICLE III.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................................................................................. 19
- A.    Introduction ................................................................................... 19
- B.    Summary of Classification ............................................................ 19
- C.    Treatment of Claims and Interests ............................................... 20

ARTICLE IV.    ACCEPTANCE REQUIREMENTS .................................................. 22
- A.    Acceptance or Rejection of this Plan ........................................... 22
- B.    Confirmation of this Plan Pursuant to Section 1129(b) of the Bankruptcy Code ........................................................................... 23
- C.    Controversy Concerning Impairment ........................................... 23

ARTICLE V.    MEANS FOR IMPLEMENTATION OF THE PLAN................................. 23
- A.    Deemed Consolidation.................................................................. 23
- B.    Transactions Effective as of the Effective Date............................. 24
- C.    The Liquidating Trust ................................................................... 24
- D.    The Unsecured Creditor Trust ...................................................... 25
- E.    Settlement Regarding Unsecured Creditor Recoveries.................. 25
- F.    Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee 25
- G.    Certain Powers and Duties of the Unsecured Creditor Trust and Unsecured Creditor Trustee ........................................................... 26
- H.    Federal Income Tax Treatment of the Plan Trusts for the Liquidating and Unsecured Creditor Trust Assets; Tax Reporting and Tax Payment Obligations................................................... 27
- I.    Authority to Pursue, Settle, or Abandon Retained Causes of Action ............ 28
- J.    Liquidating Trust's Accounting for Certain Recoveries.................. 29
- K.    Filing of Monthly and Quarterly Reports ..................................... 30
- L.    Corporate Existence; Compliance with Transition Services Agreements ...... 30
- M.    Directors and Officers of the Debtors........................................... 30
- N.    Corporate Authorization ............................................................... 30

i

| | O. | Effectuating Documents and Further Transactions | 30 |
| | P. | Employee Agreements | 31 |
| | Q. | Exemption from Certain Taxes and Fees | 31 |
| | R. | Duration of the Plan Trusts | 31 |
| | S. | Wind Down of Plan Trusts | 31 |
| ARTICLE VI. | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 32 |
| | A. | Treatment of Executory Contracts and Unexpired Leases | 32 |
| | B. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases | 32 |
| | C. | Rejection Damages Claim | 32 |
| | D. | Reservation of Rights | 32 |
| ARTICLE VII. | | PROVISIONS GOVERNING DISTRIBUTIONS | 32 |
| | A. | Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions | 32 |
| | B. | Plan Trustees | 33 |
| | C. | No De Minimis Distributions Required | 33 |
| | D. | Disputed Claims Reserves | 33 |
| | E. | Distributions on Account of Claims Allowed After the Effective Date | 34 |
| | F. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 34 |
| | G. | Compliance with Tax Requirements/Allocations | 35 |
| | H. | Claims Paid or Payable by Third Parties | 36 |
| | I. | Allocation of Plan Distributions between Principal and Interest | 36 |
| ARTICLE VIII. | | PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS | 37 |
| | A. | Allowance and Disallowance of Claims | 37 |
| | B. | Prosecution of Objections to Claims | 37 |
| | C. | Deadline to Object to Claims | 37 |
| | D. | Estimation of Claims | 38 |
| | E. | Amendments to Claims | 38 |
| | F. | Distributions After Allowance | 38 |
| ARTICLE IX. | | PATIENT RECORDS | 38 |
| | A. | Patient Records | 38 |
| | B. | Patient Publication Notice | 39 |
| | C. | Service of Notice on Patients | 39 |
| | D. | Patient Records Service Provider | 39 |
| | E. | Notice to HHS | 39 |
| | F. | Destruction of Patient Records | 39 |
| | G. | Further Orders | 40 |
| | H. | Patient Records Costs | 40 |
| ARTICLE X. | | CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE | 40 |

| | A. | Conditions Precedent to Confirmation | 40 |
| | B. | Conditions Precedent to the Effective Date | 40 |
| | C. | Waiver of Conditions | 41 |
| | D. | Effect of Nonoccurrence of Conditions | 41 |
| ARTICLE XI. | | SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS | 41 |
| | A. | Compromise and Settlement of Claims, Interests, and Controversies | 41 |
| | B. | RELEASES BY THE DEBTORS | 42 |
| | C. | RELEASES BY HOLDERS OF CLAIMS AND INTERESTS | 42 |
| | D. | EXCULPATION | 43 |
| | E. | INJUNCTION | 43 |
| | F. | Setoffs | 44 |
| | G. | Recoupment | 44 |
| ARTICLE XII. | | BINDING NATURE OF PLAN | 44 |
| ARTICLE XIII. | | RETENTION OF JURISDICTION | 45 |
| ARTICLE XIV. | | MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN | 47 |
| | A. | Modifications and Amendments | 47 |
| | B. | Effect of Confirmation on Modifications | 47 |
| | C. | Revocation or Withdrawal of the Plan | 47 |
| | D. | Substantial Consummation of the Plan | 47 |
| ARTICLE XV. | | MISCELLANEOUS PROVISIONS | 47 |
| | A. | Bar Date for Administrative Claims | 47 |
| | B. | Successors and Assigns | 48 |
| | C. | Reservation of Rights | 48 |
| | D. | Service of Documents | 48 |
| | E. | Dissolution of Committee | 49 |
| | F. | Discharge of the Patient Care Ombudsman | 49 |
| | G. | Nonseverability of Plan Provisions | 49 |
| | H. | Return of Security Deposits | 49 |
| | I. | Term of Injunctions or Stays | 50 |
| | J. | Entire Agreement | 50 |
| | K. | Exhibits | 50 |
| | L. | Votes Solicited in Good Faith | 50 |
| | M. | Conflicts | 50 |
| | N. | Filing of Additional Documents | 50 |

## INTRODUCTION

Neighbors Legacy Holdings, Inc. and its affiliates and subsidiaries in the above-captioned Chapter 11 Cases respectfully propose the following joint plan of liquidation under chapter 11 of the Bankruptcy Code. Capitalized terms used in the Plan shall have the meanings ascribed to such terms in Article I hereof.

**ALL HOLDERS OF CLAIMS OR INTERESTS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING ON THIS PLAN.**

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME AND GOVERNING LAW

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*Administrative Claim*" means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting, and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), or 331 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date through the Effective Date; (c) all fees and charges assessed against the Estates under section 1930, chapter 123, of the Judicial Code; and (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code to the extent such request is granted by the Bankruptcy Court.  With respect to Administrative Claims which are allowed pursuant to sections 503(b)(1), 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), 503(b)(6), 503(b)(7), 503(b)(8) or 503(b)(9), there shall be an Administrative Claim against the Debtors only to the extent of and only after the entry of a Final Order approving such Administrative Claim following the filing of a motion or application prior to the Administrative Claim Bar Date.

2.    "*Administrative Claim Bar Date*" means (other than for (i) quarterly U.S. Trustee fees and (ii) Professional Fee Claims) the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

3.    "*Administrative Claim Reserve*" reserve established to pay Administrative Claims that are not Professional Fee Claims.

4.    "*Administrative Claim Reserve Amount*" means the total amount of estimated Administrative Claims estimated in accordance with Article II.A.2 hereof.

5.      "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6.      "*Allowed*" means, as to a Claim, or applicable portion thereof, (a) that has been listed in the Schedules (and thereafter continues to be listed in any subsequently filed amended versions of such Schedules) as liquidated in amount and not Disputed or contingent and for which no Proof of Claim has been filed, (b) where a Proof of Claim was timely and properly filed by the applicable deadline under the Claims Bar Date Order as to which (i) such Claim is not Disputed, or (ii) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order or by the agreement of the holder of such Claim, on the one hand, and the Debtors or the Liquidating Trustee, as applicable, on the other, or (c) that has been allowed under any Final Order, whether or not such Claim was scheduled or is the subject of a filed Proof of Claim, including, without limitation, the Claims of the Agent and DIP Agent as set forth in the Final DIP Order (as hereinafter defined).

7.      "*Available Cash*" means all of the Debtors' or the Liquidating Trust's cash remaining after the payment of Administrative Claims, Priority Tax Claims, DIP Claims, quarterly U.S. Trustee fees, Other Secured Claims, Other Priority Claims, and reservation of the GUC Settlement Cash by the Unsecured Creditor Trustee.

8.      "*Avoidance Actions*" means any and all claims and Causes of Action which any of the Debtors, the Debtors in Possession, the Estates, the Unsecured Creditor Trustee or other appropriate party in interest has asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws and the proceeds thereof.

9.      "*Balloting Agent*" means Kurtzman Carson Consultants LLC, in its capacity as notice and balloting agent for the Debtors.

10.     "*Ballots*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received by the Balloting Agent on or before the Voting Deadline.

11.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases.

12.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under section 157 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

13.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated by the United States Supreme Court under 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, as each may be amended from time to time.

2

14.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

15.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

16.    "*Causes of Action*" means all actions, causes of action (including Avoidance Actions), Claims, claims for relief, rights, suits, debts, dues, damages, reckonings, accounts, rights to legal remedies, rights to equitable remedies, rights to payment, controversies, agreements, covenants, promises, judgments of every type, responsibilities, disputes, assertions, allegations, proceedings, remedies, demands, setoffs, defenses, recoupments, cross claims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date and also includes, without limitation: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 of the Bankruptcy Code; (d) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any claim to avoid transfers and/or transactions under any state or common law or other similar claim; and (f) D&O Claims.

17.    "*Chapter 11 Cases*" means the jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

18.    "*Chief Restructuring Officer*" means Chad J. Shandler, in his capacity as Chief Restructuring Officer for the Debtors.

19.    "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

20.    "*Claims Bar Date*" means the November 14, 2018 deadline by which proofs of claim must be filed under the Claims Bar Date Order by all Entities other than Governmental Units.

21.    "*Claims Bar Date Order*" means the order entered by the Bankruptcy Court setting, among other things, the Claims Bar Date [Docket No. 14].

22.    "*Class*" means a category of Holders of Claims or Interests as set forth in Article III hereof pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code.

23.    "*Closed Centers*" means the centers that the Debtors closed prior to the Petition Date (NEC Lakeline Emergency Center, LP, NEC Zaragoza Emergency Center, LP, NEC Tyler Emergency Center, LP, NEC Texas City Emergency Center, LP, NEC Wichita Falls Emergency Center, LP, NEC Longview Emergency Center, LP, NEC San Angelo Emergency Center, LP, NEC College Station Emergency Center, LP, NEC Lufkin Emergency Center, LP, NEC West

Warwick Emergency Center, LP, NEC Greeley Emergency Center, LP, NEC Kerrville Emergency Center, LP, and NEC Amarillo South Emergency Center, LP).

24.     "*Committee*" means the official committee of unsecured creditors (and all subcommittees thereof) appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as such committee may be reconstituted from time to time [Docket No. 87].

25.     "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A hereof having been: (a) satisfied; or (b) waived pursuant to Article IX.C hereof.

26.     "*Confirmation Date*" means the date upon which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

27.     "*Confirmation Hearing*" means the hearing or hearings held by the Bankruptcy Court to consider Confirmation, as such hearing may be adjourned or continued from time to time in the Debtors' sole discretion.

28.     "*Confirmation Order*" means the order or orders of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

29.     "*Consummation*" means the occurrence of the Effective Date.

30.     "*D&O Claims*" means any and all rights and claims against the Debtors' current and former directors and officers including, without limitation, claims for breach of fiduciary duty, breach of the duty of care, misrepresentation of company assets, misuse of company funds, fraud, failure to comply with workplace laws, theft of intellectual property and general errors and omissions committed in the management of the Debtors, and the proceeds of any such claims, including any recovery under D&O Policies associated therewith.

31.     "*D&O Policies*" means collectively, what is commonly understood as any "Directors and Officers Liability" coverage and any other executive or fiduciary liability and/or employment practices liability insurance policies belonging to the Debtors or under which any of the Debtors and their current and former directors and officers are insureds, insured persons or are named as an insured or additional insured (including any and all amendments, endorsements, renewals and extensions thereof).

32.     "*Debtor*" or "*Debtor in Possession*" means one of the Persons in the above-captioned cases, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases under sections 1107 and 1108 of the Bankruptcy Code.

33.     "*Debtor Releases*" shall have the meaning set forth in Article X.B of the Plan.

34.     "*DIP Agent*" means KeyBank, National Association in its capacity as the administrative agent under the DIP Credit Agreement.

35.     "*DIP Claims*" means any claim arising under the DIP Credit Agreement.

4

36.     "*DIP Credit Agreement*" means that certain Debtor-in-Possession Credit Agreement (as amended, restated, or supplemented) dated August 30, 2018 between Neighbors Global Holdings, LLC and the DIP Secured Parties.

37.     "*DIP Lenders*" means those lenders who advanced the DIP Loans pursuant to the DIP Credit Agreement.

38.     "*DIP Loans*" means the loans advanced pursuant to the DIP Credit Agreement.

39.     "*DIP Secured Parties*" means the DIP Lenders and the DIP Agent.

40.     "*Disallowed*" means, with reference to any Claim, a finding of the Bankruptcy Court in a Final Order or a provision of the Plan, providing that a Claim shall not be Allowed.

41.     "*Disclosure Statement*" means the *Disclosure Statement for Joint Plan of Liquidation of Neighbors Legacy Holdings, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated February 8, 2019, as the same may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules, and any other applicable law.

42.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

43.     "*Disputed Claims Reserve*" means a reserve of Cash that may be funded on or after the Effective Date pursuant to Article VII.D hereof.

44.     "*Distribution*" means the payment of Cash or other property, as the case may be, in accordance with the Plan, the Confirmation Order, and the Liquidating Trust Agreement.

45.     "*Distribution Record Date*" means the date on which the Confirmation Order is entered or such other date that is designated by the Debtors.

46.     "*Effective Date*" means the date declared by the Debtors after the Confirmation Order becomes a Final Order and all of the conditions specified in Article IX.B hereof have been satisfied or waived pursuant to Article IX.C hereof.

47.     "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

48.     "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

49.     "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

50.     "*Exculpated Claim*" means any Claim related to any act or omission that occurred after the Petition Date in connection with the Debtors' in- Bankruptcy Court restructuring efforts, the Debtors' Chapter 11 Cases, formulation, preparation, dissemination, negotiation or filing of

5

the Disclosure Statement or the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the Distribution of property under the Plan or any other agreement; *provided*, *however*, that Exculpated Claims shall not include any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, or fraud.

51. "*Exculpated Party*" means each of the Debtors, the Prepetition Secured Parties, the DIP Secured Parties, the Committee and each of its members, but solely in their capacities as such, and not individually, the Chief Restructuring Officer, the Patient Care Ombudsman, and, with respect to each of the foregoing, its and their officers, directors, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals, in their capacity as such, only to the extent such officers, directors, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals worked for or otherwise represented the Debtors after the Petition Date.  For the avoidance of doubt, the term Exculpated Party shall include the Debtors' officers, if any, that are terminated after the closing of all of the Purchase Agreements.

52. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

53. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or other court of competent jurisdiction in the Chapter 11 Cases.

54. "*Final DIP Order*" means the Final Order (a) Authorizing Use of Cash Collateral pursuant to Section 363(c) of the Bankruptcy Code and Granting Adequate Protection, and (b) Authorizing Debtor to Obtain Postpetition Financing and Granting Liens and Superpriority Claims [Docket No. 193].

55. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, has resulted in no modification of such order or has otherwise been dismissed with prejudice; *provided however*, that a motion under Section 502(j) of the Bankruptcy Code, Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule may be made with respect to such order shall not cause such order not to be a Final Order.

56. "*General Unsecured Claim*" means any unsecured Claim, specifically including any Prepetition Deficiency Claim, against any of the Debtors that is not an Administrative Claim,

Priority Tax Claim, Other Priority Claim, Professional Fee Claim, Section 510(b) Claim, or an Intercompany Claim.

57.    "*Governmental Claims Bar Date*" means the January 8, 2019 deadline by which Governmental Units must file proofs of claim under the Claims Bar Date Order.

58.    "*Governmental Unit*" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

59.    "*GUC Settlement Cash*" means $275,000 of the proceeds from the sale of the Collateral and/or DIP Collateral (each as defined in the Final DIP Order) pursuant to paragraph 45 of the Final DIP Order.

60.    "*HHS*" shall mean the United States Department of Health and Human Services.

61.    "*HHS Records Request*" shall mean the written request to be sent by certified mail to HHS pursuant to section 351(2) of the Bankruptcy Code requesting permission from HHS to deposit the Patient Records with HHS.

62.    "*Holder*" means any Person or Entity holding a Claim or an Interest.

63.    "*Impaired*" means any Claim or Interest in an Impaired Class.

64.    "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

65.    "*Intercompany Claim*" means any Claim held by a Debtor against another Debtor.

66.    "*Intercompany Interest*" means an Equity Security in a Debtor held by another Debtor.

67.    "*Interests*" means, collectively, the Neighbors Equity Interests, Intercompany Interests, and Series LLC Interests.

68.    "*IRC*" means the U.S. Internal Revenue Code of 1986, as amended.

69.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1-4001.

70.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

71.    "*Liquidating Debtors*" means the Debtors after the Effective Date.

72.    "*Liquidating Trust*" means the Liquidating Trust established under Article V.C of the Plan and pursuant to the Liquidating Trust Agreement.

73.    "*Liquidating Trust Agreement*" means the agreement creating the Liquidating Trust to be implemented pursuant to Article V of the Plan, and substantially in the form included in the Plan Supplement.

74. "*Liquidating Trust Assets*" means all assets of the Debtors, and proceeds from such assets, including the Remaining Prepetition Collateral and the Liquidating Trust Cash other than (i) the Unsecured Creditor Trust Assets and (ii) all permits, licenses, regulatory authorizations, approvals, and any other asset or attribute necessary to comply with the Debtors' duties under the Transition Services Agreements.

75. "*Liquidating Trust Cash*" means all Cash held by the Debtors on the Effective Date (including the Professional Fee Escrow) available after the satisfaction of the costs and expenses of the Liquidating Trust, including the fees of the Liquidating Trustee and counsel to the Liquidating Trust other than the GUC Settlement Cash and any amounts recovered by the Unsecured Creditor Trust on account of the Retained Causes of Action.

76. "*Liquidating Trustee*" means that person selected by the Debtors in consultation with the Committee and the Prepetition Agent, to be identified in the Plan Supplement.

77. "*Neighbors Equity Interest*" means any Equity Security, including warrants to acquire such interests, in Neighbors Legacy Holdings, Inc. or Neighbors Physician Group, PLLC, or any Series LLC Interest.

78. "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than: (a) an Administrative Claim or (b) a Priority Tax Claim.

79. "*Other Secured Claim*" means any Secured Claim other than Prepetition Secured Loan Claims.

80. "*Patient*" means a patient as defined in section 101(40A) of the Bankruptcy Code.

81. "*Patient Care Ombudsman*" means Susan N. Goodman, in her capacity as the Patient Care Ombudsman pursuant to the Notice of Appointment Patient Care Ombudsman [Docket No. 204].

82. "*Patient Publication Notice*" shall mean the notice by publication given to former Patients of the Debtors' Closed Centers.

83. "*Patient Records*" means patient records as defined in section 101(40B) of the Bankruptcy Code.

84. "*Patient Records Costs*" shall mean any costs reasonably incurred by the Liquidating Trustee in connection with the preservation, maintenance, storage, transfer or destruction of Patient Records, including without limitation all such costs incurred by the Liquidating Trustee in complying with Article IX of this Plan.

85. "*Patient Records Mailing List*" shall mean the list of the Debtors' Patients between the Petition Date and the Effective Date as derived from the Debtors' electronic billing records to the extent that such electronic records are reasonably available to the Debtors or the Liquidating Trustee.

8

86.     "*Patient Records Mail Notice*" shall mean notice consistent with Bankruptcy Rule 6011(b), in such form as may be approved by the Bankruptcy Court in the Confirmation Order, to be deposited in the United States Mail, first class, postage prepaid, addressed to all Persons reflected on the Patient Records Mailing List.

87.     "*Patient Records Maintenance Period*" is the 365-day period identified in section 351(1)(A) of the Bankruptcy Code immediately following the publication of the Patient Publication Notice.

88.     "*Patient Records Service Agreement*" means the document approved in form by the Bankruptcy Court pursuant to which the Patient Records Service Provider will maintain and store Patient Records and respond to requests for Patient Records during the Patient Records Maintenance Period consistent with section 351 of the Bankruptcy Code.

89.     "*Patient Records Service Provider*" means the third party service provider engaged pursuant to the Patient Records Service Agreement.

90.     "*Person*" means a person as defined in section 101(41) of the Bankruptcy Code.

91.     "*Petition Date*" means July 12, 2018, and July 23, 2018 solely with respect to NEC Beaumont Asset Holdings, LLC and NEC Beaumont Emergency Center, LP.

92.     "*Plan*" means this *Joint Plan of Liquidation of Neighbors Legacy Holdings, Inc. and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, dated February 8, 2019, as the same may be amended, supplemented, or modified from time to time, including, without limitation, any exhibits hereto, which are incorporated herein by reference.

93.     "*Plan Supplement*" means the supplemental appendix to this Plan, filed with the Court no later than five (5) calendar days prior to the Voting Deadline, which contains, among other things, draft forms or signed copies, as the case may be, of the Liquidating Trust Agreement, the Unsecured Creditor Trust Agreement, the schedule of Retained Causes of Action, and any schedules, lists, or documents that supplement or clarify aspects of this Plan and are identified as part of the Plan Supplement.

94.     "*Plan Trustees*" means the Liquidating Trustee and the Unsecured Creditor Trustee, respectively.

95.     "*Plan Trusts*" means the Liquidating Trust and the Unsecured Creditor Trust, respectively.

96.     "*Plan Trusts' Agreements*" means the Liquidating Trust Agreement and the Unsecured Creditor Trust Agreement, respectively.

97.     "*Prepetition Agent*" means KeyBank, National Association as administrative agent under the Prepetition Credit Agreement in its capacity as agent under the Prepetition Credit Agreement.

98.     "*Prepetition Collateral*" means the property subject to the Prepetition Liens.

9

99. "*Prepetition Credit Agreement*" means that certain Credit Agreement (as amended, restated, or supplemented) dated November 19, 2015 between Neighbors Global Holdings, LLC and the Prepetition Secured Parties.

100. "*Prepetition Deficiency Claim*" means the portion of any Prepetition Loan Claim that remains after payment of the Secured portion of such Claim.

101. "*Prepetition Financing Agreements*" means the Prepetition Credit Agreement together with all security, pledge and guaranty agreements and all other documentation executed in connection with any of the foregoing, each agreement, as so amended or otherwise modified (without giving effect to any other amendments restatements, supplements or modifications thereto after the date hereof).

102. "*Prepetition Lenders*" means those lenders who advanced the Prepetition Loans pursuant to the Prepetition Credit Agreement.

103. "*Prepetition Liens*" means the security interests and liens granted by the Debtors to the Prepetition Agent to secure the Prepetition Secured Debt.

104. "*Prepetition Loans*" means the loans advanced pursuant to the Prepetition Credit Agreement.

105. "*Prepetition Loan Claim*" means any Claim arising under the Prepetition Credit Agreement.

106. "*Prepetition Secured Debt*" means collectively, at least $110,195,053.48 plus interest accrued and accruing, costs, expenses, fees (including attorney's fees and legal expenses) other charges and other obligations owed to the Prepetition Lenders as of the Petition Date by the Debtors party to or otherwise obligated under the Prepetition Financing Agreements.

107. "*Prepetition Secured Loan Claim*" means the portion of any Prepetition Loan Claim that is Secured.

108. "*Prepetition Secured Parties*" means the Prepetition Lenders together with the Prepetition Agent who made certain advances under the Prepetition Credit Agreement, KeyBanc Capital Markets Inc., as joint lead arranger and joint bookrunner, Compass Bank Association, as joint lead arranger, a joint bookrunner, and sole syndication agent, and LegacyTexas Bank, as the documentation agent.

109. "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

110. "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interest under the Plan.

  
111.    "*Professional*" means a Person or Entity: (a) employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

112.    "*Professional Fee Claims*" means Administrative Claims for Professional Fees from the Petition Date through the Effective Date, as well as fees, expenses and other reimbursable costs incurred after the Effective Date in connection with the preparation and filing of fee applications with the Bankruptcy Court in respect of Professional Fee Claims.

113.    "*Professional Fee Escrow*" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount and funded by the Debtors on the Effective Date, pursuant to Article II.A.2 hereof.

114.    "*Professional Fee Reserve Amount*" means the total amount of Professional Fee Claims estimated in accordance with Article II.A.4 hereof.

115.    "*Professional Fees*" means all fees, costs and expenses incurred in these Chapter 11 Cases by any Professional and awarded by Final Order of the Bankruptcy Court pursuant to §§ 330 or 503(b) or any other provision of the Bankruptcy Code and any professional fees, costs and expenses which have been allowed pursuant to this Plan or by Final Order of the Bankruptcy Court.

116.    "*Proof of Claim*" means a proof of Claim or Interest filed against any Debtor in these Chapter 11 Cases.

117.    "*Purchase Agreements*" means, collectively, certain purchase agreements titled:

(A)    Asset Purchase Agreement by and among NEC Baytown Emergency Center, LP, NEC Crosby Emergency Center, LP, NEC Kingwood Emergency Center, LP, NEC Pasadena Emergency Center, LP, NEC Pearland Emergency Center, LP, and NEC Porter Emergency Center, LP, as Operating Sellers, NEC Baytown Asset Holdings, LLC, NEC Kingwood Asset Holdings, LLC, and NEC Pearland Asset Holdings, LLC as Owned Real Property Sellers, Neighbors Legacy Holdings, Inc., Neighbors Global Holdings, LLC, Neighbors Health, LLC, EDMG, LLC, and Neighbors Practice Management, LLC as Corporate and Shared Services Sellers, Neighbors Emergency Center, LLC as IP Seller, and Altus Health Systems OPCO, LLC, as Opco Buyer, Altus Health System Realty, LLC, as Realty Buyer dated July 10, 2018;

(B)    Asset Purchase Agreement by and among NEC Mueller Emergency Center, LP, as Operating Seller and Neighbors Legacy Holdings, Inc., Neighbors Global Holdings, LLC, Neighbors Health, LLC, EDMG, LLC, and Neighbors Practice Management, LLC, as Corporate and Shared

6778127v24

Services Sellers, and AEC ER 4, LLC, as Buyer dated September 12, 2018;

(C)  Asset Purchase Agreement by and among NEC Amarillo Emergency Center, LP, NEC Beaumont Emergency Center, LP, NEC Lubbock Emergency Center, LP, NEC McAllen Emergency Center, LP, NEC Orange Emergency Center, LP, NEC Port Arthur Emergency Center, LP, as Operating Sellers, NEC Beaumont Asset Holdings, LLC, as Owned Real Property Seller, and Neighbors Legacy Holdings, Inc., Neighbors Global Holdings, LLC, Neighbors Health, LLC, EDMG, LLC, and Neighbors Practice Management, LLC, as Corporate and Shared Services Sellers, and Exceptional H.C., Inc., as Buyer, dated September 12, 2018;

(D)  Asset Purchase Agreement by and among NEC Eastside Emergency Center, LP, NEC Brownsville Emergency Center, LP, and NEC Harlingen Emergency Center, LP, as Operating Sellers, and Neighbors Legacy Holdings, Inc., Neighbors Global Holdings, LLC, Neighbors Health, LLC, EDMG, LLC, and Neighbors Practice Management, LLC, as Corporate and Shared Services Sellers, and Tenet Business Services Corporation, as Buyer, dated September 12, 2018; and

(E)  Asset Purchase Agreement by and among NEC Bellaire Emergency Center, LP, NEC Yorktown Emergency Center, LP, NEC Midland Emergency Center, LP NEC Odessa Emergency Center, LP, NEC Texarkana Emergency Center, LP, NEC Paris Emergency Center, LP, as Operating Sellers, Neighbors Legacy Holdings, Inc., Neighbors Global Holdings, LLC, Neighbors Health, LLC, EDMG, LLC, and Neighbors Practice Management, LLC, as Corporate and Shared Services Sellers, and Greater Texas Emergency Centers, LLC, as nominee for various LLCs to be designated as the acquiring entities as Buyer, dated September 13, 2018.

118.  "*Purchaser*" means the applicable purchaser under the Purchase Agreements.

119.  "*Release Opt-Out*" means the election, to be made solely through validly-submitted Ballots, to opt-out of the release provisions.

120.  "*Released Party*" means, collectively, and in each case in its capacity as such, (a) the Prepetition Secured Parties, (b) the DIP Secured Parties, (c) the Chief Restructuring Officer, in his individual capacity, and, with respect to each of the foregoing Entities in clauses (a) through (c), such Entity's current or former subsidiaries and Affiliates, and their managed accounts or funds, officers, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals; *provided*, *however*, that if a Holder of Prepetition Loan Claim does not vote to approve the Plan or objects to confirmation of the Plan, such Holder shall not be a Released Party.  For the sake of clarity, the Debtors' current and former subsidiaries, Affiliates, directors, members, managers, officers, principals, partners, agents, employees,

6778127v24

shareholders, holders of Series LLC Interests, holders of Neighbors Equity Interests shall not be considered a Released Party.

121.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors, (b) the Prepetition Secured Parties, (c) the DIP Secured Parties, (d) the Committee, (e) each Holder of a Claim or Interest that accepts or is deemed to accept the Plan, (f) each other Holder of a Claim that is entitled to vote on the Plan and does not both (x) vote to reject the Plan or abstain from voting to accept or reject the Plan and (y) elect the Release Opt-Out on its Ballot, and (g) with respect to each of the foregoing Entities in clauses (b) through (e), such Entity's current or former subsidiaries and Affiliates, and its and their managed accounts or funds, officers, directors, managers, managing members, principals, partners, members, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other Professionals.

122.    "*Remaining Prepetition Collateral*" means the Prepetition Collateral (other than Retained Causes of Action) not sold pursuant to the Purchase Agreements or otherwise conveyed or liquidated by the Debtors prior to the Effective Date including but not limited to accounts receivable not purchased by Purchasers.

123.    "*Retained Causes of Action*" means, collectively, all claims, rights or other Causes of Action which may be asserted by or on behalf of, the Debtors, or the Estates, directly or as assigned to, the Committee, the Unsecured Creditor Trust or the Unsecured Creditor Trustee, a nonexclusive list of which is set forth in the Plan Supplement, including but not limited to all Avoidance Actions, D&O Claims, and all Causes of Action, rights, privileges, claims and demands against any the Debtors' current and former subsidiaries, Affiliates, directors, members, managers, officers, principals, partners, agents, employees, shareholders, holders of Series LLC Interests, holders of Neighbors Equity Interests, third parties, investors, individuals, insurers or insiders that have not been released in accordance with the terms and provisions of this Plan or assigned pursuant to the Purchase Agreements that the Debtors or the Estates own or have an interest in or can assert in any fashion, whether arising pre-petition or post-petition, whether such causes of action arise from contract, tort theories of liability (including all commercial tort claims), insurance claims, statutory claims or other claims, whether or not specifically identified in the Plan Supplement, including, without limitation, all litigation claims, all objections to Class 4 Claims, and all adversary proceedings.

124.    "*Sale*" means the sale of substantially all of the Debtors' assets pursuant to the Purchase Agreements.

125.    "*Sale Order*" means the order approving the Sale [Docket No. 482], as supplemented by the order [Docket No. 484] approving the Greater Texas Emergency Center, LLC Purchase Agreement, and the order [Docket No. 524] resolving cure objections for the assumption and assignment of certain 365 contracts pursuant to the Sale Order.

126.    "*Schedule of Retained Causes of Action*" means the schedule of Causes of Action to be retained by the Estates and contributed to the Unsecured Creditor Trust, which shall be included in the Plan Supplement.

127.    "*Schedules*" mean the Summary of Assets and Liabilities Schedules for Non-Individual, Schedule A/B: Property Non-Individual, Schedule D Non-Individual- Creditors Having Claims Secured by Property, Schedule E/F: Creditors Who Have General Unsecured Claims Non-Individual, Schedule G Non-Individual- Executory Contracts and Unexpired Leases, Schedule H Non-Individual-Codebtors filed by each of the Debtors on September 8, 2018 [Docket Nos. 368, 370, 372, 374, 376, 378, 380, 382, 384, 386, 388, 390, 392, 394, 396, 398, 400, 402, 404, 406, 408, 410, 412, 414, 416, 418, 420, 422, 424, 426, 428, 430, 432, 434, 436, 438, 440, 442, 444, 446, 448, 450, 452, 454, 456, 458, 460, 462, 464, 466, and 468].

128.    "*Section 510(b) Claim*" means any Claim against a Debtor arising from (a) rescission of a purchase or sale of a security of any Debtor or an Affiliate of any Debtor, (b) purchase or sale of such a security, or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

129.    "*Secured*" means: when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code; or (b) otherwise Allowed pursuant to this Plan as a Secured Claim.

130.    "*Series LLC*" means each of series 100 through series 153 existing as part of NHS Emergency Centers, LLC.

131.    "*Series LLC Claim*" means any Claim asserted by an alleged owner of a Series LLC Interest, including the Class A physicians and the Class B physicians, if the Claim is asserted in their capacity as an owner of a Series LLC Interest.

132.    "*Series LLC Interest*" means any profits interest, or equity interest in any Series LLC.

133.    "*Statement of Financial Affairs*" means the Statement of Financial Affairs filed by each of the Debtors on September 8, 2018 [Docket Nos. 369, 371, 373, 375, 377, 379, 381, 383, 385, 387, 389, 391, 393, 395, 397, 399, 401, 403, 405, 407, 409, 411, 413, 415, 417, 419, 421, 423, 425, 427, 429, 431, 433, 435, 437, 439, 441, 443, 445, 447, 449, 451, 453, 455, 457, 459, 461, 463, 465, 467, and 469].

134.    "*Transition Services Agreements*" means the agreements between certain of the Debtors and any applicable Purchaser requiring any of the Debtors or the Liquidating Debtors, as applicable, to provide services to such Purchaser following closing of the Sale, including but not limited to transition services agreements, powers of attorney, access agreements and agreements related to the collection of accounts receivable.

135.    "*Unsecured Creditor Trust*" means the Unsecured Creditor Trust established under Article V.D of the Plan and pursuant to the Unsecured Creditor Trust Agreement.

14

136.    "*Unsecured Creditor Trust Agreement*" means the agreement creating the Unsecured Creditor Trust to be implemented pursuant to Article V of the Plan, and substantially in the form included in the Plan Supplement.

137.    "*Unsecured Creditor Trust Assets*" means (i) the GUC Settlement Cash, and (ii) the Retained Causes of Action and recoveries thereof including recoveries under D&O Policies.

138.    "*Unsecured Creditor Trust Beneficiaries*" means all individuals and entities entitled to a distribution from the Unsecured Creditor Trust.

139.    "*Unsecured Creditor Trust Cash*" means the GUC Settlement Cash and any amounts recovered by the Unsecured Creditor Trust on account of the Retained Causes of Action available after the satisfaction of the costs and expenses of the Unsecured Creditor Trust, including the fees of the Unsecured Creditor Trustee and counsel to the Unsecured Creditor Trust. By way of further clarification, the cash proceeds of the Remaining Prepetition Collateral shall not constitute Unsecured Creditor Trust Cash.

140.    "*Unsecured Creditor Trust Interests*" means the uncertificated beneficial interests in the Unsecured Creditor Trust representing the right of each Holder of an Allowed General Unsecured Claim to receive Distributions from the Unsecured Creditor Trust in accordance with this Plan and the Unsecured Creditor Trust Agreement.

141.    "*Unsecured Creditor Trustee*" means that person selected by the Committee after consultation with the Debtors and the Prepetition Agent, to be identified in the Plan Supplement.

142.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

143.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

144.    "*Unimpaired Class*" means a Class that is Unimpaired.

145.    "*U.S. Trustee*" means the United States Trustee for the Southern District of Texas.

146.    "*Voting Class*" means Class 3 Prepetition Secured Loan Claims and Class 4 Unsecured Claims.

147.    "*Voting Deadline*" means 5:00 p.m. (prevailing Central Time) on March 20, 2019.

148.    "*Voting Record Date*" means February 15, 2019.

B.    *Rules of Interpretation*

For purposes of this Plan, unless otherwise provided herein: (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and neuter gender; (2) unless otherwise specified, any

reference in this Plan to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in this Plan to an existing document, schedule, or exhibit, whether or not Filed, shall mean such document, schedule or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Plan to Articles are references to Articles of this Plan or to this Plan; (6) the words "herein," "hereof," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (7) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising pursuant to this Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (9) unless otherwise set forth in this Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form in this Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and (13) any immaterial effectuating provisions may be interpreted by the Debtors or either Plan Trustee in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

C.      *Computation of Time*

        In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply. If a payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act shall instead occur on the next succeeding Business Day, but shall be deemed to have occurred as of the required date.

D.      *Governing Law*

        Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of this Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters relating to the Debtors not incorporated in Texas shall be governed by the laws of the jurisdiction of incorporation of the applicable Debtor.

E.      *Reference to Monetary Figures*

        All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS, DIP CLAIMS, AND PRIORITY CLAIMS**

        In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *Administrative Claims*

        1.      General Administrative Claims

        Except with respect to Administrative Claims that are Professional Fee Claims and except to the extent that a Holder of an Allowed Administrative Claim and the Debtors or the Liquidating Trustee agree to less favorable treatment for such Holder's Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be paid in full in Cash from the Administrative Claims Reserve or the Liquidating Trust Cash on the later of (i) the Effective Date or as soon as reasonably practical thereafter, (ii) the date on which such Administrative Claim becomes an Allowed Claim; or (iii) such other date as the Liquidating Trustee and the Holder of the Allowed Administrative Claim shall agree.  Allowed Administrative Claims that are not secured by a valid, perfected, postpetition Lien are not entitled to postpetition interest or legal fees and expenses.  For the avoidance of doubt, Holders of an Administrative Claim shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

        2.      Administrative Claim Reserve Amount

        On or before the Effective Date, the Debtors shall provide the Liquidating Trustee with an estimated amount of Administrative Claims, other than Professional Fee Claims, that are accrued and unpaid as of the Effective Date.  The Liquidating Trustee shall promptly establish the Administrative Claims Reserve in an amount not less than the Debtors' estimate. The DIP Secured Parties and the Prepetition Secured Parties shall have a security interest in all funds in the Administrative Claim Reserve and, to the extent any funds remain in the Administrative Claims Reserve after payment in full of all Allowed Administrative Claims, other than Professional Fee Claims, the Liquidating Trustee shall disburse any remaining funds to the DIP Agent, or to the extent that the DIP Claims have been satisfied in full, to the Prepetition Agent.

        3.      Professional Fee Escrow

        Each holder of a Professional Fee Claim shall be paid in respect of such Professional Fee Claim in Cash from the Professional Fee Escrow, in full, promptly after Bankruptcy Court approval of the Professional Fee Claim by a Final Order.  Final fee applications for any Professional Fee Claim shall be filed within forty-five (45) days of the Effective Date and such applications and objections thereto (if any) shall be filed in accordance with and comply in all

17

respects with the Bankruptcy Code, the Bankruptcy Rules, and applicable local rules. Upon payment in full of all Allowed Professional Fee Claims, any balance of Cash remaining in the Professional Fee Escrow shall be Available Cash. For the avoidance of doubt, Holders of a Professional Fee Claim shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

4. Professional Fee Reserve Amount

At least five (5) days prior to the Effective Date all Professionals shall provide the Debtors with an estimate of outstanding fees owed through the Effective Date and the Debtors shall estimate the amount to be reserved (the "Professional Fee Reserve Amount").

B. *DIP Claims*

To the extent not already satisfied prior to the Effective Date, the DIP Claims shall be deemed Allowed Claims under the Plan. The DIP Claims shall be satisfied in full, on the Effective Date, by the termination of all commitments under the DIP Credit Agreement, and indefeasible payment in full in Cash to the DIP Agent, as agent for the DIP Secured Parties, of all outstanding obligations thereunder. Until satisfied in full, the DIP Secured Parties shall retain all rights, Claims, and Liens available pursuant to the DIP Credit Agreement and the Final DIP Order. For the avoidance of doubt, the DIP Claims shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

C. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors or the Liquidating Trustee agree to less favorable treatment for such Holder's Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will be paid in full in Cash from the Disputed Claims Reserve established by the Liquidating Trustee in an amount equal to the amount of such Allowed Priority Tax Claim on the latest of: (i) the Effective Date or as soon as reasonably practical thereafter, (ii) the date on which such Priority Tax Claim becomes an Allowed Claim; or (iii) such other date as the Liquidating Trustee and the holder of the Allowed Priority Tax Claim shall agree. For the avoidance of doubt, Holders of Priority Tax Claims shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

D. *Statutory Fees*

On the Effective Date the Debtors shall pay all fees due and payable pursuant to section 1930 of the Judicial Code prior to the Effective Date. After the Effective Date, the Liquidating Trustee shall pay any and all such fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Liquidating Trustee shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a schedule of disbursements made by the Liquidating Trustee during the applicable period, attested to by an authorized representative of the Liquidating Trustee.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Introduction*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest is also classified in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

B.    *Summary of Classification*

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

## SUMMARY OF STATUS AND VOTING RIGHTS

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | Prepetition Secured Loan Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Neighbors Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

19

C.    *Treatment of Claims and Interests*

1.    Class 1:        Other Priority Claims

(a)    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtors or the Liquidating Trustee agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive Cash from the Liquidating Trust Cash equal to the amount of the Allowed Other Priority Claim.  For the avoidance of doubt, Holders of Class 1 Allowed Other Priority Claims shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

(b)    *Voting*: Class 1 is Unimpaired. Holders of Class 1 Other Priority Claims are deemed to accept the Plan pursuant to section 1126(f) and are not entitled to vote to accept or reject the Plan.

2.    Class 2:        Other Secured Claims

(a)    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim and the Debtors or the Liquidating Trustee agree to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive either (i) Cash from the Liquidating Trust Cash in an amount equal to the proceeds of the collateral securing such Holder's Allowed Other Secured Claim after satisfaction in full of all superior liens up to the Allowed Amount of the Allowed Other Secured Claim; or (ii) to the extent the amount of an Allowed Other Secured Claim is greater than the value of the collateral securing such Allowed Other Secured Claim and there are no Liens on such collateral senior to the Lien held by or for the benefit of the Holder of such Allowed Other Secured Claim, solely the collateral securing such Allowed Other Secured Claim in full and final satisfaction of such Claim.  For the avoidance of doubt, Holders of Class 2 Allowed Other Secured Claims shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

(b)    *Voting*: Class 2 is Unimpaired. Holders of Class 2 Other Secured Claims are deemed to accept the Plan pursuant to section 1126(f) and are not entitled to vote to accept or reject the Plan.

3.    Class 3:        Prepetition Secured Loan Claims

(a)    *Treatment*: Each Holder of a Prepetition Secured Loan Claim shall receive all Available Cash, plus the proceeds of the Remaining Prepetition Collateral up to the amount of the Prepetition Loan Claim outstanding after all payments made pursuant to the Final DIP Order.  For the

20

avoidance of doubt, Holders of Class 3 Prepetition Secured Loan Claims shall not be entitled to any claim or recovery against the Unsecured Creditor Trust, the Unsecured Creditor Trust Assets or the Unsecured Creditor Trust Cash.

(b)     *Voting*: Class 3 is Impaired. The Holders of Class 3 Prepetition Secured Loan Claims are entitled to vote to accept or reject the Plan.

4.     Class 4:          General Unsecured Claims

(a)     *Treatment*: Each Holder of a Class 4 General Unsecured Claim shall receive its Pro Rata share of the Unsecured Creditor Trust Interests.  For the sake of clarify, the Holder of the Prepetition Deficiency Claim shall receive its Pro Rata share of the Unsecured Creditor Trust Interests; *provided, however*, the Distributions on account of such interest shall be limited as follows: (i) Prepetition Deficiency Claim will not receive any recovery from the first $1,000,000 of Distributions from the Unsecured Creditor Trust Cash; (ii) Prepetition Deficiency Claim will receive the entire amount of the first $125,000 of Distributions after the first $1,000,000 of Distributions from the Unsecured Creditor Trust Cash; and (iii) Prepetition Deficiency Claim will share Pro Rata with other General Unsecured Claims on any Distributions from the Unsecured Creditor Trust Cash over $1,125,000.

(b)     *Voting*: Class 4 is Impaired. Holders of Class 4 General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.     Class 5:          Section 510(b) Claims

(a)     *Treatment*: Class 5 Section 510(b) Claims, including all Series LLC Claims, shall be subordinated to General Unsecured Claims pursuant to section 510(b) of the Bankruptcy Code.  Each holder of a Class 5 Section 510(b) Claim shall receive it Pro Rata share of the Unsecured Creditor Trust Cash, if any, after all Claims in Class 4 have been satisfied in full.

(b)     *Voting*: Class 5 is Impaired under the Plan. Each holder of a Section 510(b) Claim will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of a Section 510(b) Claim will not be entitled to vote to accept or reject the Plan.

6.     Class 6:          Intercompany Claims

(a)     *Treatment*: Class 6 Intercompany Claims shall be cancelled and discharged, with the Holders of such Class 6 Intercompany Claims receiving no Distribution on account of such Intercompany Claims.

(b)     *Voting*: Class 6 is Impaired. Holders of Class 6 Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.     Class 7:        Intercompany Interests

(a)     *Treatment*: Class 7 Intercompany Interests shall be cancelled and discharged, with the Holders of such Class 7 Intercompany Interests receiving no Distribution on account of such Intercompany Interests.

(b)     *Voting*: Class 7 is Impaired. Holders of Class 7 Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

8.     Class 8:        Neighbors Equity Interests

(a)     *Treatment*: Class 8 Neighbors Equity Interests shall be cancelled and discharged, with the Holders of such Class 8 Neighbors Equity Interests receiving no Distribution on account of such Neighbors Equity Interests.

(b)     *Voting*: Class 8 is Impaired. Holders of Class 8 Neighbors Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, Holders of Neighbors Equity Interests are not entitled to vote to accept or reject the Plan.

## ARTICLE IV.
## ACCEPTANCE REQUIREMENTS

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, (a) an impaired class of claims has accepted a chapter 11 plan if the holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in such class actually voting have voted to accept the plan and (b) an impaired class of interests has accepted the plan if the holders of at least two-thirds in amount of the allowed interests in such class actually voting have voted to accept the plan.

A.     *Acceptance or Rejection of this Plan*

1.     Voting Classes

Classes 3 and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.      Deemed Acceptance of the Plan

Class 1 and Class 2 are Unimpaired under the Plan and therefore is deemed to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.      Deemed Rejection of the Plan

Classes 5, 6, 7, and 8 are Impaired under the Plan and are not entitled to receive or retain any property on account of the Claims and Interests in Classes 5, 6, 7, and 8. Therefore, Classes 5, 6, 7, and 8 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

B.      *Confirmation of this Plan Pursuant to Section 1129(b) of the Bankruptcy Code*

The Debtors may seek Confirmation pursuant to section 1129(b) of the Bankruptcy Code.

C.      *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests (or any Class of Claims or Interests) are Impaired under this Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or prior to the Confirmation Date.

## ARTICLE V.
## MEANS FOR IMPLEMENTATION OF THE PLAN

In addition to applicable provisions set forth elsewhere in the Plan, the following shall constitute the means of execution and implementation of this Plan.

A.      *Deemed Consolidation*

The Plan is being proposed as a joint plan of liquidation for all of the Debtors.  The Plan constitutes a motion for deemed consolidation of the Debtors and their respective Estates solely for purposes of voting on the Plan, confirming the Plan, and making Distributions pursuant to the Plan. Deemed consolidation is a condition precedent to Confirmation.  Consolidation of the Debtors' Estates is for the limited purpose of making Distributions to holders of Allowed Claims to ease an administrative burden on the Debtors, their Estates, and the Plan Trustees. Accordingly, voting on the Plan shall be conducted and counted on a consolidated basis. On the Effective Date, (a) the assets of the Debtors will be merged and/or treated as if they are merged for the purpose of paying Allowed Claims against the Debtors; (b) any Claim filed or asserted against any of the Debtors will be deemed a Claim against all of the Debtors, solely for the purposes of voting and Distributions pursuant to the Plan (and any duplication of claims arising from both primary operative documents and guaranty and/or other secondary obligations shall be eliminated and all such claims against the Debtors shall be treated as a single claim that eliminates such duplications); and (c) all Intercompany Claims and Interests will be eliminated. Except as set forth in this paragraph, such consolidation shall not affect the legal and corporate structure of the Debtors nor affect Causes of Action, including Avoidance Actions. In addition, such consolidation shall not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code. For avoidance of doubt, and notwithstanding anything to

23

the contrary herein, all Retained Causes of Action are preserved as they existed immediately before the Effective Date for the Unsecured Creditor Trustee to prosecute on behalf of the Unsecured Creditor Trust, and all recoveries by the Unsecured Creditor Trust, based upon, *inter alia*, Causes of Actions, shall be accounted for on a consolidated basis. The deemed consolidation under this Plan shall not affect or impair any valid, perfected and unavoidable Lien to which the assets of any Debtors are subject in the absence of deemed consolidation under this Plan; *provided, however*, the deemed consolidation shall not cause any such Lien to secure any Claim which such Lien would not otherwise secure absent such deemed consolidation. Holders of Allowed Claims or Allowed Equity Interests who assert identical Claims against or Equity Interests in multiple Debtors shall be entitled to only a single satisfaction of such Claims or Equity Interests.

The Debtors believe that deemed consolidation will minimize costly disputes over allocation of assets to be distributed and it will also facilitate the compromise reached among the Debtors, the Committee, the Prepetition Agent, the DIP Agent, the Secured Creditors (as defined in the Final DIP Order), and the DIP Lenders as embodied in paragraph 45 of the Final DIP Order.

B.      *Transactions Effective as of the Effective Date*

The transactions contemplated by the Plan shall be approved and effective as of the Effective Date, without the need for any further state or local regulatory approvals or approvals by any non-Debtor parties, and without any requirement for further action by the Debtors, their board of directors, their stockholders, or any other person or entity.

C.      *The Liquidating Trust*

On or before the Effective Date, the Liquidating Trustee shall execute the Liquidating Trust Agreement and cause the Liquidating Trust to accept, on behalf of the beneficiaries thereof, (a) all Liquidating Trust Cash and (b) all other Liquidating Trust Assets.  For the avoidance of doubt, the permits, licenses, regulatory authorizations, approvals, and any other asset or attribute necessary to comply with the Debtors' duties under the Transition Services Agreements will be retained by the Liquidating Debtors and not transferred to the Liquidating Trust; *provided however*, that the Liquidating Trustee will be the representative of the Liquidating Debtors for all purposes as further set forth in section V.C and V.F hereof. As of the Effective Date, all assets vested in the Liquidating Trust shall be transferred and conveyed free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

On the Effective Date, the Liquidating Trust will be deemed created and effective without any further action by the Bankruptcy Court or any party. The Liquidating Trust shall be established for the primary purpose of liquidating its assets (as applicable) and for making Distributions in accordance with the Plan and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

D.    *The Unsecured Creditor Trust*

On or before the Effective Date, the Unsecured Creditor Trustee shall execute the Unsecured Creditor Trust Agreement and cause the Unsecured Creditor Trust to accept, on behalf of the beneficiaries thereof, (i) the GUC Settlement Cash, (ii) Retained Causes of Action and (iii) claims under and proceeds of D&O Policies. As of the Effective Date, all assets vested in the Unsecured Creditor Trust and all assets dealt with in the Plan shall be transferred and conveyed free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

On the Effective Date, the Unsecured Creditor Trust will be deemed created and effective without any further action by the Bankruptcy Court or any party. The Unsecured Creditor Trust shall be established for the primary purpose of administering the Unsecured Creditor Trust Assets and making all distributions to the Unsecured Creditor Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purpose of the Unsecured Creditor Trust.

E.    *Settlement Regarding Unsecured Creditor Recoveries.*

The Prepetition Agent, the DIP Agent, the Prepetition Lenders and the DIP Lenders have agreed with the Committee and the Debtors to the following: (a) the payment of the GUC Settlement Cash to the Unsecured Creditor Trust; and (b) any Prepetition Deficiency Claim will (i) not receive any recovery from the first $1,000,000 of Distributions from the Unsecured Creditor Trust Cash; (ii) receive the entire amount of the next $125,000 of Distributions from the Unsecured Creditor Trust Cash after the first $1,000,000 of Distributions from the Unsecured Creditor Trust Cash; and (iii) share Pro Rata with other General Unsecured Claims on any Distributions from the Unsecured Creditor Trust Cash over $1,125,000. Notwithstanding the foregoing, the Unsecured Creditor Trust shall have the right to object to the calculation of the Prepetition Deficiency Claim; provided, however, the Unsecured Creditor Trust shall not have the right to object to the Prepetition Secured Debt component of the Prepetition Deficiency Claim unless the Prepetition Secured Parties assert Prepetition Secured Debt in excess of $110,195,053.48, in which case the Unsecured Creditor Trust shall have the right to object to amounts in excess of $110,195,053.48.

F.    *Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee*

The Liquidating Trustee shall be the exclusive trustee of the assets of the Liquidating Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority and responsibility to: (a) receive, manage, invest, supervise, and protect the Liquidating Trust Assets; (b) supervise the receipt, deposit, and reconciliation of accounts receivable collected by the Purchasers, including any payment to Purchasers, including the ability to enforce any applicable Purchase Agreement or Transition Services Agreement; (c) reasonably cooperate to provide the Purchasers with information relevant to the Purchasers' collection of accounts receivable; (d) administer all of the Debtors' employee claims under the Consolidated Omnibus Budget Reconciliation Act of 1986 ("COBRA") (e) pay taxes and other obligations incurred by the Liquidating Trust; (f) prepare and file all required federal, state, and

local tax returns, as applicable, for the Debtors and issue corresponding K-1s; (g) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist the Liquidating Trustee; (h) calculate and implement Distributions to be made under the Plan to Holders of Claims, including Administrative Claims and Priority Claims, other than Class 4 Claims; (i) reconcile, object to and resolve issues involving all Claims, other than Class 4 Claims; and (j) undertake all administrative functions of the Chapter 11 Cases that are not granted to the Unsecured Creditor Trustee, including the ultimate closing of the Chapter 11 Cases; *provided, however*, the Liquidating Trustee shall not compromise, settle or affect any Avoidance Actions or Retained Cause of Action in connection with its duties under this Plan or the Liquidating Trust Agreement.

On the Effective Date, the Liquidating Trust shall also have the power, right, and responsibility to take possession of all books, records, and files of the Debtors and the Estates, including all Patient Records not sold pursuant to the Sale and provide for the retention and storage of such books, records, and files pursuant to this Plan and Bankruptcy Code section 351 (as applicable) until such time as the Liquidating Trustee determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or required. After the Effective Date, the Liquidating Trust shall (i) give the Unsecured Creditor Trust reasonable access to all books, records and files of the Debtors and the Estates including, without limitation, direct logon authority to access emails, accounting records, shared drives and other documents necessary to accomplish the duties of the Unsecured Creditor Trust and (ii) not destroy or abandon any such books, records and files without obtaining the consent of the Unsecured Creditor Trust. In the event the Liquidating Trust is dissolved before the Unsecured Creditor Trust, the Unsecured Creditor Trust shall have the right to take possession of the books, records and files of the Debtors and Estates and maintain such books, records and files at the expense of the Unsecured Creditor Trust.

All expenses incurred by the Liquidating Trust and the Liquidating Trustee shall be the responsibility of and paid by the Liquidating Trust, in accordance with the Plan and the Liquidating Trust Agreement.

In no event later than three (3) months following the Effective Date and on a quarterly basis thereafter until all Liquidating Trust Cash has been released or paid out in accordance with the Plan, the Liquidating Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients, and dates of all Distributions made by the Liquidating Trustee under the Plan through each applicable reporting period.

G.     *Certain Powers and Duties of the Unsecured Creditor Trust and Unsecured Creditor Trustee*

The Unsecured Creditor Trustee shall be the exclusive trustee of the assets of the Unsecured Creditor Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Unsecured Creditor Trustee shall be specified in the Unsecured Creditor Trust Agreement and shall include the authority and responsibility to: (a) prosecute, compromise, and settle, in accordance with the specific terms of the Unsecured Creditor Trust Agreement, Retained Causes of Action; (b) reconcile, object to and resolve issues

26

involving Class 4 Claims; (c) pay taxes and other obligations incurred by the Unsecured Creditor Trust; (d) calculate and implement Distributions to be made under the Plan to Holders of Class 4 Claims; and (e) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist the Unsecured Creditor Trustee.

All expenses incurred by the Unsecured Creditor Trust and the Unsecured Creditor Trustee shall be the responsibility of and paid by the Unsecured Creditor Trust, in accordance with the Plan and the Unsecured Creditor Trust Agreement.

In no event later than three (3) months following the Effective Date and on a quarterly basis thereafter until all Unsecured Creditor Trust Cash has been released or paid out in accordance with the Plan, the Unsecured Creditor Trustee shall file with the Bankruptcy Court a report setting forth the amounts, recipients, and dates of all Distributions made by the Unsecured Creditor Trustee under the Plan through each applicable reporting period.

H.    *Federal Income Tax Treatment of the Plan Trusts for the Liquidating and Unsecured Creditor Trust Assets; Tax Reporting and Tax Payment Obligations*

For U.S. federal income tax purposes, it is intended that the Plan Trusts be classified as liquidating trusts under Treasury Regulation Section 301.7701-4. Accordingly, for U.S. federal income tax purposes, it is intended that the beneficiaries of the Plan Trusts be treated as if they had received a Distribution from the Estates of an undivided interest in the assets of the Plan Trusts (to the extent of the value of their respective shares therein) and then contributed such interests to the Plan Trusts.

1.    Plan Trusts' Assets Treated as Owned by Beneficiaries of Plan Trusts

For all U.S. federal income tax purposes, all parties shall treat the transfer of assets (net of any applicable liabilities) to the Plan Trusts for the benefit of the beneficiaries thereof as (a) a transfer by the Debtors of the assets of the Plan Trusts (net of any applicable liabilities) directly to the beneficiaries of the Plan Trusts (to the extent of the value of their respective shares in the assets of the Liquidating Trust), followed by (b) the transfer of the assets of the Plan Trusts (net of any applicable liabilities) by the beneficiaries of the Plan Trusts (to the extent of the value of their respective share in the assets of the Plan Trusts) to the Plan Trusts in exchange for the beneficial interests in the Plan Trusts. Accordingly, for U.S. federal income tax purposes, the Plan Trusts shall be treated as grantor trusts, and the beneficiaries of the Plan Trusts shall be treated as the grantors of the Plan Trusts and the owners of the assets thereof.

2.    Tax Reporting

The Plan Trusts shall be responsible for filing all federal, state, local and foreign tax returns, including, but not limited to, any documentation related thereto for current or former employees, vendors or contractors of the Debtors, for the Debtors and the Plan Trusts. The Plan Trustees shall file all tax returns for the Plan Trusts as grantor trusts pursuant to Treasury Regulation Section 1.671-4(a) and in accordance with this Article V.F. Within a reasonable time following the end of the taxable year, the Plan Trustees shall send to each holder of a beneficial interest appearing on its record during such year, a separate statement setting forth such holder's

share of items of income, gain, loss, deduction or credit and each such holder shall report such items on their federal income tax returns. The Plan Trustees may provide each such holder of a beneficial interest with a copy of the Form 1041 for the Plan Trusts (without attaching any other holder's Schedule K-1 or other applicable information form) along with such holder's Schedule K-1 or other applicable information form in order to satisfy the foregoing requirement. The Plan Trustees shall allocate the taxable income, gain, loss, deduction or credit of their respective Plan Trust with respect to each holder of a beneficial interest to the extent required by the IRC and applicable law.

The Liquidating Trust shall prepare and file all required federal, state, and local tax returns, as applicable, for the Debtors and issue corresponding K-1s.

As soon as possible after the Effective Date, each Plan Trust shall make a good faith valuation of the assets of their respective Plan Trust, and such valuation shall be used consistently by all parties for all federal income tax purposes. Each Plan Trust shall also file (or cause to be filed) any other statements, returns, or disclosures relating to the Plan Trust that are required by any taxing authority.

The Plan Trusts may request an expedited determination of the tax obligations of the Plan Trusts under Bankruptcy Code Section 505(b) for all returns filed for, or on behalf of, the Plan Trusts for all taxable periods through the dissolution of the Plan Trusts.

The Plan Trusts shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions made by the Plan Trusts shall be subject to any such withholding and reporting requirements.

3.      Payment of Taxes

The Liquidating Trust shall be responsible for payments of all Allowed tax obligations of the Debtors including Priority Tax Claims, Other Secured Claims and Administrative Claims, in addition to any taxes imposed on the Liquidating Trust or its assets; *provided that* the Unsecured Creditor Trust shall be responsible for payments of any taxes imposed on the Unsecured Creditor Trust. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Disputed Claims Reserve associated with the Unsecured Creditor Trust is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the Unsecured Creditor Trust allocable to, or retained on account of, Disputed Claims, such taxes shall be (a) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (b) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts distributable by the Unsecured Creditor Trust as a result of the resolutions of such Disputed Claims.

I.      *Authority to Pursue, Settle, or Abandon Retained Causes of Action*

From and after the Effective Date, prosecution and settlement of all Retained Causes of Action shall be the sole responsibility of the Unsecured Creditor Trustee pursuant to the Plan, the Confirmation Order, and the Unsecured Creditor Trust Agreement. From and after the Effective Date, the Unsecured Creditor Trustee shall have exclusive rights, powers, and interests of the Estates to pursue, settle, or abandon such Retained Causes of Action as the sole representative of

28

the estates pursuant to section 1123(b)(3) of the Bankruptcy Code, subject to any approval or consultation rights set forth in the Unsecured Creditor Trust Agreement. Confirmation of this Plan effects no settlement, compromise, waiver or release of any Claim, Cause of Action, Right of Action or claim for relief unless this Plan or the Confirmation Order specifically and unambiguously so provides. The non-disclosure or non-discussion of any particular Claim, Cause of Action, Right of Action or claim for relief is not and shall not be construed as a settlement, compromise, waiver, or release of any such Claim, Cause of Action, Right of Action or claim for relief.

The Unsecured Creditor Trust reserves and retains any and all claims and rights against any Persons, other than those specifically released herein, including the Retained Causes of Action, whether such claims and rights arose before, on or after the Petition Date, the Confirmation Date, the Effective Date, and/or the Distribution Record Date, including, without limitation, any and all Causes of Action, Retained Causes of Actions, and/or claims for relief that the Unsecured Creditor Trust may have against (i) any insurer and/or insurance policies, including the D&O Policies, in which either the Debtors and/or their current or former personnel have an insurable or other interest in or right to make a claim against, any other of the Debtors' insurers; (ii) current and former directors, members, managers, officers, shareholders, holders of a Series LLC Interest, holders of a Neighbors Equity Interest, and employees, or (iii) any recipient of a pre or post-petition transfer that may be recovered as an Avoidance Action, Retained Cause of Action, other Cause of Action or otherwise. The entry of the Confirmation Order shall not constitute *res judicata* or otherwise bar, estop or inhibit any actions by the Unsecured Creditor Trustee relating to any claims, Causes of Action referred to in this Section or otherwise. On the Effective Date, the Unsecured Creditor Trustee shall be substituted as a party of record in all pending litigation brought by or against the Debtors, except for any actions related to the enforcement of Liquidating Trust Assets.

The Liquidating Trustee reserves and retains any and all claims and rights against any and all third parties to enforce the Liquidating Trust Assets whether such claims and rights arose before, on or after the Petition Date, the Confirmation Date, the Effective Date, and/or the Distribution Record Date; *provided, however*, the Liquidating Trustee shall not compromise, settle or affect any Avoidance Actions or Retained Cause of Action in connection with the resolution of claims relating to the Transition Services Agreements or collection of accounts receivable.

J.     *Liquidating Trust's Accounting for Certain Recoveries*

For all recoveries received, other than those related to the collection of accounts receivable, the sale of tangible personal property, or those received pursuant to any action filed to enforce the Transition Services Agreement, the Liquidating Trustee shall provide notice of any such recovery to the Unsecured Creditor Trustee. The Bankruptcy Court retains the exclusive jurisdiction to determine title to any such recovery.

K.      *Filing of Monthly and Quarterly Reports*

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports for each Plan Trust shall be the responsibility of the applicable Plan Trustee until such time as each respective Plan Trust Terminates.

L.      *Corporate Existence; Compliance with Transition Services Agreements*

On and after the Effective Date, the Debtors will be referred to as the Liquidating Debtors.  The Liquidating Debtors shall remain in existence and will not be dissolved until each Liquidating Debtor satisfies its duties under the applicable Transition Services Agreements. After each Liquidating Debtor satisfies its duties under any applicable Transition Services Agreements, such Liquidating Debtor shall be deemed dissolved without any further action by any party.  Notwithstanding anything herein to the contrary, the Liquidating Debtors will retain, and the Debtors and the Liquidating Debtors will not transfer to the Liquidating Trust or the Unsecured Creditor Trust, all permits, licenses, regulatory authorizations, approvals, status and any other asset or attribute necessary to comply with their duties under the Transition Services Agreements.  The Liquidating Trustee shall be the legal representative and sole manager of the Liquidating Debtors and is hereby vested with the authority to take all actions necessary or appropriate with respect to the Liquidating Debtors, including but not limited to the authority granted to Neighbors Health LLC or any other Debtor entity under any management agreement and any authority granted to each Liquidating Debtor under such entity's organizational documents or operating agreements.

M.      *Directors and Officers of the Debtors*

On and after the Effective Date, the board of managers or directors of each Debtor shall be terminated and all of the officers and directors of the Debtors, to the extent they have not already done so, shall be deemed to have resigned from their respective positions with the Debtors, as applicable.

N.      *Corporate Authorization*

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders, directors, members, or managers of one or more of the Debtors shall be deemed to have occurred and shall be in effect from and after the Effective Date without any requirement of further action by the stockholders, directors, members, or managers of the Debtors. After the Effective Date, to the extent necessary, the Plan Trustees shall have all authority to address any and all matters that would have required the approval of, and to act on behalf of, the stockholders, directors, members, or managers of one or more of the Debtors, including performing the Debtors' obligations under the Transition Services Agreements.

O.      *Effectuating Documents and Further Transactions*

Prior to the Effective Date, the Debtors shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan. After the Effective Date, the Plan Trusts shall be authorized to execute, deliver, file, or

record such documents, contracts, instruments, and other agreements and take such other actions as may be reasonably necessary to effectuate and further evidence the terms and conditions of the Plan.

P.     *Employee Agreements*

All employment, severance, retirement, indemnification, and other similar employee-related agreements or arrangements in place with the Debtors' employees that has not been previously terminated shall be deemed terminated as of the Effective Date.

Q.     *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate or personal property transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

R.     *Duration of the Plan Trusts*

The Plan Trusts shall have an initial term of five (5) years from the Effective Date, *provided however,* that, if warranted by the facts and circumstances, and subject to the approval of the Court, upon a finding that an extension of the term of either Plan Trust is necessary to accomplish the purpose of the respective Plan Trust, the applicable Plan Trustee shall be authorized to extend the Plan Trust for six (6) months or longer provided that such extension is approved by the Bankruptcy Court within six (6) months of the beginning of such extended term. Either Plan Trust may be terminated earlier than its scheduled termination if (a) the Bankruptcy Court has entered a Final Order closing the Case pursuant to section 350(a) of the Bankruptcy Code or (b) the applicable Plan Trustee has administered all of the Plan Trust's Assets and performed all other duties required by this Plan and the applicable Plan Trust Agreement.

S.     *Wind Down of Plan Trusts*

After the termination of each of the Plan Trusts and for the purpose of liquidating and winding down the affairs of the Plan Trusts, the Plan Trustees shall continue to act as such over their respective Plan Trust until their duties have been fully performed. Prior to the final Distribution of the remaining Plan Trusts' Assets, the Plan Trustees shall be entitled to reserve from the Plan Trusts' Assets any and all amounts required to provide for their own reasonable costs and expenses, in accordance with the terms of the Plan Trusts' Agreements, until such time as the winding down of the Plan Trusts is completed. Upon termination of each of the Plan Trusts, the respective Plan Trustee shall retain for a period of three years the books, records, lists of the Beneficiaries, the registry of claims and Beneficiaries, and other documents and files that have been delivered to or created by the Plan Trustees. Except as otherwise specifically provided herein, upon the termination of each of the Plan Trusts, the Plan Trustees and the respective Plan Trusts' professionals and agents shall have no further duties or obligations hereunder.

## ARTICLE VI.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     *Treatment of Executory Contracts and Unexpired Leases*

As of the Effective Date, the Debtors shall be deemed to have rejected all Executory Contracts and Unexpired Leases that (1) have not been previously rejected, assumed, or assumed and assigned, including in connection with the Sale, and (2) have not expired under their own terms prior to the Effective Date.

The Confirmation Order shall constitute an order of the Bankruptcy Court approving the foregoing rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

B.     *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases.

C.     *Rejection Damages Claim*

All Claims arising from the rejection of Executory Contracts or Unexpired Leases must be Filed with the clerk of the Bankruptcy Court and served upon the Liquidating Trustee within thirty (30) days of the occurrence of the Effective Date. Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a Class 4 General Unsecured Claim. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within the time required by this section will be forever barred from assertion against the Debtors, the Estates, the property of the Debtors, or the Liquidating Trust.

D.     *Reservation of Rights*

Nothing contained in this Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

## ARTICLE VII.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.     *Timing and Calculation of Amounts to Be Distributed; Entitlement to Distributions*

1.     Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in this Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the

Distributions that this Plan provides for Allowed Claims in the applicable Class. If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in this Article VII. Except as otherwise provided herein, Holders of Claims shall not be entitled to postpetition interest, dividends, or accruals on the Distributions provided for herein, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

2.    Entitlement to Distributions

On and after the Effective Date, the Plan Trustees shall be authorized (but not directed) to recognize and deal only with those Holders of Claims listed on the Debtors' books and records as of the Distribution Record Date. Accordingly, the Plan Trustees will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the close of business on the Distribution Record Date, and will be entitled for all purposes herein to recognize and distribute property, notices, and other documents only to those Holders of Allowed Claims who are Holders of such Claims (or participants therein) as of the close of business on the Distribution Record Date.

B.    *Plan Trustees*

The Unsecured Creditor Trustee shall make all Distributions under the Plan on account of Class 4 Allowed General Unsecured Claims.  The Liquidating Trustee shall make all other Distributions under the Plan.  The Plan Trustees shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. For purposes of Distribution on account of the Prepetition Secured Loan Claims and the DIP Claims, the Prepetition Agent and the DIP Agent, respectively (a) shall be deemed to be the Holder of all Prepetition Secured Loan Claims and DIP Claims and (b) are hereby directed to make Distributions to the Holders of Prepetition Secured Loan Claims and DIP Claims. In accordance with the foregoing, the delivery of any applicable property to be distributed to Holders of Prepetition Secured Loan Claims and Holders of DIP Claims to the Prepetition Agent and DIP Agent, respectively, shall satisfy all applicable Distribution obligations under the Plan.

C.    *No De Minimis Distributions Required*

No Distribution shall be required to be made hereunder to any Holder of a Claim unless such Holder is to receive in such Distribution at least $50.00, or unless such Distribution is the final Distribution to such Holder pursuant to this Plan.  The Plan Trustees shall retain any such Distribution not made in accordance with the provisions of this section.  Any Distribution not made in accordance with this section shall be held in trust for the relevant Holder until the earlier of (i) the date the next Distribution is scheduled to be made to such Holder, or (ii) the final Distribution to such Holder.

D.    *Disputed Claims Reserves*

On or prior to the Effective Date, the Plan Trustees shall be authorized to establish Disputed Claims Reserves, each of which shall be administered by the applicable Plan Trustee, respectively.  The Unsecured Creditor Trustee may, but shall not be required to, hold Cash in its Disputed Claims Reserve from the GUC Settlement Cash in trust for the benefit of the Holders of

General Unsecured Claims ultimately determined to be Allowed after the Effective Date. The Unsecured Creditor Trustee shall distribute the amounts (net of any expenses, including any taxes relating thereto) from its Disputed Claims Reserve, as provided herein, as applicable Disputed Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Disputed Claims as such amounts would have been distributable had such Disputed Claims been Allowed Claims as of the Effective Date. The Liquidating Trustee may hold Cash in its Disputed Claims Reserve in trust for the benefit parties entitled to receive payments from the Liquidating Trust Cash to the extent they hold Claims ultimately determined to be Allowed after the Effective Date. The Liquidating Trustee shall distribute the amounts (net of any expenses, including any taxes relating thereto) from its Disputed Claims Reserve, as provided herein, as applicable Disputed Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Disputed Claims as such amounts would have been distributable had such Disputed Claims been Allowed Claims as of the Effective Date. To the extent any cash remains in the Liquidating Trust's Disputed Claims Reserve after satisfaction of all applicable Disputed Claims, such remaining amount shall be paid to the Holders of the Class 3 Prepetition Secured Loan Claims.

E.      *Distributions on Account of Claims Allowed After the Effective Date*

1.      Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

2.      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in this Plan and except as otherwise agreed to by either Plan Trustee, (a) no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and such Disputed Claim becomes an Allowed Claim; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any Distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order.

F.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Delivery of Distributions in General

Except as otherwise provided herein, the Plan Trustees shall make Distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Proof of Claim filed by such Holder or the Debtors' Schedules.

2.    Undeliverable Distributions and Unclaimed Property

(a)    Failure to Claim Undeliverable Distributions

In the event that any Distribution to any Holder is returned as undeliverable, no Distribution to such Holder shall be made unless and until the respective Plan Trustee has determined the then-current address of such Holder, at which time such Distribution shall be made to such Holder without interest; provided, however, such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the respective Plan Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

(b)    Failure to Present Checks

Checks issued by either Plan Trustee on account of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the issuance of such check. Requests for reissuance of any check shall be made directly to the applicable Plan Trustee by the Holder of the relevant Allowed Claim with respect to which such check originally was issued. Any Holder of an Allowed Claim holding an un-negotiated check that does not request reissuance of such un-negotiated check within one hundred and eighty (180) days after the issuance of such check shall have its Claim for such un-negotiated check discharged and shall be discharged and forever barred, estopped, and enjoined from asserting any such Claim against the applicable Plan Trust. In such cases, any Cash held for payment on account of such Claims shall be property of the applicable Plan Trust, free of any Claims of such Holder with respect thereto. Nothing contained herein shall require either Plan Trustee to attempt to locate any Holder of an Allowed Claim.

(c)    Failure to Provide Tax Information for Distributions

If a Holder fails to provide to the applicable Plan Trustee any requisite tax information for Distributions, the Plan Trustees may, after a diligent effort to obtain such information, withhold Distributions to any such Holder and the Claim of any such Holder shall be discharged and forever barred.

G.    *Compliance with Tax Requirements/Allocations*

In connection with this Plan, to the extent applicable, the Plan Trustees shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Plan Trustees shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to be made under this Plan to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms they believe are reasonable and appropriate. Each Plan Trustee reserves the right to

allocate all Distributions made under this Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

H.      *Claims Paid or Payable by Third Parties*

      1.      Claims Paid by Third Parties

The Debtors or either Plan Trustee, as applicable, shall reduce a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment on account of such Claim from a party that is not a Debtor. To the extent a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the Distribution to the applicable Plan Trustee, to the extent the Holder's total recovery on account of such Claim from the third party and under this Plan exceeds the amount of such Claim as of the Effective Date.

      2.      Claims Payable by Third Parties

No Distributions under this Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

      3.      Applicability of Insurance Policies

Except as otherwise provided in this Plan, Distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in this Plan shall constitute or be deemed a waiver of any Retained Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

I.      *Allocation of Plan Distributions between Principal and Interest*

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest (or original issue discount) thereon, such Distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest (or original issue discount).

## ARTICLE VIII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance and Disallowance of Claims*

Except as expressly provided herein or any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases on or prior to the Effective Date (including the Confirmation Order), the Plan Trusts after Consummation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date.

Except as provided herein or otherwise agreed, any and all proofs of Claim Filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.

B.    *Prosecution of Objections to Claims*

The Liquidating Trustee shall have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment any objections to Administrative or Priority Claims as permitted under this Plan. From and after the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Administrative or Priority Claim without approval of the Bankruptcy Court. The Liquidating Trustee may also resolve any Disputed Administrative or Priority Claim outside the Bankruptcy Court under applicable governing law.

With regard to all Claims other than Administrative and Priority Claims, the Unsecured Creditor Trustee shall have the exclusive authority to File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under this Plan. From and after the Effective Date, the Unsecured Creditor Trustee may settle or compromise any Disputed Claim, which is not an Administrative or Priority Claim, without approval of the Bankruptcy Court. The Liquidating Trustee may also resolve any Disputed Claim, which is not an Administrative or Priority Claim, outside the Bankruptcy Court under applicable governing law.

C.    *Deadline to Object to Claims*

Unless otherwise ordered by the Bankruptcy Court, the Plan Trustees shall file all objections to Claims by no later than 180 days after the Effective Date, except to the extent that such Claims are filed on or after the Effective Date, in which case, the Plan Trustees shall have until the later of 180 days after the Effective Date or 90 days after such claim is filed to file an objection to same. Notwithstanding the foregoing, if either Plan Trustee determines that an extension of time is warranted, the Plan Trustee may seek the Bankruptcy Court's approval to extend such time by a period of an additional 90 days, without prejudice to the Plan Trustee's request to seek additional time upon a showing of good cause. Notwithstanding the foregoing,

the Claims in Classes 5, 6, 7 and 8 shall be deemed disallowed.  In the event the Unsecured Creditor Trustee determines that there are sufficient funds to make Distributions to Holders of Claims in Classes 5, 6, 7 and 8, the Unsecured Creditor Trustee shall file a Notice of Distribution with the Bankruptcy Court and shall have 180 days after the filing of such notice to object to such claims.

D.      *Estimation of Claims*

The Unsecured Creditor Trustee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Unsecured Creditor Trustee has previously objected to such Claim or whether the Bankruptcy Court has ruled on any objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection. In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Unsecured Creditor Trustee may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

E.      *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Court or the consent of the applicable Plan Trustee, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Court.

F.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the applicable Plan Trustee shall provide to the Holder of such Claim the Distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

## ARTICLE IX.
## PATIENT RECORDS

A.      *Patient Records*

Patient Records will be administered by the Liquidating Trustee in accordance with the provisions of this Article. The Liquidating Trustee shall have no other or further obligations with respect to the Patient Records except as expressly set forth in this Article.  The Liquidating

6778127v24

Trustee shall administer the Patient Records in accordance with section 351 of the Bankruptcy Code in accordance with the provisions set forth in the remainder of this Article.

B.      *Patient Publication Notice*

As soon as practicable following the Effective Date, the Liquidating Trustee shall publish the Patient Publication Notice for all Closed Centers in such newspaper or newspapers as the Bankruptcy Court may prescribe in the Confirmation Order. The form of the Patient Publication Notice and the manner of its publication shall also be prescribed and approved in the Confirmation Order.

C.      *Service of Notice on Patients*

During the first one hundred eighty (180) days after the publication of the Patient Publication Notice, the Liquidating Trustee shall serve the Patient Records Mail Notice to all Persons on the Patient Records Mailing List. Service of the Patient Records Mail Notice shall be complete upon depositing the same into the United States Mail, postage prepaid, addressed to each recipient at the address reflected on the Patient Records Mailing List.

D.      *Patient Records Service Provider*

The Liquidating Trustee is authorized to engage the Patient Records Service Provider to maintain and store Patient Records and respond to requests for records during the Patient Records Maintenance Period, which services by the Patient Records Service Provider shall comply with the requirements of section 351 of the Bankruptcy Code. The terms and conditions of the retention of the Patient Records Service Provider shall be included in an agreement which shall be filed as part of the Plan Supplement.

E.      *Notice to HHS*

After the Patient Publication Notice has been published and the Patient Records Mail Notice provided herein, the Liquidating Trustee shall, at the end of the Patient Records Maintenance Period, mail, by certified mail, the HHS Records Request requesting permission to deposit with HHS any remaining Patient Records that have not been claimed by an authorized party during the Patient Records Maintenance Period. Thereafter, HHS shall have thirty (30) days to grant or deny the HHS Records Request. If no written response is received by the Liquidating Trustee either granting or denying the HHS Records Request, then the HHS Records Request shall be denied on the thirty-third (33rd) day following the date the Liquidating Trustee mails the HHS Records Request.

F.      *Destruction of Patient Records*

After the Patient Records Maintenance Period has ended, if the HHS Records Request has been denied, any remaining Patient Records that have not been claimed by an authorized party shall be caused to be destroyed by the Liquidating Trustee in accordance with section 351(3) of the Bankruptcy Code. Promptly after the remaining Patient Records have been

destroyed, the Liquidating Trustee shall file a notice with the Bankruptcy Court consistent with Bankruptcy Rule 6011 certifying that the remaining Patient Records have been destroyed.

G.      *Further Orders*

The Liquidating Trustee may seek all such other and further orders from the Bankruptcy Court as may be, in the Liquidating Trustee's good faith business opinion, necessary or appropriate to facilitate the administration of the Patient Records.

H.      *Patient Records Costs*

Any Patient Records Costs incurred by the Liquidating Trustee shall be treated and paid as from the Liquidating Trust.

**ARTICLE X.**
**CONDITIONS PRECEDENT TO CONFIRMATION OF THE**
**PLAN AND THE EFFECTIVE DATE**

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation that the following provisions, terms, and conditions are satisfied (or waived pursuant to the provisions of Article IX.C hereof, except that entry of the Confirmation Order may not be waived), and Confirmation shall occur on the date upon which the last of such conditions are so satisfied and/or waived.

1.      All provisions, terms and conditions hereof are approved in the Confirmation Order.

2.      A Confirmation Order shall have been entered by the Bankruptcy Court, in form and substance acceptable to the Debtors, that approves the deemed consolidation of the Debtors for distribution and Plan voting purposes.

3.      The Confirmation Order shall provide that, among other things, the Debtors and the Plan Trustees, as applicable, are authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing, and consummating the other contracts, instruments, and other agreements or documents created in connection with or described in this Plan.

4.      All other actions, documents and agreements necessary to implement the Plan shall have been effected or executed.

5.      All required consents, approvals, and authorizations, if any, have been obtained.

B.      *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date that the following provisions, terms, and conditions are satisfied (or waived pursuant to the provisions of Article IX.C hereof), and the

Effective Date shall occur on the date upon which the last of such conditions are so satisfied and/or waived.

1.      The Debtors shall have transferred the GUC Settlement Cash to the Unsecured Creditor Trust.

2.      The Debtors shall have transferred all remaining Cash to the Liquidating Trust, including the Professional Fee Escrow.

3.      The Confirmation Order shall be a Final Order in form and substance acceptable to the Debtors and the Plan Trustees, each in their respective sole discretion. The Confirmation Order shall provide that, among other things, the Debtors and the Plan Trustees, as applicable, are authorized and directed to take all actions necessary or appropriate to consummate this Plan, including, without limitation, entering into, implementing and consummating the contracts, instruments, and other agreements or documents created in connection with or described in this Plan.

4.      The Plan Trusts' Agreements shall have been executed and delivered by all of the Entities that are parties thereto and all conditions precedent to the consummation thereof shall have been waived or satisfied in accordance with the terms thereof.

5.      All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws.

C.      *Waiver of Conditions*

Each of the conditions to Confirmation and to Consummation set forth in this Article IX may be waived with the consent of the Debtors without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

D.      *Effect of Nonoccurrence of Conditions*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders or any other Entity in any respect.

## ARTICLE XI.
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests and

6778127v24

controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any Distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and Holders of Claims and Interests and is fair, equitable and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Plan Trustees may compromise and settle Claims against them and Causes of Action against other Entities, except for Claims and Causes of Action relating to the Retained Causes of Action, which may be compromised and settled by the Unsecured Creditor Trustee.

B.     *RELEASES BY THE DEBTORS*

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, the Released Parties shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever been released and discharged by the Debtors and the Estates from any and all past or present Claims, Interests, indebtedness and obligations, rights, suits, losses, damages, injuries, costs, expenses, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, asserted or unasserted, suspected or unsuspected, accrued or unaccrued, fixed, contingent, pending or threatened, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract violations of federal or state laws or otherwise, those causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that the Debtors, the Estates, or their Affiliates would have been legally entitled to assert (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date*; provided, however*, that the foregoing "*Debtor Releases*" shall not operate to waive or release any Causes of Action of any Debtor: arising from claims for fraud, gross negligence, or willful misconduct; *provided, further,* the foregoing "*Debtor Releases*" shall not release the Debtors' current and former subsidiaries, Affiliates, directors, members, managers, officers, principals, partners, agents, employees, shareholders, holders of Series LLC Interests, holders of Neighbors Equity Interests. Notwithstanding anything to the contrary in the foregoing, the "Debtor Releases" set forth in this paragraph do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed in connection with the Plan.**

C.     *RELEASES BY HOLDERS OF CLAIMS AND INTERESTS*

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise**

specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged the Debtors and the other Released Parties from any and all past or present Claims, Interests, indebtedness and obligations, rights, suits, losses, damages, injuries, costs, expenses, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, asserted or unasserted, suspected or unsuspected, accrued or unaccrued, fixed, contingent, pending or threatened, existing or hereafter arising, in law, equity, or otherwise, whether for tort, fraud, contract violations of federal or state laws or otherwise, those causes of action based on veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability or otherwise that such Releasing Party would have been legally entitled to assert (whether individually or collectively), based on or relating to any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; *provided*, *however*, that the foregoing release shall not operate to waive or release any Causes of Action of any Releasing Party: arising from claims for fraud, gross negligence, or willful misconduct *provided, further,* the foregoing release shall not release the Debtors' current and former subsidiaries, Affiliates, directors, members, managers, officers, principals, partners, agents, employees, shareholders, holders of Series LLC Interests, holders of Neighbors Equity Interests. Notwithstanding anything to the contrary in the foregoing, the "Third Party Releases" set forth in this paragraph do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed in connection with the Plan.

D.   *EXCULPATION*

To the fullest extent permitted by applicable law no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim, except for those that are determined in a final order to have constituted actual fraud, gross negligence, willful misconduct, or criminal conduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

E.   *INJUNCTION*

Except for obligations issued pursuant to the Plan, from and after the Effective Date, all Entities who hold or may hold Claims or Interests and the Releasing Parties are permanently enjoined from taking any of the following actions against the Debtors or any Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against

**any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Nothing in the Plan or the Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors, as applicable, and any such Entity agree in writing that such Entity will: (a) waive all Claims against the Debtors and the Estates related to such action and (b) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.**

F.    *Setoffs*

Except as otherwise expressly provided for in the Plan, each Debtor and the Plan Trustees (as applicable), pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the Distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any Distribution is made on account of such Allowed Claim or Allowed Interest), any Retained Causes of Action of any nature that such Debtor, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such Retained Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Debtor or Unsecured Creditor Trustee of any such Retained Causes of Action that such Debtor or Unsecured Creditor Trustee may possess against such Holder. In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Retained Cause of Action of the Debtor unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.

G.    *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Retained Cause of Action of the Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Effective Date.

**ARTICLE XII.**
**BINDING NATURE OF PLAN**

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11

CASES, OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## ARTICLE XIII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, and this Plan to the fullest extent permitted by law, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that Distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      adjudicate, decide, or resolve any and all matters related to Retained Causes of Action;

7.      adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

6778127v24

10.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions and other provisions contained in Article X and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

12.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of Distributions and the recovery of additional amounts owed by the Holder of a Claim or an Interest for amounts not timely repaid pursuant to Article VII;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.     enter an order or final decree concluding or closing the Chapter 11 Cases;

16.     adjudicate any and all disputes arising from or relating to Distributions under the Plan;

17.     consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.     hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge;

22.     enforce all orders previously entered by the Bankruptcy Court; and

23.     adjudicate all other matters over with the Bankruptcy Court has jurisdiction.

## ARTICLE XIV.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

A.    *Modifications and Amendments*

Subject to the limitations and rights contained in this Plan: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan.

B.    *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw this Plan subject to the terms hereof, or if Confirmation or Consummation does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (x) constitute a waiver or release of any Claims by or against, or any Interests in, such Debtor or any other Entity; (y) prejudice in any manner the rights of the Debtors or any other Entity; or (z) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

D.    *Substantial Consummation of the Plan*

Substantial consummation of the Plan under Bankruptcy Code section 1101(2) shall be deemed to occur on the Effective Date.

## ARTICLE XV.
## MISCELLANEOUS PROVISIONS

A.    *Bar Date for Administrative Claims*

No Administrative Claim, other than Professional Fees and U.S. Trustee fees, will be paid unless the holder of such Administrative Claim has filed an application for payment of such Administrative Claim on or before the Administrative Claim Bar Date.  Upon the filing of any application for payment, the Entity seeking payment of an Administrative Claim shall provide notice by United States Mail in accordance with the Bankruptcy Rules.  Any Administrative

6778127v24

Claim, other than Professional Fees and U.S. Trustee fees, not filed in accordance with this section shall be barred and the Debtors, the Plan Trusts and the Plan Trustees shall have no liability for payment of any such Administrative Claim.

B.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

C.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests before the Effective Date.

D.      *Service of Documents*

Any pleading, notice, or other document required by this Plan to be served on or delivered to the Debtors shall be sent by overnight mail to:

Neighbors Legacy Holdings, Inc.
c/o FTI Consulting
Three Times Square
9th Floor
New York, NY 10036
Attn:          Chad J. Shandler
Telephone:     (212) 841-9349
Email:         chad.shandler@fticonsulting.com

with copies to:

Porter Hedges LLP
1000 Main, 36th Floor
Houston, Texas 77002

Attn:          John F. Higgins
               Eric M. English
               Genevieve M. Graham
Telephone:     (713) 226-6648
Facsimile:     (713) 226-6628
Email:         jhiggins@porterhedges.com
               eenglish@porterhedges.com
               ggraham@porterhedges.com

Cole Schotz P.C.
301 Commerce Street
Suite 1700
Fort Worth, Texas 76102
Attn: Michael D. Warner
Telephone: (817) 810-5250
Facsimile: (817) 977-1611
Email: mwarner@coleschotz.com

E.      *Dissolution of Committee*

On the Effective Date, the Committee shall dissolve automatically, whereupon its members, Professionals, and agents shall be released from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except for purposes of filing applications for Professional compensation in accordance with Article II.A.2 of this Plan.

F.      *Discharge of the Patient Care Ombudsman*

On the Effective Date, the duties and responsibilities of the Patient Care Ombudsman shall be terminated, and the Patient Care Ombudsman shall be discharged from her duties under section 333 of the Bankruptcy Code and she shall not be required to file any further reports or perform any additional duties.

G.      *Nonseverability of Plan Provisions*

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided* that any such alteration or interpretation must be in form and substance acceptable to the Debtors, the Committee, and the Prepetition Lenders; *provided*, *further*, that the Debtors may seek an expedited hearing before the Bankruptcy Court to address any objection to any such alteration or interpretation of the foregoing. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

H.      *Return of Security Deposits*

Unless the Debtors have agreed otherwise in a written agreement or stipulation approved by the Bankruptcy Court, all security deposits provided by the Debtors to any Person or Entity at any time after the Petition Date shall be returned to the Debtors within twenty (20) days after the Effective Date, without deduction or offset of any kind.

I.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      *Entire Agreement*

Except as otherwise indicated herein, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

K.      *Exhibits*

All exhibits hereto are incorporated into and are a part of the Plan as if set forth in full in the Plan. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

L.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

M.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement or any order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflicts with or is in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of a conflict between any provision of the Plan and the Confirmation Order, the Confirmation Order shall govern and control.

N.      *Filing of Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

Dated: February 20, 2019

Respectfully submitted,

**NEIGHBORS LEGACY HOLDINGS, INC.**
on behalf of itself and the other Debtors


By:    /s/  *Chad J. Shandler*
        Chad J. Shandler
        Chief Restructuring Officer

51

**EXHIBIT B**

**<u>Liquidation Analysis</u>**

## LIQUIDATION ANALYSIS
### General Assumptions

THIS LIQUIDATION ANALYSIS PRESENTS INFORMATION FOR ALL DEBTORS ON A CONSOLIDATED BASIS.

In connection with the Plan and Disclosure Statement, the following hypothetical liquidation analysis ("**Liquidation Analysis**") has been prepared by Debtors' management with the assistance of the Debtors' advisors. This Liquidation Analysis is for all the Debtors on a consolidated basis.

This Liquidation Analysis should be read in conjunction with the Plan and the Disclosure Statement.

The Debtors, with the assistance of their financial advisors, have prepared this Liquidation Analysis for evaluating whether the Plan meets the so-called best interests test under section 1129(a)(7) of the Bankruptcy Code. The Liquidation Analysis has been prepared assuming the Debtors Chapter 11 Cases convert to Chapter 7 proceedings under the Bankruptcy Code on January 31, 2019 ("**Liquidation Date**") and their assets are liquidated. A chapter 7 trustee ("Trustee") would be appointed or elected to commence the liquidation of all the Debtors assets. To maximize recovery, the liquidation is assumed to occur over a 12-month period (the "**Wind Down Period**"). The Liquidation Analysis is based on unaudited book values as of November 30, 2018 and these values, in total, are assumed to be representative of the Debtors[1] assets and liabilities as of the Liquidation Date. However, the Liquidation Analysis does not include recoveries resulting from any potential preference claims, fraudulent conveyance litigation, or other avoidance actions.

**THE DEBTORS BELIEVE THAT ANY ANALYSIS OF A HYPOTHETICAL LIQUIDATION IS NECESSARILY SPECULATIVE. THERE ARE A NUMBER OF ESTIMATES AND ASSUMPTIONS UNDERLYING THE LIQUIDATION ANALYSIS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR A CHAPTER 7 TRUSTEE. NEITHER THE ANALYSIS, NOR THE FINANCIAL INFORMATION ON WHICH IT IS BASED, HAS BEEN EXAMINED OR REVIEWED BY INDEPENDENT ACCOUNTANTS IN ACCORDANCE WITH STANDARDS PROMULGATED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THERE CAN BE NO ASSURANCE THAT ACTUAL RESULTS WOULD NOT VARY MATERIALLY FROM THE HYPOTHETICAL RESULTS PRESENTED IN THE LIQUIDATION ANALYSIS.**

---

[1] Values associated with Non- Debtor Affiliates are not contained within such assets and liabilities and are not deemed material to this Liquidation Analysis.

## Summary Notes to Liquidation Analysis

**1.** *Dependence on estimates and assumptions***.** The Liquidation Analysis is dependent on estimates and assumptions which are based on information available at the time of its preparation. In addition, the Liquidation Analysis is based on unaudited book values which contain estimates that continue to be under review and subject to further legal and accounting analysis. Furthermore, the assumptions are inherently subject to significant economic, business, regulatory uncertainties and contingencies that are beyond the control of the Debtors or their management. The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would ultimately be realized if the Debtors were to undergo a chapter 7 liquidation since actual results could vary materially from values contained herein.

**2.** *Chapter 7 liquidation process***.** The liquidation of the Debtors' assets is assumed to be completed over a 12-month period. During the 12-month period the chapter 7 trustee would oversee the remainder of the patient AR collection cycle and sell the Debtors' furnishings, owned equipment and medical supply inventory. Throughout the 12-month period the chapter 7 trustee would also be working on administrative activities, such as creditor distributions needed to complete the wind-down of the Estates.

**3.** *Litigation Proceeds***.** There may be significant recoveries for the estate preference actions, fraudulent transfer litigation and other potential causes of actions, however no review or analysis has been prepared and therefore no value has been ascribed to them in the Liquidation Analysis. While no analysis has been prepared, the Debtors believe that any recoveries would be substantially the same under the Plan of Liquidation.

**4.** *Claims Estimates***.** In preparing the Liquidation Analysis, the Debtors have estimated Allowed Claims for each creditor class based upon a review of the Debtors' unaudited balance sheet and other analyses prepared in connection with the Debtors' cash collateral and wind-down budget. In addition, the Liquidation Analysis includes an estimate for certain chapter 7 administrative claims that would be incurred during the pendency of the chapter 7 liquidation. The estimate of all allowed claims in this Liquidation Analysis is based on the book value of such claims, or projected amounts were used if book values were not available. No reconciliation of the Debtors' debts to the proof of claims filed in these cases has been prepared, nor has there been any order fixing the amount of the claims been entered in this matter. Accordingly, the estimate of the amount of set forth in the Liquidation Analysis should not be relied upon for any other purpose, including but not limited to, distributions to be made under the Plan of Liquidation. The actual value and number of Allowed Claims could be materially different from the Claims value estimated in the Liquidation Analysis.

**Neighbors Legacy Holdings, et al.**
**Liquidation Analysis**

| Assets | Asset Value | Chapter 7 Recovery % | Chapter 7 Recovery $ | Notes |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash | $ 16,263,475 | 100% | $ 16,263,475 | 1 |
| Accounts Receivable, Net | 13,320,858 | 25% | 3,330,214 | 2 |
| Inventory | 1,107,852 | 4% | 45,000 | 3 |
| Receivables from non-Debtor affiliates | 3,949,695 | 0% | - | 4 |
| Fixed Assets, Net | 32,753,089 | 2% | 650,000 | 5 |
| Other Assets | 1,216,044 | 0% | - | 6 |
| **Total Asset Recoveries** | **$ 68,611,013** | **30%** | **$ 20,288,690** | |

| Chapter 7 Costs | | | |
|---|---|---|---|
| **Chapter 7 Costs** | | | |
| Chapter 7 Trustee Fees | | 866,135 | 7 |
| Chapter 7 Trustee's Professional Fees | | 750,000 | 8 |
| Cost to Wind-down Operations | | 500,000 | 9 |
| **Total Chapter 7 Costs** | | **2,116,135** | |

| | | |
|---|---|---|
| **Proceeds Available for DIP Claims** | **18,172,554** | |
| | | |
| **DIP Claims** | **-** | 10 |
| Recovery on DIP Claims | - | |
| *% Recovery on DIP Claims* | *n/a* | |
| | | |
| **Proceeds Available for Secured Claims** | **18,172,554** | |
| | | |
| **Secured Claims** | **55,905,420** | 11 |
| Recovery on Secured Claims | 18,172,554 | |
| *% Recovery on Secured Claims* | *32.5%* | |
| | | |
| **Proceeds Available for Administrative Claims** | **-** | |
| | | |
| **Administrative Claims** | **5,932,817** | 12 |
| Recovery on Administrative Claims | - | |
| *% Recovery on Administrative Claims* | *0.0%* | |
| | | |
| **Proceeds Available for Priority Claims** | **-** | |
| | | |
| **Pre-Petition Priority Claims** | **2,436,740** | 13 |
| Recovery on Priority Claims | - | |
| *% Recovery on Priority Claims* | *0.0%* | |
| | | |
| **Proceeds Available for General Unsecured Claims** | **-** | |
| | | |
| **General Unsecured Claims** | **56,995,072** | 14 |
| Recovery on General Unsecured Claims | - | |
| *% Recovery on General Unsecured Claims* | *0.0%* | |

**Neighbors Legacy Holdings, et al.**
**Notes to the Liquidation Analysis**

1 **Cash**
The Debtors' estimated cash as of the Liquidation Date is based on the latest balance sheet (November 30, 2018). In a liquidation the estimated recovery on the balance of cash is 100%.

2 **Accounts Receivable, Net**
This balance represents the value of the net patient accounts receivable as of November 30, 2018 that were retained and not sold with the sale of the free-standing emergency room facilities. This analysis assumes that a Chapter 7 trustee would oversee the collection efforts during the pendency (12-months) of the Chapter 7 proceedings.

3 **Inventory**
This balance represents the Debtors' estimated value of medical supplies inventory as of the Liquidation Date and is based on recent indications of interest to purchase the inventory.

4 **Receivables from non-Debtor Affiliates**
The balance represents intercompany receivables from non-Debtor Affiliates. The analysis assumes that these non-Debtor Affiliates are insolvent and would be liquidated and that the Debtors would not realize a recovery.

5 **Fixed Assets, Net**
This balance represents the Debtors' estimated value of furniture and equipment (corporate headquarters and recovered from closed locations) as of the Liquidation Date and is based on recent indications of interest to purchase the substantially all the items.

6 **Other Assets**
This balance represents unamortized intangible assets and are assumed to have no value to the Estate.

**Neighbors Legacy Holdings, et al.**
**Notes to the Liquidation Analysis (continued)**

**7   Chapter 7 Trustee Fees**
Pursuant to section 326 of the Bankruptcy code, the court may allow reasonable compensation for the trustee's services not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1 million, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims. The fees were estimated for each Debtor and aggregated for the Liquidation Analysis.

**8   Chapter 7 Professional Fees**
This amount represents professional fees for legal and financial advisor costs in connection with the administration and winddown of the Estates.

**9   Cost to Wind-down Estate**
This amount represents the cost to winddown the Estates over a 12-month period. The costs include expenses for salaries, independent contractor wages, IT and overhead (primarily rent).

**10   DIP Claims**
The DIP Claim amount represents the balance after applying proceeds of the sale paid to the Secured Lenders. The DIP loan commitment was $24 million, which consisted of an $8 million Revolving Commitment and a $16 million Term Commitment. The Debtor satisfied DIP Claims from the proceeds of its asset sales. The DIP loan was terminated on or about November 8, 2018.

**11   Secured Claims**
The Secured Claim amount represents the balance of the Credit Facility of approximately $94.4 million (consisting of the pre-petition balance of approximately $110.2 million, and interest and fees of approximately $240,000, less the $16 million DIP Term Commitment) reduced by approximatley $38.5 million of asset sale proceeds remitted to the Secured Agent for a total hypothetical recovery of approximatley $56.7 million or 60%.

**12   Administrative Claims**
Administrative claims include Chapter 11 post-petition trade payables and an estimate for accrued by unbilled trade expenses, an estimate for 503(b)(9) claims, post-petition PTO/Severance for Debtors' employees, unreported employee healthcare claims. Administrative claims also include an estimate of accrued and unfunded Chapter 11 professional fees.

**13   Priority Claims**
Priority claims include claims for pre-petition property and franchise tax obligations.

**14   General Unsecured Claims**
The general unsecured claims in the Liquidation Analysis primarily represents the book value of pre-petition accounts payable. The general unsecured claims value includes the Secured Lender deficiency claim but does not include unliquidated claims stemming from litigation.