United States Courts
Southern District of Texas
FILED

JAN 27 2020

David J. Bradley, Clerk of Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Neighbors Legacy Holdings, Inc., et al, | § | Case No. 18-33836, Chapter 11 |
| | § | |
| Sohail Alam, **Plaintiff** | § | |

Adversary. Proc. No. 19-03442

Neighbors Health, LLC, Neighbors, Tensie Axton, GP, LLC, EDMG, LLC, Dharmesh Patel, MD, Michael Chang, MD, Quang Henderson, MD, Hitesh Patel, MD, Andy Chen, MD, Cyril Gillman, Setul Patel, MD, Paul Alleyne, MD, Thomas Gruenert, **Defendants**,

## ALAM'S OBJECTION AND RESPONSE TO LIQUIDATING TRUSTEE'S OBJECTION TO SOHAIL ALAM'S CLAIM AS A CREDITOR AND REQUEST TO APPOINT THE UNITED STATES ATTORNEY MR. RYAN KELLEY GOEB PATRICK TO INVESTIGATE THE COVER UP THAT LINGERS THIS BANKRUPTCY

**TO THE HONORABLE COURT:**

COMES NOW Sohail Alam, ("Alam or "Plaintiff"") files this his Objection and Response to the Liquidating Trustee's Objections to his Claims as a Creditor, and Request to Appoint the U.S. Attorney to investigate the corruption[1] that continues to linger in this bankruptcy, and would show the Court the following:

### Axton's Objections to Alam's Claim
### as a Creditor are deceptive

1.  Tensie Axton, the Liquidating Trustee of the debtor companies Neighbors Legacy Holdings, Inc., objections to Alam's Claim No. 197 on the ground: *Alam's proof of claim does not include documents to support he holds a priority, administrative, or secured*

---

[1] Based on the CRO's affidavit (Dkt 16) and the defendant's filings in court, it is Alam's opinion and profound belief that when defense lawyers withhold documents, mislead (lie) to the Court and when defendants start to file perjured testimony – it is corruption of the highest order.

*claim against the Debtors* - are deceptive.

## Axton's own Affidavit disproves her objections

2. The Axton's affidavit, attached as **[Exhibit 1]** contradicts her own statements.

*"I have reviewed the Debtors' books and records and the Claim, **as well as the supporting documentation provided by the Claimant**, and have determined that the Claim should be disallowed....".*

*I have reviewed the Objection to Sohail Alam's Claim (the "Objection") filed contemporaneously with this Affidavit.... **To the best of my knowledge, information, and belief, the assertions made in the Objection are accurate**.*

3. Contrary to Axton's assertion, Alam was not allowed to appear and/or make arguments in support of his confirmation objection **[Docket No. 828]**. Records show, the argument that Alam made before this Court on March 22, 2109 was <u>at the request of the honorable judge, related specifically to his December 15, 2018 letter of reasons why the debtors' bankruptcy was a sham</u>. In which, Alam also informed the Court that his employment contract was not a typical employee-employer contract – that it was an executory contract because the monies promised to Alam were in exchange for his software. That is why, the employment contract was deemed "non terminable" allowing Alam to pursue other interests. That his claim against the debtor included claim against the property of the debtor. He argued that since most courts applied the business judgment test to determine the true nature of the executory contract the Courts as in this case will also look to the context in which the Alam's employment contract was negotiated, who were involved and what went into the drafting and ultimate approval of the Contract.

4. As a further proof that Alam was not given full opportunity to prove up his

objections to confirmation, Alam contends that on March 22, 2019, immediately following Alam's discussion about why the Debtors bankruptcy was a sham, Debtors counsel Mr. English put up on the screen a "Summary of Objections to Confirmation". The first item on the Docket marked <u>Objection #828 was Alam's Objection to Confirmation.</u> Alam recalls a discussion between the Honorable Judge Isgur[2] and the Debtors Counsel Mr. English, which Alam overheard the <u>Judge stating something to the affect "let's pass on it" and something to the affect a "layperson".</u> **[See docket 864]**

> THE COURT: I'm going to deem him from the documents <u>that he has filed as a lay person to have opted out.</u>
>
> MR. ENGLISH: Okay.
>
> MR. HIGGINS: All of the objections have been resolved with the exception of Mr. Alam and the Phipps objection which was a limited objection.
>
> THE COURT: So, I want Dr. -- Mr. Alam to be on the opt out list in any final documents. I don't think there's any question that from reading the documents he did not intend to release people. <u>So, he has opted out</u>

5. Alam took that to believe that since the Honorable Judge did not have time to review his claim and objections that he'd make a ruling on the evidence after he had had a chance to review Alam's evidence.

> THE COURT: All right. <u>Where are those 16 exhibits?</u>
>
> MR. ALAM: They have been filed in Court on --
>
> THE COURT: With part of your proof of claim or separately from that?
>
> MR. ALAM: That's part of my proof of claim.
>
> THE COURT: Where do you express in writing to me? I mean, --
>
> MR. ALAM: It is in my objections to confirmation.

---

[2] At the time Alam filed his motion for reconsideration, the March 22, 2019 hearing transcript was not available. Alam obtained this transcript sometime in late June 2019 – which attests to Alam's version of the truth.

> MR. WARNER: <u>Your Honor, if I can help the Court.</u> I believe it's docket 828 that Mr. Alam is referring to.

6. To insure that Alam was right in his assumption, he waited to be called back to the stand, but when the Honorable Judge and the Debtors counsel did not call Alam about his Objections to the Confirmation, which was number 1 on the list, instead they moved on to a Company next in line on the list by the name <u>Century Square Commercial Venture, LLC, Objection #825.</u> Alam's assumption was right that the Judge had indeed passed on his objections for a later date. It is at this time that Alam left the Court room. Alam learned through Debtors April 8, 2019, pleading that the Judge had in fact entered the Order confirming the Plan.

### Axton's actions are in total retaliation

7. Axton, as a liquidating trustee in the Alam's adversary proceedings. [Case #: 19-03442] is a defendant in her individual capacity as well as a defendant as an officer of the debtor companies for claims of "fraud".

### The Debtors so-called uncontroverted evidence is deceptive and misleading

8. Neighbors Telehealth, LLC is not a Debtor or an entity owned by any Debtor.

> **False.** SOMEONE (the Honorable Judge, the Trustee and/or the US Attorney) at SOME POINT need to look at [Docket 16, Exhibit B] to fully understand what the defendants and defense counsel is up to.
>
> On July 12, 2018, Neighbors Health, LLC, (NH) filed for bankruptcy based on Mr. Chad Shandler, Chief Restructuring Officers affidavit. The Exhibit A of his affidavit provides an Organizational Chart of the debtors, listing Neighbors Telehealth Services, LLC as one of debtor companies. The Exhibit B of his affidavit shows Neighbors Telehealth Services, LLC as one of the guarantors of the debtor. **Dkt 16,** 18-33836 and Dkt 75 (19-3442).



**EXHIBIT B**

List of Guarantors

|  |  | NEC Baytown Emergency Center, LP |  |
|---|---|---|---|
| 60 | 8010 | NEC Waco Emergency Center, LP | X |
| 61 | 8013 | NHS Emergency Centers, LLC | X |
| 62 | 8016 | Neighbors Concierge Services, LLC | X |
| 63 | 8017 | Neighbors Telehealth Services, LLC | X |
| 64 | 9002 | NEC KinAsset Holdings LLC | X |
| 65 | 9003 | NEC Baytown Asset Holdings, LLC | X |
| 66 | 9005 | NEC Pearland Asset Holdings, LLC | X |
| 67 | 9007 | NEC Beaumont Asset Holdings, LLC | X |

9. The Administrative Services Agreement between Neighbors Telehealth, LLC and the Debtors was rejected.

**False.** The agreement was rejected for two reasons: (a) Mr. Higgins, Debtors counsel, despite knowledge of the truth, misled and withheld documents from this Court, and, (b) Mr. Scott Davenport, counsel for Telehealth was negligent in representing the interest of his client and instead assisted defendant Setul Patel to cover up the larceny in transferring funds from the debtor companies to the company owned by him and defendant Gruenert.

10. Under the Administrative Services Agreement, Neighbors Telehealth, LLC owes the Debtors almost $500,000.

**False.** Axton has perjured her testimony with regard to the alleged debt. Mr. Higgins, debtors counsel assisted her in making up this amount from whole cloth despite knowledge of the truth through Gruenert's email on July 29, 2018.

**From the evidence, it is clear that Axton, former CFO of debtor companies was involved in a scheme to transfer $490,531 into a company she "knew" was owned by defendants, Setul Patel, Tom Gruenert, and Paul Alleyne. Now that Axton is caught on embezzling money from debtor companies – she is misleading this Court that the debtor is owed this money. The irony is that Axton's lawyers are complicit in perpetrating this FRAUD.**

11. The Debtors have no outstanding obligations to Neighbors Telehealth, LLC.

**False.** Axton's admission through her affidavit admitting to owning and copying Alam's Software is *prima facia* evidence of debtors' obligation. Axton is misleading this Court into believing that Alam gave away 4-years of

uncompensated time and $818,000 dollars to benefit the debtor – **for free.** It is utter non-sense.

12. The Debtors were never involved in managing the day-to-day operations of Neighbors Telehealth, LLC and never had access to its bank accounts.

    **False.** Axton's claim that *"Debtors were never involved in managing the day-to-day operations"* belies her affidavit, showing: Administrative Services Agreement provided ………….. **executive operations management.** Axton's consistent disregard of the truth should not be tolerated by this Court.

13. Certain Debtors were party to a software license agreement…….but outside of a pilot project, the Debtors never used the software.

    **False.** Software license agreement was a pre-paid option, which the debtor acknowledged owning and making copies of, does not make a charge provision by usage. Debtors had the option of using it once or a million times.

14. Mr. Alam provided no services to the Debtors post-petition.

    **False.** As per the software agreement Alam was required to continue servicing and maintaining the software. Alam fulfilled his obligation through 12 vendors managing the software compliance at a cost of $19,000 per month beginning on May 20, 2016 to December 2018.

15. Alam has "repeatedly" informed this Court that Tensie Axton, the Liquidating Trustee of the debtor companies Neighbors Legacy Holdings, Inc., has a history of defrauding this Court through her testimony made under oath. This affidavit, **[Exhibit 1]** is yet another example of her callous disregard for the law. Because Axton "pursuant to Art.V.F of the Plan and Section 5.1 of the Liquidating Trust Agreement, has the "exclusive" authority to file, settle, compromise, withdraw, or litigate any objection to claims, she has resorted to vengeance and retaliation – all with the assistance of her lawyers, Mr. John Higgins and Mr. Eric English.

**Facts related to Alam's claims as a creditor**

16. On October 23, 2018, Alam filed a priority claim in the amount of $818,000.00 on the grounds he had an "executory contract" with the debtor. Thereafter, Alam

commenced an adversary proceeding complaining of fraud, fraudulent transfer, conspiracy, etc., Alam's objections references the existence of three contracts between Alam and debtor companies.

### Contract 1 - Administrative Services Agreement
**The Debtor sought the rejection of the administrative services agreement through fraud onto this court**

17.     The debtors entered into an administrative services agreement with one of its own company in which Alam had 30% interest and equity. The Administrative Services Agreement provided among other things, to support staffing, accounting, financial planning and forecasting, cash management, insurance administration, and executive operations management. The **only** provision for payment under this agreement was for "out of expenses" limited to credit card use only.

18.     On September 6, 2018, debtors Counsel, Mr. Eric English and Mr. John Higgins sought the rejection of the Administrative Services Agreement by providing false information to Court: (a) that Alam owned the software only to later admit it was the debtor that owned the software, and (b) despite [Gruenert's July 29, 2018, at 9:59am] they argued before this Court that the $490,000 dollar amount was a debt owed to debtors - when it was not.

19.     Axton perjured her testimony in suggesting that under the agreement debtors are owed $490,530.17 dollars – this is factually incorrect. Clearly, Axton is withholding material information from this Court with regard to just how and why she, as the CFO allowed a financially strapped company (the debtors) to **fund** a company owned by defendant Patel, defendant Gruenert, and defendant Alleyne. In light of the events, Axton, cannot continue to serve as a liquidating trustee for the debtor companies.

### Contract 2 - Employment Agreement

20. Alam's 5-year non-terminable employment agreement was related to a business owned by defendants NH (the debtor) and Dr. Setul Patel (CEO of debtor companies). That Alam was employed by EDMG and EDMG had full responsibility to Alam. Alam was NOT required to show up to work and was allowed to engage in any other business or professional activities. The employee agreement was made in exchange for debtors owning the software.

### Contract 3 – Software Agreement
**The Debtor failed to seek the rejection of the Employment Agreement/Software Agreement**

21. Alam's software license, as most software licenses are executory contracts because the licensee has obligations to pay license fees, maintain confidentiality of the software, use the software appropriately, or other material obligations and the licensor has obligations such as indemnification and software maintenance and support.

22. The Software Agreement with debtors, which the debtor denied owning, to later acknowledging owning the software with the source code and had the right to make copies of the licensed software.

23. Under section §365 of the U.S. Bankruptcy Code, an executory contract is any agreement that contains materially unperformed obligations respecting both parties. The plain language of section 365, permits a DIP or trustee to assume or reject an executory contract at any time before the confirmation of a plan, and the Bankruptcy courts will generally approve assumption or rejection of a contract if presented with evidence that either course of action is a good business decision. Although, debtors have sought the rejection of the Administrative Services Agreement, they have failed to seek the

rejection of the Software Agreement and as such, the Debtor is obligated to keep current on obligations as per the agreement - post-petition.

24. The Bankruptcy Code does not define "executory." But, based on the legislative history of section 365 an executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.

25. Based on Axton's affidavit [Exhibit 1]: (a) the software contract did not expire post-petition by its terms, (b) the DIP affirmatively acted in a way to acknowledge owning and making copies of the software. Therefore, under the software license agreement with the debtor, Alam has satisfied the standards as of the bankruptcy petition date. Since DIP did not reject the agreement it should therefore be treated as an executory contract because the agreement is actually a "<u>pre-paid option of the software license</u>". The facts of this case, especially through Axton affidavit supports the legal conclusion that the software agreement was indeed an executory contract.

26. Further, Alam never envisioned Debtors would keep the software code, reproduce the software, and file bankruptcy just two months after signing the contracts.

## BANKRUPTCY LAW

27. Bankruptcy law is provided for in the U.S. Constitution under Article I, Section 8, Clause 4 and has existed since the Bankruptcy Act of 1800. See *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 370 (2006). Its primary purpose has long been to "relieve the honest debtor from the weight of oppressive indebtedness and permit him to start

afresh free from the obligations and responsibilities consequent upon business misfortunes." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).

## APPOINTMENT OF U.S. ATTORNEY

28. On December 15, 2018, Alam informed this Court **[Docket 736]** that Debtor's bankruptcy was a "sham". Since then, the events surrounding Alam's adversary complaint "proves" overwhelmingly the need, if approved by the honorable Judge to bring in Mr. Ryan Kelley Patrick U.S Attorney to investigate this fraudulent bankruptcy - fully and completely. (in Case # 18-33836 -related to Docket #'s 878, 860, 867; 828, 848, 855, 861, 864, 227, 16] (in Case # 19-3442 related to Docket #'s 8, 9, 27, 39, 44, 49, 55, 65, 66, 67, 68, 69, 73, 74,75]

## DEBTORS BANKRUPTCY

28. Defendants counsel, Mr. Higgins and Mr. English are restricting Alam from seeking justice[3], they are threatening Alam with "Cease and Desist" and asking him to withdraw his complaint. They have also resorted to filing fake pleadings and making deceptive arguments to the Federal Court. Provided below is evidence of illicit conduct.

29. Did the Debtor "conceal" assets from the bankruptcy court *[$490,000 dollars were put away in a company owned by the CEO and CLO of the debtor company)* – was it to avoid having it forfeited.

30. Why did Defendants Setul Patel and Tom Gruenert shut down their telehealth company – was it to avoid the exposure of their wrongdoing.

31. Why is Axton withholding material information from the Court about how she was able to transfer funds from a bankrupt company into a company owned by some of the debtor and debtors' corporate officers.

---

[3] Records show that a board member of debtor companies, former chief counsel to debtor companies, and chief restructuring officer – all have judicially admitted to plaintiff's allegations.

32. What are the Debtors and some of its Officers relationship with Girish Capital, LLC's, Setul Patel, and/or Read King, a commercial real estate company?

> *Prepetition, the Debtors (and certain principals of the Debtors) partnered with Read King to develop new locations for Emergency Centers; Chad Shandler, CRO, see **Dkt 16***

33. What did the CRO look at to determine the debtor's obligation had reached $90,000,000 million dollars. What are the names of *(certain principals of the Debtors)* that partnered with Read King in the development? What did the Debtor receive in exchange for obligating the debtors with $90 million dollars? What did "certain principals of debtor companies" receive by encumbering a $90 million dollar debt. And, what was the time-frame when all this happened.

> *As of the Petition Date, the Debtors had future non-cancelable obligation commitments for operating and capital leases of approximately $90 million; Chad Shandler, CRO, see **Dkt 16***

34. What is the relationship between defendant Setul Patel, Girish Capital, LLC and Read King? Why is Read King listed as one of the companies on Girish Capital website

35. What role did Read King play at the Debtors and why

> *primary real property landlord on closed and never-opened centers is Read King. Chad Shandler, CRO, see **Dkt 16***

36. Who from the Debtor's side authored and/or reviewed the documentation, the leases and lease holding obligations between the Debtor and Read King? What analysis did the Debtors made to insure an arms-length transaction between the parties.

37. Why was Read King allowed to identify the property for the construction of the free-standing emergency rooms. What was their expertise. What studies they conducted to determine the volume of patients; payor mix vis-à-vis income.

> *In many instances, the arrangement included Read King identifying a property; Neighbors executing a long-term lease (typically 12 years);*

> *Read King financing the purchase of the real property and the building shell; Neighbors building out the interior, opening the site, and paying rent to Read King.*

38. What happened to the $120 million dollars that the Debtors drew from the Key Bank credit agreement?

> *1. On November 19, 2015, the debtor companies entered into a Credit Agreement with KeyBank National Association for $120 million dollars. On the date that it was funded [November 19, 2015], Neighbors drew $100 million on the term loan facility and $20million in September 2016.*
>
> *2. In addition to the credit agreements with KeyBank, NA, the debtors also entered into leasing medical equipment with BBVA Compass and Wells Fargo as lessors*
>
> *3. The Debtors also leased non-medical equipment, such as monitors and computer equipment from various parties.*
>
> *4. On the Petition Date, the Debtors' aggregate accounts payable to vendors is approximately $12.8 million.*

39. Why did KeyBank allow Dr. Setul Patel to take $490,000 dollars out of the loan amount to benefit defendant Patel personally. And, why did KeyBank approve the $660,000 dollars in new liability right at the time the Debtors were in default.

40. What did Mr. Chandler, CRO know about why Neighbors ended up in bankruptcy and when did he know it? Was the low reimbursement the true reason for filing for bankruptcy, if so, why did the new buyers pay almost retail price to acquire Neighbors ER's.

41. What happened to the Micro hospital that the Debtor was building and monies associated with its building, and who owns the micro hospital in Louisiana

42. Can Mr. Higgins and Mr. English defend Tensie Axton in her individual capacity, as well as continue to serve as counsel to the debtor companies. Is there a conflict of interest?

43.   Is it true that the law firm of Johnson Deluka is not representing defendants Gillman and Alleyne in the adversary proceedings?

44.   When someone succumbs to the temptation of filing fake bankruptcy, they run the risks of an accusation of bankruptcy fraud. Alam contends defendants' bankruptcy creates prima facia evidence of how they committed fraud on Alam.

### RELIEF REQUESTED

45.   For all of the foregoing reasons, Plaintiff respectfully request: (a) that Axton's Objection to Alam's Claims be overruled, and (b) if it is in the interest of this Court, allow the appointment of the United States Attorney to investigate matters related to this bankruptcy, especially when defense lawyers begin threatening the plaintiff.

Submitted By:

*/s/ Sohail Alam*

Sohail Alam, Plaintiff, Prose
7505 Fannin, Suite 300
Houston, Texas 77054
713-385-7979
samalam2@gmail.com
January 26, 2020

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re: § | |
| § | |
| Neighbors Legacy Holdings, Inc., et al, § | Case No. 18-33836, Chapter 11 |
| § | |
| Sohail Alam, Plaintiff § | |

Adversary. Proc. No. 19-03442

Neighbors Health, LLC, Neighbors, GP, LLC, EDMG, LLC, Dharmesh Patel, MD, Michael Chang, MD, Quang Henderson, MD, Hitesh Patel, MD, Andy Chen, MD, Cyril Gillman, Tensie Axton, Setul Patel, MD, Paul Alleyne, MD, Thomas Gruenert
    Defendants,

## Certificate of Service

I hereby certify that on January 27, 2020, I served a true and correct copy of Alam's Objections to Liquidating Trustee's Objections

Submitted By:

*/s/ Sohail Alam/*

Sohail Alam, Plaintiff, Prose
7505 Fannin, Suite 300
Houston, Texas 77054
713-385-7979
samalam2@gmail.com

Ms. Christie Mishew Lewis,
Moyer Lewis & Patton
11767 Katy Fwy, Suite 990, Houston, TX 77079
clewis@mlpllp.com
Counsel for Dr. Dharmesh Patel

Mr. James G. Munisteri,
Foley Gardere,
1000 Louisiana, Suite 2000,
Houston, Texas 77002
jmunisteri@foley.com

Counsel for Dr. Michael Chang, Andy Chen,
Hitesh Patel, Quang Henderson

Mr. Scott J. Davenport
Davenport Law Firm, PC
4306 Yoakum Blvd, Suite 500,
Houston, Texas 77006
scottd@davenport-law.com
Counsel for Dr. Setul Patel

Ms. Elise Susanne Miller,
Stuart PC,
712 Main Street, Suite 1100,
Houston, Texas 77010
emiller@stuartpc.com
Counsel for Drs. Cyril Gillman, Paul Alleyne

Mr. Thomas G. Gruenert
P.O.Box 1279,
Manvel, Texas 77578
tgruenert@gruenertlawgroup.com
Counsel for Thomas Gruenert

Mr. John F, Higgins
1000 Main Street, 36th Floor,
Houston, Texas 77002
jhiggins@porterhedges.com
Counsel for Debtors and Tensie Axton

# EXHIBIT 1
## Tensie Axton Affidavit

| | |
|---|---|
| DECLARATION OF TENSIE AXTON IN SUPPORT OF LIQUIDATING TRUSTEE'S OBJECTION TO SOHAIL ALAM'S CLAIM NO. 197<br><br>STATE OF TEXAS §<br>§ COUNTY OF HARRIS §<br><br>BEFORE ME, the undersigned authority, on this day personally appeared TENSIE AXTON, known to me to be the person whose name is subscribed below, and who being duly sworn, stated the following:<br><br>1.      My name is Tensie Axton and I am the Liquidating Trustee in the above- styled case with certain accounting and reporting services. I have practiced accounting for over 25 (twenty-five) years. Prior to serving as the Liquidating Trustee, beginning in December 2016, I was the Debtors' Chief Financial Officer.<br><br>2.      I am generally familiar with the Debtors' financing arrangements, business affairs and books and records that reflect, among other things, the Debtors' liabilities and the amounts owed to their creditors as of the Petition Date. I have reviewed the Objection to Sohail Alam's Claim (the "Objection") filed contemporaneously with this Affidavit.1<br><br>3.      To the best of my knowledge, information, and belief, the assertions made in the Objection are accurate.<br><br>4.      On March 31, 2017, Neighbors Health and Telehealth entered into an Administrative Services Agreement. The Administrative Services Agreement provided that Neighbors Health would furnish administrative services to Telehealth, including providing, among other things, administrative services sufficient to support staffing and human resources, accounting, financial planning and forecasting, | Axton acknowledges:<br>- 25 years of experience as a CPA<br>- Joined Debtors as CFO in Dec 2016<br>- Familiarity with Debtors "books and records"<br>- Has reviewed Alam's objections<br>- Affirms the assertions made in Alam objections are "accurate"<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>Axton acknowledges:<br>- Debtors would provide "executive operations management" services for one of its affiliates [affirmed by Gruenert former chief counsel to the Debtor], in which Alam served as partner [affirmed by Dharmesh, board member of the Debtors] |

| | |
|---|---|
| cash management, insurance administration, and executive operations management. | |
| **Telehealth owes Neighbors Health no less than $490,530.17 in unreimbursed expenses for services rendered under the Administrative Services Agreement.** | Axton, under the penalty of perjury is deceiving this court into believing the Debtor is owed $490,530.17 dollars. No monies are owed. |
| 5.      Also on March 31, 2017, Mr. Alam entered into the Contribution Agreement with Telehealth and Neighbors Health and transferred sole legal title to a telemedicine software platform to Telehealth in exchange for 1 Class A voting share, 299 shares of Class B non-voting stock, and an employment agreement with Telehealth. On March 31, 2017, EDMG, a wholly-owned subsidiary of Neighbors Health, Telehealth, and Mr. Alam entered into the five-year Employment Agreement, pursuant to which the Mr. Alam was employed as the Executive Director of Telehealth. | Axton acknowledges:<br>- Alam's consideration in the amount of $818,000 dollars<br>- Debtors consideration, in exchange, with a 5-year non-terminable employment agreement, which "did not" require Alam to "ever show up" to work, and insurance coverage (life, long-term, disability, and hospitalization – totaling $818,000 dollars<br><br>Axton, under the penalty of perjury, despite having knowledge of books and records, is deceiving this Court into believing Alam's employment contract was a true employment contract. Axton has first hand information about why EDMG signed Alam's Agreement as opposed to Neighbors Health, LLC |
| 6.      Finally, on March 31, 2017, Telehealth and Neighbors Health entered into the Software Agreement that granted Neighbors Health a license for all the source codes of Telehealth's software products, including the right to make copies of the licensed software and documentation for backup and archival purposes. Neighbors Health also entered an intellectual property license agreement with Telehealth for the use of the Neighbors name. | Axton acknowledges:<br>- Debtors acceptance of Alam's "software source code", and which allowed debtors "the right to make copies of the licensed software"<br>- With this acknowledgment, Axton and her lawyers, Mr. Higgins and Mr. English are admitting they misstated true facts and withheld crucial documents from this Court – to perpetrate fraud onto this Court |
| 7.      Although EDMG entered into that certain Employment Agreement, dated March 31, 2017, with Mr. Alam and Telehealth, to the extent Mr. Alam is claiming any amounts owed for wages, salaries or commissions, Mr. Alam has been paid what he was owed under the Employment Agreement—wages or otherwise—and there are no outstanding amounts due. | Axton, under the penalty of perjury, despite having knowledge of books and records, wants this Court to believe that Alam would give the debtor $818,000 dollar software and future value for FREE. And, then go to work for debtors as an employee is factually incorrect. |
| 8.      Mr. Alam's proof of claim does not include any documents that support the | |

| | |
|---|---|
| conclusion that Mr. Alam holds a priority, administrative, or secured claim against the Debtors. Additionally, I have reviewed the Debtors' books and records and the Claim, as well as the supporting documentation provided by the Claimant, and have determined that the Claim should be disallowed and expunged to the extent it asserts a priority, administrative, or secured claim.<br><br>9. Failure to disallow and expunge the Claim could result in the Claimant being paid when it is not entitled to payment. As such, I believe that the disallowance and expungement of the Claim is appropriate.<br><br>10. Accordingly, I request that the Claim be disallowed and expunged.<br><br>11. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the facts set forth in the foregoing declaration are true and correct to the best of my knowledge, information, and belief.<br><br>Dated: December 30, 2019<br><br>Tensie Axton, C.P.A | Axton's deception under the penalty of perjury is overwhelming.<br>- Axton acknowledges Alam's objections as "valid" then argues Alam's claims are moot<br>- Axton acknowledges Alam did not provide any documents to support its assertions, only to later admit "I have reviewed debtors books and records and the Claim, as well as supporting document provided by Alam" |